Nos. 13-56797 & 13-57106

# IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

---

GENESIS MERCHANT PARTNERS, LP,
Plaintiff-Appellant,

v.

NERY'S USA, INC., ET AL.,
Defendant-Appellant.

---

## APPELLANT'S EXCERPTS OF RECORD
## VOLUME 1 OF 2 [PAGES 1-119]

---

On Consolidated Appeals From a Judgment Following a Bench Trial and
a Postjudgment Order Awarding Attorney's Fees and Costs
United States District Court for the Southern District of California
No. 3:11-cv-01589-JM-WVG
The Honorable Jeffrey T. Miller

---

Raymond A. Cardozo (Cal. SBN 173263)
Dennis Peter Maio (Cal. SBN 99894)
REED SMITH LLP
101 Second Street, Suite 1800
San Francisco, CA 94105
Telephone: +1 415 543 8700
Facsimile: +1 415 391 8269

*Attorneys for Plaintiff-Appellant*
*Genesis Merchant Partners, LP*

***Genesis Merchant Partners, LP v. Nery's USA, Inc., et al.,***
**9th Circuit Nos. 13-56797 (USDC, S.D. Cal. No. 3:11-cv-01589-JM-WVG)**

## INDEX TO APPELLANT'S EXCERPTS OF RECORD

| NO. | DATE FILED | PARTY | DESCRIPTION OF DOCUMENT | VOL. NO. | BATES NOS. |
|-----|------------|-------|-------------------------|----------|------------|
| 1 | 01/13/14 | Court | Order (1) Deeming Defendant Cathcart's Objection To Fee Order And Request For Notice Of Errata Or Technical Correction A Motion for Reconsideration; (2) Denying Motion for Reconsideration [Doc. 192] | 1 | ER1 – ER5 <br><br> [ER6 – ER11 omitted] |
| 2 | 12/16/13 | Plaintiff | Notice of Appeal [Doc. 187] | 1 | ER12 – ER12A |
| 3 | 12/06/13 | Court | Order Granting In Part And Denying In Part Defendants' Motion For Attorneys' Fees And Costs [Doc. 186] | 1 | ER13 – ER39 |
| 4 | 10/16/13 | Plaintiff | Notice of Appeal [Doc. 170] | 1 | ER40 |
| 5 | 09/20/13 | Court | Entry Of Judgment [Doc. 164] | 1 | ER41 – ER42 |

**INDEX TO APPELLANT'S EXCERPTS OF RECORD – Continued**

| NO. | DATE FILED | PARTY | DESCRIPTION OF DOCUMENT | VOL. NO. | BATES NOS. |
|---|---|---|---|---|---|
| 6 | 07/26/13 | Court | Statement Of Decision Pursuant To Rule 52 [Doc. 156] | 1 | ER43 – ER65 |
| 7 | 06/21/13 | Court | Pretrial Order [Doc. 142] | 1 | ER66 – ER90 |
| 8 | 02/20/13 | Court | Order Denying Motion For Entry Of Judgment And Declining To Address Motion For Attorney's Fees [Doc. 127] | 1 | ER91 – ER98 |
| 9 | 12/19/12 | Court | Order Denying In Part And Granting In Part Defendants' Motion For Summary Judgment And Denying Sanctions Pursuant To This Court's Order To Show Cause [Doc. 111] | 1 | ER99 – ER119 |

Genesis Merchant Partners, LP v. Nery's USA, Inc., et al.,
9th Circuit Nos. 13-56797 (USDC, S.D. Cal. No. 3:11-cv-01589-JM-WVG)

### INDEX TO APPELLANT'S EXCERPTS OF RECORD – Continued

| NO. | DATE FILED | PARTY | DESCRIPTION OF DOCUMENT | VOL. NO. | BATES NOS. |
|---|---|---|---|---|---|
| 10 | 12/16/13 | Defendants | Defendant John Cathcart's Objection to Fee Order Or, in the Alternative, Request for Notice of Errata or Technical Correction [Doc. 190] | 2 | ER119A-ER119F |
| 11 | 09/12/13 | Defendants | Defendants' Motion for Judgment [Doc. 158] | 2 | ER119G-ER119H |
| 12 | 07/01/13 | Plaintiff Genesis Merchant Partners, LP | Plaintiff's Brief Re: The Court's Amended Request For Further Briefing [Doc. 152] | 2 | ER120 – ER131 |
| 13 | 06/24/13 | Plaintiff | Exhibit No. 1:  Senior Secured Promissory Note issued 3/31/2008 | 2 | ER132 – ER139 |
| 14 | 06/24/13 | Plaintiff | Exhibit No. 4: Amendment To Secured Promissory Note effective 3/31/2009 | 2 | ER140 – ER144 |

INDEX TO APPELLANT'S EXCERPTS OF RECORD – Continued

| NO. | DATE FILED | PARTY | DESCRIPTION OF DOCUMENT | VOL. NO. | BATES NOS. |
|---|---|---|---|---|---|
| 15 | 06/24/13 | Plaintiff | Exhibit No. 22: Stock Purchase Agreement dated 2/1/2010 | 2 | ER145 – ER187 |
| 16 | 06/24/13 | Plaintiff | Exhibit No. 23: Promissory Note dated 2/10/2010 | 2 | ER188 – ER192 |
| 17 | 06/24/13 | Plaintiff | Exhibit No. 24: Subsidiary And Affiliate Guarantee dated 2/10/2010 | 2 | ER193 – ER202 |
| 18 | 06/24/13 | Plaintiff | Exhibit No. 25: Decision Letter Regarding Payments of Proceeds Pursuant to that Certain Promissory Note … | 2 | ER203 |
| 19 | 96/24/13 | Plaintiff | Exhibit No. 26: Collateral Assignment Of Contracts dated 2/10/2010 | 2 | ER204 – ER212 |
| 20 | 06/24/13 | Transcript | Excerpts of Bench Trial, Day 1, Volume 1—pp. 1, 72, 75, 77-78, 92-96, 98-106, 113-115 | 2 | ER213 – ER234 |

## INDEX TO APPELLANT'S EXCERPTS OF RECORD – Continued

| NO. | DATE FILED | PARTY | DESCRIPTION OF DOCUMENT | VOL. NO. | BATES NOS. |
|---|---|---|---|---|---|
| 21 | 06/25/13 | Transcript | Excerpts of Bench Trial, Day 2, Volume 2—pp. 194, 202-206, 314, 316, 404, 412, 437, 484-486, 488, 496-498, 500-501 | 2 | ER235 – ER242 |
| 22 | 06/26/13 | Transcript | Excerpts of Bench Trial, Day 3, Volume 3—pp. 337, 350, 352-353, 356-357, 364-366, 370-371, 373-375 | 2 | ER243 – ER268 |
| 23 | 06/27/13 and 06/28/13 | Transcript | Excerpts of Bench Trial, Days 4 & 5, Volume 4— pp. 522, 556, 560-561, 592-594 | 2 | ER269 – ER275 |
| 24 | 06/17/13 | Plaintiff | Plaintiff's Trial Brief [Doc. 136] | 2 | ER276 – ER295 |
| 25 | 07/19/11 | Plaintiff | Complaint:  1) Breach of Contract, 2) Conversion, 3) Unjust Enrichment, 4) Negligent Misrep-resentation [and Civil Cover Sheet] [Doc. 1] | 2 | ER296 – ER305 |

Genesis Merchant Partners, LP v. Nery's USA, Inc., et al.,
9th Circuit Nos. 13-56797 (USDC, S.D. Cal. No. 3:11-cv-01589-JM-WVG)

## INDEX TO APPELLANT'S EXCERPTS OF RECORD – Continued

| NO. | DATE FILED | PARTY | DESCRIPTION OF DOCUMENT | VOL. NO. | BATES NOS. |
|---|---|---|---|---|---|
| 26 | 07/19/11 | Plaintiff | Attachment to Complaint: Direction Letter Regarding Payments Of Proceeds Pursuant To That Certain Promissory Note … dated 2/10/2010 [Doc. 1-4] | 2 | ER306 |
| 27 | 01/14/14 | Court | Civil Docket for Case #3:11-cv-01589-JM-WVG | 2 | ER307 – ER326 |

1
2
3
4
5
6
7

8                        **UNITED STATES DISTRICT COURT**

9                        **SOUTHERN DISTRICT OF CALIFORNIA**

10  GENESIS MERCHANT PARTNERS,              CASE NO. 11-cv-1589 JM (WVG)
    LP, a Connecticut corporation,
11                                          ORDER (1) DEEMING DEFENDANT
                              Plaintiff,    CATHCART'S OBJECTION TO FEE
12      v.                                  ORDER AND REQUEST FOR
                                            NOTICE OF ERRATA OR
13                                          TECHNICAL CORRECTION A
    NERY'S USA, INC., a Nevada              MOTION FOR RECONSIDERATION;
14  corporation; JOHN CATHCART, an          (2) DENYING MOTION FOR
    individual; and COMMERCIAL              RECONSIDERATION
15  TARGA, S.A. DE C.V., a Mexican
    corporation;
16
17                            Defendants.

18      On December 6, 2013, the court awarded Defendants $525,427.33 in attorneys'

19  fees and $14,283.74 in costs for a total award of $539,711.07.  Dkt. No. 186.  On

20  December 16, 2013, Defendant John Cathcart ("Cathcart") filed an objection to the

21  court's fee order or, in the alternative, a request for notice of errata or technical

22  correction.  Dkt. No. 190.  Having read the papers and considered the nature of

23  Cathcart's concerns, Cathcart's filing is more appropriately considered a motion for

24  reconsideration of the court's previous order.  For the reasons set forth below,

25  Cathcart's motion for reconsideration is denied.

26                              **BACKGROUND**

27      Cathcart initially filed an individual motion for attorneys' fees along with a

28  Rule 54(b) motion for entry of judgment on January 7, 2013.  Dkt. No. 118.  The

                                    - 1 -                    11-cv-1589 JM (WVG)

court denied Cathcart's request for attorneys' fees as moot in light of the court's denial of the Rule 54(b) motion. Dkt. No. 127. Accordingly, Cathcart joined the other Defendants and collectively filed a motion for attorneys' fees following the court's final entry of judgment in this action. Dkt. No. 167. This joint motion was filed on behalf of all three Defendants and sought a collective award of $787,933 in attorneys' fees and costs. Dkt. No. 167-1. The court subsequently granted in part and denied in part Defendants' request and awarded $539,711.07 to Defendants collectively. Dkt. No. 186. However, Cathcart objects to the court's previous order on the ground that "the court failed to specify the amount Cathcart is entitled to recover in the judgment for fees incurred in his defense through December 2012 (when he was dismissed from the action following summary judgment)." Dkt. No. 190 at 2. Cathcart contends the court found that Cathcart was entitled to an individual fee award, but failed to include the amount in the order.

## LEGAL STANDARD

Generally, reconsideration is appropriate "if the district court (1) is presented with newly discovered evidence, (2) committed clear error or the initial decision was manifestly unjust, or (3) if there is an intervening change in controlling law. . .. There may also be other, highly unusual circumstances warranting reconsideration." School Dist. No. 1J, Multnomah County, Oregon v. ACandS, Inc., 5 F.3d 1255, 1263 (9th Cir. 1993) (citations omitted). Federal Rule of Civil Procedure 60(b) "provides for reconsideration only upon a showing of (1) mistake, surprise, or excusable neglect; (2) newly discovered evidence; (3) fraud; (4) a void judgment; (5) a satisfied or discharged judgment; or (6) 'extraordinary circumstances' which would justify relief."[1] Fuller v. M.G. Jewelry, 950 F.2d 1437, 1442 (9th Cir. 1991).

---

[1] If the court were to construe this instant request as a motion for reconsideration predicated upon the interests of justice, Defendants still have not provided the court with an adequate basis to apportion the total amount of attorneys' fees awarded. See infra. footnote 2.

## DISCUSSION

Cathcart suggests the court found Cathcart was entitled to an individual fee award, but mistakenly failed to include the amount of the individual award in its previous order.  However, this was not an oversight as Cathcart suggests; rather, Cathcart has misinterpreted the court's decision regarding apportionment of fees.  In its opposition to Defendants' motion for fees, Plaintiff argued that Cathcart impermissibly sought attorneys' fees for defending against the merits of Plaintiff's contract claim, and the court concluded Cathcart's recovery of fees should not be limited to those solely associated with his defense against Plaintiff's alter ego claim as Plaintiff brought its contract claim against him in addition to the other Defendants.  While Cathcart interprets this portion of the court's opinion as authorizing an individual award to Cathcart, the court simply concluded that Cathcart would not be precluded from recovering fees related to the Defendants' joint defense against Plaintiff's contract claim.

Contrary to Cathcart's characterization, the court did not make a decision to divide the total requested fees among the Defendants.  This is partly because the joint attorneys' fees motion suggested the Defendants sought a total award.  In the joint fees motion, Defendants stated their intent to "incorporate and reference the facts, exhibits, law, and declarations from [Cathcart's previous motion] into this motion," but the joint motion itself requested a total award amount.  Dkt. No. 167-1 at 3.  It did not request an individual award for Cathcart, nor did Defendants provide a breakdown of the requested fees among the Defendants.  Indeed, the only mention made of any division of fees between Cathcart and the other two Defendants was made in a single sentence within the "Conclusion" paragraph of Defendants' reply brief.  Dkt. No. 177 at 10.  Significantly, Defendants did not provide the court with any information on the proper division of fees or propose any method for determining the proper amount for granting an individual fee award to Cathcart.  In Cathcart's own declaration attached to the motion, he attests to the total amount of

ER3

1   fees and costs incurred by the three Defendants, but does not make any distinction

2   between those fees incurred solely on his own behalf and those incurred by the other

3   Defendants. Dkt. No. 167-5. Accordingly, the Defendants' joint motion did not

4   sufficiently support an individualized award of fees for Cathcart.

5        Cathcart originally requested $272,000 in legal fees, costs, and expert witness

6   fees, and he now contends that this amount should be apportioned to him from the

7   final award. As noted by Plaintiff in its opposition to Cathcart's original request,

8   the requested $272,000 seems to reflect "the total fees and costs incurred by all of

9   the defendants on all claims from the inception of the case." Dkt. No. 124 at 3.  In

10  response to Plaintiff's argument in favor of apportioning the fees amongst the

11  Defendants, Cathcart argued that apportionment would be unreasonable as the

12  issues in the litigation were so intertwined that it would be impractical or unfair to

13  apportion the requested fees. Dkt. No. 125 at 6-7. Specifically, Cathcart argued

14  that he was personally liable for all of the fees incurred by the defense attorneys in

15  this litigation, and it would be unjust for the court to limit his recovery of fees to

16  those fees incurred on his own behalf when the Defendants had reasonably opted to

17  share an attorney and operate under a joint defense agreement. Id. The court finds

18  this argument against apportionment of fees persuasive. Similarly, the court

19  questions whether it would be appropriate to award the entirety of these initial fees

20  solely to Cathcart when the other Defendants presumably incurred a portion of these

21  fees as well. Cathcart opted to join with the other Defendants and hire counsel to

22  provide a joint defense on their behalf. As Cathcart originally argued, it would be

23  impractical, if not impossible, to equitably apportion these fees among the

24  Defendants.[2]

25

26

_____

27      [2] Should Cathcart and his co-Defendants reach an agreement as to apportionment
of attorneys' fees for which they would request a court order adopting the
28  apportionment, the court would be inclined to issue such an order upon good cause.

1

**<u>CONCLUSION</u>**

2   In sum, Cathcart joined in Defendants' collective award for fees, failed to

3 renew his request for an individual award within the Defendants' joint motion, and

4 failed to provide the court with any basis for making an individualized attorneys'

5 fees award.  Accordingly, Cathcart's request for reconsideration is denied.

6   IT IS SO ORDERED.

7 DATED:  January 13, 2014

8

          Hon. Jeffrey T. Miller

9          United States District Judge

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ER5

# ER6 – ER11 OMITTED

NAME AND ADDRESS OF ATTORNEY

Jerry D. Hemme, Esq. [SBN 99010]
GOODE, HEMME & PETERSON
6256 Greenwich Dr., Suite 500
San Diego, California 92122

PHONE: (858) 587-3555

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

TRIAL JUDGE Jeffrey T. Miller

COURT REPORTER  Debra M. Henson

Genesis Merchant Partners, LP, a
Connecticut corporation,

CIVIL NO. 11-cv-01589-JM (WVG)

_____

(Appellant/Appellee)        Plaintiff

vs

Nery's USA, Inc., a Nevada corporation, et al.

NOTICE OF APPEAL        (Civil)

_____

(Appellant/Appellee)        Defendant

Notice is hereby given that Genesis Merchant Partners, LP, a Connecticut corporation,
_____

    ✗   Plaintiff _____ Defendant above named, hereby appeals to the United States Court

of Appeals for the:        (check appropriate box)

    ✗   Ninth Circuit                 Federal Circuit

from the:        (check appropriate box)

_____ Final Judgment           ✗   Order (describe)

entered in this proceeding on the _____6_____ day of  December   20_13_ .
Transcripts required      Yes      ✗  No.
Date civil complaint filed:      7/19/11

Date: 12/11/13               /s/ Jerry D. Hemme
                            Signature

::ODMA\PCDOCS\WORDPERFECT\17861\1 May 5, 1999 (10:03am)

## ATTACHMENT TO NOTICE OF APPEAL

## Genesis Merchant Partners, LP v. Nery's USA, Inc.

The order appealed from grants in part, and denies in part, a post-judgment motion for attorney's fees and costs.

1
2
3
4
5
6
7

8          **UNITED STATES DISTRICT COURT**

9          **SOUTHERN DISTRICT OF CALIFORNIA**

10   GENESIS MERCHANT PARTNERS,      CASE NO. 11-cv-1589 JM (WVG)
     LP, a Connecticut corporation,,
11                                    ORDER GRANTING IN PART AND
                            Plaintiff, DENYING IN PART DEFENDANTS'
12        vs.                         MOTION FOR ATTORNEYS' FEES
                                      AND COSTS
13   NERY'S USA, INC., a Nevada
14   corporation; JOHN CATHCART, an
     individual; and COMMERCIAL
15   TARGA, S.A. DE C.V., a Mexican
     corporation; ,
16                          Defendants.
17   _____

18        On September 23, 2013, Defendants filed a motion for attorney fees.  Dkt.

19   No. 167.  Plaintiff Genesis Merchant Partners, LP ("Plaintiff") filed an opposition to

20   Defendants' motion, and Defendants subsequently filed their reply.  Dkt. Nos. 175

21   and 177, respectively.  After completion of briefing, the court took Defendants'

22   motion for attorneys fees under submission.  Dkt. No. 178.  On November 11, 2013,

23   Plaintiff filed a surreply to Defendants' motion.  Dkt. No. 182.  For the reasons set

24   forth below, Defendants are granted a total of $539,711.07 in attorneys' fees and

25   costs.

26                          **BACKGROUND**

27        On July 19, 2011, Plaintiff filed a complaint alleging breach of contract,

28   conversion, unjust enrichment, and negligent misrepresentation against Defendants.

ER13

1   Dkt. No. 1. Specifically, Plaintiff filed suit against Defendants Nascent Wine

2   Company, Inc. ("Nascent"), Commercial Targa ("Targa"), and John Cathcart for

3   Nery's' failure to make payments due to Plaintiff under a $1.85 million promissory

4   note ("Second Note") issued by Nery's and guaranteed by Targa. Nery's issued the

5   Second Note to Nascent in exchange for its purchase of Targa, which Nascent

6   owned at that time. Nascent then assigned the Second Note to Plaintiff to satisfy its

7   obligation on another promissory note ("First Note") that it had issued to Plaintiff

8   for $1 million. Plaintiff asserted three claims against all Defendants: (1) breach of

9   contract, (2) unjust enrichment, and (3) negligent misrepresentation. Plaintiff also

10   asserted a conversion claim solely against Nery's.

11        On August 19, 2011, Nery's filed a counterclaim against Plaintiff seeking

12   declaratory relief. Dkt. No. 8. That same day, Nery's filed a third-party complaint

13   against Nascent, alleging breach of contract, breach of implied covenant of good

14   faith and fair dealing, and negligent misrepresentation. Dkt. No. 9. On January 6,

15   2012, the court granted Plaintiff's motion to dismiss Nery's' counterclaim because

16   it made no separate factual allegations, was almost identical to the third-party

17   complaint, and requested only declaratory relief. Dkt. No. 43. When Nascent failed

18   to respond to Nery's' third-party complaint, the clerk entered default against

19   Nascent, and Nery's moved for default judgment on February 1, 2012. Dkt. No. 49.

20   The court also denied Nery's' motion for default judgment against Nascent as

21   premature on March 23, 2012. Dkt. No. 58.

22        On September 7, 2012, Defendants filed a motion for summary judgment,

23   which this court denied as to the breach of contract and unjust enrichment claims,

24   but granted as to the negligent misrepresentation and conversion claims. Dkt. No.

25   111. Additionally, the court granted summary judgment as to all of Plaintiff's

26   claims against Cathcart. Id. Following the court's ruling on the summary judgment

27   motion, Cathcart moved for entry of judgment under Rule 54(b) and attorneys' fees.

28   Dkt. Nos. 117 and 188, respectively. After reviewing the Rule 54(b) factors, the

ER14

1    court denied Cathcart's request for entry of judgment as premature and therefore

2    also denied his motion for attorneys' fees as moot.  Dkt. No. 127.

3         Following a five-day bench trial, the court found that Plaintiff had not met its

4    burden of proof on the issue of liability for the reasons set forth in the court's

5    Statement of Decision Pursuant to Rule 52, entered July 26, 2013.  See Dkt. No.

6    156.  In this order, the court further found that Defendants are entitled to reasonable

7    attorneys' fees and costs as provided by law.  Accordingly, the court entered

8    judgment in Defendants' favor on September 20, 2013.  Dkt. No. 164.

9                              **Attorneys' FEES**

10   **I. Legal Standard**

11        Because the Court is sitting in diversity, it applies California substantive law

12   and federal procedural law.  See Zamani v. Carnes, 491 F.3d 990, 995 (9th Cir.

13   2007).  The parties agree that California Civil Code § 1717 governs the award of

14   attorneys' fees when the contract expressly provides for them, as it does here.

15   Under § 1717(a), the "party who is determined to be the party prevailing on the

16   contract" is entitled to reasonable attorneys' fees as well as other costs.

17        Under California law, the lodestar  method is typically used to calculate

18   reasonable fees under § 1717.  See PLCM Group v. Drexler, 22 Cal. 4th 1084,

19   1095-96 (2000).  This begins with a calculation of a reasonable number of hours

20   expended times a reasonable rate for the market.  Id. at 1096.  The court may adjust

21   this figure up or down in order to fix the fair market value for the legal services

22   provided, based on factors such as the nature and difficulty of the litigation, the

23   amount at stake, the skill required and used, the attention given to the case, and the

24   degree of success obtained.  Id. at 1095-96.  The determination of a reasonable rate

25   may be based on such factors as the skill and experience of the attorneys, the nature

26   of the work they performed, their expertise, their customary billing rates, and the

27   prevailing rates charged by attorneys of comparable skill and experience in the

28   community while performing similar work.  See Flannery v. Cal. Highway Patrol,

1  61 Cal. App. 4th 629, 632-33 (1998).  The Court is afforded discretion in making

2  this determination.  <u>PLCM</u>, 22 Cal. 4th at 1096.

3  **II.  Discussion**

4      **A.  Defendants' Requested Fees**

5         As support for their requested attorneys' fees, lead attorneys Mark Mazzarella

6  and John McNutt submitted declarations listing the number of hours worked by

7  individual timekeepers and the amount billed for those hours.  Utilizing these

8  numbers, the court calculated the total amount of attorneys' fees.  Taking into

9  account the $16,620 in post-trial fees voluntarily deducted by McKenna Long &

10  Aldridge LLP, the court calculates Defendants seek $651,675 in attorneys' fees.[1]

11  The charts set forth below represent the figures provided by defense counsel and the

12  calculations performed by the court.

13  / / /

14  / / /

15  / / /

16  / / /

17  / / /

18  / / /

19  / / /

20  / / /

21  / / /

22  / / /

23

24

      [1] While Defendants' briefing requests $654,833 in attorneys' fees, this amount

25  does not correspond to the number of hours and billing rates set forth in the attorney declarations.  While the number of hours and individual billing rates provided by

26  McKenna Long & Aldridge LLP correlate to their overall requested amount, the amounts provided in the Mazzarella declaration are not as easily reconciled.

27  Accordingly, the court has calculated the total requested amount based upon number of hours and individual billing rates provided in the attorneys' declarations rather than

28  the total requested in the briefing.

ER16

| MAZZARELLA LAW FIRMS TIMEKEEPERS | HOURLY RATE | HOURS SPENT | AMOUNT BILLED |
|---|---|---|---|
| Mark Mazzarella  -  attorney 35 yrs | $445 | 260.85 | $116,078.25 |
| Michael Fabiano  -  attorney 18 yrs | $395 | 20.2 | $7,979.00 |
| Chris Walters  -  attorney 13 yrs | $425 | 165.65 | $70,401.25 |
| Luis Lorenzana  -  attorney 5 yrs | $320 | 515.8 | $165,056.00 |
| Geoffrey Spreter  -  attorney 4 yrs | $350 | 0.7 | $245.00 |
| Daniel Kanter  -  attorney 2 years | $250 | 4.1 | $1,025 |
| Jeff Bennion  -  attorney | $250 | 14.5 | $3,625.00 |
| Eve Mazzarella  -  paralegal | $195 | 20.4 | $3,978.00 |
| James Bond  -  paralegal | $175 | 7.5 | $1,312.5 |
| Leigh Sanders  -  paralegal | $150 | 12.2 | $1,830.00 |
| Joan Bennett  -  paralegal | $150 | 59.4 | $8,910.00 |
| Sandra Caudel  -  paralegal | $150 | 121.0 | $18,150.00 |
| Joy Salazar  -  document clerk | $125 | 1.5 | $187.50 |
| Ramesses Surban  -  law student | $125 | 43.9 | $5,487.50 |
| Kacy Thompson  -  law student | $75 | 3.0 | $225.00 |
| TOTAL REQUESTED | | 1,250.7 | $404,490.00 |

/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /

- 5 -

ER17

| MCKENNA LONG & ALDRIDGE LLP TIMEKEEPERS | HOURLY RATE[2] | HOURS SPENT | AMOUNT BILLED |
|---|---|---|---|
| Mark Hagarty  -  attorney 40 yrs | $645 | 5.9 | $3,805.50 |
| Charles Bird  -  attorney 40 yrs | $570 | 4.9 | $2,793.00 |
| John McNutt  -  attorney 10 yrs | avg. $413 | 481.8 | $199,128.50 |
| Saeid Ahmadian  -  litigation support | $275 | 18.0 | $4,950.00 |
| Susan Mohney  -  paralegal supervisor | $230 | 1.0 | $230.00 |
| Abbigail Young  -  paralegal | $210 | 71.9 | $15,099.00 |
| Martha Klein  -  librarian | $180 | 1.0 | $180.00 |
| Luis Lorenzana  -  attorney 5 yrs | $150 | 221.6 | $33,240.00 |
| Adam Noakes  -  attorney | $150 | 9.0 | $2,610.00 |
| Tracy Myrick  -  litigation support | $145 | 12.2 | $1,769.00 |
| TOTAL BILLED | | 827.3 | $263,805.00 |
| VOLUNTARY DEDUCTIONS | | - 37.5 | - $16,620.00 |
| TOTAL REQUESTED | | 789.8 | $247,185.00 |

| LAW FIRM | HOURS SPENT | TOTAL BILLED |
|---|---|---|
| Mazzarella Law Firms[3] | 1,250.7 | $404,490.00 |
| McKenna Long & Aldridge LLP | 789.8 | $247,185.00 |
| TOTAL REQUESTED | 2040.5 | $651,675.00 |

---

[2] In attorney John McNutt's declaration, he provided the number of hours spent by individual timekeepers as well as their total billed, but did not include hourly rates by individual timekeepers. In order to determine the average individual hourly rates, the court divided the total amount billed by the number of hours spent for each individual. Additionally, the court averaged the three different rates billed by Mr. McNutt throughout this case in order to come up with his average hourly rate. Mr. McNutt billed $365, $395, and $450 an hour at various points for an average hourly rate of $413 an hour based upon his time spent and amount billed.

[3] During this litigation, attorney Mark Mazzarella worked for three different law firms - Mazzarella Caldarelli LLP, Mazzarella Lorenzana LLP, and Mazzarella Law Group. For the purposes of this opinion, the court has grouped the fees and costs requested by these three law firms together as they all relate primarily to Mr. Mazzarella's representation of Defendants.

ER18

1    Defendant contends the requested attorneys' fees are reasonable considering
2    the length of litigation, the heavy burden of extensive discovery, and the large
3    amount of damages sought by Plaintiff.  Defendants contend the requested
4    attorneys' fees are reasonable because they only represent about 25 percent of
5    Plaintiff's combined alleged damages ($2,556,768) and legal fees ($236,164), which
6    total about $2,792,932.  See Iverson v. Spang Industries, Inc., 45 Cal. App. 3d 303,
7    312-13 (1975).  In response, Plaintiff does not object to the individual rates of the
8    timekeepers; rather, Plaintiff argues Defendants' request is unreasonable in light of
9    the excessive total number of hours billed by 24 individual timekeepers.  Between
10   Mr. Mazzarella's law firms and McKenna Long & Aldridge LLP, there were 11
11   attorneys, 7 paralegals, 2 law students, a litigation support manager, a litigation
12   support specialist, a librarian, and a document clerk working on this case.  Together,
13   these 24 timekeepers billed more than 2,000 hours for a total bill of over $650,000.
14   In contrast, Plaintiff emphasizes that its counsel consisted primarily of 2 attorneys, a
15   paralegal, and a legal assistant who only billed $236,164 for their efforts in this
16   case.  Defendants object to Plaintiff's use of this comparison, suggesting that
17   Defendants' fees would necessarily be higher because Defendants had the greater
18   burden during discovery and trial preparation.

19       Having reviewed the individual amounts billed and the declarations provided
20   by Defendants' attorneys, the court does not find the individual billing rates to be
21   unreasonable when considering factors such as the skill and experience of the
22   attorneys, the nature of the work they performed, their expertise, their customary
23   billing rates, and the prevailing rates charged by attorneys of comparable skill and
24   experience in the community while performing similar work.  However, the court
25   agrees that the total number of hours spent on the case is excessive and, as Plaintiff
26   suggests,  appears to result from the overstaffing of the case by defense counsel.
27   Considering the nature and duration of this case, the number of timekeepers is
28

ER19

1  unreasonable.   Moreover, while the disparity between Plaintiff's attorneys' fees and
2  Defendants' attorneys' fees is certainly not a deciding factor, the court finds it
3  provides some perspective when considering the overall reasonableness of
4  Defendants' request. Despite the overall number of timekeepers, Defendants
5  emphasize that three defense attorneys - Mark Mazzarella, Luis Lorenzana, and
6  John McNutt -  performed the majority of the work, spending approximately 1,480
7  hours combined.  However, the court notes there was an additional 560 hours spent
8  on this case by others, approximately 25% of the overall hours spent.  Furthermore,
9  unlike most cases in which lower-level associates perform the bulk of the work and
10  higher-billing attorneys spend less time on the case to review the associates' efforts,
11  the majority of the time spent on this case was by three of the higher-billing
12  attorneys.
13      Based on these considerations, the court concludes the overall number of
14  hours spent on the case by 24 individual timekeepers is excessive.  The court finds a
15  10-percent reduction of the overall amount to be reasonable under the
16  circumstances.  As it appears further deductions from the requested amount may be
17  warranted, the 10-percent reduction will be applied after any other deductions have
18  been made.
19      **B. Plaintiff's Objections**
20      Having reached a conclusion regarding the overall reasonableness of the
21  requested amount,  the court next turns to Plaintiff's specific objections to
22  Defendants' request.  The court will address each of these objections individually
23  and determine what, if any, impact it should have upon the total amount awarded.
24      **1. Alleged Block Billing by  the Mazzarella Law Firms**
25      Plaintiff further objects to the requested amount of attorneys' fees based upon
26  the billing entries in the Mazzarella law firms' invoices.  Plaintiff alleges the
27  Mazzarella law firms engaged in impermissible block billing by describing "in only
28

- 8 -

1   general terms the tasks they performed without providing an itemized statement of

2   the amount of time they spent on each task and on each claim." Pls. Resp. at 4.

3   However, Plaintiff has not provided any specific examples of the alleged block

4   billing or referred the court to any problematic entries in the Mazzarella law firms'

5   invoices.  After reviewing the invoices, the court finds that the billing entries are

6   sufficiently descriptive for the court to award attorneys' fees.  While not

7   individually itemized in some instances,  the activities are clearly listed and are not

8   unreasonably vague.  Accordingly, the court declines to reduce the award of

9   attorneys' fees for the alleged block billing.[4]

10                    **2. Deposition Attendance by Mr. Mazzarella and Mr. McNutt**

11              In addition to the more generalized objection to the overstaffing of this case

12   by defense counsel, Plaintiff also raises a specific objection regarding the

13   attendance of both Mr. Mazzarella and Mr. McNutt at the depositions of several

14   witnesses.  Plaintiff asserts that Mr. McNutt spent 25 hours to prepare for and attend

15   the depositions of Gavin Watson, Doug Bisio, Tim Doede, and Steven Sands in

16   New York at the beginning of February 2013 as well as two expert depositions at

17   the end of February 2013.  For his efforts, Mr. McNutt billed $9,975.  Yet, Plaintiff

18   notes Mr. Mazzarella also billed time to prepare for and attend the depositions, and

19   it was solely Mr. Mazzarella who took the depositions.  Plaintiff argues it was

20   Defendants' choice to have two law firms defend their interests in this case, but the

21   additional expense incurred as a result does not constitute a reasonable expense that

22   should be charged to Plaintiff.

23              In response, Defendants contend Mr. McNutt justifiably attended the

24   depositions because Defendants had asked him to serve as Mr. Mazzarella's second

25

26   _____

27   [4] The court notes that the Mazzarella law firms' entries might have been problematic had apportionment been necessary for Cathcart's attorneys' fees.  When many items are grouped into one billing entry, it would be nearly impossible to

28   apportion fees to the individual tasks.

ER21

1  chair at trial.  Defendants contend it is common practice for multiple trial attorneys
2  to attend a deposition in a complex commercial dispute.  Defendants further argue it
3  is not uncommon for a partner such as Mr. Mazzarella to personally take
4  depositions in complex commercial litigation and to have the assistance of an
5  associate attorney, like Mr. McNutt, when preparing and attending those
6  depositions.

7        As a general matter, the court recognizes that depositions are frequently
8  attended by both a partner with significant litigation experience as well as an
9  associate involved in the case.  Often, the associate attorney has provided the
10  partner with significant assistance preparing for the deposition and may provide
11  valuable insight during the deposition itself.  Additionally, junior associate
12  attorneys may benefit professionally by observing the skills of the more experienced
13  partner as he takes the deposition.  However, Defendants' argument as it pertains to
14  Mr. Mazzarella and Mr. McNutt is problematic.  Both parties agree Mr. Mazzarella
15  is an experienced litigator, capable of independently handling a deposition in
16  complex commercial litigation.  While Mr. McNutt is an associate-level attorney, he
17  is not a member of Mr. Mazzarella's firm, and he did not serve as an associate who
18  assisted Mr. Mazzarella in preparing for the depositions.  Nor does it appear likely
19  Mr. McNutt would gain significant professional benefit from observing Mr.
20  Mazzarella take these depositions.  In his declaration, Mr. McNutt indicates that he
21  was billing $365 an hour at the time these depositions were taken, but that his rate
22  rose to $450 in the spring of 2013.  He attests to having ten  years of litigation
23  experience and regularly defending companies in business litigation disputes
24  without supervision from more senior attorneys.  Mr. McNutt cannot simultaneously
25  assert qualifications warranting hourly rates in the range of $365-$450 an hour
26  while also suggesting he served merely as an associate attorney accompanying a
27  more experienced litigator to important depositions.

28

11-cv-1589 JM (WVG)

ER22

1    Therefore, this situation does not strike the court as the typical situation in
2    which an associate attorney accompanies a more experienced litigation partner to a
3    deposition.  Rather, it appears Defendants engaged two law firms to represent their
4    interests and lead counsel from both firms opted to attend these depositions.  This
5    seems  an unreasonable expense to pass on to Plaintiff as there is no indication
6    either Mr. Mazzarella or Mr. McNutt required the assistance of the other in order to
7    take these depositions.  See Carrero v. N.Y.C. Housing Authority, 685 F. Supp. 904,
8    908 (S.D.N.Y. 1988)("While the court recognizes that assistance at depositions is
9    often necessary, generally that assistance is offered by an associate at a much lower
10   rate."); Kreidler v. Pixler, 2011 WL 39054, at *5 (W.D. Wash. Jan. 3, 2011)
11   (finding the presence of a second high-level attorney at depositions to be
12   unnecessary and duplicative, and thus deducting half of the amount of fees billed by
13   each of the two attorneys); In re WICAT Sec. Litig., 671 F. Supp. 726, 735 (D.
14   Utah 1987). (granting 100% of the time for the lawyer conducting each deposition,
15   50% of the time for lawyers assisting, and 25% for all others present after finding
16   considerable duplication in the preparation as well as attendance by more attorneys
17   than necessary at depositions).  Moreover, it appears Mr. McNutt attended the
18   depositions solely in an observational capacity without asking questions of the
19   witnesses or raising objections to opposing counsel's questions.   For these reasons,
20   the court finds it appropriate to reduce the rate billed by Mr. McNutt, as the
21   observing attorney, to that of a junior associate working on this case.  Based on the
22   hourly rates set forth above, the court concludes $200 an hour would be a
23   reasonable rate for a junior associate working at either of these firms to charge for
24   attending these depositions.  At $200 an hour, the billable amount for the 25 hours
25   spent by Mr. McNutt becomes $5,000, or $4,975 less than the $9,975 originally
26   billed.  Accordingly, the court will deduct $4,975 from the total requested amount
27   of attorneys' fees.
28

ER23

### 3. Defendants' Choice to Switch Lead Counsel

Plaintiff contends the requested attorneys' fees are excessive in part because of Defendants' decision to switch trial counsel within weeks of the trial date. Specifically, Plaintiff argues Defendants abruptly substituted Mr. McNutt for Mr. Mazzarella as lead counsel approximately three weeks before the trial date, necessarily resulting in duplication of efforts as both attorneys and their firms engaged in trial preparation. In response, Defendants acknowledge their original intent was for Mr. Mazzarella to serve as lead trial counsel with Mr. McNutt slated to assist him. The trial date in this case was set for June 24, 2013. However, in early June, Defendants elected to use Mr. McNutt as lead counsel at trial. While acknowledging some overlap occurred in the trial preparation efforts of Mr. Mazzarella's firm and Mr. McNutt's firm during this transition, Defendants contend the majority of the law firms' efforts were not duplicative. As a result, Defendants contend a reasonable reduction of fees incurred during this time period would not exceed 15 percent of Mr. Mazzarella's fees for April and May 2013.

In this instance, the court finds Plaintiff has raised a valid objection to the hours billed by defense counsel for trial preparation. Defendants made the decision to switch lead counsel within three weeks of their trial date, and it would be unreasonable for Plaintiff to bear the burden of any additional attorneys' fees incurred as a result of that choice. As pointed out by Plaintiff, Defendants have not provided any explanation for their decision to switch trial counsel at such a late juncture, nor is there any suggestion that Mr. Mazzarella was incapable of handling the case or that Mr. McNutt had some special expertise required to try this case. From April through June 2013, it appears Mr. Mazzarella's firm billed $115,395 in trial preparation, and Mr. McNutt's firm billed $94,244.50 in trial preparation, not including the trial itself. In total, the two firms billed $209,639.50 from April to the start of trial on June 24, 2013. In contrast, Plaintiff's counsel billed only $69,863

ER24

1   from April through July 2013, including the time spent during the trial itself.

2   Again, while Plaintiff's billing is only one of many factors considered by the court

3   when determining the reasonableness of the requested amount, the clear disparity

4   here weighs in favor of finding the requested amount by the two law firms to be

5   excessive under the circumstances.  Under the circumstances, the court finds it

6   unreasonable to require Plaintiff to pay for Defendants' last-minute decision to

7   switch trial counsel.

8           Having reviewed the invoices provided by Mr. Mazzarella's firm and Mr.

9   McNutt's firm during this time period, the court concludes the duplication in efforts

10  resulting from the abrupt decision to switch trial counsel requires an appropriate

11  reduction in fees.  While Defendants suggest a 15-percent reduction of the fees

12  billed by Mr. Mazzarella's firm, the court is not persuaded that this sufficiently

13  remedies the duplication in effort by both firms during trial preparation.

14  Considering Defendants' unexplained decision to switch trial counsel, the timing of

15  the switch relative to the trial date, and the significant amount of time billed by both

16  firms for trial preparation during these months, the court finds a 30-percent

17  reduction of the $209,639.50 requested for trial preparation to be reasonable.

18  Accordingly, the court will deduct $62,891.85 from the overall requested amount.

19                  **4. Fees Related to Third-Party Complaint and Counterclaim**

20          Plaintiff also objects to Defendants' request for attorneys' fees relating to

21  Nery's' third-party complaint and counterclaim.  Plaintiff contends these fees are

22  unrelated to  Defendants' defense against Plaintiff's claims.  Specifically, Plaintiff

23  objects to the following: $3,600 for the preparation of a third-party complaint,

24  $19,000 for the attempt to obtain a default judgment against Nascent Wine

25  Company, and $2,800 to prosecute an unsuccessful counterclaim against Plaintiff.

26  Plaintiff emphasizes the court denied Nery's' motion for default judgment and

27  dismissed Nery's' counterclaim against Plaintiff.

28

ER25

1    In response, Defendants argue the third-party complaint and counterclaim
2  were reasonable as they arose from the terms of the SPA, the promissory note, and
3  the assignment of contract.  Defendants contend these pleadings were reasonably
4  necessary to preserve and raise Nery's' rescission claim against Plaintiff's assignor,
5  Nascent.  In Mr. Mazzarella's reply declaration, he indicates the counterclaim was
6  filed in an effort to preserve Nery's' rescission claim against Plaintiff and provide
7  Plaintiff with notice of Nery's' intent to pursue a rescission claim.  Although the
8  counterclaim was dismissed, Mr. Mazzarella notes that Nery's' rescission argument
9  was used as a successful defense at trial.  Mr. Mazzarella also contends the effort to
10  obtain default judgment against Nascent was made solely as an attempt to defend
11  against Plaintiff's claim.  Had Nery's been able to obtain default judgment against
12  Nascent, Mr. Mazzarella suggests Nery's would also have been able to obtain
13  summary judgment on Plaintiff's claims.  For these reasons, Defendants argue the
14  attorneys' fees associated with the third-party complaint, default judgment, and
15  counterclaim were reasonable and necessary to Defendants' litigation strategy.

16    As previously held by this court, Defendants are entitled to attorneys' fees as
17  the prevailing party.[5]  Pursuant to Section 1717, the prevailing party in any action
18  on a contract is entitled to reasonable attorneys' fees in addition to other costs.  See
19  Cal. Civ. Code § 1717(a).  "Under California law, where claims and counterclaims
20  arise in connection with a contract containing an attorneys' fees provision, the party
21  who obtains a favorable judgment is deemed to be the prevailing party even though
22  he did not successfully obtain all the relief which he sought in the action."  Matter
23  of Sparkman, 703 F.2d 1097, 1100 (1983)(citations omitted).  In this case,
24  Defendants prevailed by successfully defending against Plaintiff's claim and also by

25  _____

26    [5] Notably,  Plaintiff seeks to deduct the attorneys' fees relating to Defendants'
27  third-party complaint and counterclaim, but have not provided any legal authority for
   doing so.  Similarly, Defendants have not provided any legal authority justifying the
28  award of these fees.

1   successfully arguing in favor of Nery's' ability to rescind the SPA agreement.  <u>See</u>

2   Statement of Decision, Dkt. No. 156 at 22-23.  As set forth in Defendants' reply

3   brief and Mr. Mazzarella's declaration, defense counsel filed the third-party

4   complaint and counterclaim with these specific litigation objectives in mind.

5   Plaintiff emphasizes the court's denial of Defendants' motion for default judgment

6   and dismissal of Defendants' counterclaim, suggesting the related attorneys' fees

7   should be deducted from the total award because Defendants' efforts were arguably

8   unsuccessful.  However, the success of these tactics is not necessarily dispositive on

9   the issue as litigation frequently involves "a series of attacks on an opponent's case.

10  The final ground of resolution may become clear only after a series of unsuccessful

11  attacks.  [Attorney fee] [c]ompensation is ordinarily warranted even for those

12  unsuccessful attacks, to the extent that those attacks led to a successful claim.'"

13  <u>Acree v. General Motors Acceptance Corp.</u>, 92 Cal. App. 4th 385, 405

14  (2001)(quoting <u>Akins v. Enterprise Rent-A-Car Co. of San Francisco</u>, 79 Cal. App.

15  4th 1127, 1133 (2000))(citations omitted)).

16      Additionally, the court's rationale in denying default judgment and

17  dismissing the counterclaim supports Defendants' argument that the third-party

18  complaint and counterclaim were reasonably tied to their simultaneous efforts to

19  defend against Plaintiff's claims.  When denying Defendants' motion for default

20  judgment against Nascent as premature, the court expressed concern that default

21  judgment could compel the court to either accept Nery's' defenses to Plaintiff's

22  complaint as true or to contradict itself in the future by rejecting the allegations of

23  misrepresentation.  Default Judgment Order, Dkt. No. 58 at 3.  Similarly, the court

24  dismissed the counterclaim because it appeared the counterclaim's issues would be

25  fully resolved by the court's decision on Plaintiff's claims and the third-party

26  complaint.  Counterclaim Order, Dkt. No. 43 at 4.  In both instances, the court

27  determined the issues raised so thoroughly overlapped with the issues raised by

28

ER27

1   Plaintiff's complaint that it would be more prudent and efficient to reach a  decision
2   on Plaintiff's claims alone.  While arguably unsuccessful in their own right,
3   Defendants ultimately succeeded on the merits of the issues raised in the third-party
4   complaint and counterclaim.  For these reasons, the court concludes the attorneys'
5   fees associated with Defendants' efforts are reasonable and overrules Plaintiff's
6   objection accordingly.

### 5. Fees for Cathcart

8       Both parties agree that Cathcart may recover attorneys' fees incurred to
9   defend against Plaintiff's alter ego claim.  See Brown Bark III, L.P. v. Haver, 219
10  Cal. App. 4th 809, 823 (2013) ("It is well settled a breach of contract claim based on
11  an alter ego theory is still a claim on the contract and a nonsignatory who
12  successfully defends against the claim may recover its attorney fees under section
13  1717.") (citing Reynolds, 25 Cal. 3d at 128–129; Pueblo, 163 Cal. App.4th at
14  828–830).  However, Plaintiff contends Cathcart's recovery of attorneys' fees
15  should be limited to his defense against Plaintiff's alter ego theory and should not
16  include attorneys' fees incurred by the other Defendants relating to Plaintiff's
17  contract claim.[6]  Based on a review of defense counsel's invoices, Plaintiff alleges
18  Cathcart impermissibly requests an award equal to 85 percent of the total fees
19  incurred by Nery's and Targa to defend against Plaintiff's contract claim.  Plaintiff
20  contends the large majority of these fees would have been incurred by Nery's and
21  Targa regardless of whether an alter ego claim was asserted against Cathcart.
22  Because Cathcart's defense of the alter ego claim can be easily separated from
23  Nery's and Targa's defense of the contract claims, Plaintiff argues Cathcart's
24  recovery should be limited to those fees incurred to defend against the equitable

25

26      [6] Plaintiff also argues Cathcart should be limited to those fees incurred prior to
27  the court ruling in his favor on summary judgment.  As it appears Cathcart seeks only
    those fees incurred prior to that ruling, the court need not address this issue further.
28

1   alter ego claim.  Additionally, Plaintiff suggests it is important to limit Cathcart's

2   award of attorneys' fees because Plaintiff has appealed this court's previous

3   judgment.  If Plaintiff achieves reversal of the judgment in favor of Nery's and

4   Targa, but not of the judgment against Cathcart, Plaintiff contends Cathcart should

5   not be able to recover attorneys' fees based upon defense of a contract action that

6   would not have succeeded.

7        In response, Cathcart notes Plaintiff named all of the Defendants as

8   potentially liable under the breach of contract claim, and therefore Defendants

9   presented a joint defense.  Despite Plaintiff's characterization, Cathcart argues the

10  alter ego allegations were part and parcel of Plaintiff's contract claim against him,

11  and his defense of the alter ego allegations cannot be separated from his defense of

12  the contract allegations.  Because he had no way of knowing whether Plaintiff's

13  alter ego allegations would ultimately be dismissed,  Cathcart argues he was forced

14  to defend against all claims in this litigation until the alter ego issue was resolved.

15  Moreover, Cathcart contends the court is not required to apportion a fee request if

16  the issues in the litigation are intertwined such that it would impractical or unfair to

17  apportion the fees defendants incurred presenting joint defenses.  See Reynolds

18  Metals v. Alperson, 25 Cal. 3d 124, 129-30 (1979); Pueblo Radiology Medical

19  Group, Inc. v. Gerlach, 163 Cal. App. 4th 826, 830 (2008).  Cathcart relies upon

20  Reynolds Metals and Pueblo Radiology for the proposition that fees incurred by a

21  non-party to a contract who must defend against improper alter ego allegations are

22  incurred in the defense of common issues, and thus qualify for an award of

23  attorneys' fees under Section 1717.  See Reynolds Metals, 25 Cal. 3d at 130.

24       The court is not persuaded by Plaintiff's argument that Cathcart's attorneys'

25  fees award should not include attorneys' fees incurred defending against Plaintiff's

26  contract claim.  Plaintiff's complaint alleged a breach of contract claim against

27  Cathcart in addition to the other Defendants.  Under the circumstances, it is not

28

- 17 -

1  unreasonable for Cathcart to jointly defend against the contract claim with the other

2  named Defendants while simultaneously defending against Plaintiff's alter ego

3  claim.  Had Plaintiff succeeded on the alter ego claim, Cathcart would have been

4  subject to the contract claim along with the other Defendants.  In the court's view, it

5  would have been imprudent for Cathcart to limit his defense to the alter ego theory

6  to the exclusion of Plaintiff's other claims when there was no guarantee his defense

7  to the alter ego claim would prevail.  Had Plaintiff been able to establish alter ego

8  liability, Cathcart would have been unprepared to immediately defend against the

9  Plaintiff's other claims and could have incurred greater liability as a result.

10  Accordingly, the court finds Cathcart  may recover attorneys' fees incurred to

11  defend against Plaintiff's contract claim in addition to those fees related solely to

12  the defense against Plaintiff's alter ego claim.

13  **C. Final Calculation of Total Attorneys' Fee Award**

14  Based on the foregoing, the court grants Defendants' request for attorneys'

15  fees as modified herein.  Defendants request $651,675 in attorneys' fees.  From that

16  amount, the court deducts $4,975 in fees associated with Mr. McNutt's observation

17  of depositions taken by Mr. Mazzarella and $62,891.85 in duplicative fees relating

18  to the last-minute switch of lead counsel before trial.  After these deductions, the

19  requested amount becomes $583,808.15.  As noted above, the court finds a 10-

20  percent reduction of this amount warranted based upon the unreasonable number of

21  timekeepers and hours spent on this case.  Accordingly, the court deducts

22  $58,380.82 from $583,808.15 for an overall award of $525,427.33 in attorneys'

23  fees.

24  **COSTS**

25  In addition to attorneys' fees, Defendants now seek $93,137 in expert fees

26  and $33,355.92 in costs for travel expenses, deposition costs, printing/copying costs

27

28

ER30

1    and postage/messenger costs, among other things.[7]  Defendants argue they may

2    recover these costs pursuant to contractual provisions in the promissory note and the

3    SPA in addition to any available costs under California Civil Code Section 1033.5.

4    **I. Legal Standard**

5            Under California Civil Code Section 1717, a prevailing party in a contract

6    action may recover reasonable attorneys' fees and costs.  Generally, California Civil

7    Code Section 1033.5 governs whether certain types of costs may be recovered by

8    the prevailing party.  Section 1033.5(a) lists costs that may be recovered, whereas

9    Section 1033.5(b) lists costs that may not be recovered.  For instance, a prevailing

10   party may not ordinarily recover fees for experts not ordered by the court or postage,

11   telephone, and photocopying charges unrelated to the production of exhibits.  In the

12   event the parties have contractually agreed to the recovery of costs ordinarily

13   disallowed under Section 1033.5(b), California appellate courts have reached

14   differing conclusions as to whether these costs may be recovered.[8]  Despite the split

15   _____

16       [7] In Defendants' briefing, they request $39,963 for non-expert-related costs, but
     the attorney declarations contain a discrepancy regarding the costs incurred by the
17   Mazzarella law firms.  In Mr. McNutt's declaration, he indicates that the Mazzarella
     firms incurred $17,565.85 in costs and refers to Mr. Mazzarella's declaration as support
18   for this amount.  However, Mr. Mazzarella's declaration states that his firms incurred
     only $10,958.65 in costs. Deferring to Mr. Mazzarella's sworn statement regarding the
19   costs incurred by his law firms, the court has calculated the total amount by adding
     $10,958.65 to the $22,397.27 incurred by McKenna Long & Aldridge LLP for a total
20   of $33,355.92 in non-expert-related costs.

21       [8] See Bussey v. Affleck, 225 Cal. App. 3d 1162, 1164 (1990) (finding fees of
     experts could be awarded under a contract providing for an award of "'all costs and
22   expenses of collection including reasonable attorneys' fees.'"); Arntz Contracting Co.
     v. St. Paul Fire & Marine Ins. Co., 47 Cal. App. 4th 464 (1996)(concluding expert
23   witness fees may be available through contractual provision so long as the expert
     witness fees had been specially pleaded and proven); Thrifty Payless, Inc. v. Mariners
24   Mile Gateway, LLC, 185 Cal. App. 4th 1050, 1056-66 (2010)(concluding expert
     witness fees are available under a contractual provision expressly awarding them). But
25   see Ripley v. Pappadopoulos, 23 Cal. App. 4th 1616, 1626-1627 (1994)(disagreeing
     with Bussey and holding that a general contract provision for recovery of attorney fees
26   and costs must be construed in light of Code of Civil Procedure Section 1033.5);
     Fairchild v. Park, 90 Cal. App. 4th 919, 929 (concluding the exclusive list of litigation
27   costs recoverable by a prevailing party as set forth in Section 1033.5 cannot be altered
     by contract).

28

in authority regarding the availability of contractually recoverable costs generally,
California appellate courts have overwhelmingly concluded that contractually
recoverable costs must be specially pled and proven as an element of the prevailing
party's damages at trial rather than awarded pursuant to a posttrial request.[9]

## II. Discussion

### A. Contractual Recovery of Costs Unavailable Under Section 1033.5

As a general matter, the court is inclined to agree with the rationale of those
courts finding parties may contractually provide for the recovery of costs ordinarily
unavailable under Section 1033.5.[10]  See Arntz, 47 Cal. App. 4th at 491-92 ("While
it is reasonable to interpret a general contractual cost provision by reference to an
established statutory definition of costs, we do not discern any legislative intent to
prevent sophisticated parties from freely choosing a broader standard authorizing
recovery of reasonable litigation charges and expenses.")  However, even assuming
the SPA contains an enforceable indemnification provision allowing for the

---

[9]  See Hsu v. Semiconductor Systems, Inc., 126 Cal. App. 4th 1330, 1341 (2005)("Recovery of costs provided by contract must be specially pleaded and proven at trial, and not awarded posttrial as was done here."); Jones v. Union Bank of Cal., 127 Cal. App. 4th 542, 551 (2005) ("Because costs other than those allowed under section 1033.5 are not based on statute, they must be specifically pleaded and proved at trial rather than included in a memorandum of costs."); Carwash of America-PO LLC v. Windswept Ventures No. I, 97 Cal. App. 4th 540, 544 (2002) ("assuming expert witness fees may be recovered under a contractual provision, they must be specially pleaded and proven at trial rather than included in a memorandum of costs"); First Nationwide Bank v. Mountain Cascade, Inc., 77 Cal. App . 4th 871, 878 (2000)(same); Arntz Contracting Co. v. St. Paul Fire & Marine Ins. Co., 47 Cal. App. 4th 464 (1996)(finding non-statutory costs to be recoverable where "specially pleaded and proven at trial"). But see Thrifty Payless, Inc. v. Mariners Mile Gateway, LLC, 185 Cal. App. 4th 1050, 1056-66 (2010)(declining to follow Carwash and deeming "it unnecessary to specially plead and prove expert witness fees, at least in a case where expert fees are explicitly included in the contract as recoverable costs"); Cataphora Inc. v. Parker, 2012 WL 174817, at *1 (N.D. Cal. Jan. 20, 2012)(disapproving of the requirement that a party prove contractually allowable costs as damages at trial).

[10]  The California Supreme Court has yet to rule upon this issue.  However, when referring to the split in appellate authority on the issue, the California Supreme Court noted that a matter involving the effect of a contractual agreement for shifting litigation costs would turn upon the intentions of the contracting parties.  Davis v. KGO-T.V., Inc., 17 Cal. 4th 436, 458 n. 5 (1998).

ER32

1  recovery of the requested expert fees and costs, the contractual provisions here do
2  not abrogate the well-established procedural requirement that Defendants plead and
3  prove these items as an element of their damages at trial.  As Plaintiff points out,
4  Nery's had the opportunity to plead and prove these costs as damages in its
5  counterclaim, but failed to do so.  Indeed, Nery's failed to raise any specific
6  arguments regarding the potential recovery of damages in the form of costs under
7  the SPA's indemnification provisions in the counterclaim itself or in its response to
8  Plaintiff's motion to dismiss the counterclaim.  As Defendants have not pled or
9  proven their entitlement to contractually based costs as required under California
10  law, their recovery must be limited to those costs allowable under Section 1033.5.

11  **B. Costs Recoverable Pursuant to Section 1033.5**

12  Insomuch as Defendants' requested costs may not be recovered pursuant to
13  the parties' contractual agreements, the court must now determine whether the
14  requested costs may be awarded pursuant to Section 1033.5.  "An item not
15  specifically allowable under subdivision (a) nor prohibited under subdivision (b)
16  may nevertheless be recoverable in the discretion of the court if 'reasonably
17  necessary to the conduct of the litigation rather than merely convenient or beneficial
18  to its preparation.'"  <u>Ladas v. Cal. State Auto. Assn.</u>, 19 Cal. App. 4th 761, 774
19  (1993)(quoting Cal. Civ. Code §1033.5(c)(2)).

20  First, the court considers the requested $93,137 in expert fees.  Section
21  1033.5(b)(1) specifically disallows "[f]ees of experts not ordered by the court."  The
22  court did not order Defendants' experts in this case.  Accordingly, Defendants'
23  request for $93,137 in expert fees is denied.

24  Second, the court considers whether the requested $33,355.92 for costs
25  related to travel expenses, deposition costs, printing/copying costs and
26  postage/messenger costs may be awarded pursuant to Section 1033.5.  Of the total
27  requested amount, the Mazzarella law firms billed $10,958.65, and McKenna Long
28

11-cv-1589 JM (WVG)

ER33

1  & Aldridge LLP billed $22,397.27.  With regard to the $10,958.65 in costs

2  requested by the Mazzarella law firms, the court faces an immediate obstacle in

3  making a determination of their availability under the statute.  While McKenna

4  Long & Aldridge LLP provided the court with a summary describing the general

5  category and relative amounts of the billed costs, the Mazzarella law firms have not

6  provided the court with any way to determine whether their requested costs are

7  recoverable short of sorting through nearly two years of redacted billing invoices.

8  See Nelson v. Anderson, 72 Cal. App. 4th 111, 131 (1999) ("The court's first

9  determination, therefore, is whether the statute allows the particular item, and

10  whether it appears proper on its face.").  Under the circumstances, the court finds

11  Defendants have not provided the court with a sufficient basis for finding the costs

12  requested by the Mazzarella law firms to be proper under the statute, and therefore

13  declines to award the requested $10,958.65 in costs.

14      As to the remaining $22,397.27 billed by McKenna Long & Aldridge LLP,

15  the requested costs have been divided into the following categories and amounts:

16  Color Copy Charges - $400.80; Copy Charges - $1,350.15; Delivery

17  Service/Messenger - $1,117.75; Local Travel - $545.72; Out of Town Travel -

18  $9,622.05; Meals - 442.20; Trial Exhibits - $3,101.74; Litigation Support Vendors -

19  $391.66; Lexis Searches - $37.50; Westlaw Research - $5,333.50; Miscellaneous

20  Online Searches - $50.70; and Pacer Searches - $3.50.  Accordingly, the court will

21  consider the identified categories of costs and any specific objections raised by

22  Plaintiff.

23      Pursuant to Section 1033.5(b)(3), postage, telephone, and photocopying

24  charges are not recoverable, except as they pertain to exhibits.  Defendants request a

25  total of $1,750.95 in costs billed by McKenna Long & Aldridge LLP for copies,

26  specifically $400.80 for color copies and $1,350.15 for other copies.  Here, because

27  Defendants have not indicated whether the "Color Copy Charges" and "Copy

28

- 22 -

1  Charges" were related to exhibits as required by Section 1033.5(b)(3), the court

2  denies the $1,750.95 requested here for copy-related costs.[11]

3      With regard to the requested costs for Delivery Service/Messenger, Section

4  1033.5 does not expressly authorize messenger costs, but they may be allowed in

5  the discretion of the court. <u>See</u> <u>Benach v. County of Los Angeles</u>, 149 Cal. App.

6  4th 836, 857 (2007)(citing <u>Nelson</u>, 72 Cal. App. 4th at 132); <u>Foothill-De Anza</u>

7  <u>Cmty. College Dist. v. Emerich</u>, 158 Cal. App. 4th 11, (2007); <u>Ladas v. Cal. State</u>

8  <u>Auto. Assn.</u>, 19 Cal. App. 4th 761, 776(1999).  Here, the requested amount seems

9  reasonable, and Plaintiff has not made a specific objection with regard to the

10 requested amount.  Accordingly, the court grants the requested $1,117.75 in

11 messenger costs.

12     Defendants also request $545.72 in costs associated with local travel,

13 $9,622.05 in costs for Mr. McNutt's out-of-town travel for trial purposes, and

14 $442.20 for meals.  Section 1033.5(a)(3) authorizes travel costs incurred by counsel

15 to attend depositions.  Court have construed this provision as precluding local travel

16 expenses unrelated to attending depositions.  <u>See</u> <u>Gorman v. Tassajara Dev. Corp.</u>,

17 178 Cal. App. 4th 44, ("By negative implication, statute does not provide for

18 recovery of local travel expenses by attorneys and other firm employees unrelated to

19 attending depositions....")(citing <u>Ladas v. Cal. State Auto. Assn.</u>, 19 Cal. App. 4th

20 761, 775-76 (1993)(finding routine expenses for local travel are not reasonably

21 necessary to conduct of litigation)).  The court denies the requested $545.72 for

22 local travel as it is unclear whether these costs were associated with counsel's

23 attendance of deposition as required under Section 1033.5(a).

24

25 _____

26 [11] Notably, Defendants have also requested $2,201.05 for "Fees for
   exemplification and the costs of making copies of any materials where the copies are
27 necessarily obtained for use in the case" in their amended bill of costs, which Plaintiff
   does not oppose.  <u>See</u> Dkt. No. 169.
28

1    The court next considers the out-of-town travel costs. In Mr. McNutt's
2  declaration, he states that Defendants seek an award of travel costs for Mr.
3  McNutt's travel from his home city of Washington, D.C. to San Diego and back for
4  trial, his hotel charge for the three weeks prior to trial, and the cost of a rental car
5  for that same period. While not specifically allowed under Section 1033.5, courts
6  have authorized out-of-town travel expenses where reasonably necessary to conduct
7  litigation. See Page v. Something Weird Video, 960 F. Supp. 1438, 1447 (C.D. Cal.
8  1996)(allowing travel expenses for New York attorney to attend hearings in
9  California); Chaaban v. Wet Seal, Inc., 203 Cal. App. 4th 49, 59-60 (2012)(allowing
10  travel expenses awarded as costs, including hotels, car rentals, gas, and parking). In
11  this instance, it appears McKenna Long & Aldridge LLP has tailored its requested
12  travel expenses to those costs directly related to trial. It also appears the $442.20
13  requested for meals accompanied those time periods when Mr. McNutt was in San
14  Diego for litigation purposes. There is some authority for awarding the costs of
15  meals for out-of-town attorneys. See Howard v. Am. Nat. Fire Ins. Co., 187 Cal.
16  App. 4th 498, 541 (2010)(affirming trial court's award of meal expenses incurred by
17  attorneys traveling to take depositions); Gorman v. Tassajara Dev. Corp., 178 Cal.
18  App. 4th, 44, 72 (2009)(distinguishing between local meal expenses and meals
19  incurred while traveling). Under the circumstances, the court finds these travel-
20  related costs were reasonably necessary to conduct litigation. Thus, the court grants
21  the requested $9,622.05 for out-of-town travel and $442.20 for meals.
22    In the category of trial exhibits, Defendants request $3,101.74. Under
23  Section 1033.5(a)(13), costs may be allowed for models and blowups of exhibits
24  and photocopies of exhibits if they were reasonably helpful to aid the trier of fact.
25  Similarly, Section 1033.b(3) disallows costs for postage, telephone, and
26  photocopying charges, but also creates an exception for these charges if they relate
27  to exhibits. Insomuch as it appears Section 1033.5 allows recovery of costs
28

ER36

1    associated with exhibits and trial exhibits were reasonably necessary for

2    Defendants' litigation of the case, the court grants the requested $3,101.74 related to

3    trial exhibits.

4         Defendants also seek $391.66 in costs associated with "Litigation Support

5    Vendors." In Mr. McNutt's declaration, he states that a litigation support manager

6    handled all trial-related technology issues and a litigation support specialist assisted

7    Mr. McNutt with the Trial Director program. However, there is no further

8    clarification specifically regarding the litigation support vendors' costs. As it is

9    unclear from the evidence provided whether the requested costs are proper under

10   Section 1033.5 and the court is not convinced that the costs were reasonably

11   necessary to conduct litigation, the court denies the requested $391.66 in costs for

12   litigation support vendors.

13        Next, the court considers whether Defendants may recover $5,425.20 in costs

14   associated with computer research under Section 1033.5. Specifically, Defendants

15   request $37.50 for Lexis searches, $5,333.50 for Westlaw searches, $50.70 for

16   miscellaneous online searches, and $3.50 for Pacer searches. Section 1033.5(b)(2)

17   precludes recovery of investigation expenses, and at least one court has interpreted

18   this provision as meaning "[f]ees for legal research, computer or otherwise, may not

19   be recovered under section 1033.5." Ladas, 19 Cal. App. 4th at 776. Insomuch as

20   Defendants have not provided any authority in support of awarding computer

21   research costs under Section 1033.5 and the court has not found any cases making

22   such an award, Defendants' request for $5,425.20 in costs related to computer

23   research is denied.

24        **C. Final Calculation of Total Cost Award**

25        Based on the foregoing, the court grants in part and denies in part

26   Defendants' overall request for costs. The court grants a total costs award of

27   $14,283.74 that includes the following: $1,117.75 for messenger services,

28

$9,622.05 for out-of-town travel, $442.20 for meals, and $3,101.74 for trial exhibits.  However, the court denies Defendants' request for copy costs, local travel, litigation support costs, computer research costs, and costs billed by the Mazzarella law firms.  The court also denies Defendants' request for $93,137 in expert fees.

## CONCLUSION

For the reasons set forth above, the court hereby grants in part and denies in part Defendants' motion for attorneys' fees and costs.  In sum, the court awards Defendants $525,427.33 in attorneys' fees and $14,283.74 in costs for a total award of $539,711.07.

IT IS SO ORDERED.

DATED:  December 6, 2013

Hon. Jeffrey T. Miller
United States District Judge

ER38

Jerry D. Hemme, Esq. [SBN 99010]
Arnold Neves, Jr., Esq. [SBN 109711]
Goode, Hemme & Peterson, APC
6256 Greenwich Dr., Suite 500
San Diego, CA 92122
T 858.587.3555      F 858.587.3545
jhemme@sandiegoattorney.com
aneves@sandiegoattorney.com
Attorneys for GENESIS MERCHANT PARTNERS, LP

United States District Court, Southern District of California

| *Genesis Merchant Partners v Nery's USA* | Case No. 3:11-CV-01589 JM WVG |

## PROOF OF SERVICE

I, Diane Fronce, declare that I am over the age of 18 years and not a party to the within action or proceeding. My business address is Goode, Hemme & Peterson, 6256 Greenwich Drive, Suite 500, San Diego, California 92122, telephone 858-587-3555, facsimile 858-587-3545.

On December 16, 2013, I served the following documents described as:

**NOTICE OF APPEAL**

On the following interested parties in the manner described below:

John J. McNutt
McKenna Long & Aldridge
600 W. Broadway, Suite 2600,
San Diego, CA 92101
T 619.699.2438 * F 619.645.5336
jmcnutt@mckennalong.com

▣   **BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** - The foregoing document will be served by the court via NEF and hyperlink to the document to the person(s) at the email address(es) indicated above.

☐   **BY ELECTRONIC SERVICE**: I caused such document(s) to be electronically served on the interested parties in the above-referenced action.   The transmission was reported as complete without error and a copy of the report will be maintained with the document by the sender.

☐   **SERVED BY U.S. MAIL**: I placed true copies enclosed in sealed envelope(s) and caused such envelope(s) to be deposited with the U.S. Postal Service with postage thereon fully prepaid in the ordinary course of business.

☐   **SERVED BY OVERNIGHT DELIVERY**:    I placed true and correct copies in a sealed envelope and caused such envelope(s) to be deposited in a box or other facility regularly maintained by an overnight delivery service.

☐   **BY FACSIMILE**: I served the foregoing documents via facsimile transmission.   The transmission was reported as complete without error and a copy of the report will be maintained with the sender.

☐   **BY PERSONAL SERVICE**: I caused such envelope(s) to be personally served by an attorney messenger service on the interested parties in this action.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.   Executed on December 16, 2013, at San Diego, California.

Tracy M. Sheldon

NAME AND ADDRESS OF ATTORNEY

Jerry D. Hemme, Esq. [SBN 99010]
GOODE, HEMME & PETERSON
6256 Greenwich Dr., Suite 500
San Diego, California 92122                    ⊞

PHONE: (858) 587-3555


UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA


TRIAL JUDGE Jeffrey T. Miller                COURT REPORTER  Debra M. Henson

                                         )
                                         )
Genesis Merchant Partners, LP, a         )
Connecticut corporation,                 )      CIVIL NO. 11-cv-01589-JM (WVG)
_____  )
(Appellant/Appellee)         Plaintiff   )
                                         )
            vs                           )
                                         )
Nery's USA, Inc., a Nevada corporation, et al. )  NOTICE OF APPEAL        (Civil)
                                         )
_____  )
(Appellant/Appellee)         Defendant

        Notice is hereby given that  Genesis Merchant Partners, LP, a Connecticut corporation, _____

    ✗    Plaintiff _____ Defendant above named, hereby appeals to the United States Court

of Appeals for the:     (check appropriate box)

    ✗    Ninth Circuit                              Federal Circuit

from the:              (check appropriate box)

    ✗    Final Judgment                            Order (describe)

entered in this proceeding on the _____20_____ day of ____ September ____ 20 13 ____.
Transcripts required       ✗    Yes           No.
Date civil complaint filed:        7/19/11

Date: 10/16/13                       /s/ Jerry D. Hemme
                                    _____
                                     Signature

::ODMA\PCDOCS\WORDPERFECT\17861\1 May 5, 1999 (10:03am)

1
2
3
4
5
6
7
8                    UNITED STATES DISTRICT COURT

9                   SOUTHERN DISTRICT OF CALIFORNIA

10

11  GENESIS MERCHANT PARTNERS,          Case No. 11-cv-01589-JM (WVG)
    LP, a Connecticut corporation,
12                                      Hon. Jeffrey T. Miller
           Plaintiff,
13
    v.
14                                      ENTRY OF JUDGMENT
    NERY'S USA, INC., a Nevada
15  corporation; JOHN CATHCART, an
    individual; COMMERCIAL TARGA,       Complaint Filed: July 19, 2011
16  SA de CV, a Mexican corporation,    Trial Date:  June 24, 2013

17         Defendants.

18
    NERY'S USA, INC., a Nevada
19  corporation,

20         Counterclaimant,

21  v.

22  GENESIS MERCHANT PARTNERS,
    LP, a Connecticut corporation,
23
           Counterdefendants.
24

25

26

27

28

                              1

1
2 | NERY'S USA, INC., a Nevada corporation,
3 |        Third Party Complainant,
  | v.
4 | NASCENT WINE COMPANY, INC., a
5 | Nevada corporation,
6 |        Third Party Defendant.
7

8    Following a five-day bench trial in this action between Plaintiff Genesis

9 Merchant Partners, LP and Defendants Nery's USA, Inc., Commercial Targa, and

10 John Cathcart, the court found that Plaintiff had not met its burden of proof on the

11 issue of liability for the reasons set forth in the court's Statement of Decision

12 Pursuant to Rule 52, entered July 26, 2013. See Dkt. No. 156. In this order, the

13 court further found that Defendants are entitled to reasonable attorney's fees as

14 provided by law.

15    Accordingly, it is hereby ORDERED, ADJUDGED, and DECREED that

16 Plaintiff recover nothing with regard to the claims alleged in the complaint. With

17 the court having ruled in their favor, Defendants may file a motion for an award of

18 fees and a separate bill of costs in accordance with the Federal Rules of Civil

19 Procedure and the Local Rules of the Southern District of California.

20    IT IS SO ORDERED.

21 Dated: September 20, 2013

22                              Jeffrey T. Miller
                               United States District Judge
23
24
25
26
27
28

                              2                          11-cv-01589-JM (WVG)
                                                         Entry of Judgment

ER42

1
2
3
4
5
6
7

# UNITED STATES DISTRICT COURT

8

## SOUTHERN DISTRICT OF CALIFORNIA

9

| | |
|---|---|
| GENESIS MERCHANT PARTNERS, LP., a Connecticut corporation, <br>           Plaintiff, <br>    v. <br> NERY'S USA, INC., a Nevada corporation, JOHN CATHCART, an individual and COMMERCIAL TARGA, S.A. DE C.V., a Mexican corporation, <br>           Defendants. | Case No.: 3:11-cv-1589-JM (WVG) <br><br> **STATEMENT OF DECISION PURSUANT TO RULE 52** |
| NERY'S USA, INC., a Nevada corporation, <br>           Counterclaimant, <br>    v. <br> GENESIS MERCHANT PARTNERS, LP., a Connecticut corporation, <br>           Counterdefendant. | |

10
11
12
13
14
15
16
17
18
19
20
21
22

## INTRODUCTION

23

On July 18, 2011, Genesis filed suit against Defendants Nascent Wine

24

Company, Inc. ("Nascent"), Commercial Targa ("Targa"), and John Cathcart

25

1

1  (together "Defendants") for Nery's' failure to make payments due to Genesis

2  under a $1.85 million promissory note ("Second Note") issued by Nery's and

3  guaranteed by Targa.  Nery's issued the Second Note to Nascent in exchange for

4  its purchase of Targa, which Nascent owned at that time.  Nascent then assigned

5  the Second Note to Genesis to satisfy its obligation on another promissory note

6  ("First Note") that it had issued to Genesis for $1 million.  Genesis asserted three

7  claims against all defendants:  (1) breach of contract, (2) unjust enrichment, and

8  (3) and negligent misrepresentation.  Genesis also asserted a conversion claim

9  solely against Nery's.

10       On August 19, 2011, Nery's filed both a third-party complaint against

11  Nascent and a counterclaim against Genesis.  The third-party complaint alleges

12  that Nascent failed to disclose pertinent information about Targa's tax debt to the

13  Mexican government prior to the SPA's signing.  Nery's claims that the

14  undisclosed debt prevented Targa from obtaining a loan and severely limited its

15  ability to do business.  This court granted Genesis' motion to dismiss Nery's'

16  counterclaim on January 6, 2012 because it made no separate factual allegations,

17  was almost identical to the third-party complaint and requested only declaratory

18  relief.

19       On September 7, 2012, Defendants filed a motion for summary judgment,

20  which this court denied as to the breach of contract and unjust enrichment claims,

21  but granted for the negligent misrepresentation and conversion claims.  The court

22  also granted the motion for summary judgment filed on behalf of Defendant

23  Cathcart.

24       The parties have acknowledged that federal jurisdiction and venue are

25  properly before this court.  This Court has diversity jurisdiction of this action

2

pursuant to 28 U.S.C. §1332, and venue exists under 28 U.S.C. §1391(a), (d), and (f). California state substantive law applies to the cause of action alleged in Genesis' Complaint and Nery's third-party complaint.

A five-day trial began on July 24, 2013 and concluded on July 2, 2013, with Genesis insisting that it was entitled to damages and Nery's requesting rescission of its contract purchasing Targa. The court has determined that Nery's request for rescission should be granted, rendering it unnecessary for the court to address Genesis' damage claims.

## FINDINGS OF FACT

Genesis is a Delaware Corporation that operates as a private equity or investment fund. As part of its portfolio, Genesis makes loans to businesses.

Nascent, a publicly traded company, owned and operated various food service distributor companies. Between 2006 and 2008, Nascent acquired nine companies, including Commercial Targa, S.A. DE C.V. ("Targa"), a Mexican corporation, in October 2007. Targa was a cheese distribution company in Northern Baja, Mexico, which sold cheese under the brand name "Nery's." The Nery's brand name had been developed over 25 years by a family business in Northern Baja, Mexico. Targa also held three Mexican permits, including a permit to import cigarettes, as well as its "cut-and-wrap" facility and equipment.

When Nascent acquired Targa in 2007, Targa had sales of approximately $7 million with a net profit of $1.2 million with its principal market in Northern Baja. By the latter half of 2008, however, sales were declining and capital was insufficient to push the Nery's brand name nationwide through Mexico. Moreover, the Nery's brand name had been licensed to a Mexican company, Zahava, which in turn was licensed to sell cheese in Mexico. Under the license

3

ER45

agreement with Zahava, Targa retained its cut-and-wrap business and would even cut-and-wrap other cheese brought to Targa by Zahava.  The agreement was for several years but contingent upon Zahava meeting sales minimums for Nery's brand cheese.

In March 2008, Nascent borrowed $1 million from Genesis for the purpose of buying cheese for Targa.  The capital was also to be used for the purpose of taking Nery's brand nationwide.  The loan was evidenced by a written promissory note dated March 31, 2008 between Genesis and Nery's, initially for a six month term and then extended to a one-year term with accrued interest and principal due (115%) (the "Nascent Note").  In March 2009, the Nascent note was again modified and extended.  The Nascent Note was secured by all assets of Nascent, including Targa and the Nery's brand.

Sandro Piancone was the Chief Executive Officer of Nascent during this general period of time when Nascent was negotiating with Genesis for the Nascent loan.  Piancone also became Director General of Targa and responsible for its overall growth.  Piancone first met John Cathcart in 2006.  At the time, Cathcart was a mergers and acquisitions consultant who Piancone retained in 2007 for the purpose of assisting Nascent with the acquisition of food service and distribution companies.  Cathcart was an experienced businessman with over 25 years in the venture capital and business start-up area.  Cathcart also had experience with taking companies public as well as in company buyouts and roll-ups.  Piancone and Cathcart did not have any contact after Cathcart's 2007 consulting activities until early 2009 when, in the midst of Nascent's financial difficulties, Piancone reached out to Cathcart for assistance.  At that point, Cathcart became more involved with Nascent.  By May or June 2009, Cathcart met with Piancone and

ER46

Nascent board members.[1]  Piancone suggested that Cathcart become a licensee to market Nery's brand cheese in the U.S.  The licensing agreement with Zahava was fully discussed.  Piancone and Cathcart agreed to explore Cathcart's purchase of Targa.  A letter of intent by Cathcart for a $2 million cash purchase of Targa followed Cathcart's inspection of the Targa facility and review of some financials for 2009.  By late 2009, Targa was barely operating at all, and at a loss.  Targa's income was approximately $10,000 to $15,000 a month with monthly expenses at $25,000 to $30,000.  It was apparent to Cathcart that Targa could have shut down its facility and continued receiving royalties and/or restart its cut-and-wrap business.  Moreover, it appeared to Cathcart that Zahava likely could not meet its sales minimums for Nery's brand cheese, which would terminate the licensing rights for Zahava.

It became Cathcart's intention to acquire Targa after concluding he could deal with Zahava, whether Zahava met sales minimums or not.  This decision was based on Cathcart's two to three visits to the Targa plant, Cathcart's discussions with plant manager Christian Alvarez (discussed below), Cathcart's review of the financials which, being unaudited, contained some inconsistencies, and Piancone's representation that there were no more than a few hundred dollars in accounts payable other than the $150,000 to Ex-Im Bank.  Piancone further represented that any accounts payable were stale and not necessary to pay. Piancone also represented to Cathcart that facility back rent would be forgiven by the landlord in lieu of a new rental agreement.

---

[1]  Following the creation of Nery's U.S.A., Inc., all references to Cathcart and Nery's U.S.A. are interchangeable.

ER47

1     When Cathcart met with Alvarez during one of his plant visits before

2  Cathcart's acquisition of Targa, Alvarez told Cathcart none of the following: That

3  in 2008 to 2009, Targa's revenues were being diverted to other Nascent

4  companies; that Targa's vendors were not getting paid because of this diversion;

5  that taxes and labor expenses were not being paid by Targa for 2009; and that

6  Alvarez was asking Piancone to send checks to pay for these liabilities with the

7  requests being unheeded. Alvarez personally was aware of the approximately

8  $306,000 in unpaid liabilities separate and apart from approximately $285,000 in

9  unpaid taxes due to the Mexican government. Meanwhile, none of this

10  information regarding Targa's financial liabilities was communicated to Cathcart

11  by Piancone or Alvarez.

12     Cathcart, realizing he could not raise cash to pay off Genesis, negotiated

13  with Genesis to keep its loan in place as a part of a new financing structure.

14  Although Cathcart could only raise $300,000 in operating capital, both he and

15  Genesis agreed it would be sufficient for Nery's to acquire Targa and all its assets

16  from Nascent.

17     From the beginning, Genesis was informed by Nascent of Cathcart's

18  interest in purchasing Targa and was involved in the negotiations between Nery's

19  and Nascent because Genesis had a security interest in Nascent's assets including

20  Targa. Genesis also knew or should have known, through Nascent and its

21  Portfolio Manager, Tim Doede, that Targa faced a very large rent liability and

22  possible eviction from its facility, that Targa had large tax liabilities pending, and

23  that other significant liabilities and risks existed for Targa.

24     During the continued negotiations with Nascent and Genesis, Nery's did not

25  offer cash for the Targa stock but instead proposed a $2 million purchase price for

the Targa stock, which was determined by Nascent's representations concerning its debt and Targa's accounts payable that consisted only of: (1) what Nascent owed Genesis, which totaled $1,150,000; (2) $700,000 owed by Nascent on two other loans; and (3) no more than $150,000 in liabilities/accounts payable of Targa at closing.  On October 29, 2009, Nery's communicated these terms to Genesis, through Doede.

Nascent's representation that Targa's accounts payable did not exceed $150,000 was material to Nery's because Nery's would not have executed any contract to purchase Targa if the accounts payable exceeded $150,000 beyond the few hundred dollars to which Piancone and/or Alvarez had earlier referred. Nery's refused to pledge any security interest to Genesis as part of the proposed purchase terms.  As indicated previously, in November 2009, Nery's also informed Genesis, via Doede, that Nery's could only provide $300,000 of working capital.

In a "Nascent Valuation Memorandum" drafted by Doede and dated January 31, 2010, the following was set forth: "As of the writing of this Valuation, documents that would effectuate the sale of these assets in exchange for the assumption of $2,000,000 in liabilities of Nascent are being finalized.  Currently, the business of Targa has been stopped due to a lack of working capital to purchase inventory of cheese and cigarettes for distribution in Mexico. [Nery's] is providing $300,000 of working capital to restart the business . . . the plan for restarting the Targa business is risky, especially with only $300,000 of new capital as identified as of the writing of this valuation."

In the "Nascent Valuation Memorandum," Genesis also recognized that as of January 31, 2010, the amount of the Nascent Note was $1,100,000.

ER49

On or about February 10, 2010, Nascent and Nery's executed a Stock Purchase Agreement ("SPA") for the purchase of Targa's stock previously reviewed and approved by Genesis and its legal counsel.  On or about February 10, 2010, Nascent and Nery's executed a Stock Purchase Agreement ("SPA") for the purchase of Targa's stock, which included the following material terms, representations, and warranties:

- In Article I of the SPA, Nascent acknowledged that:
  - "Indemnification Acknowledgment" has the meaning set forth in Section 8.3(a)(ii) of the SPA. (SPA at p. 2)
  - Nascent, and any other officer or director of the Targa, refers to actual knowledge that would have been obtained "after reasonable due diligence or inquiry in light of the circumstances." <u>Id.</u> at p. 3.
  - Nery's was entitled to an exclusive remedy of indemnity for "Losses", including damages, costs, liabilities, losses, judgments, settlements, awards, penalties, fines, legal fees, expert fees, costs of investigation, and enforcement and collection costs.  <u>Id.</u>
  - A "Material Adverse Effect" on Nery's includes material adverse effects on Nery's' assets, operations, personnel, condition (financial or otherwise) or prospects, or Nery's ability to consummate the transactions contemplated by the SPA.  <u>Id.</u>
  - A "Welfare Plan" means any other plan or program maintained for past or present Targa employees, "including without any limitation . . . severance plan . . . vacation pay . . . holiday pay . . . severance . . . excess benefit, bonus . . . salary continuation . . . that are maintained or contributed to by [Targa]."

8

ER50

- In Article II of the SPA entitled "Purchase and Sale," Nascent agreed to transfer the Targa stock to Nery's for a purchase price of $2 million. (Id. at p. 6, ¶2.1, 2.2.)  The purchase price was based on the following:
  
  o Nascent's representation to Nery's that Targa's accounts payable would not exceed $150,000 and were to be assumed by Nery's. Id. at ¶ 2.2(a)
  
  o Nery's would execute a note payable to Nascent in the amount of $1,850,000 due and payable on or before August 1, 2011 [18 months after the SPA's effective date]. Id. at ¶ 2.2(b).

- In Article III of the SPA, Nascent and Targa, jointly and severally, made the following representation and warranties as true as a "material inducement" to Nery's to enter into the SPA and consummate the transactions contemplated therein:
  
  o Targa was not in breach of any contracts.  Id. ¶ 3.4(b).
  
  o Targa's "books of account and other financial records...are correct and complete in all material respects . . . and have been maintained in accordance with sound business and accounting practices. Each transaction is properly and accurately recorded in the books and records of [Targa].  [Targa] maintains an adequate system of internal accounting controls and does not engage in or maintain any off-the-books accounts or transactions." Id. at ¶ 3.8(a).
  
  o Targa did not have any undisclosed liabilities "whether known or unknown, whether direct or indirect, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or

9

unliquidated, and whether due or to become due, including any liability for Taxes" as no such liabilities were included in any schedule attached to the SPA.  Id. at ¶ 3.8(c).

o   Targa's accounts receivable are "collectible in the ordinary course of business."  Id. at ¶ 3.10.

o   Targa did not have any labor disputes.  Id. ¶ 3.11(d)

o   Targa's Welfare Plans are funded, id. ¶ 3.12(a); no omission has occurred with respect to any Welfare Plan "that could subject [Targa] to any Tax or penalty under applicable Law," id. ¶ 3.12(b); and none of Targa's Welfare Plans have any unfunded liabilities, id. ¶ 3.12(c).

o   Targa has filed all necessary tax returns, that said returns correctly state Targa's tax liability, that Targa has paid all taxes due or made adequate reserves for same, that Targa has no knowledge of any proposed assessment of additional taxes, and that Targa is not being audited and no such audit is pending or threatened.  Id. ¶¶ 3.13 (b), (d).

o   There is no pending or threatened "investigation, action, or proceeding" relating to or affecting Targa, its assets, or any officer, director or employee acting in their capacity as such.  Id. at ¶ 3.14.

o   "None of the representations or warranties…included in this Agreement… contains any untrue statement of a material fact or is misleading in any material respect or omits to state any material fact."  Id. ¶ 3.30.

- In Article VI of SPA entitled "Covenants of the Parties," Nascent agreed to the following:
  - o Nascent indemnifies, defends and holds harmless Targa and Nery's from any loss, claim, liability, expense, or other damage attributable to: "all Taxes (or non-payment thereof) of [Targa]" for events occurring before the closing date. Id. at ¶ 6.5(b).
  - o All transfer, and other such Taxes and fees (including any penalties and interest) incurred in connection with the SPA must be paid by Nascent.
- In Article VII of SPA entitled "Closing Conditions," Nascent attested that its representations and warranties contained in the SPA "shall be true and correct in all material respects on and as of the Closing Date with the same force and effect as though made on and as of the Closing Date." Id. at ¶ 7.1(a).
- In Article VIII of SPA entitled "Indemnification," Nascent agreed that it shall indemnify, defend and hold harmless Nery's and Targa from and against any Losses arising from or relating to: (i) Any breach of representations and warranties by Targa; (ii) Any breach of the covenants and agreements made by Targa or Nascent; and (iii) Any indemnification obligations related to Taxes. Id. at ¶ 8.1(a).
  - o In paragraph 8.3(a)(i), the SPA states that "No failure to give a Notice of Claim shall affect, limit or reduce the indemnification obligations of an Indemnitor . . . ."
  - o Indemnification is to be the exclusive remedy for all parties for all claims and in lieu of any contract or tort rights.

ER53

- In Article IX of the SPA entitled "Miscellaneous," Nascent agreed to the following:
  - The SPA represented the entire agreement; and "No waiver of any of the provisions of [the SPA] shall be deemed or shall constitute a waiver of any other provision hereof (whether or not similar), nor shall such waiver constitute a continuing waiver unless otherwise expressly provided. Neither the failure nor the delay by any Party in exercising any right, power or privilege hereunder shall operate as a waiver of such right, power or privilege, and no single or partial exercise of any such right, power or privilege shall preclude any other or further exercise of any such right, power or privilege or the exercise of any other right, power or privilege." Id. at ¶ 9.4.
- The SPA's terms "may be amended only by a written instrument signed by the Parties or, in the case of a waiver, by the Party waiving compliance." Id. at ¶ 9.6.

At the time Nascent executed the SPA, Nascent knew that Targa's accounts payable exceeded $150,000, and that Targa faced tax liabilities and liens that could freeze Targa's inventories and bank accounts. Nascent also knew that Targa had pending labor disputes and owed its employees bonuses. On or about February 10, 2010, Nery's executed a Promissory Note ("Nery's Note") payable to Nascent in the amount of $1,850,000, with 10% interest per annum as required under the SPA. The Nery's Note incorporated by reference the SPA's terms, as reflected in Paragraph 5, which required Nery's to "strictly" perform in the

12

manner provided by "any agreement including but not limited to the Stock Purchase Agreement related to this Note."

On or about February 10, 2010, Piancone, on behalf of Targa, executed a "Subsidiary and Affiliate Guarantee" ("Guarantee") for the Nery's Note on behalf of Nascent as the "Lender," which provided that Targa may assert a defense that Nascent committed fraud or misconduct.

Genesis, neither a party to the SPA, Nery's note, nor the Guarantee, executed a Collateral Assignment of Contracts with Nascent.  As a result, Genesis was Nascent's assignee entitled to receive payments due by Nery's to Nascent under the Nery's Note until Nascent's obligation under the Nascent Note was satisfied.  According to Paragraph 5 of the February 10, 2012 Collateral Assignment of Contracts ("Assignment") executed by and between Nascent, the assignor, and Genesis, the assignee: "[u]ntil all Obligations to [Genesis] have been satisfied by [Nascent] in full, [Nery's] will be instructed to remit payment directly to [Genesis] on behalf of [Nascent] . . . . Any excess funds received by [Genesis] under the Contracts, in excess of the Obligations, shall be remitted back to [Nascent]. . . ."    In essence, Genesis stands in the shoes of Nascent with respect to any defense that Nery's may assert under the Nery's note or the SPA.

At the time Genesis executed the Assignment, Genesis knew that Targa faced tax liabilities and liens that could freeze Targa's inventories and bank accounts, and neither Genesis nor Nascent disclosed to Nery's that Targa faced such tax liabilities and liens that could freeze Targa's inventories and bank accounts.

ER55

On February 10, 2010, Nery's executed a Direction Letter with Nascent, in which it agreed to send payments under the Nery's Note to Genesis directly. Nery's did not have any direct obligation to Genesis.

At the time the SPA was executed on February 10, 2010, Targa's accounts payable exceeded $850,000 in violation of Nascent's representation and warranty at ¶¶ 2.2; 3.8(a), (c) of the SPA. In violation of Nascent's representation and warranty at ¶ 3.10 of the SPA, Nery's was unable to collect on approximately $33,714 in accounts receivable that existed before February 2010. In violation of Nascent's representation and warranty at ¶ 3.11 of the SPA, Nascent failed to disclose that Targa faced labor disputes with multiple Targa employees dating back to 2009. In violation of Nascent's representation and warranty at ¶ 3.12 of the SPA, Nascent failed to disclose that Targa did not fund legally mandated employee vacation and bonus benefits in 2009. In violation of Nascent's representation and warranty at ¶ 3.13 of the SPA, Nascent failed to disclose that Targa faced multiple, large tax liabilities and liens for taxes and fines incurred of approximately $390,000 before February 2010 that threatened to shut Targa's doors. In violation of ¶ 6.5(b) of the SPA, Nascent failed to indemnify and defend Nery's for the tax liabilities and liens it faced on behalf of Targa after Nery's timely advised Nascent in writing and verbally of the obligation. In violation of ¶ 6.7 of the SPA, Nascent failed to pay any transfer taxes related to Nery's purchase of the Targa stock. In violation of ¶ 8.1(a) of the SPA, Nascent failed to defend and indemnify Nery's for the losses caused by Nascent's breach of the representations and warranties.

ER56

On February 23, 2010, Nery's learned that Targa was responsible for paying on a $50,000 loan (plus interest) owed to IFS/Robert Piancone. To date, Nery's has paid over $51,900 on this liability.

In March 2010, Nery's received notice that Instituto Mexicano del Seguro Social ("IMSS") and Servicio de Administración Tributaria ("SAT") had threatened to seize Targa's assets and freeze its accounts for unpaid social security benefits from 2009. Targa's liability to IMSS was for over $21,000. This liability remains pending. In March 2010, Nery's also received notice that SAT had threatened to seize Targa's assets and freeze its accounts for unpaid social security benefits and tax liabilities fines from 2009. Targa's liability to SAT totaled over $6,915. After nearly a year of negotiation, Nery's paid this liability in full.

In March 2010, Nery's received notice that INFONAVIT had threatened to seize Targa's assets and freeze its accounts for multiple unpaid housing/withholding taxes and fines from 2006-2009. Targa's liability to INFONAVIT was for over $35,000. After months of negotiations with INFONAVIT, Nery's paid over $30,000 for these liabilities.

In March 2010, Nery's hired attorneys to address the IMSS, SAT and INFONAVIT tax liabilities that threatened to effectively shut down the business. In March 2010, Nery's paid over $15,500 to these attorneys. In all, Nery's has paid over $17,500 to attorneys to address these tax liabilities.

In March 2010, Nery's received notice that Targa failed to pay employee vacation time and payroll bonus for 2009 for $7,775.35. Nery's paid these liabilities in full by June 2010. In March 2010, Nery's hired Targa's former accountant to audit all of Targa's outstanding liabilities.

ER57

On or about April 1, 2010, Nery's was informed that Targa owed over $88,000 for rent incurred between February 2009 and February 2010. Nery's made its first monthly payment for over $3,000 on this liability on March 3, 2010 and has paid this liability in full.

On April 6, 2010, Targa's former accountant provided Nery's with an audit of all of the liabilities incurred by Targa before February 2010. According to the audit, Targa had over $370,000 in accounts payable as of February 2010. This $370,000 amount did not include the $50,000 loan to IFS/Piancone, the full amount of outstanding tax liabilities and liens, nor employee labor obligations.

On May 17, 2010, Nery's received notice that Ex-Im Bank demanded $149,250.81 to satisfy a 2009 vendor debt owed by Targa. This liability was included in the April 6, 2010 liabilities audit.

On or about July 30, 2010, Targa received a notice of a $285,000 lien from SAT for customs tax penalties incurred by Targa in 2007. This lien was uncovered and presented to Nery's in September of 2010 by a potential investor, who refused to finance Targa because of this lien. The lien was not removed from the registry until after April 2011.

In August 2010, Nery's was notified of another vendor liability incurred by Targa before 2010 that totaled $52,852. This liability was not included in the April 6, 2010 liabilities audit.

In 2010, Nery's hired an outside accounting firm, Deloitte, to further audit Targa's books and records. Deloitte informed Nery's that under Mexican tax law, if Nascent failed to pay the transfer tax related to the sale of Targa stock to Nery's, Targa would be responsible for the tax liability, which is currently estimated at $500,000. A formal notice was provided to Nery's in January 2012.

ER58

The Mexican tax authorities have yet to levy on this tax.  This potential liability was not included in the April 6, 2010  liabilities audit or the amount in accounts payable earlier set forth.

On August 24, 2011, Nery's was notified that a judgment for $37,544 was entered against Targa for failure to pay employee severances in 2008 and 2009.  This judgment was eventually overruled.  To date, Nery's has paid or dismissed over $580,000 in accounts payables incurred by Targa before February 2010.

Nery's kept Genesis informed about the excess in accounts payables both by forwarding documentation of said liabilities and in discussions with Piancone and Alvarez.  Nery's substantially complied with any requirement under the SPA to provide written notice and request for indemnification.  Nascent, through Piancone, advised Nery's that Nascent was unable to provide Nery's with indemnification.  By April 24, 2010, Genesis knew that Targa's accounts payables totaled over $300,000.  Genesis also knew about the $285,000 tax lien that prevented Nery's from raising additional capital for Targa.  Genesis never offered to indemnify Nery's for Nascent's breaches of the SPA.  Nery's made two payments to Genesis, as required by the direction letter, in April and May 2010, for $15,416.47 each.  Nery's stopped making payments to Genesis because it needed to address the excess accounts payables and tax liens.  In July 2010, Genesis sent Nery's a Notice of Default on the Nery's Note.  In a "Nascent Valuation Memorandum" drafted by Doede dated December 31, 2010, Genesis recognized that the excess accounts payable was material, and that Nery's had to address the tax lien.  In January 2011, Nery's made another $15,616.47 payment to Genesis, for a total of $46,250.01.

**LEGAL STANDARDS AND CONCLUSIONS OF LAW**

17

**Breach of Contract**

In order to recover for breach of contract, a plaintiff must plead and prove: "(1) the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to plaintiff." Armstrong Petroleum Corp. v. Tri-Valley Oil & Gas., 116 Cal. App. 4th 1375, 1392 (Cal. Ct. App. 2004) (quoting Careau & Co. v. Security Pacific Business Credit, Inc., 222 Cal. App. 3d 1371, 1388 (1990)); see also Witkin, Summary of Cal. Law (10th ed. 2005) Contracts § 847.

An assignee under a contract "stands in the shoes" of an assignor with rights and remedies subject to the defenses that may be asserted against the assignee by the obligor. See Witkin, Summary of Cal. Law (10th ed. 2005) Contracts § 735 (citing Cal. Civ. Code § 1459).

A material breach of contract provides an injured party a right to damages or the right to refuse further performance. See Witkin, Summary of Cal. Law (10th ed. 2005) Contracts §§ 852-53.

A party to a contract may rescind when:

- that party's consent to the contract was given by mistake or through fraud (Cal. Civ. Code § 1689(b)(1)); or
- a material breach by the other party results in a failure of consideration, total or partial (Cal. Civ. Code § 1689(b)(2)); or
- the consideration for the obligation of the rescinding party, before it is rendered to him, fails in a material respect from any cause (Cal. Civ. Code § 1689(b)(4)).

Fraud in the inducement is a misrepresentation involving a contract in which "the promisor knows what he or she is signing but consent is induced by

fraud." <u>McClain v. Octagon Plaza, LLC</u>, 159 Cal. App. 4th 784, 792 (2008) (citing 1 Witkin, Summary of Cal. Law (10th ed. 2005) Contracts, § 297). "A party may claim fraud in the inducement of a contract containing a provision disclaiming any fraudulent misrepresentations and introduce parol evidence to show such fraud." <u>Ron Greenspan Volkswagen, Inc. v. Ford Motor Land Dev. Corp.</u>, 32 Cal. App. 4th 985, 992-95 (1995). Fraud in the inducement renders the entire contract voidable and subject to rescission. <u>See</u> <u>id.</u> at 996.

To establish a rescission claim, the party rescinding the contract must give notice to the other party promptly upon discovering the facts that entitle him to rescind. <u>See</u> Cal. Civ. Code § 1691(a). The rescinding party must also return or offer to return any consideration received from the other party under the contract. <u>See</u> Cal. Civ. Code § 1691(b).

As found above, Genesis stands in the shoes of Nascent, and is subject to the defenses Nery's has against Nascent. The court concludes Nascent materially breached the SPA it entered into with Nery's and, furthermore, the breaches were immediate upon execution of the SPA. The breach was multifaceted, consisting of several failures by Nascent, many of which would serve as an independent basis for breach.

Nascent represented that the accounts payable (interchangeable with "liabilities") did not exceed $150,000. In truth, total liabilities claims exceeded over $800,000, over $550,000 of which were paid or negotiated by Nery's. Within two months of executing the SPA, Nery's first learned of pre-existing liabilities exceeding $300,000 over and above the $149,000 disclosed bank liabilities earlier incurred by Targa to purchase product. The misrepresentations

ER61

regarding accounts payable/liabilities by Nascent were grossly negligent,[2] if not reckless, and consisted of a material breach of the contract excusing further performance by Nery's, and independently constituting a basis for rescission.

Nascent further represented in the SPA that all of Targa's accounts receivable were collectible. In truth and in fact, they were not and, under the circumstances of Nery's acquiring Targa on such a precarious basis with only $300,000 cash to resurrect the moribund Targa, this misrepresentation constituted a material breach and was sufficient to justify rescission.

Nascent further represented in the SPA that all labor costs and liabilities were paid and/or fully funded. In truth and in fact, they were not and, given that almost $50,000 was due under the circumstances discussed above, this misrepresentation constituted a material breach and was sufficient to justify rescission.

In addition, Nascent represented that no tax liabilities or liens existed. In truth and in fact, at the time the parties entered into the SPA, approximately $285,000 of such obligations of Targa existed, constituting another grossly negligent or reckless misrepresentation by Nascent which was material at the time of contract formation and sufficient for rescission by Nery's.

Nascent also represented in the SPA that it would defend, indemnify, and hold harmless Nery's for any loss or liability resulting from a breach of any representation or warranty of the SPA. It is fair to say that this promise, so important to Nery's as it provided for Nery's' sole recourse, was itself breached when Nascent was unable to reimburse Nery's for the most minimal undisclosed

---

[2] The court accepts the undisputed evidence the misrepresentation was not intentional.

20

pre-existing liabilities such as product arrearages to vendors and "front door demands" for past taxes due to be paid in cash. As Cathcart attempted to pass those bills, statements, and demands for payment directly to Nascent through Piancone and Alvarez, Nascent declared its inability to indemnify in even the smallest amounts. The misrepresentations related to indemnification were, under the circumstances, unconscionable on the party Nascent, and the indemnification remedy itself totally illusory and fictional. All of those representations were material and of themselves sufficient to justify rescission. Further material breaches were committed by Nascent regarding the transfer of taxes due by Targa.

The parties have acknowledged that Nascent's breaches were immediate and material. It was absolutely clear to Nascent (and Genesis independently) that Cathcart was attempting to restart Nery's with a marginal cash infusion consisting of $300,000 new investor capital, and that knowledge of Targa's undisclosed liability would have precluded Cathcart from proceeding with the acquisition of Targa through Nery's. The court concludes that any failure of due diligence related to the SPA falls on Nascent's side of the ledger. Had Nascent been committed to making a good faith assessment of Targa's financial standing before making its unconscionable representations in the SPA, it would have revealed, to one degree or another, Targa's tenuous finances and existing obligations. The suspicions of Piancone and Alvarez could have easily triggered an accounting (which came a few months later at Cathcart's insistence), which, in turn, would have disclosed more accurately the financial health of Targa. Nascent could have chosen a caveat emptor stance with Cathcart. But it did not. Nascent went on to make representations, warranties, and promises it could neither honor nor keep and did so in reckless disregard of Nery's reasonable expectations under the SPA.

21

1  Moreover, the evidence discloses that Cathcart reasonably relied upon the

2  personal representations of Piancone that, aside from the $149,000 back

3  obligations, no other liabilities existed, save and except minimal amounts totaling

4  not more than a few hundred dollars.

5      Clearly and convincingly, Nascent should have known its missteps were

6  false, unfounded, and of the type that would induce Nery's, through Cathcart, to

7  enter into the SPA to its detriment.  Although Nascent was under no duty to

8  counsel Nery's, nor to warn Nery's of the slings and arrows of the cheese business

9  in Northern Baja, Mexico, once Nascent made its representations in the SPA, it

10 was under a duty to avoid making negligent and/or reckless inducements to

11 Nery's.

12     As set forth above, Nascent materially breached the SPA in several ways,

13 individually and collectively.  The breach(es), attributed to Genesis, excuse

14 Nery's from performing under the contract.  Genesis, therefore, is not entitled to

15 recover on its breach of contract claim against Nery's or Targa.  Nery's is entitled

16 to judgment on Genesis' contract claim as well as reasonable attorney fees, as

17 provided by law in defending this claim.

18     The court also concludes that Nery's, should it so elect, is entitled to rescind

19 the SPA agreement upon tender of its Targa shares.  Such a remedy will result in

20 Genesis receiving Targa's assets.  Nery's is entitled to restitution of $46,250 from

21 Genesis representing the earlier payments by Nery's to Genesis under the SPA as

22 well as recoverable interest and attorney fees in favor of Nery's.

23                    **Unjust Enrichment Claim**

24     "[I]t is simple equity that a wrongdoer should disgorge his fraudulent

25 enrichment."  Janigan v. Taylor, 344 F.2d 781, 786 (1st Cir. 1965).  However,

22

1   "[w]hen the value of the property held in trust increases significantly because of a
2   defendant's efforts, a constructive trust that passes on the profit of the defendant's
3   labor to the plaintiff usually goes too far." Mattel, Inc. v. MGA Entm't, Inc., 616
4   F.3d 904, 911 (9th Cir. 2010).

5       Under California law, unjust enrichment is an action in quasi-contract.
6   Paracor Fin. v. Gen. Elec. Capital Corp., 96 F.3d 1151, 1167 (9th Cir. 1996).  But
7   a claim for unjust enrichment cannot lie "where a valid express contract covering
8   the same subject matter exists between the parties." Gerlinger v. Amazon.com,
9   Inc., 311 F. Supp. 2d 838, 856 (N.D. Cal. 2004).

10      Here, a valid contract was formed.  Moreover, no evidence indicates that
11  Nery's was unjustly enriched.  To date, the court finds that Nery's has expended
12  in excess of hundreds of thousands of dollars to liquidate Targa's undisclosed
13  obligations.  Although it appears that revenues substantially increased, no
14  evidence indicates that profit levels increased after Nery's' acquisition of Targa.
15  The court therefore concludes that Nery's is entitled to judgment on Genesis'
16  claim of unjust enrichment.

17                              **CONCLUSION**

18      Based on the applicable law, the evidentiary record before the court, and the
19  foregoing analysis with findings, the Court finds in favor of said Defendants and
20  each of them and against Plaintiffs on all claims. Defendants are to prepare a
21  judgment.

22      **IT IS SO ORDERED.**
23  DATED: July 26, 2013

24                                          _Jeffrey T. Miller_
                                            Jeffrey T. Miller
25                                          United States District Judge

ER65

1

2

3

4

5

6

7

8             **UNITED STATES DISTRICT COURT**

9         **FOR THE SOUTHERN DISTRICT OF CALIFORNIA**

10  GENESIS MERCHANT PARTNERS, LP, a        Case No.  11CV1589 JM WVG
    Delaware corporation,                   *Complaint Filed 7/19/11*
11
                    Plaintiff,              **PRETRIAL ORDER**
12  v.
                                            Date:        May 31, 2013
13  NERY'S USA, INC., a Nevada corporation; Time:        8:30 a.m.
    JOHN CATHCART, an individual; and       Ctrm:        5d
14  COMMERCIAL TARGA, S.A. DE C.V., a
    Mexican corporation;                    Judge Jeffrey T. Miller
15                                          Magistrate Judge Hon. William V. Gallo
                    Defendants.
16                                          Trial Date:  June 24, 2013
    NERY'S USA, INC., a Nevada corporation, Time:        10:00 a.m.
17
                    Counterclaimant,
18  v.

19  GENESIS MERCHANT PARTNERS, LP, a
    Connecticut corporation,
20
                    Counter-Defendant,
21
    NERY'S USA, INC., a Nevada corporation,
22
                    Third Party Complainant,
23  v.

24  NASCENT WINE COMPANY, INC., a
    Nevada corporation,
25
                    Third Party Defendant.
26

27

28

**ER66**

1  Following pretrial proceedings pursuant to Fed. R. Civ. P. 16 and Civil Local Rule 16.1.f.6,

2  IT IS ORDERED:

3  # I.

4  ## THE ACTION

5  **A.   PARTIES:**

6  Plaintiff:
7  GENESIS MERCHANT PARTNERS, LP, a Delaware corporation ("Genesis")
   Counsel:  Jerry D. Hemme

8  Defendant:
   COMMERCIAL TARGA, S.A. DE C.V., a Mexican corporation ("Targa")
9  Counsel: Mark C. Mazzarella and Christopher L. Walters

10  Defendant/Counterclaimant/Third Party Complainant:
    NERY'S USA, INC., a Nevada corporation ("Nery's")
11  Counsel: Mark C. Mazzarella and Christopher L. Walters

12  Defendant/Counterclaimant:
    JOHN CATHCART ("Cathcart")
13  Judgment entered in favor of John Cathcart pursuant to Order on Motion for
    Summary Judgment [Docket No. 111]

14

15  Third Party Defendant:
    NASCENT WINE COMPANY, INC., a Nevada corporation ("Nascent")
    Default entered, but no default judgment [Docket No. 58]

16

17  **B.   NATURE OF ACTION:**

18  This is an action by Genesis to collect on a promissory note partially assigned to it as

19  collateral by Nascent.  Nery's is the obligor on the Note to Nascent ("Nery's Note") and Targa is

20  the guarantor.  The Nery's Note arose from the Stock Purchase Agreement whereby Nery's

21  purchased virtually all shares of Targa stock from Nascent.  The Nery's Note has not been paid in

22  full.  Nery's alleges that Nascent has breached the Stock Purchase Agreement. The pleadings

23  which raise the issues are the complaint (Docket No. 1), the answer (Docket No. 7) and the Third

24  Party Complaint (Docket No. 9).

25  # II.

26  ## FEDERAL JURISDICTION AND VENUE

27  Federal jurisdiction and venue are invoked upon the following grounds:  Jurisdiction is

28  provided by 28 U.S.C. § 1332(a)(1) and (2) in that the matter in controversy exceeds $75,000

ER67

1   exclusive of interest and costs and is between citizens of different states.  Venue lies in this district

2   pursuant to 28 U.S.C. § 1391(b)(2).

### III.

### FACTS NOT IN DISPUTE

The following facts are admitted and require no proof:

1. All operative agreements were executed by the parties as indicated and are authentic (although there may be a dispute regarding what schedules, if any, were attached to certain documents).

2. In April 2010, May 2010 and January 2011, Nery's made separate equal payments of $15,416.67, totaling $46,250.01 to Genesis towards the Nery's Note.

### IV.

### RESERVATIONS AS TO FACTS

The reservations as to the facts recited in paragraph III above are as follows:  None.

### V.

### FACTS NOT ADMITTED

The following facts, though not admitted, are not to be contested at the trial by evidence to the contrary:

1. Genesis is a Delaware corporation that operates as an investment fund.  As a part of its portfolio, Genesis makes loans to businesses.

2. In 2008, Nascent owned and operated various food distribution companies.

3. On or about March 31, 2008, Nascent borrowed $1,000,000 from Genesis.

4. The loan was evidenced by a written promissory note dated March 31, 2008 between Genesis and Nascent.  The payment terms were:  The loan was due in 360 days when all accrued interest and 115% of the principal was due and payable; the interest accrued at the rate of 14% per annum (the "Nascent Note").

5. The Nascent Note was secured by all the assets of Nascent.

6. Nascent did not pay off the loan balance when it became due and requested an extension of time.

ER68

7. On or about March 31, 2009, the parties modified the loan agreement to extend the term of the loan and change the payments that would be due.

8. Sandro Piancone was the president of Nascent and the representative of Nascent who negotiated with Genesis for the Nascent Loan.

9. John Cathcart was a mergers and acquisitions consultant. In 2007, Piancone retained Cathcart as a consultant to help Nascent with the acquisition of companies in the food distribution business.

10. Cathcart was a member of Nascent's Board of Advisors in the area of finance and business development for a limited period of time. Cathcart also became a shareholder in Nascent.

11. From 2006 to early 2008, Nascent acquired nine companies. One of the companies that Nascent acquired was Commercial Targa, S.A. DE C.V., a Mexican Corporation ("Targa"), which it acquired in October 2007.

12. Piancone became the "Director General" of Targa.

13. Targa was a cheese distribution company in Northern Baja, Mexico which sold cheese under the brand name Nery's. The Nery's brand name had been developed over 25 years by a family business in Northern Baja, Mexico. Targa also held one of three permits, of a particular type, issued in Mexico to import tobacco. At the time Nascent acquired Targa in 2007, it had approximate sales of $7,000,000 per year and a net profit of $1,200,000.

14. Genesis' security interest in Nascent's assets included Targa and the Nery's brand.

15. In early 2009, Piancone contacted Cathcart and discussed Piancone's efforts to turn Nascent around. In the course of their discussions, Cathcart asked Piancone about acquiring a license to promote and sell the Nery's brand in the United States.

16. On or about June 23, 2009, Nascent entered into a licensing agreement with Nery's USA, Inc. a Nevada corporation ("Nery's") to sell Nery's cheese in the United States.

17. Targa already had a licensing agreement concerning the sales of Nery's cheese in Mexico with a company known as Zahava. The license agreement provided that Zahava would pay Targa a royalty for the use of the Nery's brand.

18. In mid-2009, Nascent was experiencing severe financial difficulties, due in large part to lack

ER69

of operating capital.  Genesis was aware of these financial difficulties.

19. As of March 2009, the outstanding balance on the Nascent Note was $1,150,000.  Nascent made no payments on the Nascent Note after August 2009.  Genesis had the option of defaulting Nascent and collecting on the collateral under the Note, which included Targa. Genesis chose not to avail itself of this option.

20. Cathcart was consulting with Piancone in the first half of 2009 concerning Nascent's financial problems.

21. On or about July 8, 2009, Nascent and Nery's entered into a letter of intent agreement for the purchase of the stock in Targa.

22. At the time Nery's agreed to purchase Targa, the business was in financial trouble.

23. As a result of Genesis' security interest, Nascent could not sell Targa to Nery's without the consent of Genesis.

24. Nery's initial plan was to obtain equity to pay off the Nascent Note by raising capital from investors.  From July to September 2009, Piancone and Nery's sent out inquiries to investors and brokers soliciting capital investments.  They were not able to procure sufficient capital for this purpose.

25. The parties considered several different alternatives for structuring the transaction.  Nery's and Cathcart had direct discussions with Genesis concerning the sale of Targa.

26. On or about February 10, 2010, the parties reached an agreement concerning the sale of Targa.  Nascent and Targa entered into a written Stock Purchase Agreement with Nery's by which they sold to Nery's 99% of the stock in Targa and sold and agreed to assign its rights to the Nery's brand.

27. As of February 10, 2010, Genesis and Nascent both knew that Nery's would be investing only $300,000 of new capital into Targa.

28. On or about February 10, 2010, Nery's executed a Promissory Note in favor of Nascent in the amount of $1,850,000 ("Nery's Note").  Nascent did not issue any funds to Nery's in connection with the Nery's Note.  Genesis has never paid or lent any money to Nery's.

ER70

29. Targa signed a written Subsidiary and Affiliate Guarantee Agreement dated February 10, 2010.

30. Nascent signed an Assignment dated February 10, 2010 in favor of Genesis.

31. In connection with this assignment, Nery's executed a Direction Letter, dated February 10, 2010.

32. If Genesis is entitled to recover under the Nery's Note, the amount of its recovery is limited to the amount Nascent would owe under the Nascent Note.

## VI.

## DISPUTED FACTS

The following issues of fact, and no others, remain to be litigated upon the trial:

1. Is the Nascent Note in default? If so, at what point in time was Nascent in default?

2. Did Nascent fail to disclose to Nery's the correct amount of liabilities of Targa at the time of the sale?

3. If Nascent failed to disclose the correct amount of liabilities of Targa, what is the amount of liabilities that should have been disclosed?

4. Did Nascent fail to resolve all Targa liabilities in excess of $150,000? If so, in what amount? Were the amounts in excess of $150,000 material?

5. Was Nascent obligated to resolve the Targa liabilities in exceed of $150,000?

6. What amount of Targa liabilities, for pre-February 2010 activity, has Nery's paid, resolved, or otherwise assumed? What other indirect costs were paid by Nery's?

7. Did Nascent negligently misrepresent that all of Targa's accounts receivables and outstanding royalty payments were fully collectible?

8. Did Nascent negligently misrepresent that Targa was a viable business?

9. Did Nery's justifiably rely upon the representations by Nascent concerning Targa at the time of the sale?

10. If Nery's is not excused from performance under the Nery's Note, what is the amount that it owes to Genesis? What amount, if any, of offset is Nery's entitled to on such payment to Nascent?

ER71

11. What damages has Nery's suffered as a result of Nascent failing to address and resolve Targa's liabilities in excess of $150,000?

12. Genesis had extensive contact with Nascent, Targa and Piancone during the relevant time period and obtained extensive documentation and information concerning Nascent and Targa's operations, including review of financials and future plans.

13. Nascent sought to increase the amount of the Nascent Note and obtain a larger loan from Genesis, but Genesis refused to increase the Nascent Note.

14. Nascent sought money from Genesis to be used to purchase cigarettes to generate revenue and Genesis refused to advance those funds.

15. Genesis was also involved in strategizing with Nascent regarding a solution to the financial problems, and a manner in which the Nascent Note could be repaid; all parties came to the conclusion that Nascent had to sell Targa, its most valuable asset.

16. Genesis conducted an investigation and attempted to secure a buyer for Nascent or Targa and Genesis was unsuccessful in its search.

17. Due to lack of operating capital and poor management, Targa's reputation had suffered serious injury.  It would require significant working capital and addressing the misuse of the Nery's brand by Zahava to rebuild the Nery's brand.

18. From October 2009 – January 2010, there were no discussions or negotiations between Nery's, Cathcart on the one hand and Nascent, Targa, Genesis or Piancone on the other hand concerning Nery's possible purchase of Targa.

19. Genesis was aware of the serious financial difficulties faced by Targa and extensive outstanding liabilities owed by Targa.  Some of this information was not shared with Nery's prior to the Stock Purchase Agreement.  All parties were aware that any successful effort to revive Targa would require significant working capital to acquire cheese and cigarettes.

20. In a January 2010 internal valuation memo, Genesis estimated the value of Targa at $550,000 on the assumption that Targa had $150,000 in outstanding liabilities.  At that time, Nascent owed $1,100,000 under the Nascent Note.

21. In February 2010, Targa lacked necessary capital to continue operations.  Targa was in the

ER72

1     position of likely declaring bankruptcy in a matter of weeks.

2    22. There were no other viable purchasers of Targa, except Nery's and Cathcart, and Genesis

3        was unwilling to invest any more capital into Targa.

4    23. Cathcart had the opportunity to conduct an independent investigation into the viability of

5        Targa over the seven month period between the Letter of Intent and the Stock Purchase

6        Agreement. He had complete access to the company records and employees.

7    24. All parties understood how critical operating capital was to Targa, and that it was risky for

8        Nery's to purchase Targa and commence operations with $150,000 in liabilities and only

9        $300,000 in capital.

10   25. Nascent and Piancone told Nery's and Cathcart that they would resolve all liabilities in

11       excess of $150,000. Nery's entered into the Stock Purchase Agreement and related

12       documents relying on this representation.

13   26. After the execution of the Stock Purchase Agreement, Nery's was presented with liabilities

14       of Targa which exceeded $150,000. Nascent and Genesis did not take steps to resolve these

15       liabilities or to contribute capital to replace Nery's working capital that was spent, and

16       Nery's was therefore required to pay or otherwise resolve these liabilities. Many of these

17       liabilities threatened Targa's operations, including government liens and eviction from the

18       operation facility.

19   27. Nery's management devoted significant capital and time addressing these liabilities. Nery's

20       use of its limited funds to address these liabilities damaged Nery's and interfered with the

21       company's business plan and operations.

22   28. On April 20, 2011 and June 28, 2011, Institutor Mexicano del Seguro Social (IMSS)

23       presented claims totaling $274,728.62 Mx Pesos ($21,071.34 in USD) for unpaid social

24       security by Targa for the time period 1/2009 through 2/2010. Neither Nascent nor Genesis

25       has ever paid or resolved this liability.

26   29. Targa had failed to make timely rent payments prior to the Stock Purchase Agreement and

27       the owner of the property where Targa operated presented a claim for $88,301.69 USD in

28       back rent for the time period February 2009 – February 2010. Neither Nascent nor Genesis

ER73

paid or resolved this amount. Nery's negotiated a payment plan with the property owner and paid this entire amount over the time period June 2010 – May 2012.

30. Targa had back tax fines owed to Servicio de Administracion Tributaria (SAT) totaling $92,458.00 Mx Pesos ($7,091.43 USD) for activity during the April 2009 to February 2010 time period. Neither Nascent nor Genesis paid or resolved any of this liability. Nery's has paid at least $6,915 USD of this amount.

31. SAT presented a claim for unpaid customs-related penalties for pre-February 2010 activity totaling $3,719,641 Mx Pesos ($285,290.30 USD). Neither Nascent nor Genesis paid or resolved this amount. Nery's retained an attorney who negotiated and resolved this liability.

32. Targa had unpaid employee housing taxes for the pre-February 2010 time period totaling $302,409.41 Mx Pesos ($23,194.50 USD). Neither Nascent nor Genesis paid or resolved these taxes. To date, Nery's has paid $14,535.37 to address these unpaid taxes.

33. Targa had failed to pay required vacation amounts for 2009 work totaling $29,374.91 Mx Pesos ($2,253.03 USD). Neither Nascent nor Genesis paid or resolved these liabilities. Nery's paid $29,374.91 ($2,253.00 USD) to these employees to resolve this liability.

34. Targa had failed to make required "Aguinaldo" employee payments for 2009 totaling $72,000 Mx pesos ($5,522.32 USD). Neither Nascent nor Genesis paid or resolved these liabilities. Nery's paid $5,522.32 USD to the employees to resolve this liability.

35. In March 2010, Targa employees presented labor claims for amounts owed. Neither Nascent nor Genesis paid or resolved these disputes. Nery's retained an attorney to resolve these amounts and has paid $2.354.66 USD, but there are still unresolved liabilities.

36. Since at least 2009, Ex-IM Bank has asserted a claim against Targa for $149,250.81. Neither Nascent nor Genesis has paid or resolved this claim. This liability remains outstanding and has negatively affected Targa's operations.

37. Targa was presented with additional unpaid housing tax for the 2009 time period totaling $227,695.00 Mx pesos ($17,463.96 USD). Neither Nascent nor Genesis paid or resolved this claim. Nery's paid this entire amount.

38. Targa had unpaid U.S. dollars accounts payables of $238,837.29 for pre-February 2010

ER74

1    activity.  Neither Nascent nor Genesis paid or resolved these liabilities.  Nery's has paid

2    $118,499.00 of this amount.

3  39. Targa had unpaid Mexican pesos accounts payables of $1,389,156.63 Mexican pesos

4    ($106,546.79 USD).  Neither Nascent nor Genesis paid or resolved these liabilities.  Nery's

5    has paid or resolved $32,119.14 USD of these liabilities.

6  40. Targa was presented with a judgment for severance payments totaling $489,510.61 Mexican

7    pesos ($37,544.93 USD) for pre-February 2010 activity.  Neither Nascent nor Genesis paid

8    or resolved this liability.  This liability remains outstanding.

9  41. Nascent has failed to pay taxes on the sale of the Targa stock to Nery's.  Nascent faces tax

10    liabilities up to $500,000 but has failed to pay any such taxes.  Targa is liable for any

11    claimed taxes which Nascent fails to pay.

12  42. States taxes totaling $79,903.32 Mexican pesos ($6,128.49 USD) were unpaid by Nascent or

13    Targa for the pre-February 2010 time period.   Neither Nascent nor Genesis has paid these

14    taxes.  Nery's has paid $14.134.32 Mexican pesos ($1.084.09 USD) but there is an

15    outstanding balance of $35,947.74 USD.

16  43. Within a month after the sale closed, Cathcart claimed he became aware of liabilities owed

17    by Targa that were not disclosed and predated the sale.  According to Cathcart, the liabilities

18    of Targa totaled $930,604.16, not the $150,000 Piancone/Targa had represented to Cathcart.

19  44. Piancone believed that the liabilities of Targa did not exceed $150,000 at the time of the

20    sale.  He relied upon Targa's accountants for financial information to make the

21    representation that the liabilities of Targa did not exceed $150,000.

22  45. Nery's requested Genesis's assistance with these liabilities, including renegotiation of the

23    Nery's Note, but Genesis refused to provide any financial assistance or relief.

24  46. At the time of the Stock Purchase Agreement, Targa's operations were limited to the cheese

25    and cigarette businesses.

26  47. At the time of the sale, Nery's was aware that the Targa financials were incomplete and

27    probably inaccurate.  For that reason, it insisted that Nascent resolve all liabilities exceeding

28    $150,000 and shifted the due diligence responsibilities to Nascent to identify and resolve

ER75

any additional liabilities.  Nery's knew that the Targa financials it was provided were unaudited, unreliable and incomplete.

48. As a sophisticated venture capitalist/financial consultant with 30 years in the business and with his experience dealing with distressed companies, Cathcart knew that there was a likelihood that not all liabilities were disclosed by Targa's unaudited financial statements. Further, he knew that Piancone was not always accurate.

49. In March 2010, Zahava made an offer to Targa to purchase the Nery's trademark for $100,000.

50. Since the beginning of 2011, Targa has been operating profitably, has positive cash flow and generating revenues in the millions of dollars.

## VII.

## EXHIBITS

The exhibits to be offered at the trial are as follows:

| Number | Date Marked | Date Admitted | Description |
|---|---|---|---|
| 1 | | | Nascent Note dated 3/31/2008 |
| 2 | | | Letter from S. Piancone to T. Doede & C. Kelly re loan extension dated 9/29/2008 |
| 3 | | | E-mail from T. Doede to S. Piancone with revised Nascent Wine Draft Term Sheet dated 3/31/2009 |
| 4 | | | Amendment to Secured Promissory Note and Related Amendments, between Nascent Wine Company, Inc. & Genesis Merchant Partners date 3/31/2009 |
| 5 | | | Nery's USA, Inc Executive Summary circa 6/2009 |
| 6 | | | Nascent Brands Executive Overview circa 6/2009 |
| 7 | | | License Agreement between Nascent Wine Company, Inc & Nery's USA, Inc. dated 6/24/2009 |
| 8 | | | Letter of Intent from J. Cathcart on behalf of Nery's USA to S. Piancone on behalf of Nascent Wine Company, Inc. dated 7/08/2009 |
| 9 | | | E-mail string from S. Piancone re looking for a financial partner dated 8/03/2009 |
| 10 | | | E-mail string between S. Piancone & N. Anderson re financial partnership dated 8/06/2009 |
| 11 | | | E-mail string between S. Piancone & F. Lopez re financial partner dated 8/12/2009 |
| 12 | | | E-mail from J. Cathcart to T. Doede re Nery's forecast (consolidated balance sheet attached) dated 9/09/2009 |
| 13 | | | E-mail string re Targa acquisition & Nascent loan (Nery's term sheet attached) dated 9/29/2009 |

ER76

| | | | |
|---|---|---|---|
| 14 | | | E-mail from T. Doede to J. Cathcart re Nery's USA Draft Term Sheet dated 10/14/2009 |
| 15 | | | E-mail from S. Piancone to T. Doede re cigarette financing dated 10/25/2009 |
| 16 | | | E-mail from J. Cathcart to T. Doede re assuming notes dated 10/29/2009 |
| 17 | | | Fax from J. Cathcart to T. Doede re Term Sheet adjustment dated 11/16/2009 |
| 18 | | | E-mail from J. Cathcart to T. Doede re financial help to S. Piancone dated 12/23/2009 |
| 19 | | | E-mail from J. Cathcart to T. Doede re Targa Purchase terms dated 1/29/2010 |
| 20 | | | E-mail from T. Doede re e-mail from J. Wells to G. Agron dated 2/01/2010 |
| 21 | | | E-mail from J. Cathcart to J. Wells re Stock Purchase Agreement dated 2/05/2010 |
| 22 | | | Stock Purchase Agreement by and among Nery's USA, Nascent Wine Company, Inc, and Commercial Targa dated 2/10/2010 |
| 23 | | | Promissory Note- Nascent lending to Nery's dated 2/10/2010 |
| 24 | | | Subsidiary & Affiliate Guarantee dated 2/10/2010 |
| 25 | | | Direction letter re payments pursuant to Note dated 2/10/2010 |
| 26 | | | Collateral Assignment of Contracts dated 2/10/2010 |
| 27 | | | E-mail from T. Doede to J. Cathcart re Nascent Payment Schedule dated 2/22/2010 |
| 28 | | | E-mail from T. Doede to himself re notes on conversation with J. Cathcart dated 4/24/2010 |
| 29 | | | Letter from J. Wells to J. Cathcart/ Nery's USA re default under Promissory Note dated 7/29/2010 |
| 30 | | | E-mail string between T. Doede & J. Cathcart re investor meeting & address dated 8/03/2010 |
| 31 | | | E-mail from S. Piancone to F. Carrizosa re contract with Targa dated 9/08/2010 |
| 32 | | | E-mail from J. Cathcart to T. Doede re law suit against tax authority to stop seizure of assets dated 9/08/2010 |
| 33 | | | Nery's USA Profit & Loss Statement dated 1/10- 9/10 |
| 34 | | | E-mail from S. Piancone to J. Cathcart re draft e-mail to Carrizosa dated 10/10/2010 |
| 35 | | | E-mail from J. Cathcart to S. Piancone re draft e-mail to Carrizosa with changes dated 10/10/2010 |
| 36 | | | E-mail from S. Piancone to Carrizosa re addressing concerns dated 10/10/2010 |
| 37 | | | E-mail draft from J. Cathcart to "Laura" re concerns dated 10/20/2010 |
| 38 | | | E-mail from J. Cathcart to J. Carlos re SAT Lien against Targa dated 10/20/2010 |
| 39 | | | E-mail from J. Cathcart to S. Piancone re e-mail to V. De Petris dated 10/29/2010 |
| 40 | | | E-mail from J. Cathcart to S. Piancone re draft e-mail to "Tony" dated 11/08/2010 |

PRETRIAL ORDER

ER77

| 41 | | | E-mail from S. Piancone to J. Cathcart re T. Doede's request for October financials dated 11/12/2010 |
| 42 | | | Nery's USA Balance Sheet dated 11/16/2010 |
| 43 | | | E-mail from T. Doede to C. Kelly re J. Cathcart sending financials dated 12/01/2010 |
| 44 | | | E-mail from T. Doede to J. Cathcart re year end payment dated 12/28/2010 |
| 45 | | | E-mail from J. Cathcart to S. Piancone re Genesis payment dated 12/28/2010 |
| 46 | | | E-mail from D. Bisio to J. Cathcart re Nery's payoff payment reminder dated 3/04/2011 |
| 47 | | | Nery's USA Profit & Loss Statement dated 1/11-3/11 |
| 48 | | | Commercial Targa Profit & Loss Statement dated 1/11-3/11 |
| 49 | | | E-mail from D. Bisio to J. Cathcart re sending most recent balance sheets for fund audit dated 4/18/2011 |
| 50 | | | E-mail from J. Cathcart to D. Bisio re updated balance sheets dated 4/21/2011 |
| 51 | | | E-mail from D. Bisio to C. Kelly & G. Watson re call to J. Cathcart dated 4/26/2011 |
| 52 | | | E-mail string with H. Reyes re lien cancellation dated 4/27/2011 |
| 53 | | | E-mail string between D. Bisio & J. Cathcart re supporting documents for Little Caesar's deal dated 4/29/2011 |
| 54 | | | Commercial Targa Alleged Liabilities incurred prior to 2/2010 |
| 55 | | | Nascent Note Spreadsheet Showing Balance Owed dated 10/31/2012 |
| 56 | | | Nery's USA Note Spreadsheet Showing Balance Owed dated 10/31/2012 |
| 57 | | | Expert Report of Brian Brinig dated 1/14/2013 |
| 58 | | | Summary of collection costs for Grupo Sur, Palermo, Pasanni, and supporting documents |
| 59 | | | E-mail String to & From S. Piancone dated 3/19/2007 |
| 60 | | | U.S. Securities & Exchange Commission Quarterly report for Nascent Wine Company, Inc. dated 3/31/2008 |
| 61 | | | Nascent Wine Company & Genesis Merchant Partners Note Closing Statement & Draft Term Sheet dated 3/31/2008 |
| 62 | | | E-mail from T. Doede to S. Piancone re deal dated 6/19/2009 |
| 63 | | | E-mail from H. Reyes to T. Doede re Targa eviction & IMSS taxes dated 7/31/2009 |
| 64 | | | E-mail from D. Bisio to T. Doede & C. Kelly re Nascent interest forbearance dated 8/14/2009 |
| 65 | | | E-mail string between T. Doede & C. Kelly re draft term sheet changes dated 9/28/2009 |
| 66 | | | E-mail from C. Kelly to D. Bisio re due diligence costs dated 9/30/2009 |
| 67 | | | E-mail string re Nery's USA Draft Term Sheet dated 10/13/2009 |
| 68 | | | E-mail string re Nery's USA Draft Term Sheet changes dated 10/13/2009 |
| 69 | | | E-mail from C. Kelly to T. Doede re Nery's USA Draft Term Changes dated 10/14/2009 |
| 70 | | | Vendor Settlement (Spanish) dated 11/02/2009 |

ER78

| | | | |
|---|---|---|---|
| 71 | | | Nascent Wine Company Valuation by Genesis Merchant Partners dated 2010 |
| 72 | | | E-mail from S. Piancone to A. Maldonado re documents dated 1/11/2010 |
| 73 | | | Genesis Merchant Partners Portfolio Analysis dated 1/31/2010 |
| 74 | | | Nascent Valuation Memo by Genesis Merchant Partners dated 1/2010 |
| 75 | | | E-mail from T. Doede to C. Kelly re Trinity financials & Nascent operations dated 2/08/2010 |
| 76 | | | E-mail from S. Piancone to J. Cathcart re IVA to be returned dated 2/23/2010 |
| 77 | | | E-mail string between T. Doede & C. Kelly re Nascent/ Nery's first payment & interest dated 2/24/2010 |
| 78 | | | Nascent Valuation Memo by Genesis Merchant Partners dated 03/2010 |
| 79 | | | E-mail string re Targa rent (Spanish) dated 4/01/2010 |
| 80 | | | E-mail re accounts payable (Spanish) dated 4/06/2010 |
| 81 | | | E-mail string between J. Cathcart & T. Musick re P&L statements dated 4/12/2010 |
| 82 | | | E-mail from J. Cathcart to S. Piancone re embargo for non-payment (Spanish) dated 4/16/2010 |
| 83 | | | E-mail string between S. Piancone & J. Neelis re "capital to grow" dated 5/13/2010 |
| 84 | | | E-mail from D. Bisio to T. Doede re Nascent payment dated 7/06/2010 |
| 85 | | | E-mail from S. Piancone to J. Cathcart re where to get money dated 7/25/2010 |
| 86 | | | E-mail string re Nascent documents to be translated for Genesis Merchant Partners dated 8/13/2010 |
| 87 | | | E-mail from S. Piancone to F. Carrizosa re Barosso financial interest in Nery's USA & Commercial Targa dated 9/01/2010 |
| 88 | | | E-mail from J. Cathcart to S. Piancone re money & surprises at Targa dated 9/06/2010 |
| 89 | | | E-mail from S. Piancone to J. Cathcart re Barosso contract dated 9/09/2010 |
| 90 | | | E-mail string between H. Reyes & J. Cathcart re legal issues dated 9/28/2010 |
| 91 | | | E-mail from S. Piancone to C. Alvarez re fines (Spanish) dated 10/07/2010 |
| 92 | | | E-mail string re Targa Encumbrance Certificate (Spanish) dated 10/08/2010 |
| 93 | | | E-mail string between J. Cathcart and J. Barosso re Nery's investment dated 11/06/2010 |
| 94 | | | E-mail string re C. Kelly visit to Nery's dated 11/16/2010 |
| 95 | | | E-mail string re financials dated 11/16/2010 |
| 96 | | | E-mail from T. Doede to D. Bisio re investment committee decision on Nascent loan dated 11/17/2010 |
| 97 | | | E-mail from T. Doede to C. Kelly re Nascent owing money to Genesis dated 12/06/2010 |
| 98 | | | E-mail string re Nery's interest check in the amount of $15,416.67 dated 01/03/2011 |

14

ER79

| 99 | | | E-mail string re draft e-mail for Nascent loan dated 2/01/2011 |
| 100 | | | E-mail from C. Kelly to M. Sands & S. Sands re J. Cathcart refusal to disclose Little Caesar's contract for audit dated 5/06/2011 |
| 101 | | | E-mail from D. Bisio to C. Kelly re wire to B. Krueger dated 11/04/2011 |
| 102 | | | Expert Report of Mark Hayden CPA, CFA, ASA dated 1/14/2013 |
| | | | |
| A | | | GEN000349-GEN000407; 3/31/2008 Closing Book: Genesis Merchant Partners, L.P. $1,000,000.00 Note Closing Nascent Wine Company, Inc. |
| B | | | GEN002378-GEN002380; 11/9/2008 Email from T. Doede to Chris Kelly; Peter White; Sandro Piancone re: Direction Letters (AIP & Pasani) documents for signature |
| C | | | NERY0000752-NERY0000753; 3/5/2009 Email from S. Piancone to J. Cathcart re: Names to call |
| D | | | GEN003249-GEN003254; 4/13/2009 Email from T. Doede to Sandro Piancone; Chris Kelly; Douglas Bisio; John Wells re: Nascent documents |
| E | | | NERY0000757-NERY0000759; 8/3/2009 Email from S. Piancone to J. Cathcart re: financial partner |
| F | | | NERY0000766-NERY0000768; 8/12/2009 Email from S. Piancone to J. Cathcart re: Financial partner |
| G | | | NERY0000786-NERY0000787; 9 Email from S. Piancone to J. Cathcart re: referred to Sandro by Brian Kim at Zephyr Management & Executive |
| H | | | NERY0002345-NERY0002346; 9/8/2009 Email from S. Piancone to J. Cathcart re: Prices |
| I | | | GEN000220-GEN000224; 9/29/2009 Email from T. Doede to J. Cathcart; M. Sands; S. Sands & Chris Kelly re: Nery's USA Draft Term Sheet for Targa |
| J | | | GEN001023-GEN001036; 10/6/2009 Email from T. Doede to S. Sands; J. Cathcart & Chris Kelly re: Nery's Draft term Sheet (Nascent) 9-29-09 ($1,244,204 Secured Acquisition Loan) |
| K | | | GEN000220-GEN000224; 2/10/2010 Email from T. Doede to J. Cathcart; M. Sands & Chris Kelly re: Term Sheet for Targa acquisition |
| L | | | NERY000004-NERY000007; 2/10/2010 Email from S. Piancone to T. Doede re: Nery's Targa Purchase; Stock Purchase Agreement |
| M | | | GEN002306; Genesis Merchant Partners Trial Balance |
| N | | | NERY0009690-NERY0009695; 3/23/2010 Email from Reyes Humberto to J. Cathcart re: resolution of 3 lawsuits |
| O, P, Q | | | Intentionally Omitted |
| R | | | NERY0009499; 6/4/2010 Email from Bernice Acosta to Chris Alvarez |
| T | | | NERY000098; 12/23/2010 Email from J. Cathcart to S. Piancone re: Interest Payment |
| U | | | GEN004957-GEN004959; Nascent Wine Company Valuation 2011 |
| V | | | GEN001622-GEN001623; 3/25/2011 Email from Chris Kelly to Gavin Watson re: Nascent Valuation & executed Collateral Assignment |
| W | | | GEN001624-GEN001642; 3/25/2011 Email from D. Bisio to Sal Vicari re: Fully Executed Collateral Assignment of Contracts |

ER80

| | | | |
|---|---|---|---|
| X | | | Targa Historical Income Statement 8/31/2010; 12/31/2010; 3/31/2011; 2011 Annualized |
| Y | | | NERY000333; 4/18/2011 Spanish language spreadsheet |
| Z | | | NERY0009648-NERY0009659; Spanish language spreadsheet |
| AA | | | NERY0009676-NERY0009687; Spreadsheet with attached checks |
| AB | | | GEN000065-GEN000066; 4/21/2011 Email from J. Cathcart to D. Bisio re: P&L and Balance Sheet for Nery's for period of 12/31/2010 |
| AC | | | GEN001643-GEN001644; 4/26/2011 Email from Chris Kelly to S. Sands re: Nery's 2010 Financials |
| AD | | | NERY0001356; 7/28/2011 Letter from W. Lindberg to C. Kelly regarding Nascent accounting records |
| AE | | | NERY0001354-NERY0001356; 8/22/2011 Email from S. Piancone to J. Cathcart re: Letter from Chris Kelly (Accounting records) |
| AF | | | NERY000729-NERY000740; Zahava's Cross-Complaint |
| AG | | | NERY0009355-NERY0009357; Comerical Targa Balance Sheet as of 12/31/2009 |
| AH | | | Declaration of John Cathcart In Support of Nery's USA, Inc.'s Application for Default by Court dated 2/1/2012 |
| AI | | | NERY000622; Targa's Transaction Detail By Account (January through June 2011) |
| AJ | | | GEN001663; 2/17/2012 Email from G. Watson to C. Kelly re: Nery's/Nascent Draft Valuation |
| AK | | | NERY000680-NERY000682; Nery's USA, Inc. Transaction Journal dated 2/27/2012 |
| AL | | | NERY0009321; Resignation of Sandro Piancone as Director dated 6/12/2012 |
| AM | | | Intentionally Omitted |
| AN | | | Intentionally Omitted |
| AO | | | Intentionally Omitted |
| AP | | | Intentionally Omitted |
| AQ | | | Intentionally Omitted |
| AR | | | Letter from Brian Brining to Jerry Hemme re: Requests for documents; Evaluation of Economic Loss re: Nonpayment of Promissory Note dated 11/17/2012 |
| AS | | | 11/12/2012 Email from J. Hemme to Wendy Costa re: Nery's First Expert Designation |
| AT | | | Handwritten Notes dated 11/14/2012 |
| AU | | | Intentionally Omitted |
| AV | | | Intentionally Omitted |
| AW | | | Intentionally Omitted |
| AX | | | Intentionally Omitted |
| AY | | | Intentionally Omitted |
| AZ | | | Distributors Company Overview of Targa dated 1/10/2013 |
| BA | | | GEN002176-GEN002184; Genesis Merchant Partners Investment Committee Deal Overview: Nascent Wine Company, Inc. -- Public (NCTW.OB) |
| BB | | | NERY000506-NERY000507; Chart re: Projected Cash Flows |

ER81

| BC | | | GEN004199-GEN004202; Nascent Corporate Profile |
|---|---|---|---|
| BD-CA | | | Intentionally omitted |
| CB | | | NERY000058-NERY000060; Tax Document dated 4/27/2007 |
| CC | | | NERY0009570; 1/11/2008 Invoice from Time Tracker de Mexico for $2,651.00 Pesos |
| CD | | | NERY0009626; 9/12/2008 Invoice from Rollos y Wtiquetas Rollet for $431.20 Pesos |
| CE | | | NERY000384-NERY000431; Employee Payroll Taxes Statements |
| CF | | | NERY0009628; 5/11/2009 Invoice from Representaciones de California for $184.80 Pesos |
| CG | | | NERY0009615; 5/29/2009 Invoice from Transport Federal De Carga for $159.00 Pesos |
| CH | | | NERY0009568; 10/15/2009 Invoice from Transportes Var for $5,417.52 Pesos |
| CI | | | NERY000468-NERY000502; IMSS 2009 |
| CJ | | | 2010 Currency Exchange Rate for each month |
| CK | | | NERY000306; 2/2010 Banamex System Print-Out |
| CL | | | NERY000503-NERY000518; Spreadsheet dated 2/29/2010 |
| CM | | | NERY000365; Employee Payroll Ledger |
| CN | | | NERY0009688-NERY0009689; 3/23/2010 Check to Rodriguez-$37,000.00 Pesos |
| CO | | | NERY000465; NERY0009545; 3/26/2010 Copies of check(s) for lawyer fees/Legal- Social Sec. 2009 ($200,000.00; $5,600.00 Pesos) |
| CP | | | NERY000647-NERY000654; Spanish language document regarding payment dated 3/29/2010 |
| CQ | | | GEN002038-GEN002044; 3/30/2010 Email from T. Doede to D. Bisio re: Targa Purchase |
| CR | | | NERY000305; 4/2010 Banamex System Print-Out |
| CS | | | NERY000522-NERY000527; Summary Judgment of Eviction Signatories: FIM-HER, S.C. & Comercial Targa dated 4/7/2010 |
| CT | | | NERY000645; NERY000652; Tax Document dated 4/9/2010 |
| CU | | | NERY0009556-NERY0009564; Copy of Check to Gobierno Del Estado De Baja California ($14,134,32 Pesos) Invoice(s) attached dated 4/10/2010 |
| CV | | | NERY000653; Copy of Check for $13,495.00 Pesos dated 4/12/2010 |
| CW | | | NERY000651; Copy of Check for $26,550.00 Pesos (Employee Payroll Taxes) dated 4/16/2010 |
| CX | | | NERY000383; Bill History Statement |
| CY | | | NERY0001760-NERY0001763; 5/21/2010 Email from S. Piancone to Chris Alvarez re: $14,000 pesos |
| CZ | | | NERY0009520; Spanish language letter dated 5/17/2010 |
| DA | | | NERY000307; 6/2010 Banamex System Print-Out |
| DB | | | NERY000379; 6/14/2010 Statement of Accounts Payable |
| DC | | | GEN005029-GEN005053; Nascent Wine Co.'s Complaint |
| DD | | | NERY000558; Copy of Check to FIM HER, S.C. ($3,269.29 Pesos) dated 7/4/2010 |

ER82

| | | | |
|---|---|---|---|
| DE | | | NERY000697-NERY000701; Copies of Checks dated 7/11/2010 |
| DF | | | NERY000308; 8/2010 Banamex System Print-Out |
| DG | | | NERY0009583 Spanish language document |
| DH | | | GEN001616; 12/6/2010 Email from T. Doede to Chris Kelly |
| DI | | | NERY000666-NERY000669; Tax Document dated 2/14/2011 |
| DJ | | | NERY000665; 2/25/2011 Copy of Check to Rafael Rojou Ayala for $17,102.00 Pesos |
| DK | | | NERY0009699-NERY0009711; 3/16/2011 Copy of Check to Jose Rodriguez-$84,570.00 Pesos |
| DL | | | NERY0009578-NERY0009582; 5/9/2011 Copy of Check to Alfredo Escabar Paz $40,212.00 Pesos |
| DM | | | NERY000706-NERY00707; NERY000692; Copy of Check to P.P. Vicente $9,564.73 Pesos dated 5/9/2011 |
| DN | | | NERY000317; Copy of Deposit Slip of $3,962.98 Pesos dated 5/9/2011 |
| DO | | | NERY0005320-NERY0005339; Declaration of state taxes from the state register revalidation $7,259.00 Pesos dated 5/9/2011 |
| DP | | | NERY000335-NERY000346; Application for Bond to the Regularization of Debts Strategic Agenda dated 5/13/2011 |
| DQ | | | NERY000319; Copy of Deposit Slip of $2,474.88 Pesos dated 5/16/2011 |
| DR | | | NERY0007347-NERY0007349; 5/13/2011 Spreadsheet re: Targa's Vendor Balance Detail |
| DS | | | Intentionally Omitted |
| DT | | | NERY000747-NERY000751; Spanish language document regarding settlement dated 8/24/2011 |
| DU | | | NERY000277-NERY000279; Copies of deposit slips ($2,092.48; $8,764.52; $4,820.00) dated 10/13/2011 |
| DV | | | NERY000281-NERY000284; Copies of Check & Receipt (Deposit Slips; $15,677.00-Check) |
| DW | | | NERY0005365; Copy of Check to FIM HER, S.C. for $6,303.80 Pesos dated 1/2/2012 |
| DX | | | NERY0005369; Copy of Check to FIM HER, S.C. for $6,303.80 Pesos dated 1/3/2012 |
| DY | | | NERY0005373; Copy of Check to FIM HER, S.C. for $6,308.80 Pesos dated 1/5/2012 |
| DZ | | | NERY000285-NERY000287; Copies of Deposit Slips ($2,092.49; $8,764.52; $4,820.00) dated 1/6/2012 |
| EA | | | NERY000162-NERY000163; Nery's acquired Targa shares from Nascent Wine (Taxable shares)  dated 1/20/2012 |
| EB | | | NERY0005367; Copy of Check to FIM HER, S.C. for $6,308.80 Pesos dated 2/1/2012 |
| EC | | | NERY0005359-63; NERY000289-94; Spanish language documents regarding payments |
| ED | | | NERY000552-NERY000553; Comercial Targa's Bill Payments for FIM HER, S.C. dated 2/21/2012 |
| EE | | | NERY000297-NERY000303; Copies of deposit slips dated 3/12/2012 |
| EF | | | NERY0005348-NERY0005350; Spanish language document regarding payment dated 3/20/2012 |

18
PRETRIAL ORDER

ER83

| | | | |
|---|---|---|---|
| 1 | EG | | NERY0005371; Copy of Check to FIM HER, S.C. $6,308.80 Pesos dated 4/2/2012 |
| 2 | EH | | NERY0005352-NERY0005354; Deposit Slips with Receipts ($4,820.00; $8,764.50; $2,092.52) dated 4/16/2012 |
| 3 | EI | | NERY0005356; Deposit Slip dated 5/15/2012 |
| 4 | EJ | | NERY000473-NERY000501; 1/2009 Fee Payment Schedule from IMSS to Targa with attached data table |
| 5 | EK | | NERY000483-NERY000491; 2/2009 Fee Payment Schedule from IMSS to Targa with attached data table |
| 6 | EL | | NERY000492-NERY000499; 3/2009 Fee Payment Schedule from IMSS to Targa with attached data table |
| 7 | EM | | NERY000501- NERY000502; 5/2009 Fee Payment Schedule from IMSS to Targa with attached data table |
| 8 | EN | | NERY000466-NERY000467; Copy of Check to Sensory One, S.A. $22,000.00 Pesos dated 9/13/2011 |
| 9 | EO | | NERY000555; NERY0009535; Copy of Check to FIM HER, S.C. ($3,300.00 Pesos) dated 3/3/2010 |
| 10 | EP | | NERY000556; NERY0009530; Copy of Check to FIM HER, S.C. ($3,300.00 Pesos) dated 4/7/2010 |
| 11 | EQ | | NERY000557; NERY0009503; Copy of Check to FIM HER, S.C. ($3,269.29 Pesos) dated 5/13/2010 |
| 12 | ER | | NERY000559; NERY0009454; Copies of checks to FIM HER, S.C. ($3,269.29; $6,844.62) dated 9/10/2010 |
| 13 | ES | | NERY000560; NERY0009448; Copies of checks to FIM HER, S.C. ($3,269.29; $6,844.62) dated 9/27/2010 |
| 14 | ET | | NERY000561; NERY0009446; Copies of checks to FIM HER, S.C. ($3,269.29; $6,844.62) dated 11/11/2010 |
| 15 | EU | | NERY0009440; Copy of Checks paid to FIM HER, S.C.  ($6,844.62; $3,269.29 Pesos) dated 1/25/2011 |
| 16 | EV | | NERY000564; NERY0009433; Copy of Check to FIM HER, S.C. ($3,269.29 Pesos) dated 2/14/2011 |
| 17 | EW | | NERY000565; NERY0009427; Copy of Check to FIM HER, S.C. ($10,113.91 Pesos) dated 2/14/2011 |
| 18 | EX | | NERY000566; Copy of Check to FIM HER, S.C. ($10,113.91 Pesos) dated 2/17/2011 |
| 19 | EY | | NERY000567; NERY0009421; Copy of Check to FIM HER, S.C. ($10,113.91 Pesos) dated 3/14/2011 |
| 20 | EZ | | NERY000568; NERY0009420; Copy of Check to FIM HER, S.C. ($10,113.91 Pesos) dated 4/20/2011 |
| 21 | FA | | NERY000569; NERY0009410; Copy of Check to FIM HER, S.C. ($10,113.91 Pesos) dated 5/17/2011 |
| 22 | FB | | NERY000570; NERY0009405; Copy of Check to FIM HER, S.C. ($10,113.91 Pesos) dated 6/27/2011 |
| 23 | FC | | NERY000571; NERY0009400; Copy of Check to FIM HER, S.C. ($10,113.91 Pesos) dated 7/25/2011 |
| 24 | FD | | NERY000572; NERY0009393; Copy of Check to FIM HER, S.C. ($10,113.91 Pesos) dated 8/19/2011 |
| 25 | FE | | NERY000573; NERY0009388; Copy of Check to FIM HER, S.C. ($10,113.91 Pesos) dated 9/15/2011 |

ER84

| | | | |
|---|---|---|---|
| FF | | | NERY000574; NERY0009382; Copy of Check to FIM HER, S.C. ($10,113.91 Pesos) |
| FG | | | NERY000563; Copy of Check to FIM HER, S.C. ($3,269.29 Pesos) |
| FH | | | NERY000575; Copy of Check to FIM HER, S.C. ($9,578.09 Pesos) |
| FI | | | NERY000576; NERY0009434; Copy of Check to FIM HER, S.C. ($9,578.09 Pesos) |
| FJ | | | NERY000577 & NERY0005364; Copy of Check to FIM HER, S.C. ($9,578.09 Pesos) |
| FK | | | NERY000578 & NERY0005366; Copy of Check to FIM HER, S.C. ($9,578.09 Pesos) |
| FL | | | NERY0005368; Copy of Check to FIM HER, S.C. ($9,578.09 Pesos) |
| FM | | | NERY0005370; Copy of Check to FIM HER, S.C. ($9,578.09 Pesos) dated 4/13/2012 |
| FN | | | NERY0005372; Copy of Check to FIM HER, S.C. ($9,547.54 Pesos) dated 5/11/2012 |
| FO | | | NERY000625-NERY000644; Tax Fines Owed to the SAT dated 3/16/2011 |
| FP | | | NERY000672-NERY000673; Notice from SAT to Targa of debts owed in the amount of $3,789.00 Pesos dated 7/30/2010 |
| FQ | | | NERY000674-NERY000675; Tax Document dated 10/20/2010 |
| FR | | | NERY000348; Copy of Check $5,179.10 Pesos dated 5/112/2011 |
| FS | | | NERY000349-NERY000350; Copy of Check & Deposit Slip $6,845.48 Pesos dated 5/12/2011 |
| FT | | | NERY000351-NERY000352; Copy of Check & Deposit Slip $6,163.79 Pesos dated 5/12/2011 |
| FU | | | NERY000353-NERY000354; Copy of Check & Deposit Slip $7,263.02 Pesos dated 5/12/2011 |
| FV | | | NERY000347; Deposit Slip of $5,179.10 Pesos dated 6/10/2011 |
| FW | | | NERY000355-NERY000358; Copies of 2 checks and bank deposits ($6,163.79 & $7,263.02) dated 6/13/2011 |
| FX | | | NERY000359-NERY000362; Copies of 2 checks and bank deposits ($6,163.79 & $7,263.02) dated 7/12/2011 |
| FY | | | NERY000363; NERY000271-NERY000272; $13,426.81 Pesos (Check No. 4879) dated 8/12/2011 |
| FZ | | | NERY000273-NERY000274; Copy of Check & Deposit Slip $6,163.79 Pesos dated 9/12/2011 |
| GA | | | NERY000275-NERY000276; Copy of Check & Deposit Slip $7,263.02 Pesos dated 9/12/2011 |
| GB | | | NERY000280; Copy of Check $13,426.81 Pesos dated 10/12/2011 |
| GC | | | NERY000288; Copy of Check to Rodriguez for $15,677.00 Pesos dated 12/9/2011 |
| GD | | | NERY000295 & NERY0005357-NERY0005358; Copy of Check to Alfredo Escabar Paz for $15,667.00 Pesos dated 1/16/2012 |
| GE | | | NERY000304 & NERY0005340; Copy of Check to Felix Cortez Armando for $13,731.76 Pesos dated 2/13/2012 |
| GF | | | NERY0005351; Copy of Check to Jesus Armando Felix Cortez for $15,677.02 Pesos dated 4/13/2012 |
| GG | | | NERY0005355; Copy of Check to Jesus Armando Felix Cortez for |

ER85

| | | | |
|---|---|---|---|
| 1 | | | $4,820.00 Pesos dated 5/11/2012 |
| 2 | GH | | NERY000366; Copy of Check to G.B. Manuel for $10,714.19 Pesos (2009 Vacation Pay) dated 6/14/2010 |
| 3 | GI | | NERY000371; Copy of Check to P.P. Vicente $3,214.29 Pesos (2009 Vacation Pay) dated 6/14/2010 |
| 4 | GJ | | NERY000372; Copy of Check to Tadeo $10,000.00 Pesos 2009 Vacation Pay) dated 6/14/2010 |
| 5 | GK | | NERY000367; Copy of Check to R.R. Roberto $2,785.71 Pesos (2009 Christmas Bonus) dated 6/14/2010 |
| 6 | GL | | NERY000368; Copy of Check to Alfredo $2,785.71 Pesos (2009 Christmas Bonus) dated 6/14/2010 |
| 7 | GM | | NERY000369; Copy of Check to G.B. Manuel $8,571.43 Pesos (2009 Christmas Bonus) dated 6/14/2010 |
| 8 | GN | | NERY000370; Copy of Check to A.M. Arturo $6,428.87 Pesos (2009 Christmas Bonus) dated 6/14/2010 |
| 9-10 | GO | | NERY000373; Copy of Check to Armando for $7,500.00 Pesos (2009 Christmas Bonus) dated 6/14/2010 |
| 11 | GP | | NERY000374; Copy of Check to Antonio for $7,500.00 Pesos (2009 Christmas Bonus) dated 6/14/2010 |
| 12 | GQ | | NERY000375; Copy of Check to P.P. Vicente $4,285.71 Pesos (2009 Christmas Bonus) dated 6/14/2010 |
| 13 | GR | | NERY000376; Copy of Check to Noe $6,428.57 Pesos (2009 Christmas Bonus) dated 6/14/2010 |
| 14 | GS | | NERY000377; Copy of Check to Yolotzin $4,285.71 Pesos (2009 Christmas Bonus) dated 6/14/2010 |
| 15 | GT | | NERY000378; Copy of Check to Tadeo $7,500.00 Pesos (2009 Christmas Bonus) dated 6/14/2010 |
| 16 | GU | | NERY000743; Dominguez Agreement (17,000 Pesos) dated 3/18/2010 |
| 17 | GV | | NERY000744; Sanchez Agreement (14,000 Pesos) dated 3/23/2010 |
| 18 | GW | | NERY000745; Gurrola Agreement & Proof of Payment (6,700.00 Pesos) Ochoa (10,000.00 Pesos) dated 3/23/2010 |
| 19-20 | GX | | NERY0009690-NERY0009695; Email from Reyes Humberto to J. Cathcart re: resolution of 3 lawsuits; Debra Oton-$6,700.00 Pesos; Pedro Ochoa-$10,000.00 Pesos; Ivan Sanchez-$14,000.00 Pesos dated 3/23/2010 |
| 21 | GY | | NERY000741-NERY000742; Email from Alvarez to Garcia re: Targa Payment Receipts; Pending Litigations dated 2/27/2012 |
| 22 | GZ | | NERY0005305-NERY0005309; Multiple letters regarding Targa's outstanding balance of $149,250.81 dated 5/17/2010 |
| 23 | HA | | NERY0009519; Email from Chris Alvarez to J. Cathcart re: Bank debt dated 5/17/2010 |
| 24 | HB | | NERY0001970-NERY0001977; Email from Reyes to S. Piancone re: Follow-up on ExIm Bank request dated 8/13/2010 |
| 25-26 | HC | | NERY000309-NERY000310; Copy of Check and Receipt for payment of $74,701.65 Pesos |
| 26 | HD | | NERY0009660-NERY0009675; Copy of Check for $74,701.65 Pesos |
| 27-28 | HE | | NERY000320-NERY000332; NERY0009416 & NERY0009417; Copies of Checks with backup ($2,474.88; 6 checks for $380.00 Pesos each) dated 4/8/2011 |

ER86

| | | | |
|---|---|---|---|
| HF | | | NERY000311-NERY000316; Copies of Checks for $73,864.56 Pesos; $39,136.95; $33,553.19 Pesos dated 4/25/2011 |
| HG | | | NERY000318; $3,962.98 Pesos (Additional Unpaid Housing Tax for 2009- Check #4661) dated 8/4/2011 |
| HH | | | NERY0009637-NERY0009638; Inventory Statement with handwritten notes |
| HI | | | NERY0009632-NERY0009636; 4 checks for $500.00 Pesos each to Garcia Gonzalez Carlos |
| HJ | | | NERY0009712-NERY0009715; Email from cyberkarma@hotmail.com to S. Piancone re: Meeting with Jesus Sanchez |
| HK | | | NERY0009610-NERY0009614; NERY0009639; Checks to Rob Piancone for $5,421.71 beginning on 9/1/2012-1/8/2013 |
| HL | | | NERY0009616-NERY0009625; NERY0009503; Copies of Checks (Accounts Payables) dated 5/13/2010 |
| HM | | | NERY0005310; Copy of Check to International Foodservice Specialist for $7,974.00 Pesos dated 12/14/2011 |
| HN | | | NERY0005312; Copy of Check to International Foodservice Specialist for $7,676.91 Pesos dated 1/2/2012 |
| HO | | | NERY0005314; Copy of Check to International Foodservice Specialist for $7,625.00 Pesos dated 2/4/2012 |
| HP | | | NERY0005316; Copy of Check to International Foodservice Specialist for $7,625.00 Pesos dated 3/11/2012 |
| HQ | | | NERY0005318; Copy of Check to International Foodservice Specialist for $7,625.00 Pesos dated 4/6/2012 |
| HR | | | NERY0009571; Invoice from Service Automotriz for $880.00 Pesos dated 12/10/2008 |
| HS | | | NERY0009567; Invoice from ULine Shipping for $9,806.03 Pesos dated 12/12/2008 |
| HT | | | NERY0009565; Copy of Invoice from UPS for $422.84 Pesos dated 1/2/2009 |
| HU | | | NERY0009566; Invoice from UPS for $424.59 Pesos dated 2/2/2009 |
| HV | | | NERY0009716; Invoice from Clarke, Modet & Co. for $19,313.49 Pesos dated 4/3/2009 |
| HW | | | NERY0009577; Invoice from King Press for $2,878.26 Pesos dated 4/21/2009 |
| HX | | | NERY0009576; Invoice from King Press for $2,852.39 Pesos dated 4/28/2009 |
| HY | | | NERY0009585- NERY0009586; Invoice from Alestra for $26,356.70 Pesos dated 5/4/2009 |
| HZ | | | NERY0009569; Invoice from Transportes Refrigerados for $16,490.00 Pesos dated 7/28/2009 |
| IA | | | NERY0009496-NERY0009498; Invoice from Transportes Sally for $33,390.00 Pesos dated 9/7/2009 |
| IB | | | NERY0009627; Invoice from Ricoh for $49.00 Pesos dated 11/9/2009 |
| IC | | | NERY0009587-NERY0009608; Invoice from Almacenadora De Deposito Moderino for $58,075.11 Pesos dated 2/28/2010 |
| ID | | | NERY000690; Copy of Check to ABIT (Abastecedora Indutrial de Tijuana  SA de CV) for $739.20 Pesos dated 5/13/2010 |
| IE | | | NERY000691; Copy of check paid to Maria Carrillo for$6,000.00 |

ER87

| | | | |
|---|---|---|---|
| | | | Pesos dated 1/11/2011 |
| IF | | | NERY000702-NERY000705; Copy of Check to Transportes Sally with invoices attached ($11,130.00 Pesos) dated 1/11/2011 |
| IG | | | NERY0007435-NERY0007442; Targa's Vendor Balance Detail dated 8/29/2011 |
| IH | | | NERY000661-NEARY000664; Check to Jose Rodriguez-$2,490.00 Pesos dated 7/27/2010 |
| IJ | | | GEN 000227-228; 12/16/2009 email from Cathcart to Doede re: draft of the Purchase Agreement |

## VIII.

## WITNESSES

A list of witnesses to be called by plaintiff and defendant are as follows:

1. Timothy Doede

2. Sandro Piancone

3. John Cathcart

4. Christopher Kelly

5. Douglas Bisio

6. Gavin Watson

7. Blair Krueger

8. Brian Brinig

9. Eduardo Garcia

10. Christian Alvarez

11. Humberto Reyes

12. Mark Hayden

## IX.

## ISSUES OF LAW

The following issues of law, and no others, remain to be litigated upon the trial:

1. What is the appropriate default judgment to have entered against Nascent with regard to Nery's claims against Nascent?

2. What effect, if any, does Nascent's default in this litigation have on Nery's claims and obligations relating to the Stock Purchase Agreement and the Nery's Note?  What effect, if

1    any, does this have on Genesis's claims against Nery's and Targa?

2    3.  If Nascent failed to resolve all Targa liabilities in excess of $150,000, is Nery's excused

3        from performance under the Nery's Note, and if so what degree?

4    4.  Did Nascent make any misrepresentations or breach any warranties contained in the Stock

5        Purchase Agreement?  If so, how does this affect Nery's obligations under the Stock

6        Purchase Agreement and Nery's Note?

7    5.  What damages has Nery's suffered as a direct and proximate result of Nascent's breach of

8        contract and misrepresentations, if any?

9    6.  If Nascent breached any material provision of the Stock Purchase Agreement, does this

10       suspend or delay Nery's obligations to perform under the Nery's Note?

11   7.  If Nascent materially breached the Stock Purchase Agreement, is Targa excused from

12       performance under its guaranty of the Nery's Note?

13   8.  If Nery's has not defaulted on its obligations under the Nery's Note, does Targa have any

14       obligations on the Targa guaranty?

15   9.  Is the Targa guaranty enforceable?

16   10. Is Nery's entitled to rescission of the Stock Purchase Agreement and/or the Nery's Note?  If

17       so, what are the terms under which rescission should be ordered?

18   11. Is Nery's entitled to reformation of the Stock Purchase Agreement and/or the Nery's Note?

19       If so, what are the terms under which reformation should be ordered?

20   12. If Nery's is not excused from performance under the Nery's Note, but is entitled to offset

21       certain liabilities, what is the correct measure of damages to calculate the amount Nery's

22       owes under the Nery's Note?

23   13. If Nery's is not excused from performance under the Nery's Note, but entitled to offset

24       certain liabilities, what is the correct measure of damages to calculate the amount Targa

25       owes under the Nery's Note?

26                                      **X.**

27                        **STATEMENT OF FACT AND LAW**

28   The foregoing admissions having been made by the parties, and the parties having specified

ER89

the foregoing issues of fact and law remaining to be litigated, this order must supplement the

pleadings and govern the course of the trial of this cause, unless modified to prevent manifest

injustice.

## XI.

## TRIAL BY JURY/COURT WITHOUT JURY

This case will be tried by the Court.

## XII.

## BIFURCATION

If necessary, the trial of this case shall be bifurcated as follows:  Phase 1:  The Court shall

determine whether Genesis is entitled to recover from Nery's and/or Targa under the Nery's Note.

If Genesis is entitled to recover from Nery's and Targa under the Nery's Note, and Nery's proves

that it is entitled to offset an amount, the Court shall determine the amount of the offset and the

correct measure of damages.  The parties shall then meet and confer to determine the amount of the

judgment after deducting the amount of the offset determined by the Court.  If the parties cannot

agree on the amount of the judgment, then Phase 2 shall be held to determine the amount of the

judgment.

## XIII.

## ESTIMATED TIME FOR TRIAL

Time estimated for trial is six days.

**IT IS SO ORDERED.**

DATED:  June 21, 2013

Jeffrey T. Miller
United States District Judge

ER90

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GENESIS MERCHANT PARTNERS, LP., a Connecticut corporation, <br>                Plaintiff, <br>    v. <br> NERY'S USA, INC., a Nevada corporation, JOHN CATHCART, an individual and COMMERCIAL TARGA, S.A. DE C.V., a Mexican corporation, <br>                Defendants. | Case No.: 3:11-cv-1589-JM (WVG) <br><br> **ORDER DENYING MOTION FOR ENTRY OF JUDGMENT AND DECLINING TO ADDRESS MOTION FOR ATTORNEY'S FEES** |
| NERY'S USA, INC., a Nevada corporation, <br>                Counterclaimant, <br>    v. <br> GENESIS MERCHANT PARTNERS, LP., a Connecticut corporation, <br>                Counterdefendant. | |
| NERY'S USA, INC., a Nevada corporation, <br><br>                Third Party Complainant, <br>    v. <br> NASCENT WINE COMPANY, INC., a Nevada corporation, <br>             Third Party Defendant. | |

ER91

On September 7, 2012, Defendants Nascent Wine Company, Inc.
("Nascent"), Commercial Targa ("Targa"), and John Cathcart (together
"Defendants") filed a motion for summary judgment, which this court granted as
to Defendant Cathcart and denied in part and granted in part as to the other
Defendants.  On January 7, 2013, Defendant Cathcart filed a motion for entry of
judgment ("MEJ") under Federal Rule of Civil Procedure ("Rule") 54(b) and a
motion for attorney's fees ("MFF").  For the following reasons, the court denies
Cathcart's Rule 54(b) motion for entry of judgment and declines to address
Cathcart's motion for attorney's fees because it is moot in light of the court's
denial of Cathcart's Rule 54(b) motion.

## I. BACKGROUND

In 2007, Defendant Nascent acquired Defendant Targa, a company that sold
Nery's brand cheese in Mexico.  Motion for Summary Judgment ("MSJ") at 3.  In
March 2008, Genesis received a $1,000,000 promissory note ("First Note") from
Nascent.  Compl. ¶ 11.  By March 2009, Nascent had stopped making payments
on the First Note, leaving a $1.15 million balance.  MSJ at 3.

At that time, Nascent was struggling financially and had few assets.  To
help resolve Nascent's financial difficulties, Nascent's Sandro Piancone hired
Defendant John Cathcart, a financial consultant who had helped Nascent acquire
companies and develop business from 2006 to 2008.  Opp. to MSJ at 2.  Cathcart
and Piancone ultimately concluded that Nascent needed to sell Targa.  MSJ at 1.

Originally, Nascent had been negotiating to sell Targa to a U.S. company,
but the deal fell through in June 2009.  Opp. to MSJ at 3.  After the deal fell
through, Nascent approached Cathcart and his new company, Nery's USA, Inc.
("Nery's"), which had been established to promote Targa's Nery's brand in the

ER92

United States, about purchasing Targa. Id. at 2-3. Cathcart was interested in acquiring Targa because he had helped Nascent purchase Targa in 2007. Id. at 2.

The deal between Nery's and Nascent was negotiated for months. MSJ at 3. Early into the negotiation, Nery's insisted that it would not pay cash for Targa's stock and that any deal would be done through a promissory note. MSJ at 4. In October 2009, Nery's agreed to purchase Targa from Nascent for $2 million based on Nascent's representations that (1) Nascent owed Genesis only $1.15 million, (2) it owed only $700,000 on two other loans, and (3) Targa had liabilities/accounts payable of no more than $150,000 at closing. Id.

Genesis was required to approve the deal, however, because it had the right to foreclose on Targa and Nascent's other assets due to Nascent's default on the First Note. Opp. to MSJ at 4. Although Cathcart and Piancone originally intended to raise capital to pay off Nascent's debt to Genesis, they were unable to raise the necessary funds. Id. So instead, Cathcart and Genesis negotiated to restructure Nascent's loan with Genesis. Id. Genesis agreed to restructure Nascent's loan because the only other option to recuperate its money was to foreclose on Targa's assets and sell them to another party. Opp. to MSJ at 20-21. Due to Targa's deteriorating financial state, Genesis internally valued Targa at $550,000. MSJ at 4. Genesis' low valuation was, at least in part, due to its concern regarding the amount of capital that Cathcart would inject into Targa to help it become profitable again. Opp. to MSJ at 4. Cathcart originally agreed to raise $1,000,000 in capital to inject into Targa, but was ultimately only able to raise $300,000. Id. at 4-5.

Around February 2010, Genesis and Nascent reached an agreement with the following primary terms: (1) Nascent would sell to Nery's USA all of its stock in

ER93

Targa and its rights to the Nery's brand; (2) Nery's would execute a $1.85 million promissory note ("Second Note") to Nascent which would become due and payable on August 10, 2011; (3) Nery's would assume not more than $150,000 of Targa's liabilities; (4) Targa would guarantee the Second Note without offset; and (5) Nascent would assign the Second Note to Genesis. Opp. to MSJ at 5. All parties were aware during the negotiation of the Second Note that it would be assigned to Genesis to secure Nascent's obligations to Genesis under the First Note. Compl. ¶ 16.

The agreement was set forth in a Stock Purchase Agreement ("SPA") between Nascent and Nery's in which Nery's acquired all but one share of Targa's stock, effective February 1, 2010. MSJ at 5. Genesis was not a party to the SPA, the Second Note, or the Guaranty. Id. On February 10, 2012, Nascent assigned its rights under the Second Note to Genesis in the "Collateral Assignment of Contracts" ("Assignment"), which provided that "[u]ntil all Obligations to [Genesis] have been satisfied by [Nascent] in full, [Nery's] will be instructed to remit payment directly to Plaintiff on behalf of [Nascent] . . . ." Id. at 6.

After Targa's sale, Defendants became aware of various unanticipated liabilities that predated Nery's' purchase of Targa. Opp. to MSJ at 5. Cathcart alleges that these liabilities totaled $930,604.16, or $780,604.16 more than the $150,000 that Piancone and Targa had originally represented to Cathcart and Nery's. MSJ at 7; Opp. to MSJ at 5. Genesis asserts that the majority of the $780,604.16 has either been eliminated or not been paid. Opp. to MSJ at 6.

As a result, Cathcart was forced to divert some working capital from purchasing inventory to paying off these previously undisclosed liabilities. MSJ at 6. Cathcart also alleged that these additional liabilities had resulted in cash

ER94

flow problems and stopped paying Genesis under the Second Note after only two payments. Opp. to MSJ at 5-6. One additional payment was later made in January 2011. Id. at 6. The three payments totaled $46,250.01. MSJ at 7; Opp. to MSJ at 6. According to Genesis, the amount due under the Second Note as of October 31, 2012 is $2,943,583. Opp. to MSJ at 6. Of this, Genesis is owed $2,468,638. Id.

On July 18, 2011, Genesis filed suit against Defendants for Nery's' failure to make payments due to Genesis under the Second Note. Compl. ¶ 29. Genesis asserts three claims against all Defendants: (1) breach of contract, (2) unjust enrichment, and (3) and negligent misrepresentation. Genesis also asserts a conversion claim solely against Nery's. On December 19, 2012, the court granted Cathcart's motion for summary judgment.

Cathcart now requests that he receive entry of judgment pursuant to Rule 54(b) and be reimbursed for his legal fees. Cathcart is claiming the $272,000 in legal fees, which can be broken down as:

- $5,029 in costs;
- $182,106 in legal fees from Mark Mazzarella's law firms;
- $21,936 in legal fees from McKenna Long & Aldridge; and
- $63,000 in expert fees.

MFF at 2. Genesis opposes these motions.

## II. ENTRY OF JUDGMENT PURSUANT TO RULE 54(b)

### A. Legal Standard

The district court may enter separate judgment in a case involving multiple parties or multiple claims pursuant to Rule 54(b) when "there is no just reason for delay." Fed. R. Civ. P. 54(b). The Ninth Circuit has indicated that entry of partial

ER95

judgment should not be granted as a matter of course but rather "reserved for the unusual case in which the costs and risks of multiplying the number of proceedings and of overcrowding the appellate docket are outbalanced by pressing needs of the litigants for an early and separate judgment as to some claims or parties." Morrison-Knudsen Co., Inc. v. Archer, 655 F.2d 962, 965 (9th Cir. 1981). When weighing the costs and risks of multiplying the number of proceedings and overcrowding the appellate docket, the district court should consider whether (1) certification will result in unnecessary appellate review, (2) the claims finally adjudicated are separate, distinct, and independent of any other remaining claims, (3) review of the finally adjudicated claims may be mooted by future developments, and (4) the appellate court may have to decide the same issues on more than one occasion. See id. (citing Curtiss-Wright Corp. v. Gen. Elec. Co., 446 U.S. 1, 5-6 (1980)). The district court is required to make specific findings and articulate specific reasons for granting certification under Rule 54(b). See id.

### B. Discussion

Cathcart contends that he is entitled to entry of judgment because: (1) he is not facing indemnity claims from any other party in the action; (2) he has not asserted any claims against any other party in the action; and (3) the court granted summary judgment on all claims against Cathcart in its December 19, 2012 order. MEJ at 2. In addition, Cathcart claims that he "has the right to move on with his personal and professional life now that he is no longer a party in this action." Id. at 4. Cathcart further argues that he "has the right to request an award of costs and legal fees incurred in his defense . . ." because "[i]t would be far more efficient for the court, fresh off the Motion for Summary Judgment, to resolve disputes about

ER96

1   Cathcart's right to fees now, rather than at some indeterminate point in the
2   future." Id. at 3.

3        Genesis counters that Cathcart has not provided a sufficient showing of
4   hardship. See Morrison-Knudsen Co. v. Archer, 655 F.2d 962, 965 (9th Cir.
5   1981) (providing that the hardship to the party must outweigh the burden to the
6   court system); see also Gausvik v. Perez, 392 F.3d 1006, 1009 n.2 (9th Cir. 2004)
7   ("[I]n the interest of judicial economy Rule 54(b) should be used sparingly.").
8   Genesis notes that Cathcart is still a key witness to this case and trial is only four
9   months away. Requiring Cathcart to wait until after this matter is resolved is
10  therefore not an undue burden.

11       After analyzing Cathcart's Rule 54(b) motion in light of the
12  Morrison-Knudsen factors, the court agrees with Genesis. First, even if the court
13  were to enter judgment in favor of Cathcart, it could result in unnecessary
14  appellate review because Genesis would likely appeal that entry of judgment
15  immediately. Second, as is evident from the facts alleged, the claims against
16  Cathcart are not distinct from the claims still pending against the other
17  Defendants. Cathcart will even remain a key witness to the events going forward.
18  Third, it is unclear whether review of future claims will be mooted by future
19  developments. Finally, certifying this matter might require the courts to analyze
20  the same issues, but for different defendants, twice.

21       Cathcart's arguments that he will suffer hardship or prejudice are also
22  unconvincing. Resolving any disputes over Cathcart's legal fees does not justify
23  granting entry of judgment. If Cathcart's attorneys maintain proper records
24  detailing the hours billed on this matter, then several months' delay does not
25  excessively prejudice Cathcart. Moreover, as previously mentioned, Cathcart will

ER97

remain a key witness in this matter.  Accordingly, Cathcart's Rule 54(b) motion is denied.  The court declines to address Cathcart's motion for attorney's fees because it is moot in light of the court's decision denying Cathcart's Rule 54(b) motion.

**IT IS SO ORDERED.**

DATED: February 20, 2013

Jeffrey T. Miller
United States District Judge

ER98

1
2
3
4

**UNITED STATES DISTRICT COURT**

5

**SOUTHERN DISTRICT OF CALIFORNIA**

6

| | |
|---|---|
| GENESIS MERCHANT PARTNERS, LP., a Connecticut corporation, <br> Plaintiff, <br> v. <br> NERY'S USA, INC., a Nevada corporation, JOHN CATHCART, an individual and COMMERCIAL TARGA, S.A. DE C.V., a Mexican corporation <br> Defendants. | Case No.: 3:11-cv-1589-JM (WVG) <br><br> **ORDER DENYING IN PART AND GRANTING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DENYING SANCTIONS PURSUANT TO THIS COURT'S ORDER TO SHOW CAUSE** |
| NERY'S USA, INC., a Nevada corporation, <br> Counterclaimant, <br> v. <br> GENESIS MERCHANT PARTNERS, LP., a Connecticut corporation, <br> Counterdefendant. | |
| NERY'S USA, INC., a Nevada Corporation, <br><br> Third Party Complainant, <br> v. <br> NASCENT WINE COMPANY, INC., a Nevada corporation, <br> Third Party Defendant. | |

7
8
9
10
11
12
13
14
15
16
17
18
19
20
21

22      On September 7, 2012, Defendants Nascent Wine Company, Inc. ("Nascent"),

23  Commercial Targa ("Targa"), and John Cathcart (together "Defendants") filed two motions: a

24  request for entry of default (Dkt. 72) and a motion for summary judgment (Dkt. 73).  After

25  Plaintiff Genesis Merchant Partners, LP ("Genesis") failed to file a response opposing the

ER99

Defendants' motion for summary judgment by October 15, 2012, this court issued an Order to Show Cause for failure to prosecute (Dkt. 78). Genesis explained that it had failed to respond to these motions because it had not obtained counsel since its previous counsel had withdrawn. On October 19, 2012, or four days after this court issued the Order to Show Cause, Genesis' new counsel, Good Hemme & Peterson APC's Jerry D. Hemme and Arnold Neves, Jr., first appeared on its behalf. On October 31, 2012, this court denied Defendants' motion for entry of default and granted Genesis' motion for an extension to respond. This court heard oral arguments on Defendants' summary judgment motions on December 10, 2012.

For the following reasons, Defendants' motion for summary judgment for all claims against Cathcart is GRANTED, Defendants' motion for summary judgment for the breach of contract and unjust enrichment claims is DENIED, Defendant's motion for summary judgment for the conversion and negligent misrepresentation claims is GRANTED, and sanctions relating to this court's Order to Show Cause are DENIED.

**I. BACKGROUND**

In 2007, Defendant Nascent acquired Defendant Targa, a company that sold Nery's brand cheese in Mexico. Motion for Summary Judgment ("MSJ") at 3. In March 2008, Genesis received a $1,000,000 promissory note ("First Note") from Nascent. Compl. ¶ 11. By March 2009, Nascent had stopped making payments on the First Note, leaving a $1.15 million balance. MSJ at 3.

At that time, Nascent was struggling financially and had few assets. To help resolve Nascent's financial difficulties, Nascent's Sandro Piancone hired Defendant John Cathcart, a financial consultant who had helped Nascent acquire companies and develop business from 2006 to 2008. Opp. to MSJ at 2. Cathcart and Piancone ultimately concluded that Nascent needed to sell Targa. MSJ at 1.

ER100

Originally, Nascent had been negotiating to sell Targa to a U.S. company, but the deal fell through in June 2009. Opp. to MSJ at 3. After the deal fell through, Nascent approached Cathcart and his new company, Nery's USA, Inc., which had been established to promote Targa's Nery's brand in the United States, about purchasing Targa. Id. at 2-3. Cathcart was interested in acquiring Targa because he had helped Nascent purchase Targa in 2007. Id. at 2.

The deal between Nery's and Nascent was negotiated for months. MSJ at 3. Early into the negotiation, Nery's insisted that it would not pay cash for Targa's stock and that any deal would be done through a promissory note. MSJ at 4. In October 2009, Nery's agreed to purchase Targa from Nascent for $2 million based on Nascent's representations that (1) Nascent owed Genesis only $1.15 million, (2) it owed only $700,000 on two other loans, and (3) Targa had liabilities/accounts payable of no more than $150,000 at closing. Id.

Genesis was required to approve the deal, however, because it had the right to foreclose on Targa and Nascent's other assets due to Nascent's default on the First Note. Opp. to MSJ at 4. Although Cathcart and Piancone originally intended to raise capital to pay off Nascent's debt to Genesis, they were unable to raise the necessary funds. Id. So instead, Cathcart and Genesis negotiated to restructure Nascent's loan with Genesis. Id. Genesis agreed to restructure Nascent's loan because the only other option to recuperate its money was to foreclose on Targa's assets and sell them to another party. Opp. to MSJ at 20-21. Due to Targa's deteriorating financial state, Genesis internally valued Targa at $550,000. MSJ at 4. Genesis' low valuation was, at least in part, due to its concern regarding the amount of capital that Cathcart would inject into Targa to help it become profitable again. Opp. to MSJ at 4. Cathcart originally agreed to raise $1,000,000 in capital to inject into Targa, but was ultimately only able to raise $300,000. Id. at 4-5.

Around February 2010, Genesis and Nascent reached an agreement with the following primary terms: (1) Nascent would sell to Nery's USA all of its stock in Targa and its rights to

ER101

the Nery's brand; (2) Nery's would execute a $1.85 million promissory note ("Second Note") to Nascent which would become due and payable on August 10, 2011; (3) Nery's would assume not more than $150,000 of Targa's liabilities; (4) Targa would guarantee the Second Note without offset; and (5) Nascent would assign the Second Note to Genesis. Opp. to MSJ at 5. All parties were aware during the negotiation of the Second Note that it would be assigned to Genesis to secure Nascent's obligations to Genesis under the First Note. Compl. ¶ 16.

The agreement was set forth in a Stock Purchase Agreement ("SPA") between Nascent and Nery's in which Nery's acquired all but one share of Targa's stock, effective February 1, 2010. MSJ at 5. Genesis was not a party to the SPA, the Second Note, or the Guaranty. Id. On February 10, 2012, Nascent assigned its rights under the Second Note to Genesis in the "Collateral Assignment of Contracts" ("Assignment"), which provided that "[u]ntil all Obligations to [Genesis] have been satisfied by [Nascent] in full, [Nery's] will be instructed to remit payment directly to Plaintiff on behalf of [Nascent] . . . ." Id. at 6.

After Targa's sale, Defendants became aware of various unanticipated liabilities that predated Nery's' purchase of Targa. Opp. to MSJ at 5. Cathcart alleges that these liabilities totaled $930,604.16, or $780,604.16 more than the $150,000 that Piancone and Targa had originally represented to Cathcart and Nery's. MSJ at 7; Opp. to MSJ at 5. Genesis asserts that the majority of the $780,604.16 has either been eliminated or not been paid. Opp. to MSJ at 6.

As a result, Cathcart was forced to divert some working capital from purchasing inventory to paying off these previously undisclosed liabilities. MSJ at 6. Cathcart also alleged that these additional liabilities had resulted in cash flow problems and stopped paying Genesis under the Second Note after only two payments. Opp. to MSJ at 5-6. One additional payment was later made in January 2011. Id. at 6. The three payments totaled $46,250.01. MSJ at 7; Opp. to MSJ at 6. According to Genesis, the amount due under the Second Note as of October 31, 2012 is $2,943,583. Opp. to MSJ at 6. Of this, Genesis is owed $2,468,638. Id.

4

On July 18, 2011, Genesis filed suit against Defendants for Nery's failure to make payments due to Genesis under the Second Note. Compl. ¶ 29. Genesis asserts three claims against all Defendants: (1) breach of contract, (2) unjust enrichment, and (3) and negligent misrepresentation. Genesis also asserts a conversion claim solely against Nery's.

## II. LEGAL STANDARD

### A. Summary Judgment

A moving party is entitled to summary judgment where "there is no genuine issue as to any material fact . . . ." Fed. R. Civ. P. 56(c); Prison Legal News v. Lehman, 397 F.3d 692, 698 (9th Cir. 2005). The court must examine the evidence in the light most favorable to the non-moving party. United States v. Diebold, Inc., 369 U.S. 654, 655 (1962). While Rule 56 contains "no express or implied requirement . . . that the moving party support its motion with affidavits or other similar materials negating the opponent's claim," Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986), "the moving party bears the burden of proof at trial, [and] it must come forward with evidence which would entitle it to a directed verdict if the evidence were uncontroverted at trial.'" Houghton v. South, 965 F.2d 1532, 1536 (9th Cir. 1992).

If the moving party meets its initial burden of production, the burden shifts to the non-moving party to go beyond the pleadings by citing materials in the record to show a genuine issue for trial. Celotex, 477 U.S. at 324 (citation omitted). The opposing party also may not rely solely on conclusory allegations unsupported by factual data. Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989). Nevertheless, the ultimate burden of persuasion on the motion remains with the moving party. Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., 210 F.3d 1099, 1102 (9th Cir. 2000). Doubt as to the existence of any issue of material fact requires denial of the motion. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

5

ER103

## III. DISCUSSION

### A. Cathcart's Liability

Defendants insist that Cathcart cannot be held liable for any of the claims below because he is not Nery's' or Targa's alter ego. "The two principal questions to establish alter ego are whether there is such a unity of interest and ownership between the corporation and its equitable owner that the separate personalities of the corporation and the shareholder do not in reality exist and whether there would be an inequitable result if the acts in question are treated as those of the corporation alone." VirtualMagic Asia, Inc. v. Fil-Cartoons, Inc., 99 Cal. App. 4th 228, 244-45 (2002) (internal quotations removed) (citing Sonora Diamond Corp. v. Superior Court, 83 Cal. App. 4th 523, 538 (2000)).

#### 1. Unity of Interest

A variety of factors are used to determine whether a "unity of interest" exists, including, but not limited to, the "commingling of funds and other assets, failure to segregate funds of the separate entities, . . . the unauthorized diversion of corporate funds or assets to other than corporate uses, . . . the treatment by an individual of the assets of the corporation as his own, . . . the identical equitable ownership in the two entities, the identification of the equitable owners thereof with the domination and control of the two entities, identification of the directors and officers of the two entities in the responsible supervision and management, sole ownership of all of the stock in a corporation by one individual or the members of a family . . . the failure to adequately capitalize a corporation, the total absence of corporate assets and undercapitalization, or . . . the use of a corporation as a mere shell, instrumentality or conduit for a single venture or the business of an individual or another corporation." Associated Vendors, Inc. v. Oakland Meat Co., 210 Cal. App. 2d 825, 838 (1962) (internal citations removed). "No single factor is determinative, and instead a court must examine all the circumstances to determine whether to apply the doctrine." VirtualMagic Asia, Inc. v.

6

ER104

1   Fil-Cartoons, Inc., 99 Cal. App. 4th at 245 (citing Talbot v. Fresno-Pacific Corp., 181 Cal. App.

2   2d 425, 432 (1960)).

3       Defendants assert that Genesis' allegations are based on "information and belief" rather

4   than fact and that Genesis has been unable to demonstrate that Cathcart "influenced and

5   controlled either corporation in the manner a president and director would not typically

6   influence and control closely held corporations." MSJ at 12. Defendants further contend that

7   the unity of interest requirement is not met just because a person who owns all (or the majority

8   of) the corporate stock also makes all decisions for the corporation. In Leek v. Cooper, 194 Cal.

9   App. 4th 399 (2011) former employees who claimed that they were fired and replaced by

10   younger employees sued their former employer, Auburn Honda, and their former boss. Id. at

11   415. The former employees alleged that the former boss was personally responsible because he

12   owned and managed Auburn Honda, but the court rejected this contention because the corporate

13   formalities had been maintained. Id. ("[A]lthough plaintiffs alleged Cooper was the employer,

14   the complaint contains no allegations that he should be held liable for the corporation's

15   wrongdoing."). Much like Leek, Defendants contend that Cathcart respected the corporate

16   formalities for Nery's and Targa. Defendants also insist that recently produced evidence

17   regarding unrelated Nery's and Targa shareholders and directors negates any notion that a unity

18   of interest exists. MSJ at 12.

19       Genesis counters that at least one court concluded that the unity of interest prong was

20   met when the sole owner had corresponding dominion and control. In Paul v. Palm Springs

21   Homes, Inc., 192 Cal. App. 2d 858 (1961), the court concluded that defendants, who had

22   formed inadequately financed corporations to conceal their assets from and thereby defraud

23   their creditors, were the alter egos of these inadequately financed corporations. Id. at 863. But

24   Paul seems inapplicable here because Targa and Nery's appear to be legitimate businesses that

25   continue to operate today and are not merely vehicles to hide assets. The present matter seems

7

1  more akin to <u>Leek</u> because Targa and Nery's are individual businesses for which Cathcart

2  happens to be the majority shareholder and the decision-maker.  That Genesis has been unable

3  to plead facts suggesting that Cathcart was abusing Targa's or Nery's' corporate forms thereby

4  suggests that the corporate veil was not breached.  This factor weighs in favor of dismissing

5  Cathcart.

6                    **2.  Inequitable Result**

7          "The court will not disregard the corporate entity unless it is necessary in order to

8  prevent fraud or injustice."  <u>Norins Realty Co. v. Consolidated Abstract & Title Guarantee Co.</u>,

9  80 Cal. App. 2d 879, 883 (1947).  "The alter ego doctrine does not guard every unsatisfied

10  creditor of a corporation but instead affords protection where some conduct amounting to bad

11  faith makes it inequitable for the corporate owner to hide behind the corporate form.  Difficulty

12  in enforcing a judgment or collecting a debt does not satisfy this standard."  <u>Sonora</u>, 83 Cal.

13  App. 4th at 539.  Plaintiff argues that Cathcart's decision to avoid paying Genesis the $2 million

14  that it is owed is because of $353,000 in actual undisclosed liabilities.  But Cathcart's action

15  seems to amount to nothing more than a business decision.  Genesis will not suffer an

16  inequitable result if Cathcart is not held personally liable as Targa and Nery's can be held

17  responsible for any amount owed to Genesis.  Accordingly, summary judgment is granted for all

18  against Cathcart.

19                    **B.  Breach of Contract**

20          "A cause of action for damages for breach of contract is comprised of the following

21  elements: (1) the contract, (2) plaintiff's performance or excuse for nonperformance, (3)

22  defendant's breach, and (4) the resulting damages to plaintiff."  <u>Armstrong Petroleum Corp. v.</u>

23  <u>Tri-Valley Oil & Gas.</u>, 116 Cal. App. 4th 1375, 1392 (Cal. Ct. App. 2004) (quoting <u>Careau &</u>

24  <u>Co. v. Sec. Pac. Bus. Credit, Inc.</u>, 222 Cal. App. 3d 1371, 1388 (1990)).  Defendants claim that

25

ER106

1   Nascent's negligent misrepresentations invalidated the Second Note and that Genesis cannot

2   show resulting damages beyond the amount that Defendants are entitled to offset.

3        Defendants claim that they can assert these arguments against Genesis because, as the

4   Second Note's assignee, it "'stands in the shoes' of the assignor, Nascent, taking its rights and

5   remedies, subject to any defenses that the obligor has against the assignor." Witkin, Summary

6   of Cal. Law (10th ed. 2005) Contracts § 735 (citing Cal. Civ. Code § 1459).  However, Genesis

7   contends that it is a "holder in due course"[1] of a negotiable instrument, which prevents

8   Defendants from asserting any Cal. Civ. Code § 1459 defenses against their breach of contract.

9   Such defenses only apply to non-negotiable debt instruments.  Opp. to MSJ at 16.

10        Except as provided in Cal. Com. Code § 3104(c) or (d), a negotiable instrument is

> an unconditional promise or order to pay a fixed amount of money, with or without interest or other charges described in the promise order if it is all of the following:
>
> (1) Is payable to the bearer or to order at the time it is issued or first comes into possession of a holder.
>
> (2) Is payable on demand or at a definite time.
>
> (3) Does not state any other undertaking or instruction by the person promising or ordering payment to do any act in addition to the payment of money, but the promise or order may contain (i) an undertaking or power to give, maintain, or protect collateral to secure payment, (ii) an authorization or power to the holder to confess judgment or realize on or dispose of collateral, or (iii) a waiver of the benefit of any law intended for the advantage or protection of an obligor.

Cal. Com. Code § 3104(a). Genesis asserts that the Second Note is an unconditional promise to

pay a fixed amount ($1,850,000) to "Nascent Wine Company, Inc." at a definite period of time

(August 10, 2011) that contains neither a qualification of the holder's rights nor a statement that

it is a non-negotiable instrument. Opp. to MSJ at 9.  Genesis also believes that it is "holder in

---

[1] A "holder in due course" is seen as having acquired the negotiable instrument for value, in good faith and without notice that it is overdue, has been dishonored, or that any defense against the note exists. Cal. Com. Code § 3302(a).

9

1   due course" because it took the Second Note, a negotiable instrument, for value, in good faith

2   and without notice it was overdue, had been dishonored, or that there was any defense against

3   the note. Opp. to MSJ at 9 (citing Cal. Com. Code § 3302(a)(2)).

4       Defendants counter that the Second Note is a non-negotiable debt instrument because it

5   is subject to or governed by the SPA.  Under Cal. Com. Code § 3106(a), "a promise or order is

6   unconditional unless it states . . . that the promise or order is subject to or governed by another

7   writing, or . . . that rights or obligations with respect to the promise or order are stated in

8   another writing."  Although mere reference to another writing does not make the promise

9   conditional, the Second Note is explicitly governed by the SPA.  Specifically, the Second Note

10  provides that Nery's, the Borrower, must "perform promptly at the time and strictly in the

11  manner set out in any agreement including but not limited to the Stock Purchase Agreement

12  related to this Note between the Borrower [Nery's] and the Lender [Nascent] of even date

13  herewith, or in any other agreement or loan Borrower has with Lender."  Reply to MSJ Notice

14  of Lodgment Ex. Q; Reply to Opp. at 7.  But even if the Second Note was a negotiable debt

15  instrument, Defendants claim that a partial assignee, like Genesis, cannot be a holder in due

16  course.  In support of this argument, Defendants rely on Creative Ventures, LLC v. Jim Ward &

17  Assocs, 195 Cal. App. 4th 1430 (2011), which held that "where the transferor 'purports to

18  transfer less than the entire instrument, negotiation of the instrument does not occur.  The

19  transferee obtains no rights under this division and has only the rights of a partial assignee.'"

20  Id. at 1447 (citing Cal. Com. Code § 3203(d)).

21      Genesis claims that its status as an assignee does not affect its rights as a holder in due

22  course because Cal. Com. Code § 3302(e) provides that a person having only a security interest

23  in a negotiable instrument is still entitled to enforce the instrument, but only to the extent that

24  the amount payable "does not exceed the amount of the unpaid obligation secured."  If Genesis

25  is a holder in due course, then the negotiable instrument's borrower may only assert the

10

**ER108**

1    defenses specified in Cal. Com. Code § 3305(b)[2] and, according to Genesis, those defenses are

2    inapplicable here.

3         Here, the court finds both that the Second Note is a non-negotiable debt instrument and

4    that Genesis is not a holder in due course.  The Second Note's incorporation of the SPA's terms

5    forces the Second Note holder to reference another document, which by definition means that

6    the note is non-negotiable.  The court also disagrees with Genesis' contention that its assignee

7    status does not affect its rights as a holder in due course.  Cal. Com. Code § 3203(d) is explicit:

8    "If a transferor purports to transfer less than the entire instrument, negotiation of the instrument

9    does not occur.  The transferee obtains no rights under this division and has only the rights of a

10   partial assignee."  Negotiation is defined as "a transfer of possession, whether voluntary or

11   involuntary, of an instrument by a person other than the issuer to a person who thereby becomes

12   its holder."  Cal. Com. Code § 3201(a).  California's Commercial Code considers Genesis to be

13   a partial assignee, not a holder in due course, of the Second Note.  Genesis' reliance on Cal.

14   Com. Code § 3302(e) is misplaced as it entitles a person with only a security interest in an

15   instrument to enforce his or her interest as a holder in due course, "but only to an amount

16   payable under the instrument which, at the time of enforcement of the instrument, does not

17   exceed the amount of the unpaid obligation secured."  Indeed, the official comments on the

18   uniform code explain that § 3302(e) only permits a note holder (pledgee) who accepted a note

19   as a holder in due course from a person who pledged the note as a security for a debt (pledgor)

20   to assert his right to recover the full amount of the note for both the pledgee and the pledgor.[3]  It

21   _____

22   [2] Under Cal. Com. Code § 3305(b), "[t]he right of a holder in due course to enforce the obligation of a party to pay
     the instrument is subject to defenses of the obligor stated in paragraph (1) of subdivision (a), but is not subject to

23   defenses of the obligor stated in paragraph (2) of subdivision (a) or claims in recoupment stated in paragraph (3) of
     subdivision (a) against a person other than the holder."

24   [3] The official comment for Cal. Com. Code § 3302(e) provides the following example: "Payee negotiates a note of
     Maker for $1,000 to Holder as security for payment of Payee's debt to Holder of $600. Maker has a defense which is

25   good against Payee but of which Holder has no notice. Subsection (e) applies. Holder may assert rights as a holder in
     due course only to the extent of $600. Payee does not get the benefit of the holder-in-due-course status of Holder.
     With respect to $400 of the note, Maker may assert any rights that Maker has against Payee.  A different result

11

1   contains no reference to the rights of a partial assignee.  Permitting partial assignees, as holders

2   in due course, to recover the full value of a pledged note could potentially subject the borrower

3   to paying out the note's full value to various partial assignees.  That interpretation does not

4   make sense and ignores § 3302(e)'s plain language.  Accordingly, this court finds that Genesis

5   is the partial assignee of a non-negotiable note and is subject to defenses that could have been

6   originally asserted against Nascent.

7        Defendants contend that its performance under the SPA and the Second Note is excused

8   because Nascent made numerous misrepresentations.  MSJ at 17.  Defendants note that "[a]

9   contract may be discharged by breach, impossibility and rescission, among other methods,"

10  MSJ at 17 (citing 1 Witkin, Summary, § 924).  Defendants assert that the Second Note "may be

11  rescinded or reformed on the ground of fraud or deceit."  MSJ at 17 (citing Cal. Civ. Code

12  § 1689(b), 3399; Eade v. Reich, 120 Cal. App. 32, 39 (1932) ("If the representation was

13  intentional and made for the purpose of deceiving the vendor, and the vendor relies upon it and

14  was deceived by it and would not have entered into the contract but for the fact that he was so

15  deceived, then a court of equity will not enforce the contract").  Accordingly, Defendants seek

16  reformation of the Second Note.

17       Genesis counters that, to successfully assert a negligent misrepresentation defense,

18  Defendants must prove that "Nascent, through Piancone, made the representation without any

19  reasonable ground to be true."  Opp. to MSJ at 13.  To support this argument, Genesis relies on

20  Graham v. Ellmore, 135 Cal. App. 129 (1933).  In Graham, the plaintiff purchased a property

21  from a real estate salesman who believed that the property was only encumbered by a deed of

22  trust for $2,500 when in fact another deed of trust for $6,000 was outstanding.  Id. at 130.  The

23

24

---

25  follows if the payee of a note negotiated it to a person who took it as a holder in due course and that person pledged
    the note as security for a debt. Because the defense cannot be asserted against the pledgor, the pledgee can assert
    rights as a holder in due course for the full amount of the note for the benefit of both the pledgor and the pledgee."

ER110

1    court found that the real estate salesman had reasonably relied on and believed the original

2    seller's representations that the property was only subject to the $2,500 deed of trust.  Id.  The

3    court held that the plaintiff had failed to prove that the defendant knowingly or recklessly

4    misrepresented a material fact or that defendant could not have reasonably believed that the

5    seller's statement was true.  Id. at 132-33 ("Where a man makes a representation in the

6    reasonable belief that it is true, fraud will not be imputed to him if it afterward be shown to be

7    untrue, but there must be reasonable grounds for his belief.").  Therefore, the Graham court held

8    the real estate salesman had not engaged in negligent misrepresentation.  Id.

9          Genesis claims that the present matter is similar to Graham because Nascent reasonably

10   relied on Piancone's and Targa's representations that its liabilities did not exceed $150,000.

11   Genesis notes that Cathcart was familiar with Targa because he assisted Nascent in acquiring

12   Targa and had unlimited access to Targa's books and records and any Nascent officers who

13   could have provided additional information.  Opp. to MSJ at 11.  Cathcart believed that due

14   diligence was "futile because Targa's financial records were incomplete and unreliable."

15   Cathcart 9/7/12 Dec. ¶ 17.  But Genesis theorizes that Cathcart did not hire an auditing firm in

16   spite of recognizing that Targa's financials were questionable because he was relying on

17   Nascent's Piancone.  Opp. to MSJ at 12.  Piancone, who represented both Nascent and Targa

18   during Nery's acquisition, claims that he honestly believed that Targa's liabilities did not

19   exceed $150,000.  Genesis then makes the astute observation: "[o]ne would think that

20   defendants would not continue to have a business relationship with the very same person they

21   contend made a negligent misrepresentation to them."  Opp. to MSJ at 12-13.  In other words,

22   Defendants would not have continued their business relationship with Piancone if he knew or

23   should have known that Nascent's representations about Targa were false.

24         This argument is credible and points to an issue of triable fact regarding Nascent's

25   knowledge of Targa's finances.  Defendants have not provided any evidence indicating that

ER111

1   Nascent conclusively knew or should have known that Targa had additional liabilities such that

2   they can assert that defense against Genesis as Nascent's assignee.  Defendants are therefore not

3   entitled to summary judgment based on their negligent misrepresentation defense.

4         Alternatively, Defendants claim that Genesis cannot establish any damages.

5   Defendants' argument focuses on their losses, noting that they have "been saddled with over

6   $780,000 in excess liabilities and have lost over $2 million in estimated profits, which together

7   surmount Plaintiff's claimed damages."  MSJ at 18.  The two conclusory declarations made by

8   Cathcart do not explain how Defendants arrived at either the excess liabilities figure or the

9   estimated lost profits.  As Genesis correctly points out, Defendants' alleged lost profits may

10  have been caused by other factors, including a licensing agreement that Targa had with another

11  company and a new duty imposed on cheese by the Mexican government.  Opp. to MSJ at

12  16-17.  Not being firmly established, the Defendants' losses compared to Genesis' losses are a

13  factual issue for the jury to decide.

14        Defendants and Genesis also disagree on whether Targa is entitled to an offset under the

15  Guaranty.  Genesis insists that Targa waived various defenses regarding the enforcement of the

16  Second Note, including "any defense, set-off or counterclaim . . . which may be asserted by"

17  Nery's against the underlying obligation.  Guaranty at 3, § 2(d).  Though the Guaranty's terms

18  are very restrictive, it is enforceable under California law.  Bloom v. Bender, 48 Cal. 2d 793,

19  803 (1957) (upholding a statute of limitations waiver in a sales contract because the civil code

20  permits parties to waive any benefit of statute in reference to their rights and obligations unless

21  that waiver would be against public policy); Central Building, LLC v. Cooper, 127 Cal. App.

22  4th 1053, 1059 (2005) ("A guarantor may validly waive rights and defenses in the guaranty

23  contract.") (citing Restatement (3d) Suretyship and Guaranty § 16); River Bank America v.

24  Diller, 38 Cal. App. 4th 1400, 1414-18 (1995) (upholding waiver of defenses in surety contracts

25  pursuant to Bloom v. Bender, 48 Cal. 2d 793 (1957)).

ER112

Genesis further insists that Targa and its Director General, Piancone, knew more about Targa's condition than Nascent could have known when the Guaranty was executed. Genesis relies on <u>Sumitomo Bank of Cal. v. Iwasaki</u>, 70 Cal. 2d 81 (1968), which held that "each time the creditor accepts the continuing offer of a surety on a continuing guaranty by extending further credit to the principal debtor, the creditor owes a duty to the surety to disclose facts known by the creditor if the creditor has reason to believe that those facts materially increase the risk beyond that which the surety intended to assume and that those facts are unknown to the surety." <u>Id.</u> at 84. "The Guaranty itself contained general and specific representations and warranties made by Targa to Nascent that it was in good standing as a foreign corporation, that the business of Targa was not being conducted in violation of any law, ordinance or regulation of any governmental authority and that all the representations and warranties contained in the underlying Purchase Agreement as they Related to Targa were true and correct." Opp. to MSJ at 18. Genesis therefore concludes that "Targa cannot avail itself of any asserted defense that Nascent somehow failed to disclose any material fact as to Targa's financial condition since Targa itself was the party making the representations." Opp. to MSJ at 18.

But Defendants insist that they are entitled to an offset based on Nascent's failure to disclose Targa's financial condition because, "[w]hen one corporation (the parent company) owns the shares of another (the subsidiary) and exercises sufficient control over the latter's activities, the parent may be liable on the contracts or for the torts of the subsidiary, which is treated as a mere agency or instrumentality." Reply to Opp. at 9 (citing 9 Witkin, <u>Summary of Cal. Law</u> (10th ed. 2005) Corporations § 15 (citing <u>Northern Natural Gas Co. v. Superior Court</u>, 64 Cal. App. 3d 983, 994 (1976) ("[W]here a foreign corporation uses a wholly owned subsidiary as a mere agent or instrumentality of the foreign parent corporation, then the state may exercise jurisdiction over the foreign corporation.")); <u>Michigan Nat. Bank v. Hardman Aerospace</u>, 36 Cal. App. 3d 196 (1973) (holding that the parent corporation was actually buying

ER113

1   another corporation when its subsidiary entered into the agreement).  Defendants claim that

2   Genesis recognizes that Nascent used Targa as a mere instrumentality before the SPA was

3   signed to effectuate the transaction and offloads its debts on Nery's.  Reply to Opp. at 9 (citing

4   Opp. to MSJ at 12 (noting that Piancone acted on behalf of both Nascent and Targa).  Therefore,

5   Defendants assert that Targa is entitled to an offset based on its parent corporation's failure to

6   disclose its condition.

7        But Defendants have not pled facts alleging that Targa was merely Nascent's agent or

8   instrumentality.  That Piancone worked for both Nascent and Targa doesn't mean that Targa

9   was Nascent's instrumentality.  Nor did Genesis admit as much.  Genesis' point was rather that

10  Nery's relied on Piancone and would not have continued to work with him had it believed that

11  Piancone had lied to Nery's about Targa's condition.  But more importantly, the Guaranty's

12  waiver limited its ability to set-off or counterclaim.  Defendants have not made any direct

13  argument explaining why Targa's waiver should not apply to its parent, Nascent.  Defendants

14  therefore are not entitled to offsets under the Guaranty.

15        As Defendants have been unable to show that Genesis cannot establish each element of a

16  contract claim, summary judgment for the breach of contract claim is therefore denied.

17  **C. Unjust Enrichment**

18        Defendants claim that Genesis cannot assert an unjust enrichment claim, which is seen

19  as an alternative to a breach of contract claim, when the alleged contract is somehow invalid and

20  only an implied-in-fact or quasi-contract exists, because Genesis' first cause of action alleges

21  the existence and validity of an enforceable written contract.  Defendants rely on Lance Camper

22  Mfg. Corp. v. Republic Indem. Co., 44 Cal. App. 4th 194 (1996), which found that plaintiff's

23  two claims based on the existence of an enforceable contract were "internally inconsistent" with

24  its alternate quasi-contract claim based on the same document and that plaintiff could not assert

25  the quasi-contract claim without alleging that the allegedly enforceable contract at issue was

ER114

1   actually void. Id. at 203.  Defendants also note that Genesis' own valuations, which did not

2   take into account the over $780,000 in undisclosed liabilities, concluded Targa was only worth

3   $550,000 and these valuations. MSJ at 18-19.  "Deducting [the undisclosed] liabilities from the

4   $550,000 value amount of Targa valued by Plaintiff results in no value." Id. at 19.

5        Genesis counters that it "may quite properly submit this case on both theories."

6   Marcella v. ARP Films, Inc., 778 F.2d 112, 117 (2d. Cir. 1985); see also Bernardi v. JPMorgan

7   Chase Bank, N.A., 2012 U.S. Dist. LEXIS 1951 at *7 (N.D. Cal. Jan. 6, 2012) (permitting

8   plaintiff to submit breach of contract and unjust enrichment claims).  As the parties do not agree

9   on the validity of the Second Note, Guaranty, and SPA, permitting both claims makes sense

10  because Plaintiff is submitting that, whether or not the contract was valid, it suffered harm for

11  which it is entitled to recuperate.  The valuations argument is also unpersuasive because Targa's

12  value is a question of fact that this court may not answer.  Accordingly, summary judgment is

13  denied for Genesis' unjust enrichment claim.

14       **D. Negligent Misrepresentation**

15       To establish a claim for negligent misrepresentation Genesis would need to prove that:

16  (1) a representation of a past or existing material fact exists; (2) the representation was untrue;

17  (3) the representation was made without reasonable grounds for believing it to be true; (4) the

18  representation was made with intent to induce another's reliance on the fact misrepresented, (5)

19  its ignorance of the truth and justifiable reliance thereon, and (5) damages. Fox v. Pollack, 181

20  Cal. App. 3d 954, 962 (1986); see also 5 Witkin, Summary of Cal. Law (10th ed. 2005) Torts,

21  § 818.  Genesis' negligent misrepresentation claim is based on Cathcart's allegedly false

22  representations about Nery's' and Targa's financial state and about Nery's' and Targa's ability

23  and intent to make payments on the Second Note.  MSJ at 20.

24       Defendants counter that they made no false statements, that Genesis did not rely on any

25  of their purported representations, and that Plaintiff did not suffer any damages as a result.

ER115

1    Defendants contend that Cathcart's statements regarding Nery's financial condition or ability to

2    pay were not misrepresentations because Nery's was forthcoming about its lack of assets or

3    capital and executed the Targa deal by promissory note rather than cash precisely because of

4    this lack of cash and capital. MSJ at 21. Defendants also note that Genesis knew that Targa's

5    business had been stopped due to lack of working capital. MSJ at 21. Genesis responds that

6    Defendants do not appreciate that Genesis only had two choices: "(1) accept the purchase

7    proposed by Cathcart and Piancone, or (2) foreclose on the assets of Targa, including the Nery's

8    brand." Opp. to MSJ at 20. But Genesis' response is unsatisfying. That Genesis was forced to

9    make a difficult decision about whether to permit the deal to go forward does not transform

10   Defendants' statements into misrepresentations. The facts pled by both parties suggest that

11   Genesis was aware that Nery's was a new company with limited capitalization and that Targa

12   and Nascent were facing financial difficulties. This court therefore grants Defendants' motion

13   for summary judgment on this claim.

14        **E.  Conversion**

15        In California, three elements are required to establish a conversion claim: 1) plaintiff's

16   ownership or right to possession of the property at the time of the alleged conversion; (2)

17   defendant's conversion by a wrongful act or disposition of plaintiff's property rights; and (3)

18   damages. Hartford Fin. Corp. v. Burns, 96 Cal. App. 3d 591, 598 (1979). Though "money

19   cannot be the subject of an action for conversion unless a specific sum capable of identification

20   is involved, each coin or bill need not be earmarked." Haigler v. Donnelly, 18 Cal. 2d 674, 681

21   (1941) (citing Baxter v. King, 81 Cal. App. 192, 194 (1927). Genesis alleges that, at the time of

22   Targa's sale, it had a right to foreclose on its security interest in Targa's assets and therefore a

23   right to possession. Opp. to MSJ at 20. Genesis claims that Cathcart interfered with its right to

24   Targa's assets by misrepresenting his plans for Targa's capitalization, failing to disclose that he

25

18

ER116

1    had not performed due diligence on Targa's incomplete and unreliable records, and that he

2    never intended to make payments on the note due. Id.

3            Defendants counter that Genesis only had a right to foreclose on Targa's assets, not a

4    right to immediate possession.  Without a right to immediate possession, Defendants contend

5    that Genesis cannot assert a foreclosure claim.  However, Defendants' cited authority only

6    states that "the right to immediate possession by a secured party upon default must be

7    effectuated through judicial action rather than self-help if force or threats of force are necessary

8    to secure possession of the collateral without judicial intervention." Hartford Fin. Corp. v.

9    Burns, 96 Cal. App. 3d 591, 600 (1976).

10           Defendants also contend that the alleged misrepresentations were truthful and not

11   wrongful acts.  This argument is more convincing.  Prior to the Targa deal's closure and the

12   issuance of the Second Note, Genesis knew that Targa's capitalization would be more limited

13   than originally hoped.  Failure to perform due diligence placed Nery's at risk, not Genesis,

14   because Nery's would be liable for any of Targa's losses.  And finally, Genesis' accusation that

15   Nery's and Cathcart never intended to pay off the Second Note appears to be mere speculation

16   that is insufficient to overcome the motion for summary judgment standard.  Accordingly, this

17   court grants summary judgment in favor of Defendants for this claim.

18   **IV. TREATING SPECIFIED FACTS AS ESTABLISHED**

19           Fed. R. Civ. P. 56(g) states, that "[i]f the court does not grant all the relief requested by

20   the motion [for summary judgment], it may enter an order stating any material fact that is not

21   genuinely in dispute and treating the fact as established in the case."  Here, the court declines

22   Defendants' invitation to treat any facts as established.

23   **V. SANCTIONS**

24           A plaintiff's failure to diligently prosecute may justify monetary sanctions.  Pomerance

25   v. Astrue, 2010 U.S. Dist. LEXIS 142968 at *5-6 (S.D. Cal. 2010).  Local Rule 83.1(a) also

19

1   permits this court to impose monetary sanctions for failure to comply with local rules, Federal

2   Civil Procedure Rules, or any court order.  When sanctions are based on attorneys' fees, the

3   party seeking fees has the burden of proving the reasonableness of its fees.  See Hensley v.

4   Eckerhart (1983) 461 U.S. 424, 437 (holding that the fee applicant bears the burden of

5   establishing entitlement to an award and documenting the time expended and hourly rate).  Any

6   sanctions awarded must also be reasonable.  In re Yagman, 796 F.2d 632, 1165, 1185 (9th Cir.

7   1986) ("Recovery should never exceed those expenses and fees that were reasonably necessary

8   to resist the offending action.").

9          However, "before awarding sanctions under its inherent powers, the court must make an

10  explicit finding that counsel's conduct 'constituted or was tantamount to bad faith.'"  Primus

11  Auto. Fin. Servs. v. Batarse, 115 F.3d 644, 648 (9th Cir. 1997).  Delaying or disrupting the

12  litigation or hampering enforcement of a court order may constitute bad faith.  Hutto v. Finney,

13  437 U.S. 678, 689 (1978).  The bad faith requirement is a high threshold.  Primus, 115 F.3d at

14  648.

15         Here, the court finds that the bad faith requirement is not met.  As previously discussed,

16  Genesis' failure to immediately seek and secure new counsel caused at least some of the delay,

17  although some delay would have been inevitable as any new counsel would have needed time to

18  review the matter and carefully consider entering the case.  Genesis also hired new counsel soon

19  after the two orders to show cause were issued.  Genesis' need to change counsel does not

20  appear to have been merely a tactic to delay the resolution of this matter.  Genesis' poor

21  judgment just doesn't rise to the level of bad faith.

22         The amount requested by Defendants for attorneys' fees also seems to be

23  unsubstantiated and unreasonable.  Defendants have requested $18,598, which they claim

24  reflects the attorneys' fees and costs for responding to Genesis' request for a continuance,

25  Defendants' reply to this court's Order to Show Cause for Genesis' failure to prosecute, and

ER118

1    preparing for and attending this court's October 29, 2012 hearing.  Genesis' brief states that

2    Defendants are seeking $23,217 in fees because Defendants are seeking an additional $4,619 in

3    sanctions related to Judge Gallo's Order to Show Cause.  Defendants have submitted an

4    affidavit by Mark Mazzarella stating that his firm charges the following fees: $445 for an hour

5    of his time, $320 an hour for Mr. Lorenzana, $250 an hour for Mr. Bennion, and $150 an hour

6    for Ms. Sanders.  Mazzarella Decl. at ¶ 10-13.  Mr. Mazzarella did not specify how many hours

7    each person worked or even the total hours worked, but asserts that his firm's total fees are

8    $12,940.50.  John McNutt, who also represents the Defendants, has an hourly rate of $365 and

9    spent 15.5 hours researching and drafting opposition papers related to Plaintiff's requests, for

10   fees totaling $5,657.50.  McNutt Decl. at ¶ 3-6.

11          Defendants' failure to explain how much time was spent on various tasks such that the

12   court could determine that the fees are reasonable seems highly problematic.  Additionally, the

13   high "bad faith" bar set forth for sanctions heavily weighs against sanctioning a party,

14   especially one who is not entirely culpable for the delay.  This court exercises its discretion to

15   deny reimbursement for fees and expenses.

16   **V. CONCLUSION**

17          Defendants' motion for summary judgment on all claims against Cathcart is

18   GRANTED.  Defendants' motion for summary judgment is DENIED for the breach of contract

19   and unjust enrichment claims, but GRANTED for the negligent misrepresentation and

20   conversion claims.  In addition, Defendants' request for sanctions is DENIED.

21          **IT IS SO ORDERED.**

22   DATED: December 19, 2012

23

24                                                              Jeffrey T. Miller
                                                               United States District Judge
25

21

**ER119**