Nos. 13-56797 & 13-57106

# IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

———————————————

GENESIS MERCHANT PARTNERS, LP,

Plaintiff-Appellant,

v.

NERY'S USA, INC., ET AL.,

Defendant-Appellant.

———————————————

APPELLANT'S EXCERPTS OF RECORD
VOLUME 2 OF 2 [PAGES 119A-326]

———————————————

On Consolidated Appeals From a Judgment Following a Bench Trial and
a Postjudgment Order Awarding Attorney's Fees and Costs
United States District Court for the Southern District of California
No. 3:11-cv-01589-JM-WVG
The Honorable Jeffrey T. Miller

———————————————

Raymond A. Cardozo (Cal. SBN 173263)
Dennis Peter Maio (Cal. SBN 99894)
REED SMITH LLP
101 Second Street, Suite 1800
San Francisco, CA 94105
Telephone: +1 415 543 8700
Facsimile: +1 415 391 8269

*Attorneys for Plaintiff-Appellant*
*Genesis Merchant Partners, LP*

**INDEX TO APPELLANT'S EXCERPTS OF RECORD**

| NO. | DATE FILED | PARTY | DESCRIPTION OF DOCUMENT | VOL. NO. | BATES NOS. |
|---|---|---|---|---|---|
| 1 | 01/13/14 | Court | Order (1) Deeming Defendant Cathcart's Objection To Fee Order And Request For Notice Of Errata Or Technical Correction A Motion for Reconsideration; (2) Denying Motion for Reconsideration [Doc. 192] | 1 | ER1 – ER5 [ER6 – ER11 omitted] |
| 2 | 12/16/13 | Plaintiff | Notice of Appeal [Doc. 187] | 1 | ER12 – ER12A |
| 3 | 12/06/13 | Court | Order Granting In Part And Denying In Part Defendants' Motion For Attorneys' Fees And Costs [Doc. 186] | 1 | ER13 – ER39 |
| 4 | 10/16/13 | Plaintiff | Notice of Appeal [Doc. 170] | 1 | ER40 |
| 5 | 09/20/13 | Court | Entry Of Judgment [Doc. 164] | 1 | ER41 – ER42 |

Genesis Merchant Partners, LP v. Nery's USA, Inc., et al.,
9th Circuit Nos. 13-56797 (USDC, S.D. Cal. No. 3:11-cv-01589-JM-WVG)

INDEX TO APPELLANT'S EXCERPTS OF RECORD – Continued

| NO. | DATE FILED | PARTY | DESCRIPTION OF DOCUMENT | VOL. NO. | BATES NOS. |
|---|---|---|---|---|---|
| 6 | 07/26/13 | Court | Statement Of Decision Pursuant To Rule 52 [Doc. 156] | 1 | ER43 – ER65 |
| 7 | 06/21/13 | Court | Pretrial Order [Doc. 142] | 1 | ER66 – ER90 |
| 8 | 02/20/13 | Court | Order Denying Motion For Entry Of Judgment And Declining To Address Motion For Attorney's Fees [Doc. 127] | 1 | ER91 – ER98 |
| 9 | 12/19/12 | Court | Order Denying In Part And Granting In Part Defendants' Motion For Summary Judgment And Denying Sanctions Pursuant To This Court's Order To Show Cause [Doc. 111] | 1 | ER99 – ER119 |

Genesis Merchant Partners, LP v. Nery's USA, Inc., et al.,
9th Circuit Nos. 13-56797 (USDC, S.D. Cal. No. 3:11-cv-01589-JM-WVG)

INDEX TO APPELLANT'S EXCERPTS OF RECORD – Continued

| NO. | DATE FILED | PARTY | DESCRIPTION OF DOCUMENT | VOL. NO. | BATES NOS. |
|---|---|---|---|---|---|
| 10 | 12/16/13 | Defendants | Defendant John Cathcart's Objection to Fee Order Or, in the Alternative, Request for Notice of Errata or Technical Correction [Doc. 190] | 2 | ER119A-ER119F |
| 11 | 09/12/13 | Defendants | Defendants' Motion for Judgment [Doc. 158] | 2 | ER119G-ER119H |
| 12 | 07/01/13 | Plaintiff Genesis Merchant Partners, LP | Plaintiff's Brief Re: The Court's Amended Request For Further Briefing [Doc. 152] | 2 | ER120 – ER131 |
| 13 | 06/24/13 | Plaintiff | Exhibit No. 1: Senior Secured Promissory Note issued 3/31/2008 | 2 | ER132 – ER139 |
| 14 | 06/24/13 | Plaintiff | Exhibit No. 4: Amendment To Secured Promissory Note effective 3/31/2009 | 2 | ER140 – ER144 |

## INDEX TO APPELLANT'S EXCERPTS OF RECORD – Continued

| NO. | DATE FILED | PARTY | DESCRIPTION OF DOCUMENT | VOL. NO. | BATES NOS. |
|---|---|---|---|---|---|
| 15 | 06/24/13 | Plaintiff | Exhibit No. 22: Stock Purchase Agreement dated 2/1/2010 | 2 | ER145 – ER187 |
| 16 | 06/24/13 | Plaintiff | Exhibit No. 23: Promissory Note dated 2/10/2010 | 2 | ER188 – ER192 |
| 17 | 06/24/13 | Plaintiff | Exhibit No. 24: Subsidiary And Affiliate Guarantee dated 2/10/2010 | 2 | ER193 – ER202 |
| 18 | 06/24/13 | Plaintiff | Exhibit No. 25: Decision Letter Regarding Payments of Proceeds Pursuant to that Certain Promissory Note … | 2 | ER203 |
| 19 | 96/24/13 | Plaintiff | Exhibit No. 26: Collateral Assignment Of Contracts dated 2/10/2010 | 2 | ER204 – ER212 |
| 20 | 06/24/13 | Transcript | Excerpts of Bench Trial, Day 1, Volume 1—pp. 1, 72, 75, 77-78, 92-96, 98-106, 113-115 | 2 | ER213 – ER234 |

INDEX TO APPELLANT'S EXCERPTS OF RECORD – Continued

| NO. | DATE FILED | PARTY | DESCRIPTION OF DOCUMENT | VOL. NO. | BATES NOS. |
|---|---|---|---|---|---|
| 21 | 06/25/13 | Transcript | Excerpts of Bench Trial, Day 2, Volume 2—pp. 194, 202-206, 314, 316, 404, 412, 437, 484-486, 488, 496-498, 500-501 | 2 | ER235 – ER242 |
| 22 | 06/26/13 | Transcript | Excerpts of Bench Trial, Day 3, Volume 3—pp. 337, 350, 352-353, 356-357, 364-366, 370-371, 373-375 | 2 | ER243 – ER268 |
| 23 | 06/27/13 and 06/28/13 | Transcript | Excerpts of Bench Trial, Days 4 & 5, Volume 4—pp. 522, 556, 560-561, 592-594 | 2 | ER269 – ER275 |
| 24 | 06/17/13 | Plaintiff | Plaintiff's Trial Brief [Doc. 136] | 2 | ER276 – ER295 |
| 25 | 07/19/11 | Plaintiff | Complaint: 1) Breach of Contract, 2) Conversion, 3) Unjust Enrichment, 4) Negligent Misrep-resentation [and Civil Cover Sheet] [Doc. 1] | 2 | ER296 – ER305 |

Genesis Merchant Partners, LP v. Nery's USA, Inc., et al.,
9th Circuit Nos. 13-56797 (USDC, S.D. Cal. No. 3:11-cv-01589-JM-WVG)

INDEX TO APPELLANT'S EXCERPTS OF RECORD – Continued

| NO. | DATE FILED | PARTY | DESCRIPTION OF DOCUMENT | VOL. NO. | BATES NOS. |
|---|---|---|---|---|---|
| 26 | 07/19/11 | Plaintiff | Attachment to Complaint: Direction Letter Regarding Payments Of Proceeds Pursuant To That Certain Promissory Note … dated 2/10/2010 [Doc. 1-4] | 2 | ER306 |
| 27 | 01/14/14 | Court | Civil Docket for Case #3:11-cv-01589-JM-WVG | 2 | ER307 – ER326 |

1  John J. McNutt, State Bar No. 243975
   MCKENNA LONG & ALDRIDGE LLP
2  600 West Broadway, Suite 2600
   San Diego, California 92101
3  Telephone No.: 619.236.1414
   Fax No.: 619.645.5336
4  E-Mail: jmcnutt@mckennalong.com

5  Attorneys for Defendant, Counterclaimant
   and Third Party Complainant Nery's USA, Inc.,
6  and Defendants Commercial Targa, SA de CV
   and John Cathcart
7

8              UNITED STATES DISTRICT COURT

9            SOUTHERN DISTRICT OF CALIFORNIA

10

11 | GENESIS MERCHANT PARTNERS,          Case No. 11-CV-01589-JM-WVG
   | LP, a Connecticut corporation,
12 |                                     Hon. Jeffrey T. Miller
          Plaintiff,
13 |
   | v.
14 |                                     DEFENDANT JOHN CATHCART'S
   | NERY'S USA, INC., a Nevada          OBJECTION TO FEE ORDER OR, IN
15 | corporation; JOHN CATHCART, an      THE ALTERNATIVE, REQUEST
   | individual; COMMERCIAL TARGA,       FOR NOTICE OF ERRATA OR
16 | SA de CV, a Mexican corporation,    TECHNICAL CORRECTION
17 |          Defendants.                Complaint Filed: July 19, 2011
18 | _____
   | NERY'S USA, INC., a Nevada
19 | corporation,
20 |          Counterclaimant,
21 | v.
22 | GENESIS MERCHANT PARTNERS,
   | LP, a Connecticut corporation,
23 |
   |          Counterdefendants.
24 | _____

25

26

27

28

1                    Case No. 11-CV-01589-JM-WVG
                Cathcart's Objection to Fee Order or Request for
                      Notice of Errata or Technical Correction

                                                        ER119A

1

2

NERY'S USA, INC., a Nevada
corporation,

3

      Third Party Complainant,

4

v.

NASCENT WINE COMPANY, INC., a
Nevada corporation,

5

6

      Third Party Defendant.

7

8       Defendant John Cathcart ("Cathcart") objects to the court's fee order dated

9 December 6, 2013 or, in the alternative, requests that the court issue a notice of

10 errata or technical correction to the fee order on the ground that the court failed to

11 specify the amount Cathcart is entitled to recover in the judgment for fees incurred

12 in his defense through December 2012 (when he was dismissed from the action

13 following summary judgment).

14       The court found that Cathcart was entitled to an individual fee award

15 following his successful defense on all claims asserted against him (order dated

16 December 6, 2013, page 17, line 24 through page 18, line 12 ("Accordingly, the

17 court finds Cathcart may recover attorney's fees incurred to defend against

18 Plaintiff's contract claim in addition to those fees related solely to the defense

19 against Plaintiff's alter ego claim.").)

20 ///

21 ///

22 ///

23 ///

24 ///

25 ///

26 ///

27 ///

28 ///

Case No. 11-CV-01589-JM-WVG
Cathcart's Objection to Fee Order or Request for
Notice of Errata or Technical Correction

**ER119B**

1    The court did not, however, include the actual amount of the award to

2   Cathcart at the end of the sentence quoted immediately above.  Cathcart requested

3   $272,000 in his fee motion.  Cathcart requests that the court amend the order or

4   provide a notice of errata for a scrivener's error and include a specific fee award for

5   Cathcart as an individual.

6

7   Dated: December 16. 2013        MCKENNA LONG & ALDRIDGE LLP

8

9                                    By: s/ John J. McNutt
                                        John J. McNutt
10                                       Attorneys for Defendant, Counterclaimant
                                        and Third Party Complainant Nery's USA, Inc.
11                                       and Defendant Commercial Targa. SA de CV

12
    USW 804119397.1
13  034952.1

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Case No. 11-CV-01589-JM-WVG
Cathcart's Objection to Fee Order or Request for
Notice of Errata  or Technical Correction

ER119C

1  John J. McNutt, State Bar No. 243975
   McKENNA LONG & ALDRIDGE LLP
2  600 West Broadway, Suite 2600
   San Diego, California 92101
3  Telephone No.: 619.236.1414
   Fax No.: 619.645.5336
4  E-Mail: jmcnutt@mckennalong.com

5  Attorneys for Defendant, Counterclaimant
   and Third Party Complainant Nery's USA, Inc.,
6  Defendant Commercial Targa, SA de CV, and
   Defendant John Cathcart

7

8              UNITED STATES DISTRICT COURT

9             SOUTHERN DISTRICT OF CALIFORNIA

10

| 11 | GENESIS MERCHANT PARTNERS, LP, a Connecticut corporation, | Case No. 11-CV-01589-JM-WVG |
|---|---|---|
| 12 | | |
| 13 | Plaintiff, | PROOF OF SERVICE |
| 14 | v. | Hon. Jeffrey T. Miller, Courtroom 5D |
| 15 | NERY'S USA, INC., a Nevada corporation; JOHN CATHCART, an individual; COMMERCIAL TARGA, SA de CV, a Mexican corporation, | Complaint Filed: July 19, 2011 Trial Date:  June 24, 2013 |
| 16 | | |
| 17 | Defendants. | |
| 18 | | |
| 19 | NERY'S USA, INC., a Nevada corporation, | |
| 20 | Counterclaimant, | |
| 21 | v. | |
| 22 | GENESIS MERCHANT PARTNERS, LP, a Connecticut corporation, | |
| 23 | | |
| 24 | Counterdefendants. | |

25

26

27

28

1

ER119D

1

2    NERY'S USA, INC., a Nevada
     corporation,

3           Third Party Complainant,

4    v.

     NASCENT WINE COMPANY, INC., a
5    Nevada corporation,

6           Third Party Defendant.

7

8           I declare as follows:

9           I am an attorney with the firm of McKenna Long & Aldridge LLP, whose

10   address is 600 West Broadway, Suite 2600, San Diego, California 92101-3372. I

11   am a member of the bar of this court, over the age of eighteen years and not a party

12   to this action.

13          On December 16, 2013, I caused the following to be served:

14   DEFENDANT JOHN CATHCART'S OBJECTION TO FEE ORDER OR, IN THE
     ALTERNATIVE, REQUEST FOR NOTICE OF ERRATA OR TECHNICAL
15   CORRECTION

16   on the interested parties in this action as follows:

17   Electronic Mail Notice List

18   The following are those who are currently on the list to receive e-mail notices for

19   this case.

20   Jerry D. Hemme
     jhemme@sandiegoattorney.com
21

22   ///

23   ///

24   ///

25   ///

26   ///

27   ///

28   ///

1    I hereby certify that the foregoing documents were filed electronically with

2    the Clerk of the Court to be served by operation of the Court's electronic filing

3    system upon all parties on the electronic service list maintained for this case.

4    I declare under penalty of perjury under the laws of the United States of

5    America that the foregoing is true and correct.  Executed on December 16, 2013, at

6    San Diego, California.

7

8                                        By: s/ John J. McNutt
                                             Attorneys for Defendant, Counterclaimant
9                                            and Third Party Complainant Nery's USA, Inc.,
                                             Defendant Commercial Targa, SA de CV, and
10                                           Defendant John Cathcart

11
     101928546.1
12   034952.1

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**ER119F**

1  John J. McNutt, State Bar No. 243975
   MCKENNA LONG & ALDRIDGE LLP
2  600 West Broadway, Suite 2600
   San Diego, California 92101
3  Telephone No.: 619.236.1414
   Fax No.: 619.645.5336
4  E-Mail: jmcnutt@mckennalong.com

5  Attorneys for Defendant, Counterclaimant
   and Third Party Complainant Nery's USA, Inc.,
6  Defendant Commercial Targa, SA de CV, and
   Defendant John Cathcart

7

8              UNITED STATES DISTRICT COURT

9             SOUTHERN DISTRICT OF CALIFORNIA

10

11  GENESIS MERCHANT PARTNERS,          Case No. 11-CV-01589-JM-WVG
    LP, a Connecticut corporation,
12                                      Hon. Jeffrey T. Miller
           Plaintiff,
13
    v.
14                                      DEFENDANTS' MOTION FOR
    NERY'S USA, INC., a Nevada          JUDGMENT
15  corporation; JOHN CATHCART, an
    individual; COMMERCIAL TARGA,
16  SA de CV, a Mexican corporation,    Complaint Filed: July 19, 2011
                                        Trial Date:  June 24, 2013
17         Defendants.

18  ─────────────────────────────────
    NERY'S USA, INC., a Nevada
19  corporation,

20         Counterclaimant,

21  v.

22  GENESIS MERCHANT PARTNERS,
    LP, a Connecticut corporation,
23
           Counterdefendants.
24

25

26

27

28

1

2
NERY'S USA, INC., a Nevada
corporation,

3
     Third Party Complainant,

v.

4

5
NASCENT WINE COMPANY, INC., a
Nevada corporation,

6
     Third Party Defendant.

7

8
     TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

9
     PLEASE TAKE NOTICE THAT defendant, counterclaimant and third party

10
complainant Nery's USA, Inc., defendant Commercial Targa, SA de CV, and

11
defendant John Cathcart (collectively, "Defendants") request that the court enter

12
judgment in this matter.

13
     A copy of the proposed judgment is being submitted with this motion.  This

14
motion is based on the statement of decision, the proposed judgment, and the entire

15
case file.

16
     The proposed judgment reads:  "The Court finds in favor of Defendants and

17
each of them and against Plaintiff on all claims.  The Court ORDERS that the

18
plaintiff take nothing, the action be dismissed on the merits, and defendants Nery's

19
USA, Inc., Commerical Targa, S.A. de C.V., and John Cathcart are awarded fees

20
and costs.  IT IS SO ORDERED."

21

22
Dated: September 12, 2013     MCKENNA LONG & ALDRIDGE LLP

23

24
     By: s/ John J. McNutt

25
        John J. McNutt
        Attorneys for Defendant, Counterclaimant

26
        and Third Party Complainant Nery's USA, Inc.,
        Defendant Commercial Targa, SA de CV, and

27
        Defendant John Cathcart

803949612.1
034952.1

28

1  Jerry D. Hemme, Esq. [SBN 99010]
   Arnold Neves, Jr., Esq. [SBN 109711]
2  **GOODE, HEMME & PETERSON**
   6256 Greenwich Dr., Suite 500
3  San Diego, California 92122
   Tel:  858.587.3555
4  Fax: 858.587.3545
   jhemme@sandiegoattorney.com
5  aneves@sandiegoattorney.com

6  Attorneys for Plaintiff
   GENESIS MERCHANT PARTNERS, LP
7

8              **UNITED STATES DISTRICT COURT**

9          **FOR THE SOUTHERN DISTRICT OF CALIFORNIA**

10 | GENESIS MERCHANT PARTNERS, | Case No.  11CV1589 JM WVG |
   | LP, a Connecticut corporation, | *Complaint Filed 7/19/11* |
11 | | |
   | Plaintiff, | **PLAINTIFF'S BRIEF RE: THE** |
12 | v. | **COURT'S AMENDED REQUEST** |
   | | **FOR FURTHER BRIEFING** |
13 | NERY'S USA, INC., a Nevada | |
   | corporation; JOHN CATHCART, an | |
14 | individual; and COMMERCIAL | Courtroom 5D |
   | TARGA, S.A. DE C.V., a Mexican | Judge Jeffrey T. Miller |
15 | corporation; | |
16 | Defendants. | |
17 | NERY'S USA, INC., a Nevada | |
   | corporation, | |
18 | | |
   | Third Party Complainant, | |
19 | v. | |
20 | NASCENT WINE COMPANY, INC., a | |
   | Nevada corporation, | |
21 | | |
   | Third Party Defendant. | |
22 | | |

23     **(1)    Assuming the court finds Nascent was in immediate and material**

24  **breach of the SPA and that Nery's substantially complied with the**

25  **indemnification provision's requirement of written notice, what was the effect of**

26  **Nery's not seeking rescission of the SPA between the breach and the 3rd**

27  **installment payment in late 2010?**

28

ER120

1     Since the Court's question assumes an immediate and breach by Nascent

2     (which is disputed by plaintiff), the contract analysis begins with the remedies

3     available to Nery's under this hypothetical.  The short answer is provided by the SPA:

4     there is no effect of Nery's not seeking rescission of the SPA between the breach and

5     the 3rd installment payment in late 2010 because Section 8.5 states that the

6     indemnification provisions of Article VIII are the exclusive remedies of the parties

7     "arising out of or in connection" with the SPA.  This remedy "shall be in lieu of any

8     rights under contract, tort, equity or otherwise".  The only exception is a claim based

9     on "actual fraud or intentional breach" of the agreement.  Plaintiff provided briefing in

10    its Trial Brief as to why this exception is not available.

11    Nery's sole and exclusive remedy was to seek indemnification from Nascent for

12    any breaches of the SPA.  That is exactly what Mr. Cathcart did.  He testified that

13    each time a new "undisclosed liability" arose, he contacted Sandro Piancone, provided

14    him with a copy of the documents that evidenced the debt and requested indemnity

15    from Nascent.  He said that each time, Mr. Piancone told him that Nascent did not

16    have the money.  If Nascent did not indemnify Nery's, then Nery's had the right to

17    defend or pay the claim at its own expense and the demand payment from Nascent.

18    (See Section 8.3(a)(ii) and 8.4(b)).  Since Nery's owed Nascent money under the

19    Note, Nery's had a source of reimbursement by an offset.

20    If the court were to find that Section 8.5 is not applicable, then the question is

21    what are Nery's remedies upon the breach.   A breach of a contract gives the non-

22    breaching party the election of certain remedies.  See 1 Witkin Summary of California

23    Law, Ch. I, §853.  Here, the applicable remedies are a claim for damages or a claim

24    for rescission and restitution.  However, these two remedies are inconsistent.  The

25    remedy of damages is based upon an affirmance of the contract and rescission is based

26    upon a disaffirmance of the contact.  *Davis v. Rite-Lite Sales Co.* (1937) 8 Cal. 2d

27    675, 678-679.

28    The injured party may lose his or her right to rescind by failing to give timely

1  notice of rescission to the breaching party, or by conduct (such as retention of
2  benefits) indicating an election to affirm the contract.  Therefore, the court's question
3  appears to ask whether Nery's engaged in any conduct between the assumed breach
4  and the 3rd installment which would result in a waiver of Nery's right of rescission.

5        Any act indicating the intent to abide by the contract is evidence of an
6  affirmance of the contract and of a waiver of the right to rescind. *Le Clercq v. Michael*
7  (1948) 88 Cal. App. 2d 700, 702 (Purchasers of restaurant business, furniture, and
8  fixtures, after acquiring knowledge of vendor's interest in new restaurant, continued to
9  operate restaurant, made four payments on note, offered business for sale, and refused
10  an offer which would have netted them $500 more than they had paid for the business,
11  purchasers waived right, if any, to rescind on ground that vendor misrepresented that
12  he wanted to get out of restaurant business and did not intend to re-engage in that
13  business).

14        A waiver of right to rescind will be presumed against a party who, having full
15  knowledge of circumstances which would warrant rescission, accepts and retains
16  benefits accruing under the contract.  *Neet v. Holmes* (1944) 25 Cal. 2d 447, 458.  In
17  *Hogan v. Anthony,* (1921), 52 Cal. App. 158, 166 the court stated that a party to a
18  contract of sale "cannot play fast and loose in the matter. He is not allowed to go on
19  and derive all possible benefit from the transaction and then claim the right to be
20  relieved from his own obligations by a rescission or refusal to perform on his part".

21        At no time between the assumed breach and the 3rd installment, did Nery's
22  intend to rescind the SPA.  On the contrary, Cathcart testified that he asked Nascent to
23  indemnify it for the "undisclosed liabilities" time and time again.  By making those
24  demands, Nery's affirmed the contract since it was following Article VIII's indemnity
25  provisions.  Nery's did not elect to repudiate the contract based upon the "undisclosed
26  liabilities".  Further, Nery's continued to operate the business.  Nery's used the brand,
27  used the cigarette permits, used the facility and equipment to cut and wrap cheese with
28  the clear intent to keep Targa to make a profit.  Neither Nery's nor Cathcart were

ER122

1   personally liable for any of Targa's liabilities, nor did they have any of their own

2   money in the business. They could have walked from Targa at any time without

3   consequence. Instead, they retained the benefits of the purchase.

4       During this same time period, Nery's never provided Nascent with notice of

5   rescission. A party seeking rescission is required to *promptly* provide notice of

6   rescission. *Cal. Civil Code* § 1691. While delay in providing notice of rescission

7   does not bar the claim, it will if the delay is substantially prejudicial. *Cal. Civil Code*

8   §1693. Here, Genesis as a third party was prejudiced because it released its security

9   interest to permit Nery's to take control of the business. Had Genesis foreclosed it

10  would have taken title to the Nery's brand which had been licensed to Zahava in

11  Mexico and Nery's in the United States. At the time, Zahava was paying $10,000 to

12  $15,000 per month which then would have been paid to Genesis. Genesis would have

13  also collected a royalty from Nery's if it had generated sales in the U.S. Genesis did

14  not have to take on any liabilities of Targa to maximize this asset. The difficulties

15  Nery's claims it had arose from trying to restart the cut and wrap part of the business

16  which is labor and equipment intensive. Cathcart changed the status quo by

17  terminating the Zahava license which resulted in litigation and competition that hurt

18  Targa. He certainly had the right to make the choice, but that choice, after knowing

19  about the alleged liability issues, was an affirmance of the contract which resulted in

20  the waiver of a claim for rescission.

21

22      **(2)    If some version, modification, or reformation survived after**

23  **February 10, 2010, and with the same assumptions as in the first question**

24  **operative, what was the modified, or reformed version of the SPA, when did it**

25  **take effect, and what were the rights and liabilities of Nery's and Nascent under**

26  **the modified or reformed version?**

27      If it was appropriate, a modification or reformation of the SPA would be limited

28  to Section 2.2 where Nery's agreed to assume $150,000 in accounts payable. This

ER123

1    was the only provision of the contract where the testimony contradicted the language

2    of the contract. Both Cathcart and Piancone testified that the $150,000 referred to a

3    payable owed by Targa (not owed by Nascent) to EX-IM Bank and that Nascent was

4    to take care of any other liabilities of Targa. Exhibit 19 dated January 28, 2010 is a

5    communication from Cathcart expressing his intent to purchase Targa "no matter the

6    terms" for $2,000,000 minus liabilities. To the extent this difference is material, the

7    contract could be reformed to reflect those terms. The reformation would take effect

8    as of the day the contract became effective since the purpose of reformation is to

9    correct a written instrument in order to effectuate a common intention of both parties

10   that was incorrectly reduced to writing. *Cal. Civil Code* §3399. [See discussion of

11   reformation in plaintiff's response to Question 5].

12        Modification is not applicable on these facts. Parties that enter into a written

13   contract may alter or modify the terms of their agreement by a subsequent written

14   agreement or by an executed oral agreement. As provided by *Cal. Civil Code* § 1698,

15   a written contract can be modified only by the following:

16        (1) a subsequent written agreement executed by each of the parties to the prior

17   written agreement;

18        (2) an executed oral agreement to the extent that it is executed (i.e., both parties

19   have performed the terms of the modification); or

20        (3) by a subsequent executory oral agreement (i.e., one or both parties have not

21   performed the terms of the modification), supported by new consideration.

22   The cases presented by both sides was devoid of any evidence which would support a

23   finding that any one of the three requirements of *Cal. Civil Code* § 1698 is applicable.

24   There is no written document purporting to modify the terms of the SPA and no

25   testimony indicating a discussion and executed oral agreement to modify the terms of

26   the SPA. Any revision of the SPA as written must be limited to reformation of the

27   SPA as follows: 1) the purchase price is reformed to $2,000,000 minus $150,000 in

28   liabilities, and 2) if the liabilities which existed at the time of the sale exceeded

5

1  $150,000, Nascent is to pay them or be responsible for them.  If Nascent breaches the

2  contract by not paying for actual liabilities which exceed $150,000, then Nery's is

3  made whole by offsetting its damages against the amount due under the Note.  Nery's

4  would be entitled to set off by statute and under equitable principles.  *Carmel Valley*

5  *Fire Protection Dist. v. State of California* (1987) 190 Cal. App. 3d 521, 550 ["The

6  right to offset is a long-established principle of equity. Either party to a transaction

7  involving mutual debits and credits can strike or balance, holding himself owing or

8  entitled only to the net difference. (Cite) Although this doctrine exists independent of

9  statute, its governing principle has been partially codified (Code Civ. Proc., § 431.70)

10  (limited to cross-demands for money)."]

11      However, reformation of the SPA to these terms does not make a material

12  difference in the result.  To the extent Section 2.2 is ambiguous, the court can interpret

13  Section 2.2 to mean that Nery's was responsible for $150,000 in liabilities.  If the

14  actual liabilities which existed at the time of closing exceeded $150,000 in breach of

15  the representations and warranties, then Nery's had a claim under the SPA's

16  indemnification provisions of Article VIII.  If Nascent does not pay, then Nery's has a

17  right of set off.  This is the only construction of the agreement which effectuates the

18  intent of all the parties to the transaction.

19

20      **(3)    Did Nery's or Nascent ever have a right to rescind the SPA, or any**

21  **modification thereof, after the suspension of installment payments by Nery's in**

22  **mid-2010?**

23      No.  A ground for rescission must exist. See *Cal. Civ. Code* §1689.  As to

24  Nascent, Nery's failure to pay on the Note was a breach of the terms of the Note, not

25  the SPA.  Nascent accepted the Note as consideration for the stock of Targa and

26  transferred the stock to Nery's.  The SPA was a fully executed agreement.  Nascent's

27  remedy for breach of payment on the Note was an action on the Note.  Genesis, which

28  held the right to collect on the Note, notified Nery's of its default on July 29, 2010

1   (Exhibit 29). Neither Genesis nor Nascent elected rescission as a remedy for the

2   breach. Initially, Cathcart was in regular contact with Tim Doede and informed

3   Doede of the steps Cathcart was taking to make the business profitable. Genesis then

4   accepted the 3d installment, which would act as an affirmance of the Note and waive

5   any right to rescission of the Note, just as the payment acted as a waiver by Nery's.

6   Doede decided not to file a collection action initally, but at no time did Genesis waive

7   any of its rights under the Note. As stated by Gavin Watson (Exhibit 336a), he could

8   not get Cathcart to communicate with him after he took over Doede's position as the

9   Genesis fund manager in the Spring of 2011. Despite its problems, Targa had become

10  cash flow positive and was becoming profitable (showing a $187,000 profit for the

11  first quarter of 2011. Exhibit 48). Yet, Nery's still was not making any payments.

12  Consequently, Genesis filed the action to collect breach of contact damages, and

13  waived any right to rescission.

14      As to Nery's: Under the terms of the SPA there was no material breach that

15  would have entitled Nery's to rescission, and Nery's never elected rescission in any

16  event (before filing its cross claim August 19, 2011). Further, no right of rescission

17  would exist for Nery's under any circumstances absent proof of actual fraud. Section

18  8.5 states that the indemnification provisions of Article VIII are the exclusive

19  remedies of the parties "arising out of or in connection" with the SPA and that this

20  remedy "shall be in lieu of any rights under contract, tort, equity or otherwise". To

21  the extent there were undisclosed liabilities, Nery's remedy was to make an

22  indemnification claim against Nascent. Nascent apparently did not have the funds pay

23  on Nery's claims, but Nery's would be made whole by offsetting the provable claims

24  against the Note, which Nery's was obligated to pay.

25      There was no evidence of an intentional misrepresentation. Both Piancone and

26  Cathcart confirmed that the "undisclosed liabilities" did not show on in the financial

27  records that they received from Targa's accountant. Piancone testified that he was not

28  aware of them. Cathcart, who knows Piancone better than anyone involved in this

ER126

1  case, did not think that Piancone intentionally made any misrepresentations.

2  Apparently, the Targa accountant had not entered the liabilities on the financial

3  statements.

4      Cathcart cannot ignore his own conduct and negligence in performing his due

5  diligence.  He must prove "reasonable reliance" to prove fraud.  Reliance on an

6  alleged misrepresentation is not reasonable, for purposes of determining whether

7  contract should be rescinded, when the plaintiff could have ascertained the truth

8  through the exercise of reasonable diligence.  *Brookwood v. Bank of America* (1996)

9  45 Cal. App. 4th 1667.  Cathcart did not just walk in off the street and decide to

10  purchase Targa.  He was an insider.  His relationship with Piancone went back to

11  2006, he was the consultant to Nascent for the acquisition of Targa by Nascent in

12  2007, and he was a shareholder of Nascent.  He entered into a letter of intent to

13  purchase Targa on July 8, 2009.  He then had nearly seven months to conduct due

14  diligence.  He was given unrestricted access to the books and records of Targa, and

15  any officers of Nascent who may have been able to provide information.  He knew

16  that Targa was dormant with lots of old liabilities.  He knew that it was operating at a

17  negative and not paying all of its obligations.  He knew that the financials he was

18  provided were unaudited, unreliable and incomplete.   He knew that Piancone was not

19  always accurate in making representations.  With 30 year's experience as a

20  sophisticated financial consultant and entrepreneur who deals with distressed

21  companies, he was well aware of the likelihood that not all liabilities were disclosed

22  by the unaudited financial statements.  Cathcart demonstrated that he knew how to

23  discover liabilities which may have been in the records of Targa, but not on the

24  financial statements.  He simply asked the Targa accountant to research the payables

25  and provide a list.  He received that list on April 6, 2010, just two months after

26  closing.  (Exhibit 80).  The same research could have been conducted during the seven

27  month due diligence period prior to closing.  Further, Christian Alvarez testified that

28  he was aware of the liabilities before the closing.  Cathcart visited the Targa facility at

PLAINTIFF'S BRIEF RE: THE COURT'S AMENDED REQUEST FOR FURTHER BRIEFING

ER127

1  least twice before the closing and admitted that he did not have a substantive

2  conversation with Alvarez, the general manager who was running the day-to-day

3  operations. Cathcart does not have the right to put on his blinders and ignore all of the

4  red flags that were flapping in the winds at Targa. Rescission based upon fraud was

5  not available to Nery's at any time under any reasonable interpretation of the

6  evidence.

7

8      **(4)    What was the legal effect of Nery's late 2010 installment payment to**

9  **Genesis?**

10     If there was any doubt about whether Nery's affirmed the SPA prior to making

11  the 3rd installment, all doubt should be removed by the 3rd installment Nery's made in

12  January 2011 (Admitted fact, Pretrial Order III.2). This fact, together with Exhibit 45

13  and Cathcart's testimony proves a clear waiver of Nery's claim that it has a right of

14  rescission. Exhibit 45 was an email from Cathcart to Piancone dated 12/28/10

15  discussing whether to make the 3rd installment:

16     I have to call Tim [Doede] and not positive what to say. Do I give him hope or
   tell him can't do it? I'm not sure what they'll do, but the payment (before year
17     end) will take off a lot of pressure **while we try to take them out**. (Emphasis
   added).
18

19     This email says two things: First, that Genesis was pressuring Nery's to resume

20  payments under the Note and had not waived any of its rights. Second, that Nery's

21  intended to pay off the Nery's Note. Cathcart confirmed this on cross-examination.

22  He stated that the phase "while we try to take them out" meant he intended to move

23  forward with the Targa business and pay off the Note. He made this statement, and

24  then paid the 3rd installment after he knew *all* of the alleged "undisclosed liabilities"

25  he listed on Exhibit 307. Every debt he listed on Exhibit 307 was known by August

26  2010 according to Cathcart. The large majority of them were known by April 6, 2010

27  as evidenced by Exhibit 80. Further, at the time of this email, the $285,000 SAT tax

28

ER128

1    lien time had not been removed yet.  If there was ever a time to elect rescission, this

2    was it.  Instead, Cathcart chose to affirm the contract.  Rescission is not available to

3    Nery's under any reasonable interpretation of the evidence.

4

5        **(5)     Where both parties to a contract have materially breached the terms**

6    **of the contract, but the parties are still partially performing under the contract,**

7    **may the court reform the contract under equitable principles?**

8         Yes, but only if the grounds for reformation exist.  In this case, no reformation is

9    necessary because the contract as written is sufficient.  Breach does not waive

10   reformation.  The reformed agreement, if reformation was appropriate, states the terms

11   under which the court evaluates the breaches and the consequences that flow from the

12   breaches.

13        The purpose of reformation is to correct a written instrument in order to

14   effectuate a common intention of both parties that was incorrectly reduced to writing.

15   *Cal. Civil Code* §3399 provides:   "When, through fraud or a mutual mistake of the

16   parties, or a mistake of one party, which the other at the time knew or suspected, a

17   written contract does not truly express the intention of the parties, it may be revised on

18   the application of a party aggrieved, so as to express that intention, so far as it can be

19   done without prejudice to rights acquired by third persons, in good faith and for

20   value."

21        " 'Although a court of equity may revise a written instrument to make it

22   conform to the real agreement, it has no power to make a new contract for the

23   parties....' " *American Home Ins. Co. v. Travelers Indemnity Co.* (1981) 122 Cal.

24   App.3d 951, 963.  In *Lemoge Elec. v. San Mateo County* (1956) 46 Cal.2d 659 (1956)

25   the plaintiff had submitted a bid on a project. After the bid was accepted, plaintiff

26   realized that the bid had been incorrectly prepared and notified the defendant.  The

27   defendant refused to acknowledge the mistake and submitted the contract which

28   plaintiff signed, performed the work, then sued for reformation claiming that the

ER129

1 | contract price should have been increased because the defendant knew the price was
2 | in error.  The Supreme Court disagreed: "Although a court of equity may revise a
3 | written instrument to make it conform to the real agreement, it has no power to make a
4 | new contract for the parties, whether the mistake be mutual or unilateral. (citations
5 | omitted.)  As we have seen it is not alleged that defendant ever agreed to pay plaintiff
6 | an amount greater than the sum designated in the bid, and the complaint therefore
7 | does not state facts entitling plaintiff to reformation." Id. at 663-664.  To justify the
8 | court's revision of the language of a contract sought to be reformed, it must be
9 | established that both parties agreed to something different from what was expressed in
10 | writing, and proof on such point should be clear and convincing.  *Lister v. Sorge*
11 | (1968) 260 Cal. App. 2d 333, 338.
12 |      Here, there was some conflict between the language of the agreement and
13 | Cathcart's testimony about what "assume the accounts payable not to exceed
14 | $150,000" meant.  He claimed that "accounts payable" meant all liabilities, and that
15 | although "accounts" is plural, it only referred to a single debt owed to EX-IM Bank in
16 | the amount of $149,250.81.  However, the contract did not mention EX-IM Bank's
17 | payable as required by Section 3.8.  Piancone agreed with that intent.  However,
18 | Cathcart and Piancone are business associates and have a long term relationship.
19 | Piancone was on both sides of the transaction and continues to work for Cathcart.
20 | Their spin on this transaction should not be trusted.  It was clear that Cathcart wanted
21 | to purchase Targa as long as he did not have to pay more than $150,000 in liabilities.
22 | After more than three years, he has only paid $241,122 in liabilities, and that includes
23 | $88,000 in unpaid rent which he did know about at the closing in addition to the EX-
24 | IM Bank payable.  Further, he did not pay $312,000 in debt service to Genesis on the
25 | Note which was due in the first 18 months, which he did plan on paying.  Cathcart
26 | cannot escape the fact that he had more cash to work with over the three year period
27 | than he was entitled to under the contract.
28 |

PLAINTIFF'S BRIEF RE: THE COURT'S AMENDED REQUEST FOR FURTHER BRIEFING

ER130

1       If the court wanted to reform the agreement, what would be the terms?  Reduce

2   the price?  The parties never agreed on any price other than $2,000,000.  That was the

3   price offered in Cathcart's letter of intent (Exhibit 8); he stated to Doede that he was

4   purchasing Targa for $2,000,000 "no matter the terms" but indicated his offer was

5   $2,000,000 minus liabilities". (Exhibit 19).   Cathcart's offer on January 28, 2010

6   does not express a limitation of $150,000 and neither does the SPA.  It simply says

7   that Nery's would assume accounts payable of $150,000.   The court could find that

8   Cathcart intended to reduce the price by the actual liabilities existing as of February

9   10, 2010, but then there would be no need to reform the contract.  The contract

10  already provides Nery's with indemnification for undisclosed liabilities which when

11  credited against the Note, effectively reduces the price.  Cathcart testified that if he

12  had known about the "undisclosed liabilities", he would not have purchased Targa, yet

13  that testimony is inconsistent with the statements he made just days before the sale

14  closed, and his conduct after the liabilities became known to him by affirming the

15  contract.  For purposes of reformation, the court must presume that all parties intended

16  to make an equitable and conscientious agreement.  *Cal. Civil Code* §3400.  The

17  agreement of Nery's and Nascent meets that presumption and does not need

18  reformation.

19  Dated:  July 1, 2013              GOODE, HEMME & PETERSON

20                        By:_____/s/ Jerry D. Hemme_____

21                          Jerry D. Hemme, Esq.
                            Arnold Neves, Jr., Esq.

22                          Attorneys for Plaintiff
                            GENESIS MERCHANT PARTNERS,

23                          LP

24

25

26

27

28

ER131

THIS SECURITY HAS NOT BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION OR THE SECURITIES COMMISSION OF ANY STATE IN RELIANCE UPON AN EXEMPTION FROM THE REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND ACCORDINGLY, MAY NOT BE OFFERED OR SOLD EXCEPT PURSUANT TO (I) AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT OR (II) PURSUANT TO AN AVAILABLE EXEMPTION FROM, OR IN A TRANSACTION NOT SUBJECT TO, THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND IN ACCORDANCE WITH APPLICABLE STATE SECURITIES LAWS IN WHICH THE COMPANY HAS RECEIVED AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO IT THAT SUCH TRANSFER MAY LAWFULLY BE MADE.

## SENIOR SECURED PROMISSORY NOTE

### $1,000,000.00

Issue Date:  March 31, 2008

FOR VALUE RECEIVED, Nascent Wine Company, Inc., a Nevada corporation (the "Company") hereby promises to pay to the order of Genesis Merchant Partners, LP, a Delaware limited partnership or its successors, assigns and legal representatives (the "Holder"), at 15 Valley Drive, Greenwich, Connecticut 06831, or at such other location as the Holder may designate from time to time, the aggregate principal sum of One Million Dollars ($1,000,000), in lawful money of the United States of America, together with interest thereon at a rate of 14% per annum (the "Interest Rate").

      1.    <u>Intentionally Deleted</u>

      2.    <u>Maturity.</u>

      (a)    Unless prepaid by the Company in accordance with Section 4 hereof, the Note shall mature 180 days from the date hereof (the "Base Term"), which date, upon the option of the Company subject to the terms and conditions below and thirty (30) days advance written notice to Holder, may be extended to the date one (1) year from the date hereof (the "Extended Term") (either date may be referred to as the "Maturity Date" or as applicable the "Base Term Maturity Date" or "Extended Term Maturity Date"). On the Maturity Date, unless otherwise prepaid in accordance with the provisions hereof, all outstanding principal and any accrued and unpaid interest due and owing on the Note shall be immediately paid by the Company. Additionally, the Company shall pay, (i) at any time payment is made pursuant to this Note whether upon the Base Term Maturity Date or upon prepayment prior to the Base Term Maturity Date, an amount equal to 7% of the principal amount of this Note or (ii) at any time payment is made pursuant to this Note whether upon the Extended Term Maturity Date or upon prepayment after the expiration of the Base Term and prior to the Extended Term Maturity Date, an amount equal to 15% of the principal amount of this Note (the amounts payable hereunder being the "Applicable Accrued Value").

**PLAINTIFF'S EXHIBITS**
CASE NO. 11CV1589 JM WVG
EXHIBIT NO. 1

(b)     In the event that the Company elects to extend Maturity Date to the Extended Term Maturity Date pursuant to Section 2(a) above, the Company shall pay to Holder an additional closing fee equal to two (2%) percent of the principal outstanding as of the Base Term Maturity Date prior to the Extended Term Maturity Date.

3.     Calculation and Payment of Interest.

(a)     The Note shall bear interest ("Interest") at a rate equal to fourteen (14%) percent (the "Interest Rate") per annum on a 360-day year. Interest shall be payable monthly in arrears on the first day of each month commencing May 1, 2008 and to the extent unpaid shall accrue on all outstanding principal until all amounts owed under the Note shall be fully repaid and shall be payable in full on the earlier of (i) the Maturity Date and, (ii) the Prepayment Date (as defined in Section 4 hereof) provided, however, that any interest accruing on overdue amounts pursuant to subsection (b) of this Section 3 shall be payable on demand. Interest shall be calculated on a simple interest basis and shall accrue monthly and be payable monthly, in arrears.

(b)     If all or a portion of the principal amount of the Note or any interest payable thereon shall not be repaid when due whether on the applicable repayment date, by acceleration or otherwise, such overdue amounts shall bear interest at a rate of seventeen and one-half (17.5%) percent per annum from the date of such non-payment until such amount is paid in full (whether before or after judgment) and Holder shall be entitled to reasonable attorneys' fees, costs and expenses incurred in the collection of the amount of non-payment on the Note or any interest thereon.

(c)     All payments to be made by the Company hereunder or pursuant to the Note shall be made, without setoff or counterclaim, in lawful money of the United States and in immediately available funds.

4.     Prepayment.

(a)     Voluntary Prepayment. All or any portion of the Note (along with all interest accrued and the Applicable Accrued Value) may be prepaid by the Company on or after the second (2nd) business day (the "Prepayment Date") following receipt by Holder of written notification from the Company of the Company's intent to prepay the Note.

(b)     Mandatory Prepayment.

(i)     Upon a "Change in Control" (as hereinafter defined) or in the event that the Company consummates an "Asset Disposition" (as hereinafter defined) all obligations (including principal and interest together with costs and expenses, including, without limitation, reasonable fees, charges and disbursements of counsel) shall become immediately due and payable. The Company shall give written notice to the Holder of any Asset Disposition at least ten (10) and not more than sixty (60) Business Days prior to the consummation of same. Nothing contained in this Section 4 shall be deemed a consent by the Holder to the consummation of any Asset Disposition.

2

(ii)    For purposes hereof the following terms shall have the following meaning:

"Asset Disposition" shall mean the sale, lease, assignment or other transfer for value (each a "Disposition") by the Company or any Subsidiary to any person (other than the Company) of all or substantially all of the assets of the Company and its Subsidiaries.

"Change in Control" means the current equity owners of the Company cease to own a majority of the outstanding equity and a majority of the voting control of the Company.

(c)    Prepayments Generally.

(i)    The Company shall give written notice to the Holder of the amount and date of any voluntary prepayment of this Note not less than two (2) Business Days prior to the date of such prepayment. Upon notice of prepayment being given by the Company, the Company covenants and agrees that it will pay the prepayment amount set forth in such notice, on the date fixed for prepayment in such notice, together with interest accrued and unpaid thereon to the date fixed for such prepayment and together with any applicable costs and expenses, and the Applicable Accrued Value on any such prepayment.

(ii)    Voluntary and Mandatory prepayments of this Note shall all be subject to payment of Applicable Accrued Value.

5.    Covenants. The Company agrees that, so long as any amount payable under this Note remains unpaid, it will not, and will cause its Subsidiaries not to, without the prior written consent of the Holder:

(a)    create, incur, guarantee, issue, assume or in any manner become liable in respect of, any obligation (i) for borrowed money, other than trade payables incurred in the ordinary course of business, (ii) evidenced by bonds, debentures, notes, or other similar instruments, (iii) in respect of letters of credit or other similar instruments (or reimbursement obligations with respect thereto), except letters of credit or other similar instruments issued to secure payment of trade payables arising in the ordinary course of business consistent with past practices, (iv) to pay the deferred purchase price of property or services, except trade payables arising in the ordinary course of business consistent with past practices, (v) as lessee under capitalized leases, (vi) secured by a Lien (as defined below) on any asset of the Company or a Subsidiary that is secured by the Security Agreement, whether or not such obligation is assumed by the Company or such Subsidiary and (vii) of any other person or entity, other than indebtedness for borrowed money existing on the date of this Note or other obligations or other liabilities incurred in connection with Liens permitted to be incurred under Section 5(b) hereof;

(b)    create, incur, assume or suffer to exist any lien, claim, pledge, charge, security interest or encumbrance of any kind ("Liens") on any asset secured by the Security

3

ER134

Agreement, except Liens for taxes or assessments and similar charges either (x) not delinquent or (y) contested in good faith by appropriate proceedings and as to which the Company shall have set aside on its books adequate reserves; or

(c)     declare or make (i) any dividend, distribution or other payment on any capital stock; or (ii) any payment on account of the purchase, redemption, retirement or acquisition of (A) any capital stock or (B) any option, warrant or other right to acquire capital stock, other than with respect to repurchases of stock from former employees, officers, directors, consultants or other persons who performed services for the Company or any subsidiary in connection with the cessation of such employment or service at the lower of the original purchase price or the then-current fair market value thereof.

6.     Intentionally Deleted.

7.     Intentionally Deleted.

8.     Security.

(a)     The indebtedness evidenced by this Note and the obligations created hereby are secured by a senior first priority lien on substantially all of the assets of the Company pursuant to the Security Agreement. The Company represents and covenants that this grant of security interest is, and shall remain while any indebtedness hereunder is outstanding, senior in right to all other security interests of the Company with regard to such assets and is not subordinated to any other security interest of any other party.

9.     Events of Default.  Each of the following shall constitute an "Event of Default" hereunder:

(a)     The Company shall fail to pay the principal amount of this Note, accrued interest thereon and the Applicable Accrued Value when due and payable (whether at the Maturity Date, upon acceleration or otherwise);

(b)     The Company shall fail to pay any other amount under this Note when due and payable (whether at the maturity date therefor, upon acceleration or otherwise) and such failure shall continue for a period of five (5) business days;

(c)     There shall have occurred and be continuing without cure for a period of not less than ten (10) days a material breach by the Company of any provision of this Note, the Security Agreement, the Note Purchase Agreement of even date herewith between the Company and Holder, if applicable, (collectively, the "Transaction Documents");

(d)     Any representation or warranty made by the Company in the Transaction Documents shall have been untrue or misleading in any material respect when made;

4

ER135

(e)     Any material covenant, agreement or obligation of the Company in any Transaction Document shall cease to be enforceable, or shall be determined by a court of competent jurisdiction to be unenforceable in any material respect;

(f)     The Company shall sell, transfer, lease or otherwise dispose of all or any substantial portion of its assets in one transaction or a series of related transactions, participate in any share exchange, consummate any recapitalization, reclassification, reorganization or other business combination transaction or the Company shall adopt a plan of liquidation or dissolution or agree to do any of the foregoing;

(g)     The Company shall have applied for or consented to the appointment of a custodian, receiver, trustee or liquidator, or other court-appointed fiduciary of all or a substantial part of its properties; or a custodian, receiver, trustee or liquidator or other court appointed fiduciary shall have been appointed with or without the consent of the Company; or the Company is generally not paying its debts as they become due by means of available assets, or has made a general assignment for the benefit of creditors; or the Company files a voluntary petition in bankruptcy, or a petition or an answer seeking reorganization or an arrangement with creditors or seeking to take advantage of any insolvency law, or an answer admitting the material allegations of a petition in any bankruptcy, reorganization or insolvency proceeding or has taken action for the purpose of effecting any of the foregoing; or if, within ninety (90) days after the commencement of any proceeding against the Company seeking any reorganization, rehabilitation, arrangement, composition, readjustment, liquidation, dissolution or similar relief under the Federal bankruptcy code or similar order under future similar legislation, the appointment of any trustee, receiver, custodian, liquidator, or other court-appointed fiduciary of the Company or of all or any substantial part of its properties, such order or appointment shall not have been vacated or stayed on appeal or otherwise or if, within ninety (90) days after the expiration of any such stay, such order or appointment shall not have been vacated (collectively, "Insolvency Events"); or

(h)     Any Insolvency Event shall have occurred with respect to any Subsidiary.

Upon the occurrence of any Event of Default, the Holder may, at its option, declare all amounts due hereunder to be due and payable immediately and, upon any such declaration, the same shall become and be immediately due and payable. If an Insolvency Event occurs with respect to the Company or any Subsidiary, then all amounts due hereunder, which amounts shall include the Applicable Accrued Value for payments made subsequent to the Base Term Maturity Date, shall become immediately due and payable without any declaration or other act on the part of the Holder. Upon the occurrence of any Event of Default, the Holder may, in addition to declaring all amounts due hereunder to be immediately due and payable, pursue any available remedy, whether at law or in equity. If an Event of Default occurs, the Company shall pay to the Holder the reasonable attorneys' fees and disbursements and all other reasonable out-of-pocket costs incurred by the Holder in

ER136

order to collect amounts due and owing under this Note or otherwise to enforce the Holder's rights and remedies hereunder.

10.    <u>Waiver of Presentment, Demand and Dishonor</u>. The Company hereby waives presentment for payment, protest, demand, notice of protest, notice of non-payment and diligence with respect to this Note, and waives and renounces all rights to the benefit of any statute of limitations or any moratorium, appraisement, exemption or homestead now provided or that hereafter may be provided by any federal or applicable state statute, including but not limited to exemptions provided by or allowed under the Federal Bankruptcy Code, both as to itself and as to all of its property, whether real or personal, against the enforcement and collection of the obligations evidenced by this Note and any and all extensions, renewals and modifications hereof.

No failure on the part of the Holder hereof to exercise any right or remedy hereunder with respect to the Company, whether before or after the happening of an Event of Default, shall constitute a waiver of any future Event of Default or of any other Event of Default. No failure to accelerate the debt of the Company evidenced hereby by reason of an Event of Default or indulgence granted from time to time shall be construed to be a waiver of the right to insist upon prompt payment thereafter; or shall be deemed to be a novation of this Note or a reinstatement of such debt evidenced hereby or a waiver of such right of acceleration or any other right, or be construed so as to preclude the exercise of any right the Holder may have, whether by the laws of the state governing this Note, by agreement or otherwise; and the Company hereby expressly waives the benefit of any statute or rule of law or equity that would produce a result contrary to or in conflict with the foregoing.

11.    <u>Intentionally Deleted</u>.

12.    <u>Enforcement Costs</u>. In the case of any Event of Default under this Note, the Company shall pay to Holder such reasonable amounts as shall be sufficient to cover the cost and expense of such Holder due to such Event of Default, including all reasonable attorneys fees and expenses and all reasonable costs of collection and enforcement.

13.    <u>Amendment; Waiver</u>. Any term of this Note may be amended or waived only upon the written consent of the Company and the consent of the Holder. No such waiver or consent on any one instance shall be construed to be a continuing waiver or a waiver in any other instance unless it expressly so provides.

14.    <u>Transfers</u>. The Holder shall have the right to transfer this Note or any interest herein in any transaction meeting the requirements of applicable securities laws.

15.    <u>Governing Law; Consent to Jurisdiction</u>. This Note shall be binding upon the Company and its successors, assigns and legal representatives. The validity, construction and interpretation of this Note will be governed, and construed in accordance with, the laws of the State of Connecticut. **EACH OF THE COMPANY AND, BY ITS ACCEPTANCE HEREOF, THE HOLDER HEREBY WAIVES ANY RIGHT TO**

ER137

**REQUEST A TRIAL BY JURY IN ANY LITIGATION WITH RESPECT TO THIS NOTE AND REPRESENTS THAT COUNSEL HAS BEEN CONSULTED SPECIFICALLY AS TO THIS WAIVER.**

Each of the Company and, by its acceptance of this Note, the Holder irrevocably submits to the exclusive jurisdiction of any state or federal court located in the State of Connecticut for the purpose of any suit, action, proceeding or judgment relating to or arising out of this Note and the transactions contemplated hereby. Each of the Company and, by its acceptance of this Note, the Holder irrevocably consents to the jurisdiction of any such court in any such suit, action or proceeding and to the laying of venue in such court. Each of the Company and, by its acceptance of this Note, the Holder irrevocably waives any objection to the laying of venue of any such suit, action or proceeding brought in such courts and irrevocably waives any claim that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum.

16.     Notices.     All notices required or permitted hereunder shall be in writing and shall be deemed effectively given: (a) upon personal delivery to the party to be notified; (b) five days after having been sent by registered or certified mail, return receipt requested, postage prepaid; or (c) the next business day after deposit with a nationally recognized overnight courier, specifying next day delivery, with written verification of receipt. All communications shall be sent to the Company or the Holder at the address below or at such address as either party hereto may designate by 10 days' advance written notice to the other party hereto.

**Nascent Wine Company, Inc.**

2355B Paseo De Las Americas

San Diego, California 92154

**Genesis Merchant Partners, LP**

15 Valley Drive

Greenwich, Connecticut 06831

*[Signature Page Immediately Follows]*

7

ER138

ATTEST:                              Nascent Wine Company, Inc.

_____              By _____
Name                                 Name:
                                     Title:  ~~President~~  *CEO*

Dated:  March 31, 2008

ER139

# AMENDMENT TO SECURED PROMISSORY NOTE

This **AMENDMENT** effective March 31, 2009 is an amendment to that certain Secured Promissory Note (the "Original Note") dated as of March 31, 2008 from **NASCENT WINE COMPANY, INC.**, a Nevada corporation (the "Company"), to **GENESIS MERCHANT PARTNERS, LP**, a Delaware limited partnership (the "Genesis") in the aggregate original principal sum of **ONE MILLION ($1,000,000.00) DOLLARS.**

**WHEREAS**, the Company has requested that Genesis extend the "Maturity Date" and the "Extended Term Maturity Date" as defined in the Original Note to April 30, 2009, which date shall be extended to the last day of each successive month following April 30, 2009, up to and including September 30, 2009, until such time as Genesis, in its sole discretion, provides the Company with thirty (30) days prior written notice of the termination of such automatic renewal (the "New Maturity Date"); and

**WHEREAS**, the Company has requested that Genesis reduce the "Interest Rate" as defined in the Original Note to ten (10%) percent per annum on a 30 day month and 360 day year; and

**WHEREAS**, Genesis has agreed to the New Maturity Date provided that the Company (i) pay to Genesis an extension fee of two (2%) percent of the aggregate principal sum outstanding as of the date hereof, equal to $23,000.00, which sum shall be added to the aggregate principal sum outstanding pursuant to the Original Note (the "Extension Fee"), and (ii) agree that an additional extension fee equal to one and one half (1.5%) percent of the aggregate principal sum outstanding as of the date of each monthly renewal of the Maturity Date shall be added to the aggregate principal sum outstanding pursuant to the Original Note as hereby amended (the "Renewal Extension Fee"); and

**NOW, THEREFORE**, in consideration of the promises and mutual covenants herein contained, the parties hereto agree as follows:

1.    **Definitions.**    Terms not otherwise defined herein shall have the meanings provided in the Original Note.

2.    **Amendment to Original Note.**

    (a)    The term "Interest Rate" as defined in the Original Note shall be ten (10%) percent per annum on a 30 day month and 360 day year, and shall be payable in accordance with Schedule A attached hereto and made a part hereof, assuming that Genesis in its sole discretion elects not to terminate the Renewal (defined below) prior to September 30, 2009. In the event of termination of the Renewal prior to September 30, 2009, Schedule A shall be adjusted accordingly."

    (b)    The terms "Maturity Date" and "Extended Term Maturity Date" as defined in the Original Note shall now mean "April 30, 2009, which date shall be extended to the last day of each successive month following April 30, 2009, up to and including September 30, 2009 (the "Renewal") until such time as Genesis provides the Company with thirty (30) days prior written notice of the termination of such Renewal. In such event of termination of the Renewal by Genesis, the Maturity Date and Extended Term Maturity Date shall be deemed to be the last day of the month immediately following the month in which the termination of the Renewal occurs. In no event shall the Maturity Date be extended past September 30, 2009."

**PLAINTIFF'S EXHIBITS**

CASE NO. 11CV1589 JM WVG

EXHIBIT NO. 4

(c)     The aggregate principal sum outstanding as of the date hereof shall be equal to $1,173,000.00.

(d)     The Renewal Extension Fee shall be added to the aggregate principal sum outstanding pursuant to the Original Note as hereby amended, as of the date of each monthly Renewal of the Maturity Date and the Extended Term Maturity Date.

(d)     The following Sections 5(d) and 5(e) are added to the end of Section 5:

"5(d).    fail to deliver to Holder financial statements reasonably requested by Holder, including commentary by management of the Company, on or before the fifteenth (15th) business day following each month.

5(e).    increase any salary or other compensation payable to any employee, officer or director of the Company."

2.     **Confirmation**.  The Company hereby confirms the validity of all terms and conditions of the Original Note, as hereby amended.  The Parties hereto agree that unless otherwise modified herein, all terms and conditions of the Original Note remain in full force and effect.

**IN WITNESS WHEREOF**, the Parties have duly executed and delivered this Amendment to the Original Note effective as of the first date above written.

**NASCENT WINE COMPANY, INC.**

By: _____
    Name: Sandro Piancone
    Title: CEO.

**GENESIS MERCHANT PARTNERS, LP**
By:  Genesis Merchant Partners GP, LLC
    Its General Partner

By: _____
    Name: Christopher Kelly
    Title: Member

2

ER141

Schedule A

# Schedule A: Nascent Wine Rolling 30 Day Extension Schedule

| Date | Days | Interest | Principal Outstanding | Principal Payment | Extension Fee | New Principal Balance | Total Payment |
|---|---|---|---|---|---|---|---|
| | | 10.00% | | | | | |
| 3/30/2009 | 30 | | $1,150,000 | $0.00 | $23,000 | $1,173,000 | |
| 4/30/2009 | 30 | $9,775 | $1,173,000 | $0.00 | $17,595 | $1,190,595 | $9,775 |
| 5/31/2009 | 30 | $9,922 | $1,190,595 | $0.00 | $17,859 | $1,208,454 | $9,922 |
| 6/30/2009 | 30 | $10,070 | $1,208,454 | $0.00 | $18,127 | $1,226,581 | $10,070 |
| 7/31/2009 | 30 | $10,222 | $1,226,581 | $0.00 | $18,399 | $1,244,979 | $10,222 |
| 8/31/2009 | 30 | $10,375 | $1,244,979 | $0.00 | $18,675 | $1,263,654 | $10,375 |
| 9/30/2009 | 30 | $10,530 | $1,263,654 | $1,263,654 | $0 | $1,263,654 | $1,274,185 |

ER142

## AMENDMENT TO SECURITY AGREEMENT

This **AMENDMENT** effective March 31, 2009 is an amendment to that certain Security Agreement (the "Original Security Agreement") dated as of March 31, 2008 by **NASCENT WINE COMPANY, INC.**, a Nevada corporation ("Debtor"), in favor of **GENESIS MERCHANT PARTNERS, LP**, a Delaware limited partnership (the "Secured Party").

**WHEREAS,** Debtor and Secured Party have agreed to amend that certain Secured Promissory Note in the original principal sum of $1,000,000.00 from Debtor to Secured Party dated as of March 31, 2008 (the "Original Note") pursuant to the terms and conditions contained in that certain Amendment to Secured Promissory Note effective as of the date hereof (the "Note Amendment"); and

**WHEREAS,** Debtor and Secured Party intend to amend the Original Security Agreement to incorporate the Note Amendment.

**NOW, THEREFORE,** in consideration of the promises and mutual covenants herein contained, the parties hereto agree as follows:

1. **Amendment to Original Security Agreement.** The term "Bridge Note" or "Note" as defined under the Security Agreement shall, for all purposes under the Security Agreement, mean and include the Original Note, as amended by the Note Amendment.

2. **Confirmation.** The Secured Party hereby confirms the validity of all of the terms and conditions of the Original Security Agreement as hereby amended. The Parties hereto confirm that unless otherwise modified herein, all terms and conditions of the Original Security Agreement remain in full force and effect.

**IN WITNESS WHEREOF,** the Parties have duly executed and delivered this Amendment to the Original Security Agreement effective as of the first date above written.

**NASCENT WINE COMPANY, INC.**

By: _____
   Name: Sandro Piancone
   Title: CEO

**GENESIS MERCHANT PARTNERS, LP**
By: Genesis Merchant Partners GP, LLC
   Its General Partner

By: _____
   Name: Christopher Kelly
   Title: Member

## AMENDMENT TO COLLATERAL ASSIGNMENT OF CONTRACTS

This **AMENDMENT** effective March 31, 2009 is an amendment to that certain Collateral Assignment of Contracts (the "Original Collateral Assignment") dated as of October 31, 2008 by and between **GENESIS MERCHANT PARTNERS, LP**, a Delaware limited partnership ("Genesis"), and **NASCENT WINE COMPANY, INC.**, a Nevada corporation ("Assignor").

**WHEREAS,** Assignor and Genesis have executed that certain Amendment to Security Agreement of even date herewith (the "Amendment to Security Agreement") which amends that certain Security Agreement dated March 31, 2008 by Assignor in favor of Genesis; and

**WHEREAS,** Assignor and Genesis hereby intend to amend the Original Collateral Assignment of Contracts to incorporate the Amendment to Security Agreement.

**NOW, THEREFORE,** in consideration of the promises and mutual covenants herein contained, the parties hereto agree as follows:

1. <u>Amendment</u>.

   (a)  The term "Security Agreement" as defined in the Original Collateral Assignment of Contracts shall, for all purposes under the Original Collateral Assignment of Contracts, include the Original Security Agreement and the Amendment to Security Agreement.

   (b)  The term "Note", as defined in the Original Collateral Assignment of Contracts, shall, for all purposes under the original Collateral Assignment of Contracts, include the Secured Promissory Note dated as of March 31, 2008 from Assignor to Genesis as amended by that certain Amendment to Secured Promissory Note effective as of the date hereof.

2. <u>Confirmation</u>.  Assignor hereby confirms the validity of all terms and conditions contained in the Original Collateral Assignment and the Parties hereto acknowledge that unless otherwise amended herein, all terms and conditions of the Original Collateral Assignment of Contracts remain in full force and effect.

**IN WITNESS WHEREOF,** the Parties have duly executed and delivered this Amendment to the Original Pledge Agreement effective as of the date first written above.

**NASCENT WINE COMPANY, INC.**

By: _____
Name:  Sandro Piancone
Title:  CEO

**GENESIS MERCHANT PARTNERS, LP**
By:  Genesis Merchant Partners GP, LLC
   Its General Partner

By: _____
   Name: Christopher Kelly
   Title:  Member

# STOCK PURCHASE AGREEMENT

by and among

**NERY'S USA, INC.,**
a Nevada corporation,

**NASCENT WINE COMPANY, INC.,**
a Nevada corporation,

and

**COMERCIAL TARGA, S.A. de C.V.,**
a Mexican corporation

Dated as of February 1, 2010

PLAINTIFF'S EXHIBITS
CASE NO. 11CV1589 JMWVG
EXHIBIT NO. 22

# TABLE OF CONTENTS

Page

ARTICLE I        DEFINITIONS ........................................................... 1
    1.1    Definitions ................................................................ 1

ARTICLE II       PURCHASE AND SALE .............................................. 6
    2.1    Purchase and Sale ....................................................... 6
    2.2    Purchase Price ............................................................. 6
    2.3    Closing ...................................................................... 7

ARTICLE III      REPRESENTATIONS AND WARRANTIES OF THE COMPANY
                 AND SELLERS .......................................................... 7
    3.1    Organization and Qualification ........................................ 7
    3.2    Corporate Power ........................................................... 8
    3.3    Authorization; Binding Obligations .................................... 8
    3.4    Conflict; Existing Defaults .............................................. 8
    3.5    Consents and Approvals ................................................. 8
    3.6    Capitalization ............................................................... 8
    3.7    Subsidiaries ................................................................. 9
    3.8    Financial Statements; Undisclosed Liabilities ....................... 9
    3.9    Contracts ..................................................................... 10
    3.10   Accounts Receivable ...................................................... 11
    3.11   Employees; Labor Relations ............................................ 12
    3.12   Welfare Plans ............................................................... 12
    3.13   Taxes .......................................................................... 13
    3.14   Litigation ..................................................................... 13
    3.15   Transactions with Related Parties ..................................... 14
    3.16   Licenses and Permits ..................................................... 14
    3.17   Personal Property .......................................................... 14
    3.18   Real Property ................................................................ 14
    3.19   Environmental Matters .................................................... 15
    3.20   Intellectual Property ....................................................... 16
    3.21   Powers of Attorney ......................................................... 16
    3.22   Insurance ..................................................................... 16
    3.23   Business Relationships .................................................... 17
    3.24   Inventories ................................................................... 17
    3.25   Depository and Other Accounts ......................................... 17
    3.26   Books and Records ......................................................... 17
    3.27   Brokers ........................................................................ 17
    3.28   Compliance with Laws ..................................................... 18
    3.29   Interim Changes ............................................................ 18
    3.30   No Omissions or Misstatements ........................................ 18

ARTICLE IV       REPRESENTATIONS AND WARRANTIES OF SELLERS ....... 19



4.1    Ownership of Capital Stock .................................................... 19
4.2    Legal Capacity ..................................................................... 19
4.3    Authorization; Binding Obligation ....................................... 19
4.4    Conflict ................................................................................ 19
4.5    Consents and Approvals ...................................................... 19
4.6    Litigation ............................................................................. 20
4.7    Brokers ................................................................................ 20

ARTICLE V      REPRESENTATIONS AND WARRANTIES OF BUYER ...................... 20

5.1    Organization ........................................................................ 20
5.2    Corporate Power .................................................................. 20
5.3    Authorization; Binding Obligations ..................................... 20
5.4    Conflict; Existing Defaults .................................................. 21
5.5    Consents and Approvals ...................................................... 21
5.6    Brokers ................................................................................ 21
5.7    Compliance with Laws ........................................................ 21

ARTICLE VI      COVENANTS OF THE PARTIES ................................................ 21

6.1    Conduct of Company Business ............................................. 21
6.2    Access to Information ........................................................... 22
6.3    Efforts to Consummate Transaction ..................................... 23
6.4    No Solicitation .................................................................... 23
6.5    Tax Matters ......................................................................... 24
6.6    Noncompete ......................................................................... 26
6.7    Certain Taxes ...................................................................... 27
6.8    Notification of Certain Matters ............................................ 27
6.9    Supplementation and Amendment of Schedules ................... 27

ARTICLE VII      CLOSING CONDITIONS ........................................................ 27

7.1    Obligation of Buyer to Close .............................................. 27
7.2    Obligation of Sellers to Close ............................................. 28

ARTICLE VIII      INDEMNIFICATION ............................................................ 29

8.1    Indemnification .................................................................... 29
8.2    Limitations of Indemnity ..................................................... 30
8.3    Indemnification Procedures - Third Party Claims ................ 30
8.4    Indemnification Procedures - Other Claims, Indemnification Generally ............ 32
8.5    Exclusive Remedy .............................................................. 32

ARTICLE IX      MISCELLANEOUS ................................................................ 32

9.1    Termination ......................................................................... 33
9.2    Publicity .............................................................................. 33



ER147

**TABLE OF CONTENTS**
(continued)

Page

| | | |
|---|---|---|
| 9.3 | Expenses | 33 |
| 9.4 | Entire Agreement; Amendments and Waivers | 33 |
| 9.5 | Notices | 34 |
| 9.6 | Waivers and Amendments | 35 |
| 9.7 | Governing Law | 35 |
| 9.8 | Consent to Jurisdiction and Venue | 35 |
| 9.9 | Waiver of Trial by Jury | 36 |
| 9.10 | Counterparts | 37 |
| 9.11 | Invalidity | 37 |
| 9.12 | Negotiated Agreement | 37 |
| 9.13 | Assignment | 37 |
| 9.14 | Further Assurances | 37 |



**ER148**

EXHIBITS

Exhibit A      None


SCHEDULES

| | |
|---|---|
| Schedule A | Sellers; Stock |
| Schedule 1.1 | Permitted Liens |
| Schedule 3.8(a) | Company Historical Financials |
| Schedule 3.8(c) | Undisclosed Liabilities |
| Schedule 3.9(a) | Material Contracts |
| Schedule 3.11(b) | Employment Agreements |
| Schedule 3.12 | Welfare Plans |
| Schedule 3.13 | Taxes |
| Schedule 3.14 | Litigation |
| Schedule 3.16(a) | Licenses and Permits |
| Schedule 3.18 | Real Property |
| Schedule 3.20 | Intellectual Property |
| Schedule 3.22 | List of Insurance Policies |
| Schedule 3.23 | Business Relationships |
| Schedule 3.25 | Depository and Other Accounts |
| Schedule 3.28 | Compliance with Laws |
| Schedule 3.29 | Company Interim Changes |



## STOCK PURCHASE AGREEMENT

STOCK PURCHASE AGREEMENT dated as of February 1, 2010 by and among NERY'S USA, INC., a Nevada corporation ("Buyer"), and NASCENT WINE COMPANY, INC. ("Sellers"), and COMERCIAL TARGA, S.A. de C.V., a Mexican corporation (the "Company").

## RECITALS

WHEREAS, Sellers own and are the record holders of 100% of the issued and outstanding capital stock of the Company as set forth on Schedule A (collectively, the "Stock"); and

WHEREAS, each Seller desires to sell to Buyer all of the Stock owned by such Seller (except Rafael Morales Cuevas shall retain one share of the Stock following the Closing (as defined below)), and Buyer desires to purchase the Stock from Sellers, subject to the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the premises and mutual covenants contained in this Agreement and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties, intending to be legally bound hereby, agree as follows:

## Article I
## Definitions

1.1     Definitions.  For purposes of this Agreement, the following terms shall have the respective meanings set forth below:

"Affiliate" of any specified Person means (i) any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person and (ii) any five percent stockholder of such Person.  For purposes of this definition, "control" when used with respect to any specified Person, means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by Contract or otherwise, and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

"Agreement" means this Agreement and includes all of the schedules and exhibits annexed hereto.

"Bankruptcy Laws" means the United States Bankruptcy Code (Title 11, United States Code) and any state or federal Laws pertaining to insolvency, as the same may be amended from time to time.

"Business Day" means any weekday, except for any weekday on which banks are to close in California.

"Buyer" has the meaning set forth in the introduction to this Agreement.

ER150

"Buyer Indemnified Parties" has the meaning set forth in Section 8.1(a).

"Closing" has the meaning set forth in Section 2.3.

"Closing Date" has the meaning set forth in Section 2.3.

"Company" has the meaning set forth in the introduction to this Agreement.

"Company Current Financials" has the meaning set forth in Section 3.8(b)(ii).

"Company Historical Financials" has the meaning set forth in Section 3.8(b).

"Competing Transaction" means any business combination or recapitalization involving the Company or any acquisition or purchase of all or a portion of the assets of, or any equity interest in, the Company or any other similar transaction with respect to the Company involving any Person or entity other than Buyer or its Affiliates (other than any sale by the company of inventory in the ordinary course of business).

"Confidential Information" means the confidential affairs and proprietary information of the Company, including all information, observations and data disclosed to, or developed or obtained by, Sellers while owning the Company if related to the Company's business.

"Contract" means any contract, lease, license, purchase order, sales order, obligation or other agreement or binding commitment, whether or not in written form.

"Court Order" means any judgment, decree, injunction, order or ruling of any Governmental Authority or authority that is binding on any Person or its property under applicable Law.

"Environmental Laws" means any Law relating to Hazardous Substances, the protection of human health and safety, the environment or natural resources, including without limitation any Governmental Rule relating to the generation, use, processing, treatment, storage, release, transport or disposal of Hazardous Substances.

"Governmental Authority" means any (a) nation, state, commonwealth, province, territory, county, municipality, district or other jurisdiction of any nature, or any political subdivision thereof, (b) federal, state, local, municipal, foreign or other government, or (c) governmental or quasi-governmental authority of any nature (including any governmental division, department, agency, commission, instrumentality, official, organization, body or other entity and any court, arbitrator or other tribunal).

"Hazardous Material" means any substance, material, liquid or waste that is regulated, classified, or otherwise characterized under or pursuant to any Environmental Law as "hazardous," "toxic," "pollutant," "contaminant," "radioactive," or words of similar meaning or effect, including, without limitation, petroleum and its by-products, asbestos, polychlorinated biphenyls, radon, mold, and urea formaldehyde insulation.

"Indemnification Acknowledgment" has the meaning set forth in Section 8.3(a)(ii).



2

"Indemnitee" has the meaning set forth in Section 8.3(a).

"Indemnitor" has the meaning set forth in Section 8.3(a).

"Intellectual Property" has the meaning set forth in Section 3.20.

"Knowledge" and "Knowledge of the Company" means, the actual knowledge or awareness of each Seller and any other officer or director of the Company and the knowledge or awareness that each such Person would have obtained after reasonable due diligence or inquiry in light of the circumstances.

"Laws" means any federal, state, local or foreign statute, code, law, ordinance, regulation, Court Order, judgment, writ, injunction, award or decree or rule of any Governmental Authority, including without limitation those covering environmental, energy, safety, health, transportation, bribery, record keeping, zoning, antidiscrimination, antitrust, wage and hour, and price and wage control matters, as well as any applicable principle of common law.

"Licenses and Permits" means all foreign, local, state and federal licenses, permits, registrations, certificates, Contracts, consents, accreditations and approvals necessary for the operation of the Business.

"Lien" means any lien (statutory or other), pledge, mortgage, deed of trust, assignment, deposit arrangement, priority, security interest, restriction on voting or disposition or other charge or encumbrance or other preemptive or preferential arrangement of any kind or nature whatsoever (including the interest of a lessor under a capitalized lease having substantially the same economic effect), any conditional sale or other title retention agreement, any lease in the nature thereof and the filing or existence of any financing statement or other similar form of notice under the Laws of any jurisdiction, any security agreement authorizing any Person to file such a financing statement, whether arising by contract, operation of law, or otherwise, or any restriction on the right to vote.

"Losses" means any and all damages, costs, liabilities, losses, judgments, settlements, awards, penalties, fines, expenses or other costs, including reasonable attorneys' fees, expert fees and costs of investigation, enforcement and collection suffered or incurred by an Indemnified Party.

"Material Adverse Effect" means, (i) with respect to the Company or Sellers, a material adverse effect on either (A) the assets, operations, personnel, condition (financial or otherwise) or prospects of the Company, or (B) any of Sellers' ability to consummate the transactions contemplated hereby, and (ii) with respect to Buyer, a material adverse effect on either (A) the assets, operations, personnel, condition (financial or otherwise) or prospects of Buyer, or (B) Buyer's ability to consummate the transactions contemplated hereby.

"Mexican GAAP" means generally accepted accounting principles in effect in Mexico, consistently applied, as in effect on the date of this Agreement.

"Noncompete Period" has the meaning set forth in Section 6.6(a).

3

ER152

"Notice of Claim" has the meaning set forth in Section 8.3(a)(i).

"Party" and "Parties" means, individually and collectively, the Company, Sellers and Buyer.

"Permitted Liens" means (i) Liens and other exceptions to title that are disclosed on Schedule 1.1; and (ii) liens for Taxes, fees, levies, duties or other governmental charges of any kind which are not yet delinquent or are being contested in good faith by appropriate proceedings which suspend the collection thereof.

"Person" means any individual, partnership, limited liability company, limited liability partnership, corporation, association, joint stock company, trust, joint venture, unincorporated organization or governmental entity (or any department, agency or political subdivision thereof).

"Pre-Closing Tax Period" has the meaning set forth in Section 6.5(b).

"Pro Rata Share" means the pro rata share of each Seller of the Purchase Price based on his relative ownership of the Company as set forth on Schedule A hereto.

"Purchase Price" has the meaning set forth in Section 2.2.

"Real Property" has the meaning set forth in Section 3.18

"Release" means any release, spill, emission, leaking, pumping, injection, deposit, disposal, discharge, dispersal, leaching into the indoor or outdoor environment, and includes any migration of any Hazardous Material from or onto the properties owned or leased by the Company.

"Related Party" means (w) the Company, (x) any Affiliate of the Company, (y) any manager, officer or equity holder of the Company or of any Affiliate of the Company and (z) any Affiliate or family member of any Person described in clause (y) above.

"Remedial Action" means all actions to (i) clean up, remove, treat or in any other way address any Hazardous Material, (ii) prevent the Release of any Hazardous Material so it does not endanger or threaten to endanger public health or welfare or the indoor or outdoor environment, (iii) perform pre-remedial studies and investigations or post-remedial monitoring and care or (iv) to otherwise correct a condition of noncompliance with Environmental Laws.

"Sellers" has the meaning set forth in the introduction to this Agreement.

"Solvent" means, with respect to any Person, that at the time of determination: (i) the present fair saleable value of the assets (i.e., the price a buyer is willing to pay for such asset in an arms-length transaction) of such Person will exceed the amount that will be required to pay the probable liability on the existing debts (whether matured or unmatured, liquidated or unliquidated, absolute, fixed or contingent) of such Person as they become absolute and matured; (ii) the sum of the debts (whether matured or unmatured, liquidated or unliquidated, absolute, fixed or contingent) of such Person will not exceed all of the property of such Person at a fair valuation; (iii) the assets of such Person do not constitute unreasonably small capital for such

4



Person to carry on its businesses as now conducted or proposed to be conducted; and (iv) such Person does not intend to, and does not believe that it will, incur debts or liabilities beyond such Person's ability to pay such debts and liabilities as they mature. For purposes of the preceding sentence, the amount of contingent obligations outstanding at any time shall be computed as the amount that, in the light of all the facts and circumstances existing at such time, represents the amount that are reasonably expected to become an actual or matured liability.

"Stock" has the meaning set forth in the Recitals to this Agreement.

"Straddle Period" has the meaning set forth in Section 6.5(c).

"Subsidiary" and "Subsidiaries" means, with respect to any Person, any other Person of which more than 50% of the total voting power of capital stock entitled to vote (without regard to the occurrence of any contingency) in the election of directors (or other Persons performing similar functions) are at the time directly or indirectly owned by such specified Person.

"Tax" or "Taxes" means any federal, state, local or foreign income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, capital gain, intangible, environmental (including taxes under Section 59A of the Code or otherwise), custom duties, capital stock, profits, franchise, employee's income withholding, foreign withholding, social security (or its equivalent), unemployment, disability, real property, personal property, sales, use, transfer, value added, registration, alternative or add-on minimum, estimated or other tax of any kind, including any interest, penalties or additions to tax in respect of the foregoing, whether disputed or not, and any obligation to indemnify, assume or succeed to the liability of any other Person in respect of the foregoing; and the term "Tax Liability" shall mean any liability (whether known or unknown, whether absolute or contingent, whether liquidated or unliquidated, and whether due or to become due) with respect to Taxes.

"Tax Determination" has the meaning set forth in Section 6.5(f).

"Tax Return" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"Third Party Claim" means a claim or demand made by any Person, other than Buyer, Sellers or the Company, against an Indemnified Party.

"Transaction Documents" means this Agreement, the Escrow Agreement, the Employment Agreements, the Asset Purchase Agreement and any document or instrument which shall be executed and delivered at the Closing by the Company, Sellers or Buyer, as the case may be.

"Welfare Plan" means any other plan or program maintained for past or present employees of the Company, including without any limitation health insurance plan, life insurance plan, option plan, bonus plan, savings plan or severance plan, profit sharing, bonus, stock option, stock purchase, stock bonus, restricted stock, stock appreciation right, phantom stock or other equity-based compensation arrangement, vacation pay, holiday pay, tuition reimbursement, scholarship, severance, dependent care assistance, excess benefit, bonus,

ER154

incentive compensation, salary continuation, supplemental retirement, deferred compensation, employee loan or loan guarantee program, split dollar, cafeteria plan, and other compensation arrangements and other material agreement, arrangement, plan, policy, practice or program related to employment, compensation or employee benefits whether written or unwritten, funded or unfunded, formal or informal, that are maintained or contributed to by the Company.

"Working Capital Amount" has the meaning set forth in Section 6.9.

"U.S. GAAP" means generally accepted accounting principles in effect in the United States of America, consistently applied, as in effect on the date of this Agreement.

## Article II
## Purchase and Sale

2.1    Purchase and Sale.  On the Closing Date, subject to the terms and conditions hereof, Sellers agree to sell, transfer, assign, convey and deliver to Buyer, and Buyer agrees to purchase from Sellers, all of the Stock (except **Rafael Morales Cuevas** shall retain one share of the Stock following the Closing), free and clear of all Liens.

2.2    Purchase Price.  Subject to the terms and conditions hereof, as consideration for the Stock and the agreements contained herein, the purchase price for the Stock shall be an aggregate of TWO MILLION U.S. DOLLARS (U.S.$2,000,000) (the "Purchase Price").  On the Closing Date, Buyer shall pay the Purchase Price as follows:

        (a)    assume the accounts payable not to exceed $150,000

        (b)    a note payable to the Seller in the amount of $1,850,000.00 due and payable on or before August 1, 2011 (the "Note Payment")

2.3    Closing.  Subject to the terms and conditions hereof, the closing of the transactions contemplated by this Agreement (the "Closing") shall be held at 10:00 a.m. local time on the later of (i) February, 2010, or (ii) the satisfaction or waiver of all conditions to closing contained herein, at the offices of Nascent Wine Company or at such other time and/or place as the Parties otherwise agree (the "Closing Date").

## Article III
## Representations and Warranties of the Company and Sellers

As a material inducement to Buyer to enter into this Agreement and to consummate the transactions contemplated herein, the Company and Sellers hereby, jointly and severally, make the following representations and warranties to Buyer, subject to qualification by the disclosure schedules.  The information disclosed in any particular disclosure schedule shall be deemed to relate to and to qualify only the particular representation or warranty set forth in the corresponding numbered section in this Agreement and shall not be deemed to relate to or to qualify any other representation or warranty.

3.1    Organization and Qualification.  The Company is a corporation duly organized, validly existing and in good standing under the Laws of the Mexico.  The Company is duly

6

qualified or licensed to do business in each jurisdiction in which the character of the properties or assets owned, leased or operated by it or the nature of the activities conducted makes such qualification or licensing necessary.

3.2     Corporate Power.  The Company has all requisite corporate power and authority necessary to own and/or lease and operate its properties and assets and to carry on its business as now conducted.  The Company has all requisite corporate power and authority to execute, deliver, carry out and perform its obligations under this Agreement and each other Transaction Document to which it is a party and to consummate the transactions contemplated hereby and thereby.

3.3     Authorization; Binding Obligations.  The execution, delivery and performance of this Agreement and each other Transaction Document to which the Company is a party and the consummation of the other transactions contemplated hereby and thereby, have been duly authorized by all requisite action on the part of the Company.  This Agreement has been duly executed and delivered by the Company and, at the Closing, each of the other Transaction Documents to which the Company is a party will be duly executed and delivered by the Company.  This Agreement is, and at the Closing each of the other Transaction Documents to which the Company is a party will be, a legal, valid and binding obligation of the Company, enforceable against the Company in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium, fraudulent transfer or conveyance or similar Laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability, and except as rights of indemnity or contribution may be limited by securities Laws or the public policy underlying such Laws.

3.4     Conflict; Existing Defaults.

(a)     Neither the execution, delivery and performance by the Company of this Agreement or the other Transaction Documents to which the Company is a party nor the consummation of the transactions contemplated hereby or thereby, will conflict with, violate, or cause a default under, result in the imposition of any Lien under or give rise to a right of termination, acceleration, suspension, revocation, cancellation or amendment under, (i) the organizational documents of the Company, (ii) any Contract to which the Company is a party, or by which its assets are bound, or (iii) any applicable Laws.

(b)     The Company is not (i) in default, breach or violation of its organizational documents, as in effect as of the date hereof, as applicable, or (ii) in default, breach or violation of any Contract required to be disclosed on Schedule 3.9(a) to which it is a party or by which it or its assets is or may be bound, except, in the case of clause (ii), for such default, breach or violation as, individually or in the aggregate, is not likely to have a Material Adverse Effect.

3.5     Consents and Approvals.  No consent, approval or authorization of, or declaration, filing or registration with, any Governmental Authority or any other Person is required to be obtained or made by the Company in connection with the execution, delivery and performance of this Agreement or any other Transaction Document to which the Company is a party and the consummation of the transactions contemplated hereby and thereby.



3.6     Capitalization. The Company's authorized capital stock consists of **8,000 series A and 2,930,684 series B** shares of common stock. The issued and outstanding shares of common stock are owned as set forth on Schedule A. All of the outstanding shares of capital stock of the Company are validly issued, fully paid and nonassessable and were not issued in violation of any preemptive rights or Contract binding upon the Company or any applicable Laws. Except as set forth on Schedule A, there are no outstanding (i) shares of capital stock or other voting securities of the Company, (ii) securities convertible into or exchangeable for shares of capital stock or voting securities of the Company, (iii) options, warrants or other rights to acquire from the Company or obligations of the Company to issue any capital stock, voting securities or securities convertible into or exchangeable for capital stock or voting securities of the Company, or (iv) equity equivalent interests in the ownership or earnings of the Company or stock appreciation, phantom stock, right of first refusal, commitment or other similar rights. There are no voting trusts, proxies or other agreements or understandings with respect to the voting, registration or transfer of ownership of the Company's capital stock. The Company is not subject to any obligations (contingent or otherwise) to repurchase, redeem or otherwise acquire or retire any shares of its capital stock. All dividends or distributions on securities of the Company that have been declared or authorized prior to the date of this Agreement have been paid in full or accrued for in the Historical Financials.

3.7     Subsidiaries. The Company has no Subsidiaries. The Company does not own, directly or indirectly, any capital stock, partnership interest, joint venture interest or other equity interest of any other Person.

3.8     Financial Statements; Undisclosed Liabilities.

(a)     The books of account and other financial records of the Company, all of which have been made available to Buyer, are correct and complete in all material respects, represent actual bona fide transactions and have been maintained in accordance with sound business and accounting practices. Each transaction is properly and accurately recorded in the books and records of the Company. The Company maintains an adequate system of internal accounting controls and does not engage in or maintain any off-the-books accounts or transactions.

(b)     Attached hereto as Schedule 3.8 are the following (the financial statements referred to in clauses (i) and (ii) below being collectively referred to as the "Company Historical Financials"):

(i)     the Company's audited balance sheets and statements of income, retained earnings and cash flows as of and for its fiscal years ended December 31, 2009; and

(ii)     the Company's unaudited interim balance sheet and statements of income, retained earnings and cash flows as of and for the one month ended January 31, 2010 (the "Company Current Financials").

The Company Historical Financials (including, in each case, the related schedules and notes, if any) fairly present the financial condition, results of operations and changes in financial position of the Company as of and for the respective dates and periods covered thereby and were

8



prepared in accordance with Mexican GAAP applied on a consistent basis throughout the periods covered thereby subject, in the case of the Company Current Financials, to year-end audit adjustments (which will not be material) and the lack of footnotes and other presentation items.

(c)     Except as set forth on Schedule 3.8(c), the Company does not have any liabilities (whether known or unknown, whether direct or indirect, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated, and whether due or to become due, including any liability for Taxes), except for (i) liabilities set forth in the Company Current Financials, and (ii) liabilities that have arisen after the Company Current Financials in the ordinary course of business.

(d)     On the date hereof and immediately prior to the Closing Date, the Company is Solvent.

3.9     Contracts.

(a)     Schedule 3.9(a) sets forth a true, correct and complete list of all Contracts to which the Company is a party or to which any of its assets or properties is bound:

(i)     under which the Company is indemnified for or against any liability, or under which the Company is or could be obligated to indemnify any Person;

(ii)     under which the Company leases personal property from or to third parties under capitalized leases per annum or under operating leases;

(iii)     for the purchase or sale of products or other personal property or for the furnishing or receipt of services (A) that calls for performance over a period of more than one year or (B) in which the Company has agreed to purchase a minimum quantity of goods or services or has agreed to purchase goods or services exclusively from any Person;

(iv)     (A) granting representation, marketing, manufacturing, purchase or distribution rights or (B) relating to Company Intellectual Property (including license, development or similar agreements);

(v)     under which the Company has created, incurred, assumed or guaranteed (or may create, incur, assume or guarantee) indebtedness for borrowed money;

(vi)     establishing or maintaining any partnership, joint venture or strategic alliance;

(vii)     under which there is or may be imposed a security interest or other Lien on any of its assets, whether tangible or intangible (other than security interests or Liens granted in favor of Buyer);

(viii)     concerning any confidentiality or non-solicitation obligations;

(ix)     under which the Company is restricted from carrying on its business or any part thereof, or from competing in any line of business or with any Person;

9



ER158

        (x)     with officers, directors, employees or consultants of the Company, in each case involving payments by the Company in excess of U.S.$5,000 per annum;

        (xi)     involving any Affiliates of the Company;

        (xii)     under which the consequences of a default or termination would reasonably be expected to have, a Material Adverse Effect;

        (xiii)     under which the Company will (A) receive aggregate payments from customers, (B) make aggregate payments to vendors or other suppliers or (C) make or receive aggregate payments to or from any other Persons, in each case in excess of U.S.**$25,000** per annum (with specific reference to those agreements in excess of U.S.**$500,000** per annum);

        (xiv)     which are subject to termination or modification by any third party as a result of the transactions contemplated by this Agreement;

        (xv)     not entered into in the ordinary course of business and not otherwise disclosed on <u>Schedule 3.9(a)</u> in response to any of the foregoing clauses; or

        (xvi)     are otherwise material to the Company's business.

        The Company has delivered to Buyer true, correct and complete copies of each such Contract. To the extent that written Contracts do not exist, the Company has delivered to Buyer accurate summaries of the material terms and conditions of such oral Contracts. Such Contracts constitute all material Contracts necessary for the Company to conduct its business as currently conducted.

        (b)     (i) each Contract existing as of the date hereof is a legal, valid and binding obligation of the Company, enforceable against the Company in accordance with its terms (except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium, fraudulent transfer or conveyance or similar Laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability), and (ii) to the Knowledge of the Company, each Contract existing as of the date hereof is a legal, valid and binding obligation of the other parties thereto, enforceable against the other parties in accordance with its terms (except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium, fraudulent transfer or conveyance or similar Laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability) and is in full force and effect. The Company is and, to the Knowledge of the Company each other party to each Contract existing as of the date hereof are, in compliance with the terms thereof, and no default or event of default by the Company or any other party thereto exists thereunder.

    3.10    <u>Accounts Receivable</u>. All accounts receivable of the Company (a) are legal, valid and binding obligations of the Persons shown in the accounting records of the Company as the obligor with respect thereto, (b) arose out of bona fide sales actually made or services actually performed on or prior to such date in the ordinary course of business, (c) are not subject to discount, rebate, off-set, return privilege (other than return privileges granted in the ordinary course of business consistent with past practice) or claim, and (d) have been billed and are valid and collectible in the ordinary course of business.



3.11    Employees; Labor Relations.

(a)    The Company has previously provided to Buyer a correct and complete list of (i) all managers and executive officers of the Company, (ii) all other employees of or consultants to the Company, (iii) the current job title or relationship to the Company of each such Person and (iv) the amount of compensation (including bonuses and commissions or other benefits) paid to each such Person during the fiscal year ended December 31, 2009 and which each of them is expected to receive in the current fiscal year.

(b)    Except as otherwise disclosed on Schedule 3.11(b), the Company is not a party to any written employment agreements, independent contractor or consulting agreements and sales representative (or similar) agreements, golden parachute agreements, change of control agreements and employee-related non-competition and non-solicitation or similar agreement, written or oral, with any Person.

(c)    (i) Except as otherwise disclosed on Schedule 3.11(c), no employees of the Company are represented by any labor union or similar organization, (ii) the Company is not party to any collective bargaining or similar agreement covering any of its employees and (iii) no labor union or similar organization or group of employees has made a demand for recognition, filed a petition seeking a representation proceeding, given the Company notice of any intention to hold an election of a collective bargaining representative or engaged in any organizing activities at any time during the past three years.

(d)    (i) No strike, work stoppage, contract dispute or other labor disturbance involving any employees of the Company currently exists or, to the Company's knowledge, is threatened and (ii) no investigation, action or proceeding by or before any governmental entity which relates to allegedly unfair or discriminatory employment or labor practices by the Company or the violation by the Company of any applicable Law relating to employment or labor practices is pending or, to the Company's knowledge, threatened.

3.12    Welfare Plans.  Schedule 3.12 sets forth a correct and complete list of all Welfare Plans.  Except as otherwise disclosed on Schedule 3.12:

(a)    each Welfare Plan and any related trust has been established, maintained, administered and funded in all material respects in compliance with all applicable Laws;

(b)    no transaction or omission has occurred with respect to any Welfare Plan or related trust that could subject the Company to any Tax or penalty under applicable Laws;

(c)    none of the Welfare Plans or any related trusts have any unfunded liabilities;

(d)    none of the Welfare Plans provides medical, health, life insurance or other welfare-type benefits to former employees of the Company or any Affiliate;

11



ER160

      (e)     there are no actions, suits, investigations or other proceedings pending or, to the Company's knowledge, threatened against any Plan or any related trust or any fiduciary thereof;

      (f)     there are no outstanding Governmental Orders that name any Plan or any related trust or any fiduciary thereof or are directed to any Plan or related trust, any fiduciary thereof or any assets thereof;

      (h)     there are no benefits or perquisites available to any employees of the Company that are not generally available to all employees of the Company.

The Company has delivered to Buyer true, correct and complete copies of all Welfare Plan documentation.

3.13    <u>Taxes</u>. Except as set forth on <u>Schedule 3.13</u>:

      (a)     all Tax Returns with respect to Taxes which are required to be filed by or on behalf of the Company with any Governmental Authority have been properly prepared and filed and correctly state the Company's Tax liability;

      (b)     the Company has paid, or has made adequate reserves on its books for the payment of, all Taxes shown to be due on such Tax Returns or claimed to be due by any Governmental Authority or which the Company otherwise is liable for or is required to withhold on behalf of any other Person;

      (c)     the reserves and provisions for Taxes on the books of the Company are adequate for all open years and for its current fiscal period;

      (d)     the Company has no knowledge of any proposed assessment of any additional Taxes by any governmental entity or of any basis for any such assessment (whether or not reserved against);

      (e)     the Company is not currently being audited by any governmental entity, and no such audit is pending or, to the Company's knowledge, threatened;

      (f)     the Company has not given any waiver or extension of any period of limitation governing the time of assessment or collection of any Tax; and

      (g)     the Company is not party to any Tax sharing or similar agreement with any other Person.

3.14    <u>Litigation</u>. Except as otherwise disclosed on <u>Schedule 3.14</u>, there is no pending or, to the Company's knowledge, threatened investigation, action or proceeding against, relating to or affecting the Company or its assets or any officer, director or employee thereof in his or her capacity as such, by or before any Governmental Authority or arbitrator. <u>Schedule 3.14</u> sets forth a correct and complete list of each investigation, action and proceeding (a) described in the preceding sentence or (b) in which the Company is the plaintiff or initiating party, together with the parties thereto, the alleged basis therefore, the relief sought therein and the current status.

ER161

3.15    Transactions with Related Parties.  (a) none of the customers, suppliers, distributors or sales representatives of the Company are Related Parties; (b) none of the Company's assets are owned or used by or leased to any Related Parties; (c) no Related Party is a party to any Business Agreement; and (d) no Related Party provides any legal, accounting or other services to the Company.

3.16    Licenses and Permits.

(a)    Schedule 3.16(a) lists all Licenses and Permits.  No other governmental authorizations are necessary or required for the Company to lawfully conduct its Business as currently conducted or for the Company to own, lease or use its assets.

(b)    Each of the Licenses and Permits is valid and in full force and effect.  The Company has not received any notice that remains outstanding from any Governmental Authority regarding any actual or proposed revocation, withdrawal, suspension, cancellation or termination (other than by expiration) of any material Licenses and Permits.  The transactions contemplated by this Agreement will not adversely affect the Company's right to utilize the Licenses and Permits.  The Company has delivered to Buyer true, correct and complete copies of each License and Permit.

3.17    Personal Property.  The Company has good and marketable title to all personal property purported to be owned by it and good leasehold title to all personal property purported to be leased by it, in each case free and clear of any Liens, other than Permitted Liens.  The Company's machinery, equipment, vehicles and other tangible assets have been maintained in good working condition (normal wear and tear excepted).  The Company owns or properly leases all the assets necessary to and currently utilized in the operation of the Business.  No Seller owns any of the assets currently utilized in the Business.

3.18    Real Property.

(a)    Schedule 3.18 sets forth a correct and complete list of all real property owned, leased, occupied or used by the Company (collectively, the "Real Property") and indicates whether such property is owned or leased by the Company.

(b)    Schedule 3.18 sets forth a correct and complete list of (i) all leases, subleases and other material agreements or rights pursuant to which any Person has the right to occupy or use any Real Property owned by the Company and (ii) all leases, subleases and other material agreements or rights pursuant to which the Company has the right to occupy or use any Real Property owned by others.

(c)    Except as set forth on Schedule 3.18, the Company has good and marketable and fee simple title to all Real Property purported to be owned by it and good leasehold title to all Real Property purported to be leased by it, in each case free and clear of any Liens, other than Permitted Liens.

(d)    All buildings and other improvements located on the Real Property (including without limitation all water, sewer, gas, electrical and HVAC systems servicing the same) are in good repair and operating condition and are suitable for the purposes for which they

13



are used. The Real Property constitutes all real property, buildings and other improvements necessary for the Company to conduct its business as currently conducted and as currently planned to be conducted.

(e)     All buildings and other improvements located on the Real Property, and the use of the Real Property by the Company and all Persons claiming under it, comply with all Governmental Rules relating to zoning and land use and with all easements, covenants and other restrictions applicable to the Real Property, except where such non-compliance would, individually or in the aggregate, have a Material Adverse Effect.

(f)     The Real Property: (i) is adequately serviced by all utilities necessary for the Company to conduct its business as currently conducted and as currently planned to be conducted thereon; (ii) has adequate means of ingress and egress, either directly or by means of perpetual easements or rights-of-way which run with the Real Property; (iii) has adequate parking that is sufficient to meet the needs of the Company's employees and business invitees and to comply with applicable Laws; and (iv) is not located in whole or in part within an area identified as a flood hazard area by any Governmental Authority.

3.19     Environmental Matters.

(a)     the operations of the Company is in compliance with all applicable Environmental Laws and all Licenses and Permits issued pursuant to the Environmental Laws or otherwise;

(b)     the Company has obtained all Licenses and Permits required to operate its business in compliance with all applicable Environmental Laws;

(c)     the operations of the Company have not resulted in Releases of Hazardous Material into the environment;

(d)     the Company is not the subject of any outstanding Court Order or Contract, nor, to the Knowledge of the Company, is it threatened to be the subject of any Court Order or Contract, with any Governmental Authority respecting (i) compliance with Environmental Laws, (ii) Remedial Action, or (iii) any Release or threatened Release of a Hazardous Material, and the Company has not received any written communication alleging that the Company may be in violation of any Environmental Law or any License or Permit issued pursuant to Environmental Law, or may have any liability under any Environmental Law;

(e)     there are no investigations of the Business, or currently or previously owned, operated or leased property of the Company pending or, to the Knowledge of the Company, threatened which alleges any liability or other obligation pursuant to any Environmental Law;

(f)     no Hazardous Substances have been or are being generated, used, processed, treated, stored, released, transported or disposed of by the Company, except in compliance with applicable Environmental Laws;

14



(g)     to the Company's knowledge, no Person who has owned, leased, occupied or used any real property now or previously owned, leased, occupied or used by the Company generated, used, processed, treated, stored, released or disposed of any Hazardous Substances on such property; and

(h)     to the Company's knowledge, no underground storage tanks are located on any real property owned, leased, occupied or used by the Company.

3.20    Intellectual Property.  Schedule 3.20 sets forth a correct and complete list of (a) all patents, registered and unregistered trademarks, service marks, logos, corporate and trade names, domain names and registered and unregistered copyrights, and all applications therefor, both in the United States and Mexico which are owned, licensed or used by the Company (together with all inventions, discoveries, techniques, processes, methods, formulae, designs, computer software, trade secrets, confidential information, know-how and ideas which are owned, licensed or used by the Company, the "Intellectual Property"), specifically the "Nery's" trademarks, (b) all licenses or other agreements pursuant to which any Person has the right to use any Intellectual Property owned by the Company and (c) all licenses or other agreements pursuant to which the Company has the right to use any Intellectual Property owned by others (excluding "shrink-wrapped" software applications that are generally available to the public). The Company has the lawful right to use all of the Intellectual Property, and no such use infringes upon the lawful rights of any other Person.  To the Company's knowledge, no Person is using any Intellectual Property in a manner which infringes upon the lawful rights of the Company.  The Intellectual Property constitutes all intellectual property necessary for the Company to conduct its business as currently conducted.

3.21    Powers of Attorney.  There are no outstanding powers of attorney in effect with respect to the Company.

3.22    Insurance.  Schedule 3.22 sets forth a correct and complete list of all insurance policies of which the Company is the owner, insured, loss payee or beneficiary and indicates for each such policy any pending claims thereunder.  Except as otherwise disclosed on Schedule 3.22; (a) there has been no failure to give any notice or present any material claim under any such policy in a timely fashion or as otherwise required by such policy; (b) all premiums under such policies which are due and payable have been paid in full; (c) no such policy provides for retrospective or retroactive premium adjustments; (d) the Company has not received notice of any material increase in the premium under, cancellation or non-renewal of or disallowance of any claim under any such policy; (e) the Company has not been refused any insurance, nor has its coverage been limited by any carrier; and (f) since January 1, 2003, the Company has maintained, or been the beneficiary of, general liability and product liability policies reasonable, in both scope and amount, in light of the risks attendant to their respective businesses and which provide coverage comparable to coverage customarily maintained by others in similar lines of business, and such policies have been "occurrence" policies and not "claims made" policies.

3.23    Business Relationships.  The Company has not received any notice with respect to any actual or threatened termination or cancellation of, or any adverse modification or material change in, the business relationship between the Company, on the one hand, and any vendor,



ER164

distributor, supplier or customer, on the other hand, and to the Knowledge of the Company, there is no basis for such termination or cancellation of any such business relationships, other than the termination of any such relationships upon expiration of the agreement related thereto. <u>Schedule 3.23</u> contains a list of the 10 largest customers, and the 10 largest suppliers of the Company for each of the two most recent fiscal years (determined on the basis of the total dollar amount of gross sales) showing the total dollar amount of gross sales to each such customer and the percentage of all sales during each such year and the total amount of purchases made to each such supplier and the percentage of all purchases made during each such year.

3.24    <u>Inventories</u>.  Except to the extent of inventory reserves reflected in the Company Historical Financials, the items included in such inventories are normal items of inventory carried by the Company, and are current, suitable and merchantable at customary prices for the filling of orders in the normal course of business, and are not obsolete, damaged, defective or slow moving.  The Company has all right, title and interest in the inventories reflected in the Company Historical Financials (except to the extent they have been sold in the ordinary course of business since the date thereof).  Except for such items acquired or produced after December 31, 2009, all items of inventory carried by the Company are reflected on the Company Historical Financials at the lower of cost (determined on a first-in, first-out bases) or market in accordance with Mexican GAAP applied on a consistent basis, with adequate provisions or adjustments having been made for excess and slow-moving inventory and inventory obsolescence and shrinkage.

3.25    <u>Depository and Other Accounts</u>.  <u>Schedule 3.25</u> sets forth a true, correct and complete list of all banks and other financial institutions and depositories at which the Company maintains (or has caused to be maintained) deposit accounts, lockbox accounts, spread accounts, yield supplement reserve accounts, operating accounts, trust accounts, trust receivable accounts or other accounts of any kind or nature into which funds of the Company are deposited from time to time.  Such <u>Schedule 3.25</u> correctly identifies the name and address of each depository, the name in which each account is held, the purpose of the account, the type of account, the account number, the specific contact person at such depository and his or her direct telephone number and email address.

3.26    <u>Books and Records</u>.  The minute books and similar records of the Company contain true and complete records of all actions taken at any meeting of the Company's stockholders, directors, or any committees thereof, as the case may be, and of all written consents executed in lieu of the holding of any such meeting, and have been maintained in accordance with good business accounting and bookkeeping practices.

3.27    <u>Brokers</u>.  None of the Company nor any of its Affiliates is obligated to pay any fee or commission to any broker, finder, investment banker or other intermediary, in connection with this Agreement, any other agreement, or any of the transactions contemplated hereby or thereby for which Buyer (or the Company after the Closing Date) will have any liability.

3.28    <u>Compliance with Laws</u>.  Except as set forth in <u>Schedule 3.28</u>, the Company is in compliance in all material respects with all applicable Laws.  The Company is not subject to any Court Orders.  Except as set forth on <u>Schedule 3.28</u>, no investigation or review by any Governmental Authority with respect to the Company is pending or filed or, to the Knowledge of

16



the Company, threatened nor, to the Knowledge of the Company, has any Governmental Authority indicated an intention to conduct the same.

3.29    Interim Changes.  Except as set forth on Schedule 3.29, since December 31, 2009, there has been no:

(a)    change in the condition, financial or otherwise, of the Company, which had, or would reasonably be expected to have, a Material Adverse Effect;

(b)    material loss, damage or destruction of or to any of the Company's assets, whether or not covered by insurance;

(c)    sale, lease, transfer or other disposition by the Company of, or mortgages or pledges of or the imposition of any Lien (other than Permitted Liens) on, any portion of the Company's assets, other than the sale of assets in the ordinary course of the Company's business;

(d)    adjustment or write-off of accounts receivable not reflected in the Company Historical Financials or any change in the collection, payment or credit experience or practices of the Company;

(e)    change in the Tax or cash basis accounting methods or practices employed by the Company or change in depreciation or amortization policies;

(f)    payment by the Company of any dividend, distribution or extraordinary or unusual disbursement or expenditure;

(g)    termination, waiver or cancellation of any material rights or claims of the Company, under any Contract or otherwise;

(h)    the Company has not made, or committed to make, any capital expenditures in excess of U.S.$10,000 in the aggregate;

(i)    other transaction not in the ordinary course of business and consistent with past practice;

(j)    the Company has not granted or is committed to grant any salary or other compensation increase to any of its employees other than in the ordinary course of business; or

(k)    binding commitment with respect to any of the foregoing.

3.30    No Omissions or Misstatements.  None of the representations or warranties of the Company included in this Agreement as qualified by the disclosure schedules hereto, or other Transaction Documents furnished or to be furnished by the Company contains any untrue statement of a material fact or is misleading in any material respect or omits to state any material fact necessary in order to make any of the statements herein or therein not misleading in light of the circumstances in which they were made.

17



ER166

## Article IV
## Representations and Warranties of Sellers

As a material inducement to Buyer to enter into this Agreement and to consummate the transactions contemplated herein, each Seller, severally and not jointly, hereby represents and warrants to Buyer, with respect to such Seller only, as follows:

4.1     Ownership of Capital Stock.  Such Seller is the beneficial and record owner of the Stock identified next to such Seller's name on Schedule A hereto, free and clear of any Liens. Such Seller has the requisite right, power and authority to transfer the Stock owned by such Seller, and immediately following the Closing, Buyer will own 100% of the capital stock of the Company (except **Rafael Morales Cuevas** shall retain one share of the Company following the Closing), free and clear of any Liens.

4.2     Legal Capacity.  Such Seller has the legal capacity to execute, deliver, carry out and perform its obligations under this Agreement and each other Transaction Document to which it is a party and to consummate the transactions contemplated hereby and thereby.

4.3     Authorization; Binding Obligation.  No action, consent or approval on the part of such Seller is necessary to authorize such Seller's due and valid execution, delivery and consummation of this Agreement and each other Transaction Document to which it is a party. This Agreement has been duly executed and delivered by such Seller and, at the Closing, each of the other Transaction Documents to which such Seller is a party will be duly executed and delivered by such Seller.  This Agreement is, and at the Closing each of the other Transaction Documents to which such Seller is a party will be, a legal, valid and binding obligation of such Seller, enforceable against such Seller in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium, fraudulent transfer or conveyance or similar Laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability, and except as rights of indemnity or contribution may be limited by securities Laws or the public policy underlying such Laws.

4.4     Conflict.  Neither the execution, delivery and performance by such Seller of this Agreement or any of the other Transaction Documents to which such Seller is a party nor the consummation of the transactions contemplated hereby or thereby, will conflict with, violate, or cause a default under, result in the imposition of any Lien under or give rise to a right of termination, acceleration, suspension, revocation, cancellation or amendment under (a) any Contract to which such Seller is a party, or by which its assets are bound, which could reasonably be expected to adversely impact such Seller's obligations under this Agreement, or (b) any applicable Laws, which could reasonably be expected to adversely impact such Seller's obligations under this Agreement.

4.5     Consents and Approvals.  No consent, approval or authorization of, or declaration, filing or registration with, any Governmental Authority or any other Person is required to be made or obtained by such Seller in connection with the execution, delivery and performance of this Agreement or the Transaction Documents to which such Seller is a party and the consummation of the transactions contemplated hereby and thereby.

18



4.6   Litigation.  There is no pending, or to such Seller's knowledge, threatened, investigation, action or proceeding to which such Seller is a party or which relates to such Seller, which questions the validity of this Agreement or impairs the ability of such Seller to consummate the transactions contemplated hereby or the transactions contemplated by the other Transaction Documents to which such Seller is a party.

4.7   Brokers.  Such Seller is not obligated to pay any fee or commission to any broker, finder, investment banker or other intermediary, in connection with this Agreement, any other agreement, or any of the transactions contemplated hereby or thereby for which Buyer (or the Company after the Closing Date) will have any liability.

**Article V**
**Representations and Warranties of Buyer**

As a material inducement to the Company and Sellers to enter into this Agreement and to consummate the transactions contemplated hereunder, Buyer hereby represents and warrants to Sellers, as follows:

5.1   Organization.  Buyer is a corporation duly organized, validly existing and in good standing under the Laws of the State of Nevada.  Buyer is duly qualified or licensed to do business in each jurisdiction in which the character of the properties or assets owned, leased or operated by it or the nature of the activities conducted makes such qualification or licensing necessary.

5.2   Corporate Power.  Buyer has all requisite corporate power and authority to own and/or lease and operate its properties and assets and to carry on its business as now conducted. Buyer has all requisite corporate power and authority to execute, deliver, carry out and perform its obligations under this Agreement and each other Transaction Document to which it is a party and to consummate the transactions contemplated hereby and thereby.

5.3   Authorization; Binding Obligations.  The execution, delivery and performance by Buyer of this Agreement and each other Transaction Documents to which Buyer is a party, and the consummation of the transactions contemplated hereby and thereby, have been duly authorized by all requisite action on the part of Buyer.  This Agreement has been duly executed and delivered by Buyer, and, at the Closing, each of the other Transaction Documents to which Buyer is a party will be duly executed and delivered by Buyer.  This Agreement is, and at the time of the Closing each of the other Transaction Documents to which Buyer is a party will be, a legal, valid and binding obligation of Buyer, enforceable against Buyer in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium, fraudulent transfer or conveyance or similar Laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability, and except as rights of indemnity or contribution may be limited by securities Laws or the public policy underlying such Laws.

5.4   Conflict; Existing Defaults.  Neither the execution, delivery and performance by Buyer of this Agreement or the other Transaction Documents to which Buyer is a party nor the consummation of the transactions contemplated hereby or thereby, will conflict with, violate, or

19

ER168

cause a default under, result in the imposition of any Lien under or give rise to a right of termination, acceleration, suspension, revocation, cancellation or amendment under, (i) the organizational documents of Buyer, (ii) any Contract to which Buyer is a party, or by which its assets are bound, or (iii) any applicable Laws.

5.5     Consents and Approvals.  No consent, approval or authorization of, or declaration, filing or registration with, any Governmental Authority or any other Person is required to be obtained or made by Buyer in connection with the execution, delivery and performance of this Agreement or any other Transaction Document to which Buyer is a party and the consummation of the transactions contemplated hereby and thereby.

5.6     Brokers.  Other than certain fees payable to **[none]** or which Buyer will be solely responsible, Buyer has not paid and is not obligated to pay any fee or commission to any broker, finder, investment banker or other intermediary in connection with this Agreement, any other agreement or any of the transactions contemplated hereby or thereby for which Sellers will have any liability.

5.7     Compliance with Laws.  Buyer is in compliance in all material respects with all applicable Laws.  Buyer is not subject to any Court Orders.  No investigation or review by any Governmental Authority with respect to Buyer is pending or filed or, to the Knowledge of Buyer, threatened nor, to the Knowledge of Buyer, has any Governmental Authority indicated an intention to conduct the same.

### Article VI
### Covenants of the Parties

6.1     Conduct of Company Business.  From the date hereof to the Closing, except as expressly contemplated by this Agreement or otherwise consented to by Buyer in writing, Sellers shall use their reasonable best efforts to cause the Company to, and the Company shall:

(a)     conduct its business only in the usual, regular and ordinary course in substantially the same manner as heretofore conducted;

(b)     maintain in all material respects all of the structures, equipment, vehicles and other tangible personal property of its business in its present condition, except for ordinary wear and tear and damage by unavoidable casualty and sales of inventory in the ordinary course of business;

(c)     keep in full force and effect insurance comparable in amount and scope of coverage to insurance now carried with respect to its business;

(d)     perform in all material respects all obligations under Contracts relating to or affecting its business;

(e)     maintain the books of account and records of its business in the usual, regular and ordinary manner consistent with past practice;



ER169

(f)　comply in all material respects with all Laws applicable to the conduct of its business;

(g)　not enter any employment agreement or commitment to employees of its business or effect any increase in the compensation or benefits payable or to become payable to any officer, director or employee of the Business other than increases in non-officer employee compensation effected in the ordinary course of business;

(h)　create or permit to exist any Lien on the assets of the Company other than a Permitted Lien;

(i)　not enter into or materially modify any agreement for indebtedness or any Contract obligating the Company to purchase goods or services for a period of 90 days or more, or sell, lease, license or otherwise dispose of any asset of its business (other than dispositions of obsolete assets and inventory in the ordinary course of business) or acquire any substantial assets other than replacement assets, inventory and supplies to be used in its business;

(j)　not take any action with respect to, or make any material change in its accounting or Tax policies or procedures;

(k)　not make, change or revoke any Tax election or settle or compromise any Tax Liability, or amend any Tax Return, change an annual accounting period, adopt or change any accounting method, file any amended Tax Return, enter into any closing agreement, settle any Tax claim or assessment, surrender any right to claim a refund of Taxes, consent to any extension or waiver of the limitation period applicable to any Tax claim or assessment, or take any other similar action relating to the filing of any Tax Return or the payment of any Tax, if such election, adoption, change, amendment, agreement, settlement, surrender, consent or other action would have the effect of increasing the Tax Liability of the Company for any period ending after the Closing Date or decreasing any Tax attribute of the Company existing on the Closing Date; and Company shall promptly notify Buyer if Company makes any amendment to a Tax Return or files and amended Tax Return;

(l)　not issue any capital stock or securities convertible into capital stock; or

(m)　not authorize or enter into any commitment with respect to any of the matters described above.

6.2　Access to Information.

(a)　Buyer's Investigation. Between the date of this Agreement and the Closing Date, the Company will (i) give Buyer and its authorized representatives (including lenders, legal counsel and accountants) access to all officers, employees, independent accountants, attorneys and any other advisors or contractors of the Company, all offices, warehouses and other facilities and property of the Company's business and all of the Company's books and records, including without limitation, financial statements, tax returns and Contracts, (ii) permit Buyer and its authorized representatives to make such inspections thereof as Buyer may require, and (iii) furnish Buyer and its representatives and advisers with such financial and operating data and other information with respect to the business and properties of the

21



ER170

Company's business as Buyer may from time to time request; provided, however, that any such investigation shall be conducted in such a manner as not to interfere unreasonably with the operation of the Business.

(b)    Confidentiality.  If the transactions contemplated by this Agreement are not consummated (and in any event prior to the Closing Date), Buyer, Sellers and the Company will maintain the confidentiality of all information and materials obtained from the other Parties and will not use or permit others to use such information for any other purpose, except to the extent disclosure of any such information is authorized by the other Parties or required by Law, and upon termination of this Agreement, Buyer, Sellers and the Company and their respective representatives will promptly return to the other Parties all materials obtained from such other Parties in connection with the transactions contemplated by this Agreement and all copies thereof.  The provisions of this Section 6.2(b) will not apply to any information, documents or material which are in the public domain other than by reason of a breach of this Section 6.2(b).

6.3    Efforts to Consummate Transaction.  The Parties shall use their commercially reasonable efforts to take or cause to be taken all such actions required to consummate the transactions contemplated hereby including, without limitation, such actions as may be necessary to obtain, prior to the Closing, all necessary governmental or other third-party approvals and consents required to be obtained by the Company, Sellers or Buyer in connection with the consummation of the transactions contemplated by this Agreement.

6.4    No Solicitation.  Unless this Agreement shall have been terminated pursuant to Section 9.1, Sellers shall not, and shall not permit the Company to, directly or indirectly through any officer, director, employee, agent, affiliate, representative or otherwise, accept or enter into any agreement, agreement in principle or other commitment (whether or not legally binding) relating to a Competing Transaction or solicit or initiate the submission of any proposal or offer from any person or entity (including the Company's officers, partners, employees and agents) relating to any Competing Transaction, nor participate in any discussions or negotiations regarding, or furnish to any other person or entity any information with respect to, or otherwise consider, entertain, cooperate in any way with, or assist or participate in, facilitate or encourage, any effort or attempt by any other person or entity to effect a Competing Transaction.  The Company and Sellers shall immediately cease any and all contacts, discussions and negotiations with third parties regarding any Competing Transaction.  Sellers shall, and shall cause the Company to, notify Buyer if any such offer or proposal regarding a Competing Transaction (or any inquiry or contact with any person or entity with respect thereto) is made and shall advise Buyer of the contents thereof (and, if in written form, provide Buyer with copies thereof).  Notwithstanding the foregoing, nothing contained in this Section 6.4 shall prohibit the Company, directly or indirectly through any officer, director, employee, agent, affiliate, representative or otherwise, from taking any of the actions described in this Section 6.4 in response to an unsolicited inquiry, offer or proposal to the extent that the Board of Directors of the Company determines in good faith that the fiduciary obligations of the directors to the Company require that such actions be taken.  In the event of (i) a breach by Sellers or the Company of this Section 6.4 or (ii) the approval of a Competing Transaction by the Board of Directors of the Company, then the Company and Sellers jointly and severally agree to pay to Buyer a break-up fee of U.S.$500,000 within three (3) Business Days of such termination, provided however that such payment shall be subject to the prior written consent of Genesis Merchant Partners, LP.

22



6.5    Tax Matters.

(a)    Sellers will be responsible for and shall cause the Company to timely file any income Tax Returns with a filing due date that is after the Closing Date for Tax periods of the Company that end on or before the Closing Date. Sellers shall permit Buyer to review and comment on each such Tax Return described in the preceding sentence prior to filing, and Sellers shall make any revisions to such Tax Returns as may be reasonably requested by Buyer in order to comply with applicable Laws. Buyer will be responsible for and shall cause the Company to timely file any income Tax Returns with a filing due date that is after the Closing Date for Tax periods of the Company that begin after the Closing Date.

(b)    Each Seller jointly and severally indemnifies, defends and holds harmless the Company, Buyer, and each Buyer Affiliate and the Buyer Indemnified Parties and hold them harmless from and against without duplication, any loss, claim, liability, expense, or other damage attributable to (i) all Taxes (or the non-payment thereof) of the Company for all taxable periods ending on or before the Closing Date and the portion through the end of the Closing Date for any taxable period that includes (but does not end on) the Closing Date ("Pre-Closing Tax Period"), (ii) all Taxes of any member of an affiliated, consolidated, combined or unitary group of which the Company (or any predecessor of any of the foregoing) is or was a member on or prior to the Closing Date, including pursuant to U.S. Treasury Regulation § 1.1502 6 or any analogous or similar state, local or foreign Law, and (iii) any and all Taxes of any person (other than the Company) imposed on the Company as a transferee or successor, by contract or pursuant to any Law, which Taxes relate to an event or transaction occurring before the Closing. Sellers shall reimburse Buyer for any Taxes of the Company that are the responsibility of Sellers pursuant to this Section 6.5(b) within 15 Business Days after payment of such Taxes by Buyer or the Company.

(c)    Buyer and the Company agree that, in the case of any taxable period that includes (but does not end on) the Closing Date (a "Straddle Period"), the amount of any Taxes based on or measured by income or receipts of the Company for the Pre-Closing Tax Period shall be determined based on an interim closing of the books as of the close of business on the Closing Date (and for such purpose, the taxable period of any partnership or other pass-through entity in which the Company holds a beneficial interest shall be deemed to terminate at such time) and the amount of other Taxes of the Company for a Straddle Period that relates to the Pre- Closing Tax Period shall be deemed to be the amount of such Tax for the entire taxable period multiplied by a fraction the numerator of which is the number of days in the taxable period ending on the Closing Date and the denominator of which is the number of days in such Straddle Period.

(d)    Except to the extent required by Law, Buyer shall not amend, and shall not permit the Company to amend, any income Tax Return or election made in connection with such income Tax Return for any Tax period ending on or prior to Closing without the prior written consent of Sellers if such amendment would have the effect of increasing the amount of Tax payable by Sellers with respect to such period.

(e)    Buyer and Sellers covenant and agree to cooperate with each other regarding Tax matters as follows:



(i)     Buyer, the Company and Sellers shall cooperate fully, as and to the extent reasonably requested by the other Party, in connection with the filing of Tax Returns pursuant to this Section 6.5(e) and any audit, litigation or other proceeding with respect to Taxes. Such cooperation shall include the retention and (upon the other Party's request) the provision of records and information that are reasonably relevant to any such audit, litigation or other proceeding and making employees available on a mutually convenient basis to provide additional information and explanation of any material provided hereunder. Buyer, the Company and Sellers agree (A) to retain all books and records with respect to Tax matters pertinent to the Company relating to any taxable period beginning before the Closing Date until the expiration of the statute of limitations (and, to the extent notified by Buyer or Sellers, any extensions thereof) of the respective taxable periods, and to abide by all record retention agreements entered into with any taxing authority, and (B) to give the other Party reasonable written notice prior to transferring, destroying or discarding any such books and records and, if the other Party so request, the Company or Sellers, as the case may be, shall allow the other Party to take possession of such books and records.

(ii)     Buyer and Sellers further agree, upon request, to use their best efforts to obtain any certificate or other document from any Governmental Authority or any other Person as may be necessary to mitigate, reduce or eliminate any Tax that could be imposed (including, but not limited to, with respect to the transactions contemplated hereby).

(iii)     Buyer and Sellers further agree, upon request, to provide the other Party with all reasonably requested information related to Taxes that either Party may be required to report to any Governmental Authority.

(f)     Buyer shall notify Sellers in writing within five (5) Business Days after receipt by Buyer or the Company of any notice of audit or request for information regarding any Taxes and upon notice of any determination of liability for Taxes from an official inquiry, examination, audit or proceeding (each, a "Tax Determination") regarding any Tax Return related to a period that ends on or prior to the Closing Date. Sellers shall have the right to exercise control, on behalf of the Company for any such Tax Return, and at its own expense, at any time over the handling, disposition or settlement of any issue raised in any such Tax Determination, if and to the extent the disposition or settlement would be reasonably expected to result in a liability to the Company or Sellers. Buyer and the Company shall cooperate with Sellers, as reasonably requested in connection with any such Tax Determination.

(g)     Sellers shall notify Buyer in writing within five (5) Business Days after receipt by Sellers of any Tax Determination regarding any Tax Return for the Straddle Period or any period thereafter. Sellers, on behalf of the Company, for any pre-Closing period, and Buyer, on behalf of the Company, with respect to any post-Closing period, in each case, at its own respective expense, shall have the right to exercise control at any time over the handling, disposition or settlement of any issue raised in any such Tax Determination regarding any Straddle Period, if and to the extent the disposition or settlement would be reasonably expected to result in a liability to the Company for such period. Buyer and the Company shall cooperate with Sellers, as reasonably requested, in connection with any such Tax Determination.



(h)     Sellers and Buyer shall cooperate with each other in allocating the Purchase Price among the classes of assets of the Company for any Tax purposes. To the extent requested by Buyer, within 120 days after the Closing Date, Sellers and Buyer shall agree on an allocation of such Purchase Price among the classes of assets of the Company to be reported to any Governmental Authority.

6.6     <u>Noncompete</u>. In partial consideration of the Purchase Price:

(a)     Each Seller agrees that for the five (5) year period following the Closing Date (the "<u>Noncompete Period</u>"), he shall not, directly or indirectly, either for himself or for any other Person participate in any business similar to that of the Company or any of its Affiliates anywhere in Mexico, other than on behalf of the Company or such Affiliate. For purposes of this Agreement, the term 'participate' includes any direct or indirect interest in any enterprise, whether as an officer, director, employee, partner, member, sole proprietor, agent, representative, independent contractor, consultant, franchisor, franchisee, creditor, lender, owner or otherwise; provided that the term 'participate' shall not include ownership of less than 1% of the stock of a publicly-held corporation whose stock is traded on a national securities exchange or in the Over-The-Counter market. Each Seller agrees that this covenant is reasonable with respect to its duration, geographical area and scope.

(b)     Each Seller agrees that during the Noncompete Period, such Seller shall not, directly or indirectly, (i) induce or attempt to induce any employee of the Company or any of its Affiliates (including Buyer) to leave the employ of Company or any such Affiliate or in any way interfere with the relationship between the Company or any such Affiliate and any employee thereof, (ii) induce or attempt to induce any customer or supplier of the Company or any of its Affiliates (including Buyer) to cease doing business or reduce their volume of business with the Company or any such Affiliate, or (iii) except to the extent required by applicable Law or in connection with a claim under Article VIII, use for their own personal benefit, or disclose, communicate or divulge to, or use for the direct or indirect benefit of any Person, any confidential information of the Company or any of its Affiliates (including Buyer).

(c)     Each Seller agrees that Buyer would suffer irreparable harm from a breach by such Seller of any of the covenants or agreements contained in this Section 6.6. In the event of an alleged or threatened breach by a Seller of any of the provisions of this Section 6.6, Buyer or its successors or assigns may, in addition to all other rights and remedies existing in its favor, apply to any court of competent jurisdiction for specific performance and/or injunctive or other relief in order to enforce or prevent any violations of the provisions hereof. To the extent of any breach of this Section 6.6 by any Seller, the Noncompete Period (with respect to such breaching Seller) shall automatically be extended by the length of such breach.

(d)     If, at the time of enforcement of any of the provisions of this Section 6.6, a court holds that the restrictions stated therein are unreasonable under the circumstances then existing, the Parties hereto agree that the maximum period, scope or geographical area reasonable under such circumstances shall be substituted for the stated period, scope or area. Each Seller acknowledges that, without provisions contained in this Section 6.6, Buyer would have not entered into this Agreement.

25

6.7     Certain Taxes.  All transfer, documentary, sales, use, stamp, registration and other such Taxes and fees (including any penalties and interest) incurred in connection with this Agreement (including any corporate-level gains tax triggered by the sale of the Stock), shall be paid by Sellers when due, and Sellers will, at their own expense, file all necessary Tax Returns and other documentation with respect to all such transfer, documentary, sales, use, stamp, registration and other Taxes and fees and, if required by applicable Law, Buyer will, and will cause its Affiliates to, join in the execution of any such Tax Returns and other documentation.

6.8     Notification of Certain Matters.  Each of Buyer, Sellers and the Company shall give prompt written notice of the occurrence or non-occurrence of any event which would be likely to cause (i) any representation or warranty by such Party contained in this Agreement to be untrue or inaccurate in any material respect, or (ii) any failure by such Party to comply with or satisfy, or be able to comply with or satisfy, in any material respect any condition, covenant or agreement to be complied with or satisfied by it hereunder.

6.9     Supplementation and Amendment of Schedules.  From time to time prior to the Closing, the Company shall have the right to supplement or amend the Schedules with respect to any matter arising in the ordinary course of business after the date hereof; provided, however, that all such supplements or amendments shall be disregarded for purposes of determining whether the conditions to Buyer's obligations to close this Agreement contained in Section 7.1(a) have been satisfied.  Notwithstanding the foregoing, if the Closing shall occur, then Buyer shall be deemed to have waived any right or claim pursuant to the terms of this Agreement or otherwise, including pursuant to Article VIII hereof, with respect to any and all matters disclosed pursuant to any such supplement or amendment relating to any event occurring after the date hereof.

**Article VII**
**Closing Conditions**

7.1     Obligation of Buyer to Close.  The obligation of Buyer to close the transactions contemplated hereby shall be subject to the fulfillment and satisfaction, prior to or at the Closing, of the following conditions, or the written waiver thereof by Buyer:

(a)     Representations and Covenants.  The representations and warranties of the Company and Sellers contained in this Agreement shall be true and correct in all material respects on and as of the Closing Date with the same force and effect as though made on and as of the Closing Date.  Sellers and the Company shall have performed and complied in all material respects with all covenants and agreements required by this Agreement to be performed or complied with by Sellers or the Company on or prior to the Closing Date.

(b)     No Injunction.  No Court Order shall be in effect which forbids or enjoins the consummation of the transactions contemplated by this Agreement, no proceedings for such purpose shall be pending, and no Law shall have been enacted which prohibits, restricts or delays the consummation of the transactions contemplated hereby.

(c)     Approvals.  All governmental and third party approvals, consents (including, without limitation, with respect to all leased real property), permits or waivers

26



necessary for consummation of the transactions contemplated by this Agreement and any other Transaction Document shall have been obtained in form and substance reasonably satisfactory to Buyer.

(d) <u>Good Standing</u>. Buyer shall have received good standing certificates, dated within 10 days of the Closing Date, issued by the appropriate Mexican authorities with respect to the Company.

(e) <u>Material Adverse Effect</u>. No Material Adverse Effect shall have occurred with respect to the Company or Sellers.

(f) <u>Employment Agreements</u>. Each of **[none]** shall have entered into an Employment Agreement with Buyer or the Company.

(g) <u>Stock Certificates</u>. Buyer shall have received the stock certificates representing the Stock (except **Rafael Morales Cuevas** shall retain one share of the Stock) duly endorsed for transfer and accompanied by any applicable documentary stamp tax.

(h) <u>Audited Financial Statements</u>. Buyers hall have received, at least five (5) Business Days prior to the Closing Date, audited balance sheets and statements of income, operations and cash flows for the fiscal years ended December 31, 2008 and December 31, 2009 ) in accordance with Buyer's disclosure requirements under Form 8-K of the U.S. Securities Exchange Act of 1934, as amended, which financial statements will be presented in accordance with U.S. GAAP and otherwise in form and substance reasonably satisfactory to Buyer.

(i) <u>Legal Opinion</u>. Buyer shall have received a legal opinion customary for acquisitions of the type contemplated by this Agreement in the United States from counsel to the Company and Sellers in form and substance satisfactory to Buyer and its counsel.

(j) <u>Other Document Deliveries</u>. The Company and Sellers shall have delivered to Buyer copies of each of the other Transaction Documents to which they are party duly executed thereby and such other documents as Buyer or its counsel may reasonably request to evidence the transactions contemplated hereby.

(k) <u>Due Diligence</u>. Buyer shall be satisfied, in its sole and absolute discretion, with the results of its legal, financial or business due diligence investigations of the Company and Sellers.

7.2 <u>Obligation of Sellers to Close</u>. The obligation of Sellers to close the transactions contemplated hereby shall be subject to the fulfillment and satisfaction, prior to or at the Closing, of the following conditions, or the written waiver thereof by Sellers:

(a) <u>Representations and Covenants</u>. The representations and warranties of Buyer contained in this Agreement shall be true and correct in all material respects on and as of the Closing Date with the same force and effect as though made on and as of the Closing Date.



Buyer shall have performed and complied in all material respects with all covenants and agreements required by this Agreement to be performed or complied with by Buyer on or prior to the Closing Date.

(b)     No Injunction.  No Court Order shall be in effect which forbids or enjoins the consummation of the transactions contemplated by this Agreement, no proceedings for such purpose shall be pending, and no federal, state, local or foreign statute, rule or regulation shall have been enacted which prohibits, restricts or delays such consummation.

(c)     Approvals.  All governmental and third party approvals, consents, permits or waivers necessary for consummation of the transactions contemplated by this Agreement shall have been obtained in form and substance satisfactory to the Company.

(d)     Material Adverse Effect.  No Material Adverse Effect shall have occurred with respect to Buyer.

(e)     Employment Agreements.  The Company or Buyer shall have entered into the Employment Agreements with each of [none].

(f)     Other Document Deliveries. Buyer shall have delivered to Sellers copies of each of the other Transaction Documents to which it is party duly executed thereby and such other documents as Sellers or their counsel may reasonably request to evidence the transactions contemplated hereby.

(g)     Purchase Price.  Buyer shall have delivered to the Sellers the Note referenced in this Agreement..

(h)     Asset Purchase Agreement.  The transactions contemplated by the Asset Purchase Agreement shall have been consummated.

## Article VIII
## Indemnification

8.1     Indemnification.

(a)     By Sellers.  Each Seller, jointly and severally, hereby agrees to indemnify, defend and hold harmless Buyer, the Company and their respective directors, officers, employees, stockholders, agents, attorneys, representatives, successors, permitted assigns and Affiliates (collectively, the "Buyer Indemnified Parties") from and against any Losses arising from or relating to: (i) any breach of the representations and warranties made by the Company in this Agreement; (ii) any breach of the covenants or agreements made by the Company or Sellers in this Agreement; and (iii) any indemnification obligations pursuant to Section 6.5.  In addition, each Seller, severally and not jointly, hereby agrees to indemnify, defend and hold harmless Buyer Indemnified Parties from and against any Losses based upon or arising from any breach of the representations and warranties of such Seller contained in Article IV.

(b)     By Buyer.  Following the Closing, Buyer shall indemnify, defend and hold harmless Sellers at all times from and against any Losses arising from or relating to: (i) any

ER177

breach of any representation or warranty made by Buyer in this Agreement, and (ii) any breach of any covenant and agreement made by Buyer in this Agreement and (iii) any and all losses of the Company arising after the Closing Date.

8.2     Limitations of Indemnity.

(a)     Notwithstanding the foregoing, no claim for indemnification under Section 8.1 shall first be asserted after the two year anniversary of the Closing Date; provided, however, that (i) a claim for indemnification under Section 3.2 (Corporate Power), Section 3.6 (Capitalization), Section 4.1 (Ownership of Capital Stock) and Section 4.2 (Legal Capacity) shall survive indefinitely, and (ii) a claim for indemnification under Section 3.12 (Welfare Plans), Section 3.13 (Taxes) and Section 3.19 (Environmental Matters) shall survive until the expiration of the applicable statute of limitations.

(b)     Claims for indemnification by Buyer under this Article IX shall be reduced to the extent of any insurance proceeds received by or paid on behalf of the Indemnitee from any insurance policy in effect immediately prior to the Closing (the "Pre-Closing Insurance Policies") (and for clarification, not from insurance policies bound by Buyer following the Closing with respect to the Company) covering the occurrence(s) that is or are the basis for such claims. In addition, where applicable, Buyer agrees to, and shall cause the Company to, submit all claims covered by the Pre-Closing Insurance Policies to the respective insurance carrier and pursue recovery from the insurers under such Pre-Closing Insurance Policies in accordance with the terms of such policies.

8.3     Indemnification Procedures - Third Party Claims.

(a)     The rights and obligations of a Party claiming a right of indemnification hereunder (each an "Indemnitee") from a Party to this Agreement (each an "Indemnitor") in any way relating to a Third Party Claim shall be governed by the following provisions of this Section 8.3:

(i)     The Indemnitee shall give prompt written notice to the Indemnitor of the commencement of any claim, action suit or proceeding, or any threat thereof, or any state of facts which Indemnitee determines will give rise to a claim by the Indemnitee against the Indemnitor based on the indemnity provisions contained in this Agreement setting forth, in reasonable detail, the nature and basis of the claim and the amount thereof, to the extent known, and any other relevant information in the possession of the Indemnitee (a "Notice of Claim"). The Notice of Claim shall be accompanied by any relevant documents in the possession of the Indemnitee relating to the claim (such as copies of any summons, complaint or pleading which may have been served and, or any written demand or document evidencing the same). No failure to give a Notice of Claim shall affect, limit or reduce the indemnification obligations of an Indemnitor hereunder, except to the extent such failure actually prejudices such Indemnitor's ability successfully to defend the claim, action, suit or proceeding giving rise to the indemnification claim.

29



        (ii)      In the event that an Indemnitee furnishes an Indemnitor with a Notice of Claim, then, upon the written acknowledgment by the Indemnitor given to the Indemnitee within 30 days after receipt of the Notice of Claim, stating that the Indemnitor is undertaking and will prosecute the defense of the claim under such indemnity provisions and confirming that based on the information available as between the Indemnitor and the Indemnitee, the claim covered by the Notice of Claim is subject to this Article VIII and that the Indemnitor will be able to pay the full amount of potential liability in connection with any such claim (including, without limitation, any action, suit or proceeding and all proceedings on appeal or other review which counsel for the Indemnitee may reasonably consider appropriate) (an "Indemnification Acknowledgment"), then the claim covered by the Notice of Claim may be defended by the Indemnitor, at the sole cost and expense of the Indemnitor; provided, however, that the Indemnitee is authorized to file any motion, answer or other pleading that may be reasonably necessary or appropriate to protect its interests during such 30-day period. The delivery of an Indemnification Acknowledgment shall not preclude Indemnitor's subsequent right to deny indemnification and Indemnitor's right to reimbursement of all costs of any nature incurred, if it is ultimately determined that such claim was not indemnifiable by Indemnitor. However, in the event the Indemnitor does not furnish an Indemnification Acknowledgment to the Indemnitee or does not offer reasonable assurances to the Indemnitee as to Indemnitor's financial capacity to satisfy any final judgment or settlement, the Indemnitee may, upon written notice to the Indemnitor, assume the defense (with legal counsel chosen by the Indemnitee) and dispose of the claim, and the Indemnitor shall be responsible for Indemnitee's reasonable costs and expenses. Notwithstanding receipt of an Indemnification Acknowledgment, the Indemnitee shall have the right to employ its own counsel in respect of any such claim, action, suit or proceeding, but the fees and expenses of such counsel shall be at the Indemnitee's own cost and expense, unless (A) the employment of such counsel and the payment of such fees and expenses shall have been specifically authorized by the Indemnitor in connection with the defense of such claim, action, suit or proceeding, or (B) the Indemnitee shall have reasonably concluded based upon a written opinion of counsel that there may be specific material defenses available to the Indemnitee which are different from or in addition to those available to the Indemnitor, in which case the costs and expenses incurred by the Indemnitee for such counsel shall be borne by the Indemnitor, provided that Indemnitor shall not be obligated to pay for the costs and expenses of more than one counsel to the Indemnitee.

        (iii)      The Indemnitee or the Indemnitor, as the case may be, who is controlling the defense of the claim, action, suit or proceeding, shall keep the other party fully informed of such claim, action, suit or proceeding at all stages thereof, whether or not such party is represented by counsel. The Parties hereto agree to render to each other such assistance as they may reasonably require of each other in order to ensure the proper and adequate defense of any such claim, action, suit or proceeding. Subject to the Indemnitor furnishing the Indemnitee with an Indemnification Acknowledgment in accordance with Section 8.3(a)(ii), the Indemnitee shall cooperate with the Indemnitor and provide such assistance, at the sole cost and expense of the Indemnitor, as the Indemnitor may reasonably request in connection with the defense of any such claim, action, suit or proceeding, including, but not limited to, providing the Indemnitor with access to and use of all relevant corporate records and making available its officers and employees for depositions, pre-trial discovery and as witnesses at trial, if required. In requesting any such cooperation, the Indemnitor shall have due regard for, and attempt not to be disruptive of, the business and day-to-day operations of the Indemnitee and shall follow the requests of the

30



Indemnitee regarding any documents or instruments which the Indemnitee believes should be given confidential treatment.

(b)     Neither Party shall make or enter into any settlement of any claim, action, suit or proceeding which one Party has undertaken to defend, without the other Party's prior written consent (which consent shall not be unreasonably withheld, delayed or conditioned), provided that no consent shall be required if (i) there is no obligation, directly or indirectly, on the part of such other Party to contribute to any portion of the payment for any of the Losses, (ii) such other Party receives a general and unconditional release with respect to the claim (in form, substance and scope reasonably acceptable to such other Party), (iii) there is no finding or admission of any violation of law by, or effect on any other claim that may be made against such other Party and, (iv) in the reasonable judgment of such other Party, the relief granted in connection therewith is not likely to have a Material Adverse Effect on such other Party or its reputation or prospects.

(c)     Any claim for indemnification that may be made under more than one subsection under Section 8.1 may be made under the subsection that the claiming party may elect in its sole discretion, notwithstanding that such claim may be made under more than one subsection.

8.4     Indemnification Procedures - Other Claims, Indemnification Generally.

(a)     A claim for indemnification for any matter not relating to a Third Party Claim may be asserted by giving reasonable notice directly by the Indemnitee to the Indemnitor. The Indemnitee shall afford the Indemnitor reasonable access to all relevant corporate records and other information in its possession relating thereto.

(b)     If any Party becomes obligated to indemnify another Party with respect to any claim for indemnification hereunder and the amount of liability with respect thereto shall have been finally determined in accordance with this Article VIII, the Indemnifying Party shall pay such amount to the Indemnified Party in immediately available funds within ten (10) days following written demand therefor by the Indemnified Party. The indemnifying Party shall not be obligated to pay any amount under this Article VIII until such final determination.

8.5     Exclusive Remedy.  Except as specifically provided elsewhere herein, the provisions for indemnification set forth in this Article VIII are the exclusive remedies of Sellers, Buyer and the Company arising out of or in connection with this Agreement, and shall be in lieu of any rights under contract, tort, equity or otherwise (other than claims based on actual fraud or intentional breach of this Agreement).

## Article IX
## Miscellaneous

9.1     Termination.  Anything herein to the contrary notwithstanding, this Agreement may be terminated at any time prior to the Closing Date: (i) by mutual written consent of Buyer and Sellers; (ii) by either Buyer (if Buyer negotiates in good faith and makes commercially reasonable efforts to consummate the Closing), or Sellers (if Sellers negotiate in good faith and makes commercially reasonable efforts to consummate the Closing), if for any reason the



Closing shall not have occurred on or before 60 days after the date hereof (or such other date as may be mutually agreed by the Parties); (iii) by either Buyer or Sellers in the event that a condition to the terminating Party's obligations to close the transactions contemplated by this Agreement shall become incapable of satisfaction, without fault by the terminating Party; (iv) by Buyer in the event of any occurrence or occurrences, having individually or in the aggregate, a Material Adverse Effect on the Company or Sellers; (v) by Sellers in the event of any occurrence or occurrences, having individually or in the aggregate, a Material Adverse Effect on Buyer; (vi) by Buyer in the event it is not satisfied, in its sole and absolute discretion, with the results of its legal, financial or business due diligence investigations of the Company and Sellers; or (vii) by the Company, Sellers or Buyer in the event the Board of Directors of the Company shall have approved a Competing Transaction; provided, however, that no Party shall be entitled to terminate this Agreement in the event that the failure of the Closing to occur or any condition to Closing to be satisfied shall be attributable to such Party's willful breach of this Agreement. If this Agreement is terminated pursuant to this Section 9.1, all rights and obligations of the Parties hereunder shall terminate, and no Party shall have any liability to the other Party, except for obligations of the Parties in Sections 6.4, 9.2, 9.3, 9.7, 9.8 and 9.9, which shall survive the termination of this Agreement, and except that nothing herein will relieve any Party from liability for any willful breach of this Agreement prior to such termination.

9.2     Publicity.  Except as required by law, no press release or other public announcement concerning this Agreement or the transactions contemplated hereby shall be made without advance written approval thereof by the Company, Sellers and Buyer, which approval shall not unreasonably be withheld.

9.3     Expenses.  The Company and each Seller, on the one hand, and Buyer, on the other hand, shall bear all of their own expenses in connection with the execution, delivery and performance of this Agreement and the transactions contemplated hereby, including without limitation all fees and expenses of its agents, representatives, counsel and accountants. Notwithstanding the foregoing, Buyer shall reimburse the Company for any reasonable expenses incurred by the Company in connection with the Form 8-K compliant financial statements to be delivered by the Company pursuant Section 7.1(h) which are in excess the expenses ordinarily incurred by the Company in preparing its financial statements for such periods.

9.4     Entire Agreement; Amendments and Waivers.  This Agreement, together with all Exhibits and Disclosure Schedules hereto and the other Transaction Documents, constitutes the entire agreement among the Parties pertaining to the subject matter hereof and supersedes all prior agreements, understandings, negotiations and discussions, whether oral or written, of the Parties, except that the Confidentiality Agreement and the confidentiality provisions of the Letter of Intent shall survive and continue in full force and effect until the Closing.  This Agreement may not be amended or modified except by an instrument in writing signed by Buyer and the Representative.  No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provision hereof (whether or not similar), nor shall such waiver constitute a continuing waiver unless otherwise expressly provided.  Neither the failure nor the delay by any Party in exercising any right, power or privilege hereunder shall operate as a waiver of such right, power or privilege, and no single or partial exercise of any such right, power or privilege shall preclude any other or further exercise of any such right, power or privilege or the exercise of any other right, power or privilege.  To the maximum extent permitted by applicable

32



Law, (a) no waiver that may be given by a Party shall be applicable except in the specific instance for which it was given and (b) no notice to or demand on one Party shall be deemed to be a waiver of any obligation of such Party or the right of the Party giving such notice or demand to take further action without notice or demand as provided in this Agreement or the other Transaction Documents.

9.5    Notices. All notices, demands and other communications to be given or delivered under or by reason of the provisions of this Agreement will be in writing and will be deemed to have been given (i) when delivered if personally delivered by hand (with written confirmation of receipt), (ii) when received if sent by a nationally recognized overnight courier service (receipt requested), or (iii) when receipt is acknowledged by an affirmative act of the Party receiving notice, if sent by facsimile, telecopy or other electronic transmission device (provided that such an acknowledgement does not include an acknowledgment generated automatically by a facsimile or telecopy machine or other electronic transmission device). Notices, demands and communications to Buyer, Seller and the Company will, unless another address is specified in writing, be sent to the address indicated below:

If to Buyer, to:

NERY'S USA, Inc.
 774 Mays Blvd #10-450
Incline Village, Nevada 89451
Attention:  John Cathcart, Chief Executive Officer
Telephone: 775.338.7060
Facsimile: 775.201.0204

with a copy (which shall not serve as notice) to:

If to the Company to:

Comercial Targa, S.A. de C.V.
**Blvd Insurgentes No. 19801 #4A, Col. Cuaycura**
**Tijuana, Baja California, Mexico 22216**
Attention:  **Director Gereral**
Telephone:
Facsimile:



ER182

with a copy (which shall not serve as notice) to:

**[Name]**
**[Address]**
Attention:  **[Name], [Title]**
Telephone:     [_____]
Facsimile:     [_____][_____]

<u>If to the Sellers to:</u>

Nascent Wine Company, Inc.
1330 Orange Ave. Suite 300
Coronado, California 92118
Attention:  Sandro Piancone, Chief Executive Officer
Telephone:     (619) 661-0458
Facsimile:     (619) 661-97345

with a copy (which shall not serve as notice) to:

**[Name]**
**[Address]**
Attention:  **[Name], [Title]**
Telephone:     [_____]

Facsimile:     [_____][_____]

or at such other address or addresses Buyer, the Company or Sellers, as the case may be, may specify by written notice given in accordance with this Section 9.5.

9.6     <u>Waivers and Amendments</u>.  This Agreement may be amended, superseded, canceled, renewed or extended and the terms hereof may be waived only by a written instrument signed by the Parties or, in the case of a waiver, by the Party waiving compliance.

9.7     <u>Governing Law</u>.  IN ALL RESPECTS, INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE STATE OF NEVADA APPLICABLE TO CONTRACTS MADE AND PERFORMED IN THAT STATE (WITHOUT REGARD TO THE CHOICE OF LAW OR CONFLICTS OF LAW PROVISIONS THEREOF) AND ANY APPLICABLE LAWS OF THE UNITED STATES OF AMERICA.

9.8     <u>Consent to Jurisdiction and Venue</u>.  THE PARTIES HEREBY IRREVOCABLY AND UNCONDITIONALLY CONSENT AND AGREE THAT ALL ACTIONS, SUITS OR OTHER PROCEEDINGS ARISING UNDER OR IN CONNECTION WITH THIS AGREEMENT SHALL BE TRIED AND LITIGATED IN STATE OR FEDERAL COURTS LOCATED IN THE STATE OF NEVADA, WHICH COURTS SHALL HAVE EXCLUSIVE JURISDICTION TO HEAR AND DETERMINE ANY AND ALL CLAIMS, CONTROVERSIES AND DISPUTES ARISING OUT OF OR RELATED TO THIS

34



AGREEMENT. NOTWITHSTANDING THE FOREGOING, NOTHING CONTAINED IN THIS SECTION 9.8 SHALL PRECLUDE BUYER FROM BRINGING ANY ACTION, SUIT OR OTHER PROCEEDING IN THE COURTS OF ANY OTHER LOCATION WHERE THE COMPANY OR SELLERS OR ANY ONE OF THEM OR ANY OF ITS OR THEIR ASSETS OR THE COLLATERAL MAY BE FOUND OR LOCATED OR TO ENFORCE ANY JUDGMENT OR OTHER COURT ORDER IN FAVOR OF BUYER.

EACH OF THE COMPANY AND EACH SELLER, FOR ITSELF AND ITS PROPERTY, (A) IRREVOCABLY SUBMITS TO THE JURISDICTION OF ANY SUCH COURT AND CONSENTS IN ADVANCE TO SUCH JURISDICTION IN ANY ACTION, SUIT OR OTHER PROCEEDING COMMENCED IN ANY SUCH COURT, (B) WAIVES ANY RIGHT IT MAY HAVE TO ASSERT THE DOCTRINE OF FORUM NON CONVENIENS OR ANY OBJECTION THAT SUCH PERSON MAY HAVE BASED UPON LACK OF PERSONAL JURISDICTION OR IMPROPER VENUE AND (C) CONSENTS TO THE GRANTING OF SUCH LEGAL OR EQUITABLE RELIEF AS IS DEEMED APPROPRIATE BY SUCH COURT.

TO THE EXTENT PERMITTED UNDER THE APPLICABLE LAWS OF ANY SUCH JURISDICTION, EACH OF THE COMPANY AND EACH SELLER HEREBY WAIVES, IN RESPECT OF ANY SUCH ACTION, SUIT OR OTHER PROCEEDING, THE JURISDICTION OF ANY OTHER COURT OR COURTS THAT NOW OR HEREAFTER, BY REASON OF SUCH PARTY'S PRESENT OR FUTURE DOMICILE, OR OTHERWISE, MAY BE AVAILABLE TO IT.

9.9     Waiver of Trial by Jury. BECAUSE DISPUTES ARISING IN CONNECTION WITH COMPLEX FINANCIAL TRANSACTIONS ARE MOST QUICKLY AND ECONOMICALLY RESOLVED BY AN EXPERIENCED AND EXPERT PERSON AND PARTIES WISH APPLICABLE STATE AND FEDERAL LAWS TO APPLY (RATHER THAN ARBITRATION RULES), THE PARTIES DESIRE THAT THEIR DISPUTES BE RESOLVED BY A JUDGE APPLYING SUCH APPLICABLE LAWS. THEREFORE, TO ACHIEVE THE BEST COMBINATION OF THE BENEFITS OF THE JUDICIAL SYSTEM AND OF ARBITRATION, AND UNDERSTANDING THEY ARE WAIVING A CONSTITUTIONAL RIGHT, EACH OF THE PARTIES HEREBY KNOWINGLY, INTENTIONALLY AND VOLUNTARILY, WITH AND UPON THE ADVICE OF COMPETENT COUNSEL, WAIVES, RELINQUISHES AND FOREVER FORGOES THE RIGHT TO A TRIAL BY JURY IN ANY ACTION, SUIT OR OTHER PROCEEDING BASED UPON, ARISING OUT OF OR IN ANY WAY RELATING TO (a) THIS AGREEMENT, INCLUDING ANY PRESENT OR FUTURE AMENDMENT HEREOF, OR ANY OF THE TRANSACTIONS CONTEMPLATED BY OR RELATED TO THIS AGREEMENT, OR (b) ANY CONDUCT, ACT OR OMISSION OF THE PARTIES OR THEIR AFFILIATES (OR ANY OF THEM) WITH RESPECT TO THIS AGREEMENT, INCLUDING ANY PRESENT OR FUTURE AMENDMENT HEREOF, WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE, REGARDLESS OF WHICH PARTY INITIATES SUCH ACTION, SUIT OR OTHER PROCEEDING; AND EACH PARTY HEREBY AGREES AND CONSENTS THAT ANY SUCH ACTION, SUIT OR OTHER PROCEEDING SHALL BE DECIDED BY A COURT TRIAL WITHOUT A JURY, AND THAT ANY PARTY MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN



EVIDENCE OF THE CONSENT OF THE PARTIES TO THE WAIVER OF ANY RIGHT THEY MIGHT OTHERWISE HAVE TO TRIAL BY JURY.

9.10     Counterparts.  This Agreement may be executed in two or more counterparts (delivery of which may occur via facsimile), each of which shall be binding as of the date first written above, and, when delivered, all of which shall constitute one and the same instrument. A facsimile signature or electronically scanned copy of a signature shall constitute and shall be deemed to be sufficient evidence of a Party's execution of this Agreement, without necessity of further proof. Each such copy shall be deemed an original, and it shall not be necessary in making proof of this Agreement to produce or account for more than one such counterpart.

9.11     Invalidity.  If any term or other provision of this Agreement is held by a court of competent jurisdiction to be invalid, illegal or incapable of being enforced under any applicable Law in any particular respect or under any particular circumstances, then, so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party, (a) such term or provision shall nevertheless remain in full force and effect in all other respects and under all other circumstances, and (b) all other terms, conditions and provisions of this Agreement shall remain in full force and effect.  Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner so that the transactions contemplated hereby are fulfilled to the fullest extent possible.

9.12     Negotiated Agreement.  The Parties hereby acknowledge that the terms and language of this Agreement were the result of negotiations among the Parties and, as a result, there shall be no presumption that any ambiguities in this Agreement shall be resolved against any particular Party.  Any controversy over construction of this Agreement shall be decided without regard to events of authorship or negotiation.

9.13     Assignment.  This Agreement shall inure to the benefit of, and be binding upon, the Parties and their respective successors and permitted assigns.  In addition, it is the intent of the Parties that the Indemnitees that are not a party hereto be third party beneficiaries of Article VIII.  No Party may assign, transfer or delegate any of their rights and obligations hereunder or any interest herein or therein, by operation of law or otherwise, without the prior written consent of the other Parties; provided, however, that Buyer may assign its rights and obligations under this Agreement to a successor to Buyer's business.

9.14     Further Assurances.  From time to time after the Closing, each Party will timely execute and deliver to the other such instruments of sale, transfer, conveyance, assignment and delivery, and such consents, assurances, powers of attorney and other instruments, as may be reasonably requested by such Party or its counsel in order to carry out the purpose and intent of this Agreement.

**[Remainder of Page Intentionally Left Blank]**

36

ER185

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the date first above written.

**BUYER**:

NERY'S USA, INC., a Nevada corporation

By: _____
      John Cathcart
      Chief Executive Officer

**SELLERS**:

NASCENT WINE COMPANY, INC., a Nevada corporation

By: _____
      Sandro Piancone
      Chief Executive Officer

**THE COMPANY**:

COMERCIAL TARGA, S.A. de C.V., a Mexican corporation

By: _____
      Sandro Piancone
      Chief Executive Officer

**Schedule A**

**Sellers; Stock**

| Shareholders | Shares Owned | |
|---|---|---|
| Nascent Wine Company, Inc. | 8000 Series A<br>2,930,684 Series B | -- |



**PLAINTIFF'S EXHIBITS**

CASE NO. 11CV1589 JMWVG

EXHIBIT NO. 23

# PROMISSORY NOTE

| LENDER: | BORROWER: |
|---|---|
| Nascent Wine Company, Inc. | NERY'S USA Inc. |
| 1330 Orange Ave. Suite 300 | 774 Mays Blvd #10-450 |
| Coronado, California 92118 | Incline Village, Nevada 89451 |

PRINCIPAL AMOUNT: $1,850,000

INTEREST RATE: 10%

DATE OF NOTE: February 10, 2010

**1.     Promise to Pay.** Nery's USA, Inc., a Nevada corporation ("Borrower"), promises to pay to Nascent Wine Company, Inc. a Nevada corporation ("Lender"), or order, in lawful money of the United States of America, the principal amount of One Million Eight Hundred Thousand Dollars, ($1,850,000), together with interest on the unpaid principal balance commencing 60 days from the date of this Note until paid in full.

**2.     Payment.** Borrower will pay this loan in monthly payments of principal and interest as provided in Schedule A, referred to as "Monthly Payment." Borrower's first Monthly Payment is due April 10, 2010, and all subsequent Monthly Payments are due on the 1st day of the following calendar month until the final payment of all principal and accrued interest not yet paid shall be due on or before August 10, 2011. Borrower payments shall be made in accordance with the attached Schedule A. Borrower will pay Lender at Lender's address shown above or at such other place as Lender may designate in writing. Unless otherwise agreed or required by applicable law, payments will be applied first to any unpaid collection costs, then to accrued unpaid interest and any remaining amount then to principal.

**3.     Interest Rate.** The interest rate on this Note is ten percent (10%) percent per annum.

**4.     Prepayment.** Borrower may pay without penalty all or a portion of the amount owed earlier than it is due. Early payments will not, unless agreed to by Lender in writing, relieve Borrower of Borrower's obligation to continue to make payments under the payment schedule, but rather, they will reduce the principal balance due and may result in Borrower's making fewer payments.

**5.     Default.** Borrower will be in default if any of the following happens: (a) Borrower fails to make any payment within ten (10) days of when due; (b) Borrower breaks any promise Borrower has made to Lender, or Borrower fails to perform promptly at the time and strictly in the manner provided in this Note or any agreement including but not limited to the Stock Purchase Agreement related to this Note between Borrower and Lender of even date herewith, or in any other agreement or loan Borrower has with Lender; (c) Any representation or statement made or furnished to Lender by Borrower or on Borrower's behalf is false or misleading in any material respect; (d) Borrower becomes insolvent, a receiver is appointed for any part of Borrower's property, Borrower makes an assignment for the benefit of creditors, or any proceeding is commenced either by Borrower or against Borrower under any bankruptcy or insolvency laws; (e) Any creditor tries to take any of Borrower's property; or (f) A sale of more than majority of the membership interests of Borrower or a sale of substantially all of the assets of Borrower.

C:\Documents and Settings\rpinacost\Local Settings\Temporary Internet Files\OLK62D\NerysTargahtus05Feb10(Redline) (2).doc

ER188

**6.** **Lender's Rights.** Upon default, Lender may declare the entire unpaid principal balance on this Note and all accrued unpaid interest immediately due, without notice, and then Borrower will pay that amount. Upon default, including failure to pay any payment within ten (10) days of when due or upon the final maturity, whichever occurs first, Lender, at its option, may also, if permitted under applicable law, do any or all of the following: (a) increase the interest rate on this Note to 15%, compounded monthly (b) access a late fee of 5% of the payment due and (c) add any unpaid accrued interest and late fee to principal and such sum will bear interest therefrom until paid at the rate provided in this Note (including any increased rate). The interest rate will not exceed the maximum rate permitted by applicable law and if, by the terms of this Note, it does exceed the amount permitted under applicable law, the interest rate shall be reduced to the highest rate so permitted. Lender may hire or pay someone else to help collect this Note if Borrower does not pay. Borrower also will pay Lender that amount. This includes, subject to any limits under applicable law, Lender's attorney's fees and legal expenses whether or not there is a lawsuit, including attorney's fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services. If not prohibited by applicable law, Borrower also will pay any court costs, in addition to all other sums provided by law. This Note has been delivered to Lender and accepted by Lender in the State of California. This Note shall be governed by and construed exclusively in accordance with the laws of the State of California.

**7.** **Security for Loan.** This Note is secured by a first position lien on (i) all of Borrower's assets to include, but not limited to, cigarette permits, equipment, any intellectual property rights including but limited to Nery's trademark USPTO Serial #77699776, etc., and (ii) all of the assets of Borrower's Subsidiary, Comercial Targa, S.A. de C.V, to include, but not limited to, cigarette permits, equipment, any intellectual property rights. It will not include accounts receivable and inventory.

**8.** **Joint and Several Liability; Waiver of Maker.** Maker and each party liable hereon in any capacity, whether as endorser, surety, guarantor or otherwise and all others who may become liable, primarily or secondarily, for all or any part of the Obligations, jointly and severally:

    a. waives presentment for payment, demand, protest and notice of presentment, notice of protest, notice of non-payment and notice of dishonor of this debt and each and every other notice of any kind respecting this Note and all lack of diligence or delays in collection or enforcement hereof,

    b. agrees that Lender and any subsequent holder of this Note, at any time or times, without notice to the undersigned or its consent, may grant extensions of time, without limit as to the number of the aggregate period of such extensions, for the payment of any principal, interest or other sums due hereunder,

    c. to the extent permitted by law, waives all exemptions under the laws of the State of California and/or any state or territory of the United States,

    d. consents to the release of any security, and agrees that any such extension or release may be made without notice to any of the parties and without in any way affecting or discharging liability for the obligations hereunder,

    e. to the extent permitted by law, waives the benefit of any law or rule of law intended for its advantage or protection as an obligor hereunder or providing for its release or discharge from liability hereon, in whole or in part, on account of any facts or circumstances other than full and complete payment of all amounts due hereunder, and

2




f.    agrees to pay, in addition to all other sums of money due, all cost of collection and attorney's fees, whether suit be brought or not, if this Note is not paid in full when due, whether at the stated maturity or by acceleration.

9.    **Miscellaneous.**

a.    It is not intended hereby to charge interest at a rate in excess of the maximum rate of interest permitted to be charged to Borrower under applicable law, but if, notwithstanding such intention, interest in excess of the maximum rate shall be paid hereunder, the excess shall be applied to principal and the interest rate on this Note shall be adjusted to the maximum permitted under applicable law during the period or periods that the interest rate otherwise provided herein would exceed such rate.

b.    Any reference herein to the Lender shall be deemed to include and apply to every subsequent holder of this Note.

c.    **This Note shall be governed by and construed in accordance with the laws of the State of California, regardless of the laws that might otherwise govern under applicable principles of conflicts of laws thereof. The Borrower agrees that process may be served upon it in any manner authorized by the laws of the State of California for such person and waives and covenants not to assert or plead any objection that it might otherwise have to such jurisdiction and such process.**

10.    **Guarantee.**  All obligations of Borrower to Lender whenever incurred or evidenced are absolutely, unconditionally and irrevocably hereby guaranteed in all respects by Comercial Targa, S.A. de C.V., a Mexican corporation.

**BORROWER:**

Nery's USA, Inc.

By _____
John Cathcart, CEO

**GUARANTOR:**

Comercial Targa, S.A. de C.V.

By: _____
Sandro Piancone, Director General

3

ER190

**Schedule A**

Payment Schedule

| | | | |
|---|---|---|---|
| Principal Amount of Loan | $1,850,000 |
| Principal Repayment | $10,000 |
| Interest Rate | 10% |
| Payoff Premium (Base Term) | 100% |
| Payoff Premium (Extended Term) | 100% |

Schedule A: Nery's USA Loan Repayment

| Date | Days | Interest | Principal Outstanding | Principal Payment | Total Payment |
|---|---|---|---|---|---|
| | | 10.00% | | | |
| 2/10/2010 | | | $1,850,000.00 | | |
| 3/10/2010 | | | $1,850,000.00 | | $0.00 |
| 4/10/2010 | 30 | $15,416.67 | $1,850,000.00 | $0.00 | $15,416.67 |
| 5/10/2010 | 30 | $15,416.67 | $1,850,000.00 | $0.00 | $15,416.67 |
| 6/10/2010 | 30 | $15,416.67 | $1,850,000.00 | $0.00 | $15,416.67 |
| 7/10/2010 | 30 | $15,416.67 | $1,850,000.00 | $0.00 | $15,416.67 |
| 8/10/2010 | 30 | $15,416.67 | $1,850,000.00 | $0.00 | $15,416.67 |
| 9/10/2010 | 30 | $15,416.67 | $1,850,000.00 | $0.00 | $15,416.67 |
| 10/10/2010 | 30 | $15,416.67 | $1,850,000.00 | $0.00 | $15,416.67 |
| 11/10/2010 | 30 | $15,416.67 | $1,850,000.00 | $10,000.00 | $25,416.67 |
| 12/10/2010 | 30 | $15,333.33 | $1,840,000.00 | $10,000.00 | $25,333.33 |
| 1/10/2011 | 30 | $15,250.00 | $1,830,000.00 | $10,000.00 | $25,250.00 |
| 2/10/2011 | 30 | $15,166.67 | $1,820,000.00 | $10,000.00 | $25,166.67 |
| 3/10/2011 | 30 | $15,083.33 | $1,810,000.00 | $10,000.00 | $25,083.33 |
| 4/10/2011 | 30 | $15,000.00 | $1,800,000.00 | $10,000.00 | $25,000.00 |
| 5/10/2011 | 30 | $14,916.67 | $1,790,000.00 | $10,000.00 | $24,916.67 |
| 6/10/2011 | 30 | $14,833.33 | $1,780,000.00 | $10,000.00 | $24,833.33 |
| 7/10/2011 | 30 | $14,750.00 | $1,770,000.00 | $10,000.00 | $24,750.00 |
| 8/10/2011 | 30 | $14,666.67 | $1,760,000.00 | $10,000.00 | $24,666.67 |

ER192

**PLAINTIFF'S EXHIBITS**

CASE NO. 11CV 1589 JMWVG

EXHIBIT NO. 24

## SUBSIDIARY AND AFFILIATE GUARANTEE

SUBSIDIARY AND AFFILIATE GUARANTEE, dated as of February _10_, 2010, made by the signatory (the "Guarantor"), in favor of Nascent Wine Company Inc., a Nevada corporation (the "Lender") pursuant to that certain Stock Purchase Agreement between Lender and Nery's USA, Inc., a Nevada corporation (the "Company").

### WITNESSETH:

WHEREAS, pursuant to that certain Stock Purchase Agreement of even date herewith, by and between the Company and the Lender (the "Purchase Agreement"), the Company has agreed to issue to the Lender, and the Lender has agreed to purchase from the Company, the Company's 10% Secured Promissory Note, in the original principal amount of $1,850,000 (the "Note"), subject to the terms and conditions set forth therein; and

WHEREAS, the Guarantor will directly benefit from the extension of credit to the Company represented by the issuance of the Note.

NOW, THEREFORE, in consideration of the premises and to induce the Lender to enter into the Purchase Agreement and to carry out the transactions contemplated thereby, the Guarantor hereby agrees with the Lender as follows:

1. <u>Definitions</u>. Unless otherwise defined herein, terms defined in the Purchase Agreement and used herein shall have the meanings given to them in the Purchase Agreement. The words "hereof," "herein," "hereto" and "hereunder" and words of similar import when used in this Guarantee shall refer to this Guarantee as a whole and not to any particular provision of this Guarantee, and Section and Schedule references are to this Guarantee unless otherwise specified. The meanings given to terms defined herein shall be equally applicable to both the singular and plural forms of such terms. The following terms shall have the following meanings:

"<u>Guarantee</u>" means this Subsidiary and Affiliate Guarantee, as the same may be amended, supplemented or otherwise modified from time to time.

"<u>Obligations</u>" means the collective reference to all obligations and undertakings of the Company of whatever nature, monetary or otherwise, under the Note, the Purchase Agreement, the Security Agreement, together with all reasonable attorneys' fees, disbursements and all other costs and expenses of collection incurred by Lender in enforcing any of such Obligations and/or this Guarantee.

2. <u>Guarantee</u>.

    (a)    <u>Guarantee</u>.

        (i)    The Guarantor hereby, jointly and severally, unconditionally and irrevocably, guarantees to the Lender and its respective successors, indorsees, transferees and assigns, the prompt and complete payment and performance by the Company when due (whether at the stated maturity, by acceleration or otherwise) of the Obligations.

C:\Documents and Settings\epineconn\Local Settings\Temporary Internet Files\OLK62D\Subsidiary and Affiliate Guarantee.doc

ER193

(ii)     Anything herein or in any other Transaction Document to the contrary notwithstanding, the maximum liability of the Guarantor hereunder and under the other Transaction Documents shall in no event exceed the amount which can be guaranteed by such Guarantor under applicable federal and state laws, including laws relating to the insolvency of debtors, fraudulent conveyance or transfer or laws affecting the rights of creditors generally (after giving effect to the right of contribution established in Section 2(b)).

(iii)    The Guarantor agrees that the Obligations may at any time and from time to time exceed the amount of the liability of such Guarantor hereunder without impairing the guarantee contained in this Section 2 or affecting the rights and remedies of the Lender hereunder.

(iv)    The guarantee contained in this Section 2 shall remain in full force and effect until all the Obligations and the obligations of the Guarantor under the guarantee contained in this Section 2 shall have been satisfied by payment in full.

(v)    No payment made by the Company, the Guarantor, any other guarantor or any other Person or received or collected by the Lender from the Company, the Guarantor, any other guarantor or any other Person by virtue of any action or proceeding or any set-off or appropriation or application at any time or from time to time in reduction of or in payment of the Obligations shall be deemed to modify, reduce, release or otherwise affect the liability of the Guarantor hereunder which shall, notwithstanding any such payment (other than any payment made by such Guarantor in respect of the Obligations or any payment received or collected from such Guarantor in respect of the Obligations), remain liable for the Obligations up to the maximum liability of such Guarantor hereunder until the Obligations are paid in full.

(vi)    Notwithstanding anything to the contrary in this Agreement, with respect to any defaulted non-monetary Obligations the specific performance of which by the Guarantor is not reasonably possible, the Guarantor shall only be liable for making the Lender whole on a monetary basis for the Company's failure to perform such Obligations in accordance with the Transaction Documents.

(b)    <u>No Subrogation</u>. Notwithstanding any payment made by the Guarantor hereunder or any set-off or application of funds of the Guarantor by the Lender, the Guarantor shall not be entitled to be subrogated to any of the rights of the Lender against the Company or any collateral security or guarantee or right of offset held by the Lender for the payment of the Obligations, nor shall the Guarantor seek or be entitled to seek any contribution or reimbursement from the Company in respect of payments made by such Guarantor hereunder, until all amounts owing to the Lender by the Company on account of the Obligations are paid in full. If any amount shall be paid to the Guarantor on

 

ER194

account of such subrogation rights at any time when all of the Obligations shall not have been paid in full, such amount shall be held by such Guarantor in trust for the Lender, segregated from other funds of such Guarantor, and shall, forthwith upon receipt by such Guarantor, be turned over to the Lender in the exact form received by such Guarantor (duly indorsed by such Guarantor to the Lender, if required), to be applied against the Obligations, whether matured or unmatured, in such order as the Lender may determine.

(c)     Amendments, Etc. With Respect to the Obligations. The Guarantor shall remain obligated hereunder notwithstanding that, without any reservation of rights against the Guarantor and without notice to or further assent by the Guarantor, any demand for payment of any of the Obligations made by the Lender may be rescinded by the Lender and any of the Obligations continued, and the Obligations, or the liability of any other Person upon or for any part thereof, or any collateral security or guarantee therefor or right of offset with respect thereto, may, from time to time, in whole or in part, be renewed, extended, amended, modified, accelerated, compromised, waived, surrendered or released by the Lender, and the Purchase Agreement and the other Transaction Documents and any other documents executed and delivered in connection therewith may be amended, modified, supplemented or terminated, in whole or in part, as the Lender may deem advisable from time to time, and any collateral security, guarantee or right of offset at any time held by the Lender for the payment of the Obligations may be sold, exchanged, waived, surrendered or released. The Lender shall have no obligation to protect, secure, perfect or insure any Lien at any time held by it as security for the Obligations or for the guarantee contained in this Section 2 or any property subject thereto.

(d)     Guarantee Absolute and Unconditional. The Guarantor waives any and all notice of the creation, renewal, extension or accrual of any of the Obligations and notice of or proof of reliance by the Lender upon the guarantee contained in this Section 2 or acceptance of the guarantee contained in this Section 2; the Obligations, and any of them, shall conclusively be deemed to have been created, contracted or incurred, or renewed, extended, amended or waived, in reliance upon the guarantee contained in this Section 2; and all dealings between the Company and the Guarantor, on the one hand, and the Lender, on the other hand, likewise shall be conclusively presumed to have been had or consummated in reliance upon the guarantee contained in this Section 2. The Guarantor waives to the extent permitted by law diligence, presentment, protest, demand for payment and notice of default or nonpayment to or upon the Company or the Guarantor with respect to the Obligations. The Guarantor understands and agrees that the guarantee contained in this Section 2 shall be construed as a continuing, absolute and unconditional guarantee of payment without regard to (a) the validity or enforceability of the Purchase Agreement or any other Transaction Document, any of the Obligations or any other collateral security therefor or guarantee or right of offset with respect thereto at any time or from time to time held by the Lender, (b) any defense, set-off or counterclaim (other than a defense of payment or performance, or fraud or misconduct by Lender) which may at any time be available to or be asserted by the Company or any other Person against the Lender, or (c) any other circumstance whatsoever (with or without notice to or knowledge of the Company or the Guarantor) which constitutes, or might be construed to constitute, an equitable or legal discharge of the Company for the Obligations, or of the Guarantor under the guarantee contained in this Section 2, in bankruptcy or in any other instance. When making any demand hereunder or otherwise pursuing its rights and remedies hereunder against the Guarantor, the Lender may, but shall be under no obligation to, make a similar demand on or

ER195

otherwise pursue such rights and remedies as it may have against the Company, the Guarantor or any other Person or against any collateral security or guarantee for the Obligations or any right of offset with respect thereto, and any failure by the Lender to make any such demand, to pursue such other rights or remedies or to collect any payments from the Company, the Guarantor or any other Person or to realize upon any such collateral security or guarantee or to exercise any such right of offset, or any release of the Company, the Guarantor or any other Person or any such collateral security, guarantee or right of offset, shall not relieve the Guarantor of any obligation or liability hereunder, and shall not impair or affect the rights and remedies, whether express, implied or available as a matter of law, of the Lender against the Guarantor. For the purposes hereof, "demand" shall include the commencement and continuance of any legal proceedings.

(e)    Reinstatement. The guarantee contained in this Section 2 shall continue to be effective, or be reinstated, as the case may be, if at any time payment, or any part thereof, of any of the Obligations is rescinded or must otherwise be restored or returned by the Lender upon the insolvency, bankruptcy, dissolution, liquidation or reorganization of the Company or the Guarantor, or upon or as a result of the appointment of a receiver, intervenor or conservator of, or trustee or similar officer for, the Company or the Guarantor or any substantial part of its property, or otherwise, all as though such payments had not been made.

(f)    Payments. The Guarantor hereby guarantees that payments hereunder will be paid to the Lender without set-off or counterclaim in U.S. dollars at the address set forth or referred to in the Purchase Agreement.

3.    Representations and Warranties. The Guarantor hereby makes the following representations and warranties to Lender as of the date hereof:

(a)    Organization and Qualification. The Guarantor is a corporation, duly incorporated, validly existing and in good standing under the laws of the applicable jurisdiction set forth on Schedule 1, with the requisite corporate power and authority to own and use its properties and assets and to carry on its business as currently conducted. The Guarantor is duly qualified to do business and is in good standing as a foreign corporation in each jurisdiction in which the nature of the business conducted or property owned by it makes such qualification necessary, except where the failure to be so qualified or in good standing, as the case may be, could not, individually or in the aggregate, (x) adversely affect the legality, validity or enforceability of any of this Guaranty in any material respect, (y) have a material adverse effect on the results of operations, assets, prospects, or financial condition of the Guarantor or (z) adversely impair in any material respect the Guarantor's ability to perform fully on a timely basis its obligations under this Guaranty (a "Material Adverse Effect").

(b)    Authorization; Enforcement. The Guarantor has the requisite corporate power and authority to enter into and to consummate the transactions contemplated by this Guaranty, and otherwise to carry out its obligations hereunder. The execution and delivery of this Guaranty by the Guarantor and the consummation by it of the transactions contemplated hereby have been duly authorized by all requisite corporate action on the part of the Guarantor. This Guaranty has been duly executed and delivered by the Guarantor and constitutes the valid and binding obligation of the Guarantor enforceable against the Guarantor in accordance with its terms, except as such enforceability may be



ER196

limited by applicable bankruptcy, insolvency, reorganization, moratorium, liquidation or similar laws relating to, or affecting generally the enforcement of, creditors' rights and remedies or by other equitable principles of general application.

(c)  No Conflicts. The execution, delivery and performance of this Guaranty by the Guarantor and the consummation by the Guarantor of the transactions contemplated hereby do not and will not (i) conflict with or violate any provision of its Certificate of Incorporation or By-laws or other organization documents or (ii) conflict with, constitute a default (or an event which with notice or lapse of time or both would become a default) under, or give to others any rights of termination, amendment, acceleration or cancellation of, any agreement, indenture or instrument to which the Guarantor is a party, or (iii) result in a violation of any law, rule, regulation, order, judgment, injunction, decree or other restriction of any court or governmental authority to which the Guarantor is subject (including Federal and state securities laws and regulations), or by which any material property or asset of the Guarantor is bound or affected, except in the case of each of clauses (ii) and (iii), such conflicts, defaults, terminations, amendments, accelerations, cancellations and violations as would not, individually or in the aggregate, have or result in a Material Adverse Effect. The business of the Guarantor is not being conducted in violation of any law, ordinance or regulation of any governmental authority, except for violations which, individually or in the aggregate, do not have a Material Adverse Effect.

(d)  Consents and Approvals. The Guarantor is not required to obtain any consent, waiver, authorization or order of, or make any filing or registration with, any court or other federal, state, local, foreign or other governmental authority or other person in connection with the execution, delivery and performance by the Guarantor of this Guaranty.

(e)  Purchase Agreement. The representations and warranties of the Company set forth in the Purchase Agreement as they relate to the Guarantor, each of which is hereby incorporated herein by reference, are true and correct as of each time such representations are deemed to be made pursuant to such Purchase Agreement, and the Lender shall be entitled to rely on each of them as if they were fully set forth herein, provided, that each reference in each such representation and warranty to the Company's knowledge shall, for the purposes of this Section 3, be deemed to be a reference to the Guarantor's knowledge.

(f)  Foreign Law. The Guarantor has consulted with appropriate foreign legal counsel with respect to any of the above representations for which non-U.S. law is applicable. Such foreign counsel have advised the Guarantor that such counsel knows of no reason why any of the above representations would not be true and accurate. Such foreign counsel was provided with copies of this Subsidiary and Affiliate Guarantee and the Transaction Documents prior to rendering their advice.

4.  Covenants. The Guarantor covenants and agrees with the Lender that, from and after the date of this Guarantee until the Obligations shall have been paid in full, the Guarantor shall take, and/or shall refrain from taking, as the case may be, each commercially reasonable action that is necessary to be taken or not taken, as the case may be, so that no Event of Default is caused by the failure to take such action or to refrain from taking such action by the Guarantor.

5.  Miscellaneous.



(a)  Amendments in Writing. None of the terms or provisions of this Guarantee may be waived, amended, supplemented or otherwise modified except in writing by the Guarantor and the Lender.

(b)  Notices. All notices, requests and demands to or upon the Lender or the Guarantor hereunder shall be effected in the manner provided for in the Purchase Agreement; provided that any such notice, request or demand to or upon the Guarantor shall be addressed to the Guarantor at its notice address set forth herein.

(c)  No Waiver By Course Of Conduct; Cumulative Remedies. The Lender shall not by any act (except by a written instrument pursuant to Section 5(a)), delay, indulgence, omission or otherwise be deemed to have waived any right or remedy hereunder or to have acquiesced in any default under the Transaction Documents or Event of Default. No failure to exercise, nor any delay in exercising, on the part of the Lender, any right, power or privilege hereunder shall operate as a waiver thereof. No single or partial exercise of any right, power or privilege hereunder shall preclude any other or further exercise thereof or the exercise of any other right, power or privilege. A waiver by the Lender of any right or remedy hereunder on any one occasion shall not be construed as a bar to any right or remedy which the Lender would otherwise have on any future occasion. The rights and remedies herein provided are cumulative, may be exercised singly or concurrently and are not exclusive of any other rights or remedies provided by law.

(d)  Enforcement Expenses; Indemnification.

(i)  The Guarantor agrees to pay, or reimburse the Lender for, all its costs and expenses incurred in collecting against such Guarantor under the guarantee contained in Section 2 or otherwise enforcing or preserving any rights under this Guarantee and the other Transaction Documents to which such Guarantor is a party, including, without limitation, the reasonable fees and disbursements of counsel to the Lender.

(ii)  The Guarantor agrees to pay, and to save the Lender harmless from, any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever with respect to the execution, delivery, enforcement, performance and administration of this Guarantee to the extent the Company would be required to do so pursuant to the Purchase Agreement.

(iii)  The agreements in this Section shall survive repayment of the Obligations and all other amounts payable under the Purchase Agreement and the other Transaction Documents.

(e)  Successor and Assigns. This Guarantee shall be binding upon the successors and assigns of the Guarantor and shall inure to the benefit of the Lender and its successors and assigns; provided that the Guarantor may not assign, transfer or delegate any of its rights or obligations under this Guarantee without the prior written consent of the Lender.



ER198

(f)     Set-Off.  The Guarantor hereby irrevocably authorizes the Lender at any time and from time to time while an Event of Default under the Note shall have occurred and be continuing, without notice to such Guarantor, any such notice being expressly waived by the Guarantor, to set-off and appropriate and apply any and all deposits, credits, indebtedness or claims, in any currency, in each case whether direct or indirect, absolute or contingent, matured or unmatured, at any time held or owing by the Lender to or for the credit or the account of such Guarantor, or any part thereof in such amounts as the Lender may elect, against and on account of the obligations and liabilities of such Guarantor to the Lender hereunder and claims of every nature and description of the Lender against such Guarantor, in any currency, whether arising hereunder, under the Purchase Agreement, any other Transaction Document or otherwise, as the Lender may elect, whether or not the Lender has made any demand for payment and although such obligations, liabilities and claims may be contingent or unmatured. The Lender shall notify such Guarantor promptly of any such set-off and the application made by the Lender of the proceeds thereof, provided that the failure to give such notice shall not affect the validity of such set-off and application. The rights of the Lender under this Section are in addition to other rights and remedies (including, without limitation, other rights of set-off) which the Lender may have.

(g)     Counterparts. This Guarantee may be executed by one or more of the parties to this Guarantee on any number of separate counterparts (including by telecopy), and all of said counterparts taken together shall be deemed to constitute one and the same instrument.

(h)     Severability. Any provision of this Guarantee which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

(i)     Section Headings. The Section headings used in this Guarantee are for convenience of reference only and are not to affect the construction hereof or be taken into consideration in the interpretation hereof.

(j)     Integration. This Guarantee and the other Transaction Documents represent the agreement of the Guarantor and the Lender with respect to the subject matter hereof and thereof, and there are no promises, undertakings, representations or warranties by the Lender relative to subject matter hereof and thereof not expressly set forth or referred to herein or in the other Transaction Documents.

(k)     Governing Law. THIS GUARANTEE SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF CALIFORNIA WITHOUT REGARD TO ANY PRINCIPLES OF CONFLICTS OF LAWS.

(l)     Submission to Jurisdictional; Waiver.   The Guarantor hereby irrevocably and unconditionally:

(i)     submits for itself and its property in any legal action or proceeding relating to this Guarantee and the other Transaction



Documents to which it is a party, or for recognition and enforcement of any judgment in respect thereof, to the non-exclusive general jurisdiction of the courts of the State of California, the courts of the United States of America, and appellate courts from any thereof;

(ii) consents that any such action or proceeding may be brought in such courts and waives any objection that it may now or hereafter have to the venue of any such action or proceeding in any such court or that such action or proceeding was brought in an inconvenient court and agrees not to plead or claim the same;

(iii) agrees that service of process in any such action or proceeding may be effected by mailing a copy thereof by registered or certified mail (or any substantially similar form of mail), postage prepaid, to the Guarantor at its address referred to in Schedule 1 attached hereto or at such other address of which the Lender shall have been notified pursuant thereto;

(iv) agrees that nothing herein shall affect the right to effect service of process in any other manner permitted by law or shall limit the right to sue in any other jurisdiction; and

(v) waives, to the maximum extent not prohibited by law, any right it may have to claim or recover in any legal action or proceeding referred to in this Section any special, exemplary, punitive or consequential damages.

(m) <u>Acknowledgements</u>. The Guarantor hereby acknowledges that:

(i) it has been advised by counsel in the negotiation, execution and delivery of this Guarantee and the other Transaction Documents to which it is a party;

(ii) the Lender has no fiduciary relationship with or duty to the Guarantor arising out of or in connection with this Guarantee or any of the other Transaction Documents, and the relationship between the Guarantor, on the one hand, and the Lender, on the other hand, in connection herewith or therewith is solely that of debtor and creditor; and

(iii) no joint venture is created hereby or by the other Transaction Documents or otherwise exists by virtue of the transactions contemplated hereby between the Guarantor and the Lender.

(n) <u>Additional Guarantor</u>. The Company shall cause each of its subsidiaries formed or acquired on or subsequent to the date hereof to become a Guarantor for all purposes of this Guarantee by executing and delivering an Assumption Agreement in the form of Annex 1 hereto.



(o)    Release of Guarantor. Subject to Section 2(f), the Guarantor will be released from all liability hereunder concurrently with the repayment in full of all amounts owed under the Purchase Agreement, the Note and the other Transaction Documents.

(p)    Seniority. The Obligations of the Guarantor hereunder rank senior in priority to any other debt of such Guarantor.

(q)    Waiver of Jury Trial. THE GUARANTOR AND, BY ACCEPTANCE OF THE BENEFITS HEREOF, THE LENDER, HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS GUARANTEE AND FOR ANY COUNTERCLAIM THEREIN.

IN WITNESS WHEREOF, each of the undersigned has caused this Guarantee to be duly executed and delivered as of the date first above written.


Commercial Targa, S.A. de C.V.


By:_____
      Name: Sandro Piancone
      Title: Director General.

## SCHEDULE 1

## GUARANTOR

The following is the name, notice address and jurisdiction of organization of the Guarantor.

| NAME | ADDRESS | JURISDICTION OF INCORPORATION | COMPANY OWNED BY PERCENTAGE |
|------|---------|-------------------------------|-----------------------------|
| Commercial Targa, S.A. de C.V. | | Mexico | 100% |

ER202

**EXHIBIT 1**

Nascent Wine Company, Inc.
1330 Orange Ave. Suite 300
Coronado, California 92118


February _10_, 2010

Nery's USA, Inc.
774 Mays Blvd #10-450
Incline Village, Nevada 89451


Re:   Direction Letter Regarding Payments of Proceeds Pursuant to that Certain
      Promissory Note ("Note") dated February __, 2010 between Nascent Wine
      Company, Inc. ("Nascent") and Nery's USA, Inc. ("NERYS")

Ladies and Gentlemen:

The undersigned has authorized Genesis Merchant Partners, L.P. ("Genesis") to receive all payments to which the undersigned is entitled under the Note.

By this letter, you are hereby directed (1) to make all checks, in payment of sums due to Nascent under the Note, payable to the order of "Genesis Merchant Partners, LP", and (2) to deliver such checks or otherwise make such payments to the following address:

Genesis Merchant Partners, LP
15 Valley Drive
Greenwich, Connecticut 06831

The foregoing direction is irrevocable, except with the written consent of Genesis (or its successors or assigns), notwithstanding any future contrary request or direction from the undersigned or any other person (other than Genesis (or its successors or assigns)). Please execute the enclosed copy of this letter and return to the undersigned to confirm receipt and acceptance. Thank you for your cooperation.


Nascent Wine Company, Inc.

By: _____


Agreed to and Accepted by
Nery's USA, Inc.

By: _____

PLAINTIFF'S EXHIBITS
CASE NO. 11CV1589JMWVG
EXHIBIT NO. 25

ER203

PLAINTIFF'S EXHIBITS
CASE NO. 11CV1589 JMWVG
EXHIBIT NO. 26

## COLLATERAL ASSIGNMENT OF CONTRACTS

Assignee                       Genesis Merchant Partners, LP
(or "Genesis")                 15 Valley Drive
                               Greenwich, Connecticut 06831

Assignors:                     Nascent Wine Company, Inc.
("Assignor")                   1330 Orange Ave. Suite 300
                               Coronado, California 92118

Note Purchase Agreement:       Note Purchase Agreement dated March 31, 2008 between the
                               Assignee and the Assignor, as amended (the "Note Purchase
                               Agreement") regarding that certain promissory note in the
                               principal amount of $1,000,000.00 dated March 31, 2008, as
                               amended (the "Original Note")

For valuable consideration received and to induce Assignee to release certain assets from the
lien in favor of Assignee as provided in the Security Agreement dated March 31, 2008, as amended
(the "Security Agreement") executed in connection with the Note Purchase Agreement, as further
detailed in that certain Stock Purchase Agreement (defined below), the Assignor does hereby represent
and covenant to the Assignee as follows:

1.   Capitalized terms used herein which are not otherwise defined shall have the meaning
given to them above or in the Security Agreement or the Note Purchase Agreement.

2.   The Assignor as further security for the payment and the performance of Obligations to
Assignee, hereby assigns, pledges, transfers and sets over unto the Assignee all of Assignor's right,
title, and interest in and to the Assignor's rights and remedies contained in or referred to in the Stock
Purchase Agreement between Nery's USA, Inc. (the "Payor") and Assignor dated February 10, 2010
(the "Stock Purchase Agreement"), the Promissory Note executed in connection with the Stock
Purchase Agreement (the "Note") a copy of which is attached hereto as Schedule A, and any and all
ancillary documents executed in connection with the Stock Purchase Agreement (said Stock Purchase
Agreement, Note and ancillary documents being referred to as the "Contracts"). This instrument is
not an assignment or delegation of any duties or obligations under the Contracts.

4.   This Assignment is made to further secure the Obligations as defined in the Security
Agreement dated March 31, 2008. This Assignment shall terminate upon complete, indefeasible
satisfaction of the Obligations as defined in the Security Agreement.

5.   Assignor hereby immediately assigns to Assignee all payments and proceeds which
Assignor will receive under the Contracts. Assignor and Payors shall each execute and deliver the
Direction Letter regarding Payment of Proceeds attached hereto as Exhibit 1. Until all Obligations to
Assignee have been satisfied by Assignor in full, the Payors will be instructed to remit payment



c:\Documents and Settings\rplancone\Local Settings\Temporary Internet Files\OLK62D\NerysTargaAssignmentofContracts05Feb10[Redline].doc

ER204

directly to Assignee on behalf of Assignor. Assignee shall provide account information to the Payors for such purpose. Any excess funds received by Assignee under the Contracts, in excess of the Obligations, shall be remitted back to Assignor within five (5) business days of the funds being received by Assignee. Payments received by Assignee hereunder shall be applied as provided in the Original Note. Other than the fact that each payment by the Payors received by Assignee shall reduce the amount payable by Assignor pursuant to the Original Note, this Assignment shall not affect Assignors' obligations to Assignee pursuant to any of the Transaction Agreements.

6.    Upon the occurrence of any Event of Default (as defined in the Transaction Agreements), Assignee may, without notice or demand, elect to exercise any and all of Assignor's rights and remedies from time to time under any one or more of the Contracts without any interference or objection from Assignor. Nothing contained herein shall be deemed a waiver of any of Assignee's rights regarding any Event of Default that exists as of the date hereof.

7.    Upon the occurrence of an Event of Default, Assignee may without notice or demand, at its option, from time to time take over and enjoy the benefits of any one or more of the Contracts, to the same extent as Assignor might do. Assignor hereby releases Assignee from any and all claims which it has or might have against Assignee arising out of any of such actions by Assignee. Assignee may in connection with any and all of the foregoing powers, and without limiting the same, effect new Contracts, cancel or surrender existing Contracts, alter and amend the terms of and renew existing Contracts and Assignor hereby irrevocably appoints Assignee as its attorney in fact, coupled with an interest, to do all acts pertaining thereto in Assignor's place and stead.

8.    Nothing herein shall constitute a satisfaction of any indebtedness, liability or obligation, now or hereafter owed by Assignor to Assignee. Nothing herein contained shall be construed as making Assignee a mortgagee in possession, or as constituting a waiver or suspension in any respect by Assignee of its right to enforce payment of the debts or other obligations under the terms of any of the Transaction Agreements. Assignee is not the agent, partner, or joint venturer of either the Assignor or of any of the Governmental Authorities or other persons or entities.

11.    At the option of Assignee, except as otherwise provided herein, this Assignment may be enforced from time to time upon the occurrence and during the continuance of an Event of Default with or without order of any court and with or without appointment of a receiver, as Assignee shall determine. Assignee may also at any time cease to enforce this Assignment. Any failure on the part of the Assignee promptly to exercise any option hereby given or reserved shall not prevent the exercise of any such option at anytime thereafter. Assignee may pursue and enforce any remedy or remedies accorded to it herein independently of, in conjunction or concurrently with, or subsequent to its pursuit and enforcement of any other remedy or remedies which it may have under the Transaction Agreements or by law.

12.    Assignor represents, warrants and covenants to and with the Assignee as follows:

    a.    Assignor has the right to execute and deliver this Assignment;



- 2 -

b.    Assignor has made no prior assignment, encumbrance of any kind or transfer of any Contracts and it will not assign, pledge or otherwise encumber the same without the prior written consent of Assignee;

c.    The Contracts are subject to no defenses, setoffs or counterclaims whatsoever;

d.    Assignor will not cancel, terminate or accept any surrender of any of the Contracts, or amend or modify the same in any material respect, without having obtained the prior written consent of Assignee;

e.    Assignor will not waive or give any consent with respect to any default or variation in the performance of the Contracts, it will at all times take proper steps to enforce all of the provisions and conditions thereof and prevent the same from lapsing, and it will notify Assignee of any defaults under the Contracts;

f.    No party is in breach of any Contract;

g.    Assignor shall observe and perform all obligation imposed on it under the Contracts; will maintain the Contracts in full force and effect; will not do or permit to be done anything to impair the security thereof;

h.    Assignor will exercise and diligently and promptly enforce its rights with the Contracts;

i.    Assignor will not execute any other assignment of Assignor's interest in the Contracts;

j.    Assignor will notify Assignee in writing of (i) any default by any party under any Contract, (ii) the giving of any notice by any party under or relative to any Contract to Assignor of any alleged default by Assignor, in the performance or observance of any of the terms of the Contract, or of the termination or expiration of any such Contract, together with a true copy of each such notice, and (iii) any other event or occurrence which could affect the Assignor's rights under the Contracts or the value thereof to the Assignee.

13.    Assignee shall not be liable for any loss or liability sustained by Assignor resulting from any act or omission in connection with Assignee's exercise of its rights and remedies hereunder, without exception. At no time prior to the express, voluntary assumption thereof by Assignee shall Assignee be obligated to perform or discharge any obligation or duty under any Contract. To the extent permitted by law, Assignor agrees to indemnify Assignee for any cost, expense, liability, loss or damage which may be incurred under any Contract or by reason of this Assignment or the exercise of Assignee's rights hereunder. In the event Assignee incurs any such cost, expense or liability referred to above or in the exercise of its rights hereunder in defense of any such claims or demands, the amount thereof, including costs and reasonable attorney's fees, shall be secured by this Assignment and the other Transaction Agreements and Assignor shall reimburse Assignee immediately therefor

- 3 -



ER206

immediately therefor upon the demand of Assignee. The foregoing indemnity shall survive any release or termination of this Assignment.

14.    Assignee may take or release other security for the Obligations or any part thereof secured by this Assignment, and may further release any party primarily or secondarily liable, and may apply any other security held by Assignee to the satisfaction of the Obligations or any part thereof without prejudice to any rights under this Assignment.

15.    Nothing contained in this Assignment nor any act done or omitted by Assignee pursuant to the terms of this Assignment shall be deemed a waiver by Assignee or any of rights or remedies under any of the Transaction Agreements and this Assignment is executed without prejudice to any rights or remedies possessed by Assignee under the terms of any other instruments, whether referred to herein or otherwise or under applicable law. The right of Assignee to collect the principal, interest and other indebtedness secured by this Assignment, and to enforce any other security, may be exercised by Assignee prior or subsequent to any action taken under this Assignment. All rights and remedies of the Assignee however arising or created are cumulative and not exclusive.

16.    This Agreement shall inure to the benefit of and be binding upon the parties and their respective heirs, legal representatives, successors and assigns. Assignee's interests in and rights under this Agreement and other Transaction Agreements are freely assignable, in whole or in part, by Assignee. In addition, nothing in this Agreement or any of the Transaction Agreements shall prohibit Assignee from pledging or assigning this Agreement or any of the Transaction Agreements or any interest therein. Assignor shall not assign its rights and interest hereunder without the prior written consent of Assignee, and any attempt by Assignor to assign without Assignee's prior written consent is null and void. Any assignment shall not release Assignor from the Obligations.

17.    This Agreement shall be governed by and interpreted in accordance with federal law and, except as preempted by federal law, the laws of the state named in Assignee' address on the first page hereof without regard to that state's conflict of laws principles. If the terms of this Agreement should conflict with the terms of any Note Purchase Agreement or any commitment letter that survives closing, the terms of this Agreement shall control. The state or federal courts located in Connecticut shall have exclusive jurisdiction to hear and determine any claims or disputes pertaining to this Agreement or to any matter arising out of or related to this Agreement; PROVIDED, that any appeals from those courts may have to be heard by a court located outside of Connecticut. The parties expressly submit and consent in advance to such jurisdiction in any action or suit commenced in any such court, and waive any objection which they may have based upon lack of personal jurisdiction, improper venue or FORUM NON CONVENIENS and hereby consent to the granting of such legal or equitable relief as is deemed appropriate by such court. The parties hereby waive personal service of the summons, complaint and other process issued in any such action or suit and agrees that service of such summons, complaints and other process may be made as set forth in the Notice section below.



ER207

18.     If any provision of this Agreement or of the other Transaction Agreements shall be prohibited or invalid under applicable law, such provision shall be ineffective but only to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement or other such document.

19.     Any notices to Assignor shall be sufficiently given, if in writing and mailed or delivered to the Assignor's address shown above or such other address as provided hereunder and to Assignee, if in writing and mailed or delivered to Genesis Merchant Partners L.P., 15 Valley Drive, Greenwich, Connecticut 06831 or such other address as Assignee may specify in writing from time to time with a copy to Jonathan M. Wells, Esq., Gilbride, Tusa, Last & Spellane LLC, 31 Brookside Drive, Greenwich, Connecticut 06830. In the event that Assignor changes Assignor's address at any time prior to the date the Obligations are paid in full, Assignor agrees to promptly give written notice of said change of address by registered or certified mail, return receipt requested, all charges prepaid.

20.     All references in the Transaction Agreements to Assignor, Assignee, a person, document or other nouns of reference mean both the singular and plural form, as the case may be, and the term "person" shall mean any individual, person or entity. The captions contained in the Transaction Agreements are inserted for convenience only and shall not affect the meaning or interpretation of the Transaction Agreements.

21.     Assignor by execution of and Assignee by acceptance of this Agreement agree that each party is bound to all terms and provisions of this Agreement.

22.     If there is more than one Assignor, each is jointly and severally obligated.

23.     Assignor shall promptly pay all documentary, intangible recordation and/or similar taxes on this transaction whether assessed at closing or arising from time to time.

24.     EACH OF THE PARTIES HERETO AGREES THAT IN ANY JUDICIAL, MEDIATION OR ARBITRATION PROCEEDING OR ANY CLAIM OR CONTROVERSY BETWEEN OR AMONG THEM THAT MAY ARISE OUT OF OR BE IN ANY WAY CONNECTED WITH THIS AGREEMENT, THE TRANSACTION AGREEMENTS OR ANY OTHER AGREEMENT OR DOCUMENT BETWEEN OR AMONG THEM OR THE OBLIGATIONS EVIDENCED HEREBY OR RELATED HERETO, IN NO EVENT SHALL ANY PARTY HAVE A REMEDY OF, OR BE LIABLE TO THE OTHER FOR, (1) INDIRECT, SPECIAL OR CONSEQUENTIAL DAMAGES OR (2) PUNITIVE OR EXEMPLARY DAMAGES. EACH OF THE PARTIES HEREBY EXPRESSLY WAIVES ANY RIGHT OR CLAIM TO PUNITIVE OR EXEMPLARY DAMAGES THEY MAY HAVE OR WHICH MAY ARISE IN THE FUTURE IN CONNECTION WITH ANY SUCH PROCEEDING, CLAIM OR CONTROVERSY, WHETHER THE SAME IS RESOLVED BY ARBITRATION, MEDIATION, JUDICIALLY OR OTHERWISE.



- 5 -

ER208

25.    This Agreement and the other Transaction Agreements represent the final agreement between the parties and may not be contradicted by evidence of prior, contemporaneous or subsequent agreements of the parties.  There are no unwritten agreements between the parties.

26.    EACH PARTY ACKNOWLEDGES THAT THE TRANSACTIONS REPRESENTED BY THIS AGREEMENT ARE COMMERCIAL TRANSACTIONS.

27.    TO THE EXTENT PERMITTED BY APPLICABLE LAW, EACH PARTY BY EXECUTION HEREOF, KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ANY RIGHT EACH MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED ON, OR ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT, THE TRANSACTION AGREEMENTS OR ANY AGREEMENT CONTEMPLATED TO BE EXECUTED IN CONNECTION WITH THIS AGREEMENT, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF ANY PARTY WITH RESPECT HERETO.   THIS PROVISION IS A MATERIAL INDUCEMENT TO ASSIGNEE TO ACCEPT THIS AGREEMENT.  EACH OF THE PARTIES AGREES THAT THE TERMS HEREOF SHALL SUPERSEDE AND REPLACE ANY PRIOR AGREEMENT RELATED TO ARBITRATION OF DISPUTES BETWEEN THE PARTIES CONTAINED IN ANY LOAN DOCUMENT OR ANY OTHER DOCUMENT OR AGREEMENT HERETOFORE EXECUTED IN CONNECTION WITH, RELATED TO OR BEING REPLACED, SUPPLEMENTED, EXTENDED OR MODIFIED BY, THIS AGREEMENT.

*[Signature Page Follows]*



- 6 -

ER209

IN WITNESS WHEREOF Assignor has caused this Assignment to be executed under seal as of the __10__ day of February, 2010.

ASSIGNOR'S:
Nascent Wine Company, Inc.

Witness

By: _____

ASSIGNEE:
Genesis Merchant Partners, LP
By: Genesis Merchant Partners GP, LLC

_Sensa M Beldt_
Witness

By: _____

- 7 -

#6980 P.005 /033

02/23/2010  00165 6617935

IN WITNESS WHEREOF Assignor has caused this Assignment to be executed under seal as of the $\underline{10}^{\text{th}}$ day of February, 2010.

ASSIGNORS:
Nascent Wine Company, Inc.

By: _____

Witness

ASSIGNEE:
Genesis Merchant Partners, LP
By: Genesis Merchant Partners GP, LLC

By: _____

Witness

ER211

## SCHEDULE A

<u>Attach</u>:
1. Promissory Note

1                United States District Court

2              Southern District of California

3

4   GENESIS MERCHANT PARTNERS, LP,)
    a Connecticut corporation,    )
5                                 )
                    Plaintiff,    )
6                                 )
       vs.                        ) Case No. 11-CV-1589 JM
7                                 ) Bench Trial, Day 1
    NERY'S USA, a Nevada          ) Volume 1
8   corporation, et al.,          )
                                  ) Monday, June 24, 2013
9                   Defendants.   )
                                  )
10  ------------------------------)
    AND RELATED CROSS-ACTIONS.    )
11

12          Before the Honorable Jeffrey T. Miller
                United States District Judge
13

14  Appearances:

15  For the Plaintiff:       Jerry D. Hemme, Esq.
                             GOODE HEMME & PETERSON
16                           6256 Greenwich Drive, Suite 300
                             San Diego, CA  92122
17

18  For the Defendants:      John J. McNutt, Esq.
                             MCKENNA LONG & ALDRIDGE
19                           600 W. Broadway, Suite 2600
                             San Diego, CA  92101

20

21  Official Court Reporter: Debra M. Henson, CSR, RPR
                             U.S. Courthouse
22                           221 W. Broadway, Suite 5190
                             San Diego, CA  92101
23                           (619) 238-4538

24

25          Record produced by stenographic reporter

1   Timothy Doede; is that right?

2   A.  Yes.

3   Q.  And he's the only one you talked to at Genesis?

4   A.  Correct.

5   Q.  So when you negotiated the terms of the loan and it was

6   approved and you closed it, that was -- he was your exclusive

7   contact at Genesis, right?

8   A.  Yes.

9   Q.  And then Nascent actually used that million dollars to

10  buy cheese, right?

11  A.  Correct.

12  Q.  And it was all for Targa?

13  A.  Yes.

14  Q.  Now, when the loan became due in September of 2008,

15  Nascent couldn't pay off the loan, could it?

16  A.  No.

17  Q.  And so then you on behalf of Nascent requested a -- a

18  extension of time, right?

19  A.  Yes.

20  Q.  Take a look at Exhibit 2.  Is Exhibit 2 a letter dated

21  September 29, 2008 to Tim Doede from you, right?

22  A.  From me to Tim Doede?  No.

23  Q.  Do you see the letter?

24  A.  Yeah.

25  Q.  Yeah, this is the one -- the letter you sent to Tim Doede

1   Q.  There were no profits, right?

2   A.  Correct.

3   Q.  And at the middle of 2009, Nascent didn't have the

4   capital to make Targa profitable, correct?

5   A.  Correct.

6   Q.  Nascent was having its own problems; is that right?

7   A.  Correct.

8   Q.  That was the result of the overall state of the economy

9   and everything else that was going on in the 2008 to 2009

10   time frame, right?

11   A.  Correct.

12   Q.  Now, you didn't have much contact with Mr. Cathcart in

13   2008, did you?

14   A.  No.

15   Q.  He had pretty much satisfied most of his consulting

16   obligations or what you needed him for in the acquisition

17   phase through the end of 2007?

18   A.  Correct.

19   Q.  And then so in 2008, you didn't talk to him much, but in

20   2009, early 2009, you reconnected with Mr. Cathcart, right?

21   A.  Correct.

22   Q.  And you explained to him about the problems that you were

23   having with Nascent and Targa, right?

24   A.  Correct.

25   Q.  And Mr. Cathcart expressed an interest in licensing the

1  your conversations with the input from Mr. Cathcart that

2  Nascent needed to sell Targa?

3  A.  With our board, yes.  The decision was made from our

4  board to sell Targa.

5  Q.  All right.  So when Targa went up for sale, didn't you --

6  you actually went back east and met with Mr. Doede of Genesis

7  because he had a company that might be interested in Targa,

8  right?

9  A.  Correct.

10 Q.  And you and Mr. Cathcart met Mr. Doede in I think it was

11 Kentucky?

12 A.  Correct.

13 Q.  But that deal didn't work out, right?

14 A.  Right.

15 Q.  So then the idea arose that Mr. Cathcart should purchase

16 Mexico Targa, right?

17 A.  Correct.

18 Q.  And, in fact, Mr. Cathcart drafted a letter of intent

19 dated July 8, 2009 expressing his intent to purchase Targa;

20 is that right?

21 A.  I don't know the date, but he drew up a letter of intent.

22 Q.  If you'd take a look at Exhibit 8.

23 A.  Okay.

24 Q.  Is that the letter of intent?

25 A.  It is.

1      (Exhibit No. 8 identified.)

2   Q.  It's dated July 8?

3   A.  Yep.

4   Q.  And the purchase price was to be $2 million?

5   A.  Correct.

6   Q.  And that was payable in cash on the closing date, right?

7   A.  Yes.

8   Q.  So the initial intent was that Mr. Cathcart would

9   purchase Targa for $2 million cash, right?

10  A.  Correct.

11  Q.  And then Nascent would use that cash to then pay off its

12  debt to Genesis?

13  A.  Genesis and others.

14  Q.  And others.

15  A.  Others.

16  Q.  Of course.  Now, at that point in time, July of 2009,

17  Nascent still owed Genesis the full principal amount of the

18  note plus some accrued interest, right?

19  A.  Correct.

20  Q.  And Nascent was in default on the note again, right?

21  A.  Correct.

22  Q.  So you had previously gotten the amendment to change the

23  terms of the note, Nascent was able to perform on that

24  amendment for a while, but in July of 2009, even that deal

25  was in default; is that right?

1    Q.   Take a look at Exhibit 5.   It's in your book there.

2    A.   What number?

3    Q.   Five.

4    A.   Okay.

5    Q.   Okay.   Have you seen Exhibit 5 before?

6    A.   Yes.

7    Q.   This is an executive summary of Nery's?

8    A.   Correct.

9    Q.   This was a summary that was used to give to potential

10   investors to tell them what you're raising money for?

11   A.   Correct.

12      (Exhibit No. 5 identified.)

13   Q.   If you'd take a look at page 6 of the exhibit --

14   A.   Okay.

15   Q.   -- it says -- you see where it says management?

16   A.   I do.

17   Q.   And there on the bottom it says Sandro Piancone,

18   director?

19   A.   Correct.

20   Q.   And you testified earlier that you didn't think you were

21   a director of Nery's.   Does that refresh your recollection as

22   to whether you were a director or not?

23   A.   Well, at the beginning, as I said, I came on as a

24   director or I planned to come on as a director.   I don't know

25   if I officially became a director, but -- for all intents and

1   purposes, I was a director, but I don't know if officially I

2   went on as a -- I'm no longer a director now.

3   Q.  Yes.  No, I'm --

4   A.  Okay.

5   Q.  But you may have been a director for a while --

6   A.  Yes.

7   Q.  -- and then resigned?

8   A.  Correct.

9   Q.  Did you remember if you ever signed a resignation as

10  director?

11  A.  I don't know.

12  Q.  Now, let's take a look at Exhibit 9.

13          THE COURT:  Five was not being offered; it was

14  just --

15          MR. HEMME:  Well, I'll offer it.

16          THE COURT:  Well, I'd rather not --

17          MR. HEMME:  Okay.

18          THE COURT:  -- receive exhibits if they're not

19  necessary to be a part of the record.  Were you just using it

20  to see if it would refresh the witness's memory on something?

21          MR. HEMME:  I was primarily, yes, your Honor.

22  We'll leave it out.

23          THE COURT:  So 9 is next?

24          BY MR. HEMME:  Q.  Now, what -- you see Exhibit 9?

25  A.  Yes.

1  Q.  Okay.  And this is an email string?  If you look at the

2  second page of Exhibit 9 --

3  A.  Okay.

4  Q.  -- says to a Ryan Kim?

5  A.  Okay.

6  Q.  Says subject, we need a financial partner.  Who's Ryan

7  Kim; do you remember?

8  A.  Name sounds familiar.  It's from an investment fund.

9       (Exhibit No. 9 identified.)

10  Q.  Well, was this you telling an investor about -- about the

11  investment opportunity to acquire Targa?

12  A.  Yes.  We're helping Nery's with the funding, to get

13  funding to buy Targa.

14  Q.  Let's take a look at Exhibit 10.  See that?

15  A.  Yes.

16  Q.  This is to a Noah Anderson, right?

17  A.  Correct.

18       (Exhibit No. 10 identified.)

19  Q.  And take a look at the -- is this another investor you

20  were helping Nery's with?

21  A.  Correct, correct.

22  Q.  And this was a communication you had in about August 4,

23  2009 to this investor, ask him if he'd be interested in

24  Targa?

25  A.  Yes.

1  Q.  Okay.  Let's take a look at the third page.  Says Dear

2  Noah, you sent me an email about your company and deals you

3  have.  In this case I am the seller and the buyer.  What do

4  you mean by you were the seller and the buyer?

5  A.  Well, I was a board member of Nascent, and I was to be

6  board member of Nery's USA.

7  Q.  So you were telling him that you were on the selling side

8  of the entity, but you would also be on the buyer side of the

9  entity when the transaction was completed?

10  A.  Correct.

11  Q.  Then Exhibit 11, do you see that?

12  A.  Yes.

13  Q.  And that's an email to a Pichardo, is it?

14  A.  Francisco Lopez, no.

15     (Exhibit No. 11 identified.)

16  Q.  France Lopez, okay.  This is another investor that you

17  had attempted to solicit an interest in Targa?

18  A.  Correct.

19        MR. HEMME:  Your Honor, I'll just move in Exhibits

20  9 through 11 -- 9, 10, and 11 -- into evidence.

21        THE COURT:  Okay.  Nine through 11 are admitted.

22     (Exhibit Nos. 9-11 admitted.)

23        BY MR. HEMME:  Q.  Now, during this time period

24  that you were looking for money, to acquire Targa to do the

25  cash sale, you had informed Tim Doede that that's what you

1  were doing, right?

2  A.  Correct.

3  Q.  And while the note was in default, he was giving you

4  extra time to see if you couldn't resolve the note by selling

5  Targa, right?

6  A.  Correct.  We were trying to find a buyer to satisfy his

7  loan.

8  Q.  Yeah, Genesis was cooperating with your efforts, right?

9  A.  Correct.

10  Q.  And as it turned out, neither you nor Cathcart could find

11  any investors who would raise enough money to do -- be able

12  to do a cash purchase, right?

13  A.  Correct.

14  Q.  So around the October 2009 time frame, that's when you

15  started talking to Genesis about Genesis carrying the money

16  for the transaction, right?

17  A.  Yeah.  I don't know the exact date but sometime after.

18  Q.  In the September --

19  A.  Right.

20  Q.  -- October -- we don't know the exact date but --

21  A.  Exactly.

22  Q.  -- we know it was after these emails we just looked at

23  when you were out there still trying to get money?

24  A.  Correct.

25  Q.  At some point you became convinced that that was not

1  A.  Nascent did.

2  Q.  Nascent did, okay.  It was you and other persons in

3  Nascent did that?

4  A.  Correct.

5  Q.  Who were all the persons that provided information to

6  Mr. Cathcart about Targa?

7  A.  From our finance team it would have been Bill Lindberg.

8  Q.  All right.  And who is Bill Lindberg?

9  A.  He was our acting CFO.

10 Q.  And what would have been his responsibility -- what kind

11 of information would he have given to Mr. Cathcart?

12 A.  If they asked for financial reports or sales reports,

13 balance sheet, those kind of things.

14 Q.  And what information did you give to Mr. Cathcart?

15 A.  More just verbal, telling him about the company.  I don't

16 think I ever gave him any paperwork.

17 Q.  Okay.  Did you ever review any financial documents with

18 Mr. Cathcart?

19 A.  No.

20 Q.  So any documents that would have been given to

21 Mr. Cathcart from Nascent, he would have reviewed that

22 outside of your knowledge?

23 A.  Correct.

24 Q.  Now, were you aware whether Mr. Cathcart went down and

25 visited the facility?

1  A.  Yes.

2  Q.  Did you accompany him when he went down there?

3  A.  Yes.

4  Q.  And that was during the seven-month due diligence period,

5  right?

6  A.  Correct.

7  Q.  How many times did you go down with him?

8  A.  Couple times.

9  Q.  And did you provide him access to any of the employees

10  while you were down there?

11  A.  I did.

12  Q.  And there was a general manager, right?

13  A.  Correct.

14  Q.  What was his name?

15  A.  There was two at that -- different times.  One was

16  Moises, and one was Chris, but I think Chris was at the end.

17  But it was Moises.

18  Q.  Well, there was one general manager that spoke good

19  English, right?

20  A.  Yes.

21  Q.  And which one was that?

22  A.  Chris.

23  Q.  Okay.  And Chris had been there for a few years?

24  A.  He was with the company for a few years but not with

25  Targa for a few years.

1   Q.  And Mister -- did Mr. Cathcart have any conversations

2   with Chris while he was down there that you saw?

3   A.  A few, but -- I don't know if it had to do with the

4   business, but --

5   Q.  Okay.  But certainly any questions that Mr. Cathcart had

6   of the employees, you gave him full access, right?

7   A.  Correct.

8   Q.  And for that cigarette permit that Targa had, was there a

9   supplier for that permit?  I mean a supplier for the

10  cigarettes that would be imported into Mexico under the

11  permit?

12  A.  Yes.

13  Q.  And that was somebody in New York?

14  A.  No.

15  Q.  What was the name of that company?

16  A.  It was called -- well, the name of the company --

17  Q.  Yeah.

18  A.  -- was The Marketing Group.

19  Q.  Right.

20  A.  The name of the brand was New York New York.

21  Q.  Okay.  That's where I got my New York from.

22  A.  I think the guy lived in San Diego.

23  Q.  Okay.  And Mr. Cathcart, did you introduce him to that

24  supplier?

25  A.  I did.

1  Q.  And he met with him as well?

2  A.  Yes.

3  Q.  And you made sure that anything Mr. Cathcart asked for

4  was available to him, right?

5  A.  Yes.

6  Q.  And he never complained to you that he did not receive

7  everything he asked for, right?

8  A.  No.

9  Q.  That was a double negative.  Isn't it true that he did

10  not complain to you about not receiving all of this

11  information?

12  A.  He did not complain.

13  Q.  Good.  So when this -- just to summarize, when the

14  transaction closed in February of 2010, a description of the

15  assets would be the Zahava license agreement, the Nery's

16  brand, the right to market Nery's brand in Mexico if Zahava

17  canceled, cigarette permits, equipment, store cheese and

18  perform cut-and-wrap, and then the lease of the facility,

19  right?

20  A.  Correct.

21  Q.  Is there any assets that I would have left out that you

22  can think of?

23  A.  No.

24  Q.  And that facility was about a 20,000-square-foot

25  facility; is that correct?

1  A.  Correct.

2  Q.  And at the time that the sale closed, that lease was in

3  default, right?

4  A.  I don't want to say default, but --

5  Q.  Okay.  The rent had not been paid for several months on

6  the lease, right?

7  A.  Correct.

8  Q.  And the number of months, do you remember seven, eight

9  months?

10 A.  I don't recall, but it was a few months.

11 Q.  All right.  And prior to the sale closing, you told

12 Mr. Cathcart that the rent had not been paid for several

13 months, right?

14 A.  Correct.

15 Q.  And it was your assumption, wasn't it, that the landlord

16 would forgive the past due rent and accept a new lease from

17 the new owner, right?

18 A.  That they would sign a new lease with the new owner.

19 Q.  And they would not ask the new owner to pay the past

20 rent, right?

21 A.  Correct.

22 Q.  That was your assumption, right?

23 A.  That was my assumption.

24 Q.  And prior to the closing of the sale, you did not go to

25 the landlord and ask for that agreement, right?

1  A.  No.

2  Q.  Did you did -- did you ever introduce Mr. Cathcart to the

3  owner to get that agreement?

4  A.  No.

5  Q.  To the best of your knowledge, did Mr. Cathcart get any

6  agreement from the landlord before the sale closed to not

7  require the payment of the past rent?

8  A.  No.

9  Q.  So during this seven-month period from July of '09 till

10  February of 2010, Targa continued to decline, right?

11  A.  Yes.

12  Q.  It was only producing five to $10,000 a month in income,

13  and its expenses were roughly $25,000 a month, right?

14  A.  Correct.

15  Q.  And Mr. Cathcart knew that as well, right?

16  A.  Exact numbers I don't know, but -- the answer to your

17  question --

18  Q.  Was it your understanding that Mr. Cathcart was aware of

19  Targa's negative cash flow?

20  A.  Yes.

21  Q.  But despite the poor financial condition, the Nery's

22  brand was still a valuable asset; isn't that correct?

23  A.  The capital, yes.

24  Q.  And that's -- that Nery's brand, that represented the

25  true value of Targa at the time of the sale, right?

1  A.  Yes.

2  Q.  So during the period of around September of '09 down to

3  February of 2010, there were a few different types --

4  different structures of the sales transaction that were

5  negotiated between Mr. Cathcart, you, and Genesis, right?

6  A.  Correct.

7  Q.  And then ultimately the one that actually closed is the

8  agreement that was reached, right?

9  A.  Right.

10  Q.  So let's take a look at Exhibit 22.

11  A.  Okay.

12  Q.  Okay.  So Exhibit 22 is the stock purchase agreement, and

13  this is the agreement which provides the terms under which

14  Nery's was buying from Nascent the stock of Targa, correct?

15  A.  Correct.

16  Q.  I'd like you to look through that agreement and see if

17  you can determine whether that's the complete agreement.

18  A.  It appears to be.

19      (Exhibit No. 22 identified.)

20  Q.  Now, the agreement itself refers to some schedules?

21  A.  I'm sorry?

22  Q.  The agreement itself refers to some schedules, so let's

23  zero in on a couple of them.  Let's look at page 11 of the

24  agreement.  Can you see in page 3 -- it's section 311.

25  There's a reference to a schedule 311?

1  A.  Correct.

2  Q.  And there's no schedule 311 attached to this, right?

3  A.  Correct.

4  Q.  Do you recall ever seeing a schedule 311?

5  A.  No.

6  Q.  Okay.  3.12 says welfare plans.  Schedule 3.12 says --

7  sets forth the complete -- correct and complete list of all

8  welfare plans.  And is there -- there's no 3.12 schedule, is

9  there?

10  A.  No.

11  Q.  Do you recall ever seeing one?

12  A.  No.

13  Q.  So the next document in the transaction was Exhibit 23.

14  This is a promissory note with the lender as Nascent Wine

15  Company and the borrower is Nery's USA.  This represents the

16  $1.85 million debt that Nery's agreed to undertake to acquire

17  Targa, correct?

18  A.  Correct.

19      (Exhibit No. 23 identified.)

20  Q.  Or at least part of it because there was also $150,000 in

21  liabilities or payables it was assuming, correct?

22  A.  Correct.

23  Q.  And this is a note that you signed as a guarantor on

24  behalf of Targa, right?  It's on page 3.

25  A.  Correct.

1  Q.  You had two roles in here; one, you were representing

2  Nascent as the seller, and then also you were acting on

3  behalf of Targa as the guarantor, right?

4  A.  Correct.

5  Q.  And Exhibit 24, see that?

6  A.  Yes.

7  Q.  Exhibit 24 is the subsidiary and affiliates guarantee.

8  This represents the guarantee by Targa of the Nery's-Nascent

9  note, right?

10  A.  Correct.

11     (Exhibit No. 24 identified.)

12  Q.  And this is one you signed as well?

13  A.  Yes.

14  Q.  And the next document is a letter that's Exhibit 25; see

15  that?

16  A.  Yes.

17     (Exhibit No. 25 identified.)

18  Q.  And this is a letter directing Nery's to make any

19  payments under the note it just signed directly to Genesis,

20  right?

21  A.  Yes.

22  Q.  And it was to make those payments under the Nery's note

23  until the Nascent obligation to Genesis had been satisfied,

24  right?

25  A.  Right.

1  and then sell it?

2  A.  Correct.

3  Q.  Do you recall in 2010, just after closing of the sale,

4  what percentage of the cheese came from the U.S. that Targa

5  would sell?

6  A.  I think it was all of it, but I can't be sure.

7  Q.  Certainly a very large percentage of its inventory of

8  cheese came from the U.S.?

9  A.  Correct.

10  Q.  Now, after the sale closed, apparently there was some

11  liabilities that arose that you were not aware of when you --

12  when the sale closed; is that right?

13  A.  Correct.

14  Q.  Okay.  Did Mr. Cathcart tell you what those liabilities

15  were?

16  A.  As they came up, yes.

17  Q.  And what was your involvement in dealing with those

18  liabilities?

19  A.  They would send an email asking if I knew about it or

20  what's this organization or what the hell's going on,

21  different scenarios, but --

22  Q.  And were there any liabilities that he asked you about

23  which you were aware of did exist prior to the sale?

24  A.  No.

25  Q.  So these were surprises to you as well; is that right?

1   A.   Correct.

2   Q.   And one of the biggest surprises that came was apparently

3   a claim by the government that Targa owed $285,000 for a

4   tariff, right?

5   A.   Correct.  It was like four million pesos, but -- I don't

6   know what the translation was, but I'm sure it was close to

7   that number.

8   Q.   It's around $300,000?

9   A.   Correct.

10  Q.   -- 285, right?  And the government didn't actually

11  place -- when did you discover that lien?

12  A.   When John made it aware to me or John's finance people

13  made it aware to him and he made it aware to me.

14  Q.   And that was around October of 2010, wasn't it?

15  A.   September, October.

16  Q.   Yeah.  And the lien had actually been placed on the

17  business two or three months before that, right?

18  A.   I think sometime in April.

19  Q.   Yeah.  And it didn't get placed on the business until

20  after the closing of the sale, right?

21  A.   Correct.

22  Q.   It was your understanding that the source of that tax or

23  the obligation that was causing the government to put a lien

24  on the business, the source was from around 2007?

25  A.   Prior to Nascent buying it.

1  Q.  And that was prior to Nascent buying it?

2  A.  Correct.

3  Q.  So the entire time that Nascent owned Targa from last

4  quarter of 2010 until it sold the business in February 2010

5  to Mr. Cathcart, the government never provided Targa or

6  Nascent any notice of the lien, right?

7  A.  That's correct.

8  Q.  And that wasn't a lien that was on the books, right?

9  A.  Correct.

10 Q.  And in the period of due diligence that Nascent conducted

11 before buying Targa, that lien didn't come up, did it?

12 A.  No.

13 Q.  There was nothing on the books of the Arana brothers or

14 the Arana family that showed that that was owed, right?

15 A.  No.

16 Q.  And then Targa challenged that lien, right?

17 A.  Yes.

18 Q.  And Targa, or Nery's, was successful in having the lien

19 and the obligation dismissed, right?

20 A.  Yes.

21 Q.  And that dismissal or word of the dismissal came about

22 April of 2011; is that right?

23 A.  I don't remember the date.

24 Q.  Let's take a look at Exhibit 52.  See Exhibit 52?

25 A.  Yes.

1                    United States District Court

2                    Southern District of California

3

4   GENESIS MERCHANT PARTNERS, LP,)
    a Connecticut corporation,    )
5                                 )
                     Plaintiff,   )
6                                 )
       vs.                        ) Case No. 11-CV-1589 JM
7                                 ) Bench Trial, Day 2
    NERY'S USA, a Nevada          ) Volume 2
8   corporation, et al.,          )
                                  )
9                    Defendants.  ) Tuesday, June 25, 2013
    _____)
10                                )
    AND RELATED CROSS-ACTIONS.    )
11

12             Before the Honorable Jeffrey T. Miller
                    United States District Judge
13

14  Appearances:

15  For the Plaintiff:       Jerry D. Hemme, Esq.
                             GOOD HEMME & PETERSON
16                           6256 Greenwich Drive, Suite 300
                             San Diego, CA  92122
17
    For the Defendants:      John J. McNutt, Esq.
18                           MCKENNA LONG & ALDRIDGE
                             600 W. Broadway, Suite 2600
19                           San Diego, CA  92101

20

21  Official Court Reporter: Debra M. Henson, CSR, RPR
                             U.S. Courthouse
22                           221 W. Broadway, Suite 5190
                             San Diego, CA  92101
23                           (619) 238-4538

24

25             Record produced by stenographic reporter

1  A.  First column is just the ending date for the period.  The

2  following is the days; it's a 30/360 day count.  Following

3  column the principal outstanding.  Next column is the

4  interest that is accrued for that period.  Then there's a

5  principal payment.  There's the extension fee.  Following

6  column is the total payments due.  And then we've got total

7  payments received, and the ending principal balance.

8  Q.  Okay.  So as part of your duties, you would also account

9  for any payments that were received to be credited towards

10  the note, right?

11  A.  That's right.

12  Q.  And that's shown in that second-to-last column?

13  A.  That's right.

14  Q.  So on this Nascent note, you have three payments of

15  $15,416.67?

16  A.  That's right.

17  Q.  Then the ending principal balance, which is the last

18  column, would be the balance of the note as it accumulated

19  interest and other fees?

20  A.  That's correct.

21  Q.  Okay.  And then the conclusions at the bottom, what is

22  the balance due on this note?

23  A.  The balance due is $2,556,768.34.

24  Q.  And what was the day you calculated -- what is that, the

25  as-of date?

1    A.   The as-of date is 6-24-2013.

2    Q.   That was yesterday, right?

3    A.   Yes.

4    Q.   Now, let's take a look at Exhibit 56.

5    A.   Okay.

6    Q.   What is Exhibit 56?

7    A.   This is the loan breakout for the Nery's note.

8       (Exhibit No. 56 identified.)

9    Q.   All right. And then did you prepare this?

10   A.   I did.

11   Q.   And how did you prepare this?

12   A.   Based on the Nery's note, the promissory note.

13   Q.   And you read the terms of the Nery's note and then

14   plugged the payments that were due and the interest into this

15   schedule?

16   A.   That's correct.

17   Q.   And then the columns across the top, can you explain each

18   of those columns.

19   A.   Similar to the ones previously, the date is the ending

20   period, the days is the 30/360 count convention, principal

21   outstanding as of the end of the period, interest, late fee,

22   5 percent, the principal payment, the total payment due, and

23   the total payment received, we have the unpaid balance, the

24   difference, and then the final column is the ending principal

25   balance.

1  Q.  Okay.  And then in the payments made column, you have the

2  same three payments that were credited on the Nascent note,

3  right?

4  A.  That's right.

5  Q.  And what's the balance that's presently owed on the

6  Nery's note?

7  A.  $2,978,682.

8  Q.  And that's as of what date?

9  A.  That's also as of June 24, yesterday.

10  Q.  Now, let's take a look at Exhibit 58.  What is

11  Exhibit 58?

12  A.  This would be expenses related to Nascent.

13       (Exhibit No. 58-1 identified.)

14  Q.  Did you prepare this first page of Exhibit 58?

15  A.  I did.

16  Q.  And what does it show?

17  A.  It's showing the payments that were made out of the

18  Genesis fund to lawyer fees regarding the Nascent loan.

19  Q.  And it says regarding -- there's a filing fee regarding

20  Passani and Grupo -- do you see that?

21  A.  I do.

22  Q.  Do you know what these relate to?

23  A.  I know it relates to the Nascent note, I know it is in

24  regards to a legal matter.  I plug in as much detail into our

25  bookkeeping as I can in case we have to recognize it, but --

1   Q.   And the supporting documents are behind that first page?

2   Take a look at the --

3   A.   Okay.

4   Q.   -- second page.

5   A.   Yes.

6   Q.   So can you just briefly explain what each of those

7   documents are.

8   A.   This looks like an engagement that the Genesis Merchant

9   Funds made with Krueger in an attempt to collect on the

10  Nascent loan.

11  Q.   And the next document?

12  A.   Are you referring to the wire?

13  Q.   Yes.

14  A.   This is a copy of the wire that the Genesis Fund made to

15  Blair Krueger regarding the Nascent loan retainer.

16  Q.   And the remaining documents are the expenses that are

17  summarized on that first page?

18  A.   Yes.

19          MR. HEMME:   Like to move Exhibits 55, 56, and 58

20  into evidence, your Honor.

21          THE WITNESS:   I'm sorry?

22          MR. HEMME:   I did that.   It's not a question.

23          THE COURT:   They're admitted.   Is all of 58

24  necessary?

25          MR. HEMME:   No, just the summaries.

1          THE COURT:  Which pages?

2          MR. HEMME:  The first page.

3          THE COURT:  Just the first page?

4          MR. HEMME:  That shows the total and the expenses.

5          THE COURT:  Okay.  All right.

6      (Exhibit Nos. 55, 56, 58-1 admitted.)

7          MR. HEMME:  That's all the questions I have, your

8    Honor.

9          THE COURT:  Okay.  Cross-examination?

10          MR. MCNUTT:  No, thank you.

11          THE COURT:  Okay.  All right.  Thank you, sir.  You

12    are excused.

13          THE WITNESS:  Thank you.

14          MR. HEMME:  Your Honor, for our next witness it's

15    going to be Timothy Doede, who will be appearing by his

16    videotaped deposition.

17          THE COURT:  Okay.

18      (The video was played.)

19          THE COURT:  May we stop this at this point?

20    Thanks.  We are going to need to turn that a little bit

21    louder.  I assume counsel would not request the court

22    reporter to report the videotaped deposition as it's being

23    played.  We have a written --

24          MR. HEMME:  Correct, we can --

25          THE COURT:  -- transcript.  So that should be --

1  gives us what the total in pesos is, right?

2  A.  Yes.

3  Q.  Then it's been converted to US dollars in the next

4  column?

5  A.  Uh-huh.

6  Q.  And then the next column is liabilities in dollars, and

7  that would be for just those liabilities that only existed in

8  dollars, right?

9  A.  Exactly.

10  Q.  Then the next one would be total paid by Nery's or

11  dismissed, so that's something that actually was paid by

12  Nery's or they were able to get someone to agree that they

13  didn't owe it?

14  A.  Exactly.

15  Q.  For example, on the $285,295.80 lien, which is category

16  4, Nery's never paid that, right?

17  A.  Yes, they never paid.

18  Q.  And Targa never paid that, right?

19  A.  No, sir.

20  Q.  It was dismissed or --

21  A.  Yes, it was dismissed, but after the fact that John

22  acquired the company.

23  Q.  Then I see that the next column would be payments that

24  were just actually made in pesos?

25  A.  Uh-huh.

1  ahead.

2  Q.  You want me to restate the question?

3  A.  Yes, please.

4  Q.  My question is -- make sure I understand this -- that

5  this represents -- what you're stating by this summary is

6  that since February of 2010 to the present time, which would

7  be what, a little over three years, Nery's or Targa has paid

8  $241,122.69 towards these obligations?

9  A.  Yes, sir.

10 Q.  So not all of the obligations have been paid; is that

11 right?

12 A.  Some of them still in dispute, okay.

13 Q.  Which ones are in dispute?

14 A.  I think some of the related employees that -- for

15 instance, I think -- let me see.  Hold on.  Hold on.  Hold

16 on.  Yeah.

17 Q.  You need to refer to Exhibit 308 to determine which ones

18 are in dispute?

19 A.  Some social security payments still on the labor courts.

20 Q.  Okay.  So which category is that?

21 A.  Hold on.  Hold on.  Hold on.  Hold on.  Let me see it

22 here.

23        THE COURT:  We're still working with 307, are we

24 not?

25        MR. HEMME:  Correct.  That's what's been --

1                United States District Court

2              Southern District of California

3

4    GENESIS MERCHANT PARTNERS, LP,)
     a Connecticut corporation,    )
5                                  )
                    Plaintiff,     )
6                                  )
        vs.                        ) Case No. 11-CV-1589 JM
7                                  ) Bench Trial, Day 3
     NERY'S USA, a Nevada          ) Volume 3
8    corporation, et al.,          )
                                   )
9                   Defendants.    ) Wednesday, June 26, 2013
     _____)
10                                 )
     AND RELATED CROSS-ACTIONS.    )
11

12           Before the Honorable Jeffrey T. Miller
                United States District Judge

13

14   Appearances:

15   For the Plaintiff:      Jerry D. Hemme, Esq.
                             GOOD HEMME & PETERSON
16                           6256 Greenwich Drive, Suite 300
                             San Diego, CA  92122
17
     For the Defendants:     John J. McNutt, Esq.
18                           MCKENNA LONG & ALDRIDGE
                             600 W. Broadway, Suite 2600
19                           San Diego, CA  92101

20

21   Official Court Reporter: Debra M. Henson, CSR, RPR
                              U.S. Courthouse
22                            221 W. Broadway, Suite 5190
                              San Diego, CA  92101
23                            (619) 238-4538

24

25           Record produced by stenographic reporter

1  decision to sell Targa, right?

2  A.  I don't know that's true.  They made a decision to do

3  whatever it took to survive.  And when Sandro got word that

4  nothing was going to happen with that other company, shortly

5  after is when the suggestion came up that maybe I'd buy

6  Targa.

7  Q.  And do you remember who made that suggestion?

8  A.  I really don't.  I believe it was Sandro, but I -- yes,

9  I'm sure me buying Targa was not in the top of my mind, so

10  I'm sure Sandro made the suggestion.

11  Q.  But in any event, you thought it was a good idea?

12  A.  I was saw the possibilities, yes.

13  Q.  Right.  And so then you entered in -- you at least gave

14  Nascent a letter of intent.  That's Exhibit 8, right?

15  A.  Yes, we drafted a letter of intent somewhere around that

16  conversation.

17  Q.  And take a look at Exhibit 8 in your white book there.

18  Is that the letter of intent that you drafted?

19  A.  Seems to be.

20  Q.  That's essentially an offer to pay $2 million cash for

21  Targa, right?

22  A.  Correct.

23  Q.  Now, at that point in time -- you had had no prior

24  experience with food distribution companies in Mexico, right?

25  A.  Other than my advisory services and certain understanding

1  looked at some of those for Targa.

2  Q.  But Targa at that time wasn't really operating at a

3  profit, was it?

4  A.  It was barely operating at all.  Early on in the year,

5  it -- it was doing a little cut-and-wrap as part of that

6  licensing agreement with Zahava, and then around the time

7  that this first letter of intent was generated, it was doing

8  nothing but collecting the royalties.  So it seemed to be an

9  idle company to me with very little business, somewhere

10  housing some storage, some cut-and-wrap for other labels, but

11  revenues that amounted -- that amounted to a few thousand

12  dollars a month.

13  Q.  Well, what's your recollection of how much Zahava was

14  paying per month in royalty fees?

15         THE COURT:  Well, before we get there, the question

16  was whether or not Targa was operating at a profit.  And did

17  your review allow you to determine whether or not Targa was

18  operating at a target (sic) irrespective of how small a

19  profit may have been generated?

20         THE WITNESS:  It was operating at a loss.

21         THE COURT:  Okay.  Thank you.

22         BY MR. HEMME:  Q.  And generally the income at that

23  point was around ten grand a month, is that right, ten to 15?

24  A.  It varied.  Most of the income was the royalty stream

25  from -- or the income from the Zahava deal, which changed

1  again halfway through the year, but --

2  THE COURT:  The question was not where this income

3  was coming from, sir; the question was was it operating at

4  about $10,000 per income -- income per month.

5  THE WITNESS:  Sorry, your Honor.  I'll be more

6  careful.

7  THE COURT:  Yes.  Well, it helps me though.  These

8  questions are pinpointed questions, so if there's a specific

9  question that can be answered -- for example, is it true that

10  Targa was operating at about $10,000 income per month, that

11  could be answered yes or no.  And if you need to explain, I'd

12  like you to have that opportunity, Mr. Cathcart, okay, either

13  now during examination by Mr. Hemme or later on.  But the

14  question was was Targa operating at about $10,000 income per

15  month, if you know.

16  THE WITNESS:  I'll answer this way:  Between ten

17  and 15.

18  BY MR. HEMME:  Q.  Okay.  So between ten and

19  $15,000 a month, and the large majority of that was coming

20  from the Zahava royalty payment; isn't that correct?

21  A.  I believe so.

22  Q.  And then the costs of Targa in this July '09 to the end

23  of the year time frame were running about 25 to $30,000 a

24  month, weren't they?

25  A.  It depended on the staff.  At high end, if they were

1   Q.  And then Zahava, when they got their license, they tried
2   to go more national, right?
3   A.  I don't know that.
4   Q.  You don't?  The other asset that Targa had of value was
5   the cigarette permits, right?
6   A.  Yes.
7   Q.  You saw those as a valuable thing?
8   A.  Potentially, yes.
9   Q.  And ones you felt with working capital you could profit
10  from those permits, right?
11  A.  Takes working capital and a supplier and distributor,
12  yes.
13  Q.  Now, at the time you did your letter of intent, you were
14  aware that Genesis had a security interest in all of
15  Nascent's assets, including Targa and the Nery's brand,
16  right?
17  A.  Yes.
18  Q.  So initially it was the intent of you and Mr. Piancone to
19  raise money to pay off the Nery's debt and then move forward
20  with the company without that debt, right?
21  A.  Yes.
22  Q.  Got it?
23  A.  Yes.  Thank you.
24  Q.  Okay.  So you went through a period of time where you
25  tried to raise the money, and Mr. Piancone, he testified that

1   he had helped try and reach out to sources he had, but the

2   markets had changed at that point in time, hadn't they?

3   A.  Yes.

4   Q.  And the -- describe how the markets, financial markets

5   had changed in the summer of 2009.

6   A.  '08 was the start of the real estate meltdown, which had

7   effect through all the financial markets, brokerage markets,

8   crumbled a lot of value throughout the investment community

9   and pretty much put anything that was going on on hold.

10   Q.  And it certainly affected the profits in a lot of

11   businesses, didn't it?

12   A.  I don't know.

13   Q.  Well, and the businesses -- at that time how many

14   businesses were you involved in?

15   A.  One.

16   Q.  That Targa?

17   A.  No.

18   Q.  Another one?

19   A.  In '08?

20   Q.  Yes.

21   A.  No.

22   Q.  Did the financial meltdown affect that business?

23   A.  The one I was working with?  No.

24   Q.  Yes.

25   A.  It wasn't in the United States.

1   perhaps the accounts payable.

2   Q.  Well, you were given a profit-and-loss statement, right?

3   A.  Yes.

4   Q.  As of what dates?

5   A.  I don't recall.

6   Q.  You were given balance sheet?

7   A.  Probably, yes.  I just don't recall.

8   Q.  And any books and records that were available were --

9   certainly you had access to them if you wanted to?

10  A.  Yes.

11  Q.  And after you reviewed the records that you did review,

12  you concluded that there were errors in the records, right?

13  A.  I would find inconsistencies, numbers that wouldn't add

14  up one quarter, the next quarter, the next quarter that had

15  the previous quarter on it wouldn't match.  There were just

16  subtle enough differences that I -- I'd see a few errors, and

17  it'd just become unreliable to me.  But they gave me ballpark

18  numbers.

19  Q.  So prior to your purchase of Targa, you knew that their

20  financial statements were unreliable and there was

21  inconsistencies, right?

22  A.  Yes.

23  Q.  And some of those inconsistencies were between the

24  balance sheet and the payables, right?

25  A.  I don't recall that was recorded on the balance sheet and

1  the accounts payable/accounts receivable.  I don't recall if

2  that was one of them or not.

3          MR. HEMME:  Like to read from Mr. Cathcart's

4  deposition, your Honor.

5          THE COURT:  Okay.

6          MR. HEMME:  Page 53, lines 16 through 24.  Actually

7  let's go into line 10 to give it some context.  So line 10,

8  through 24 on page 53.  "Question:  "At the time you were

9  entering into this negotiation or at this stage of

10  negotiations, October-November" --

11          THE REPORTER:  Can you slow down just a little.

12          MR. HEMME:  Yes.  "-- 2009, had you reviewed any

13  financial statements of Targa?

14          "Answer:  I'm sure I had seen sets of numbers,

15  correct.

16          "Question:  Sets of numbers versus formal financial

17  statements?

18          "Answer:  Well, a -- a set of numbers produced in

19  Mexico, which typically took a little bit different than" --

20  I'm sorry -- "which typically look a little bit different

21  than the financial statements you see in the United States.

22  Through this, as I updated numbers occasionally, I could find

23  errors in them.  They were somewhat unreliable as they had

24  some inconsistencies between, you know, balance sheets,

25  payables.  I received an accounts receivable" -- well, that

1  was the line 24.  We'll stop there.  I'm sorry.

2  We'll continue on to page 54, line 8, which is the

3  balance of the answer.  "I had an accounts receivable and an

4  accounts payable and there were millions of dollars on them

5  that were offsets between other Nascent intercompany transfer

6  transactions, which would all come off and did.  There were

7  payables and receivables on there three years old, I think

8  some five years old.  But, you know, the certainly two and

9  three years old, which is kind of meaningless.  Are they

10  still owed or not?  Are they?  Still, I did not find them

11  completely reliable."

12  THE COURT:  I don't know how much of a record we

13  got there after the court reporter asked you to slow down.

14  But in any event, if you're going to be reading in the

15  future, I suggest your voice up at all times and slow down

16  just a tad.

17  MR. HEMME:  Thank you, your Honor.

18  THE COURT:  Thanks.

19  BY MR. HEMME:  Q.  These financials you were given,

20  they were unaudited, right?

21  A.  Correct.

22  Q.  And you received a lot of that information that you --

23  about the financials of the company from Mr. Piancone, right?

24  A.  Either he would deliver them to me or Bill Lindberg or --

25  yeah, I guess they would have directly come through Sandro

1  right?

2  A.  Correct.

3  Q.  And that was as a result of a supplier, a U.S. supplier,

4  who had not been paid for cheese that it supplied to Targa,

5  right?

6  A.  Yes.

7  Q.  And that supplier had bought insurance through the Exim

8  Bank, and Exim Bank paid the supplier off, right?

9  A.  Correct.

10  Q.  And then so it essentially was a subrogation claim by the

11  Exim Bank, right?

12  A.  I'm not sure of the definition of that word, but I think

13  my answer's yes.

14  Q.  The Exim Bank had the right to come collect the money,

15  right?

16  A.  Yes.

17  Q.  And so it -- as far as you knew, it was a legitimate

18  debt, right?

19  A.  Yes.

20  Q.  You were also aware that the landlord had not been paid,

21  right?

22  A.  Yes.

23  Q.  And the landlord for the facility at Targa in Mexico had

24  not been paid for several months prior to the closing, right?

25  A.  At the time I was told a few months.

1  Q.  You had no conversations with the landlord prior to the

2  closing, right?

3  A.  No.

4  Q.  You thought the landlord would forgive the rent if you

5  entered into a new lease and started paying rent, didn't you?

6  A.  Yes.

7  Q.  Rather than contact the landlord to find out if he would

8  make such a deal, you just went forward with the closing with

9  blind optimism or confidence that you could -- would be able

10  to deal with the landlord, right?

11  A.  Well, there were reasons for that, but yes.

12  Q.  And it wasn't till after the closing that you found out

13  that the landlord would not forgive the rent, right?

14  A.  Correct.

15  Q.  Now, the rent would not -- the past due rent would not be

16  like an account payable; isn't that correct.

17  A.  I think it would be.

18  Q.  Now, prior to the closing you did not hire an accountant

19  to review the financial records of Targa, right?

20  A.  Correct.

21  Q.  And the sellers did not refuse -- Targa or Nascent,

22  neither one of them refused to give you anything you asked

23  for, right?

24  A.  Correct.

25  Q.  And you didn't care as much about the business of Targa

1   and directors list until it was due the following year, June.

2   Q.  Why don't you take a look at Exhibit 136.

3   A.  Can you point me to which binder?

4   Q.  That's probably in the first black binder.

5   A.  Okay.

6   Q.  Do you see that?

7   A.  Yes, I do.

8   Q.  And what is it?

9   A.  That I'm memorializing when I removed him from the board

10  of directors.  This was when they would have been due in the

11  annual update.

12     (Exhibit No. 136 identified.)

13  Q.  Right.  So this says it was resolved and accepted the

14  resignation of Sandro Piancone as director as of June 2011,

15  right?

16  A.  Correct.

17  Q.  And you've signed that as of June 12, 2012?

18  A.  Sure that's when I signed it.

19  Q.  That's your signature there?

20  A.  Yes.

21  Q.  And you're memorializing that the resignation actually

22  took place in June of 2011, right?

23  A.  This is when I formally removed him.  I no longer

24  included him in board operations well before this.

25  Q.  Right, but -- so he remained as a board member of Nery's

1  for the first year after the closing and then some?

2  A.  Technically, yes.

3  Q.  Well, it's more than technical.  You put him on the board

4  and then he didn't resign until January 11, right?

5  A.  Yes.

6  Q.  Or June 2011?

7  A.  Yes.

8          MR. HEMME:  I like to move 136 into evidence, your

9  Honor.

10          THE COURT:  136 is admitted.

11      (Exhibit No. 136 admitted.)

12          BY MR. HEMME:  Q.  So after the closing you then

13  terminated the Zahava license agreement, right?

14  A.  At one point, yes.

15  Q.  But they still kept selling Nery's cheese, didn't they?

16  A.  I believe they stopped for a little while, but yes.

17  Q.  And Zahava's direct competition with Targa hurt Targa's

18  sales, didn't it?

19  A.  In some facets, yes.

20  Q.  Was more than some facets.  They sold cheese under the

21  Nery's brand for less than what Targa was selling it, right?

22  A.  Correct.

23  Q.  And that direct competition hurt Targa's profits, didn't

24  it?

25  A.  Yes.  Some customers would complain about pricing in

ER255

1 other stores.

2 Q.  I just asked you whether it hurt the profits or not.

3 A.  Yes.

4 Q.  It reduced the amount of Nery's brand cheese sales that

5 should have been realized, right?

6 A.  Yes.

7 Q.  And another event which occurred in 2010 after the

8 closing which affected Nery's Targa sales was the imposition

9 of a 25-percent duty on imported cheese by the Mexican

10 government?

11 A.  For a short period, yes.

12 Q.  Well, that probably lasted to about six to nine months of

13 that year, right?

14 A.  No.

15 Q.  The reason why it affected the sales is because the cost

16 of the imported cheese increased by 25 percent; is that

17 right?

18 A.  That was the effect, yes.

19 Q.  So you either had to eat the cost or charge more for your

20 cheese, right?

21 A.  Yes.

22 Q.  There was no pun intended on eating the cost there.  It

23 was a short period of time that the import tax impacted the

24 sales, but it was few months, wasn't it?

25 A.  Well, the impact was really a few weeks.  Everybody's

A. Yes, I'm sure I did a few times during the negotiations, but I think ultimately what seemed to be around the December time frame -- and some of the time line changed my memory, but certainly through January I had no intent of doing this deal.

Q. Why?

THE COURT: December of '08 to January '09?

THE WITNESS: Sorry, no, your Honor. December '09 --

THE COURT: '09 to '10.

THE WITNESS: -- but certainly in January of '10.

BY MR. MCNUTT: Q. Why?

A. It looked rough. It was a start-up, it was a challenge, and on top of that, I was trying to work with Genesis in this, and I did not enjoy working with them.

Q. When you say a start-up, did you mean you would be starting up Targa from scatch? Targa was an existing company at the time, right?

A. Yeah, but it was, again, not literally but figuratively it was idle; there was nothing really going on.

Q. So to restart production would require a significant injection of working capital. Did you have a person who would give you that working capital?

A. Ultimately the 300,000 that is throughout these negotiations, yes, I had a commitment for that capital.

1  MR. MCNUTT:  Sure, your Honor.  I'm asking

2  Mr. Cathcart to offer testimony about the existence of

3  company liabilities --

4  THE COURT:  I know what you're going to -- would

5  you just repeat the question so I can --

6  MR. MCNUTT:  Sure.

7  BY MR. MCNUTT:  Q.  Mr. Cathcart, were there

8  liabilities of Targa that you ended up paying that did not

9  end up in Exhibit 308 in 2010?

10  A.  Yes.

11  Q.  And how did you pay those liabilities?

12  A.  Well, a lot of them were in cash because that's customary

13  in Mexico for immediate credit.  People don't trust a check

14  or sometimes even a cashier's check.

15  Q.  And why don't we have the documentation that we can add

16  into Exhibit 308 from the liabilities that were paid in cash?

17  A.  Well, everything went into 308 that we had documentation

18  for.  There were some items, especially those first few

19  visits from the tax authority where they levied a notice and

20  got paid, whether check or somebody went and got cash and

21  paid it.  A lot of that initial paperwork was lost.  The

22  company in those first few weeks was in disarray still.  I

23  didn't show one day with a crack accounting team.  And there

24  was also subsequent turnover because everybody who stayed

25  started to believe that we were going to be shut down, so

1   the labor fulfillment part in this contract, no unfunded
2   labor costs.
3   Q.  Okay.  We'll get to the labor section here in a minute.
4   Let me ask you a question I'm sure everyone has in their
5   minds.  When this aguinaldo liability came in, why didn't you
6   immediately file a lawsuit against Nascent to rescind this
7   contract for breach of the warranty?
8   A.  At that point it wasn't really material; it was five or
9   $6,000.
10  Q.  Okay.  So at some point did all of these liabilities
11  coming in the door give you cause to believe that Nascent had
12  breached this contract?
13  A.  Absolutely, a technical breach, and when it became
14  material, it was a matter of weeks.
15  Q.  Any particular reason why you didn't file a lawsuit
16  against Nascent to rescind the contract?  Did you have
17  conversations with Mr. Piancone about these problems?
18  A.  I brought every problem to his attention, and along the
19  way he had told me there's nothing Nascent can do about it,
20  Nascent doesn't have any money; so I had a choice to fold or
21  keep fighting, and I kept fighting.
22  Q.  Would it have been a pointless act to sue Nascent?
23              MR. HEMME:  Objection; calls for speculation.
24              THE COURT:  Sustained.
25              BY MR. MCNUTT:  Q.  Did you believe there would

1  transaction to satisfy yourselves that Targa was a company

2  you wanted to buy?

3  A.  Yes.

4  Q.  And, in fact, on page 27 of the agreement, as one of the

5  closing conditions in Article 7 (k), there's a due diligence

6  provision that says the buyer shall be satisfied in its sole

7  absolute discretion with the results of its legal, financial,

8  or business due diligence investigations of the company and

9  sellers.  And you -- in signing this agreement in closing,

10  you represented that you had completed that provision, right?

11  A.  To say yes or no, I'd say yes.

12  Q.  You've made a characterization or a comment that Nascent

13  was responsible for anything above $150,000, right; that was

14  your understanding?

15  A.  Yes.

16  Q.  And so the consequence of any representation being

17  breached as you saw it or these additional liabilities, that

18  would be Nascent's responsibility, right?

19  A.  Yes.

20  Q.  And to handle that claim, should that violation occur,

21  isn't that the reason why Article 8 for indemnification was

22  inserted into this agreement?

23         MR. MCNUTT:  Objection; calls for a legal

24  conclusion.

25         THE COURT:  Well, I don't think the question calls

1    for a legal conclusion.  You can question the witness as to

2    his understanding, if any, as to why Article 8 was placed in

3    the agreement.  You want to restate the question, counsel?

4         BY MR. HEMME:  Q.  Yeah.  Is it your understanding

5    the transaction, the deal that you made, that the

6    indemnification provisions of Article 8 were placed so that

7    if there was a breach of the reps and warranties, that that

8    would give your remedy vis-a-vis Nascent.

9    A.  That's my understanding of indemnification, yes.

10   Q.  And you -- when you read this agreement, you understood

11   those provisions, and that was your -- and when you signed

12   this, you accepted these provisions of Article 8 as the

13   applicable provisions of indemnity, right?

14   A.  For my understanding of indemnity, yes.

15   Q.  Now, 8.3 (a)(1) -- this is under indemnification

16   procedures -- says that the indemnitee shall give prompt

17   written notice to the indemnitor of the commencement of any

18   claim, action, suit or proceeding, or threat of or any states

19   which gives rise to the indemnification provisions.  And I

20   paraphrased that, but did you provide Nascent with any

21   written notice of these claims?

22   A.  In a way, yes.

23   Q.  You stated that you called Mr. Piancone up and told him

24   that, but are there any written notifications of

25   indemnification?

1  A.  I handed him some of the documents.

2  Q.  But you didn't -- so you handed him the actual claim

3  itself?

4  A.  Yes.  I did not formulate a letter or sentence.

5  Q.  That was my question.  Did you make any claims or -- to

6  the board of Nascent?

7  A.  I saw my conversations with Sandro as addressing the

8  board of Nascent.

9  Q.  Did you keep Nascent informed as to the activities that

10  you were doing to defend against these claims or take care of

11  them?

12  A.  Most of them, yes.

13  Q.  These initials on the lower right-hand corner of each

14  page, those are yours, right, at least one of them, the one

15  to the left?

16  A.  Yes.

17  Q.  The one on the right is Mr. Piancone?

18  A.  Correct.

19  Q.  And you haven't made an actual --

20          MR. MCNUTT:  Objection; calls for --

21          THE COURT:  I'm sorry.  I missed that question.

22          THE REPORTER:  I did too.  I was just going to ask

23  you to -- and I'm really having trouble hearing you.

24          THE COURT:  Yes, if you would speak a little more

25  slowly.

1  that have been asserted in the case, I don't think

2  Mr. Cathcart -- it's fair to ask him that kind of a question.

3       MR. HEMME:  Let me withdraw the question, your

4  Honor.

5       THE COURT:  Okay.

6       BY MR. HEMME:  Q.  Isn't it true, Mr. Cathcart,

7  that you don't believe that Mr. Piancone intentionally

8  misrepresented anything to you?

9  A.  Yes, that's correct.

10 Q.  Take a look at Exhibit 26.  This is the collateral

11 assignment of contracts; do you recognize this document?

12 A.  Yes.

13 Q.  Now, this document is not one that you signed, right?

14 A.  It was signed at closing.  I did witness it.

15 Q.  Well, my question is did you review this as part of the

16 contract documents?

17 A.  I don't believe so.

18 Q.  And that was because you didn't need to sign it?

19 A.  Correct, I wasn't a party to it.

20 Q.  Now, you've testified extensively --

21      THE COURT:  Counsel, let me interject for just a

22 moment.  Do we have a stipulation or at least an

23 understanding that there's no dispute as to who actually

24 drafted 22, the contract, the SPA?

25      MR. HEMME:  I don't think there's been any

1   Q.  Okay.  Well, let's look at Exhibit 35.  So this is --
2   looks like -- this is a similar email on the same day.  It's
3   from you back to Sandro, and at the top there's a byline that
4   says it's a start but needs work, we should get it out
5   tonight, right?  So you made some revisions to his email and
6   sent it back to him?
7   A.  That seems to be the case, yes.
8       (Exhibit No. 35 identified.)
9   Q.  Right.  And let's look at Exhibit 30 -- 36, I'm sorry,
10  Exhibit 36.
11  A.  Okay.
12  Q.  And this is a letter -- email on the same day,
13  October 10, 2010, from Sandro to -- looks like Fernando,
14  right?  There's an email address there with a copy to you,
15  right?  So was this the final letter that the two of you
16  worked out to send to Fernando at La Central?
17  A.  Without -- it seems to be.  I don't know if Sandro made
18  further edits or not.
19  Q.  There in the fourth paragraph it says both John and I can
20  assure you that Mister -- and Mr. Barosa that the company is
21  in sound financial position and has no liens or lawsuits that
22  could put the assets in jeopardy for the loan, right?
23  A.  Yes.
24  Q.  And that was a representation you made to La Central, and
25  that was certainly your belief and truth at the time, right?

1  A.  It was, yes.

2  Q.  So by saying it was in sound financial position, that

3  sounds like you had a few cash flow problems at the beginning

4  of your time with the business, but in October 2010 you were

5  on good footing again and moving forward, right?

6  A.  I thought I had a handle on all the liabilities because I

7  had paid for most of them up front and -- didn't know things

8  would trickle in the door, and I'm also saying that I

9  believed that the liens they found, by advice of my attorney,

10  that had been removed, although in fact had not been.

11  Q.  But then it was eventually removed, right?

12  A.  I believe in October of '11, so about a year later.

13  Q.  So after October of 2010 was the only substantial

14  surprise, this -- that you had to deal with was the $300,000

15  Mexican tax lien?

16  A.  Substantial -- other than learning about a transfer tax,

17  and I'm not sure when that came into play.

18  Q.  But that -- that was it?  I mean there was no more

19  knocking on the door, we're going to shut you down from the

20  authorities; you'd already taken care of those?

21  A.  I believe so.

22  Q.  In the meantime, starting in July of 2010, you stopped

23  paying on the Genesis note, right?

24  A.  Correct.

25  Q.  And by stopping the payments on the Genesis note, that

1  was the initial part of the schedule, $15,000 a month and

2  then at some point changed to $25,000 a month, that was

3  actually a savings or a positive effect on your cash flow by

4  not making those payments, right?

5  A.  No.

6  Q.  Well, you had testified that you -- in your projections

7  counted on making the debt service while you were also paying

8  the cost of the business and running it, right?  Was part of

9  your projections.

10 A.  I can't --

11 Q.  It was -- it was -- withdrawn.  You, when you bought this

12 business, projected that you were going to pay costs as

13 you're projected them plus the debt service, right?

14 A.  Correct.

15 Q.  And so then when you stopped paying the debt service,

16 while you may have had additional expenses, you also had less

17 debt service, right?

18 A.  It's not that simple, but yes.

19 Q.  Well, on a straight cash-in cash-out basis.

20 A.  My business plan to generate that cash was crushed, so --

21 Q.  Yeah, well --

22 A.  -- I don't know.

23 Q.  But one of the ways you dealt with your cash-flow crunch

24 was to not pay Genesis, right?

25 A.  Actually it's -- yes.

1   A.   Combined with the dollars, yes.

2   Q.   Yeah.  And when I go back to Exhibit 307, the only

3   payables -- the total of the payables on Exhibit 307 is

4   51,000 in pesos -- that was the conversion -- and 169 in U.S.

5   for a total of about 220.

6   A.   I'm sorry.  What document are you looking at?

7   Q.   It's 307, showing about $220,000 in payables owed.

8   A.   I don't think I have 307.

9   Q.   307's the one you just had in your hand.

10  A.   Oh, I apologize.  I'm sorry.  It is marked.  Okay.  I'm

11  sorry.  Where were you looking?

12  Q.   Lines 12 and 11.  Total payables are --

13  A.   Yes.

14  Q.   -- $220,000.

15  A.   Right.  And it looks like about 85,000 was paid.

16  Q.   Right.  And but that total of $220,000 is less than the

17  total payables that are on this Exhibit 80, right?

18  A.   Correct.  What was paid here is less than the totals on

19  the exhibit in Exhibit 80.

20  Q.   Now, let's take a look at Exhibit 48.

21  A.   Okay.

22  Q.   Exhibit 48 appears to be a profit-and-loss statement for

23  Commercial Targa in January through March of 2011, right?

24  A.   Correct.

25       (Exhibit No. 48 identified.)

1   Q.  And it also includes a balance sheet?

2   A.  Correct.

3   Q.  Balance sheet as of March 31, 2011?

4   A.  Correct.

5   Q.  And these numbers are all in pesos, right?

6   A.  Yes.

7   Q.  And if we look at the third page of the balance and

8   profit-and-loss statement --

9   A.  Okay.

10  Q.  -- it shows a net income of 2,439,317 pesos, right?

11  A.  Correct.

12  Q.  We divide that by 13, it's roughly $187,000 net profit

13  for that quarter, right?

14  A.  Correct.

15  Q.  Now, you offered an opinion as to what the value of Targa

16  was on the date of the sale, your testimony on --

17  A.  Yes.

18  Q.  -- direct.  Was that opinion based on solely on your own

19  investigation and work?

20  A.  Yes.

21  Q.  Isn't it true that you had also hired a business

22  valuation expert whose name was Mark Hayden to do a valuation

23  of Targa as of that day, right?

24  A.  Yes.

25         MR. MCNUTT:  Your Honor, Mr. Hemme and I stipulated

```
1                United States District Court

2               Southern District of California

3

4   GENESIS MERCHANT PARTNERS, LP,)
    a Connecticut corporation,    )
5                                 )
                    Plaintiff,    )
6                                 )
        vs.                       ) Case No. 11-CV-1589 JM
7                                 ) Bench Trial, Days 4 & 5
    NERY'S USA, a Nevada          ) Volume 4
8   corporation, et al.,          )
                                  )
9                   Defendants.   ) Thursday, June 27, 2013
    _____) Tuesday, July 2, 2013
10                                )
    AND RELATED CROSS-ACTIONS.    )
11

12          Before the Honorable Jeffrey T. Miller
                United States District Judge
13

14  Appearances:

15  For the Plaintiff:      Jerry D. Hemme, Esq.
                            GOOD HEMME & PETERSON
16                          6256 Greenwich Drive, Suite 300
                            San Diego, CA  92122
17
    For the Defendants:     John J. McNutt, Esq.
18                          MCKENNA LONG & ALDRIDGE
                            600 W. Broadway, Suite 2600
19                          San Diego, CA  92101

20

21  Official Court Reporter: Debra M. Henson, CSR, RPR
                             U.S. Courthouse
22                           221 W. Broadway, Suite 5190
                             San Diego, CA  92101
23                           (619) 238-4538

24

25          Record produced by stenographic reporter
```

1   Exhibit 132 in the book.

2           THE COURT:  132?

3           MR. HEMME:  Yeah.  His declaration is marked as an

4   exhibit.

5           THE COURT:  I didn't hear the last.

6           MR. HEMME:  132 is marked as an exhibit in the

7   exhibit notebook.

8        (Exhibit No. 132-11 identified.)

9           THE COURT:  132, okay.  Why don't you check that,

10  Mr. Cathcart.

11          THE WITNESS:  Do you know what book, Mr. Hemme?

12          BY MR. HEMME:  Q.  It would be the first black

13  volume.

14  A.  Okay.

15  Q.  All right.  So at paragraph 29 --

16  A.  Okay.

17  Q.  -- this would be in, what was it, February 1st, 2012,

18  right?

19  A.  Okay.  I didn't look at the front page.  Yes.

20  Q.  At paragraph 29 you stated that the Nery's actual total

21  sales and net profit loss for 2010 and 2011 were, 2010, a net

22  loss of $896,000 on sales of $20,880,000; and 2011, a net

23  profit of $24,000 on sales of three -- $38,720,676, correct?

24  A.  That's what this says, but I --

25  Q.  And that's what you said under penalty of perjury in this

1  Esmeralda this week?  Who is Esmeralda?

2  A.  A cheese distributor.

3  Q.  Is that a cheese distributor that you had given the

4  Nery's license to?

5  A.  Never gave them the license.  They were an exclusive

6  distributor.  I did all my own cutting and wrapping and

7  labeling of cheese.

8  Q.  I see.  Then on the next paragraph, it says that I have

9  to call Tim and not positive what to say.  Do I give him hope

10  or tell him I can't -- can't do it.  I am not sure what they

11  will do, but the payment before year end will take a lot of

12  pressure off while we try to take them out.  See that?

13  A.  Yes.

14  Q.  It sounds like what you're talking about there is you

15  were contemplating making another payment to Genesis?

16  A.  Yes or no or --

17  Q.  Yes, one -- tell me what you meant by that.

18  A.  What I meant is Tim had called me and asked to try and

19  get a payment in towards the end of the year, it would help

20  reflect better on Genesis's books?

21  Q.  Okay.

22  A.  So I said I would try.  And I'm under cash pressures,

23  didn't know if I'd have the money or not by the time the day

24  got there that I needed to roll it out, so -- send it out,

25  and that's what this is saying.

ER271

1   Q. Okay. And so you actually did make that third payment

2   shortly thereafter, right?

3   A. I mailed it out or FedEx'd it about then. Because of the

4   holidays, I don't think he got it for a few days.

5   Q. I think he got it the first part of January, but that's a

6   stipulated payment; that's -- this is the email that preceded

7   that payment?

8   A. Yes.

9   Q. And then the last part of that clause, it says, while we

10   try to take them out. Are you referring to you still wanted

11   to try and get them paid off?

12   A. Yeah, I'm still trying to raise money or capital or bring

13   in new investment capital to pay down the Genesis note, and

14   that's what I mean by take them out, pay off the debt.

15   Q. So at that point in time, you were still intending to

16   keep Targa and move forward, right?

17   A. At that point yes.

18          MR. HEMME: That's the questions I have, your

19   Honor.

20          THE COURT: Anything further, Mr. McNutt?

21          MR. MCNUTT: No, your Honor. Well -- I'm sorry --

22   not from Mr. Cathcart. Actually no, I'm done because we got

23   the Watson thing. Right, yeah, yeah, your Honor, I'm done.

24   Defense rests.

25          THE COURT: I've got a --

1  happened in this case; it really did happen.

2        So that's how the contract works, and if we get

3  into post-closing, Cathcart opens for business with his

4  bucket of liabilities, $150,000, but he claims that these

5  things just started walking through the door, destroyed his

6  ability to make the business successful.  But it's critical

7  -- what's really critical is to examine his cash flow in

8  detail because that's something that the defense really

9  didn't do.

10        The one missing summary here is when did he

11  actually have to make these payments and when did he make

12  them.  So I took a look at Exhibit 308 and created a little

13  summary I just gave the Court, and that's very telling.

14        If you look at the first year -- all I did was I

15  went to the documents in 308 under each tab and find out when

16  he actually paid stuff.  The checks are there, the date, they

17  have a little summary in front of each tab that actually

18  identifies when things were paid.  So let's take a look at

19  the first year, and what you have is in March -- that's when

20  most of it came through the door -- it totaled $48,000.   In

21  April there was only $3,000 paid.  May, 4200; June, 11,800;

22  July, $50; August, nothing; September, $12,538; and then

23  5,073 in October; 3269 -- those are the rent payments, the

24  past-due rent payments in November and December.  So all told

25  in 2010, Cathcart paid a total of $93,000.  But look what he

1    didn't pay on the note:  He didn't pay $127,000 on the note,
2    so that's a positive gain in his cash flow.

3           So had Nascent given him the money for the $93,000,
4    he'd have been indemnified, he'd have been made whole, and he
5    would have had to turn around and pay $127,000 to Genesis.
6    But he didn't pay that.  So as a practical matter, he was
7    indemnified because he ended up actually -- he's in better
8    shape, actually has an extra $40,000 in his pocket in year 1.

9           Take a look at 2011, the next one.  The total paid
10   that year was $69,000.  The note payments not paid, $184,250,
11   and the note was due that August.  At that point in time,
12   Mr. Cathcart had intended to go out and raise money and pay
13   them off.

14          Now, if you add up these claims, he doesn't exhaust
15   his $150,000 bucket until October of 2011, and that's
16   including the rent payments.  If you take the rent payments
17   out of, which he already knew about, the total to date is
18   only $148,000 that he's actually paid.

19          If you look in exhibit -- the next page of the
20   exhibit is 12, 2012, and it dropped even lower.  The large
21   majority of the payments are to the unpaid rent and the
22   employment housing tax.  The liabilities paid that year,
23   $41,000.  After May of 2012 there's nothing paid other than
24   this 5422; you can see that's paid in September, November,
25   December, and then 2013, January through June, exact same

1  payment.  And if you look at that tab -- it's under accounts
2  payable for '11, those payments are being made to Rob
3  Piancone; that's Sandro's brother.  Apparently the way the
4  document states, he had made a $50,000 loan to Targa, so they
5  were paying that back; so Mr. Cathcart's paying back Sandro's
6  brother in the last year, but he's not paying any other
7  accounts payable.

8          On the third page I gave you the yearly totals and
9  then it shows on the summary that if you include the rent,
10  the total gain in cash flow is $2,250,000.  So Mr. Cathcart
11  has -- and Nery's have already been indemnified for these
12  undisclosed liabilities or whatever you want to call them,
13  but they were dealt with, and he hasn't -- they are certainly
14  not what impacted his cash flow.

15          Now, I went through that analysis because I asked
16  Mr. Cathcart to -- on the stand, I took --

17          THE COURT:  In your view, offsets equal
18  indemnification.

19          MR. HEMME:  Correct.  It's a form of payment.

20          THE COURT:  Offsets equal indemnification.

21          MR. HEMME:  Yes.

22          THE COURT:  Is it your claim that by not making the
23  payments, Nery's breached the contract?

24          MR. HEMME:  Yes.

25          THE COURT:  So offsets equal indemnification, but

1  Jerry D. Hemme, Esq. [SBN 99010]
   Arnold Neves, Jr., Esq. [SBN 109711]
2  **GOODE, HEMME & PETERSON**
   6256 Greenwich Dr., Suite 500
3  San Diego, California 92122
   Tel: 858.587.3555
4  Fax: 858.587.3545
   jhemme@sandiegoattorney.com
5  aneves@sandiegoattorney.com

6  Attorneys for Plaintiff/Counter-Defendant
   GENESIS MERCHANT PARTNERS, LP

7

8                **UNITED STATES DISTRICT COURT**

9          **FOR THE SOUTHERN DISTRICT OF CALIFORNIA**

10  GENESIS MERCHANT PARTNERS, LP, a        Case No.  11CV1589 JM WVG
    Connecticut corporation,                *Complaint Filed 7/19/11*
11
                    Plaintiff,              **PLAINTIFF'S TRIAL BRIEF**
12  v.

13  NERY'S USA, INC., a Nevada corporation;  Trial Date:  June 24, 2013
    JOHN CATHCART, an individual; and        Time:    10:00 a.m.
14  COMMERCIAL TARGA, S.A. DE C.V., a        Ctrm:    16
    Mexican corporation;
15
                    Defendants.              Judge Jeffrey T. Miller
16  ──────────────────────────────          Magistrate Judge Hon. William V. Gallo
    NERY'S USA, INC., a Nevada corporation,
17
                    Counterclaimant,
18  v.

19  GENESIS MERCHANT PARTNERS, LP, a
    Connecticut corporation,
20
                    Counter-Defendant,
21  ──────────────────────────────
    NERY'S USA, INC., a Nevada corporation,
22
                    Third Party Complainant,
23  v.

24  NASCENT WINE COMPANY, INC., a Nevada
    corporation,
25
                    Third Party Defendant.
26

27

28

1       Plaintiff Genesis Merchant Partners, LP ("Genesis") submits the following Trial Brief in

2 support of its claims to be proven at trial:

### I.

### INTRODUCTION

5       This is a collection action by plaintiff Genesis Merchant Partners, LP ("Genesis") to recover

6 on a promissory note obligation ("Nery's Note") (Exhibit 23) owed by defendant Nery's USA, Inc.

7 ("Nery's"), and guaranteed by defendant Commercial Targa, S.A. DE C.V ("Targa"). Genesis holds

8 the Nery's Note as collateral for a promissory note signed by third party defendant Nascent Wine

9 Company, Inc. ("Nascent") in favor of Genesis ("Nascent Note") (Exhibit 1).

10       The amount owed under the Nery's Note is $2,978,682 as of June 24, 2013. The amount

11 owed to Genesis under the Nascent Note as of June 24, 2013 is $2,556,768, which together with the

12 collection costs, is the limit of Genesis' interest in the Nery's Note. Any balance owed after full

13 payment to Genesis would be owed to Nascent. It is undisputed that Nery's made only three

14 payments of $15,416.67 totaling $46,250.01 on the Nery's Note. The above balance includes credits

15 for those payments.

16       Plaintiff's case is simple. Genesis holds the right to collect on the Nery's Note up to the

17 amount it is owed on the Nascent Note. That amount is $2,556,768 plus collection costs. Those

18 facts are undisputed. The dispute lies in the defendants' claim that Nery's is entitled to equitable

19 offsets against the Nery's Note. As the court knows from prior motions, Nery's executed the Nery's

20 Note as consideration for the purchase of stock in defendant Targa, and agreed to assume no more

21 than $150,000 in liabilities. After the transaction closed, Nery's claims it discovered that the actual

22 liabilities of Targa were $930,000, not $150,000 as represented by Nascent and Targa.

23       As a result of the "undisclosed liabilities", Nery's contends, it was excused from any further

24 payments under the Nery's Note due to the cash flow problems it created. However, in less than a

25 year after the transaction closed, Targa was cash flow positive and operating at a profit. Still, Nery's

26 made no further payments on the Nery's Note. Nery's is taking the position that: 1) the "undisclosed

27 liabilities represent a breach of the purchase agreement and therefore Nery's is excused from further

28 performance under the Nery's Note, 2) if Nery's is still obligated on the Nery's Note, then it is only

1

ER277

1  required to pay the "fair market value" of Targa and the Nery's brand as of February 10, 2010 if all

2  of the "undisclosed liabilities" were known, and 3) as a backup position, the amount of "undisclosed

3  liabilities" should be deducted from the balance the Nery's Note.

4       The evidence will show that the amount of the "undisclosed liabilities" that Targa actually

5  paid is less than $300,000.  The evidence will further show that the amount of Nery's did *not* make,

6  exceed the amount of liabilities that Nery's did not anticipate.  In other words, Targa's actual cash

7  flow over the initial 18 months of the business was better than Nery's had projected.  Further,

8  $285,000 of the alleged "undisclosed liabilities" was a tax lien that did not arise until after the sale,

9  and Nery's was successful in having the lien removed without paying it.  Soaking wet, even the most

10  optimistic view of the "undisclosed liabilities" does not exceed $400,000.  Even with a credit of

11  $400,000, Genesis would still be entitled to full recovery because it has over $400,000 equity in the

12  Nery's Note above its debt.

13       As this brief will demonstrate, Nery's claims for negligent misrepresentation, rescission,

14  reformation and breach of contract against Nascent (which it wants to assert against Genesis) are

15  meritless.  Nery's ignores the very specific language of the purchase agreement which limits it

16  remedies to an indemnity claim against Nascent.  A claim for indemnity is Nery's sole remedy.  To

17  the extent that Nery's can prove actual loss due to liabilities which exceed $150,000, that amount

18  can be offset against the Nery's Note.  That is the defendants' case in a nutshell, and any attempt to

19  expand their claim beyond Nery's negotiated remedy of indemnity should be quickly rejected by the

20  Court.

21  ## II.

22  ## STATEMENT OF FACTS

23       This story begins with Sandro Piancone, John Cathcart and the Nascent Wine Company.

24  Nascent was a food distribution company that Piancone had taken public in 2006.  His goal was to

25  acquire other companies to grow the business.  Piancone met John Cathcart at an investor

26  conference; they hit it off and established a relationship.  Cathcart had been a sophisticated venture

27  capitalist and financial advisor since 1980.  Finding promising companies and helping them become

28  profitable was his business.  Consequently, Piancone retained Cathcart as a paid consultant to help

1   shepherd Nascent's acquisition plan.  Nascent promoted Cathcart as a member of its Board of

2   Advisors in the area of finance and business development.  Cathcart also became a shareholder in

3   Nascent.  From 2006 to early 2008, Nascent acquired nine companies.  One of those companies

4   Nascent acquired, with Cathcart's help, was Targa.

5          Nascent acquired Targa in late 2007.  Targa is a cheese distribution company in Mexico

6   which sells cheese under the brand name "Nery's".  The Arana family developed the Nery's brand

7   name in Baja, Mexico over 27 years and built a very profitable business.  Targa also held one of

8   three permits issued in Mexico to import tobacco which gave it a unique position to sell cigarettes

9   profitably.  At the time Nascent acquired Targa, it had sales of $7,000,000 per year and a net profit

10  of $1,200,000

11         By the end of 2007, Cathcart's work was done and he did not have much contact with

12  Piancone and Nascent in 2008.  As we all know, 2008 brought economic chaos, and Nascent was not

13  immune to the economic downturn.  In early 2009, Piancone and Cathcart reconnected.  Piancone

14  told Cathcart about the business problems Nascent was experiencing.  He also informed Cathcart of

15  the decline in Targa's business because Nascent was unable to provide the capital to purchase

16  inventory and take advantage of its unique market position in Baja, Mexico.

17         From his prior involvement in the acquisition of Targa by Nascent, Cathcart was fully aware

18  of the value of Targa and the Nery's brand.  Cathcart was interested in promoting the Nery's brand

19  in the United States, which was a market untouched by the Nery's brand.  On June 23, 2009, Nascent

20  granted Cathcart's newly formed corporation Nery's USA, Inc., a license to sell Nery's cheese in the

21  United States. (Exhibit 7).  While Cathcart had an interest in Mexico also, Targa had already

22  licensed the right to Nery's in Mexico to a company known as Zahava.  Zahava paid Targa a royalty

23  for the use of the Nery's brand.

24         At about the same time, Cathcart was also consulting with Piancone and the board of Nascent

25  to solve Nascent's financial difficulties.  They came to the conclusion that Nascent had to sell Targa,

26  its most valuable asset.  Nascent had been negotiating with a U.S. company for the sale of Targa, but

27  that deal fell through.  Cathcart then indicated an interest in purchasing Targa.  Piancone was more

28  than willing to sell the company to his friend and business associate.  Piancone was the Director

1  General for Targa, and Cathcart indicated that he would have a role in Targa after the purchase. It

2  seemed like the perfect solution.

3      On July 8, 2009, Nascent and Nery's USA (Cathcart's new corporation) entered into a letter

4  of intent agreement for the purchase of the stock in Targa.  (Exhibit 8).  Under the terms of the

5  agreement, Cathcart agreed to pay $2,000,000 for the stock of Targa and all rights to the Nery's

6  brand.

7      It is important to note that at the time Cathcart agreed to purchase Targa, the business was

8  barely functioning.  Its payroll of 30 employees had been reduced to about 8 employees.  Targa had

9  sales of less than $10,000 per month and expenses in the range of $20,000 to $25,000.  In other

10  words, Targa was operating at a negative and Nascent could neither afford to feed it nor inject

11  capital into Targa to revive it.  Cathcart was fully aware of these problems, yet willing to pay

12  $2,000,000 based on the high value he placed on the Nery's brand.  As he will testify, he was buying

13  a brand and a physical business which he thought he could revive.  The lack of positive cash flow at

14  the time of the sale was not important to him.

15      There was only one problem with this marriage made in heaven.  Nascent had borrowed

16  $1,000,000 from Genesis on March 31, 2008.  Genesis held a blanket security interest in all of

17  Nascent's assets, including Targa and the Nery's brand.  The loan was in default and Genesis had the

18  right to foreclose on the Targa assets.  The sale to Cathcart of Targa could not go forward unless

19  Genesis was paid off, or some other agreement with Genesis was worked out.  At first, Cathcart and

20  Piancone intended to raise the capital to pay off the Genesis debt.  From July to September 2009,

21  both of them sent out inquiries to investors and brokers soliciting capital investments.

22  Unfortunately, the capital markets were still reeling from the "Great Recession" and they could not

23  raise the money.

24      That left one alternative for Cathcart and Piancone:  strike a deal with Genesis.  Cathcart

25  negotiated directly with Genesis to have Genesis restructure its loan and permit Nascent to transfer

26  Targa to Nery's USA.  Genesis was open to the idea.  Its alternatives were to make a deal with

27  Cathcart/Piancone or take the Targa assets, including the Nery's brand, and sell them to someone

28  else.  The parties considered several different methods of structuring the transaction from September

ER280

1   2009 to January 2010.  One of the issues was the amount of capital Cathcart would inject into the

2   Targa business to get it going again and be profitable.  Initially, Cathcart proposed to raise

3   $1,000,000 to put into the business.  That amount was acceptable to Genesis.  However, Cathcart

4   later discovered could not raise that much money.  The most he could raise was $300,000.  He

5   reworked his projections for the Targa business and represented to Genesis that $300,000 would be

6   sufficient capital to restart the business, be profitable and make the payments to Genesis.  The only

7   consequence of not having $1,000,000 in working capital was slower growth for the company.

8   Genesis relied upon those representations and the parties reached an agreement on or about February

9   10, 2010.  The primary terms were as follows:

10      1.  Nascent would sell to Nery's USA all of its stock in Targa and its rights to the Nery's
            brand.

11

12      2.  Nery's would execute a promissory note to Nascent in the amount of $1,850,000.  The
            note had a payment schedule requiring seven monthly interest only payments of

13          $15,416.67; the monthly payments then increased to approximately $25,000.00 so as to
            include a monthly principal payment of $10,000, with the entire balance due and payable
            on August 10, 2011.

14

15      3.  Nery's would assume no more than $150,000 of Targa's account payables.

16      4.  Targa would guarantee the note "without offset".

17      5.  Nascent would then assign the note to Genesis along with the irrevocable right to receive
            all of the payments under the note until its obligation to Genesis was paid in full.  At the
            time of the transaction, Nascent owed Genesis about $1,450,000.  If all went well,

18          Nascent would receive the $400,000 difference on the back end.

19          These terms are reflected in the SPA (Exhibit 22), (signed by Piancone on behalf of Nascent

20   and Targa as their CEO, respectively.), the Nery's Note (Exhibit 23), the Guaranty (Exhibit 24), the

21   Direction Letter (Exhibit 25) and the Collateral Assignment (Exhibit 26).  The transaction closed on

22   February 10, 2010 and Cathcart took over.  Piancone remained as Director General for Targa, and

23   became a director of Nery's USA, Cathcart's company.  The SPA was a 100% financed transaction.

24   No money has been paid by Nery's for Targa and the Nery's brand except for three monthly

25   payments after the transaction closed which totaled $46,250.01.

26          According to Cathcart, he became aware of liabilities owed by Targa within a month of the

27   closing that were not anticipated and predated the sale.  Over the next few months, the amount of

28

ER281

1   alleged "undisclosed liabilities" grew larger. All told, the alleged liabilities of Targa according to

2   Cathcart were $930,604.16, not the $150,000 Piancone/Targa had represented to Cathcart.

3       Cathcart claims that the additional liabilities severely affected his ability to restart the Targa

4   business profitably. He will testify he had to devote money that would have purchased inventory to

5   satisfying the additional liabilities which were not in his projections for the business. At the same

6   time, Nery's was not making payments towards its note that was assigned to Genesis.

7       Claiming cash flow problems from the "undisclosed liabilities", Cathcart stopped paying

8   Genesis under the Nery's Note. He made the first two payments and then stopped. The Nery's Note

9   has been in default since June 10, 2010. Cathcart made one more payment in January 2011, but has

10  not made any payments since then. The three payments totaled $46,250.01; this fact not in dispute.

11  (See Pre-Trial Order, p. 3, lns. 9-10.)

12      Under the terms of the Nery's Note, the balance Nery's owes as of June 24, 2013 is

13  $2,978,682. Under the Nascent Note, Genesis is owed $2,556,768 as of June 24, 2013 and is entitled

14  to all payments made under the Nery's Note until paid in full under the terms of the Collateral

15  Assignment. (Exhibit 26.) Nery's has had ownership of the Targa assets and the Nery's brand since

16  February 10, 2010. Nery's has only paid $46,250.01 for those assets which it valued at $2,000,000.

17  Nery's continues to use Targa's assets to conduct millions of dollars of business and sell cheese in

18  Mexico. Targa is a profitable company.

19      Nery's attempts to justify not paying for the assets it purchased because it had to deal with

20  $780,000 of "undisclosed liabilities". However, the large majority of the $780,000 has either been

21  eliminated or not paid. Cathcart has admitted that he has only paid $235,629.16 of the liabilities,

22  and that $335,290.35 has been withdrawn and is not owed. As it turns out, three years after the

23  transaction closed, Targa still has not paid the $150,000 of the disclosed liabilities. That fact brings

24  into question whether it is in fact a liability. Moreover, Nery's mitigated against the impact of the

25  alleged liabilities by not making the payments due under the Nery's Note. The monthly payments

26  that Cathcart did not pay Genesis total $312,000.11. In other words, Cathcart used the money he

27  should have paid to Genesis to pay the "undisclosed liabilities", and had money left over.

28      The defendants' itemization of the "undisclosed liabilities" has been through the testimony of

ER282

1   John Cathcart. They have yet to produce the documents supporting the claim in a form that can be

2   reviewed by Genesis. The various liabilities that Nery's will assert at trial consist of the following

3   categories: 1) Employee Taxes and Benefits, 2) Import Tax, 3) Unpaid Rent, 4) Bank Payment

4   Demand, and 5) Accounts Payable. The particular amounts, and Genesis's response to each are as

5   follows:

6      1)   Employee Taxes and Benefits: $119,105.07

7          Response: These were taxes and penalties owed by Targa which apparently were not entered into the books and records of Targa by the accountant.
8          Piancone was not aware of them, and it was reasonable for him to rely on his accountants. At best, it was an innocent misrepresentation. Cathcart has not
9          paid $37,544 of this amount and is contesting it. To the extent that Nascent agreed to indemnify Nery's from this type of mistake, it is an offset against
10          Nascent's remainder interest in the Nery's Note.

11      2)   Import Tax: $285,290.30

12          Response: This was not an undisclosed liability. It did not arise until after the sale in July 2010 when the Mexican Government made the claim. The claim
13          was improper and based upon alleged import taxes not paid by the owners of Targa who sold the business to Nascent. The claim never arose during the
14          time Nascent owned Targa. Targa successfully challenged the claim and it was exonerated. The money is not owed, not paid and as a result, there is no
15          indemnification available.

16      3)   Unpaid Rent: $88,301.69

17          Response: This was not an undisclosed claim and hence no indemnity is available. Both Cathcart and Piancone knew that the rent had not been paid at
18          the time of the sale. Both of them incorrectly believed that the landlord would forgive the rent and let Targa enter into a new lease. Neither one of them
19          attempted to obtain that commitment from the landlord before the sale closed. Nery's cannot claim the offset because it relied upon a speculative premise
20          and did not take steps to protect itself.

21      4)   Bank Payment Demand: $149,250.81

22          Response: This was not an undisclosed liability. This is the liability that formed the basis for Targa's representation that the liabilities were about
23          $150,000. Because it was disclosed, there can be no indemnification. Further, the obligation was never paid.
24

25      5)   Accounts Payable: $288,656.28:

26          Response: For the most part, these are unsubstantiated claims against Targa. Nery's has successfully challenged one of the claims for $50,000. The
27          remaining claims of $233,000 are not being paid by defendants, and may never be paid if the claimants do not filed legal actions to collect. As time
28          passes, there is less chance that these claims will materialize. It is now three years after the sale closed and no legal claims have been asserted against

ER283

1   Targa. In any event, Nery's has not paid these liabilities nor have they been
    finally determined. Liability for, and hence, entitlement to indemnification
2   does not exist.

3       As the court can see, the "undisclosed liabilities" do not exceed $352,105 (the sum of the

4   employee taxes plus accounts payable). Nery's at best has only paid $235,290.30 of these liabilities

5   which includes $65,380 paid towards the unpaid rent. That amount does not include any payment

6   towards the $150,000 in liabilities that Nery's did agree to pay and has not paid. If the $150,000

7   known liability has been eliminated, then the extent of Nery's offset claim is $85,000 since it agreed

8   to assume $150,000. In any event, any offset below $400,000 does not affect Genesis' claim

9   because it is owed less than the amount Nery's owes on the Nery's Note.

10                                      **III.**

11                         **STATEMENT OF THE CASE**

12      Genesis filed its complaint against Nery's and Targa on July 19, 2011, seeking to recover on

13  the Nery's Note and Targa's Guaranty. (Doc. #1.) Nery's filed its Answer on August 19, 2011, and

14  asserted a number of affirmative defenses, including the right to setoff of claims against Nascent.

15  (Doc. #7.) At the same time, Nery's filed a third party complaint against Nascent for, among other

16  things, negligent misrepresentation, and rescission or reformation of the SPA and Nery's Note. (Doc.

17  #9.) Nery's did not allege a cause of action for intentional misrepresentation or intentional

18  concealment.

19      Following the taking of Nascent's default, Nery's applied for a default judgment. The Court

20  denied Nery's motion because default judgment would create a risk of inconsistency with future

21  judgments in the case and there was no showing of prejudice to Nery's. (Doc. #58, p. 6, lns. 2-5.)

22      Thereafter, on September 7, 2012, Nery's filed a motion for summary judgment ("MSJ").

23  The Court denied the MSJ in part and granted in part. (Doc. #111.) The Court granted the MSJ as to

24  all claims against defendant Cathcart; denied summary judgment as to Genesis' breach of contract

25  and unjust enrichment causes of action; and granted summary judgment as to Genesis' claims for

26  conversion and negligent misrepresentation. (Doc. #111, p. 2, lns. 9-12.)

27      The Ruling also resolved certain specific issues relevant to the trial in this case, namely, that

28  the Court found that Genesis was not a "holder in due course" on the Nery's Note (Id., p. 11, lns. 3-

ER284

1  4), and that Defendants are not entitled to any offsets under the Guaranty. (Id., p.16, lns. 13-14.)

2                                            IV.

3                        **GENESIS IS ENTITLED TO RECOVER**

4                        **UNDER THE TERMS OF NERY'S NOTE**

5      The starting point of the legal analysis, of course is Genesis' breach of contract claim to

6  establish its right to recovery.

7      **A.      Breach of Contract**

8      "A cause of action for damages for breach of contract is comprised of the following

9  elements: (1) the contract, (2) plaintiff's performance or excuse for performance, (3) defendant's

10 breach, and (4) the resulting damages to plaintiff." *Armstrong Petroleum Corp. v. Tri-Valley Oil &*

11 *Gas.* (2004) 116 Cal. App. 4th 1375, 1392.

12     Here, the principal contract consists of the Nery's Note.  By its expressed terms, Nery's

13 agreed to pay the principal amount of $1,850,000 to Nascent plus interest. (Exhibit 23).  A payment

14 schedule was included as part of the Note and provided for interest only payments until November

15 10, 2010, when an additional principal payment of $10,000 was added to each monthly amount.

16 Nery's Note then provides that the outstanding balance of principal and accrued but unpaid interest

17 became all due and payable on August 10, 2011.

18     "A contract must receive such an interpretation as will make it lawful, operative, definite,

19 reasonable, and capable of being carried into effect, if it can be done without violating the intention

20 of the parties." (Cal. Civil Code §1643.)  "The words of a contract are to be understood in

21 their ordinary and popular sense, rather than according to their strict legal meaning; unless used by

22 the parties in a technical sense, or unless a special meaning is given to them by usage, in which case

23 the latter must be followed." (Cal. Civil Code §1644.)

24     In the "Default" paragraph of the Nery's Note, Nery's is deemed in default if, among other

25 things, Nery's "fails to make any payment within ten (10) days of when due; . . . or [Nery's] fails to

26 perform promptly at the time and strictly in the manner provided in this Note or any agreement

27 including but not limited to the [SPA] related to this Note between [Nery's] and [Nascent] of even

28 date herewith . . . . (Exhibit 23, ¶5.)  The reference to the SPA only appears in the "Default"

ER285

1  paragraph and nowhere else in the Nery's Note.  Plaintiff is not suing Nery's for a default in its

2  performance under the SPA.  To the contrary, Genesis is asserting a breach of Nery's obligation to

3  make the payments required under its Note.

4       It is undisputed that Nery's only made three payments on its Note, totaling $46,250.01.

5  (Pretrial Order, p. 3, lns. 9-10.) As such, Nery's breached the payment terms of the Note. Nery's

6  obligations under its Note are straight forward and clear.  Genesis is entitled to judgment against

7  both Nery's and Targa (as guarantor) for the full amount due Genesis, plus attorneys fees.

8       The Nery's Note further provides, at paragraph 8(e), <u>Joint and Several Liability; Waiver of

9  Maker</u>, that Nery's "to the extent permitted by law, waives the benefit of any law or rule of law

10 intended for its advantage or protection as an obligor hereunder or <u>providing for its release or

11 discharge from liability hereon, in whole or in part, on account of any facts or circumstances</u> other

12 than full and complete payment of all amounts due hereunder, and f. agrees to pay, in addition to all

13 other sums of money due, all cost of collection and attorney's fees . . . if this Note is not paid in full

14 when due. . . ." (Emphasis added).  The California Commercial Code provides that an obligor on a

15 promissory note may waive the benefits of a law intended to protect him or her.

16      Cal.Com.Code § 3104 (a) provides:

17/18      Except as provided in subdivisions (c) and (d), "negotiable instrument" means an
          unconditional promise or order to pay a fixed amount of money, with or without
          interest or other charges described in the promise or order, if it is all of the following:

19/20/21/22  …(3) Does not state any other undertaking or instruction by the person promising or
          ordering payment to do any act in addition to the payment of money, but the promise
          or order may contain (i) an undertaking or power to give, maintain, or protect
          collateral to secure payment, (ii) an authorization or power to the holder to confess
          judgment or realize on or dispose of collateral, or (iii) <u>a waiver of the benefit of any
          law intended for the advantage or protection of an obligor.</u> (Emphasis added.)

24      By the express terms of Nery's Note, it expressly waived any claim of offsets under law that

25 would result in the full or partial discharge from liability for payment of the full amount due under

26 its Note.  Therefore, Nery's cannot claim that Nascent did not perform its obligations under the

27 terms of the Nery's Note as distinguished from the SPA.  The Nery's Note does not require any

28 performance on Nascent's part.  Nor were there any obligations owed to Nery's by Genesis under

1   the terms of the Collateral Assignment that were not fulfilled.

2          Under paragraph 2 of the Collateral Assignment (Exhibit 26), it was clearly understood that

3   "[t]his instrument is not an assignment or delegation of any duties or obligations under the

4   Contracts." (The term "Contracts" is defined in the previous sentence of the Collateral Assignment

5   as consisting of the SPA, the Nery's Note, and ancillary documents executed in connection with the

6   SPA.)

7          As such, Genesis received all the benefits of performance under the 'Contracts", but it did

8   not assume any duty or obligation of Nascent, including the obligation of indemnification set forth in

9   Article VIII of the SPA that may be owed to Nery's. This provision makes eminent sense in the

10  overall transaction. Nascent was selling its stock in Targa and Targa's intangible assets to Nery's

11  through a 100% financed transaction that required Genesis' cooperation. Genesis was willing to

12  release its security interest on Targa, including Targa's intangible assets to allow the sale so long as

13  Genesis was paid as agreed. Any dispute between Nery's and Nascent was their dispute, not

14  Genesis' dispute. Genesis did what it agreed to do. Rather than foreclosing on Nascent's assets,

15  including Targa, it agreed effectively agreed to extend Nascent's obligations by virtue of the Nery's

16  Note and the Collateral Assignment. Nery's waived its right to set off as against Nascent as far as its

17  obligations under the terms of its Note, and therefore Genesis as a result of the assignment. Genesis

18  is not liable to Nery's under the terms of the SPA given the clear language of the Collateral

19  Assignment. This principle is important because defendants have broadly claimed that Genesis

20  "stands in the shoes" of Nascent and have contended that Genesis should have stepped in to pay the

21  "undisclosed liabilities" when Nascent did not take care of them. Genesis had no obligation resolve

22  any of Targa's liabilities or indemnify Nery's in any respect.

23         This is not to say that Nery's does not have indemnification rights as against Nascent under

24  the terms of the SPA, which may provide some offset for Nery's against the balance owed on the

25  Nery's Note. As will be next analyzed, the parties to the SPA provided indemnification as the

26  exclusive remedy for problems such as "undisclosed liabilities".

27  **B.     Nery's Rights for Disclosure Errors is expressly limited to the terms of the SPA**

28         At trial, Nery's will attempt to introduce a multitude of evidence in its attempt to show that

1   the representations made by Nascent as to the amount of liabilities of Targa were understated.

2   However, Nery's claim is significantly restricted by the plain language of the SPA to an indemnity

3   claim.

4       The evidence will show that Cathcart knew the financial statements he received were

5   inconsistent, unreliable and unaudited.  He knew that Targa had been operating at a negative for

6   several months before the sale and many obligations were not being paid.  He had determined by his

7   financial analysis and financial projections that he did not want to have more than $150,000 in

8   liabilities going forward.  Piancone represented to Cathcart Targa's liabilities would not exceed

9   $150,000 and Nascent would take care of any liabilities in excess of $150,000.  Piancone relied on

10  the information provided by Targa's accountants in making the representation as to the amount of

11  liabilities Targa had as of closing.  Cathcart will testify that he knew that Piancone was not always

12  accurate in his statements, but chose to rely upon his figures.  Despite the uncertainty over the

13  financial condition of Targa, Cathcart elected not to conduct an independent audit of Targa to verify

14  its liabilities.  Instead, he negotiated an indemnity provision in the SPA to protect himself.  Article

15  VIII of the SPA was drafted give Nery's a remedy in the event the representations turned out to be in

16  error.  This provision expressly provided Nery's with its *exclusive* remedies if the representations

17  were wrong.

18      Section 8.1 entitled Indemnification, subpart (a) provides that Nascent agreed to indemnify

19  and hold Nery's harmless from any "Losses" arising from or relating to "(i) any breach of the

20  representations and warranties made by [Targa] in this Agreement; (ii) any breach of the covenants

21  or agreements made by [Targa] or [Nascent] in this Agreement; and (iii) any indemnification

22  obligations pursuant to Section 6.5 [Tax Matters]. . . ."

23      "Losses" is expressly defined under Section 1.1 of the SPA as meaning "any damages, costs,

24  liabilities, ... suffered or incurred by an Indemnified Party."

25      Subsection 8.4 (b) provides, in part, "[t]he indemnifying Party shall not be obligated to pay

26  any amount under this Article VIII until such final determination."

27      Most importantly, Section 8.5 entitled "Exclusive Remedy" bars Nery's from what it will

28  attempt to do at trial, namely, seek damages for breach of contract, negligent misrepresentation,

ER288

1 | rescission or reformation.  Nery's waived those causes of action as follows:

2 |     "Except as specifically provided elsewhere herein, the provisions for indemnification set
3 |     forth in this Article VIII <u>are the exclusive remedies of [Nascent], [Nery's] and [Targa]</u>
    <u>arising out of or in connection with this Agreement, and shall be in lieu of any rights under</u>
4 |     <u>contract, tort, equity or otherwise</u> other than claims based on actual fraud or intentional
    breach of this Agreement." (Emphasis added.)

5 |

6 |       As stated, Nery's has never alleged actual fraud against Nascent.  Therefore, by virtue of

7 | Section 8.5 of the SPA, Nery's is barred from asserting a claim for rescission, reformation or other

8 | theories of damage than claims for indemnification for items "finally determined".

9 |       Subsection 8.2(a) further prevents any party to the SPA from asserting a claim for

10 | indemnification two years after the "closing" which was February 10, 2010.  Since that time has

11 | expired, any claims Nery's may have had for indemnification from Nascent due to "undisclosed

12 | liabilities" may be barred under the terms of the SPA since Nery's has not asserted an

13 | indemnification claim.

14 |       In any event, Genesis owes no duty to indemnify Nery's for any of its "Losses" since

15 | Genesis assumed no obligations under the terms of the SPA given the clear language of the

16 | Collateral Assignment (Exhibit 26, para. 2.) and the fact that Nery's Note contains a waiver

17 | preventing Nery's release or discharge from any portion of its debt on account of any facts or

18 | circumstances other than payment in full. (Exhibit 23, para. 8.e.).   In other words, any claim for

19 | recovery by Nery's can only be asserted against Nascent and is expressly limited to the

20 | indemnification procedures the parties agreed to that are contained in Article VIII of the SPA.  More

21 | importantly, there was no provision in the SPA or elsewhere that permitted Nery's to divert funds

22 | that were to be used to pay its Note to instead pay for Targa's business operations, including alleged

23 | "undisclosed liabilities".  Nery's has effectively received a free ride in its acquisition of Targa and

24 | all its assets.

25 |       In its ruling on Nery's MSJ, the Court found that Genesis was not entitled to the status of a

26 | "holder in due course".  As such, Nery's may be permitted to assert such claims under the terms of

27 | the SPA against the amount agreed for the purchase of Targa's stock.  However, Nery's claims are

28 | <u>limited</u> to the express indemnity provisions set forth in SPA's Article VIII as quoted above.  All

1  other claims under contract, tort, equity or otherwise were expressly waived. (Exhibit 22, Section

2  8.5.)

3      The next issue is the amount of equitable setoff Nery's can seek under its indemnity claim.

4  For indemnity against claims, demands, damages, or costs, expressly or in other equivalent terms,

5  the indemnitee is not entitled to recover unless the indemnitee has actually gone out-of-pocket.

6  Cal.Civil Code § 2778(2).  Statutes listing rules for interpretation of indemnity agreements are not

7  confined in their application to insurance agreements.  *Crawford v. Weather Shield Mfg. Inc.*(2008)

8  44 Cal. 4th 541, 567.  To recover on indemnity contract to save an indemnitee from loss, indemnitee

9  must prove loss actually suffered by him, but, under contract to save indemnitee from liability,

10  indemnitor's liability for indemnitee's loss of money held by him as bailee does not arise until

11  indemnitee suffers loss by payment of debt.  *Alberts v. American Cas. Co. of Reading, Pa*(1948)

12  88 Cal.App.2d 891, 899 (1948).

13      The extent of duty to indemnify is determined from contract.  *Building Maintenance Service*

14  *Co. v. AIL Systems, Inc.*, (1997) 55 Cal.App.4th 1014, 1029.  Here, the SPA specifically requires a

15  "final determination" before Nascent's obligation to pay the indemnity amount arises. (Exhibit 22,

16  Section 8.4(b).)

17      The net result of Nery's "offsets" is that the entire amount due Genesis under the Nery's

18  Note is recoverable against Nery's.  Nery's may be entitled to a deduction from the balance owed

19  thereafter to Nascent.

20      The Court has already determined that Targa is not entitled to a right of setoff against the

21  obligations as guarantor of the Nery's Note. (Ruling, MSJ, p.16, lns. 13-14.).  Therefore, Targa is

22  fully obligated for payment of the entire balance of the Nery's Note.

23  V.

24  **NERY'S IS NOT ENTITLED TO RESCISSION OR REFORMATION**

25      As discussed above, Nery's is barred from making a claim for rescission or reformation

26  because the SPA provided indemnification as the exclusive remedy.  However, these claims also fail

27  on their merits.  Nery's waited too long to assert these claims, so equity bars them as well.

28      Eighteen months after Nery's acquired Targa's stock, it first asserted a claim for rescission as

14

PLAINTIFF'S TRIAL BRIEF

ER290

1  to the SPA and Nery's Note and reformation on the basis of negligent misrepresentation. (Doc. 9, 3rd

2  Party Complaint, p.5.)  These causes of actions were only then asserted notwithstanding Cathcart's

3  admission that he had "discovered" that Targa's liabilities were understated a month after the

4  transaction closed in March 2010.  A party seeking rescission is required to promptly provide notice

5  of rescission. *Cal. Civil Code* § 1691. While delay in providing notice of rescission does not bar the

6  claim, it will if the delay is substantially prejudicial. *Cal. Civil Code* § 1693.  Further, as a condition

7  of rescission, Nery's must restore the consideration, i.e, return the stock of Targa and the Nery's

8  brand to Nascent, which Genesis does not believe that Nery's is prepared to do.  Counsel for Nery's

9  has stated several times through these proceedings he believes that instead of giving Targa back,

10  Nery's is just required to pay for the "fair market value" of the business as of February 10, 2010.  In

11  essence, this would be nothing more than a claim for tort damages, not a rescission claim.  There is

12  no basis for tort damages.  Nery's does allege a claim for negligent misrepresentation, but it will be

13  unable to prove a negligent misrepresentation (Piancone made innocent, justified representations

14  based upon information provided by Targa's accountants) and Cathcart did not rely on the

15  representations.  He knew that Targa's financials were inconsistent, unreliable and unaudited.  In any

16  event, given the time that has lapsed and the fact that Targa has been operating profitably since

17  2011, rescission would be difficult, if not impossible for the Court to award.

18      *Cal. Civil Code* § 1689 sets forth the grounds of when a contract may be rescinded.

19  Applicable here is CC§1689(b)(1): A party to a contract may rescind the contract in the following

20  cases:

21      "(1) If the consent of the party rescinding, or of any party jointly contracting with him, was
       given by mistake, or obtained through duress, menace, fraud, or undue influence, exercised

22      by or with the connivance of the party as to whom he rescinds, or of any other party to the
       contract jointly interested with such party."

23

24      In *Runyan v. Pacific Air Industries* (1970) 2 Cal. 3d 304, plaintiff, a geologist employed by T

25  Corp., entered into a contract with defendant, under which plaintiff paid $25,000 for an exclusive

26  franchise, and defendant undertook duties of instruction and technical assistance. Plaintiff quit his

27  employment and began the franchise operation, but defendant failed to perform. Plaintiff gave notice

28  of rescission for failure of consideration and fraud, and then brought his action for restitution and

15

ER291

1  consequential damages. He received judgment for the $25,000 paid, plus $5,273.25, representing the

2  income he would have received in his former employment, less the amount he received from the

3  franchise operation. *Held,* affirmed.

4      The court confirmed that *Cal. Civil Code* § 1692 provides that the aggrieved party may claim

5  restitution and consequential damages, and "shall be awarded complete relief," and that the court

6  may adjust the equities <u>but may not allow double recovery</u>.  Under this statute, and the principle

7  underlying the purchaser's recovery of consequential damages after rescission for fraud, necessary

8  monetary relief may be given in an action for restitution. (2 Cal.3d 316, 317.)  In that case, plaintiff

9  was properly allowed to recover the original consideration and damages he sustained in reliance on

10  the contract, <u>while defendant retrieved its franchise and was credited with the amount produced by</u>

11  <u>it</u>. (2 Cal.3d 319.).

12      In 1 Witkin, Summary 10th (2005) Contracts, §938, it is explained that the codified

13  principles set forth in *Cal. Civil Code* § 1692 precluding recovery of duplicate or inconsistent items

14  and authorizing adjustment of the equities were applied to rescission for a vendor's fraud in *McCoy*

15  *v. West* (1977) 70 Cal .App.3d 295.  McCoy, owner of a moving and storage business, sold it to W &

16  M on an installment contract.  W & M took possession, operated the business for some months, and

17  then gave notice of rescission for fraud. The trial judge held that the rescission was effective and that

18  W & M were entitled to the return of their down payment and installment payments. He also

19  concluded, however, that McCoy was entitled to an offset in the amount of the reasonable rental

20  value of the business property while the buyers were in possession. *Held,* judgment for the offset

21  reversed.

22      The court's reasoning was that the general rule supports the vendor's position in the usual

23  case; but the vendor's right is not absolute, and he or she will not be permitted to retain an unjust

24  benefit as a result of the rescission. (70 C.A.3d 301, 302.)  The rule applicable here is set forth in the

25  Restatement of Restitution, §157: The innocent purchaser is entitled to pay either the reasonable

26  rental value or the profits, if any, from operation of the business, whichever is less. "In this way the

27  guilty vendor, the one more at fault, bears the loss, if any, resulting from a failure to use the subject

28

PLAINTIFF'S TRIAL BRIEF

ER292

1  matter profitably." (70 C.A.3d 303.)   Because the record contained no evidence that the business

2  was profitable, and W's uncontradicted testimony was that it was operated at a loss. (70 C.A.3d 303.)

3  "[W]here, as here, the vendor of a business enterprise existing for the purpose of making a profit

4  sells the business to a buyer under a contract of sale, and thereafter the contract of sale is rescinded

5  on the grounds of the vendor's fraud, the vendor is not entitled to receive the reasonable rental value

6  for the vendee's use of the business without proof that the vendee's profits equaled or exceeded the

7  reasonable rental value. We further hold that absent such proof, the guilty vendor is at most entitled

8  to the profits, if any, the vendee may have made in the operation of the business during the period

9  that the vendee was in possession thereof." (70 C.A.3d 303.)

10       It should be pointed out that in McCoy, actual fraud was found and that the buyers returned

11  the business shortly after they gave notice of rescission.  That is not the case here.

12       As such, even if Nery's was successful in obtaining rescission of the SPA, at most, it would

13  recover the three payments made under the Note and would be required to return all of Targa's stock

14  and rights to distribution *together with all profits derived from the business* since realty or tangible

15  personal property was not part of the transaction.  Genesis would be entitled to receive all secured

16  rights it gave up to permit Nery's to acquire Targa and its assets, including licenses and distribution

17  rights.

18       As to Nery's claim for reformation, the Court will not rewrite the SPA and the term of Nery's

19  Note. *Bailard v. Marden,* (1951) 36 C.2d 703, 709; *Lemoge Elec. v. San Mateo,* (1956) 46 C.2d 659,

20  662.

21       This is especially true where, as here, reformation would prejudice the "rights acquired by

22  third persons, in good faith and for value." *Cal. Civil Code* §3399.  Genesis was not aware of any of

23  Nery's alleged claims when it accepted the Collateral Assignment since these did not arise until after

24  the Note was assigned to Genesis.  Genesis gave value to the transaction without which Nery's

25  would never have been able to acquire any interest in Targa.  As such, reformation is not available to

26  Nery's.

27

28

ER293

# VI.

## ALTERNATIVELY, GENESIS IS ENTITLED TO RECOVER FOR UNJUST ENRICHMENT

As the Court held in its ruling on the Summary Judgment Motion, Genesis' claim for unjust enrichment is an alternative to its breach of contract action against Nery's and Targa.

One of the "Underlying Principles" of the Restatement is that "[a] person who has been unjustly enriched at the expense of another is required to make restitution to the other." (Rest., Restitution §1; see 66 Am.Jur.2d (2001 ed.), Restitution and Implied Contracts §9.) This is in harmony with the opening sentence: "The Restatement of this Subject deals with situations in which one person is accountable to another on the ground that otherwise he would unjustly benefit or the other would unjustly suffer loss." (Rest., Restitution, p. 1.) Where the facts do not come within a specific section, a court may base recovery on this underlying principle. Witkin, supra., §1016.

In the event Nery's is successful in its effort to set aside the SPA and its Note, Genesis is entitled to an award preventing Nery's from being unjustly enriched by the retention of Targa without payment at the agreed value of $2,000,000.

# VII

## DEFENDANTS DO NOT HAVE THE RIGHT TO SUSPEND PERFORMANCE

Defendants claim that Nascent's breach of the representation that liabilities do not exceed $150,000 excused defendants from performing under the Nery's Note, relying on *Cal. Civ. Code* §1511. This position is in error because it confuses the SPA with the Nery's Note and ignores the distinction between a condition and a covenant.

This same issue was addressed in *Starr v. Davis* (1930) 105 Cal. App. 632. The plaintiff sued for breach of a promissory note given by defendant for the purchase price in the sale of plaintiff's retail florist business. Defendant argued he did not have to pay the balance of the note because the plaintiff had breached his covenant not to engage in a similar business in the City of Turlock. The court refused to excuse defendant from paying the balance of the note. It held that the two obligations, the obligation to pay on the note and the obligation not to compete, were separate

1  and independent obligations since they were to be performed at different times.  The obligations

2  could not be construed as concurrent conditions.

3     This case is no different.  There is no provision in the SPA which provides that a breach of

4  the representation and warranties excuses Nery's from paying on the Note, which was a separate

5  document.  No such conditional language exists in the four corners of the agreement.  The breach of

6  the representations and warranties may entitle Nery's to indemnity, but only to the extent it can

7  prove it paid undisclosed liabilities coming within the scope of Article VIII of the SPA.  Such

8  indemnity, if proved, does not wipe out the entire balance now due on the Nery's Note.

9                                         X.

10                                  **CONCLUSION**

11     At the heart of this dispute is Cathcart's dissatisfaction with the deal he made.  He did not

12  anticipate some of the problems he encountered and he is now trying to rewrite the terms and keep

13  Targa for a highly discounted price.  The value of a written contract is that it provides the Court with

14  a basis to enforce the terms as the parties intended at the time of the contract.  Cathcart and Nery's

15  asked for and received indemnification as their exclusive remedy.  They cannot be heard to complain

16  about it now.  To the extent they can prove actual payments on "liabilities" above $150,000, they

17  may offset them against the Nery's Note.  As the evidence will show, the amount of offsets Nery's

18  will be able to prove will not be sufficient to prevent Genesis from obtaining a judgment for the full

19  amount of its claim based upon the amount owed under the Nascent Note.  Genesis requests, and the

20  Court should enter, judgment in the amount of $2,556,768 plus collection costs.

21

22  Dated: June 17, 2013                   GOODE, HEMME & PETERSON

23                           By:_____/s/ Jerry D. Hemme_____
                                  Jerry D. Hemme, Esq.
24                                Arnold Neves, Jr., Esq.
                                  Attorneys for Plaintiff/Counter-Defendant
25                                GENESIS MERCHANT PARTNERS, LP

26

27

28

ER295

1  **LAW OFFICES OF RONALD A. MARRON**
   RONALD A. MARRON (175650)
2  MARGARITA SALAZAR (224649)
3  3636 4th Avenue, Suite 202
   San Diego, CA 92103
4  Telephone:    (619) 696-9006
   Facsimile:    (619) 564-6665
5  ron.marron@gmail.com
   msalazaresq02@gmail.com
6  Attorneys for Plaintiff
7  GENESIS MERCHANT PARTNERS, LP

8              **UNITED STATES DISTRICT COURT**

9          **FOR THE SOUTHERN DISTRICT OF CALIFORNIA**

10

11
   GENESIS MERCHANT PARTNERS, LP.,      Case No.
12  a Connecticut corporation,
                                         **'11 CV 1589 JM   WVG**
13                      Plaintiff,
                                         **COMPLAINT:**
14         vs.
                                         1)   **BREACH OF CONTRACT**
15  NERY'S USA, INC., an Nevada
16  Corporation, JOHN CATHCART, an       2)   **CONVERSION**
   individual and COMMERCIAL TARGA,
17  S.A. DE C.V., a Mexican Corporation  3)   **UNJUST ENRICHMENT**

18                      Defendants.      4)   **NEGLIGENT**
                                              **MISREPRESENTATION**
19
                                         [Jury Trial Demanded]
20

21  ///

22  ///

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

                        ─────────────────
                           COMPLAINT

ER296

1      For its Complaint (the "Complaint") herein, Plaintiff Genesis Merchant Partners, LP.

2  ("Genesis") alleges as follows:

3  **INTRODUCTION**

4      1.    This lawsuit arises out of Defendants' breach of a promissory note and guaranty.

5      2.    Plaintiff Genesis is a Delaware limited partnership with its principal place of

6  business in Greenwich, Connecticut. No partner in Genesis is a citizen of Nevada or Mexico.

7      3.    Based on information and belief, Defendant John Cathcart ("Cathcart") is an

8  individual residing in the State of Nevada.

9      4.    Based on information and belief, Defendant Nery's USA, Inc. ("Nery's") is a

10  Corporation residing in and organized under the laws of the State of Nevada.

11      5.    Based on information and belief, Defendant Commercial Targa S.A. de C.V.

12  ("Targa") is a Corporation residing in and organized under the laws Mexico.

13      6.    Based on information and belief, Targa is a wholly owned subsidiary of Nery's.

14      7.    Plaintiff is informed and believes, and based thereon alleges, that all of the

15  Defendants herein are in some manner responsible for the acts herein alleged, and that each was

16  the agent, servant, employee, representative, alter-ego, principal, employer or master of the

17  other Defendant and, further, was acting within the scope of such agency, servitude,

18  employment, representation or capacity and/or for the benefit of each other Defendant in doing

19  the acts herein alleged.

20      8.    Upon information and belief, at all relevant times, Cathcart was and is the alter

21  ego of Nery's and Targa.  Upon information and belief, Cathcart controlled and directed Nery's

22  and Targa for his own purposes, and to the detriment of Plaintiff.  Plaintiff is informed and

23  believes that there exists, and at all times herein mentioned there existed, a unity of interest and

24  ownership between, by and among Cathcart, Nery's and Targa such that any individuality and

25  separateness between the Defendant Cathcart, Nery's and Targa has ceased to exist.  The

26  adherence to the fiction of the separate existence of Cathcart as a individual, and Nery's and

27  Targa as corporate entities distinct from each would and did permit an abuse of the corporate

28  privileges by Cathcart and promote injustice as well as the fraud of Plaintiff.

2<br>COMPLAINT

ER297

**JURISDICTION AND VENUE**

9.      This Court has jurisdiction over the controversy pursuant to 28 U.S.C.

§ 1332(a)(1) and (2) in that the matter in controversy exceeds $75,000 exclusive of interest and

costs and is between citizens of different states and because Defendants consented in writing to

personal jurisdiction in the State of California in connection with the promissory note and

guarantee which are the subject of this action.

10.      Venue lies in this district pursuant to 28 U.S.C. § 1391(a), (d) and (f).

**FACTS**

**The March 2008 Promissory Note by Nascent in Favor of Genesis**

11.      Genesis received a fourteen percent (14%) secured promissory note from

Nascent Wine Company, Inc., a Nevada Corporation with its principal place of business in San

Diego, California ("Nascent") dated March 31, 2008 in the principal amount of $1,000,000

together with interest at 14% per annum ("First Note").

**The February 2010 Promissory Note by Nery's in Favor of Nascent**

12.      In connection with a stock purchase agreement, which is not relevant to this

action, on February 10, 2010, Nascent received a ten percent (10%) secured promissory note

from Nery's in the principal amount of $1,850,000 together with an interest at 10% per annum

("Second Note").  A copy of the Second Note is annexed hereto as Exhibit A.

13.      Paragraph 9(c) of the Second Note requires that the Note be governed by and

construed in accordance with the law of the State of California.  The same paragraph also states

that each party waives any objection to jurisdiction in the State of California.

14.      Paragraph 5 of the Second Note provides that among the occurrences which are

an Event of Default under the Second Note are: (1) the failure to make payment within ten (10)

days of when due and (2) fails to perform promptly at the time and strictly in the manner

provided in the Note.

15.      Paragraph 6 of the Second Note provides that in the event of default, Nascent is

entitled to increase the interest rate to fifteen percent (15%) compounded monthly and access

late fees of 5% on payments past due.  Paragraph 6 further provides that Nery's shall be

ER298

1   responsible for Nascent's collection costs, including but not limited to attorneys' fees, in the

2   event that Nascent incurs costs attempting to collect amounts owed under the Second Note.

3       16.    In connection with the making of the Second Note, all parties to said Note and

4   Guaranty listed below, were made aware that the Second Note was going to be assigned to

5   Genesis, the details of said assignment being set forth in detail below. (verify for accuracy)

6       17.    In connection with the making of the Second Note, Nery's, through its agent and

7   alter ago Cathcart, made representations to Genesis regarding its ability and intent to make

8   payments on the Second Note, as well as making representations about the financial status of

9   Nery's and its guarantor, Targa.

10       18.    The above representations were false.

11       19.    Defendants knew or should have known that the above representations were

12   false.

13       20.    Genesis reasonably relied upon those representations in that it issued funds in

14   exchange for the Second Note.

15       21.    Genesis' reliance on said representations caused it to suffer damage in an

16   amount no less than $2,295,311.23 (calculated with interest as of July 10, 2011)..

17   **Targa's Guaranty**

18       22.    Concurrent with Nery's execution of the Second Note, Targa, a wholly owned

19   subsidiary of Nery's, executed a guaranty in favor of Nascent guarantying the obligation of the

20   Second Note (the "Guaranty"). A copy of the Guaranty is annexed hereto as Exhibit B.

21       23.    Paragraph 5(k) of the Guaranty provides that the Guaranty shall be governed in

22   accordance with California law and Paragraph 5(l) states that Targa submits to the jurisdiction

23   of the State of California and the United States of America should any legal action be initiated

24   under the terms of the Guaranty.

25       24.    Paragraph 5(d)(i) provides that Targa shall reimburse Nascent for any costs,

26   including legal fees, incurred by Nascent in collecting against Targa and/or enforcing the terms

27   of the Guaranty.

28

ER299

**The Assignment of the Second Note as Security for the First Note**

25.    Concurrent with the execution of the Second Note, Nascent assigned its interest and rights under the same to Plaintiff Genesis in a document entitled Collateral Assignment of Contracts (the "Assignment"). A copy of the Assignment is annexed hereto as Exhibit C.

26.    The Assignment was made to secure Nascent's obligations under the First Note.

27.    Paragraph 7 of the Assignment provides that, "[u]pon the occurrence of any Event of Default, Assignee may, without notice or demand, at its option, from time to time take over and enjoy the benefits of any one or more of the Contracts, to the same extent as Assignor might do."

28.    Nascent sent to Nery's, simultaneous with the execution of the Assignment, a Direction Letter instructing Nery's to remit all future payments due under the Second Note to Plaintiff Genesis (the "Direction Letter"). A copy of the Direction Letter is annexed hereto as Exhibit D.

**The Events of Default**

29.    On or about May 10, 2010, Nery's ceased making payments to Plaintiff Genesis that were due to Genesis under the Second Note and the Assignment.

30.    No further payments have been received by Genesis the Second Note.

31.    The Second Note has been accelerated.

**FIRST CAUSE OF ACTION**

Breach of Contract

(Against all Defendants)

32.    Plaintiff Genesis repeats and realleges each and every allegation contained in paragraphs 1 through 31 of this Complaint with the same force and effect as if set forth in full herein.

33.    Nery's (a) has failed to make payments of principal and interest when due on the Second Note and (b) has failed to pay the amount due upon acceleration of the Second Note and continued to fail to make such payments for more than five business days.

34.    Each of the above-described acts was an Event of Default as such term is

ER300

1 | defined in the Second Note.

2 |     35.    As a result of Nery's failure to pay installments due and past due on the Second

3 | Note, Nery's is presently indebted to Genesis in an amount not less than $2,295,311.23

4 | (calculated with interest as of July 10, 2011).

5 |     36.    As a result of Nery's default under the Second Note, Targa is indebted to

6 | Genesis on the Guaranty in an amount not less than $2,295,311.23 and Genesis has been

7 | damaged by the failure of Targa, as guarantor, to make such payments to Genesis.

8 | **SECOND CAUSE OF ACTION**

9 | Unjust Enrichment

10 | (Against all Defendants)

11 |     37.    Plaintiff Genesis repeats and realleges each and every allegation contained in

12 | paragraphs 1 through 36 of this Complaint with the same force and effect as if set forth in full

13 | herein.

14 |     38.    Defendant Nery's has not repaid the loan as required under the Second Note,

15 | and yet has had use of the proceeds.

16 |     39.    By virtue of the Assignment, Plaintiff Genesis is entitled to enjoy all rights and

17 | benefits of the Second Note, including the receipt of payment of all amounts due under the

18 | Note.

19 |     40.    The use of the proceeds without payment to Plaintiff constitutes an unjust

20 | enrichment of Defendant Nery's at Plaintiff's expense.

21 |     41.    Defendant Targa benefited from the loan to Nery's in that Targa is a wholly

22 | owned subsidiary of Nery's and, based on information and belief, the proceeds from the loan

23 | were used for the benefit of Targa.

24 |     42.    The failure of Targa to pay all amounts owed under the Second Note constitutes

25 | unjust enrichment of Defendant Targa at Plaintiff's expense.

26 |     43.    As a result of the unjust enrichment of Defendant, Plaintiff has been damaged in

27 | an amount in excess of $2,295,311.23.

28 | / / /

ER301

**THIRD CAUSE OF ACTION**

Conversion

(Against Nery's)

44.    Plaintiff Genesis repeats and realleges each and every allegation contained in paragraphs 1 through 43 of this Complaint with the same force and effect as if set forth in full herein.

45.    Nery's have taken funds that were due to Nascent and failing to repay the amount of the loan back to Nascent as required under the Second Note.

46.    By virtue of the Assignment, Plaintiff Genesis is entitled to enjoy all rights and benefits of the Second Note, including the receipt of payment of all amount due under the Note.

47.    By taking money due to Plaintiff, and not remitting that money to Plaintiff on demand, Nery's acted inconsistently with Plaintiff's ownership of the Second Note.

48.    By acting so inconsistently with Plaintiff's ownership of the Second Note, Nery's has converted the property of Plaintiff.

49.    Defendant's actions have caused Plaintiff damage in an amount to be determined at trial, but in excess of $2,295,311.23.

**FOURTH CAUSE OF ACTION**

NEGLIGENT MISREPRESENTATION

(Against all Defendants)

50.    Plaintiff Genesis repeats and realleges each and every allegation contained in paragraphs 1 through 49 of this Complaint with the same force and effect as if set forth in full herein.

51.    In connection with the making of the Second Note, all parties to said Note and Guaranty listed below, were made aware that the Second Note was going to be assigned to Genesis, the details of said assignment being set forth in detail below. (verify for accuracy)

///

///

7

COMPLAINT

ER302

1       52.     In connection with the making of the Second Note, Nery's, through its agent and

2  alter ago Cathcart, made representations to Genesis regarding its ability and intent to make

3  payments on the Second Note, as well as making representations about the financial status of

4  Nery's and its guarantor, Targa.

5       53.     The above representations were false.

6       54.     Defendants knew or should have known that the above representations were

7  false.

8       55.     Genesis reasonably relied upon those representations in that it issued funds in

9  exchange for the Second Note.

10      56.     Genesis' reliance on said representations caused it to suffer damage in an

11 amount no less than $2,295,311.23 (calculated with interest as of July 10, 2011).

12      57.     Defendants' conduct was wanton, willful, intentional and offensive to the extent

13 that it warrants the imposition of punitive damages.

14 / / /

15 / / /

16 / / /

17 / / /

18 / / /

19 / / /

20 / / /

21 / / /

22 / / /

23 / / /

24 / / /

25 / / /

26 / / /

27 / / /

28 / / /

ER303

1

## PRAYER FOR RELIEF

2       WHEREFORE, Plaintiffs pray for judgment against Defendants, and each of them, as

3  follows:

4       1)      For damages according to proof but not less than $2,295,311.23 (calculated with

5  interest as of July 10, 2011);

6       2)      For special damages according to proof;

7       3)      For pre-judgment interest according to proof;

8       4)      For costs of suit incurred herein, including attorneys' fees to the extent

9               applicable;

10      5)      For punitive damages; and

11      6)      For such other and further relief as this Court may deem just and proper.

12

13  Dated:  July 18, 2011

14

15                              By: /s/ Ronald A. Marron

16                              Ronald A. Marron, Esq.
                                Margarita Salazar, Esq.
17                              LAW OFFICES OF RONALD A. MARRON, APLC
                                Attorneys for Plaintiff
18                              Genesis Merchant Partners, LP

19

20

21

22

23

24

25

26

27

28

ER304

%JS 44  (Rev. 12/07)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Genesis Merchant Partners, LP | Nery's USA, INC. |

| (b)  County of Residence of First Listed Plaintiff   Greenwich, CT | County of Residence of First Listed Defendant   Nevada |
|---|---|
| (EXCEPT IN U.S. PLAINTIFF CASES) | (IN U.S. PLAINTIFF CASES ONLY) |
| | NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED. |

| (c)  Attorney's (Firm Name, Address, and Telephone Number) | Attorneys (If Known) |
|---|---|
| Law Offices of Ronald A. Marron, APLC, Ronald A. Marron, Esq. | unknown |

'11CV1589 JM  WVG

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1  U.S. Government Plaintiff

☐ 3  Federal Question (U.S. Government Not a Party)

☐ 2  U.S. Government Defendant

☒ 4  Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☒ 2 | ☒ 2 | Incorporated and Principal Place of Business In Another State | ☒ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | PERSONAL INJURY | PERSONAL INJURY | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | PROPERTY RIGHTS | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | PERSONAL PROPERTY | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | LABOR | SOCIAL SECURITY | ☐ 810 Selective Service |
| ☒ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 196 Franchise | | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| REAL PROPERTY | CIVIL RIGHTS | PRISONER PETITIONS | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | Habeas Corpus: | ☐ 791 Empl. Ret. Inc. Security Act | FEDERAL TAX SUITS | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | IMMIGRATION | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | ☐ 900Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | ☐ 463 Habeas Corpus - Alien Detainee | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | ☐ 465 Other Immigration Actions | | |

## V. ORIGIN (Place an "X" in One Box Only)

☒ 1  Original Proceeding

☐ 2  Removed from State Court

☐ 3  Remanded from Appellate Court

☐ 4  Reinstated or Reopened

☐ 5  Transferred from another district (specify)

☐ 6  Multidistrict Litigation

☐ 7  Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity)
28 U.S.C. s. 1332(a)(1) and (2)

Brief description of cause:
Breach of promissory note, failure to pay, negligent misrepresentation

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☒ Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY

(See instructions)

JUDGE

DOCKET NUMBER

DATE
07/18/2011

SIGNATURE OF ATTORNEY OF RECORD

FOR OFFICE USE ONLY

RECEIPT #          AMOUNT          APPLYING IFP          JUDGE          MAG. JUDGE

<u>EXHIBIT 1</u>

*Nascent Wine Company, Inc.*

███████████████████████

Coronado, California 92118

February 10, 2010

Nery's USA, Inc.

███████████████████████

Incline Village, Nevada 89451

Re:   Direction Letter Regarding Payments of Proceeds Pursuant to that Certain
Promissory Note ("Note") dated February __, 2010 between Nascent Wine
Company, Inc. ("Nascent") and Nery's USA, Inc. ("NERYS")

Ladies and Gentlemen:

The undersigned has authorized Genesis Merchant Partners, L.P. ("Genesis") to receive
all payments to which the undersigned is entitled under the Note.

By this letter, you are hereby directed (1) to make all checks, in payment of sums due
to Nascent under the Note, payable to the order of "Genesis Merchant Partners, LP", and (2) to deliver
such checks or otherwise make such payments to the following address:

Genesis Merchant Partners, LP

███████████████████████

Greenwich, Connecticut 06831

The foregoing direction is irrevocable, except with the written consent of Genesis (or
its successors or assigns), notwithstanding any future contrary request or direction from the
undersigned or any other person (other than Genesis (or its successors or assigns)). Please execute the
enclosed copy of this letter and return to the undersigned to confirm receipt and acceptance. Thank
you for your cooperation.

Nascent Wine Company, Inc.

By: _____

Agreed to and Accepted by
Nery's USA, Inc.
By: _____

**ER306**

**U.S. District Court**
**Southern District of California (San Diego)**
**CIVIL DOCKET FOR CASE #: 3:11−cv−01589−JM−WVG**

| | |
|---|---|
| Genesis Merchant Partners, LP. v. Nery's USA, Inc. et al | Date Filed: 07/19/2011 |
| Assigned to: Judge Jeffrey T. Miller | Date Terminated: 09/20/2013 |
| Referred to: Magistrate Judge William V. Gallo | Jury Demand: Plaintiff |
| Case in other court:  USCA, 13−56797 | Nature of Suit: 190 Contract: Other |
| USCA, 13−57106 | Jurisdiction: Diversity |
| Cause: 28:1332 Diversity−Breach of Contract | |

**Plaintiff**

**Genesis Merchant Partners, LP.**
*a Connecticut corporation*

represented by **David J Noonan**
Kirby Noonan Lance and Hoge
DiamondView Tower
350 Tenth Avenue
Suite 1300
San Diego, CA 92101
(619)231−8666
Fax: (619)231−9593
Email: dnoonan@knlh.com
*TERMINATED: 08/09/2012*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ethan Thomas Boyer**
Kirby Noonan Lance and Hoge
350 Tenth Avenue
Suite 1300
San Diego, CA 92101
(619)231−8666
Fax: (619)231−9593
Email: eboyer@knlh.com
*TERMINATED: 08/09/2012*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jacob M Slania**
Kirby Noonan Lance &Hoge LLP
350 Tenth Avenue
Suite 1300
San Diego, CA 92101−8700
(619)231−8666
Fax: (619)231−9593
Email: jslania@knlh.com
*TERMINATED: 08/09/2012*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jerry D Hemme**
Goode Hemme &Peterson
6256 Greenwich Drive
Suite 500
San Diego, CA 92122
(858)587−3555
Fax: (858)587−3545
Email: jhemme@sandiegoattorney.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Margarita Salazar**
Law Offices of Margarita Salazar

611 K Street
Suite B–Box 322
San Diego, CA 92101
619–994–9578
Fax: 619–207–0620
Email: msalazaresq@gmail.com
*TERMINATED: 01/03/2012*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ronald Marron**
Law Office of Ronald Marron
651 Arroyo Drive
San Diego, CA 92103
(619)696–9006
Fax: (619)564–6665
Email: ron@consumersadvocates.com
*TERMINATED: 01/03/2012*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Nery's USA, Inc.**
*an Nevada Corporation*

represented by **John Joseph McNutt**
McKenna Long &Aldridge
600 W Broadway
Suite 2600
San Diego, CA 92101
619–699–2438
Fax: 619–645–5336
Email: jmcnutt@mckennalong.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael D Fabiano**
Fabiano Law Firm, P.C.
12526 High Bluff Drive, Suite 300
San Diego, CA 92130
619–742–9631
Email: mdfabiano@fabianolawfirm.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Luis E. Lorenzana**
Mazzarella Lorenzana, LLP
1620 5th Avenue
Suite 725
San Diego, CA 92101
(619) 238–4900
Fax: (619) 238–4959
Email: llorenzana@mazzlorenz.com
*TERMINATED: 12/07/2012*
*ATTORNEY TO BE NOTICED*

**Mark C. Mazzarella**
Mazzarella Law Group
1620 5th Avenue
Suite 600
San Diego, CA 92101
(619) 238–4900
Fax: (619) 238–4959
Email: mmazzarella@mazzlorenz.com
*TERMINATED: 06/11/2013*

**Defendant**

**John Cathcart**
*an individual*

     represented by **John Joseph McNutt**
             (See above for address)
             *LEAD ATTORNEY*
             *ATTORNEY TO BE NOTICED*

             **Michael D Fabiano**
             (See above for address)
             *LEAD ATTORNEY*
             *ATTORNEY TO BE NOTICED*

             **Luis E. Lorenzana**
             (See above for address)
             *TERMINATED: 12/07/2012*
             *ATTORNEY TO BE NOTICED*

             **Mark C. Mazzarella**
             (See above for address)
             *TERMINATED: 06/11/2013*

**Defendant**

**Commercial Targa, S.A. DE C.V.**
*a Mexican Corporation*

     represented by **John Joseph McNutt**
             (See above for address)
             *LEAD ATTORNEY*
             *ATTORNEY TO BE NOTICED*

             **Luis E. Lorenzana**
             (See above for address)
             *TERMINATED: 12/07/2012*
             *ATTORNEY TO BE NOTICED*

             **Mark C. Mazzarella**
             (See above for address)
             *TERMINATED: 06/11/2013*

**Counter Claimant**

**John Cathcart**
*an individual*

     represented by **Michael D Fabiano**
             (See above for address)
             *LEAD ATTORNEY*
             *ATTORNEY TO BE NOTICED*

             **Luis E. Lorenzana**
             (See above for address)
             *TERMINATED: 12/07/2012*
             *ATTORNEY TO BE NOTICED*

             **Mark C. Mazzarella**
             (See above for address)
             *TERMINATED: 06/11/2013*

**Counter Claimant**

**Nery's USA, Inc.**
*an Nevada Corporation*

     represented by **John Joseph McNutt**
             (See above for address)
             *LEAD ATTORNEY*
             *ATTORNEY TO BE NOTICED*

             **Michael D Fabiano**
             (See above for address)
             *LEAD ATTORNEY*
             *ATTORNEY TO BE NOTICED*

             **Luis E. Lorenzana**

(See above for address)
*TERMINATED: 12/07/2012*
*ATTORNEY TO BE NOTICED*

**Mark C. Mazzarella**
(See above for address)
*TERMINATED: 06/11/2013*

V.

**Counter Defendant**

**Genesis Merchant Partners, LP.**                represented by   **David J Noonan**
*a Connecticut corporation*                                        (See above for address)
                                                                   *TERMINATED: 08/09/2012*
                                                                   *LEAD ATTORNEY*
                                                                   *ATTORNEY TO BE NOTICED*

                                                                   **Ethan Thomas Boyer**
                                                                   (See above for address)
                                                                   *TERMINATED: 08/09/2012*
                                                                   *LEAD ATTORNEY*
                                                                   *ATTORNEY TO BE NOTICED*

                                                                   **Jacob M Slania**
                                                                   (See above for address)
                                                                   *TERMINATED: 08/09/2012*
                                                                   *LEAD ATTORNEY*
                                                                   *ATTORNEY TO BE NOTICED*

                                                                   **Jerry D Hemme**
                                                                   (See above for address)
                                                                   *LEAD ATTORNEY*
                                                                   *ATTORNEY TO BE NOTICED*

                                                                   **Ronald Marron**
                                                                   (See above for address)
                                                                   *TERMINATED: 01/03/2012*
                                                                   *LEAD ATTORNEY*
                                                                   *ATTORNEY TO BE NOTICED*

**ThirdParty Plaintiff**

**Nery's USA, Inc.**                              represented by   **John Joseph McNutt**
*an Nevada Corporation*                                            (See above for address)
                                                                   *LEAD ATTORNEY*
                                                                   *ATTORNEY TO BE NOTICED*

                                                                   **Michael D Fabiano**
                                                                   (See above for address)
                                                                   *LEAD ATTORNEY*
                                                                   *ATTORNEY TO BE NOTICED*

                                                                   **Luis E. Lorenzana**
                                                                   (See above for address)
                                                                   *TERMINATED: 12/07/2012*
                                                                   *ATTORNEY TO BE NOTICED*

                                                                   **Mark C. Mazzarella**
                                                                   (See above for address)
                                                                   *TERMINATED: 06/11/2013*

V.

**ThirdParty Defendant**

**Nascent Wine Company, Inc**

| Date Filed | # | Docket Text |
|---|---|---|
| 07/19/2011 | 1 | COMPLAINT with Jury Demand against John Cathcart, Commercial Targa, S.A. DE C.V., and Nery's USA, Inc. ( Filing fee $ 350 receipt number 0974−3775295.)Filed by Genesis Merchant Partners, LP. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D)<br><br>The new case number is 3:11−cv−1589−JM−WVG. Judge Jeffrey T. Miller and Magistrate Judge William V. Gallo are assigned to the case. (Marron, Ronald)(amh) (av1). (Entered: 07/19/2011) |
| 07/19/2011 | 2 | Corporate Disclosure Statement by Genesis Merchant Partners, LP. (amh) (av1). (Entered: 07/19/2011) |
| 07/19/2011 | 3 | Summons Issued.<br>**Counsel receiving this notice electronically should print this summons and serve it in accordance with Rule 4, Fed.R.Civ.P and LR 4.1.** (amh) (av1). (Entered: 07/19/2011) |
| 07/27/2011 | 4 | SUMMONS Returned Executed by Genesis Merchant Partners, LP. John Cathcart served on 7/26/2011, answer due 8/16/2011. (Marron, Ronald) (knh). (Entered: 07/27/2011) |
| 07/27/2011 | 5 | SUMMONS Returned Executed by Genesis Merchant Partners, LP. Nery's USA, Inc. served on 7/26/2011, answer due 8/16/2011. (Marron, Ronald) (knh). (Entered: 07/27/2011) |
| 07/27/2011 | 6 | SUMMONS Returned Executed by Genesis Merchant Partners, LP. Commercial Targa, S.A. DE C.V. served on 7/26/2011, answer due 8/16/2011. (Marron, Ronald)(knh). (Entered: 07/27/2011) |
| 08/19/2011 | 7 | ANSWER to 1 Complaint, with Jury Demand by John Cathcart, Nery's USA, Inc.. (Attachments: # 1 Proof of Service)(Fabiano, Michael). (jah). (Entered: 08/19/2011) |
| 08/19/2011 | 8 | COUNTERCLAIM with Jury Trial Demand against Genesis Merchant Partners, LP., filed by John Cathcart, Nery's USA, Inc.. (Attachments: # 1 Proof of Service) (Fabiano, Michael). Modified on 8/22/2011 − Added jury demand to text (jah). (Entered: 08/19/2011) |
| 08/19/2011 | 9 | THIRD PARTY COMPLAINT with Jury Trial Demand against Nascent Wine Company, Inc, filed by Nery's USA, Inc.. (Attachments: # 1 Proof of Service) New Summons Requested. (Fabiano, Michael). Modified on 8/22/2011 − Corrected filer. Added jury demand to text (jah). (Entered: 08/19/2011) |
| 08/22/2011 | 10 | NOTICE AND ORDER for Early Neutral Evaluation Conference. Early Neutral Evaluation set for 10/14/2011 09:00 AM in Courtroom F before Magistrate Judge William V. Gallo. Signed by Magistrate Judge William V. Gallo on 8/22/2011. (jah)(jrd) (Entered: 08/22/2011) |
| 08/22/2011 | 11 | Summons on Third Party Complaint Issued.<br>**Counsel receiving this notice electronically should print this summons and serve it in accordance with Rule 4, Fed.R.Civ.P and LR 4.1.** (jah) (Entered: 08/22/2011) |
| 08/23/2011 | 12 | NOTICE of Appearance by Mark C Mazzarella on behalf of John Cathcart, Commercial Targa, S.A. DE C.V., Nery's USA, Inc. (Attachments: # 1 Proof of Service)(Mazzarella, Mark). (jah). (Entered: 08/23/2011) |
| 08/23/2011 | 13 | SUMMONS Returned Executed by Genesis Merchant Partners, LP.. Commercial Targa, S.A. DE C.V. served on 8/22/2011, answer due 9/12/2011. (Marron, Ronald). (jah). (Entered: 08/23/2011) |

| 09/12/2011 | 14 | ANSWER to 1 Complaint, with Jury Demand by Commercial Targa, S.A. DE C.V.. (Attachments: # 1 Notice of Appearance of Atty Luis Lorenzana, # 2 Notice of Appearance of Atty Luis Lorenzana)(Mazzarella, Mark). Modified on 9/14/2011 − No proof of service. Notice of Appearance must be filed separately. Email sent to Atty to file proof of service and for Atty Lorenzana to file Notice of Appearance(jah). (Entered: 09/12/2011) |
|---|---|---|
| 09/12/2011 | 15 | MOTION to Dismiss Counterclaim by Genesis Merchant Partners, LP.. (Attachments: # 1 Memo of Points and Authorities, # 2 Proposed Order, # 3 Proof of Service)(Marron, Ronald). Modified on 9/14/2011 − Proposed Order attached. Email sent to Atty re ECF Proposed Order policy (jah). (Entered: 09/12/2011) |
| 09/12/2011 | 16 | NOTICE of Appearance by Ronald Marron on behalf of Genesis Merchant Partners, LP. (Attachments: # 1 Proof of Service)(Marron, Ronald). (jah). (Entered: 09/12/2011) |
| 09/12/2011 | 17 | NOTICE of Appearance by Margarita Salazar on behalf of Genesis Merchant Partners, LP. (Attachments: # 1 Proof of Service)(Salazar, Margarita). (jah). (Entered: 09/12/2011) |
| 09/13/2011 | 18 | NOTICE of Appearance by Luis Enrique Lorenzana on behalf of John Cathcart, Commercial Targa, S.A. DE C.V., Nery's USA, Inc. (Attachments: # 1 Proof of Service)(Lorenzana, Luis). Modified on 9/15/2011 − Has s/ of different atty. Email sent to Atty re ECF signature policy (jah). (Entered: 09/13/2011) |
| 09/14/2011 | 19 | CERTIFICATE OF SERVICE by Commercial Targa, S.A. DE C.V. re 14 Answer to Complaint, (Mazzarella, Mark). (jah). (Entered: 09/14/2011) |
| 09/21/2011 | 20 | MINUTE ORDER. The date and time of the Early Neutral Evaluation set for 10/14/2011 9:00 AM is vacated and reset for 11/10/2011 09:00 AM before Magistrate Judge William V. Gallo. Signed by Magistrate Judge William V. Gallo on 9/21/2011. (jah) (Entered: 09/21/2011) |
| 09/23/2011 | 21 | MINUTE ORDER. The time of the Early Neutral Evaluation Conference set for 11/10/2011 at 9:00 AM is changed to 09:30 AM before Magistrate Judge William V. Gallo. Signed by Magistrate Judge William V. Gallo on 9/23/2011. (jah) (Entered: 09/23/2011) |
| 09/28/2011 | 22 | Amended NOTICE AND ORDER for Early Neutral Evaluation Conference. The ENE set for November 10, 2011 at 9:30 AM is vacated. (Early Neutral Evaluation set for 11/30/2011 09:00 AM in Courtroom F before Magistrate Judge William V. Gallo.) Signed by Magistrate Judge William V. Gallo on 9/28/11.(lao)(jrd) (Entered: 09/28/2011) |
| 10/14/2011 | 23 | WAIVER OF SERVICE Returned Executed by Nascent Wine Company, Inc. Nascent Wine Company, Inc waiver sent on 10/14/2011, answer due 12/13/2011. (Mazzarella, Mark). (jah). (Entered: 10/14/2011) |
| 10/24/2011 | 24 | RESPONSE in Opposition re 15 MOTION to Dismiss Counterclaim by Genesis Merchant Partners, Inc filed by Nery's USA, Inc.. (Attachments: # 1 Proof of Service)(Mazzarella, Mark) Modified on 10/25/2011 (jah). (Entered: 10/24/2011) |
| 10/31/2011 | 25 | REPLY to Response to Motion re 15 MOTION to Dismiss Counterclaim filed by Genesis Merchant Partners, LP.. (Attachments: # 1 Proof of Service)(Salazar, Margarita). (jah). (Entered: 10/31/2011) |
| 11/01/2011 | 26 | Minute Order by Judge Jeffrey T. Miller: Motions Submitted 15 MOTION to Dismiss Counterclaim. Motion Hearing set for 11/7/2011 10:00 AM before Judge Jeffrey T. Miller, is vacated. Written order to follow. (gac) (Entered: 11/01/2011) |
| 11/21/2011 | 27 | NOTICE OF CHANGE OF ADDRESS by John Cathcart, Commercial Targa, S.A. DE C.V., Nery's USA, Inc. (Attachments: # 1 Proof of Service)(Lorenzana, Luis). Modified on 11/22/2011 − Wrong event. Email sent to Atty. Corrected text. ATTY MAINT (jah). (Entered: 11/21/2011) |
| 11/21/2011 | 28 | NOTICE OF CHANGE OF ADDRESS by John Cathcart, Commercial Targa, S.A. DE C.V., Nery's USA, Inc. (Attachments: # 1 Proof of Service)(Mazzarella, Mark). Modified on 11/22/2011 − Wrong event. Email sent to Artty. Corrected text. ATTY MAINT (jah). (Entered: 11/21/2011) |

| 11/21/2011 | 29 | NOTICE by Genesis Merchant Partners, LP. *of Association of Counsel* (Attachments: #1 Proof of Service)(Marron, Ronald) Modified on 11/22/2011. Wrong event. Atty Blair Krueger not admitted to Dist or registered for ECF. Email sent to filing atty for Atty Krueger to register to be admitted, for ECF and file Notice of Appearance of own behalf pursuant to L.R. 83.3 (jah). (Entered: 11/21/2011) |
| --- | --- | --- |
| 11/30/2011 | 30 | Minute Order for proceedings held before Magistrate Judge William V. Gallo: Early Neutral Evaluation Conference held on 11/30/2011. Further Early Neutral Evaluation set for 1/3/2012 09:00 AM before Magistrate Judge William V. Gallo. Martin Sands shall appear in person at the 1/3/2012 Continued ENE. Plaintiff shall provide to Dfts by 12/2/2011, a list of documents it wants to review. Pla's and Dft's counsel shall submit to the Court a Protective Order by 12/9/2011. Dfts shall provide to Plaintiff by 12/16/2011, pursuant to the Protective Order, the documents requested by Plaintiff. Signed by Magistrate Judge William V. Gallo on 11/30/2011. (Plaintiff Attorney: Blair Krueger, Ronald Marron). (Defendant Attorney: Mark Mazzaralla). (jah) (Entered: 11/30/2011) |
| 12/09/2011 | 31 | Joint MOTION for Protective Order by John Cathcart, Commercial Targa, S.A. DE C.V., Genesis Merchant Partners, LP., Nery's USA, Inc.. (Attachments: #1 Proof of Service)(Mazzarella, Mark). Modified on 12/12/2011 − Proposed Order attached (jah). (Entered: 12/09/2011) |
| 12/12/2011 | 32 | MINUTE ORDER granting 31 Joint Motion for Protective Order. Signed by Magistrate Judge William V. Gallo on 12/12/2011. (jah) (Entered: 12/12/2011) |
| 12/12/2011 | 33 | ORDER granting 31 Joint MOTION for Protective Order. Signed by Magistrate Judge William V. Gallo on 12/12/2011. (jah) (Entered: 12/13/2011) |
| 12/15/2011 | 34 | Request for Entry of Clerk Default against Nascent Wine Company, Inc. (Attachments: #1 Declaration)(Mazzarella, Mark). Modified on 12/16/2011 − Declaration of staff member. Request has signature of different Atty. Email sent to Atty to refile Request and Declaration w/ proper signatures. Per Chambers Clerk's Default not prepared (jah). (Entered: 12/15/2011) |
| 12/16/2011 | 35 | MINUTE ORDER. The date and time of the Early Neutral Evaluation Conference set for 1/3/2012 at 9:00am is vacated and reset for 1/26/2012 09:00 AM before Magistrate Judge William V. Gallo. Martin Sands shall appear in person at the 1/16/2012 Continued ENE. Signed by Magistrate Judge William V. Gallo on 12/16/2011. (jah)(jrd) (Entered: 12/16/2011) |
| 12/19/2011 | 36 | Ex Parte MOTION to Withdraw as Attorney by Genesis Merchant Partners, LP.. (Attachments: #1 Declaration of Ronald A. Marron, #2 Exhibit 1 to Marron Decl., #3 Exhibit 2 to Marron Decl., #4 Exhibit 3 to Marron Decl., #5 Exhibit 4 to Marron Decl., #6 Proof of Service)(Marron, Ronald)(leh). (Entered: 12/19/2011) |
| 12/19/2011 | 37 | AMENDED DOCUMENT by Genesis Merchant Partners, LP.. Amendment to 36 Ex Parte MOTION to Withdraw as Attorney *Amended Proof of Service re: Ex Parte Motion to Withdraw as Attorney of Record.*. (Marron, Ronald) (lmt). (Entered: 12/19/2011) |
| 12/20/2011 | 38 | SECOND AMENDED DOCUMENT by Genesis Merchant Partners, LP. Amendment to 36 Ex Parte MOTION to Withdraw as Attorney *Second Amended Proof of Service re: Ex Parte Application to Withdraw as Counsel of Record.* (Marron, Ronald) (cge). (Entered: 12/20/2011) |
| 01/03/2012 | 39 | ORDER granting The Law Offices of Ronald A. Marron's 36 Ex Parte Motion to Withdraw as Attorney. Attorney Ronald Marron and Margarita Salazar terminated as counsel of record for Plaintiff Genesis Merchant Partners, LP. Court further orders Genesis to retain replacememt counsel who shall appear at the January 26, 2012 conference. Signed by Judge Jeffrey T. Miller on 1/3/2012. (jah) (Entered: 01/03/2012) |
| 01/03/2012 | 40 | Request for Entry of Clerk Default against Nascent Wine Co.. (Attachments: #1 Declaration Re Amended Request for Default)(Lorenzana, Luis) Modified on 1/4/2012 − No Proof of Service. Email sent to Atty to file Separate Proof of Service. Clerk's Default prepared (jah). (Entered: 01/03/2012) |

| | | |
|---|---|---|
| 01/04/2012 | 41 | Clerk's ENTRY OF DEFAULT as to Third–Party Defendant Nascent Wine Company, Inc. (jah)(jrd) (Entered: 01/04/2012) |
| 01/05/2012 | 42 | CERTIFICATE OF SERVICE by John Cathcart, Commercial Targa, S.A. DE C.V., Nery's USA, Inc. re 40 Request for Entry of Clerks Default, (Lorenzana, Luis). Modified on 1/6/2012 – Edited text (jah). (Entered: 01/05/2012) |
| 01/06/2012 | 43 | ORDER granting Genesis Merchant Partners, LP's 15 Motion to Dismiss Counterclaim. The motion to dismiss Dft's declaratory judgment claim is granted and Dft Nery is granted leave to amend. Dft's request that Court stay the ongoing proceedings pending resolution of its third party complaint is denied. Signed by Judge Jeffrey T. Miller on 1/6/2012. (jah) (jrl). (Entered: 01/06/2012) |
| 01/17/2012 | 44 | MOTION to Substitute Attorney by Genesis Merchant Partners, LP.. (Boyer, Ethan). Modified on 1/18/2012 – No Proof of Service. Email sent to Atty to file Proof of Service (jah). (Entered: 01/17/2012) |
| 01/18/2012 | 45 | CERTIFICATE OF SERVICE by Genesis Merchant Partners, LP. re 44 MOTION to Substitute Attorney (Boyer, Ethan). (jah). (Entered: 01/18/2012) |
| 01/19/2012 | 46 | ORDER granting Plaintiff's 44 Motion to Substitute Attorney. Attorneys David J Noonan, Ethan T. Boyer, and Jacob M Slania are substituted as attorneys of records for Genesis Merchant Partners, LP.. Signed by Judge Jeffrey T. Miller on 1/19/2012. (jah) (Entered: 01/19/2012) |
| 01/26/2012 | 47 | Minute Entry for proceedings held before Magistrate Judge William V. Gallo: Early Neutral Evaluation Conference held on 1/26/2012(jmy) (Entered: 01/26/2012) |
| 01/26/2012 | 48 | Order Following Early Neutral Evaluation Conferences, Setting Rule 26 Compliance and Notice of Case Management Conference: Early Neutral Evaluation Conferences were held on 11/30/2011 and 1/26/2012. Rule 26(f) conference shall be completed by 2/21/2012. Discovery plan shall be lodged by 3/8/2012. Case Management Conference set for 3/21/2012 08:30 AM before Magistrate Judge William V. Gallo. Counsel shall participate by telephone. Court will initiate the conference call. Signed by Magistrate Judge William V. Gallo on 1/26/2012. (jah)(jrd) (Entered: 01/26/2012) |
| 02/01/2012 | 49 | MOTION for Default Judgment against Nascent Wine Company by Nery's USA, Inc.. (Attachments: # 1 Declaration, # 2 Exhibit, # 3 Declaration, # 4 Proof of Service)(Mazzarella, Mark). (jah). (Entered: 02/01/2012) |
| 02/03/2012 | 50 | CERTIFICATE OF SERVICE by Nery's USA, Inc. re 49 MOTION for Default Judgment against Nascent Wine Company (Mazzarella, Mark). (jah). (Entered: 02/03/2012) |
| 02/17/2012 | 51 | RESPONSE in Opposition re 49 MOTION for Default Judgment against Nascent Wine Company filed by Genesis Merchant Partners, LP.. (Attachments: # 1 Proof of Service)(Boyer, Ethan). Modified on 2/22/2012 – Proof of Service has s/ of staff. Additional text added in all caps. Email sent to Atty to file Corrected Proof of Service. Edited text to remove extra caps (jah). (Entered: 02/17/2012) |
| 02/22/2012 | 52 | CERTIFICATE OF SERVICE by Genesis Merchant Partners, LP. re 51 Response in Opposition to Motion, (Boyer, Ethan). (jah). (Entered: 02/22/2012) |
| 02/27/2012 | 53 | REPLY to Response to Motion re 49 MOTION for Default Judgment against Nascent Wine Company filed by Nery's USA, Inc.. (Attachments: # 1 Proof of Service)(Mazzarella, Mark) (ag). (Entered: 02/27/2012) |
| 02/28/2012 | 54 | Minute Order by Judge Jeffrey T. Miller: Motions Submitted 49 MOTION for Default Judgment against Nascent Wine Company. Motion Hearing set for 3/5/2012 10:30AM before Judge Jeffrey T. Miller, is vacated. Written order to follow. (gac) (Entered: 02/28/2012) |
| 03/13/2012 | 55 | Supplemental DECLARATION of John Cathcart filed as AFFIDAVIT in Support re 49 MOTION for Default Judgment against Nascent Wine Company filed by John Cathcart, Commercial Targa, S.A. DE C.V., Nery's USA, Inc. (Attachments: # 1 Proof of Service)(Mazzarella, Mark) Modified on 3/14/2012 to clarify text; supplemental documents require leave of court (lao). (Entered: 03/13/2012) |

| 03/21/2012 | 56 | Minute Entry for proceedings held before Magistrate Judge William V. Gallo: Case Management Conference held on 3/21/2012(jmy) (Entered: 03/21/2012) |
|---|---|---|
| 03/21/2012 | 57 | CASE MANAGEMENT CONFERENCE ORDER Regulating Discovery and Other Pretrial Proceedings: Case Management Conference was held on 3/21/2012. Any motion to join other parties, to amend the pleadings, or to file additional pleadings shall be filed by 4/23/2012. All motions, other than motions to amend or join parties, or motions in limine shall be filed by 11/30/2012. Mandatory Settlement Conference set for 12/12/2012 09:00 AM in the chambers of Magistrate Judge William V. Gallo. Memorandum of Contentions of Fact and Law due by 1/13/2013. Proposed Pretrial Order due by 1/25/2013. Final Pretrial Conference set for 2/1/2013 08:30 AM before Judge Jeffrey T. Miller. Jury Trial set for 3/4/2013 10:00 AM before Judge Jeffrey T. Miller. Signed by Magistrate Judge William V. Gallo on 3/21/2012.(jah)(jrd) (Entered: 03/21/2012) |
| 03/23/2012 | 58 | ORDER denying Nery's USA, Inc's 49 Motion for Default Judgment. The motion is denied because entry of default judgment would be premature. Further, Nery's has not demonstrated that prejudice will result absent immediate entry of default judgment against Nascent. Signed by Judge Jeffrey T. Miller on 3/23/2012. (jah) (Entered: 03/23/2012) |
| 04/17/2012 | 59 | AMENDED CASE MANAGEMENT CONFERENCE ORDER Regulating Discovery and Other Pretrial Proceedings: Mandatory Settlement Conference set for 12/12/2012 09:00 AM in the chambers of Magistrate Judge William V. Gallo. Memorandum of Contentions of Fact and Law due by 1/11/2013. Proposed Pretrial Order due by 1/25/2013. Final Pretrial Conference set for 2/1/2013 08:30 AM before Judge Jeffrey T. Miller. Jury Trial set for 3/4/2013 10:00 AM before Judge Jeffrey T. Miller. Signed by Magistrate Judge William V. Gallo on 4/17/2012.(knb)(jrd) (Entered: 04/17/2012) |
| 05/08/2012 | 60 | ORDER Sustaining In Part and Overruling In Part Defendants' Objections to Production of Documents. Signed by Magistrate Judge William V. Gallo on 5/8/2012.(knb)(jrd) (Entered: 05/08/2012) |
| 05/10/2012 | 61 | Joint MOTION for Extension of Time to Complete Discovery *extending time to compel further responses and/or production of documents* by Genesis Merchant Partners, LP. (Attachments: #_1 Proof of Service)(Slania, Jacob) (knb). (Entered: 05/10/2012) |
| 05/10/2012 | 62 | MINUTE ORDER Granting 61 Joint Motion To Extend Deadline To File Motion To Compel Further Responses And/Or Production of Documents. Signed by Magistrate Judge William V. Gallo on 5/10/2012. (knb)(jrd) (Entered: 05/10/2012) |
| 06/01/2012 | 63 | Joint MOTION for Extension of Time to File *Motion to Compel Further Responses and/or Production of Documents* by Genesis Merchant Partners, LP. (Boyer, Ethan) (knb). (Entered: 06/01/2012) |
| 06/04/2012 | 64 | ORDER Granting 63 Joint Motion to Extend Deadline to File Motion to Compel Further Responses and/or Production of Documents. The date by which a Motion to Compel Further Responses And/Or Production of Documents is extended to July 15, 2012. Signed by Magistrate Judge William V. Gallo on 6/4/2012. (knb)(jrd) (Entered: 06/04/2012) |
| 07/16/2012 | 65 | NOTICE of Appearance by John Joseph McNutt on behalf of John Cathcart, Commercial Targa, S.A. DE C.V., Nery's USA, Inc. (Attachments: #_1 Proof of Service)(McNutt, John) (knb). (Entered: 07/16/2012) |
| 08/03/2012 | 66 | Ex Parte MOTION to Withdraw as Attorney of *Record for Plaintiff* by Genesis Merchant Partners, LP. (Attachments: #_1 Declaration)(Boyer, Ethan) (mdc) (Entered: 08/03/2012) |
| 08/06/2012 | 67 | Joint MOTION for Extension of Time to File *EXPERT WRITTEN REPORT* by John Cathcart, Commercial Targa, S.A. DE C.V., Genesis Merchant Partners, LP., Nery's USA, Inc. (Attachments: #_1 Proof of Service)(Lorenzana, Luis) (knb). (Entered: 08/06/2012) |
| 08/07/2012 | 68 | MINUTE ORDER: Granting 67 Joint Motion to Extend Deadline To Supplement Expert Designations and File Expert Written Reports. Signed by Magistrate Judge |

| | | |
|---|---|---|
| | | William V. Gallo on 8/7/2012. (knb)(jrd) (Entered: 08/07/2012) |
| 08/09/2012 | 69 | ORDER Granting 66 Motion to Withdraw as Counsel. Attorney Ethan Thomas Boyer withdrawn. Signed by Judge Jeffrey T. Miller on 8/9/2012. (knb) (Entered: 08/09/2012) |
| 08/20/2012 | 70 | MOTION to Compel *Further Responses to Request for Production of Documents Set No. Two* by Nery's USA, Inc. (Attachments: #_1 Memo of Points and Authorities, #_2 Declaration, #_3 Proof of Service)(Lorenzana, Luis) (knb). (Entered: 08/20/2012) |
| 09/07/2012 | 71 | EX PARTE MOTION *to Further Extend Defendants Deadline to serve the Fed. R. Civ. P. 26(a)(2)(A) and (B) Expert Written Report* by John Cathcart, Commercial Targa, S.A. DE C.V., Nery's USA, Inc. (Attachments: #_1 Proof of Service)(Lorenzana, Luis) Modified to remove duplicate and all caps from text on 9/10/2012 (cge). (Entered: 09/07/2012) |
| 09/07/2012 | 72 | Request for Entry of Clerk Default Judgment against Genesis Merchant Partners, LP. (Attachments: #_1 Declaration, #_2 Proof of Service)(Lorenzana, Luis). Modified on 9/10/2012 − Chambers contacted re Default Judgment (jah). Modified on 9/11/2012 − Default not entered per Chambers (jah). (Entered: 09/07/2012) |
| 09/07/2012 | 73 | MOTION for Summary Judgment *OR IN THE ALTERNATIVE FOR AN ORDER TREATING SPECIFIED FACTS AS ESTABLISHED* by John Cathcart, Commercial Targa, S.A. DE C.V., Nery's USA, Inc. (Attachments: #_1 Memo of Points and Authorities, #_2 Declaration, #_3 Declaration, #_4 Statement of Facts, #_5 Request for Judicial Notice, #_6 Proof of Service)(Lorenzana, Luis) Modified on 9/10/2012 − Sent QC reminder e−mail re uppercase letters in text, and re s/signature matching log−in. (mdc) (Entered: 09/07/2012) |
| 09/10/2012 | 74 | Notice of Lodgement re MOTION for Summary Judgment 73 *Notice of Lodging of Evidence* by John Cathcart, Commercial Targa, S.A. DE C.V., Nery's USA, Inc. (Attachments: #_1 Exhibit)(Lorenzana, Luis)(yeb). QC Mailer sent for wrong event used. (Entered: 09/10/2012) |
| 09/10/2012 | 75 | MINUTE ORDER: granting 71 Defendants Ex Parte Motion To Further Extend Defendants Deadline To Serve Expert Report. The date by which Defendants shall serve their expert witness reports is VACATED. Telephonic Status Conference set for 11/9/2012 10:30 AM before Magistrate Judge William V. Gallo. Signed by Magistrate Judge William V. Gallo on 09/10/2012. (yeb)(jrd) (Entered: 09/10/2012) |
| 10/11/2012 | 76 | Minute Order. The Court held a motion hearing on 10/11/2012 and Granted (Doc. 70 ) Defendant Nery's Motion to Compel Further Responses To Nery's Request for Production of Documents, Set Two. Plaintiff shall provide further responses by 11/13/2012. (Plaintiff Attorney N/A).(Defendant Attorney Luis Lorenzana). (srm)(jrd) (Entered: 10/11/2012) |
| 10/11/2012 | 77 | ORDER TO SHOW CAUSE. An Order to Show Cause Hearing is set for 12/5/2012 at 8:30 AM in Courtroom F before Magistrate Judge William V. Gallo. Plaintiff's Order to Show Cause response due by 11/5/2012. Defendant's Reply due by 11/19/2012. Signed by Magistrate Judge William V. Gallo on 10/11/2012. (All non−registered users served via U.S. Mail Service)(srm)(Modified on 10/18/2012 to serve Plaintiff.)(srm)(jrd) (Entered: 10/11/2012) |
| 10/17/2012 | 78 | ORDER TO SHOW CAUSE For Failure to Prosecute. A Hearing for Dismissal for Want of Prosecution is set for 10/29/2012 10:00 AM before Judge Jeffrey T. Miller. Signed by Judge Jeffrey T. Miller on 10/17/2012. (All non−registered users served via U.S. Mail Service)(srm)(Modified on 10/18/2012 to serve Plaintiff.)(srm)(jrd) (Entered: 10/17/2012) |
| 10/19/2012 | 79 | NOTICE of Appearance by Jerry D Hemme on behalf of Genesis Merchant Partners, LP. (Attachments: #_1 Proof of Service)(Hemme, Jerry) (srm). (Entered: 10/19/2012) |
| 10/19/2012 | 80 | Ex Parte MOTION to Continue *Hearing on Defendant's Motion for Summary Judgment* by Genesis Merchant Partners, LP.. (Attachments: #_1 Memo of Points and Authorities, #_2 Declaration of Jerry D. Hemme, #_3 Declaration of |

| | | |
|---|---|---|
| | | Christopher Kelly)(Hemme, Jerry) (srm). (Entered: 10/19/2012) |
| 10/23/2012 | 81 | RESPONSE in Opposition re 80 Ex Parte MOTION to Continue *Hearing on Defendant's Motion for Summary Judgment* filed by John Cathcart, Commercial Targa, S.A. DE C.V., Nery's USA, Inc.. (Attachments: # 1 Declaration, # 2 Declaration, # 3 Request for Judicial Notice, # 4 Proof of Service)(McNutt, John) (jao). (Entered: 10/23/2012) |
| 10/25/2012 | 82 | NOTICE of Hearing on Motion. Motion Hearing set for 10/29/2012 10:00 AM is vacated and continued to 01:00 PM 10/29/2012 in Courtroom 16 before Judge Jeffrey T. Miller. (no document attached) (gac) (Entered: 10/25/2012) |
| 10/25/2012 | 83 | REPLY to Response to Motion re 80 Ex Parte MOTION to Continue *Hearing on Defendant's Motion for Summary Judgment and Response to the Court's Order to Show Cause for Failure to Prosecute* filed by Genesis Merchant Partners, LP.. (Attachments: # 1 Supplement Declaration of Christopher Kelly, # 2 Supplement Declaration of Jerry D. Hemme, # 3 Proof of Service)(Hemme, Jerry) Mailer sent on 10/26/2012 (jao). (Entered: 10/25/2012) |
| 10/26/2012 | 84 | DECLARATION re 83 Reply to Response to Motion, by Counter Defendant Genesis Merchant Partners, LP., Plaintiff Genesis Merchant Partners, LP. (Attachments: # 1 Proof of Service)(Hemme, Jerry) (jao). (Entered: 10/26/2012) |
| 10/26/2012 | 85 | RESPONSE re 78 Order to Show Cause, filed by Genesis Merchant Partners, LP.. (Attachments: # 1 Supplement Declaration of Kelly, # 2 Supplement Declaration of Sands, # 3 Supplement Declaration of Hemme, # 4 Proof of Service)(Hemme, Jerry)(jao). (Entered: 10/26/2012) |
| 10/26/2012 | 86 | DECLARATION re 85 Response – Other, by Counter Defendant Genesis Merchant Partners, LP., Plaintiff Genesis Merchant Partners, LP.. (Attachments: # 1 Proof of Service)(Hemme, Jerry) (jao). (Entered: 10/26/2012) |
| 10/28/2012 | 87 | REPLY to Response to Motion re 80 Ex Parte MOTION to Continue *Hearing on Defendant's Motion for Summary Judgment and Order to Show Cause for Failure to Prosecute* filed by John Cathcart, Commercial Targa, S.A. DE C.V., Nery's USA, Inc.. (Attachments: # 1 Declaration, # 2 Proof of Service)(Lorenzana, Luis) (jao). (Entered: 10/28/2012) |
| 10/29/2012 | 88 | Minute Entry for proceedings held before Judge Jeffrey T. Miller: Dismissal for Want of Prosecution Pursuant to LR 41.1 held on 10/29/2012. Matter taken into submission. Motions Submitted 80 Ex Parte MOTION to Continue Hearing on Defendant's Motion for Summary Judgment. Written order to follow. (Court Reporter Debra Henson).(Plaintiff Attorney Jerry D Hemme). (Defendant Attorney John McNutt (telephonically), Luis Lorenzana, Mark Mazzarella). (no document attached) (gac) (Entered: 10/29/2012) |
| 10/31/2012 | 89 | ORDER Denying 72 Defendants' Motion to Dismiss for Failure to Prosecute and Granting 80 Rule 56(d) Extension to File Response. Defendants' motion for a request for entry of default is denied and Genesis' motion for an extension to file its opposition to Defendants' motion for summary judgment is granted. Genesis is instructed to file its response to Defendants' motion for summary judgment no later than November 26, 2012. Defendants must file their reply to Genesis' response, which must include any requests for non–terminating sanctions resulting from Genesis' delay, no later than December 3, 2012. Genesis may file a response to Defendants' request for non–terminating sanctions no later than December 5, 2012. The hearing on 73 Defendants' motion for summary judgment is rescheduled for December 10, 2012 at 11:00 a.m. in Courtroom 16 before Judge Jeffrey T. Miller. Signed by Judge Jeffrey T. Miller on 10/31/2012. (jao)(jrd) (Entered: 10/31/2012) |
| 11/01/2012 | 90 | Minute Order. Telephonic Status Conference set for 11/2/2012 02:00 PM before Magistrate Judge William V. Gallo. Only counsel must participate and the Court will initiate the call. Signed by Magistrate Judge William V. Gallo on 11/1/2012.(jao)(jrd) (Entered: 11/02/2012) |
| 11/02/2012 | 91 | Minute Entry for proceedings held before Magistrate Judge William V. Gallo: Status Conference held on 11/2/2012(no document attached) (mcb) (Entered: 11/02/2012) |

| 11/05/2012 | 92 | RESPONSE re 77 Order to Show Cause, *re Sanctions* filed by Genesis Merchant Partners, LP.. (Attachments: # 1 Declaration, # 2 Proof of Service)(Hemme, Jerry) (jao). (Entered: 11/05/2012) |
|---|---|---|
| 11/07/2012 | 93 | Second Amended Case Management Conference Order Regulating Discovery and Other Pretrial Proceedings: Telephonic Status Conference with counsel for all parties held on 11/2/12. Mandatory Settlement Conference set for 3/11/2013 09:00 AM in the chambers of Magistrate Judge William V. Gallo. Memorandum of Contentions of Fact and Law due by 5/3/2013. Proposed Pretrial Order due by 5/17/2013. Final Pretrial Conference set for 5/24/2013 08:30 AM before Judge Jeffrey T. Miller. Jury Trial set for 6/24/2013 10:00 AM before Judge Jeffrey T. Miller. Signed by Magistrate Judge William V. Gallo on 11/7/2012.(jao)(jrd) (Entered: 11/08/2012) |
| 11/12/2012 | 94 | Joint MOTION for Extension of Time to File *Defendants' Deadline to Serve The Fed. R. Civ. P. 26(A)(B) Expert Witness Reports* by John Cathcart, Commercial Targa, S.A. DE C.V., Nery's USA, Inc.. (Attachments: # 1 Proof of Service)(Mazzarella, Mark) (jao). (Entered: 11/12/2012) |
| 11/13/2012 | 95 | Minute Order. 94 Joint Motion to Further Extend Defendants' Deadline To Serve Expert Written Reports is Granted. The date by which each expert witness designated by a party shall prepare a written report be provided to all other parties is extended to January 14, 2013. The date by which any supplemental reports are due is extended to January 28, 2013. Signed by Magistrate Judge William V. Gallo on 11/13/2012. (jao)(jrd) (Entered: 11/13/2012) |
| 11/16/2012 | 96 | MOTION to Substitute Attorney *Mark C. Mazzarella* by John Cathcart, Commercial Targa, S.A. DE C.V., Nery's USA, Inc.. (Attachments: # 1 Notice, # 2 Notice, # 3 Proof of Service)(Mazzarella, Mark) (jao). (Entered: 11/16/2012) |
| 11/19/2012 | 97 | REPLY – Other re 92 Response – Other, 77 Order to Show Cause, filed by John Cathcart, Commercial Targa, S.A. DE C.V., Nery's USA, Inc.. (Attachments: # 1 Proof of Service, # 2 Declaration)(Mazzarella, Mark) (jao). (Entered: 11/19/2012) |
| 11/26/2012 | 98 | RESPONSE in Opposition re 73 MOTION for Summary Judgment *OR IN THE ALTERNATIVE FOR AN ORDER TREATING SPECIFIED FACTS AS ESTABLISHED* filed by Genesis Merchant Partners, LP.. (Attachments: # 1 Response to Separate Statement, # 2 Declaration Christopher Kelly, # 3 Declaration Gavin Watson, # 4 Declaration Timothy Doede, # 5 Declaration Douglas Bisio, # 6 Proof of Service)(Hemme, Jerry) (jao). (Entered: 11/26/2012) |
| 11/26/2012 | 99 | NOTICE OF LODGMENT re 73 MOTION for Summary Judgment *OR IN THE ALTERNATIVE FOR AN ORDER TREATING SPECIFIED FACTS AS ESTABLISHED Notice of Lodgment* filed by Genesis Merchant Partners, LP.. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8)(Hemme, Jerry) Mailer sent, text corected on 11/27/2012 (jao). (Entered: 11/26/2012) |
| 11/28/2012 | 100 | MOTION for Extension of Time to File Response/Reply *Defendants' Deadline to Serve The Fed. R. Civ. P. 26(A)(B) Expert Witness Reports* by John Cathcart, Commercial Targa, S.A. DE C.V., Nery's USA, Inc.. (Attachments: # 1 Declaration, # 2 Declaration, # 3 Proof of Service)(Mazzarella, Mark) (jao). (Entered: 11/28/2012) |
| 11/29/2012 | 101 | Minute Order denying 100 Ex Parte Motion to Further Extend Deadline to Serve Expert Written Reports, Extend Discovery Deadline, and Deadline for Discovery Motions. Signed by Magistrate Judge William V. Gallo on 11/29/2012. (jao)(jrd) (Entered: 11/29/2012) |
| 12/03/2012 | 102 | REPLY to Response to Motion re 73 MOTION for Summary Judgment *OR IN THE ALTERNATIVE FOR AN ORDER TREATING SPECIFIED FACTS AS ESTABLISHED* filed by John Cathcart, Commercial Targa, S.A. DE C.V., Nery's USA, Inc.. (Attachments: # 1 Declaration, # 2 Declaration, # 3 Declaration, # 4 Statement of Facts, # 5 Exhibit, # 6 Proof of Service)(Mazzarella, Mark) (jao). (Entered: 12/03/2012) |
| 12/05/2012 | 103 | Minute Order for proceedings held before Magistrate Judge William V. Gallo: Show Cause Hearing held on 12/5/2012. An award of sanctions is taken under |

| | | |
|---|---|---|
| | | advisement. (Plaintiff Attorney Jerry Hemme). (Defendant Attorney Luis Lorenzana). Signed by Magistrate Judge William V. Gallo on 12/5/2012. (jao)(jrd) (Entered: 12/05/2012) |
| 12/05/2012 | 104 | RESPONSE re 97 Reply − Other, 77 Order to Show Cause, *re Sanctions* filed by Genesis Merchant Partners, LP.. (Attachments: # 1 Proof of Service)(Hemme, Jerry) (jao). (Entered: 12/05/2012) |
| 12/06/2012 | 105 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings (Order to Show Cause) held on 12/5/2012, before Magistrate Judge William V. Gallo. Court Reporter/Transcriber: Debra M. Henson. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or the Court Reporter/Transcriber. If redaction is necessary, parties have seven calendar days from the file date of the Transcript to E−File the Notice of Intent to Request Redaction. The following deadlines would also apply if requesting redaction: Redaction Request Statement due to Court Reporter/Transcriber 12/27/2012. Redacted Transcript Deadline set for 1/7/2013. Release of Transcript Restriction set for 3/6/2013. (akr) (Entered: 12/06/2012) |
| 12/06/2012 | 106 | **Document Stricken** NOTICE by John Cathcart, Commercial Targa, S.A. DE C.V., Nery's USA, Inc. *of Withdrawal of Attorney Luis E. Lorenzana* (Attachments: # 1 Proof of Service)(Mazzarella, Mark) (jao). (Main Document 106 replaced on 12/10/2012) (jao). (Entered: 12/06/2012) |
| 12/07/2012 | 107 | NOTICE by John Cathcart, Commercial Targa, S.A. DE C.V., Nery's USA, Inc. *Amended Withdrawal of Attorney Luis E. Lorenzana* (Attachments: # 1 Proof of Service)(Mazzarella, Mark) (jao). (Entered: 12/07/2012) |
| 12/10/2012 | 108 | ORDER granting 96 Motion to Substitute Attorney. Signed by Judge Jeffrey T. Miller on 12/10/2012. (jao) (Entered: 12/10/2012) |
| 12/10/2012 | 109 | Notice of Document Discrepancies and Order Thereon by Judge Jeffrey T. Miller: Rejecting Document, from Defendants John Cathcart, Commercial Targa, S.A. DE C.V., Nery's USA, Inc., re 106 Notice (Other). Non−compliance with local rule(s), OTHER: Filed in the wrong case. IT IS HEREBY ORDERED: The document is rejected. It is ordered that the Clerk STRIKE the document from the record, and serve a copy of this order on all parties. Signed by Judge Jeffrey T. Miller on 12/10/2012.(jao) (Entered: 12/10/2012) |
| 12/10/2012 | 110 | Minute Entry for proceedings held before Judge Jeffrey T. Miller: Motion Hearing held on 12/10/2012. Motion Submitted, 73 MOTION for Summary Judgment or in the alternative for an order treating specified facts as established. Written order to follow. (Court Reporter Debra Henson).(Plaintiff Attorney Jerry D Hemme). (Defendant Attorney Mark Mazzarella; John McNutt (telephonically)). (no document attached) (gac) (Entered: 12/11/2012) |
| 12/19/2012 | 111 | ORDER Denying in Part and Granting in Part Defendants' Motion for Summary Judgment and Denying Sanctions Pursuant to This Court's Order to Show Cause re 73 Motion for Summary Judgment. Defendants' motion for summary judgment on all claims against Cathcart is granted. Defendants' motion for summary judgment is denied for the breach of contract and unjust enrichment claims, but granted for the negligent misrepresentation and conversion claims. In addition, Defendants' request for sanctions is denied. Signed by Judge Jeffrey T. Miller on 12/19/2012. (jao) (Entered: 12/19/2012) |
| 12/20/2012 | 112 | ORDER After Order to Show Cause Hearing. Before the Court is whether Plaintiff Genesis Merchant Partners should be sanctioned for its failure to attend a hearing on Defendants' Motion To Compel further Responses to their Request for Production of Documents. Since Judge Miller has ruled on this issue, this Court is without authority to rule. Moreover, Judge Miller's well−reasoned decision is one with which this Court entirely agrees. Accordingly, the question of whether monetary sanctions should be imposed on Plaintiff is moot. Signed by Magistrate Judge William V. Gallo on 12/20/2012.(jao)(jrd) (Entered: 12/20/2012) |
| 01/02/2013 | 113 | **Document stricken per Order** NOTICE by John Cathcart, Commercial Targa, S.A. DE C.V., Nery's USA, Inc. *[Proposed] Final Judgment* (Attachments: # 1 |

| | | |
|---|---|---|
| | | Proof of Service Proof of Service)(McNutt, John) (jao). (Main Document 113 replaced on 1/3/2013) (jao). (Entered: 01/02/2013) |
| 01/02/2013 | 114 | **Document stricken per Order** MOTION for Attorney Fees by John Cathcart. (Attachments: # 1 Declaration Lorenzana Declaration, # 2 Declaration McNutt Declaration, # 3 Proof of Service Proof of Service)(McNutt, John) (jao). (Main Document 114 replaced on 1/3/2013) (jao). (Entered: 01/02/2013) |
| 01/03/2013 | 115 | Notice of Document Discrepancies and Order Thereon by Judge Jeffrey T. Miller: Rejecting Document, from Defendant John Cathcart, re 113 Notice (Other). Non-compliance with local rule(s), ECF 2(h): Includes a proposed order or requires judges signature, Civ. L. Rule 5.1: Missing time and date on motion and/or supporting documentation. IT IS HEREBY ORDERED: The document is rejected. It is ordered that the Clerk STRIKE the document from the record, and serve a copy of this order on all parties. Signed by Judge Jeffrey T. Miller on 1/3/2013.(jao)(jrd) (Entered: 01/03/2013) |
| 01/03/2013 | 116 | Notice of Document Discrepancies and Order Thereon by Judge Jeffrey T. Miller: Rejecting Document, from Defendant John Cathcart, re 114 MOTION for Attorney Fees . Non-compliance with local rule(s), Civ. L. Rule 5.1: Missing time and date on motion and/or supporting documentation. IT IS HEREBY ORDERED: The document is rejected. It is ordered that the Clerk STRIKE the document from the record, and serve a copy of this order on all parties. Signed by Judge Jeffrey T. Miller on 1/3/2013.(jao) (Entered: 01/03/2013) |
| 01/07/2013 | 117 | MOTION for Entry of Judgment under Rule 54(b) by John Cathcart. (Attachments: # 1 Memo of Points and Authorities, # 2 Declaration, # 3 Proof of Service)(McNutt, John) (jao). (Entered: 01/07/2013) |
| 01/07/2013 | 118 | MOTION for Attorney Fees by John Cathcart. (Attachments: # 1 Memo of Points and Authorities, # 2 Declaration, # 3 Declaration, # 4 Supplement, # 5 Proof of Service)(McNutt, John) (jao). (Entered: 01/07/2013) |
| 01/22/2013 | 119 | Minute Order for proceedings held before Magistrate Judge William V. Gallo: Discovery Conference held on 1/22/2013. The depositions of Martin and Steven Sands shall be taken in New York. The depositions to be taken in New York shall be scheduled so that there are no large gaps of time between depositions.(Plaintiff Attorney Jerry Hemme). (Defendant Attorney Mark Mazzarella). Signed by Magistrate Judge William V. Gallo on 1/22/2013. (jao) (Entered: 01/22/2013) |
| 02/04/2013 | 120 | **Withdrawn per ECF 122 ** RESPONSE in Opposition re 118 MOTION for Attorney Fees filed by Genesis Merchant Partners, LP.. (Attachments: # 1 Proof of Service)(Hemme, Jerry) (jao). (Entered: 02/04/2013) |
| 02/04/2013 | 121 | **Withdrawn per ECF 122 ** RESPONSE in Opposition re 117 MOTION for Entry of Judgment under Rule 54(b) filed by Genesis Merchant Partners, LP.. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Proof of Service)(Hemme, Jerry) (jao). (Entered: 02/04/2013) |
| 02/04/2013 | 122 | NOTICE by Genesis Merchant Partners, LP. re 121 Response in Opposition to Motion, 120 Response in Opposition to Motion *of Withdrawal of documents* (Attachments: # 1 Proof of Service)(Hemme, Jerry) (jao). (Entered: 02/04/2013) |
| 02/04/2013 | 123 | RESPONSE in Opposition re 117 MOTION for Entry of Judgment under Rule 54(b) filed by Genesis Merchant Partners, LP.. (Attachments: # 1 Proof of Service)(Hemme, Jerry) (jao). (Entered: 02/04/2013) |
| 02/04/2013 | 124 | RESPONSE in Opposition re 118 MOTION for Attorney Fees filed by Genesis Merchant Partners, LP.. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Proof of Service)(Hemme, Jerry) (jao). (Entered: 02/04/2013) |
| 02/12/2013 | 125 | REPLY to Response to Motion re 117 MOTION for Entry of Judgment under Rule 54(b) , 118 MOTION for Attorney Fees filed by John Cathcart. (Attachments: # 1 Proof of Service)(McNutt, John) (jao). (Entered: 02/12/2013) |
| 02/14/2013 | 126 | Minute Order by Judge Jeffrey T. Miller: Motions Submitted 117 MOTION for Entry of Judgment under Rule 54(b), 118 MOTION for Attorney Fees. Motion Hearing set for 2/19/2013 11:00 AM before Judge Jeffrey T. Miller is vacated. |

| | | |
|---|---|---|
| | | Written order to follow. (no document attached) (gac) (Entered: 02/14/2013) |
| 02/20/2013 | <u>127</u> | ORDER Denying <u>117</u> Motion for Entry of Judgment under Rule 54(b); and Declining to Address <u>118</u> Motion for Attorney Fees. Tthe court denies Cathcart's Rule 54(b) motion for entry of judgment and declines to address Cathcart's motion for attorney's fees because it is moot in light of the court's denial of Cathcart's Rule 54(b) motion. Signed by Judge Jeffrey T. Miller on 2/20/2013. (jao) (Entered: 02/20/2013) |
| 03/11/2013 | <u>128</u> | Minute Entry for proceedings held before Magistrate Judge William V. Gallo: Settlement Conference held on 3/11/2013. (Plaintiff Attorney Jerry Hemme). (Defendant Attorney Mark Mazzarella). (jao) (Entered: 03/11/2013) |
| 05/03/2013 | <u>129</u> | PRETRIAL MEMORANDUM by John Cathcart, Nery's USA, Inc. (Attachments: #<u>1</u> Proof of Service)(Mazzarella, Mark) (jao). (Entered: 05/03/2013) |
| 05/20/2013 | 130 | NOTICE of Hearing: On the Courts own motion Final Pretrial Conference set for 5/24/2013 8:30 AM is vacated and continued to 5/31/2013 08:30 AM in Courtroom 5D before Judge Jeffrey T. Miller. (no document attached) (gac) Modified on 5/22/2013 edit hrg type(gac). (Entered: 05/20/2013) |
| 05/31/2013 | 131 | Minute Entry for proceedings held before Judge Jeffrey T. Miller: Final Pretrial Conference held on 5/31/2013. Trial going forward as Bench Trial set for 6/24/2013 10:00 AM in Courtroom 5D before Judge Jeffrey T. Miller. Trial Briefs due by 6/17/2013. Pretrial Order accepted. (Court Reporter Debra Henson). (Plaintiff Attorney Jerry D. Hemme). (Defendant Attorney Christopher Walters). (no document attached) (gac) (Entered: 05/31/2013) |
| 05/31/2013 | <u>132</u> | Pretrial Disclosures by Genesis Merchant Partners, LP. (Attachments: #<u>1</u> Exhibit A, #<u>2</u> Exhibit B, #<u>3</u> Proof of Service)(Hemme, Jerry) (jao). (Entered: 05/31/2013) |
| 06/11/2013 | <u>133</u> | NOTICE by John Cathcart, Commercial Targa, S.A. DE C.V., Nery's USA, Inc. *of Withdrawal of Attorney Mark C. Mazzarella* (Attachments: #<u>1</u> Proof of Service)(Mazzarella, Mark) (jao). (Entered: 06/11/2013) |
| 06/14/2013 | <u>134</u> | Joint MOTION to Allow the Use of Electrical Equipment in the Courtroom by John Cathcart, Commercial Targa, S.A. DE C.V., Nery's USA, Inc. (Attachments: #<u>1</u> Proof of Service)(McNutt, John) (jao). (Entered: 06/14/2013) |
| 06/17/2013 | <u>135</u> | Proposed Findings of Fact by Genesis Merchant Partners, LP.. (Attachments: #<u>1</u> Proof of Service)(Hemme, Jerry) (jao). (Entered: 06/17/2013) |
| 06/17/2013 | <u>136</u> | TRIAL BRIEF by Genesis Merchant Partners, LP. (Attachments: #<u>1</u> Proof of Service)(Hemme, Jerry) (jao). (Entered: 06/17/2013) |
| 06/17/2013 | <u>137</u> | TRIAL BRIEF by Commercial Targa, S.A. DE C.V., Nery's USA, Inc. (Attachments: #<u>1</u> Proof of Service)(McNutt, John) (jao). (Entered: 06/17/2013) |
| 06/18/2013 | <u>138</u> | ORDER Permitting Use of Audio−Visual or Electronic Evidence Presenting Equipment at Trial re <u>134</u> Motion to Allow the Use of Electrical Equipment in the Courtroom. Signed by Judge Jeffrey T. Miller on 6/18/2013. (jao) (Entered: 06/18/2013) |
| 06/19/2013 | <u>139</u> | Proposed Findings of Fact by Commercial Targa, S.A. DE C.V., Nery's USA, Inc. (Attachments: #<u>1</u> Proof of Service)(McNutt, John) (jao). (Entered: 06/19/2013) |
| 06/20/2013 | <u>140</u> | In Limine MOTION to Exclude *Documents in Spanish* by Genesis Merchant Partners, LP.. (Attachments: #<u>1</u> Proof of Service)(Hemme, Jerry) (jao). (Entered: 06/20/2013) |
| 06/21/2013 | <u>141</u> | RESPONSE in Opposition re <u>140</u> In Limine MOTION to Exclude *Documents in Spanish* filed by John Cathcart, Commercial Targa, S.A. DE C.V., Nery's USA, Inc.. (Attachments: #<u>1</u> Exhibit Exhibit A, #<u>2</u> Exhibit Exhibit B, #<u>3</u> Exhibit Exhibit C, #<u>4</u> Exhibit Exhibit D, #<u>5</u> Exhibit Exhibit E, #<u>6</u> Exhibit Exhibit F, #<u>7</u> Exhibit Exhibit G, #<u>8</u> Exhibit Exhibit H, #<u>9</u> Exhibit Exhibit I, #<u>10</u> Exhibit Exhibit J, #<u>11</u> Exhibit Exhibit K, #<u>12</u> Proof of Service Proof of Service)(McNutt, John) (jao). (Entered: 06/21/2013) |

| 06/21/2013 | 142 | PRETRIAL ORDER. Signed by Judge Jeffrey T. Miller on 6/21/2013.(jao) (Entered: 06/21/2013) |
|---|---|---|
| 06/21/2013 | 143 | RESPONSE in Opposition re 140 In Limine MOTION to Exclude *Documents in Spanish (McNutt Declaration in Opposition to MIL)* filed by John Cathcart, Commercial Targa, S.A. DE C.V., Nery's USA, Inc.. (Attachments: # 1 Exhibit Exhibit A, # 2 Exhibit Exhibit B, # 3 Proof of Service Proof of Service)(McNutt, John) Mailer sent on 6/24/2013 (jao). (Entered: 06/21/2013) |
| 06/21/2013 | 144 | RESPONSE in Opposition re 140 In Limine MOTION to Exclude *Documents in Spanish (Walters Declaration in Opposition to MIL)* filed by John Cathcart, Commercial Targa, S.A. DE C.V., Nery's USA, Inc. (Attachments: # 1 Proof of Service)(McNutt, John) (jao). (Entered: 06/21/2013) |
| 06/24/2013 | 145 | Minute Order. for proceedings held before Judge Jeffrey T. Miller: Deferring ruling on 140 Motion to Exclude. Bench Trial held on 6/24/2013. Day of Trial 1. Swore witnesses. Exhibits marked/received. Bench Trial continued to 6/25/2013 09:00 AM in Courtroom 5D before Judge Jeffrey T. Miller. (Court Reporter Debra Henson). (Plaintiff Attorney Jerry Hemme).(Defendant Attorney John Joseph McNutt). (no document attached) (gac) (Entered: 06/25/2013) |
| 06/25/2013 | 146 | Minute Entry for proceedings held before Judge Jeffrey T. Miller: Bench Trial held on 6/25/2013. Day of Trial 2. Swore witnesses. Exhibits marked/received. Bench Trial continued to 6/26/2013 09:00 AM in Courtroom 5D before Judge Jeffrey T. Miller.(Court Reporter/ECR Debra Henson). (Plaintiff Attorney Jerry D Hemme). (Defendant Attorney John Joseph McNutt). (no document attached) (gac) (Entered: 06/26/2013) |
| 06/26/2013 | 149 | Minute Entry for proceedings held before Judge Jeffrey T. Miller: Bench Trial held on 6/26/2013. Day of Trial 3. Swore witnesses. Exhibits marked/received. Defendants oral Motion for Dismissal − denied. Bench Trial continued to 6/27/2013 10:00 AM in Courtroom 5D before Judge Jeffrey T. Miller.(Court Reporter/ECR Debra Henson). (Plaintiff Attorney Jerry D Hemme). (Defendant Attorney John Joseph McNutt). (no document attached) (gac) (Entered: 06/27/2013) |
| 06/27/2013 | 147 | Request for Further Briefing. The parties are requested to provide legal analysis citing applicable state and Restatement of Contracts authority. Simultaneous briefs are to be filed by Monday July 1, 2013 by 10:00 a.m. Closing arguments are scheduled for Tuesday, July 2, 2013 at 10:00 a.m. Signed by Judge Jeffrey T. Miller on 6/27/2013.(jao) (Entered: 06/27/2013) |
| 06/27/2013 | 148 | Amended Request for Further Briefing. The parties are requested to provide legal analysis citing applicable state and Restatement of Contracts authority. Simultaneous briefs, not to exceed 12 pages, are to be filed by Monday July 1, 2013 at 10:00 a.m. Closing arguments are scheduled for Tuesday, July 2, 2013 at 10:00 a.m. Signed by Judge Jeffrey T. Miller on 6/27/2013.(jao) (Entered: 06/27/2013) |
| 06/27/2013 | 150 | Minute Entry for proceedings held before Judge Jeffrey T. Miller: Bench Trial held on 6/27/2013. Day of Trial 4. Exhibits marked/received. Bench Trial continued to 7/2/2013 10:00 AM in Courtroom 5D before Judge Jeffrey T. Miller. Closing arguments to be held 7/2/2013. (Court Reporter/ECR Debra Henson). (Plaintiff Attorney Jerry Hemme). (Defendant Attorney John Joseph McNutt). (no document attached) (gac) (Entered: 06/27/2013) |
| 07/01/2013 | 151 | TRIAL BRIEF *(Defendants' Closing Brief)* by Commercial Targa, S.A. DE C.V., Nery's USA, Inc.. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Proof of Service)(McNutt, John) (jao). (Entered: 07/01/2013) |
| 07/01/2013 | 152 | SUPPLEMENTAL BRIEFING by Plaintiff Genesis Merchant Partners, LP.. (Attachments: # 1 Proof of Service)(Hemme, Jerry) (jao). (Entered: 07/01/2013) |
| 07/02/2013 | 153 | Minute Entry for proceedings held before Judge Jeffrey T. Miller: Bench Trial completed on 7/2/2013. Day of Trial 5. Oral closing arguments held. Court takes matter into submission. Written order to follow. (Court Reporter/ECR Debra Henson). (Plaintiff Attorney Jerry D Hemme). (Defendant Attorney John Joseph McNutt). (no document attached) (gac) (Entered: 07/02/2013) |

| 07/02/2013 | 154 | Joint Exhibit List. (gac) (Entered: 07/02/2013) |
|---|---|---|
| 07/02/2013 | 155 | Witness List. (gac) (Entered: 07/02/2013) |
| 07/26/2013 | 156 | Statement of Decision Pursuant to Rule 52. Based on the applicable law, the evidentiary record before the court, and the foregoing analysis with findings, the Court finds in favor of said Defendants and each of them and against Plaintiffs on all claims. Defendants are to prepare a judgment. Signed by Judge Jeffrey T. Miller on 7/26/2013.(jao) (Entered: 07/26/2013) |
| 09/11/2013 | 157 | BILL OF COSTS and MOTION for Attorney Fees by John Cathcart, Commercial Targa, S.A. DE C.V., Nery's USA, Inc.. (Attachments: # 1 Proposed Judgment, # 2 Bill of Costs, # 3 Bill of Costs, # 4 Memo of Points and Authorities, # 5 Declaration, # 6 Declaration, # 7 Declaration, # 8 Declaration, # 9 Proof of Service)(McNutt, John). Modified on 9/12/2013 − Bills of Costs should be separate entries. Motion and judge association termed per Chambers. Edited text (jah). (Entered: 09/11/2013) |
| 09/12/2013 | 158 | MOTION for Judgment by John Cathcart, Commercial Targa, S.A. DE C.V., Nery's USA, Inc.. (Attachments: # 1 Proof of Service)(McNutt, John). (jah). (Entered: 09/12/2013) |
| 09/13/2013 | 159 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings (Bench Trial, Day 1) held on 6/24/2013, before Judge Jeffrey T. Miller. Court Reporter/Transcriber: Debra M. Henson. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or the Court Reporter/Transcriber. If redaction is necessary, parties have seven calendar days from the file date of the Transcript to E−File the Notice of Intent to Request Redaction. The following deadlines would also apply if requesting redaction: Redaction Request Statement due to Court Reporter/Transcriber 10/4/2013. Redacted Transcript Deadline set for 10/15/2013. Release of Transcript Restriction set for 12/12/2013. (akr) (Entered: 09/13/2013) |
| 09/13/2013 | 160 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings (Bench Trial, Day 2) held on 6/25/2013, before Judge Jeffrey T. Miller. Court Reporter/Transcriber: Debra M. Henson. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or the Court Reporter/Transcriber. If redaction is necessary, parties have seven calendar days from the file date of the Transcript to E−File the Notice of Intent to Request Redaction. The following deadlines would also apply if requesting redaction: Redaction Request Statement due to Court Reporter/Transcriber 10/4/2013. Redacted Transcript Deadline set for 10/15/2013. Release of Transcript Restriction set for 12/12/2013. (akr) (Entered: 09/13/2013) |
| 09/13/2013 | 161 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings (Bench Trial, Day 3) held on 6/26/2013, before Judge Jeffrey T. Miller. Court Reporter/Transcriber: Debra M. Henson. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or the Court Reporter/Transcriber. If redaction is necessary, parties have seven calendar days from the file date of the Transcript to E−File the Notice of Intent to Request Redaction. The following deadlines would also apply if requesting redaction: Redaction Request Statement due to Court Reporter/Transcriber 10/4/2013. Redacted Transcript Deadline set for 10/15/2013. Release of Transcript Restriction set for 12/12/2013. (akr) (Entered: 09/13/2013) |
| 09/13/2013 | 162 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings (Bench Trial, Days 4 &5) held on 6/27/2013 and 7/2/2013, before Judge Jeffrey T. Miller. Court Reporter/Transcriber: Debra M. Henson. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or the Court Reporter/Transcriber. If redaction is necessary, parties have seven calendar days from the file date of the Transcript to E−File the Notice of Intent to Request Redaction. The following deadlines would also apply if requesting redaction: Redaction Request Statement due to Court |

| | | |
|---|---|---|
| | | Reporter/Transcriber 10/4/2013. Redacted Transcript Deadline set for 10/15/2013. Release of Transcript Restriction set for 12/12/2013. (akr) (Entered: 09/13/2013) |
| 09/13/2013 | 163 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings (Bench Trial, Master Index) before Judge Jeffrey T. Miller. Court Reporter/Transcriber: Debra M. Henson. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or the Court Reporter/Transcriber. If redaction is necessary, parties have seven calendar days from the file date of the Transcript to E–File the Notice of Intent to Request Redaction. The following deadlines would also apply if requesting redaction: Redaction Request Statement due to Court Reporter/Transcriber 10/4/2013. Redacted Transcript Deadline set for 10/15/2013. Release of Transcript Restriction set for 12/12/2013. (akr) (Entered: 09/13/2013) |
| 09/20/2013 | 164 | ENTRY OF JUDGMENT in favor of Defendants and against Plaintiff. It is Ordered, Adjudged, and Decreed that Plaintiff recover nothing with regard to claims alleged in the Complaint. Dfts may file a motion for an award of fees and a separate bill of costs in accordance w/ the Federal Rules of Civil Procedures and the Local Rules of the Southern District of California. Signed by Judge Jeffrey T. Miller on 9/20/2013. (jah) (av1). (Entered: 09/20/2013) |
| 09/23/2013 | 165 | BILL OF COSTS submitted by Defendants John Cathcart, Commercial Targa, S.A. DE C.V., Nery's USA, Inc., ThirdParty Plaintiff Nery's USA, Inc., Counter Claimant Nery's USA, Inc. in the amount of $ 46,570.32. Hearing set for 10/11/2013 at 10:00AM. (Attachments: #_1 Mazzarella Bill of Costs, #_2 Declaration re Bill of Costs, #_3 Proof of Service)(McNutt, John). Modified on 9/24/2013 – Removed duplicate attachment description (jah). (Entered: 09/23/2013) |
| 09/23/2013 | 166 | NOTICE of Hearing – Bill of Costs, re_165 Bill of Costs, filed by John Cathcart, Commercial Targa, S.A. DE C.V., Nery's USA, Inc. : Hearing set for 10/11/2013 at 10:00AM. Any opposition or responsive pleading due 10/7/2013. All parties requesting to appear telephonically for this Bill of Costs hearing are directed to join on a conference call, then contact L. Barkins 619–557–6416 at the time of the hearing. (no document attached) (nsp) (Entered: 09/23/2013) |
| 09/23/2013 | 167 | MOTION for Attorney Fees by John Cathcart, Commercial Targa, S.A. DE C.V., Nery's USA, Inc.. (Attachments: #_1 Memo of Points and Authorities, #_2 McNutt Declaration, #_3 Mazzarella Declaration, #_4 Lorenzana Declaration, #_5 Cathcart Declaration, #_6 Proof of Service)(McNutt, John). Modified on 9/24/2013 – Removed duplicate attachment descriptions (jah). (Entered: 09/23/2013) |
| 10/04/2013 | 168 | Objection to Bill of Costs re_165 Bill of Costs, filed by Genesis Merchant Partners, LP.. (Attachments: #_1 Proof of Service)(Hemme, Jerry). (jah). (Entered: 10/04/2013) |
| 10/15/2013 | 169 | AMENDED BILL OF COSTS submitted by Defendants John Cathcart, Commercial Targa, S.A. DE C.V., Nery's USA, Inc., ThirdParty Plaintiff Nery's USA, Inc., Counter Claimant Nery's USA, Inc. in the amount of $7433.25. Hearing set for 10/11/2013 at 10:00AM. (Attachments: #_1 Declaration, #_2 Proof of Service)(McNutt, John). Modified on 10/16/2013 – Edited text (jah). (Entered: 10/15/2013) |
| 10/16/2013 | 170 | NOTICE OF APPEAL to the 9th Circuit as to_164 Entry of Judgment, by Genesis Merchant Partners, LP. (Filing fee $ 455 receipt number 0974–6400994.) (Notice of Appeal electronically transmitted to US Court of Appeals.) (Hemme, Jerry). Modified on 10/16/2013 to add link to the Entry of Judgment. (akr). (Entered: 10/16/2013) |
| 10/17/2013 | 171 | NOTICE of Non–Opposition by Genesis Merchant Partners, LP. re_169 Bill of Costs, (Hemme, Jerry). Modified on 10/18/2013 – Wrong event. Edited text to match pleading (jah). (Entered: 10/17/2013) |
| 10/17/2013 | 172 | CERTIFICATE OF SERVICE by Genesis Merchant Partners, LP. re_171 Notice of Non–Opposition to Bill of Costs. (Hemme, Jerry) Modified on 10/18/2013 (jah). Modified on 10/18/2013 – Wrong event. QC Email sent to Atty. Corrected text |

| | | |
|---|---|---|
| | | (jah). (Entered: 10/17/2013) |
| 10/17/2013 | 173 | USCA Case Number 13−56797 for 170 Notice of Appeal to 9th Circuit, filed by Genesis Merchant Partners, LP. (akr) (Entered: 10/17/2013) |
| 10/17/2013 | 174 | USCA Time Schedule Order as to 170 Notice of Appeal to 9th Circuit, filed by Genesis Merchant Partners, LP. (NOTICE TO PARTIES of deadlines regarding appellate transcripts: Appellant shall file transcript designation and ordering form with the US District Court (see attached), provide a copy of the form to the court reporter, and make payment arrangements with the court reporter on or by 11/15/2013 (see Ninth Circuit Rule 10−3.1); Due date for filing of transcripts in US District Court is 12/16/2013.) (cc: Court Reporter). (Attachments: # 1 Transcript Designation and Ordering Form). (akr) (Entered: 10/17/2013) |
| 10/21/2013 | 175 | RESPONSE in Opposition re 167 MOTION for Attorney Fees filed by Genesis Merchant Partners, LP.. (Attachments: # 1 Declaration, # 2 Proof of Service)(Hemme, Jerry). (jah). (Entered: 10/21/2013) |
| 10/24/2013 | 176 | TRANSCRIPT DESIGNATION AND ORDERING FORM by Genesis Merchant Partners, LP, for proceedings held on 10/29/12, 12/05/12, 12/10/12, 05/31/13, 06/24/13, 06/25/13, 06/26/13, 06/27/13, 07/02/13 re 170 Notice of Appeal to 9th Circuit. (Attachments: # 1 Proof of Service)(Hemme, Jerry). (akr). (Entered: 10/24/2013) |
| 10/28/2013 | 177 | REPLY to Response to Motion re 167 MOTION for Attorney Fees filed by John Cathcart, Commercial Targa, S.A. DE C.V., Nery's USA, Inc.. (Attachments: # 1 Declaration of John J. McNutt # 2 Declaration of Mark C. Mazzarella, # 3 Declaration of Luis E. Lorenzana, # 4 Proof of Service)(McNutt, John). Modified on 10/29/2013 − Edited attachment descriptions (jah). (Entered: 10/28/2013) |
| 10/29/2013 | 178 | Minute Order by Judge Jeffrey T. Miller: Motions Submitted 167 MOTION for Attorney Fees. Motion Hearing set for 11/4/2013 10:00 AM before Judge Jeffrey T. Miller. Written order to follow.(no document attached) (gac) (Entered: 10/29/2013) |
| 10/30/2013 | 179 | MOTION to Strike 177 Reply to Response to Motion by Genesis Merchant Partners, LP.. (Attachments: # 1 Proof of Service)(Hemme, Jerry). (jah). (Entered: 10/30/2013) |
| 10/31/2013 | 180 | NON−OPPOSITION to Request to File Surreply; RESPONSE in Opposition re 179 MOTION to Strike 177 Reply to Response to Motion filed by John Cathcart, Commercial Targa, S.A. DE C.V., Nery's USA, Inc.. (Attachments: # 1 Proof of Service)(McNutt, John). Modified on 11/1/2013 − Multi pleadings filed as one. Edited to add Non−Opposition (jah). (Entered: 10/31/2013) |
| 11/04/2013 | 181 | ORDER Denying Plaintiff's 179 Motion to Strike Portions of Defendant's 177 Reply to Response to Motion And Granting Plaintiff's Request To File A Surreply. Plaintiff's surreply must be filed by 11/11/2013. Signed by Judge Jeffrey T. Miller on 11/4/2013.(jah)(jrd) (Entered: 11/04/2013) |
| 11/06/2013 | 182 | SUR−REPLY − re 167 MOTION for Attorney Fees filed by Genesis Merchant Partners, LP.. (Attachments: # 1 Exhibit A, # 2 Proof of Service)(Hemme, Jerry) (cxl). (Entered: 11/06/2013) |
| 11/26/2013 | 183 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT (Motion Hearing) for date of 10/29/2012 before Judge Jeffrey T. Miller, re 170 Notice of Appeal to 9th Circuit. Court Reporter/Transcriber: Debra M. Henson. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or the Court Reporter/Transcriber. If redaction is necessary, parties have seven calendar days from the file date of the Transcript to E−File the Notice of Intent to Request Redaction. The following deadlines would also apply if requesting redaction: Redaction Request Statement due to Court Reporter/Transcriber 12/17/2013. Redacted Transcript Deadline set for 12/27/2013. Release of Transcript Restriction set for 2/24/2014. (akr) (Entered: 11/26/2013) |
| 11/26/2013 | 184 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT (Motion Hearing) for date of 12/10/2012 before Judge Jeffrey T. Miller, re 170 Notice of Appeal to 9th Circuit. |

| | | |
|---|---|---|
| | | Court Reporter/Transcriber: Debra M. Henson. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or the Court Reporter/Transcriber. If redaction is necessary, parties have seven calendar days from the file date of the Transcript to E–File the Notice of Intent to Request Redaction. The following deadlines would also apply if requesting redaction: Redaction Request Statement due to Court Reporter/Transcriber 12/17/2013. Redacted Transcript Deadline set for 12/27/2013. Release of Transcript Restriction set for 2/24/2014. (akr) (Entered: 11/26/2013) |
| 11/26/2013 | 185 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT (Pretrial Conference) for date of 5/31/2013 before Judge Jeffrey T. Miller, re 170 Notice of Appeal to 9th Circuit. Court Reporter/Transcriber: Debra M. Henson. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or the Court Reporter/Transcriber. If redaction is necessary, parties have seven calendar days from the file date of the Transcript to E–File the Notice of Intent to Request Redaction. The following deadlines would also apply if requesting redaction: Redaction Request Statement due to Court Reporter/Transcriber 12/17/2013. Redacted Transcript Deadline set for 12/27/2013. Release of Transcript Restriction set for 2/24/2014. (akr) (Entered: 11/26/2013) |
| 12/06/2013 | 186 | ORDER granting in part and denying in part Defendants' 167 Motion for Attorney Fees and Costs. Court awards Defendants $525,427.33 in attorneys' fees and $14,283,74 in costs for a total award of $539,711.07. Signed by Judge Jeffrey T. Miller on 12/6/2013. (jah) (jrl). (Entered: 12/06/2013) |
| 12/16/2013 | 187 | NOTICE OF APPEAL to the 9th Circuit as to 186 Order granting in part and denying in part Defendants' Motion for Attorney Fees and Costs, by Genesis Merchant Partners, LP. (Filing fee $ 505 receipt number 0974–6591981.) (Notice of Appeal electronically transmitted to US Court of Appeals.) (Attachments: # 1 Proof of Service)(Hemme, Jerry). Modified on 12/16/2013 to edit docket text re Order being appealed. (akr). (Entered: 12/16/2013) |
| 12/16/2013 | 188 | USCA Case Number 13–57106 for 187 Notice of Appeal to 9th Circuit, filed by Genesis Merchant Partners, LP. (akr) (Entered: 12/16/2013) |
| 12/16/2013 | 189 | USCA Time Schedule Order as to 187 Notice of Appeal to 9th Circuit, filed by Genesis Merchant Partners, LP. (NOTICE TO PARTIES of deadlines regarding appellate transcripts: Appellant shall file transcript designation and ordering form with the US District Court (see attached), provide a copy of the form to the court reporter, and make payment arrangements with the court reporter on or by 1/15/2014 (see Ninth Circuit Rule 10–3.1); Due date for filing of transcripts in US District Court is 2/14/2014.) (cc: Court Reporter). (Attachments: # 1 Transcript Designation and Ordering Form). (akr) (Entered: 12/16/2013) |
| 12/16/2013 | 190 | OBJECTION by John Cathcart re 186 Order on Motion for Attorney Fees, (Attachments: # 1 Proof of Service)(McNutt, John). (jah). (Entered: 12/16/2013) |
| 12/23/2013 | 191 | Costs Taxed in amount of $7,088.54 against plaintiffs (llb) (Entered: 12/23/2013) |
| 01/13/2014 | 192 | ORDER Deeming Dft John Cathcart's 190 Objection to Fee Order 186 and Request for Notice of Errata or Technical Correction a Motion for Reconsideration. Dft Cathcart's request for reconsideration is denied. Signed by Judge Jeffrey T. Miller on 1/13/2014. (jah) (Entered: 01/14/2014) |