# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

———————————

## GENESIS MERCHANT PARTNERS, LP

*Plaintiff and Appellant,*

v.

## NERY'S USA, INC., ET AL.

*Defendants and Appellees.*

———————————

Appeal From The United States District Court,
Southern District of California, Case No. 3:11-cv-
01589-JM-WVG, Hon. Jeffrey T. Miller

———————————

## APPELLEES' ANSWER BRIEF

———————————

McKENNA LONG & ALDRIDGE LLP
Charles A. Bird
cbird@mckennalong.com
John J. McNutt
600 West Broadway, Suite 2600
San Diego, California 92101-3372
Telephone: 619.236.1414
Facsimile: 619.232.8311

Attorneys for Nery's USA, Inc., Commercial Targa, S.A. de
C.V., and John Cathcart

## Corporate Disclosure Statement

### Rule 26.1, Federal Rules of Appellate Procedure

Comercial Targa, S.A. de C.V. is wholly owned by Nery's USA, Inc., which, in turn, is a privately held corporation with no parent corporation or publicly held corporation that owns 10% or more of its stock.

# TABLE OF CONTENTS

**Page**

Corporate Disclosure Statement.................................................i

STATEMENT OF THE CASE ................................................1

    A.    Overview with defined terms...............................1

    B.    Statement of Facts ................................................2

        1.    Targa becomes a nonfunctioning subsidiary of Nascent...................................2

        2.    Genesis and Nascent gull Cathcart and Nery's into buying Targa by false representations ...........................................5

        3.    The Stock Purchase Agreement...................9

        4.    Targa is a nightmare of undisclosed liabilities......................................................16

        5.    Nascent was and is insolvent ....................20

        6.    Targa has not paid the note and makes no profit ........................................21

    C.    Proceedings Below ............................................22

        1.    The pretrial order......................................22

        2.    Trial and factual findings .........................23

        3.    Applying law to the facts ...........................30

        4.    Attorney's Fees...........................................32

SUMMARY OF ARGUMENT ..............................................32

ARGUMENT ......................................................................37

I.    Technical Points...........................................................37

II.    With Genesis's Knowledge, Nascent Fraudulently Induced, then Materially Breached, the Stock Purchase Agreement ...................................................38

    A.    The standard of review is unmodified clear error...................................................................38

    B.    The breaches were material................................41

C.      Reasonable reliance is immaterial to breach of contract ............................................................ 45

D.      Genesis's argument fails as an objection to fraud as an alternative ground of rescission ...... 48

III.    The District Court Committed No Error in Denying Genesis Recovery and Granting Rescission ................................................................... 54

A.      The District Court did not err in refusing to use the exclusive remedy clause as a bar to defenses ............................................................ 55

     1.      By its own terms, the remedy provision does not apply ............................. 56

     2.      The remedy provision does not bar a defense ...................................................... 60

     3.      If it applied, the remedy provision could not be enforced ................................. 61

B.      The District Court did not err in recognizing that defendants have complete defenses to the note ............................................................... 64

     1.      The standard of review is clear error ........ 64

     2.      The parties' at-issue duties are not severable ..................................................... 67

C.      Defendants obtained no windfall ........................ 70

IV.    Denying the Unjust Enrichment Claim Was Not Clearly Erroneous ........................................................ 75

V.     Attorney's Fees and Costs: Affirm with Limited Remand as to Cathcart ............................................... 76

CONCLUSION ........................................................................ 79

CERTIFICATE OF COMPLIANCE ..................................... 80

STATEMENT OF RELATED CASES ................................. 81

# TABLE OF AUTHORITIES

**Page**

## CASES

*Associated Lathing & Plastering Co. v. Louis C. Dunn, Inc.*,
286 P.2d 825 (Cal.Ct.App. 1955) ................................. 42

*Bauer v. Neuzil*,
152 P.2d 47 (Cal.Ct.App. 1944) ................................. 61

*Behrendt v. Abraham*,
410 P.2d 828 (Cal. 1966) ............................................. 72

*Brown v. Grimes*,
120 Cal.Rptr.3d 893 (Cal.Ct.App. 2011) ..................... 40

*Caminetti v. Pac. Mut. Life Ins. Co.*,
142 P.2d 741 (Cal. 1943) ............................................. 42

*Cataphora Inc. v. Parker*,
No. C09- 5749 BZ, 2010 WL 4791643, (N.D. Cal. Nov. 17, 2010) ........................................................... 73

*Chapman v. Skype, Inc.*,
162 Cal.Rptr.3d 864 (Cal.Ct.App. 2013) ............... 34, 51

*City of Santa Barbara v. Superior Court*,
161 P.3d 1095 (Cal. 2007) ........................................... 63

*Commercial Centre Realty Co. v. Superior Court*,
59 P.2d 978 (Cal. 1936) ............................................... 60

*Covenant Care, Inc. v. Superior Court*,
86 P.3d 290 (Cal. 2004) ............................................... 59

*Dept. of Fair Emp. & Housing v. 1105 Alta Loma Road Apts., LLC*,
65 Cal.Rptr.3d 469 (Cal.Ct.App. 2007) ...................... 61

*Durell v. Sharp Healthcare,*
   108 Cal.Rptr.3d 682 (Cal.Ct.App. 2010) ............... 75, 76

*Foremost Guar. Corp. v. Meritor Savings Bank,*
   910 F.2d 118 (4th Cir. 1990) ........................................ 48

*Freedman v. Rector ETC. of St. Matthias Parish,*
   230 P.2d 629 (Cal 1951) ......................................... 71, 72

*Furla v. Jon Douglas Co.,*
   76 Cal.Rptr.2d 911 (Cal.Ct.App. 1998) ....................... 57

*Grove v. Grove Valve & Regulator Co.,*
   84 Cal.Rptr. 300 (Cal.Ct.App. 1970) ........................... 67

*Heintzsch v. LaFrance,*
   44 P.2d 358 (Cal. 1935) .............................................. 75

*Int'l Poly Bag, Inc. v. Liu,*
   No. D053054, 2009 WL 3387947 (Cal.Ct.App. 4th
   Dist. Oct. 22, 2009) .............................................. 68, 69

*Kern Oil & Ref. Co. v. Tenneco Oil Co.,*
   840 F.2d 730 (9th Cir. 1988) cert. denied, 488
   U.S. 948 (1988) ........................................................... 65

*Kerr Land & Timber Co. v. Emmerson,*
   43 Cal.Rptr. 333 (Cal.Ct.App. 1965) ........................... 67

*Khawar v. Globe Internat.,*
   965 P.2d 696 (Cal. 1998) ............................................ 59

*Kuish v. Smith,*
   105 Cal.Rptr.3d 475 (Cal.Ct.App. 2010) ...................... 73

*L.K. Comstock & Co. v. United Eng'rs & Constructors
   Inc.,*
   880 F.2d 219 (9th Cir. 1989) ....................................... 65

*Lawrence v. Doty,*
   216 P.2d 465 (Cal.Ct.App. 1950) ................................. 49

*Laws v. Sony Music Entertainment, Inc.*,
   448 F.3d 1134 (9th Cir. 2006) ......................................39

*Lentini v. Cal. Ctr. for the Arts, Escondido*,
   370 F.3d 837 (9th Cir. 2004) .......................................41

*Linden Partners v. Wilshire Linden Assocs.*,
   73 Cal.Rptr.2d 708 (Cal.Ct.App. 1998) ............ 34, 44, 51

*MacFadden v. Walker*,
   488 P.2d 1353 (Cal. 1971) ...........................................72

*Mattel, Inc. v. MGA Entm't, Inc.*,
   616 F.3d 904 (9th Cir. 2010) ............................ 36, 71, 75

*McCaffrey Group, Inc. v. Superior Court*,
   169 Cal.Rptr.3d 766 (Cal.Ct.App. 2014) ......................63

*Moreno v. City of Sacramento*,
   534 F.3d 1106 (9th Cir. 2008) ......................................78

*O'Toole v. Superior Court*,
   44 Cal.Rptr.3d 531 (Cal.Ct.App. 2006) ........................60

*Pacific Gas & Elec. Co. v. G.W. Thomas Drayage and
   Rigging Co.*,
   442 P.2d 641 (Cal. 1968) .............................................67

*People v. Heslington*,
   125 Cal.Rptr.3d 740 (Cal.Ct.App. 2011) ......................59

*Perez v. So. Pac. Transp. Co.*,
   267 Cal.Rptr. 100 (Cal.Ct.App. 1990) ..........................60

*Raphael v. Hill*,
   No. G032152, 2004 WL 1466027 (Cal.Ct.App. 4th
   Dist. June 30, 2004) .....................................................62

*Reynolds Metals Co. v. Alperson*
   599 P.2d 83 (Cal. 1979) ...............................................77

*Rutherford v. Prudential Ins. Co.*,
44 Cal.Rptr. 697 (Cal.Ct.App. 1965) ............................ 47

*Salve Regina College v. Russell*,
499 U.S. 225 (1991) ................................................. 33, 40

*Sands v. Eagle Oil & Refining Co.*,
188 P.2d 782 (Cal.Ct.App. 1948) .................................. 54

*Saunders v. Taylor*,
50 Cal.Rptr.2d 395 (Cal.Ct.App. 1996) ........................ 57

*Serpa v. Cal. Surety Investigations, Inc.*,
155 Cal.Rptr.3d 506 (Cal.Ct.App. 2013) ...................... 63

*Sixta v. Ochsner*,
9 Cal.Rptr. 617 (Cal.Ct.App. 1961) ............................. 57

*Starr v. Davis*,
288 P. 706 (Cal.Ct.App. 1930) ..................................... 68

*Stephens v. City of Vista*,
994 F.2d 650 (9th Cir. 1993) ........................................ 65

*Superior Motels, Inc. v. Rinn Motor Hotels, Inc.*,
241 Cal.Rptr. 487 (Cal.Ct.App. 1987) .......................... 40

*Taylor v. Maddox*,
366 F.3d 992 (9th Cir. 2004) ................................... 38, 39

*Terra Sec. ASA Konkursbo v. Citigroup, Inc.*,
Nos. 10-4712, 10-4714, 2011 WL 6067260 (2d Cir.
Dec. 7, 2011) ............................................................. 48

*Tolbert v. Page*,
182 F.3d 677 (9th Cir. 1999) ................................... 33, 40

*Tri-Valley CAREs v. U.S.D.O.E.*,
671 F.3d 1113 (9th Cir. 2012) ..................................... 37

*U.S. for Use of Palmer Constr., Inc. v. Cal State Elec., Inc.*,
    940 F.2d 1260 (9th Cir. 1991) ......................................73

*Wiechmann Engineers v. State ex rel. Dept. of Public Works*,
    107 Cal.Rptr. 529 (Cal.Ct.App. 1973)....................46, 47

*Wong v. Jing*,
    117 Cal.Rptr.3d 747 (Cal.Ct.App. 2010) ......................59

## STATUTES

28 U.S.C. § 2254 ....................................................................38

Cal. Civ. Code § 1572 ..........................................................57

Cal. Civ. Code § 1668 ..........................................................63

Cal. Civ. Code § 1689 ..........................................................49

Cal. Civ. Code § 3532 ..........................................................56

## OTHER AUTHORITIES

1 Witkin, Summary of Cal. Law
    (10th ed. 2005) Contracts §§ 852-53 ......................41, 42

34A Cal.Jur.3d, Fraud and Deceit, § 15 at 380
    (2008 Thomsom/Reuters West)...................................45

34A Cal.Jur.3d, Fraud and Deceit, § 52 at 426
    (2008 Thomson/Reuters West)...................................45

34A Cal.Jur.3d, Fraud and Deceit, § 53 at 427
    (2008 Thomson/Reuters West)...................................46

34A Cal.Jur.3d, Fraud and Deceit, § 58 at 432
    (2008 Thomson/Reuters West)...................................46

34A Cal.Jur.3d, Fraud and Deceit, § 60 at 435
    (2008 Thomsom/Reuters West) ............................. 50, 51

34A Cal.Jur.3d, Fraud and Deceit, at 359
    (2008 Thomson/Reuters West) ..................................... 46

Rest.3d Agency § 5.04 & com. c, illus 3 ................................ 54

Webster's Third New Int'l Dict. (1971) at 1176, col. 1. ........ 59

## STATEMENT OF THE CASE

### A.    Overview with defined terms

Nery's, USA, Inc. ("Nery's") bought the stock of

Comercial Targa, S.A. de C.V. ("Targa") from Nascent Wine

Company ("Nascent"). Consideration included a $1.85

million note payable from Nery's to Nascent and guaranteed

by Targa ("Nery's note"). Nascent made materially false

representations and warranties to Nery's. To illustrate,

Nascent warranted that Targa had no more than $150,000

liabilities, but Targa had more than $850,000 in liabilities.

(Dkt. 156, 1 ER 56:4-6.)

At the time of the sale, Nascent, the seller, owed a debt

to Genesis Merchant Partners, LP ("Genesis") secured by

Nascent's stock in Targa, among other assets. Nascent had

no prospect of paying Genesis, Targa's recoverable value was

zero or less, and Genesis had no solution to the debt except

the stock sale. Knowing before the stock sale about Nascent's

false representations to buyer Nery's, Genesis took a

windfall assignment of the Nery's note. Undisputedly,

Genesis is *not* a holder in due course. (4 RT 605-06, ASER 104-105.)

In the District Court, Genesis attempted to enforce the Nery's note against Nery's and Targa. Genesis also sued John Cathcart ("Cathcart"), Nery's chief executive. Cathcart prevailed on summary judgment, and Genesis argues no error in the summary judgment. After a four-day bench trial on Genesis's claims against Nery's and Targa, the court issued its Statement of Decision Pursuant to Rule 52 ("Statement") and judgment denying Genesis any recovery. Genesis's appeal attacks the Statement, the judgment for Nery's and Targa, and a later order awarding attorney's fees.

"Defendants" refers collectively to Nery's and Targa. Defendants will now show that the judgment and the attorney's fee order should be affirmed.

## B.    Statement of Facts

### 1.    *Targa becomes a nonfunctioning subsidiary of Nascent*

Sandro Piancone (Piancone) was chief executive of Nascent, a publicly traded food service company. (1 RT 64-

65.) Cathcart consulted with Nascent on capital development. (3 RT 343-44.) Nascent acquired Targa in late 2007. (1 RT 67; 3 RT 344.) Targa sold cheese, including the proprietary Nery's brand, in northern Baja California. (1 RT 67-68; 3 RT 355.) It also had a license to import cigarettes. (1 RT 69; 3 RT 356.) In 2006, Targa had $7 million revenue. (1 RT 126; 4 RT 546, ASER 96.)

After the Targa acquisition, Cathcart had no contact with Piancone in 2007 or 2008. (3 RT 345.)

Nascent took a loan from Genesis in March 2008 to finance taking the Nery's brand national in Mexico. (1 RT 71.) Nascent executed a promissory note to Genesis for $1 million, initially for a six-month term. (1 RT 71.) Genesis is an entity of Sands Brothers, the principals of which are the Sands brothers. (See 3 RT 405, ASER 49; TE 335, ASER 6-7, 17; TE 63, ASER 4.) Timothy Doede ("Doede") was an employee of Sands Brothers and portfolio manager for Genesis. (TE 335, ASER 6-7.) Piancone negotiated the loan

with Doede. (1 RT 72; TE 335, ASER 8.) The term of the loan was later extended to March 31, 2009. (1 RT 73.)

Targa's sales began to fall in 2008, and Nascent did not have the capital to take the Nery's brand national. (1 RT 74, ASER 20.) By the middle of 2009, Targa was operating at a loss, and Nascent lacked capital to do anything to make Targa profitable. (1 RT 74-75, ASER 20-21.) Nascent was in default on the Genesis loan. (1 RT 78.) Targa continued to decline until the sale to Nery's. (1 RT 103.)

Under financial stress, Nascent and Targa's financial systems started to break down. In late 2008, because other businesses were not doing well, sometimes Targa's money went to pay bills of other companies. (2 RT 218.) These diversions continued into 2009. (2 RT 219.) Taxes were not being paid. (2 RT 219-21.) Targa's employee Christmas bonuses and vacation pay were not paid. (2 RT 221.) General manager Alvarez requested checks from Piancone to pay the tax and employee liabilities, but Piancone did not send any checks for delivery. (2 RT 222.)

In 2009, Piancone contacted Cathcart about Nascent's problems. (3 RT 346.) That led to a "handful" of consulting conversations. (3 RT 346-47.) Cathcart was on a board of advisors for Nascent, advising Nascent about how to raise capital. (1 RT 76, ASER 22.) The "board" of Nascent, not the "board of advisors," decided to sell Targa. (1 RT 77.) No evidence suggests Cathcart ever served as a Nascent officer or director.

Cathcart formed Nery's in June or July of 2009. (3 RT 403.) At first, Nery's pursued a license agreement with Targa for distribution of Nery's cheese in the United States. (3 RT 347-49, 403; TE 7.)

## 2. Genesis and Nascent gull Cathcart and Nery's into buying Targa by false representations

Around July 2009, Cathcart met with Piancone and Doede about solving Nascent's capital problems. (3 RT 349.) Nothing resulted. (3 RT 349-50.) Piancone suggested that Cathcart could buy Targa. (3 RT 350.) Nery's offered to buy

Targa from Nascent. (3 RT 350; TE 8.) Cathcart thought Targa had value if it had working capital. (3 RT 354.)

At about the same time, Nascent's tax attorney, Reyes, informed Doede of Genesis directly, with a copy to Piancone, that Targa was delinquent in social security taxes, and those taxes (i) could not be negotiated and (ii) could cause liens and embargos on bank accounts, inventory, and equipment. (1 RT 143, ASER 31; TE 63, ASER 5.) Doede forwarded the report to the Sands brothers. (TE 335, ASER 17; TE 63, ASER 4.) Doede received Reyes's email because the consequences of the tax delinquency would materially affect the value of Nascent's assets—the Targa stock—and thereby the collateral on the loan. (TE 335, ASER 18-19.)

Beginning in September 2009, Piancone consistently told Cathcart that Nascent would deliver Targa to Nery's with $150,000 in liabilities and everything else cleaned up. (1 RT 139-40, ASER 29-30; 3 RT 368-69.) Piancone told Cathcart that a few months of rent had not been paid; he did not disclose that Targa owed rent for a full year in the

amount of $88,000. (1 RT 164-65, ASER 40-41; 3 RT 370.)

Piancone said the new company would be able to sign a new

lease for Targa's facility on favorable terms. (1 RT 164-65,

ASER 40-41; 3 RT 371.) Doede knew Targa's rent was in

arrears. (TE 335, ASER 15.)

By September or October 2009, Cathcart began to

negotiate with Doede for an arrangement that would allow

Nery's to buy Targa without paying off Nascent's secured

debt but with an infusion of $1 million working capital.

(3 RT 360-61, 450-51.) Cathcart found, and disclosed, that he

could raise only $300,000. (3 RT 361, 468, ASER 87.)

Targa was not solvent and did not have working capital

to develop sales. (1 RT 127-28, ASER 23-24.) Targa would

close but for the deal. (1 RT 133-36, ASER 25-28.) Piancone

so informed Doede. (1 RT 136, ASER 28.)

In January 2010, Cathcart walked away from the

potential purchase of Targa. (3 RT 407, ASER 51.) Not long

afterward, Piancone revived the deal in a structure of Nery's

buying Targa's stock on a promissory note. (*Id*.) Genesis,

primarily through Doede but with some input from the Sands brothers, negotiated the terms of the documents, and its lawyers made comments and edits. (3 RT 405, 408, ASER 49, 52; TE 335, ASER 16.) As secured creditor, Genesis had complete control of whether the deal would be done. (3 RT 408, ASER 52; see 3 RT 472; TE 19.)

Before the stock purchase, the Nascent loan was in default, and Doede understood Targa had no working capital. (TE 335, ASER 10.) Doede also understood Cathcart needed outside investment to do the deal (3 RT 506, ASER 93; TE 30), had tried to raise $1 million for working capital, but was able to raise only $300,000 (TE 335, ASER 11). Doede knew that the $2 million purchase price would have to be paid from future earnings of Targa. (TE 335, ASER 9.) Genesis did not take collection action between July 2009 and the stock sale because it was trying to find a solution to the loan. (TE 335 at 185.) Genesis's only alternative to the stock purchase was to foreclose on Nascent's pledged assets. (TE 335, ASER 13-14.)

Targa had essentially regressed to a start-up company. (3 RT 404, 406, ASER 48, 50.) Nery's was buying Targa's (rented) physical plant, the Nery's brand, the tobacco importation license, and a business free enough of debt to be restarted with $300,000 working capital. (3 RT 372, 404, 406, ASER 48, 50.)

The $150,000 debt acknowledged by Piancone resulted from a transaction with a vendor called Collica, and because of the involvement of Ex-Im Bank, that Targa liability could not be avoided. (3 RT 370, 426-27, 430-31, ASER 60-61, 64-65; TE 335, ASER 12 [Doede's knowledge].) Assumption of that liability became part of the stock purchase price. (3 RT 432-33, 475-76, ASER 66-67, 88-89; *see* 430-31, ASER 64-65; TE 22, § 2.2(a), 2 ER 155.)

### 3. *The Stock Purchase Agreement*

The revived deal was memorialized in the Stock Purchase Agreement. (3 RT 363; TE 22, 2 ER 145-87.) Nery's bought 99% of Targa's stock from Nascent for an assumption of "accounts payable not to exceed $150,000" and a note

payable to Nascent for $1,850,000. (TE 22, § 2.2, 2 ER 155.) At closing, Nery's signed and delivered the note. (3 RT 372; TE 23, 2 ER 188-92.) Nascent assigned the note to Genesis. (1 RT 106.) Nery's was to pay the Nery's note to Genesis until Genesis's loan to Nascent was paid off. (1 RT 107.)

Piancone signed the Stock Purchase Agreement for Nascent, the seller, and also signed the agreement and the guaranty of the Nery's note for Targa. (1 RT 105-06; TE 22, 2 ER 186; TE 23, 2 ER 190.) Cathcart did not review or sign the collateral assignment of the Nery's note. (3 RT 488.)

Section 3.8 of the Stock Purchase Agreement contains representations and warranties about Targa's financial condition. First, § 3.8(a) states that Targa's books and records are correct, complete, and maintained under an

adequate system of internal controls.[1] (TE 22, 2 ER 157.)

Section 3.8(c) represents and warrants that Targa has no liabilities except those set forth in its current financial statements, liabilities arising in the ordinary course of business after the date of that statement, and liabilities disclosed on a schedule to the agreement.[2] (TE 22, 2 ER 158.) Section 3.8(c) specifically represents there are no tax liabilities. (*Id.*) There is no schedule of additional liabilities. (TE 22, 2 ER 145-87.)

_____

[1] "(a) The books of account and other financial records of the Company, all of which have been made available to Buyer, are correct and complete in all material respects, represent actual bona fide transactions and have been maintained in accordance with sound business and accounting practices. Each transaction is properly and accurately recorded in the books and records of the Company. The Company maintains an adequate system of internal accounting controls and does not engage in or maintain any off-the-books accounts or transactions."

[2] "(c) Except as set forth on Schedule 3.8(e), the Company does not have any liabilities (whether known or unknown, whether direct or indirect, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated, and whether due or to become due, including any liability for Taxes), except for (i) liabilities set forth in the Company Current Financials, and (ii) liabilities that have arisen after the Company Current Financials in the ordinary course of business."

Section 3.10 of the Stock Purchase Agreement represents and warrants that Targa's booked accounts receivable "have been billed and are valid and collectible in the ordinary course of business." (TE 22, 2 ER 159.)

Section 3.12 of the Stock Purchase Agreement addresses employee costs other than the actual paycheck. (3 RT 440, ASER 73.) Specifically, it declares that each Welfare Plan for Targa employees "has been established, maintained, administered and funded in all material respects in compliance with all applicable Laws." (TE 22, § 3.12(a), 2 ER 160.) A Welfare Plan includes any employee

benefit program to which Targa contributes. (TE 22, 2 ER 155-56.[3])

In § 3.13(b), Nascent represented and warranted that "[e]xcept as set forth on Schedule 3.13 [there is none]: [¶], the Company has paid, or has made adequate reserves on its books for the payment of, all Taxes shown to be due on such Tax Returns or claimed to be due by any Governmental Authority or which the Company otherwise is liable for or is

---

[3] " 'Welfare Plan' means any other plan or program maintained for past or present employees of the Company, including without any limitation health insurance plan, life insurance plan, option plan, bonus plan, savings plan or severance plan, profit sharing, bonus, stock option, stock purchase, stock bonus, restricted stock, stock appreciation right, phantom stock of other equity-based compensation arrangement, vacation pay, holiday pay, tuition reimbursement, scholarship, severance, dependent care assistance, excess benefit, bonus, incentive compensation, salary continuation, supplemental retirement, deferred compensation, employee loan or loan guarantee program, split dollar, cafeteria plan, and other compensation arrangements and other material agreement, arrangement, plan, policy, practice or program related to employment, compensation or employee benefits whether written or unwritten, funded or unfunded, formal or informal, that are maintained or contributed to by the Company."

required to withhold on behalf of any other Person." (TE 22, 2 ER 160; see 3 RT 440, ASER 73.)

The Stock Purchase Agreement contains many terms backing up the specific representations and warranties. The agreement recites that the representations and warranties are made "[a]s a material inducement to [Nery's] to enter into this Agreement and to consummate the transactions completed herein. . . ." (TE 22, 2 ER 155.) "None of the representations or warranties . . . included in this Agreement . . . includes any untrue statement of a material fact or is misleading in any material respect or omits to state any material fact." (TE 22, ¶ 3.30, 2 ER 166.) Nascent stated that the representations and warranties "shall be true and correct in all material respects on and as of the Closing Date with the same force and effect as though made on and as of the Closing Date." (TE 22, ¶ 7.1(a), 2 ER 175.)

The agreement provides for Nascent to indemnify Targa and Nery's from any loss, claim, liability, expense, or other damage, as may be attributed to taxes. (TE 22, p. 25,

§ 6.5(b), 2 ER 172.) It also has a more general indemnity and exclusive remedy[4] provision. (TE 22, pp. 28-31, 2 ER 177-80.)

Before closing the Stock Purchase Agreement, Cathcart had never seen the email from Mexican Social Security to Doede in July 2009. (3 RT 408-09, ASER 52-53.) Nobody disclosed the content of the email or the fact that social security taxes were due. (3 RT 409, ASER 53.) Cathcart would not have executed the Stock Purchase Agreement if he had known about the social security taxes. (*Id.*) He could not have provided enough working capital to deal with the taxes; Targa would not have been worth the investment of effort and money. (3 RT 410, ASER 54.)

Cathcart relied on the representations and warranties of Nascent in § 3.8 in signing the contract; they induced him to sign. (3 RT 434-35, 440-41, ASER 68-69, 73-74.)

---

[4] Section 8.5 provides: "Except as specifically provided elsewhere herein, the provisions for indemnification set forth in this Article VIII are the exclusive remedies of Sellers, Buyer and the Company arising out of or in connection with this Agreement, and shall be in lieu of any rights under contract, tort, equity or otherwise (other than claims based on actual fraud or intentional breach of this Agreement)."

Piancone's disclosures related to § 3.8(c) included that Nascent would address all liabilities except Ex-Im Bank before closing the deal. (3 RT 435, ASER 69.)

### 4. *Targa is a nightmare of undisclosed liabilities*

Unbeknownst to Cathcart, at closing time Targa had negative value because of its undisclosed liabilities. (3 RT 459, ASER 79.) Even in the most optimistic scenario, Targa's value would have been close to zero. (3 RT 460, ASER 80.)

Cathcart first suspected warranties and representations were false within a few days of closing when he received a list of employees who had not received their mandatory Christmas bonuses of about $6,000. (3 RT 436-37, ASER 70-71.) Shortly thereafter, Cathcart received a list of employees who were entitled to wrongfully unpaid vacation pay and severance pay. (3 RT 440, ASER 73.)

In about the second week after the deal, a tax collector arrived at Targa with an order requiring immediate cure of social security taxes, or the tax authority would embargo and confiscate all inventory and machinery. (2 RT 253,

ASER 44; 3 RT 410-11, ASER 54-55.) On Cathcart's direction, Targa manager Alvarez did a wire transfer into the checking account, went to the bank to get cash, and paid cash to the collector. (2 RT 254, ASER 45.) A second time, a social security tax collector showed up with police and a locksmith to close the doors. (*Id.*) Alvarez again paid in cash, including the expenses of the police and the locksmith. (2 RT 255, ASER 46.) Another time, a tax collector took some equipment equivalent in value to a tax bill. (2 RT 256, ASER 47.)

An income tax officer showed up one day with a three-million-peso lien notice. (2 RT 256, ASER 47, 268.) Cathcart demanded that Nascent deal with the tax lien, and Piancone said Nascent could not do so. (4 RT 545, ASER 95.) In October 2011, a tax consultant was finally able to have the tax lien removed. (3 RT 448, ASER 77; *see* 4 RT 557.)

The Mexican government could still claim up to $500,000 as a transfer tax on the stock purchase, which could be asserted against Targa because Nascent is

insolvent. (4 RT 545-46, ASER 95-96.) Section 6.7 of the Stock Purchase Agreement requires Nascent to pay all transfer taxes. (ER 175.)

It took months to get Targa's financial and records system in order. (3 RT 413, ASER 57.) There was no clear picture of liabilities (3 RT 422-23, ASER 58-59), and Piancone did not know what they were (1 RT 163-64, ASER 39-40). The result of an early post-closing review of the corporate records showed real liabilities of $370,000. (3 RT 428, ASER 62.) There were more. (See Dkt. 156, 1 ER 56:4-23.)

For almost two years after closing, Cathcart continuously learned about unpaid taxes, starting with the social security. (3 RT 441-42, ASER 74-75.)

Since closing, Nery's or Targa paid $241,122.69 towards undisclosed liabilities documented in one trial exhibit. (2 RT 316; 3 RT 490-91, ASER 90-91; TE 307.) Targa and Nery's made other payments that did not result in complete documentation because Targa remained in disarray

and some payments, like to tax authorities, were emergencies paid in cash. (3 RT 412-13, 491, ASER 56-57, 91.)

Nery's paid $88,000 in back rent. (3 RT 491, ASER 90.) The landlord was not willing to forgive any rent. (3 RT 371.)

Most of the unexpected debts were paid in the first six months. (3 RT 494, ASER 92.) As of trial, the Ex-Im Bank debt was still in negotiation. (4 RT 525.)

None of Targa's accounts receivable, represented by Piancone to be about $30,000, could be collected. (3 RT 439, ASER 72.)

Cathcart's business plan was to use new working capital to buy and resell Nery's brand cheese and tobacco products, but the surprise liabilities destroyed the business plan. (3 RT 428-29, 442, 447, 454, 462-66, ASER 62-63, 75, 78, 82-86.) Cathcart could not raise capital on the basis of a failed plan. (3 RT 443.)

### 5. *Nascent was and is insolvent*

After the closing, Cathcart told Piancone about the surprise liabilities and provided documentation as they were discovered, functionally demanding indemnity. (1 RT 113; 3 RT 437, 486, ASER 71.) Piancone claimed to be surprised by the liabilities as well. (1 RT 113-14.) Piancone said Nascent could do nothing because Nascent was broke. (1 RT 149-50, ASER 37-38; 3 RT 437, ASER 71.)

Piancone admits Nascent breached the warranty as to taxes because Targa had several unpaid tax liabilities at closing. (1 RT 144-45, ASER 32-33.) Piancone admits Nascent breached the warranty as to employee plans because there were unpaid employment liabilities at closing. (1 RT 146-47, ASER 34-35.) Piancone admits that Nascent had no assets to perform on its indemnity. (1 RT 149, ASER 37.) Piancone admits he understood Nascent was responsible for the accuracy of the representations and warranties regardless of whether he personally knew their truth. (1 RT 167, ASER 42.)

Nascent is financially bankrupt, but has never filed for bankruptcy. (1 RT 168, ASER 43.)

### 6. *Targa has not paid the note and makes no profit*

Targa or Nery's made the first two payments on the Nery's note. (3 RT 379.) Nery's stopped paying on the Nery's note in July 2010. (3 RT 497.) Targa or Nery's made another payment on the Nery's note in December 2010. (3 RT 379.) No other payments have been made. (3 RT 380.) According to a Genesis accountant, the amount due on Nascent's debt to Genesis is $2,556,768.34 as of June 24, 2013. (2 RT 202-03.) He testified that the amount due to Nascent, assigned to Genesis, was $2,978.682 as of the same date. (2 RT 204.)

Targa has not produced net profit in the three years since the deal. (3 RT 460, ASER 80; *see* 516-17; TE 311 [2010]; 4 RT 531, 556, ASER 97.) Its 2012 revenues were about $8 million. (3 RT 460, ASER 80.) On those revenues it had about a $150,000 loss. (3 RT 461, ASER 81.)

The silence of the record establishes that nobody but Cathcart and his investors ever contributed anything to

Nery's, Genesis did not contribute anything to Targa or Nascent after the 2008 loan, and Nascent contributed nothing to Targa after the stock purchase. (*See* Dkt. 142, 1 ER 70, ¶ 28.)

## C. Proceedings Below

The District Court granted summary judgment in favor of Cathcart. (Dkt. 111, 1 ER 100, 104-06, 119.) In partially granting and partially denying summary judgment sought by others, the court found that Genesis is not a holder in due course of the Nery's note. (*Id.*, 1 ER 109-10.) Genesis has not challenged the holder-in-due course finding in any court thereafter. Before entering a pretrial order, the District Court denied Cathcart's motion to enter a separate judgment in his favor. (Dkt. 127, 1 ER 91-98.)

### 1. *The pretrial order*

The case was tried on a pretrial order. (Dkt. 142, 1 ER 66-90.) The parties stipulated that Nery's made three separate, equal payments to Genesis on the Nery's note in April 2010, May 2010, and January 2011, totaling $46,250.01. (*Id.* at 68.)

The parties agreed not to contest certain facts. (Dkt. 142, 1 ER 68.) "Cathcart was a member of Nascent's Board of Advisors in the area of finance and business development for a limited period of time. Cathcart also became a shareholder in Nascent." (Dkt. 142, 1 ER 69.) In 2007, Targa had "a net profit of $1,200,000." (*Id.*) "In mid-2009, Nascent was experiencing severe financial difficulties, due in large part to lack of operating capital. Genesis was aware of these financial difficulties." (*Id.* at 69-70.)

## 2. *Trial and factual findings*

The District Court issued a statement of decision after argument. (Dkt. 156, 1 ER 43-65.) The statement of decision finds substantially what defendants have reported *ante* in their statement of facts. Here, defendants will summarize and quote findings on some of the primary controverted issues.

"By late 2009, Targa was barely operating at all, and at a loss. Targa's income was approximately $10,000 to $15,000

a month with monthly expenses at $25,000 to $30,000." (Dkt. 156, 1 ER 47:6-8.)

Cathcart's decision to acquire Targa was based on, among other things, "Piancone's representation that there were no more than a few hundred dollars in accounts payable other than the $150,000 to Ex-Im Bank. Piancone further represented that any accounts payable were stale and not necessary to pay. Piancone also represented to Cathcart that facility back rent would be forgiven by the landlord in lieu of a new rental agreement." (Dkt. 156, 1 ER 47:18-22.)

Cathcart was not told: "That in 2008 to 2009, Targa's revenues were being diverted to other Nascent companies; that Targa's vendors were not getting paid because of this diversion; that taxes and labor expenses were not being paid by Targa for 2009; and that Alvarez was asking Piancone to send checks to pay for these liabilities with the requests being unheeded. Alvarez personally was aware of the approximately $306,000 in unpaid liabilities separate and

apart from approximately $285,000 in unpaid taxes due to the Mexican government. Meanwhile, none of this information regarding Targa's financial liabilities was communicated to Cathcart by Piancone or Alvarez." (Dkt. 156, 1 ER 48:2-11.)

"Genesis also knew or should have known, through Nascent and [Doede], that Targa faced a very large rent liability and possible eviction from its facility, that Targa had large tax liabilities pending, and that other significant liabilities and risks existed for Targa." (Dkt. 165, 1 ER 20-23.)

"Nascent's representation that Targa's accounts payable did not exceed $150,000 was material to Nery's because Nery's would not have executed any contract to purchase Targa if the accounts payable exceeded $150,000 beyond the few hundred dollars to which Piancone and/or Alvarez had earlier referred. . . . As indicated previously, in November 2009, Nery's also informed Genesis, via Doede,

that Nery's could only provide $300,000 of working capital."
(Dkt. 156, 1 ER 7-14.)

The stock sale price was based in part on "Nascent's representation to Nery's that Targa's accounts payable would not exceed $150,000 and were to be assumed by Nery's." (Dkt. 156, 1 ER 51:4-5.)

The representations and warranties in the Stock Purchase Agreement were expressly made "as a 'material inducement' to Nery's to enter into" and close the agreement. (Dkt. 156, 1 ER 51:11-13.)

"At the time Nascent executed the [Stock Purchase Agreement], Nascent knew that Targa's accounts payable exceeded $150,000, and that Targa faced tax liabilities and liens that could freeze Targa's inventories and bank accounts. Nascent also knew that Targa had pending labor disputes and owed its employees bonuses." (Dkt. 156, 1 ER 54: 17-20.)

"At the time Genesis executed the [assignment of the Nery's note], Genesis knew that Targa faced tax liabilities

and liens that could freeze Targa's inventories and bank accounts, and neither Genesis nor Nascent disclosed to Nery's that Targa faced such tax liabilities and liens that could freeze Targa's inventories and bank accounts." (Dkt. 156, 1 ER 55:19-23.)

"At the time the [Stock Purchase Agreement] was executed on February 10, 2010, Targa's accounts payable exceeded $850,000 in violation of Nascent's representation and warranty at ¶¶ 2.2; 3.8(a), (c) of the [Stock Purchase Agreement]. In violation of Nascent's representation and warranty at ¶ 3.10 of the [Stock Purchase Agreement], Nery's was unable to collect on approximately $33,714 in accounts receivable that existed before February 2010. In violation of Nascent's representation and warranty at ¶ 3.11 of the [Stock Purchase Agreement], Nascent failed to disclose that Targa faced labor disputes with multiple Targa employees dating back to 2009. In violation of Nascent's representation and warranty at ¶ 3.12 of the [Stock Purchase Agreement], Nascent failed to disclose that Targa

did not fund legally mandated employee vacation and bonus benefits in 2009. In violation of Nascent's representation and warranty at ¶ 3.13 of the [Stock Purchase Agreement], Nascent failed to disclose that Targa faced multiple, large tax liabilities and liens for taxes and fines incurred of approximately $390,000 before February 2010 that threatened to shut Targa's doors. In violation of ¶ 6.5(b) of the [Stock Purchase Agreement], Nascent failed to indemnify and defend Nery's for the tax liabilities and liens it faced on behalf of Targa after Nery's timely advised Nascent in writing and verbally of the obligation. In violation of ¶ 6.7 of the [Stock Purchase Agreement], Nascent failed to pay any transfer taxes related to Nery's purchase of the Targa stock. In violation of ¶ 8.1(a) of the [Stock Purchase Agreement], Nascent failed to defend and indemnify Nery's for the losses caused by Nascent's breach of the representations and warranties." (Dkt. 156, 1 ER 56:4-23.)

The District Court made detailed findings based on the accounting exhibits that Targa: (i) paid more than $51,900

on an undisclosed loan to IFS/Robert Piancone; (ii) has a pending liability for undisclosed social security benefits of more than $21,000; (iii) caused Nery's to pay $6,915 for other undisclosed social security benefits; (iv) caused Nery's to pay more than $30,000 for undisclosed housing/withholding taxes; (v) caused Nery's to incur more than $17,500 for attorneys to address tax liabilities; (vi) caused Nery's to pay $7,775.35 for undisclosed vacation and bonus liabilities; (vii) caused Nery's to pay over $88,000 for undisclosed arrearages on Targa's rent; (viii) among other undisclosed liabilities that Targa and Nery's either had to pay or had to contest. (Dkt. 156, 1 ER 58-58.) Targa remains exposed to a $500,000 transfer tax liability. (Dkt. 156, 1 ER 58-59.)

"Nery's substantially complied with any requirement under the [Stock Purchase Agreement] to provide written notice and request for indemnification." (Dkt. 156, 1 ER 59:10-13.)

"Genesis recognized that the excess accounts payable was material, and that Nery's had to address the tax lien." (Dkt. 156, 1 ER 59:21-23.)

### 3. *Applying law to the facts*

The District Court concluded that Nascent induced Nery's to do the deal by misrepresentation, then Nascent materially breached the Stock Purchase Agreement and that the defendants were entitled to rescind the contract. (Dkt. 156, 1 ER 60-64.) "The breach was multifaceted, consisting of several failures by Nascent, many of which would serve as an independent basis for breach." (Dkt. 156, 1 ER 61:16-18.)

"The misrepresentations related to indemnification were, under the circumstances, unconscionable on the [part of] Nascent, and the indemnification remedy itself totally illusory and fictional. All of those representations were material and of themselves sufficient to justify rescission. Further material breaches were committed by Nascent regarding the transfer of taxes due by Targa." (Dkt. 156, 1 ER 63:5-9.)

"As set forth above, Nascent materially breached the [Stock Purchase Agreement] in several ways, individually and collectively. The breach(es), attributed to Genesis, excuse Nery's from performing under the contract. Genesis, therefore, is not entitled to recover on its breach of contract claim against Nery's or Targa. Nery's is entitled to judgment on Genesis' contract claim as well as reasonable attorney fees, as provided by law in defending this claim." (Dkt. 156, 1 ER 64:12-17.)

The court concluded that Nery's had a right, if it elected, to rescind the Stock Purchase Agreement by tendering the Targa shares to Genesis. (Dkt. 156, 1 ER 64:18-20.) Further, Nery's is entitled to restitution of the $46,250 it paid on the Nery's note. (*Id.* at 64:20-21.)

Finally, the District Court concluded that Genesis is not entitled to an unjust enrichment remedy. (Dkt. 156, 1 ER 65.) "Moreover, no evidence indicates that Nery's was unjustly enriched. To date, the court finds that Nery's has expended in excess of hundreds of thousands of dollars to

liquidate Targa's undisclosed obligations. Although it appears that revenues substantially increased, no evidence indicates that profit levels increased after Nery's' acquisition of Targa." (*Id.* at 65:10-14.)

### 4. *Attorney's Fees*

The District Court entered a detailed order granting in part and denying in part defendants' and Cathcart's motion for attorney's fees. (Dkt. 186, 1 ER 13-38.) The District Court denied Cathcart's request to consider whether his fees should be evaluated separately from the other defendants'. (Dkt. 192, 1 ER 1-5.) Cathcart has not appealed from that denial.

## SUMMARY OF ARGUMENT

After a bench trial, Genesis contends that the effective standard of review is de novo for all its issues. When it concedes that the usual standard of review is clear error, it nevertheless argues the District Court erred in law predicate to fact-finding. Only once does it cite authority for the standard of review. AOB 31.

Genesis is universally wrong, usually in application. For example, each of Genesis's supposed legal issues, to the extent they contain legal analysis at all, are the final results of applying to adjudicated facts principles of California law as to which Genesis argues no error. To the extent legal analysis is involved, Genesis's issues present mixed questions of law and fact, to which the deferential clearly erroneous standard applies. *Tolbert v. Page*, 182 F.3d 677, 682 (9th Cir. 1999) (en banc). Each is "essentially a factual inquiry" as to which "probing appellate scrutiny will not contribute to the clarity of legal doctrine." *Salve Regina College v. Russell*, 499 U.S. 225, 233 (1991).

The heading of Genesis's lead argument promises to challenge the materiality of Nascent's breaches of contract. But the text of the argument does not do so, and any attempt to do so would be overwhelmed by the facts. Instead, Genesis's argument claims Nery's did not rely reasonably on the misrepresentations Nascent and Genesis made to Cathcart. This argument is immaterial to breach of contract.

It is legally pertinent to the alternative ground of deceit by negligent misrepresentation.

To the extent it could apply to rescission for deceit, Genesis's argument errs in both law and fact. Genesis relies on a legal encyclopedia to claim Nery's reliance was not reasonable because Nery's failed in a duty to investigate. But the encyclopedia's own text limits the duty to investigate to cases in which there is *no* affirmative misrepresentation and the buyer and seller have equal access to facts. The encyclopedia and California precedent are clear that the victim of misrepresentation has no duty to investigate the truth of a fraudulent misrepresentation. *Linden Partners v. Wilshire Linden Assocs.*, 73 Cal.Rptr.2d 708, 722 (Cal.Ct.App. 1998); *Chapman v. Skype, Inc.*, 162 Cal.Rptr.3d 864, 877 (Cal.Ct.App. 2013). On the facts, the defects of Genesis's argument include that Genesis cannot find any evidence that an investigation would have exposed the near-fatal tax liabilities.

Genesis makes three sub-arguments contesting the defense judgment, principally claiming that Nery's was entitled only to an offset for its actual expenses. First, Genesis *assumes* that the exclusive remedy provision of the Stock Purchase Agreement bars defenses, not just affirmative claims. No California law supports this theory, and related principles show the California Supreme Court would not adopt it. Even more fundamentally, the exclusive remedy provision cannot support Genesis's theory because of its own text, which excludes actual fraud—negligent misrepresentation is actual fraud under California law—and intentional breach of contract.

The second sub-argument is that the Nery's note and the Stock Purchase Agreement create independent duties, so Nascent's breaches do not create a defense to paying the note. Once again, California law does not support the argument; Genesis's cases narrowly address breach of covenants not to compete. In any event, both textually and under the abundant extrinsic evidence, Nascent's duty to

indemnify for breaches of representations and warranties connects the obligation to pay the note with the representations and warranties as a matter of fact.

The third sub-argument is that Nery's received a windfall. This is false on the evidence. Genesis provided nothing of value to Nery's and gave up nothing in consenting to release its security interest in Targa's worthless stock. Genesis is attempting to grab the "sweat equity" Nery's has generated by partially overcoming the deceit and breaches of contract. Ninth Circuit precedent rejects such claims. *Mattel, Inc. v. MGA Entm't, Inc.*, 616 F.3d 904, 910-11 (9th Cir. 2010).

According to Genesis, the District Court should have awarded it restitution for unjust enrichment. This argument fails for the same reason the windfall argument fails.

As to attorney's fees, Cathcart agrees his award should be remanded for further but limited consideration for a somewhat different reason than what Genesis argues.

# ARGUMENT

## I.

## Technical Points

Defendants and Cathcart do not disagree with Genesis's discussion of jurisdiction. AOB 6-7.

Defendants and Cathcart accept Genesis's statement of the issues as defining the perimeters of Genesis's appeal. AOB 8.

Because the District Court did not enter a separate judgment for Cathcart, the judgment on appeal provided Genesis with its only opportunity for review of order granting summary judgment to Cathcart. Genesis has briefed no claim of error in the summary judgment, so the judgment for Cathcart must be affirmed. *See, e.g., Tri-Valley CAREs v. U.S.D.O.E.*, 671 F.3d 1113, 1129-30 (9th Cir. 2012).

# II.

## With Genesis's Knowledge, Nascent Fraudulently Induced, then Materially Breached, the Stock Purchase Agreement

Genesis's first argument is that the "District Court erred by finding that Nascent materially breached the" Stock Purchase Agreement. AOB 33, initial capitals reduced. At least that is what the heading and the statement of issues say. AOB 8, 33. The argument is not about materiality of breach at all; rather, Genesis contends defendants—in the person of Cathcart—could not rely reasonably on Nascent's representations and warranties. AOB 33-37.

### A. The standard of review is unmodified clear error

Although Genesis concedes the standard of review is clear error, AOB 8, its first thrust is to try to convert the standard to de novo when a finding "is based on an error of law." AOB 33. The citation for that theory is *Taylor v. Maddox*, 366 F.3d 992, 1001 (9th Cir. 2004). *Taylor* does not contain either the phrase "clearly erroneous" or the phrase "clear error." It is a 28 U.S.C. § 2254, *i.e.* habeas corpus, case

that states at the cited page that when a "state court's legal error infects the fact-finding process, the resulting factual determination will be unreasonable. . . ." *Taylor*, 366 F.3d at 1001. Genesis provides no reason why habeas jurisprudence should be transplanted to civil diversity cases.

The District Court's interpretation of California law is reviewed de novo. *Laws v. Sony Music Entertainment, Inc.*, 448 F.3d 1134, 1137 (9th Cir. 2006). Therefore, if the court had concluded that a breach of contract is material if it "makes the promisee really, really angry," the court's application of law to the facts would be suspect. But that is not what happened here, nor is it what Genesis argues.

The supposed error of law is the District Court's statement on the fourth of five pages of analysis of breach of contract: "The court concludes that any failure of due diligence related to the [Stock Purchase Agreement] falls on Nascent's side of the ledger." (Dkt. 156, 1 ER 63:15-16, partially quoted at AOB 33.) The statement is not a proposition of California law; rather, it is a summary of how

the court applied California law to the case-specific facts that the court found. (Dkt. 156, 1 ER 60-63.) Although the statement involves some legal analysis, the underlying question of who knew, or should have known, what and when is "essentially a factual inquiry" as to which "probing appellate scrutiny will not contribute to the clarity of legal doctrine." *Salve Regina*, 499 U.S. at 233. Therefore, even treating Genesis's issue as a mixed question of law and fact, the deferential clearly erroneous standard applies. *Id.*; *Tolbert*, 182 F.3d at 677.

Under well-settled California law, a material breach of a contract excuses the other party's performance, and the distinction between a material and an inconsequential breach is an issue of fact. *Superior Motels, Inc. v. Rinn Motor Hotels, Inc.*, 241 Cal.Rptr. 487, 495-96 (Cal.Ct.App. 1987); *Brown v. Grimes*, 120 Cal.Rptr.3d 893, 902-03 (Cal.Ct.App. 2011). The District Court correctly stated the standard, relying on a well-accepted secondary source that cites *Superior Motels*. (Dkt. 156, 1 ER 60, citing 1 Witkin,

Summary of Cal. Law (10th ed. 2005) Contracts §§ 852-53.) Genesis does not dispute the court's statement of California law and cites no California law as to which the District Court erred on materiality of breach or excuse of performance.[5] AOB 33-38.

In sum, Genesis has the standard of review dead wrong. Genesis seeks review of the District Court's case-specific and fact-based determination that the breached representations and warranties were material, not of the District Court's interpretation of California law. The clear error standard applies to all aspects of Genesis's argument. Reversal would be warranted only if the Court of Appeals "is left with a definite and firm conviction that a mistake has been committed." *Lentini v. Cal. Ctr. for the Arts, Escondido*, 370 F.3d 837, 843 (9th Cir. 2004).

## B. The breaches were material

Under well-settled California law, materiality of breach is powerfully bonded to the facts of the particular

---

[5] The only attempt to define materiality is materiality of a representation, not materiality of a breach. AOB 33.

case. *See, e.g., Associated Lathing & Plastering Co. v. Louis C. Dunn, Inc.*, 286 P.2d 825, 830 (Cal.Ct.App. 1955). No universal formulation can be found. 1 Witkin, Summary of Cal. Law (10th ed. 2005) Contracts §§ 852-53. Timing is important; a "breach prior to or at the outset of performance may justify rescission when the same breach late in performance would not be significant." *Associated Lathing*, 286 P.2d at 830.

Here, Nascent breached the Stock Purchase Agreement by the falsity of its representations and warranties about Targa's liabilities and receivables, and by repudiating its obligation to indemnify Nery's from any undisclosed liabilities.[6] The breaches were immediate on closing of the stock purchase or very soon thereafter. Among the reasons the breaches were material:

---

[6] Nascent's insolvency as an indemnitor was "tantamount to a breach" before defendants made any demand. *See Caminetti v. Pac. Mut. Life Ins. Co.*, 142 P.2d 741, 745 (Cal. 1943).

- Targa had regressed to start-up status; it had the Nery's cheese brand and tobacco import license as exploitable assets but no financial capacity to exploit those assets. *Ante* at 9.

- Nery's had only $300,000 capital to invest in Targa, and $150,000 of that capital was encumbered with the need to pay the Ex-Im liability; Nascent and Genesis knew of and approved this limited capacity. *Ante* at 8-9.

- Because they knew the financial structure and Nery's plan, Nascent and Genesis knew that undisclosed liabilities would prevent Nery's from executing its plan to infuse Targa with capital and develop the company by buying and selling cheese and tobacco products. *Ante* at 8-9.

- The Stock Purchase Agreement expressly recognizes that the representations and warranties are made "[a]s a material inducement to [Nery's] to enter

into this Agreement and to consummate the transactions completed herein. . . ." (TE 22, 2 ER 155.)

- Acting for Nery's, Cathcart actually relied on the representations and warranties. *Ante* at 15.

- The undisclosed liabilities cascaded on Targa and Nery's immediately after closing and prevented Cathcart from executing the business plan; Nascent repudiated its indemnity obligations, so Targa and Nery's lost their back-up plan as well. *Ante* at 16-19.

The District Court correctly applied settled law to the adjudicated facts in finding materiality. (Dkt. 156, 1 ER 61-64.) A false representation or warranty in contract documents easily constitutes a material breach of the contract. *Linden Partners*, 73 Cal.Rptr.2d at 711, 722 (false representation of one tenant's rent in defendant's certificate provided at close of escrow). The absence of any true materiality analysis in Genesis's brief tells a story: no basis exists to challenge the materiality findings.

## C. Reasonable reliance is immaterial to breach of contract

Despite its heading, Genesis's argument does not discuss either the law or the facts of material breach of contract. Instead, Genesis argues that defendants could not reasonably rely on Nascent's representations. But Genesis provides no authority whatsoever to apply a reasonable-reliance element in determining whether a material breach excused performance under a contract.

Genesis relies primarily on a legal encyclopedia, the cited sections of which address only affirmative claims of fraud. AOB 33-34. The first cited section of the encyclopedia begins: "To constitute fraud, the misrepresentation or concealment complained of must be of a material fact. . . ." 34A Cal.Jur.3d, Fraud and Deceit, § 15 at 380 (2008 Thomsom/Reuters West). The second cited section begins: "To establish the justifiable reliance element *of a fraud claim*, a plaintiff must show. . . ." *Id.*, § 52 at 426, emphasis added. The third cited section begins: "The reasonableness of the plaintiff's reliance, *in a fraud action*, is judged by

reference to the plaintiff's knowledge and experience." *Id.*, § 53 at 427, emphasis added. The final cited section concerns a duty to investigate as an element of justifiable reliance in a fraud case. *Id.*, § 58 at 432; see 359 (outline structure).

Consistent with the barren text of the encyclopedia, Genesis's case authorities do not purport to discuss material breach of contract. For example, *Wiechmann Engineers v. State ex rel. Dept. of Public Works*, 107 Cal.Rptr. 529, 533-34 (Cal.Ct.App. 1973) is a public works case in which what would ordinarily be a tort action for fraudulent concealment is statutorily converted into an action on the contract " 'if the contractor is unable to perform according to the contract provisions.' " The cited pages discuss the state engineer's denial of the contractor's claim for additional compensation and does not support the claim in Genesis's brief. *Id.* at 533. The issue in the case was whether the state had an affirmative duty to disclose certain subsurface tests in a certain manner when "an onsite inspection made the same disclosure." *Id.*

*Wiechmann* involved "no partial disclosure, no half-truths which purported to be the whole truth or which were likely to mislead." *Id.* at 534. "We hold there was no misrepresentation of factual matters within the state's knowledge or concealment of material information." *Id.* at 536. Nothing in the case suggests that a duty to investigate is an element of breach of contract based on false representations and warranties. *Id.*

*Rutherford v. Prudential Ins. Co.*, 44 Cal.Rptr. 697 (Cal.Ct.App. 1965) concerns the circumstances under which an insurer that knows one answer in a policy application is false must investigate the truth of other answers or be subjected to waiver of the right to cancel the policy. *Id.* at 706-07. The answer is, it "depends upon the type and seriousness of the known misrepresentation." *Id.* at 706. This is an issue of statutory insurance law. *Id.* at 700. The case does not address material breach of representations and warranties.

The other authorities are not California law and are off-point. *Foremost Guar. Corp. v. Meritor Savings Bank*, 910 F.2d 118 (4th Cir. 1990) (at 122: oral fraud in the inducement; at 123 n.9: North Carolina and Virginia law; at 126-27: insurance companies had written memoranda that contradicted the oral representations); *Terra Sec. ASA Konkursbo v. Citigroup, Inc.*, Nos. 10-4712, 10-4714, 2011 WL 6067260, at *2 (2d Cir. Dec. 7, 2011) (New York law, fraud claim for damages).

Genesis's duty-to-investigate argument is impertinent to defendants' material-breach defense to liability on the Nery's note. In the next part, defendants will show that the argument errs as an objection to the alternative ground of rescission that Nery's consent was procured by fraud.

### D. Genesis's argument fails as an objection to fraud as an alternative ground of rescission

Under the heading "Breach of Contract," the District Court analyzed two defenses to the Nery's note. One, discussed *ante*, is material breach of contract. The other is

that "consent to the contract was given by mistake or through fraud (Cal. Civ. Code § 1689(b)(1). . . ." (Dkt. 156, 1 ER 60, see *id.* at 61, 64; Dkt. 151, ASER 1 [briefing negligent misrepresentation]; 4 RT 624-25, ASER 106-07 [arguing same].) Defendants agree that under California law reasonable reliance is an element of fraud as a basis to rescind a contract. *See Lawrence v. Doty*, 216 P.2d 465, 469 (Cal.Ct.App. 1950).

The first insuperable problem with Genesis's argument is that it is wrong on California law. That is clear from the encyclopedia on which Genesis relies. While Genesis may be correct about a duty to investigate when no affirmative misrepresentation was made and the parties had equal access to the facts, Genesis is wrong about cases based on affirmative misrepresentation. The encyclopedia summarizes California law thus: "There is ordinarily no duty to investigate as to fraudulent misrepresentations, and the party making the representation cannot escape responsibility by showing that the other might have

ascertained that the representation was untrue, or had no

right to believe it." 34A Cal.Jur.3d, Fraud and Deceit, § 60 at

435 (2008 Thomsom/Reuters West), footnotes omitted.

The encyclopedia goes on to state that positive

misrepresentation precludes imputing constructive

knowledge to the victim. "Thus, the mere fact that the means

of knowledge are open to a defrauded party does not

necessarily bar the party from relief, even though by reason

thereof, in the absence of any representation at all, a

constructive notice would be inferred. The doctrine of

constructive notice does not apply where there has been such

a representation of fact." *Id.*, footnote omitted.

Indeed, the encyclopedia adamantly repeats the point.

"Every contracting party has the right to rely, where his or

her reliance is otherwise justifiable, on the express

statement of an existing fact, the truth of which is known to

the opposite party and unknown to him or her. . . ." *Id.* at

434, footnote omitted. And the defrauded party "is under no

obligation to investigate and verify statements to the truth

of which the other party to the contract, with full means of knowledge, has deliberately pledged his or her faith." *Id.* The victim "is not bound to verify it by an independent investigation." *Id.*

California law is as the encyclopedia states. *Chapman*, 162 Cal.Rptr.3d at , 877 (consumer not required to review fair usage policy closely to determine whether it contradicted defendant's representation that plan was "unlimited"); *Linden Partners*, 73 Cal.Rptr.2d at 721 (buyer of rental property not barred by its own negligent calculation of a tenant's rent from claiming fraud based on seller's positive representation of the amount of that tenant's rent).

The second insuperable problem with Genesis's argument is that it could not prevail on the evidence if Genesis were correct about the law. On the evidence, an independent investigation would have shown Cathcart only that the books, formerly kept for a publicly traded company, were no longer in good order. (3 RT 413, ASER 57 [months needed to get financial system in order]; 3 RT 422-23, ASER

58-59 [no clear picture of liabilities]; 1 RT 163-64, ASER 39-40 [Piancone did not know the liabilities].) There is no evidence that Cathcart could have discovered such things as the social security tax, the tax lien, the extent of rent arrearages, or Nascent's insolvency by preclosing investigation.

Instead of citing evidence, Genesis speculates. AOB 34. Cathcart was once a member of an advisory board, but there is no evidence he had any such status near the time of the stock purchase. Cathcart was once a Nascent shareholder, but there is no evidence he had that status, or that shareholders were receiving any information, near the time of the stock purchase. Certainly he knew about Targa's lack of capital, but there is no evidence he knew of the liabilities that were not recorded on the financial statements. The only undisclosed liabilities that Cathcart discovered "readily," AOB 35, were those that crashed on him from governmental agencies. *Ante* at 16-17. To cite 1 ER 57-58 for "discovered

them readily" misrepresents the District Court's statement. *See* AOB 35.

Genesis also ignores critical timing. The representations needed to be true at closing (TE 22, ¶ 7.1(a), 2 ER 175); Genesis fails to show why Cathcart could not expect Piancone to have Targa in the represented condition at closing. (1 RT 139-40, ASER 29-30; 3 RT 368-69, 477.)

Genesis appends a final paragraph questioning whether Targa has a defense to its guaranty, given that Piancone, a perpetrator of the false representations, signed the guaranty on Targa's behalf. AOB 37-38. Genesis cites no authority. *Id.* And does not deal with such thorny issues as how a guarantor can be liable when the obligor is discharged. But there is a simple refutation to Genesis's argument. Piancone acted adversely to Targa by making the false representations in order to unload Targa and thereby attempt to solve Nascent and family debt problems. (3 RT 452.) And, as detailed *ante* and in the statement of decision, Genesis colluded with Piancone or at least knew that

Nascent's key representations were false. Knowledge of Piancone's misrepresentations is therefore *not* imputed to Targa for the benefit of Genesis. *Sands v. Eagle Oil & Refining Co.*, 188 P.2d 782, 786 (Cal.Ct.App. 1948); Rest.3d Agency § 5.04 & com. c, illus. 3. Targa therefore has a good defense to its guaranty.

Genesis's lead argument fails. The District Court's decision that defendants may rescind the contract stands up heartily to any standard of review.

## III.

## The District Court Committed No Error in Denying Genesis Recovery and Granting Rescission

Genesis makes three arguments contending the District Court granted the wrong remedy by finding defendants are excused from paying the Nery's note. AOB 38-54. Genesis insists that every aspect of these arguments triggers de novo review, but Genesis cites no authority for that position. AOB 3, 8, 27, 38, 46.

## A. The District Court did not err in refusing to use the exclusive remedy clause as a bar to defenses

Genesis's first remedy argument is that the material breach defense is barred by § 8.5, the exclusive remedy provision of the Stock Purchase Agreement. AOB 38-43. Except on abstract principles, Genesis cites no authority for its argument. *Id.* And most of the text is devoted to asking the appellate court to perform offset calculations. *Id.* at 41-43. Genesis errs.

Genesis primarily argues that Nery's could not recover any remedy except indemnity on a cause of action for Nascent's fraud or breach, so, Genesis assumes, Nery's cannot allege fraud or breach as a defense to an action on the note. This part of defendants' brief will explain several independent reasons why Genesis errs: the exclusive remedy provision does not apply to the facts found by the District Court, the exclusive remedy provision does not bar a defense, and the exclusive remedy provision cannot be enforced on the facts found by the District Court.

Secondarily, and without connection to any legal analysis, Genesis notes that Nery's did not give a written notice demanding indemnity from Nascent. AOB 40. The District Court found "Nery's substantially complied with any requirement . . . to provide written notice and request for indemnification." (Dkt. 156, 1 ER 59:10-13.) Nascent having repudiated indemnity because it was insolvent, this finding is irreproachable. (*See* 1 RT 113-14, 149-50, ASER 37-38; 3 RT 437, 486, ASER 71; 4 RT 545, ASER 95.) Genesis does not attempt to attack it. AOB 39-41. To the contrary, Genesis conceded at trial that substantial compliance is a proper legal analysis and only contested whether it applies in fact; then Genesis made no factual argument. (4 RT 589-90, ASER 98-99.) Attack would be futile; California law does not require idle acts. Cal. Civ. Code § 3532. No more need or will be said about written notice.

### 1. *By its own terms, the remedy provision does not apply*

Genesis's argument flounders on the very text on which it relies. Section 8.5 does not apply to "claims based on

actual fraud or intentional breach of this Agreement." (2 ER

180.) One of the defenses on which the District Court relied

was negligent misrepresentation. (Dkt. 156, 1 ER 60-64.)

"Negligent misrepresentation is a form of 'actual fraud,'

consisting of '[t]he positive assertion, in a manner not

warranted by the information of the person making it, of

that which is not true, though he believes it to be true.'

([Cal.] Civ. Code § 1572, subd. 2.)" *Furla v. Jon Douglas Co.*,

76 Cal.Rptr.2d 911, 915 (Cal.Ct.App. 1998). As causes of

action, they are identical except for the nature of the

perpetrator's scienter. *See, e.g.*, *Saunders v. Taylor*, 50

Cal.Rptr.2d 395, 396, 398-99 (Cal.Ct.App. 1996) (same

measure of damages); *Sixta v. Ochsner*, 9 Cal.Rptr. 617, 620

(Cal.Ct.App. 1961) (same).

Without explaining why, Genesis equates "actual

fraud" with intentional misrepresentation. AOB 39. Yet in

the same phrase, the parties modified "fraud" with "actual"

and "breach" with "intentional." If they had meant

"intentional" fraud, they would have used that word.

Particularly in a very technical, lawyer-drafted indemnity article of a corporate stock sale agreement (2 ER 177-80), the parties' selection of "actual" and "intentional" must be taken as careful, intentional, and meaningful. Therefore, exclusive remedy provision does not apply here.

Genesis's argument also fails because the evidence and findings establish intentional breach. The court found that Nascent could have adopted a caveat emptor stance with Cathcart, did not, but instead made "representations, warranties, and promises it could neither honor nor keep and did so in reckless disregard of Nery's reasonable expectations under the" Stock Purchase Agreement. (Dkt. 156, 1 ER 63:22-25.) The ordinary meaning of "intentional" applied to an act is synonymous with conscious or willful and does not imply a specific intent to cause particular consequences, as Genesis apparently assumes. Webster's

Third New Int'l Dict. (1971) at 1176, col. 1.[7] Under the evidence and the District Court's findings, there can be no question that Nascent *intentionally* made representations and warranties, breached them, and intentionally refused to indemnify Nery's.

Legal language points to substantially the same meaning. California differentiates little, if at all, between intentional acts and acts undertaken with reckless disregard for their consequences. *See*, *e.g.*, *Covenant Care, Inc. v. Superior Court*, 86 P.3d 290, 297 (Cal. 2004) (elder abuse liability standard); *Khawar v. Globe Internat.*, 965 P.2d 696, 700 (Cal. 1998) (constitutional malice in defamation of public figure); *People v. Heslington*, 125 Cal.Rptr.3d 740, 749 (Cal.Ct.App. 2011) (standard for attack on a warrant); *Wong v. Jing*, 117 Cal.Rptr.3d 747, 766 (Cal.Ct.App. 2010)

---

[7] The first definition is "relating to intention or design: having an intention. . . ." The second is "done by intention or design: intended, designed ([intentional] damage). . . ." Thus, "damage" must be added to a phrase to connote intent to cause injury; intent to act does not connote intent to injure without the additional word.

(elements of cause of action for intentional infliction of emotional distress); *O'Toole v. Superior Court*, 44 Cal.Rptr.3d 531, 544 (Cal.Ct.App. 2006) (definition of malice for civil liability of peace officer); *Perez v. So. Pac. Transp. Co.*, 267 Cal.Rptr. 100, 104-05 (Cal.Ct.App. 1990) (standard for railroad liability to trespasser).

Nascent intentionally breached the Stock Purchase Agreement. Section 8.5 therefore did not bar anything.

### 2. *The remedy provision does not bar a defense*

Genesis assumes, without authority, that § 8.5 bars not only positive remedies but also defenses to claims of other parties. After diligent research, defendants have found no California authority, published or unpublished, so applying an exclusive remedy provision. California would not apply an exclusive remedy provision to a defense because a "remedy" in California jurisprudence is inextricably connected with a cause of action. *See*, *e.g.*, *Commercial Centre Realty Co. v. Superior Court*, 59 P.2d 978, 981 (Cal. 1936); *Frost v. Witter*, 64 P. 705, 707 (Cal. 1901); *Dept. of Fair Emp. & Housing v.*

*1105 Alta Loma Road Apts., LLC*, 65 Cal.Rptr.3d 469, 475

n.3 (Cal.Ct.App. 2007); *Bauer v. Neuzil*, 152 P.2d 47, 52

(Cal.Ct.App. 1944).

Once again, a Genesis argument fails because Genesis

assumes—incorrectly—an element of the argument's

essential logic. The exclusive remedy provision does not bar

a defense just because that defense might be pled as a cause

of action on which Nery's could claim a remedy.

### 3. *If it applied, the remedy provision could not be enforced*

The District Court found "[t]he misrepresentations

related to indemnification were, under the circumstances,

unconscionable on the [part of] Nascent, and the

indemnification remedy itself totally illusory and fictional.

All of those representations were material and of themselves

sufficient to justify rescission." (Dkt. 156, 1 ER 63:5-7.)

Genesis partially quotes the finding, omitting

"unconscionable." AOB 39. Genesis never addresses

unconscionability. It claims that self-help made indemnity

"not illusory" when Nery's stopped paying on the note. AOB

40. Oddly, this seems to be an argument in favor of Nery's having a defense to the note far beyond dollar-for-dollar offset.

The District Court correctly looked to both the illusory nature of Nascent's indemnity and unconscionability doctrine as alternative grounds not to enforce the exclusive remedy provision.

An exclusive remedy provision cannot be enforced against an innocent party when another party to a transaction has rendered the remedy worthless or illusory. *Raphael v. Hill*, No. G032152, 2004 WL 1466027 *8-9 (Cal.Ct.App. 4th Dist. June 30, 2004). That is exactly what happened here: Nascent, in documents driven by Genesis, attempted to limit Nery's remedies to indemnity from an insolvent Nascent.

This exclusive remedy provision also cannot be enforced because it is unconscionable. Misrepresentation is an extreme form of surprise that infects a contract or a provision with procedural unconscionability regardless of the

balance of bargaining power. *See McCaffrey Group, Inc. v. Superior Court*, 169 Cal.Rptr.3d 766, 781-82 (Cal.Ct.App. 2014). As to substantive unconscionability, the exclusive remedy provision is inherently suspect because its object is to exempt parties to the contract from liability for their wrongdoing. See Cal. Civ. Code § 1668; *City of Santa Barbara v. Superior Court*, 161 P.3d 1095, 1104-05 (Cal. 2007) (liability for future gross negligence generally cannot be released). Asserted against Nery's, it takes a second hit because the only allowed remedy, indemnification, was at all times illusory. *See Serpa v. Cal. Surety Investigations, Inc.*, 155 Cal.Rptr.3d 506, 514 (Cal.Ct.App. 2013) (facially illusory arbitration provision salvaged by implying employer's duty of good faith and fair dealing). The District Court did not err in finding the exclusive remedy provision unconscionable as applied to the facts and Genesis's claim. Genesis failed to discuss the point, so defendants will say no more.

### B. The District Court did not err in recognizing that defendants have complete defenses to the note

Genesis next argues that the Nery's note creates obligations independent of any duty of Nascent, so defendants' defenses are limited to offset. AOB 43-46. Belatedly in the argument, Genesis asserts it is a matter of contract interpretation reviewed de novo. Genesis errs on both the standard of review and the substance.

Genesis's argument floundered when Genesis could not explain it to the District Court. (4 RT 594-97, ASER 100-03.) The initial problem was simultaneously asserting that Nery's could exercise self-help and that nonpayment was breach. *Id.* When Genesis tried to escape that dilemma, its theory clashed with Genesis's default-demand letter of July 2010. *Id.*; see TE 29, ASER 2-3.

#### 1. *The standard of review is clear error*

"When the interpretation of a contract includes review of factual extrinsic evidence, the findings of fact are reviewed for clear error, and the principles of law applied to those facts are reviewed de novo." *Stephens v. City of Vista*, 994

F.2d 650, 655 (9th Cir. 1993) (California law), citing *L.K. Comstock & Co. v. United Eng'rs & Constructors Inc.*, 880 F.2d 219, 221 (9th Cir. 1989). But "when the inquiry focuses on extrinsic evidence of related facts, trial court's conclusions will not be reversed unless clearly erroneous." *Id.*, citing ; see *Kern Oil & Ref. Co. v. Tenneco Oil Co.*, 840 F.2d 730, 736 (9th Cir. 1988) cert. denied, 488 U.S. 948 (1988).

The obligations of the Nery's note and Nascent's covenant to indemnify were connected duties to be performed simultaneously. Genesis should lose this point on the documents alone. The integration clause of the Stock Purchase Agreement integrates not only that instrument but also "all Exhibits and Disclosure Schedules hereto and the other Transaction Documents. . . ." (TE 22, § 9.4, 2 ER 181.) The " 'Transaction Documents' [include] any document or instrument which shall be executed and delivered at the Closing by the Company, Sellers or Buyer, as the case may be." (TE 22, 2 ER 154.) The Nery's note is to be delivered at closing. (TE 22, §§ 2.2, 2.3, 2 ER 155.) Also, the financial

connection between the obligations is at least visible on the face of the documents, and simultaneous performance is established by them.

But the documents are not the sole source of enlightenment, and that is why Genesis has the standard of review wrong. The District Court received abundant extrinsic evidence on the connection. Everything about Targa's regression to start-up conditions bereft of working capital, Cathcart's business plan, Cathcart's limited success in raising capital, the represented maximum of Targa's liabilities, the advance knowledge of the consequences of surprise liabilities, and the importance of indemnity is: (i) evidence extrinsic to the written instruments bearing on their meaning, (ii) contested by Genesis at trial, (iii) found as fact by the District Court, and (iv) neither attacked nor shown to be clearly erroneous on appeal.

Genesis never explains its assumption that there was no relevant extrinsic evidence. Perhaps that is because nobody testified about whether the independence or

relatedness of obligations was specifically negotiated. But California law sponsors no such crabbed meaning of "extrinsic." In contract interpretation, extrinsic evidence includes the circumstances under which the contract is made, custom and usage, and any practical construction given to the contract before a dispute arose. *Kerr Land & Timber Co. v. Emmerson*, 43 Cal.Rptr. 333, 345-46 (Cal.Ct.App. 1965); *see Pacific Gas & Elec. Co. v. G.W. Thomas Drayage and Rigging Co.*, 442 P.2d 641, 643, 645, 646 (Cal. 1968) (conduct under similar contract, trade usage, circumstances of making the agreement); *Grove v. Grove Valve & Regulator Co.*, 84 Cal.Rptr. 300, 304-05 (Cal.Ct.App. 1970) (extrinsic evidence did not establish agreed interpretation before dispute).

The standard of review is clear error.

## 2.     *The parties' at-issue duties are not severable*

In explaining the standard of review, defendants anticipated the analysis of the substance of Genesis's argument for separate duties that could interact only by

setoff. The integration clause textually refutes Genesis's argument, and in economic substance Nascent's materially breached indemnity obligation inseparably connects Nery's note and the Stock Purchase Agreement.

Genesis's authorities are easily distinguishable. *Starr v. Davis*, 288 P. 706 (Cal.Ct.App. 1930) affirmed a finding that a promissory note given for purchase of a business was *not* a mutual and dependent agreement with a covenant-not-to-compete in purchase agreement. There was (i) no textual integration, (ii) performance at different times, (iii) no misrepresentation, (iv) no citation in the appellant's brief supporting his theory, and (v) no materiality analysis. *Starr* serves Genesis only to show that, abstractly, a note arising from the sale of a business may be either mutual and dependent with obligations in the purchase agreement or separate and independent.

*Int'l Poly Bag, Inc. v. Liu*, No. D053054, 2009 WL 3387947 (Cal.Ct.App. 4th Dist. Oct. 22, 2009) is as easily distinguished. It also arose out of the sale of a business and

a breach of a noncompetition agreement by the seller. The jury quantified the buyer's damages for breach at $176,361.22, and the buyer stipulated that the amount due on the note was $63,028.52. *Id.* at *1. Again, no contractual text integrated the note and the contract. *Id.* at *2. There was no misrepresentation and no defense of rescission. *Id.* at *10-11 (court regards absence of a rescission defense as important), *13-14 (trial court correctly granted directed verdict on buyer's misrepresentation-based claims). The analysis depends on the specific nature of a covenant not to compete. *Id.* at *9. Future compliance with that covenant was secured by an injunction. *Id.* at *10.

Genesis fails to discuss the effect—which should be conclusive—of the District Court's alternative finding that Nascent's material breach justified rescission.

The District Court committed no error. The error, again, is Genesis's.

## C. Defendants obtained no windfall

Genesis argues at length that the judgment confers a windfall on the defendants. The argument rests on Genesis's unsupported introductory invocation of the de novo standard of review. Again Genesis errs. The issue is factual: did a defendant receive any benefit from the judgment that the District Court should have quantified and awarded to Genesis? The answer is no, and certainly not under the clearly erroneous standard.

A short summary of pertinent facts helps. Genesis provided value of $1 million to Nascent, not to Targa. (1 RT 71.) Nascent's obligation to pay the loan was secured by Targa's stock. (TE 1, 2 ER 135.) Genesis provided no new value to Targa or Nery's in the stock sale transaction. (Dkt. 142, 1 ER 70, ¶ 28.) Rather, Genesis released its security interest in the Targa stock, which was worthless as collateral. *Ante* at 7-8. This allowed Nascent the prospect of paying its obligation to Genesis, mutually benefitting Nascent and Genesis. But because Nascent misrepresented

the extent of Targa's liabilities by a factor of nearly 6x, swamping Nery's modest capacity to infuse Targa with working capital, Nery's received Targa as a burdensome asset. *Ante* at 16-19. The evidence is not detailed, but the only possible inference is that any value of the Targa stock derives from "sweat equity" of the stubborn and effective Cathcart. *Ante* at 19, 21-22.

Even when a party has committed a tort—misappropriation of a trademark—that party does not receive a windfall to the extent development of its brand and business result from legitimate business development and operations. *Mattel,* 616 F.3d 904 at 910-11. The law will not transfer that "sweat equity" to the victim of the misappropriation. *Id.* at 911.

Here, Genesis's windfall argument is just a way to grab for Nery's sweat equity. The cited authorities do not support the argument. *Freedman v. Rector ETC. of St. Matthias Parish*, 230 P.2d 629 (Cal 1951) involves return of a $2,000 deposit made by the intended buyer at the outset of a failed

real estate sale. *Id.* at 630. That is new value the buyer brought to the transaction before breach. The court held the breaching buyer was entitled to *restitution* of the $2,000 on deposit, less any loss or expense the seller incurred from the failed buyer's breach. *Id.* at 633. Here, neither Nascent nor Genesis provided anything of value on which a court could base a restitution remedy, neither Nascent nor Genesis gave up anything of value, and Nery's obtained no value from either Nascent or Genesis. Because of these facts, the District Court's decision is not clearly erroneous, or any other kind of erroneous.

Nothing in Genesis's string-cited cases affects the analysis; if anything, they flavor *Freedman* narrowly. *MacFadden v. Walker*, 488 P.2d 1353, 1356 (Cal. 1971) (characterizing *Freedman* as an anti-forfeiture case and holding there is no categorical bar to granting specific performance to a defaulting vendee; *Behrendt v. Abraham*, 410 P.2d 828, 831 (Cal. 1966) (same characterization of *Freedman* in a landlord-tenant context); *Kuish v. Smith*, 105

Cal.Rptr.3d 475, 480-81 (Cal.Ct.App. 2010) (seller's retention of deposit in a rising real estate market is a forfeiture prohibited by *Freedman*); *U.S. for Use of Palmer Constr., Inc. v. Cal State Elec., Inc.*, 940 F.2d 1260, 1262 (9th Cir. 1991) (not citing *Freedman*; basing the potential for recovery by the breaching party on "the breaching party has conferred a benefit upon the innocent party"); *Cataphora Inc. v. Parker*, No. C09- 5749 BZ, 2010 WL 4791643, at *2 (N.D. Cal. Nov. 17, 2010) (magistrate judge opinion denying summary judgment and applying anti-forfeiture concept to action to recover a supposedly nonrefundable fee). *Palmer Construction*, as Circuit precedent, compelled the District Court to deny restitution to Genesis because Genesis conferred no benefit on Nery's on which restitution could be based.

The reference to Sherlock Holmes does not help Genesis. Targa may have been worth something by the time judgment was entered, but, as explained *ante*, that value came from Nery's sweat equity, not any benefit conferred by

Genesis. Finally, Genesis appears to quarrel with the District Court's findings about the liabilities that Targa and Nery's incurred. AOB 52-53 n.2. This invades credibility determinations made by the District Court without explaining why those determinations are not entitled to great deference. *See Rozay's Transfer v. Local Freight Drivers, Local 208*, 850 F.2d 1321, 1325-26 (9th Cir.1988). In observing that Nery's survival depended on not paying the note, Genesis once again emphasizes why the District Court's remedy rulings are correct and equitable. AOB 52 n.2.

Defendants conclude with a note about appellate remedies. If Genesis were correct that the District Court should have forced Nery's to tender the Targa stock and complete a rescission, AOB 54-55 n.3, Nery's would have done so. (4 RT 645-47, ASER 108-10.) Genesis seeks an unjust appellate remedy to deprive Nery's of that election by forcing a District Court that correctly decided rescission to limit the remedy to offset. If Genesis were entitled to

reconsideration of the remedy—which it isn't—Nery's would be entitled to rescind and to a hearing on the equitable adjustment required by California law at the time of rescission. See *Heintzsch v. LaFrance*, 44 P.2d 358, 359-60 (Cal. 1935).

## IV.

## Denying the Unjust Enrichment Claim Was Not Clearly Erroneous

For the same reasons the District Court did not err in entering a defense judgment over Genesis's windfall and forfeiture objections, the District Court appropriately denied Genesis's unjust enrichment claim. Genesis is simply, and inequitably, trying to grab sweat equity. *Mattel*, 616 F.3d at 910-11.

Unjust enrichment is not available when the parties have an express contract covering the subject matter. *Durell v. Sharp Healthcare*, 108 Cal.Rptr.3d 682, 699 (Cal.Ct.App. 2010). Restitution may be available when a contract is rescinded. *Id.* Therefore, *if* Genesis had a basis for restitution under the facts and findings at trial—and it does

75

not—then the availability of restitution would depend on whether the entire contract is rescinded or Genesis merely lost a defense judgment on the note. Genesis cites a 1999 Ninth Circuit unpublished case as if it were precedent, but the proposition argued is not inconsistent with *Durell*. That is, a party may plead both express contract and restitution, but it may recover under only one. The remaining cited authorities are consistent with the either/or nature of express contract and restitution. *See* AOB 56.

## V.

### Attorney's Fees and Costs: Affirm with Limited Remand as to Cathcart

Genesis makes just one argument against the awards of attorney's fees and costs to defendants. Genesis contends the award should be reversed as to any defendant that is not a prevailing party under the Court of Appeals' disposition. AOB 58. Defendants have shown the judgment should be affirmed, so Genesis's conditional argument should not come into play. But defendants concede that Genesis's conditional position is correct; that is, if a judgment is reversed,

dependent awards of fees and costs must also be reversed, to abide the outcome of whatever proceedings are mandated in the District Court.

Cathcart's position differs materially. He prevailed below, and the judgment in his favor will be affirmed because Genesis raised no claim of error. As a defendant who was exposed to paying Genesis's attorney's fees if Genesis prevailed, Cathcart is entitled to recover his attorney's fees, although he was not a party to the contract containing the attorney's fees clause. *Reynolds Metals Co. v. Alperson* 599 P.2d 83, 85-86 (Cal. 1979).

What Genesis seems to be arguing is that the District Court erred as a matter of law when it awarded Cathcart the same $525,427.33 attorney's fees that it awarded defendants, when Cathcart sought only about $272,000 after he prevailed on summary judgment before trial. AOB 58-59. Cathcart disagrees. He may have been required to guaranty payment of the fees incurred by defendants. He may have concluded that with his own summary judgment subject to

appeal, it was prudent for him to incur fees to support defendants' presentation at trial. In either case, his legal liability for, or actual payment of, attorney's fees after summary judgment may have been reasonably necessary and prudent.

Although Cathcart makes no concession about his actual entitlement to attorney's fees, he concedes a lesser included argument. *If* Genesis adequately preserved the contention that Cathcart could not recover the same award as defendants, the District Court should have explained separately the amount it awarded to Cathcart. *See, e.g.,* *Moreno v. City of Sacramento*, 534 F.3d 1106, 1111 (9th Cir. 2008). With that condition stated in the mandate, the attorney's fee order as to Cathcart should be remanded for the sole purpose of allowing the District Court to explain the award or, in its discretion, to modify the award if it finds there is not adequate support for the order.

# CONCLUSION

The judgment should be affirmed in full. The attorney's fee order should be affirmed as to Nery's and Targa. The attorney's fee order should be remanded with the condition and instructions described *ante*. Nery's and Targa are entitled to recover attorney's fees on appeal, and the Court of Appeals should award attorney's fees to Cathcart as well because he remains the prevailing party regardless of any tinkering that is done with the amount of his attorney's fee award.

Respectfully submitted,

s/ Charles A. Bird

McKenna Long & Aldridge LLP
Attorneys for Nery's, USA, Inc.; Comercial
Targa, S.A. de C.V.; and John Cathcart

## CERTIFICATE OF COMPLIANCE

I, Charles A. Bird, appellate counsel to Nery's, USA, Inc.; Comercial Targa, S.A. de C.V.; and John Cathcart, certify that the foregoing brief is prepared in proportionally spaced Century Schoolbook 14 point type and, based on the word count of the word processing system used to prepare the brief, the brief is **12,814** words long.

s/ Charles A. Bird

## STATEMENT OF RELATED CASES

Nery's, USA, Inc.; Comercial Targa, S.A. de C.V.; and John Cathcart are unaware of any related cases as defined in applicable rules.

| 9th Circuit Case Number(s) | 13-56797 & 13-57106 |
|---|---|

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## CERTIFICATE OF SERVICE
### When All Case Participants are Registered for the Appellate CM/ECF System

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system

on (date) | June 2, 2014 | .

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Signature (use "s/" format) | s/Charles A. Bird |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## CERTIFICATE OF SERVICE
### When <u>Not</u> All Case Participants are Registered for the Appellate CM/ECF System

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system

on (date) | June 2, 2014 | .

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

I further certify that some of the participants in the case are not registered CM/ECF users. I have mailed the foregoing document by First-Class Mail, postage prepaid, or have dispatched it to a third party commercial carrier for delivery within 3 calendar days to the following non-CM/ECF participants:

A hard copy was also mailed to Raymond A. Cardozo.

Signature (use "s/" format) | s/Charles A. Bird |