CASE NO. 13-56797 & 13-57106

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

---

GENESIS MERCHANT PARTNERS, LP

*Plaintiff and Appellant,*

v.

NERY'S USA, INC., ET AL.

*Defendants and Appellees.*

---

Appeal From The United States District Court,
Southern District of California, Case No. 3:11-cv-01589-JM-
WVG, Hon. Jeffrey T. Miller

---

## APPELLEES' SUPPLEMENTAL EXCERPTS OF RECORD

---

McKENNA LONG & ALDRIDGE LLP
Charles A. Bird
cbird@mckennalong.com
John J. McNutt
600 West Broadway, Suite 2600
San Diego, California 92101-3372
Telephone: 619.236.1414
Facsimile: 619.232.8311

Attorneys for Nery's USA, Inc., Commercial Targa, S.A. de C.V., and
John Cathcart

# INDEX TO APPELLEES' SUPPLEMENTAL EXCERPTS OF RECORD

| DOCUMENT TITLE | DKT. | PAGE |
|---|---|---|
| Defendant's Closing Brief, page 2 | 151 | 001 |
| Trial Exhibit 29 | N/A | 002 |
| Trial Exhibit 63 | N/A | 004 |
| Trial Exhibit 335, pages 16-17, 19, 28-30, 38, 48-49, 55, 69, 136-138 | N/A | 006 |
| Reporter's Transcript, Volume 1 | 159 | |
|     Pages 74-76 | | 020 |
|     Pages 127-128 | | 023 |
|     Pages 133-136 | | 025 |
|     Pages 139-140 | | 029 |
|     Pages 143-150 | | 031 |
|     Pages 163-165 | | 039 |
|     Pages 167-168 | | 042 |
| Reporter's Transcript, Volume 2 | 160 | |
|     Pages 253-256 | | 044 |
| Reporter's Transcript, Volume 3 | 161 | |
|     Pages 404-413 | | 048 |
|     Pages 422-423 | | 058 |
|     Pages 426-437 | | 060 |
|     Pages 439-442 | | 072 |
|     Pages 447-448 | | 076 |

| DOCUMENT TITLE | DKT. | PAGE |
|---|---|---|
| Page 454 | | 078 |
| Pages 459-466 | | 079 |
| Page 468 | | 087 |
| Pages 475-476 | | 088 |
| Pages 490-491 | | 090 |
| Page 494 | | 092 |
| Page 506 | | 093 |
| Reporter's Transcript, Volume 4 | 162 | |
| Page 532 | | 094 |
| Pages 545-546 | | 095 |
| Page 556 | | 097 |
| Pages 589-590 | | 098 |
| Pages 594-597 | | 100 |
| Pages 605-606 | | 104 |
| Pages 624-625 | | 106 |
| Pages 645-647 | | 108 |

## II.

## QUESTION NO. 1

**ANSWER**: No effect at all.

Nery's takes questions 1 through 3 to call for discussion of legal principles applicable to events before the December 2010 payment and question 4 to relate to that payment. The legal principles are the same at all times. Under California law, a party does not lose the right to rescind a contract upon learning of a right to seek rescission even if it continues to partially perform its obligations or makes a payment under de facto protest.

**A.     California Provides Broad Statutory Rescission Rights**

A party may rescind a contract for a variety of reasons, including if there is a material breach by the other party that results in a total or even partial failure of consideration. (Civ. Code § 1689(b)(2).) A party may rescind if his consent to the contract was given by mistake or through fraud.[1] (Civ. Code § 1689(b)(1).) A party may rescind if the consideration for the obligation of the rescinding party, before it is rendered to him, fails in a material respect from any cause. (Civ. Code § 1689(b)(4).)

Civil Code section 1691 controls the timing of rescission. Filing a pleading requesting rescission constitutes notice of rescission as a matter of law. (Civ. Code § 1691.) Section 1693 provides that rescission "relief shall not be denied because of delay in giving notice of rescission unless such delay has been substantially prejudicial to the other party." "Since the 1961 amendments of sections 1691 and 1693 of the Civil Code, reasonable diligence or promptness on the part of the party seeking rescission is no longer a prerequisite for the remedy. The

---

[1] "Negligent misrepresentation is a form of 'actual fraud,' consisting of the 'positive assertion, in a manner not warranted by the information of the person making it, of that which is not true, though he believes it to be true.'" (*Furla v. Jon Douglas Co.* (1998) 65 Cal.App.4th 1069, 1077.)

001

PLAINTIFF'S EXHIBITS
CASE NO. 11CV1589JMWVG

EXHIBIT NO. 29

FRANK J. GILBRIDE II
CHARLES S. TUSA
BENNETT H. LAST*
THOMAS P. SPELLANE*
JOHN H. TEBELER.C.†
ERIC H. BELTZER*
KENNETH M. CAMMELL, JR.*
JONATHAN M. WELLS*
LINCOLN W. BRIGGS
SAL MILLI*
DOROTHY MATTHEWS FREEBURG*

## GILBRIDE, TUSA, LAST & SPELLANE LLC
### ATTORNEYS AT LAW
31 BROOKSIDE DRIVE
P.O. BOX 658
GREENWICH, CONNECTICUT 06836

(203) 622-9360
FACSIMILE (203) 622-9392
WWW.GTLSLAW.COM

THEODORE L. GARRET***
ERNESTO SPINELLI PIRANDO*
ASHLEY VAN VOORHUIZEN*
NICHOLAS E. FEDEROF*

COUNSEL
GORDON H. LIPMAN*
SHEILA WADHWANI BHUTANI**

*NOT ADMITTED IN CONNECTICUT
**NOT ADMITTED IN CONNECTICUT OR CALIFORNIA
***NOT ADMITTED IN CONNECTICUT OR NEW YORK
ALSO ADMITTED IN NEW JERSEY
†ALSO ADMITTED IN FLORIDA
‡‡‡ALSO ADMITTED IN WASHINGTON, D.C. & VA

July 29, 2010

**FEDERAL EXPRESS**

Nery's USA, Inc.
774 Mays Blvd #10-450
Incline Village, Nevada 89451

**Attention:** John Cathcart, CEO

Re: **Event of Default Under Promissory Note from Nery's USA, Inc. ("Nery's") to Nascent Wine Company, Inc. dated February 10, 2010, in the original principal amount of $1,850,000 (the "Note")**

Dear Mr. Cathcart:

We are attorneys for Genesis Merchant Partners, LP, a Delaware limited partnership ("Genesis"). As you are aware, Genesis has been assigned all payments of principal and interest under the Note pursuant to that certain Collateral Assignment of Contracts between Genesis and Nascent Wine Company, Inc., a Nevada corporation ("Nascent"), dated on or about February 10, 2010, as agreed to and accepted by Nery's, a copy of which is attached hereto as Exhibit A (the "Collateral Assignment of Contracts").

As of the date hereof, Nery's has failed to pay to Genesis certain amounts of principal and interest due on June 10, 2010 and July 10, 2010 pursuant to the Note as further provided in Schedule A to the Note. Accordingly, a Default has occurred pursuant to Section 5 of the Note and, pursuant to Section 6 of the Note, interest shall now accrue on such amounts at the default rate of fifteen (15%) percent per annum, compounded monthly. A late fee is also due on the amounts owed in the amount of $1,241.66 for the June 2010 payment and $1,237.50 for the July 2010 payment. Accordingly, we hereby demand that Nery's pay to Genesis $52,062.49 immediately. In the event that such sums are not immediately received, Genesis hereby reserves its rights to, among other remedies it may have, immediately accelerate the obligations in full.

Please be advised that Genesis reserves all of its rights and remedies with regard to the above matters and is not waiving, limiting or otherwise adversely affecting any of its rights, remedies or powers, all of which rights, remedies and powers are expressly reserved. In

G:\Common\NWC\Nery's\Genesis\Notices of Default\Nery's USA, Inc\DEFAULT... TO Nery's.doc

700 THIRD AVENUE
25th FLOOR
NEW YORK, NEW YORK 10017
(212) 697-0446

780 FIFTH AVENUE SOUTH
SUITE 200
NAPLES, FLORIDA 34102
(239) 261-8780

777 SOUTH FLAGLER DRIVE
SUITE 800 - WEST TOWER
WEST PALM BEACH, FLORIDA 33401
(561) 515-4106

GEN000277



addition, neither the passage of time nor the failure to act, or any acts which Genesis may take in its discretion, shall be construed as waiving or modifying any term or condition of any document or agreement, all of which remain in full force and effect in accordance with the original terms thereof.

I trust that your immediate attention to this matter will make further involvement by my firm unnecessary.

If you have any questions or concerns, please do not hesitate to contact me.

Sincerely yours,

Jonathan M. Wells

cc:    Genesis Merchant Partners, LP
       Nascent Wine Company Inc.

GEN000278

29-2

003

PLAINTIFF'S EXHIBITS
CASE NO. 11CV1589JMWVG

EXHIBIT NO. 63

| | |
|---|---|
| From: | Timothy W. Doede [tdoede@sandsbros.com] |
| Sent: | Friday, July 31, 2009 6:26 AM |
| To: | Martin S. Sands; sbsands@gmail.com; Christopher Kelly |
| Subject: | Nascent Attorney's description of events to follow August 1 |

See below.

Tim Doede
Genesis Merchant Partners, LP
Sands Brothers Asset Management, LLC
(773) 456-3553 Cell
tdoede@sandsbros.com

90 Park Avenue, 31st Floor
New York, NY 10016
(212) 953-4999 Tel
(212)953-4978 Fax

15 Valley Drive
Greenwich CT 06831
(203) 661 - 7500 Tel
(203) 661 - 6500 Fax

This email and attachments are being communicated on a confidential basis solely for the purpose of remitting information about Sands Brothers Asset Management, LLC ("Sands Brothers"). This email and attachments are not and should not be construed as an offer with respect to any fund managed by Sands Brothers (a "Fund"). Any investment in a Fund will be accepted solely on the basis of the Confidential Offering Memorandum (the "OM"). This email and attachments in whole or in part will not form the basis of and should not be relied upon in connection with any subsequent investment in a Fund when established or offered. To the extent that statements made in this email and attachments summarize provisions of the OM, they are qualified in their entirety by the terms of such OM. A copy of the OM must be reviewed prior to making a decision to invest in a Fund. An investment in a Fund may result in loss to an investor.

Alternative investments such as the Funds are subject to less regulation than other types of pooled investment vehicles, may be illiquid and can involve the use of leverage, making them substantially riskier than other investments. Any investor who subscribes, or proposes to subscribe, for an investment in a Fund must: (1) be able to bear the risks involved and (2) must meet the Fund's suitability requirements. Investments in a Fund may not be suitable for certain investors. No assurance can be given that the Fund's investment objectives will be achieved. Any decision to invest in a Fund should be made after reviewing the OM, conducting such investigations as the investor deems necessary and consulting the investor's own investment, legal, accounting, and tax advisors in order to make an independent determination of the suitability and consequences of an investment in a Fund.

The following notice is based on U.S. Treasury Regulations governing practice before the Internal Revenue Service ("IRS"): (i) any U.S. federal tax advice contained herein, including any opinion of counsel referred to herein, is not intended or written to be used, and cannot be used, by any taxpayer for the purpose of avoiding U.S. federal tax penalties that may be imposed on the taxpayer; (ii) any such advice is written to support the motion or marketing of the transactions described herein (or in any such opinion of counsel); and (iii) each

1

EXHIBIT 42
WIT. Piancone
DATE 11-14-12
KRAMM COURT REPORTING

42.1

GEN002076

taxpayer should seek advice based on the taxpayer's particular circumstances from an
independent tax advisor.

-----Original Message-----
From: Humberto Reyes [mailto:humberto_reyes@yahoo.com]
Sent: Thursday, July 30, 2009 9:36 PM
To: Timothy W. Doede
Cc: Sandro Piancone
Subject:


Good evening Mr. Timothy I just want to remind you as I told you before that if we don't pay
the rent before next month starts (before august 1st) we will be in a "point of no return"
situation 'cause the landlord already has the legal right to evict TARGA.
Regarding SOCIAL SECURITY INSTITUTE (IMSS) as you know we're past due the payments of those
taxes, so what they can and will do is put a lien(embargo) on our inventories and bank
accounts, they are not open to negotiation 'cause the terms and requirements that they put
are almost impossible to comply with.

Regarding possible legal actions against liens there are certain legal strategies but they
take time (the fastest could be almost 30business days) and in the mean time the company is
in not in our control.  For example: recently another client of mine didn't pay certain taxes
and the autority put a lien on the bank accounts so we couldn't even pay the employees or
receive payment from clients.  The best course of action is to prevent the eviction and liens
that I have mention.

If you need a more detailed explanation or in legal terms please tell me

(i have trouble receiving my emails in this account so i will give you my personal account
that is cyberkarma@hotmail.com )

2

42.2

GEN002077

63-2

005

| | | |
|---|---|---|
| 02:27:52 | 1 | A.   Yes.   European exchange traded stock |
| 02:27:57 | 2 | options, employment stock options. |
| 02:28:02 | 3 | Q.   I am not even going to ask what those |
| 02:28:07 | 4 | are. |
| 02:28:07 | 5 | A.   Don't worry. |
| 02:28:08 | 6 | MR. HEMME:  Good. |
| 02:28:08 | 7 | BY MR. MAZZARELLA: |
| 02:28:09 | 8 | Q.   And where did you go after that? |
| 02:28:16 | 9 | A.   From Corelia, I worked for Unique |
| 02:28:20 | 10 | Leisure Cruises. |
| 02:28:21 | 11 | Q.   And what was your role there? |
| 02:28:23 | 12 | A.   Evaluating a wrap-up -- a rollup of |
| 02:28:29 | 13 | specialty cruise lines. |
| 02:28:31 | 14 | Q.   So it was a specific job targeted for a |
| 02:28:35 | 15 | specific transaction? |
| 02:28:36 | 16 | A.   A specific job targeting specific |
| 02:28:39 | 17 | transactions in that space. |
| 02:28:41 | 18 | Q.   And then where did you go to work? |
| 02:28:43 | 19 | A.   And from there I went to Sands Brothers. |
| 02:28:47 | 20 | Q.   And when did you start at Sands |
| 02:28:50 | 21 | Brothers? |
| 02:28:50 | 22 | A.   You would probably be better with the |
| 02:28:56 | 23 | dates, but I believe it was October of 2007 or |
| 02:29:03 | 24 | '8. |
| 02:29:04 | 25 | Q.   Well, it might help, I think the million |

006

| | | |
|---|---|---|
| 02:29:09 | 1 | dollar loan to Nascent took place in the summer |
| 02:29:13 | 2 | of 2008. |
| 02:29:14 | 3 | A.  Yes.  So I was there in '07. |
| 02:29:16 | 4 | Q.  And when did you leave Sands Brothers? |
| 02:29:20 | 5 | A.  Roughly about two years ago. |
| 02:29:25 | 6 | Q.  So somewhere around the beginning of |
| 02:29:27 | 7 | 2011? |
| 02:29:28 | 8 | A.  Yeah. |
| 02:29:31 | 9 | Q.  So it was after the Nery's Nascent, Inc. |
| 02:29:39 | 10 | transaction, about a year or so afterwards that |
| 02:29:41 | 11 | you left? |
| 02:29:41 | 12 | A.  Correct. |
| 02:29:41 | 13 | Q.  And what was your role -- and if it |
| 02:29:45 | 14 | changed, tell me how it changed -- at Sands |
| 02:29:47 | 15 | Brothers between October of '07 and sometime say |
| 02:29:50 | 16 | the first quarter of '11. |
| 02:29:52 | 17 | A.  I was the portfolio manager for Genesis |
| 02:30:01 | 18 | Merchant Partners, GMP. |
| 02:30:03 | 19 | MR. MAZZARELLA:  Let me take a break |
| 02:30:05 | 20 | here.  This is my family crisis I got to |
| 02:30:06 | 21 | deal with. |
| 02:14:43 | 22 | THE VIDEOGRAPHER:  We are now off the |
| 02:30:08 | 23 | record at 2:29 p.m., February 11, 2013. |
| 02:30:20 | 24 | (Recess taken.) |
| 02:33:23 | 25 | THE VIDEOGRAPHER:  We are now on the |

007

| | | |
|---|---|---|
| 02:34:18 | 1 | A. No. |
| 02:34:20 | 2 | Q. I don't want to get into a lot of detail |
| 02:34:33 | 3 | on the first -- the million dollar loan |
| 02:34:35 | 4 | transaction, but just so we can use some |
| 02:34:38 | 5 | shorthand terms, if I talk about the million |
| 02:34:40 | 6 | dollar loan, I am talking about the 2008 loan |
| 02:34:42 | 7 | from Genesis. And shorthand, Genesis for the |
| 02:34:46 | 8 | company; I'll either use the company or Genesis. |
| 02:34:50 | 9 | The million dollar loan to Nascent; and |
| 02:34:53 | 10 | if I'm talking about the note that was given from |
| 02:34:58 | 11 | Nery's USA, Inc. in February of 2010 to Nascent, |
| 02:35:01 | 12 | I will talk about the Nery's Nascent note. |
| 02:35:04 | 13 | A. Okay. |
| 02:35:04 | 14 | Q. What was your involvement in negotiating |
| 02:35:06 | 15 | the million dollar note? |
| 02:35:11 | 16 | A. I was the portfolio manager of the fund |
| 02:35:16 | 17 | at that time, and was responsible for the |
| 02:35:22 | 18 | underwriting of the loan at that time. |
| 02:35:22 | 19 | (Exhibit 98, marked for Reference.) |
| 02:35:24 | 20 | BY MR. MAZZARELLA: |
| 02:35:24 | 21 | Q. Let me give you a document that's been |
| 02:35:31 | 22 | previously marked as Exhibit 98. It's called the |
| 02:35:45 | 23 | Genesis Merchant Partners LP Investment Committee |
| 02:35:49 | 24 | Deal Overview. Do you recognize that? |
| 02:35:56 | 25 | A. Yes. |

008

|  |  |
|---|---|
| 02:46:36 | 1 |
| 02:46:38 | 2 |
| 02:46:40 | 3 |
| 02:46:44 | 4 |
| 02:46:49 | 5 |
| 02:46:50 | 6 |
| 02:46:53 | 7 |
| 02:46:57 | 8 |
| 02:46:59 | 9 |
| 02:47:00 | 10 |
| 02:47:01 | 11 |
| 02:47:02 | 12 |
| 02:47:05 | 13 |
| 02:47:07 | 14 |
| 02:47:07 | 15 |
| 02:47:08 | 16 |
| 02:47:12 | 17 |
| 02:47:16 | 18 |
| 02:47:17 | 19 |
| 02:47:19 | 20 |
| 02:47:20 | 21 |
| 02:47:22 | 22 |
| 02:47:25 | 23 |
| 02:47:25 | 24 |
| 02:47:26 | 25 |

A.   He believed that he could profitably purchase it for $2 million.

Q.   Did he ever tell you that he thought the value was $2 million, fair market value?

A.   I don't recall.

Q.   And am I correct that the amount that somebody might pay for a business depends in part upon the terms under which they are able to acquire that business?

A.   Certainly.

Q.   Am I also correct that Mr. Cathcart contemplated that the bulk of that $2 million would be paid from future earnings of the company?

A.   Correct.

Q.   Do you remember that initially he was contemplating gaining or obtaining some additional financing of approximately a million dollars to put into the company's equity?

A.   Correct.

Q.   And ultimately, he wasn't able to do that and he cut back to about $300,000, do you remember that?

A.   Correct.

Q.   Now, did you do any assessment before

009

| | | |
|---|---|---|
| 02:47:32 | 1 | the Nascent/Nery's transaction was consummated as |
| 02:47:37 | 2 | to the reasons why Targa was not able to make a |
| 02:47:39 | 3 | go of it? |
| 02:47:42 | 4 | A.  Say that again, please? |
| 02:47:44 | 5 | Q.  Before the sale to Nery's USA, Inc. did |
| 02:47:48 | 6 | you do any assessment or analysis as to why it |
| 02:47:50 | 7 | was that Targa was not able to maintain its |
| 02:47:52 | 8 | business profitably? |
| 02:47:56 | 9 | A.  My recollection is that there was a lack |
| 02:48:01 | 10 | of working capital and that I did make a second |
| 02:48:05 | 11 | visit to Nascent and Nery's. |
| 02:48:11 | 12 | Q.  What was the first visit? |
| 02:48:13 | 13 | A.  Before the $1 million loan. |
| 02:48:15 | 14 | Q.  Okay.  And so you say you took a second |
| 02:48:19 | 15 | visit out to Nascent and Nery's at some point |
| 02:48:21 | 16 | before the second transaction? |
| 02:48:22 | 17 | A.  I believe that is correct. |
| 02:48:23 | 18 | Q.  And the purpose of that was just to |
| 02:48:26 | 19 | gather information? |
| 02:48:26 | 20 | A.  Correct.  I had a defaulted loan. |
| 02:48:29 | 21 | Q.  And then I understand that you said that |
| 02:48:33 | 22 | the problem that Targa was having was a result of |
| 02:48:37 | 23 | lack of working capital? |
| 02:48:39 | 24 | A.  Correct. |
| 02:48:39 | 25 | Q.  Was it unable to buy inventory to turn |

010

| | | |
|---|---|---|
| 02:48:42 | 1 | the sales out?  Do you know what the result was |
| 02:48:44 | 2 | or how it was impacting operations? |
| 02:48:46 | 3 | A.  Working capital has many facets, one of |
| 02:48:51 | 4 | which is inventory. |
| 02:48:55 | 5 | Q.  Did you have any discussions with |
| 02:48:57 | 6 | Mr. Cathcart before the Nascent/Nery's |
| 02:48:58 | 7 | transaction was consummated with respect to his |
| 02:49:02 | 8 | view as to how much working capital was going to |
| 02:49:05 | 9 | be required in order to -- I will use the word |
| 02:49:09 | 10 | jump start Targa, if that makes sense? |
| 02:49:11 | 11 | A.  I wouldn't use the word jump start, but |
| 02:49:16 | 12 | yes. |
| 02:49:16 | 13 | Q.  Resuscitate? |
| 02:49:17 | 14 | A.  No.  We certainly had numerous |
| 02:49:21 | 15 | discussions with regard to working capital that |
| 02:49:24 | 16 | would be part of the purchase of the Targa |
| 02:49:30 | 17 | assets. |
| 02:49:30 | 18 | Q.  Did Mr. Cathcart ever express to you |
| 02:49:32 | 19 | what he felt was, in his mind, the minimum amount |
| 02:49:36 | 20 | of working capital that would be required in |
| 02:49:38 | 21 | order to be able to have a meaningful chance of |
| 02:49:41 | 22 | getting Targa back on its feet? |
| 02:49:43 | 23 | A.  Well, as we have previously discussed, |
| 02:49:46 | 24 | he believed it was a million dollars, and then |
| 02:49:49 | 25 | reduced it to 300,000. |

011

| | | |
|---|---|---|
| 02:59:27 | 1 | Q. And do you remember any discussion at |
| 02:59:29 | 2 | all as to how that $150,000 was set, how that was |
| 02:59:35 | 3 | determined? |
| 02:59:35 | 4 | A. John Cathcart, after evaluating the |
| 02:59:43 | 5 | opportunity with Sandro Piancone, determined that |
| 02:59:49 | 6 | $150,000 was the amount of the assumed liability |
| 02:59:55 | 7 | that would be necessary to go forward with the |
| 02:59:59 | 8 | transaction. |
| 02:59:59 | 9 | Q. And if there were -- when you say that |
| 03:00:02 | 10 | the amount of assumed liabilities that would be |
| 03:00:03 | 11 | necessary to go forward with the transaction, |
| 03:00:06 | 12 | does that mean that if the assumed liabilities |
| 03:00:08 | 13 | were greater than $150,000, that would jeopardize |
| 03:00:11 | 14 | the liability of the ongoing operation? |
| 03:00:20 | 15 | A. That is possible. |
| 03:00:21 | 16 | Q. At some point, possible became more |
| 03:00:25 | 17 | likely, I should assume, some amount of |
| 03:00:29 | 18 | liabilities? |
| 03:00:29 | 19 | A. Well, when you purchase a company, you |
| 03:00:34 | 20 | have assumed liabilities and you have the |
| 03:00:37 | 21 | injection of working capital contemplated with |
| 03:00:41 | 22 | the transaction. So it's the balance between |
| 03:00:44 | 23 | those two. |
| 03:00:46 | 24 | Q. So here we have got $300,000 of |
| 03:00:49 | 25 | anticipated projection of working capital; is |

012

| | | |
|---|---|---|
| 03:10:17 | 1 | Nery's brand? |
| 03:10:23 | 2 | A. I know that this was done, but I do not |
| 03:10:25 | 3 | recall the results. |
| 03:10:26 | 4 | Q. Do you remember what format that was |
| 03:10:29 | 5 | presented, how that was presented? Was it a -- |
| 03:10:31 | 6 | A. No. We -- it would not have been |
| 03:10:32 | 7 | written. |
| 03:10:33 | 8 | Q. Okay. Who did that analysis? |
| 03:10:34 | 9 | A. Me. |
| 03:10:35 | 10 | Q. Do you recall what the conclusions were |
| 03:10:38 | 11 | as to the value if you foreclosed? |
| 03:10:40 | 12 | A. No, I don't know. |
| 03:10:42 | 13 | Q. Do you remember the range at all? |
| 03:10:43 | 14 | A. No, I don't recall. |
| 03:10:48 | 15 | Q. Would those values have been reflected |
| 03:10:52 | 16 | at any point in time in any of the amounts by |
| 03:10:59 | 17 | which the Nascent loan was carried on the books |
| 03:11:01 | 18 | of Genesis? |
| 03:11:02 | 19 | A. Uh-huh. |
| 03:11:03 | 20 | Q. It would have been? |
| 03:11:04 | 21 | A. It would have been part of the |
| 03:11:08 | 22 | subjective nature of that analysis. |
| 03:11:10 | 23 | Q. On the bottom of page 2 and top of page |
| 03:11:18 | 24 | 3, you indicate that the -- you say, "A |
| 03:11:21 | 25 | foreclosing of the assets, assuming that Cathcart |

013

| | | |
|---|---|---|
| 03:11:24 | 1 | could take over the company and run it |
| 03:11:26 | 2 | profitably, we preferred the first option."  What |
| 03:11:28 | 3 | was your assumption -- I guess your assumption |
| 03:11:30 | 4 | was that he could -- |
| 03:11:32 | 5 | A.  Correct. |
| 03:11:33 | 6 | Q.  -- take over and run the company? |
| 03:11:34 | 7 | A.  Correct. |
| 03:11:34 | 8 | Q.  And that assumption was based upon |
| 03:11:37 | 9 | having the agreed upon amount of working capital |
| 03:11:39 | 10 | available, am I right? |
| 03:11:41 | 11 | A.  Part of it was the working capital, part |
| 03:11:43 | 12 | of it was his knowledge of the business, part of |
| 03:11:46 | 13 | it was his relationships with Sandro. |
| 03:11:50 | 14 | Q.  Would that opinion that he was capable |
| 03:11:52 | 15 | of doing that have been adversely affected if, |
| 03:11:54 | 16 | say, it turned out he was unwilling to put in |
| 03:11:57 | 17 | the -- 150 -- the $300,000 in working capital? |
| 03:12:03 | 18 | A.  Yes. |
| 03:12:03 | 19 | Q.  That would have been a material change |
| 03:12:05 | 20 | in the game plan? |
| 03:12:06 | 21 | A.  It would have been a consideration. |
| 03:12:12 | 22 | Q.  Is there a term of art that's used in |
| 03:12:18 | 23 | connection with SEC compliance, compliance with |
| 03:12:22 | 24 | GAAP and a number of other contexts by which the |
| 03:12:27 | 25 | term "materiality" is used? |

014

03:18:15   1     Q. Now you state here in paragraph and 18,

03:18:25   2   "I understood from the representations made to me

03:18:27   3   by Cathcart that the obligations of Targa were

03:18:30   4   approximately $150,000."

03:18:32   5       Was it Mr. Cathcart or Mr. Piancone who

03:18:34   6   "was representing what liabilities were of Targa?

03:18:38   7     A. Cathcart.

03:18:39   8     Q. He -- strike that. Did he ever tell you

03:18:44   9   where he was getting the information from which

03:18:47 10   he determined that the liabilities were

03:18:48 11   approximately 150,000?

03:18:50 12     A. No. But he was on the ground at the

03:18:54 13   company.

03:18:55 14     Q. In the next sentence you say, "I was

03:19:03 15   aware that Targa's rent was in arrears."

03:19:07 16       When did you first learn that Targa's

03:19:09 17   rent was in arrears?

03:19:10 18     A. Probably a month or two before the

03:19:14 19   transaction.

03:19:15 20     Q. Do you recall what the amount of rent

03:19:17 21   was?

03:19:18 22     A. No, I don't recall.

03:19:19 23     Q. Do you recall how long it had been since

03:19:22 24   rent was paid prior to the transaction in

03:19:24 25   February --

015

| | | |
|---|---|---|
| 03:48:24 | 1 | Q.  Okay.  So this was not just a |
| 03:48:26 | 2 | transaction that was negotiated between |
| 03:48:28 | 3 | Mr. Piancone on behalf of Nascent and |
| 03:48:33 | 4 | Mr. Cathcart on behalf of Nery's; in fact, it was |
| 03:48:37 | 5 | Mr. Cathcart on behalf of Nery's and Mr. Piancone |
| 03:48:40 | 6 | on behalf of Nascent and Mr. Genes -- and |
| 03:48:43 | 7 | Genesis -- and you on behalf of Genesis and |
| 03:48:45 | 8 | others from Genesis working together as a seller, |
| 03:48:49 | 9 | am I right? |
| 03:48:50 | 10 | A.  Correct. |
| 03:48:58 | 11 | Q.  And you read this stock purchase |
| 03:49:02 | 12 | agreement before it was executed, correct? |
| 03:49:04 | 13 | A.  I believe I did. |
| 03:49:05 | 14 | Q.  And what was your purpose in reading |
| 03:49:06 | 15 | this document? |
| 03:49:07 | 16 | A.  It was to evaluate the sale and the |
| 03:49:15 | 17 | obligations under which I would be releasing an |
| 03:49:23 | 18 | asset to which I had a security claim upon. |
| 03:49:26 | 19 | Q.  And as far as who had what dog in this |
| 03:49:31 | 20 | fight -- and I don't mean fight pejoratively; I'm |
| 03:49:36 | 21 | using it as an expression -- Mr. Piancone |
| 03:49:37 | 22 | basically had a secured creditor that had senior |
| 03:49:40 | 23 | rights on all the assets of his company, right? |
| 03:49:43 | 24 | A.  Yes, he did. |
| 03:49:43 | 25 | Q.  And he was looking at not getting a |

016

| | | |
|---|---|---|
| 08:15:50 | 1 | That's at the top of the first page.  The e-mail |
| 08:15:52 | 2 | on the second page is from an Humberto Reyes |
| 08:15:58 | 3 | July 30th, 2009, the previous day to you and a |
| 08:16:01 | 4 | carbon copy to Mr. Piancone. |
| 08:16:05 | 5 | Do you recognize this document? |
| 08:16:07 | 6 | A.  It appears to be an e-mail. |
| 08:16:10 | 7 | Q.  Do you recognize that?  Have you seen it |
| 08:16:13 | 8 | before? |
| 08:16:13 | 9 | A.  It appears as though I authored it. |
| 08:16:17 | 10 | Q.  And the attachment, the e-mail from |
| 08:16:19 | 11 | Mr. Reyes to you, do you remember receiving that? |
| 08:16:22 | 12 | A.  I don't recall, but apparently I did. |
| 08:16:23 | 13 | Q.  Now, Mr. Reyes I will have you assume to |
| 08:16:28 | 14 | be an attorney working with Mr. Piancone.  Do you |
| 08:16:33 | 15 | recognize his name, Mr. Reyes? |
| 08:16:34 | 16 | A.  No. |
| 08:16:35 | 17 | Q.  Do you know if during this period of |
| 08:16:39 | 18 | time, July of 2009, if you had had other |
| 08:16:42 | 19 | communications with Mr. Piancone's attorney? |
| 08:16:44 | 20 | A.  I don't recall. |
| 08:16:47 | 21 | Q.  Do you have any idea why Mr. Piancone's |
| 08:16:49 | 22 | attorney would be providing you with the |
| 08:16:50 | 23 | information contained on the second page of |
| 08:16:53 | 24 | Exhibit 100? |
| 08:16:54 | 25 | A.  Because the potential to -- it appears |

017

| | | |
|---|---|---|
| 08:17:15 | 1 | as though there was potential for eviction, and |
| 08:17:20 | 2 | that would materially affect the value of the |
| 08:17:25 | 3 | assets and the collateral on that loan. |
| 08:17:28 | 4 | Q. And so Mr. Piancone's lawyer was |
| 08:17:31 | 5 | advising you that Mr. Piancone's loan or his |
| 08:17:35 | 6 | company's loan was potentially in jeopardy? |
| 08:17:39 | 7 | A. It appears so. |
| 08:17:42 | 8 | Q. Do you know if Mr. Cathcart or anyone |
| 08:17:45 | 9 | from Nery's USA, Inc. was provided a copy of |
| 08:17:49 | 10 | Exhibit 100? |
| 08:17:49 | 11 | A. I don't recall. |
| 08:17:50 | 12 | Q. Do you recall any other discussions with |
| 08:17:59 | 13 | anyone regarding the topic discussed in the first |
| 08:18:03 | 14 | paragraph of Mr. Reyes' e-mail and that |
| 08:18:07 | 15 | specifically is the arrearages and the Targa |
| 08:18:11 | 16 | rent? |
| 08:18:11 | 17 | A. I don't recall. |
| 08:18:12 | 18 | Q. Do you recall any discussions with |
| 08:18:14 | 19 | anyone else regarding the topic discussed in the |
| 08:18:17 | 20 | second paragraph of Mr. Reyes's e-mail to you of |
| 08:18:20 | 21 | July the 30th, 2009 pertaining to the potential |
| 08:18:24 | 22 | that certain taxes had not been paid and that |
| 08:18:28 | 23 | could result in the taxing authorities in Mexico |
| 08:18:32 | 24 | shutting down the business? |
| 08:18:33 | 25 | A. I don't recall. |

018

| 08:18:34 | 1 | Q. Will you agree that that also could be |
| 08:18:39 | 2 | material to the repayment of your loan if the |
| 08:18:44 | 3 | taxing authorities in Mexico shut down the |
| 08:18:46 | 4 | business? |
| 08:18:46 | 5 | A. It could have an adverse effect on the |
| 08:18:51 | 6 | value of the collateral, yes. |
| 08:19:00 | 7 | MR. MAZZARELLA: Mark as Exhibit 126 the |
| 08:19:02 | 8 | next document. |
| 02:08:01 | 9 | (Defendant's Exhibit 126, E-mail dated |
| 02:08:01 | 10 | September 28, 2009 Bates stamped |
| 02:08:01 | 11 | GEN002196-2201, marked for Identification.) |
| 08:19:17 | 12 | BY MR. MAZZARELLA: |
| 08:19:18 | 13 | Q. I have marked as Exhibit 126 an e-mail, |
| 08:19:19 | 14 | top of the first page, which is from Mr. Kelly to |
| 08:19:24 | 15 | you dated December 28, 2009. And again, I think |
| 08:19:29 | 16 | this has been previously marked, but I will just |
| 08:19:31 | 17 | mark it again for purposes of time. I would like |
| 08:19:36 | 18 | you to look at that, including the attached draft |
| 08:19:39 | 19 | term sheet with the handwriting, and ask if you |
| 08:19:41 | 20 | recognize that? |
| 08:19:42 | 21 | A. It appears to be a draft term sheet |
| 08:19:55 | 22 | from -- for Nery's USA. |
| 08:19:58 | 23 | Q. Now, do you recognize the handwriting on |
| 08:20:00 | 24 | the page that's marked Genesis 002198? |
| 08:20:05 | 25 | A. Not -- no. |

019

1  Q.  And, in fact, from the time -- pretty much from the time

2  that Nascent took over, Targa started to decline in sales,

3  and so was Nascent, right?

4  A.  No.

5  Q.  Not -- well, when did the decline start?

6  A.  At the end of 2008, last -- second, third, fourth quarter

7  of 2008.

8  Q.  And that was after Nascent had put a million dollars into

9  the inventory for cheese, right?

10  A.  Yes.

11  Q.  Assume with the sales going down in Targa, its

12  profitability also went down, correct?

13  A.  Correct.

14  Q.  And Nascent did not have the capital to push the Nery's

15  brand nationwide in Mexico in 2008 or 2009; is that right?

16  A.  Yes.

17  Q.  In fact, that -- while that was in Nascent's plan to push

18  the brand nationwide, it never did it, correct?

19  A.  Correct.

20  Q.  So the Nery's brand and the Targa business remained in

21  the northern Baja market, correct?

22  A.  Correct.

23  Q.  And by the middle of 2009, Targa was operating at a

24  negative, wasn't it?

25  A.  Yes.

1  Q.  There were no profits, right?

2  A.  Correct.

3  Q.  And at the middle of 2009, Nascent didn't have the

4  capital to make Targa profitable, correct?

5  A.  Correct.

6  Q.  Nascent was having its own problems; is that right?

7  A.  Correct.

8  Q.  That was the result of the overall state of the economy

9  and everything else that was going on in the 2008 to 2009

10  time frame, right?

11  A.  Correct.

12  Q.  Now, you didn't have much contact with Mr. Cathcart in

13  2008, did you?

14  A.  No.

15  Q.  He had pretty much satisfied most of his consulting

16  obligations or what you needed him for in the acquisition

17  phase through the end of 2007?

18  A.  Correct.

19  Q.  And then so in 2008, you didn't talk to him much, but in

20  2009, early 2009, you reconnected with Mr. Cathcart, right?

21  A.  Correct.

22  Q.  And you explained to him about the problems that you were

23  having with Nascent and Targa, right?

24  A.  Correct.

25  Q.  And Mr. Cathcart expressed an interest in licensing the

1  Nery's brand for the USA, right?

2  A.  Yes.

3  Q.  And those discussions resulted in a license agreement

4  between Nascent -- or Nascent -- or Nascent and Nery's,

5  correct?

6  A.  Yes.

7  Q.  Let's take a look at Exhibit 7.  Is Exhibit 7 the license

8  agreement that you entered into with Mr. Cathcart for a USA

9  Nery's?

10  A.  It is.

11      (Exhibit No. 7 identified.)

12  Q.  So this agreement essentially -- well, the document

13  speaks for itself, but essentially it gave Mr. Cathcart the

14  right to market Nery's in the United States?

15  A.  Correct.

16  Q.  And that's dated July 8, 2009, right?  I'm sorry.

17  June 23 --

18  A.  June 23, yeah.

19  Q.  And then in addition to that deal, isn't it true that

20  Mr. Cathcart was also consulting with Nascent's board on how

21  to resolve Nascent's financial problems?

22  A.  He wasn't consulting.  He was on the board of advisors,

23  and I would ask him questions on how to -- what should we do

24  to get out of our problems and how to raise capital.

25  Q.  And then wasn't there a decision between the board and

1  Q.  Isn't it true you called him in Miami to help out with

2  Nascent's problems?

3          MR. HEMME:  Objection, your Honor; leading.

4          THE COURT:  Sorry?

5          MR. HEMME:  Objection, your Honor; leading.  This

6  is not an adverse witness.

7          THE COURT:  I'm sorry.  I'm just not hearing you.

8  You're not --

9          MR. HEMME:  This is not an adverse witness.

10         THE COURT:  It's cross-examination.

11         MR. HEMME:  Correct.  Okay.

12         MR. MCNUTT:  Your Honor, this is absolutely an

13  adverse witness.

14         MR. HEMME:  Withdrawn, your Honor.  I'm sorry.

15         BY MR. MCNUTT:  Q.  So isn't it true that you

16  called Mr. Cathcart in Miami to discuss Nascent's financial

17  distress?

18  A.  Yes.

19  Q.  You reached out to him, not the other way around?

20  A.  Correct.

21  Q.  Mr. Hemme asked you some questions about Targa's

22  accounting department in 2009, and during the transition

23  period when Mr. Cathcart bought the company using Nery's.

24  Isn't it true that there were two or three different

25  accountants in Targa in that year, 2009?

1  A.  That's correct.

2  Q.  And one of the obligations of the accounting team was to

3  make sure that the government obligations, including taxes,

4  were being paid on a regular basis, correct?

5  A.  Correct.

6  Q.  In hindsight, they didn't do a very good job, did they?

7  A.  They did not.

8  Q.  And in January of 2010, at the time Targa was essentially

9  about to be sold to Mr. Cathcart under the stock purchase

10  agreement that's Exhibit 22, it was not a solvent company in

11  essence; it didn't have working capital to ramp up sales,

12  correct?

13  A.  Correct.

14  Q.  Its cash in was not equal to its cash out; is that fair?

15  A.  That's fair.

16  Q.  Were you involved in any discussions with Mr. Cathcart

17  regarding the use of a company named Esmeralda to do

18  nationwide distribution for Nery's?

19  A.  Yes.

20  Q.  Tell me about that.

21  A.  Well, he talked about taking the brand nationwide.  He

22  asked me who I thought could be a good distributor; I gave

23  him a couple names, but that was one of them, Esmeralda.

24  Q.  Tell me about the cigarette import business.  Why is it

25  such a challenging thing to import cigarettes into Mexico?

1  excess of the $150,000 that was being negotiated in the deal,

2  that that would have a negative impact on Mr. Cathcart's

3  profit projections?

4  A.   That's correct.

5  Q.   Did anyone at Genesis ever object to the idea that you

6  would stay on and provide consulting services to Targa after

7  the company was sold to Nery's?

8  A.   No.

9  Q.   They knew you were going to be doing that, right?

10  A.   Correct.   I think they were happy that I was doing it.

11  Q.   Because you knew Targa?

12  A.   I knew Targa, and we were looking out for our interests.

13  Q.   When you say we -- who are you referring to when you say

14  we?

15  A.   Nascent and Genesis.

16  Q.   Mr. Hemme asked you about a multi-month period in which

17  you and Mr. Cathcart were looking around the markets trying

18  to raise money to find some way to make all of this work.

19  What was your understanding of what would happen if

20  Mr. Cathcart didn't end up closing on this stock purchase

21  agreement?   What would have happened to Targa and to Genesis?

22          MR. HEMME:   Calls for speculation.

23          THE WITNESS:   We would have closed Targa.

24          THE COURT:   If there's an objection, let me get

25  that resolved, sir, before you answer.   Thank you.

1        MR. MCNUTT:  I can restate.

2        THE COURT:  No, no.  The objection is overruled.

3   If you want to repeat the -- I'll have the reporter read back

4   the question and the answer.

5        (The previous question and answer were read.)

6        BY MR. MCNUTT:  Q.  Let me ask that a little

7   cleaner with a couple of background questions.  At the time

8   of the sale of Targa, the stock of Targa to -- to Nery's,

9   Nascent was an existing company that had not yet filed for

10  bankruptcy, correct?

11  A.  Correct.

12  Q.  And Nascent had a number of subsidiaries or operating

13  divisions, correct?

14  A.  Correct.

15  Q.  How many?

16  A.  We had three and three that we had sold.

17  Q.  In 2009?

18  A.  Correct.

19  Q.  And, in fact, there was an entity called Best Beer

20  Company, correct?

21  A.  Correct.

22  Q.  Was that a division or a subsidiary?  Was it -- did it

23  have its own stock or was it just a division of Nascent?

24  A.  It was a subsidiary.

25  Q.  And was that a working company?  Did it have employees,

1   payroll, product?

2   A.   Yes.

3   Q.   And what did that company do?

4   A.   We ended up closing it.

5   Q.   At the time of the sale of Targa to Mr. Cathcart, what

6   was Best Beer doing?

7   A.   It was selling product.

8   Q.   So it was a living, breathing company even though it

9   might not have been making any money?

10  A.   Correct.

11  Q.   How many employees did Best Beer have in 2009 to your

12  best estimate?

13  A.   I don't recall, maybe 10 or 12.

14  Q.   And it was a beer distributor, right?

15  A.   It started off as a beer distributor, but in 2009 we were

16  not selling beer.

17  Q.   What products was Best Beer moving?

18  A.   Some food products for restaurants, hotels.

19  Q.   So Nascent didn't have any capital to keep Targa going,

20  correct?  At the time that the company was sold to

21  Mr. Cathcart, there were no other options on the table,

22  right?

23  A.   Correct.

24  Q.   And if Mr. Cathcart had not executed this stock purchase

25  agreement, is it your testimony that Nascent would have

1    simply closed down Targa?

2    A.    Correct.

3    Q.    And was it your understanding that that was -- that was

4    Genesis's plan as well if this deal didn't go through?

5                MR. HEMME:  Objection; vague and ambiguous.

6                THE COURT:  Sustained.

7                BY MR. MCNUTT:  Q.  Did you have any discussions

8    with --

9                THE COURT:  It lacks foundation more than anything

10   else.

11               BY MR. MCNUTT:  Q.  Did you have any discussions

12   with anyone at Genesis about what would happen if

13   Mr. Cathcart didn't close this transaction?

14   A.    Yes.

15   Q.    And in those discussions was there any commentary about

16   what would happen if Mr. Cathcart didn't do this deal?

17   A.    We told Tim at Genesis that we would have to close, and

18   his answer was well, okay.  I mean I don't know what they

19   would have done, but we would have closed it.

20   Q.    Okay.  And who was that at Genesis you were communicating

21   with?

22   A.    Tim Doede.

23   Q.    So given those particular circumstances, it was Cathcart

24   or Targa shuts down; is that -- is that too simplistic or is

25   that right?

028

1  meeting?

2  A.  It was early on, but we did have a conversation about

3  that.

4  Q.  So I wasn't there and the Court wasn't there and Mr.

5  Hemme wasn't there, and I don't think Mr. Kelly was there.

6  Was there anybody there other than you and Mr. Cathcart?

7  A.  No.

8  Q.  So tell me about this meeting.  What happened?  Did you

9  just basically discuss here's all the liabilities, here's all

10  the assets, and here's all the intercompany that we're going

11  to get cleaned up?

12  A.  There was a discussion about there was accounts

13  receivable and accounts payable between Targa and Best Beer,

14  which we were told that those would come out.  But I don't

15  think we had financials and we went like this.  It was a

16  statement that there was going to come out some payables and

17  some receivables, intercompany.

18  Q.  So did you assure Mr. Cathcart that essentially you're

19  going to be giving him Targa with $150,000 in liabilities and

20  that everything else would be cleaned up; is that a fair

21  statement?

22  A.  Yes.

23  Q.  In hindsight, knowing now -- if you knew then what you

24  know now, $150,000 would have been a little optimistic for

25  accounts payable, correct?

1  A.  Correct.

2  Q.  Would you agree or disagree that Nascent represented that

3  the liabilities of Targa would not exceed 150 and that

4  Nascent would be responsible for any excess liabilities;

5  would you agree with that statement?

6  A.  Yes.

7  Q.  Did you make Genesis aware of that issue, that the

8  liabilities needed to be less than $150,000?

9  A.  Correct.

10  Q.  Would you agree or disagree that Mr. Cathcart told you

11  that he would not have done the deal if the liabilities were

12  over 150?

13  A.  That's correct.

14  Q.  Mr. Hemme asked you a number of questions about the

15  existence of tax liens and when they accrue and when the

16  liability arises and when you get notice of it.  You

17  testified that you didn't know about the four million peso

18  liability, but we've seen a couple of emails where you were

19  communicating or Mr. Reyes was communicating with Genesis

20  talking about taxes, so I want to talk a sliver of time here.

21  In 2009 were you aware that Targa was accruing and paying tax

22  liabilities of Targa?

23  A.  Well, as a normal course of business, we were paying

24  taxes, so I think the answer is yes.

25  Q.  And is it your testimony that given the fact that the

1  about in the business, so --

2  Q.  All right.  Now, I'm going to ask you to turn to trial

3  Exhibit No. 63, please.  Now, you mentioned before, Mr.

4  Piancone, that Mr. Humberto Reyes was an attorney for

5  Nascent, correct?

6  A.  Correct.

7  Q.  So he wouldn't have been sending out emails to Genesis

8  without your authority, right?

9  A.  Correct.

10  Q.  So this is appears to be an email that he sent, which he

11  copied to you, to Mr. Doede from July of '09, so several

12  months before the October email referenced taxes.  And do you

13  see the block that's being highlighted right now about -- let

14  me just read it:  Regarding Social Security Institute, IMSS,

15  as you know, we're past due the payments of those taxes, so

16  what they can and will do is put a lien, embargo, on our

17  inventories and bank accounts.  They are not open to

18  negotiation because the terms and requirements that they put

19  are almost impossible to comply with.  Did you -- did you

20  send a response email after you got this to Tim Doede telling

21  him that the statement from Mr. Reyes about the social

22  security liens was not accurate?

23  A.  I don't think so.

24     (Exhibit No. 63 identified and admitted.)

25  Q.  So would you agree that that's an accurate statement?

1  A.  Correct.

2  Q.  You never gave this email to Mr. Cathcart, did you?

3  A.  No.

4  Q.  And you never told Mr. Cathcart that there were potential

5  liens from the Social Security Institute, or IMSS, that would

6  be pending at the time he took over the company, correct?

7  A.  No.

8  Q.  No, I'm not correct or I am correct that you never told

9  him?

10  A.  You're correct, I never told him.

11  Q.  So let's turn to trial Exhibit No. 22, please, and if you

12  could, turn to page 6, article 2, purchase and sale, section

13  2.2.  Do you see that?  See section 2.2?

14  A.  Yes.

15  Q.  All right.  So this purchase price of $2 million and the

16  accounts payable of 150, is this -- is this consistent with

17  the expectations and understandings of you and Genesis and

18  Mr. Cathcart as to how this deal was going to be put

19  together?

20  A.  Yes.

21  Q.  And we talked earlier about how that $2 million number

22  was negotiated based on Nascent liabilities, correct?

23  A.  Correct.

24  Q.  All right.  Let's turn to taxes.  And if you could turn

25  to section 3.13 on page 12 of the contract -- are you there?

1    A.  Yes.

2    Q.  All right.  Do you see the section that states that --

3    3.3 -- 3.13 (b) that the company has paid or has made

4    adequate reserves on its books for the payment of all taxes

5    shown to be due on such tax returns or claimed to be due by

6    any governmental authority or which the company is otherwise

7    liable for or is to required to withhold on behalf of any

8    person.  Do you see that section?

9    A.  Yes.

10   Q.  And you would agree, wouldn't you, that after the sale of

11   the company to Nery's that IMSS and SAT, "infonavit," these

12   tax authorities did in fact arrive to Targa and request

13   payment for back taxes; you'd agree with that, right?

14   A.  Yes.

15   Q.  So you would agree that section 3.13 (b) in fact was not

16   accurate, that the company had in fact not paid all of the

17   taxes that were due prior to the sale of the company,

18   correct?

19   A.  Correct.

20   Q.  Let's turn back one page to section 3.12, which is

21   welfare plans.  Let's -- actually, I apologize, Mr. Piancone.

22   We need to go back to the definitions section for just one

23   moment.  It's on page 1 of the contract, which actually turns

24   out to be about page 6 of this document, under definitions,

25   and if you flip to the definitions, you'll eventually find a

1  definition for welfare plans on page 5, and going to page 6.

2  Are you there?

3  A.   Five or six?

4  Q.   Take your time.

5  A.   Five or six?

6  Q.   See welfare plan under definitions?

7  A.   Welfare plan, okay.

8  Q.   Okay.  So I'm not going through this whole thing because

9  it will drive the court reporter crazy and we'll bore

10  everyone, but let me just get the gist of it.  A welfare plan

11  in the contract means any plan or program maintained for past

12  or present employees of the company which would include,

13  among other things -- and I'll summarize here -- severance

14  plan, bonuses, savings plan, vacation pay, holiday pay,

15  severance, benefit, bonus, salary continuation related to

16  employment, compensation, or employee benefits.

17      Would you agree that this would cover all back pay

18  owed to employees of Targa at the time that Mr. Cathcart

19  purchased the company?

20  A.   Correct.

21  Q.   All right.  Now, let's turn to section 3.12, which

22  discusses welfare plans and representations of Nascent on

23  page 11 of this contract.  Would you agree or disagree that

24  by executing this contract on behalf of Nascent that Nascent

25  represented that each welfare plan had been established,

1   maintained, administered, and funded in all material respects

2   in compliance with all applicable laws. Do you agree that

3   that representation was made to Mr. Cathcart and to Nery's?

4   A. Yes.

5   Q. And would you agree or disagree that in fact employees

6   came forward after the close of this transaction and demanded

7   vacation pay, aguinaldo, and severance that had remained

8   unpaid?

9   A. Correct.

10   Q. Mr. Piancone, I don't want to jump around too much, but

11   I'd like to go to section 9.4 briefly, and then I'm going to

12   go back to section 8.1 on indemnity.

13   A. What page is 9.4?

14   Q. It's page 32 of the contract. Are you there?

15   A. I am.

16   Q. So -- you're not a lawyer, correct?

17   A. No.

18   Q. So as lawyers we have a word for a paragraph like this;

19   we call it an integration clause. But what I'd like to ask

20   you is -- I want to ask you what your understanding of

21   section 9.4 was at the time you signed this contract.

22   A. Explained that this is the entirety agreement, there was

23   no verbal, there was no other agreements to this but this

24   one.

25   Q. So it was your understanding at the time you executed

1  this agreement that everything in here was supposed to be and

2  should be true, that all reps needed to be accurate from a

3  contractual prospective.

4  A.  Correct.

5  Q.  Now, let's turn to section 8.1, please, which is a couple

6  pages prior to that.  It's under article 8 or

7  indemnification, page 28 of the contract.  Are you there?

8  A.  Yes.

9  Q.  So you would agree that Nascent in fact was the seller

10 under this contract; it was selling the stock of Targa to

11 Nery's, correct?

12 A.  Correct.

13 Q.  And that references to the company are defined in the

14 first few pages as Targa?

15 A.  Correct.

16 Q.  And that the buyer was Nery's USA, Inc., right?

17 A.  Correct.

18 Q.  So let's read this sentence along together and then I'm

19 going to ask you a couple of questions about what you

20 understood this to mean and whether or not Nascent complied

21 with this provision of the contract.

22         Each seller, jointly and severally, hereby agrees

23 to indemnify, defend, and hold harmless buyer and Targa, the

24 company -- skip over the rest of that stuff -- from and

25 against any losses arising from or relating to any breach of

1  the reps and warranties made by the company in this

2  agreement, any breach of the covenants or agreements made by

3  the company or sellers, and any indemnification obligations

4  pursuant to section 6.5.  In addition, each seller, severally

5  and not jointly, hereby agrees to indemnify, defend, and hold

6  harmless buyer indemnified parties from and against any

7  losses based upon or rising from any breach of the reps and

8  warranties of such seller contained in article 4.

9          Now, we've discussed how there were unpaid taxes in

10  violation of the contract, unfunded labor liabilities, and

11  excess accounts payable.  You've agreed with all those

12  things, and they're effectively undisputed.  Would you agree

13  or disagree that Nascent had no cash available to defend,

14  indemnify, and hold Nery's and Targa harmless from all of

15  these excess liabilities?

16  A.  I agree.

17  Q.  In fact, Nascent was, for all practical purposes, a dead

18  company --

19  A.  Correct.

20  Q.  -- at the time of this transaction or shortly thereafter?

21  A.  Correct.

22  Q.  When Mr. Cathcart asked you if Nascent could assist in

23  paying off some of these excess liabilities, you told him

24  that Nascent was broke, right?

25  A.  Correct.

1   Q. I don't mean that in a way to be critical, Mr. Piancone;

2   businesses fail and I understand that. That's not a personal

3   criticism. But this conversation took place, didn't it?

4   A. Yes.

5   Q. Mr. Cathcart said in essence Mr. Piancone, or Sandro,

6   there's a problem here, can Nascent fix it; and your response

7   in essence was what?

8   A. No. We didn't have the money.

9   Q. Was it frustrating for you when Genesis didn't respond to

10   your letter requesting defense and indemnity of Nascent? Did

11   that irritate you?

12   A. Yes.

13            MR. HEMME: Objection, relevance.

14            THE COURT: Overruled.

15            BY MR. MCNUTT: Q. The answer?

16   A. Yes.

17   Q. Let's turn to trial Exhibit No. 24, please.

18            MR. MCNUTT: Apologize, your Honor. Slight

19   technical problem with my outlet. I think we've fixed it.

20            BY MR. MCNUTT: Q. I believe 28 is the exhibit I'd

21   like to question you about now. I have very little doubt

22   that you may never have received a copy of this email, so I'm

23   not going to ask you to authenticate it. Let me ask you

24   about some of the content of the email. Do you see how Mr.

25   Doede sent himself an email on April 24 and the subject line

038

1  A.  Yes.

2  Q.  And would you agree that you were CC'd on the email from

3  Moncerrat?

4  A.  Yes.

5      (Exhibit No. 82 identified and admitted.)

6  Q.  And what is your understanding of what Moncerrat is

7  trying to explain to Mr. Alvarez and Mr. Cathcart and to you

8  about this SAT tax lien?

9  A.  That the government came in and provided this, and if it

10  wasn't paid, there would be -- and this is a fine -- and if

11  it wasn't paid, there would be an embargo.

12  Q.  A seizure?

13  A.  Lien seizure, yes.

14  Q.  And at the top of this document, do you see this sentence

15  from Mr. Cathcart to you, this email, that says "another

16  embargo today if we don't pay.  Does someone know of all the

17  liabilities?"

18      As of April 16, 2010, did you, Mr. Piancone, have

19  the personal capability to give Mr. Cathcart a complete list

20  of every liability of Targa that was accurate?

21  A.  No.

22  Q.  Why not?

23  A.  I didn't know what all the liabilities were.

24  Q.  So you would agree that Mr. Cathcart was in fact

25  surprised about all of these liabilities that were popping up

1  in 2010?

2  A.  Correct.

3  Q.  And there's no particular reason why he wouldn't be

4  surprised because you didn't know about the liabilities

5  either, correct?

6  A.  Correct.

7  Q.  Do you agree or disagree that you never notified

8  Mr. Cathcart prior to this transaction closing that Targa in

9  fact owed rent for a full year to the landlord of $88,000?

10  A.  I never told him the amount.

11  Q.  You told him it was a few months, correct?

12  A.  Correct.

13  Q.  But it's true, isn't it, that in fact the liability for

14  the unpaid rent was a full year?

15  A.  I don't remember the exact date -- exact amount.

16  Q.  And I don't want to get into a game of semantics, I'm not

17  trying to trick you with this question, but there's a

18  subtlety here with respect to the things you told

19  Mr. Cathcart about the rent.  Did you assure him or represent

20  to him, if you will, that dealing with the back rent would

21  not be a major problem?

22  A.  Correct.  I told him that he would be able to sign a new

23  lease, I believed he could sign a new lease, and start making

24  payments on the new lease and maybe even get a lower price.

25  Q.  So get the back rent forgiven by signing a new lease and

040

1   maybe even do a better deal than what Targa already had; is

2   that fair?

3   A.  Correct.

4   Q.  And why would you tell him something like that?  Is that

5   based on your personal experience, you're just a good

6   business guy, that's the way things are done in Mexico?

7   A.  All the above.  They needed a tenant, we were behind, and

8   so that money was technically lost; so my feeling was he

9   could sign a new lease.

10  Q.  But you'd agree that you never specifically told

11  Mr. Cathcart that the back rent was $88,000 and that the

12  landlord was going to evict Targa if it wasn't paid; you

13  would agree with that statement?

14  A.  I never told him.

15  Q.  I'd like to turn to the transfer tax.  There's a couple

16  of different documents I'm going to refer you to, Mr.

17  Piancone.  The first thing I'm going to ask you to look at is

18  the -- is Exhibit 22 in the white binder.  There's a section

19  covering transfer taxes, and that is on -- I know I have it;

20  I will find that somewhere.  It's -- turn to page 9 of the

21  stock purchase agreement, which is Exhibit 22, on section 3.8

22  (c).  It's the top of page 9 of the contract.  Do you see

23  that?

24  A.  Yes.

25  Q.  So this section states that except as set forth in

041

1   responsibility?

2   A.   Correct.

3   Q.   Why don't we confirm this known or unknown issue on

4   page 5 of the contract, Mr. Piancone.   It's under the

5   definitions section for taxes.   If you could turn to page 5,

6   the middle paragraph, the last three sentences.   Do you see

7   that?

8   A.   Yes.

9   Q.   I'm going to read the following statement:   The term tax

10  liability, in quotes, shall mean any liability whether known

11  or unknown, whether absolute or contingent, whether

12  liquidated or unliquidated, and whether due or to become due

13  with respect to taxes.

14       Given Mr. Hemme's line of questioning earlier today

15  where he asked you if you knew about these tax liabilities

16  and you disclaimed knowledge, would you agree that, whether

17  you personally knew or didn't know, that Nascent was still on

18  the hook for these unpaid back taxes?

19  A.   That's correct.

20  Q.   Under the contract?

21  A.   Correct.

22  Q.   Now, there was an issue that came up with respect to a

23  report from Deloitte and Touche related to transfer taxes.

24  Did you ever have a conversation with Mr. Cathcart where Mr.

25  Cathcart asked you about who was going to be responsible for

1  paying transfer taxes for the sale of the stock?

2  A.  Well, he informed us that the seller was responsible for

3  it, and he asked us if Nascent was able to pay it.

4  Q.  And your response to Mr. Cathcart?

5  A.  We did not have the money to pay it.

6  Q.  Seems to be a common theme here.  The financials of

7  Nascent -- what are the financials of Nascent today in broad

8  strokes?  The company still exist?  Did it file bankruptcy?

9  A.  It did not file bankruptcy.  It's dormant.  I don't

10  remember all the numbers, but it's upside down; it's

11  basically bankrupt.

12  Q.  How many other creditors have been pursuing Nascent, if

13  any?

14  A.  Recently I'm not aware of, but back in 2008 or 2009,

15  quite a few.

16  Q.  Genesis never sued Nascent for breach of the promissory

17  note though, did it?

18  A.  No.

19  Q.  You would agree that Nascent in fact has not complied

20  with the terms of its promissory note to Genesis, correct?

21  A.  Correct.

22  Q.  You'd agree that the only document that ties Nery's to

23  Genesis is the direction letter that was marked as Exhibit

24  25?

25            MR. HEMME:  Objection; calls for legal conclusion.

1  A.  Yes.

2  Q.  What can you recall about the first time that a Mexican

3  tax agent arrived at Targa to request payment?

4  A.  It was a tax collector per se.  They showed up with a

5  piece of paper saying that, you know, we were behind on some

6  IMSS taxes.

7  Q.  Is that i-m-s-s?

8  A.  IMSS taxes.  And that -- he had the order and he

9  presented it that either we either we cured the back taxes

10  that he had -- it was at that point it was not only the

11  taxes, it was the taxes plus the interest that accumulated

12  and the fine for not presenting the taxes in time.  So he

13  showed up at the door with an embargo notice, notification to

14  confiscate goods basically, and either the -- we paid it at

15  the moment or they would confiscate whatever goods we had in

16  the warehouse equivalent to the amount of the owed taxes that

17  he had.

18  Q.  And in your entire life, had any event like that ever

19  happened to you before?

20  A.  No.

21  Q.  Did it concern you?

22  A.  Of course.

23  Q.  And after this man walks in and presents you a notice,

24  what did you do?

25  A.  I called -- I called the main office and told them what

1   was going on and that we needed to take care of it ASAP or

2   they were going to confiscate machinery that we needed to

3   work.

4   Q.  And did Mr. Cathcart authorize you to pay that bill?

5   A.  Yes.

6   Q.  And how did you do it?

7   A.  I wrote a check, they did a wire transfer to the check

8   account, the checking account, and I went to cash a check at

9   the bank and came back to give the money to the tax collector

10  person.

11  Q.  And how many times in total did you personally interact

12  with tax agents coming to serve embargoes?

13  A.  About six.

14  Q.  Other than the one you just described to me, can you

15  recall with specificity any other specific times and any

16  details about any of those times?

17  A.  Yes, the time that actually the tax collection person

18  showed up with the police, with a locksmith, and with a

19  platform, and they were there to collect.

20  Q.  So tell me about that event.  What happened?

21  A.  Well, the tax collection person showed up with the notice

22  like some other ones did before.  I told them that, you know,

23  if we will come back tomorrow, I would give him a check or if

24  he would let us go and deposit the money at the bank to pay

25  the tax and give him the, you know, the proof that the tax

1   was paid. And he said that no, that he was there to actually

2   do the confiscation, and a few moments later the police

3   arrived with a locksmith and with a, you know, platform, and

4   he said he was going to take either -- if we didn't open the

5   door, he was going to cut through the door with the

6   locksmith, go in with the police, and take whatever -- you

7   know, whatever machinery or equipment or whatever he could

8   find that was equivalent to the taxes we owed.

9   Q.   And so how did you respond to that? What did you do?

10  A.   I again called the office and told them that I needed the

11  money ASAP and I told the person to wait for me for a half

12  hour, the time that was going to take me give or take to go

13  to the bank, get the cash and pay not only the tax but pay

14  the locksmith, give the police money because they were there

15  because they charge for that as well, and the person with the

16  platform because they charge you because they already went

17  out there even if they do the service or not.

18  Q.   And so did you pay all those guys?

19  A.   Yes.

20  Q.   In cash?

21  A.   Yes.

22  Q.   All right. Can you remember any incident in which you

23  were unable to pay cash and items were actually seized?

24  A.   Yes, there was a time when somebody was not liened and

25  they didn't want to wait and they took a couple of items

1   that, you know, were equivalent to the tax that was owed.

2   Q.  What did they take?

3   A.  Took a washer, a compression washer, they took a pallet

4   jack and some other item that I actually don't recall.

5   Q.  I'm not a factory guy.  Can you explain what a pallet

6   jack is.

7   A.  A pallet jack is something that you utilize to lift a

8   pallet and move around by hand, so it's actually a work tool

9   that we didn't need at the warehouse to actually perform the

10   jobs.

11   Q.  And what did you use the power washer for?

12   A.  To wash the -- the production rooms.

13   Q.  And the other items, all inventory stuff, equipment?

14   A.  Yep, equipment mainly.  They would confiscate mainly

15   equipment because it's something that can be sold at an

16   auction.  You know, the second line item -- I would say the

17   next line items on their, if it's not equipment, it's

18   product.  But first it's equipment.

19   Q.  Do you have any recollection of any tax agent showing at

20   a point in time asking for millions of pesos?

21   A.  Yes.

22   Q.  What are your -- what are your memories of that event?

23   A.  Well, they showed up with a notification on a lien

24   against Targa from s-a-t, SAT, that it was over three million

25   pesos.

1    A.  Yes, I'm sure I did a few times during the negotiations,

2    but I think ultimately what seemed to be around the December

3    time frame -- and some of the time line changed my memory,

4    but certainly through January I had no intent of doing this

5    deal.

6    Q.  Why?

7            THE COURT:  December of '08 to January '09?

8            THE WITNESS:  Sorry, no, your Honor.  December

9    '09 --

10           THE COURT:  '09 to '10.

11           THE WITNESS:  -- but certainly in January of '10.

12           BY MR. MCNUTT:  Q.  Why?

13   A.  It looked rough.  It was a start-up, it was a challenge,

14   and on top of that, I was trying to work with Genesis in

15   this, and I did not enjoy working with them.

16   Q.  When you say a start-up, did you mean you would be

17   starting up Targa from scatch?  Targa was an existing company

18   at the time, right?

19   A.  Yeah, but it was, again, not literally but figuratively

20   it was idle; there was nothing really going on.

21   Q.  So to restart production would require a significant

22   injection of working capital.  Did you have a person who

23   would give you that working capital?

24   A.  Ultimately the 300,000 that is throughout these

25   negotiations, yes, I had a commitment for that capital.

1  Q.  When did you first get that commitment for that?

2  A.  I don't recall.

3  Q.  Was it the time you first started working with Mr.

4  Piancone?

5  A.  When I first started?  No.

6  Q.  That was a poorly formed question.  I apologize.  In the

7  summer of 2009, you started working with Mr. Piancone to find

8  a way to help Nascent survive; is that a fair statement?

9  A.  Yes.

10  Q.  Mr. Hemme asked you about the initial plan to raise a

11  million dollars.  Did you have any investors lined up to help

12  find a million dollars?

13  A.  No commitments, no.

14  Q.  Did you have that 300,000 committed at least?

15  A.  Probably not at that time.

16  Q.  Tell me about your negotiations and involvement with

17  Genesis.  How often were you speaking with the Sands brothers

18  during these negotiations?

19  A.  Most of the conversations were with Tim Doede, and I had

20  sprinkled conversations in there with Marty Sands primarily

21  and a few with Steve Sands.

22  Q.  And what was your impression of their objective in

23  negotiating with you?

24  A.  They wanted their Nascent note paid.

25  Q.  Was that their number 1 priority?

1  A.  I believe so.

2  Q.  Did they -- did they ever tell you that they wanted to

3  get an equity interest in Targa?

4  A.  Not in Targa.  They asked for an equity interest in

5  Nery's when we were contemplating the transaction.

6  Q.  And what was your response to that?

7  A.  No.

8  Q.  Why not?

9  A.  Well, I wasn't paying a fair market price; I was already

10  overpaying what I felt the company was worth, and why would I

11  give up, on top of that, equity.  And plus, I needed whatever

12  equity I can in the company to be able to allocate that to

13  investors who were writing checks, and at the end of the day,

14  I need to keep as much as I can.

15  Q.  Do you recall if the Sands brothers ever asked you to

16  sign a personal guarantee on the -- on the Nery's note to

17  Nascent?

18  A.  I don't know if it was them or Tim Doede, but Genesis did

19  ask me -- ask for a personal guarantee, yes.

20  Q.  Obligating you as a natural person to pay off all of

21  Nery's debts to Nascent?

22  A.  Correct.

23  Q.  And what was your response to that request?

24  A.  I don't know the exact words, but no.

25  Q.  When the transaction was on -- I'll call it pause, did

1  you have any -- any interest in -- in going back to
2  renegotiate?  Was that in the back of your brain or had you
3  kind of said I can't do this deal with them at the moment in
4  January?
5  A.  Didn't want to do it.
6  Q.  So what changed?
7  A.  Sandro Piancone came back to me and said I have an idea,
8  let's do this -- he was familiar with my past, but I don't
9  know if that was an influence in it or not -- and recommended
10  we do it on a note to Nascent so I didn't have to raise all
11  the capital we'd been talking about and didn't have to enter
12  a new note with Genesis, Nascent would carry it back, and I
13  would just need to provide the working capital and carry on.
14  Q.  So from that conversation until the time that you ended
15  up executing Exhibit 22, which is the contract, was that a
16  short period of time?
17  A.  Several days, not many weeks.
18  Q.  So in the grand scheme of business acquisition, was that
19  shorter than what you were used to doing?
20  A.  Well, in this form, yes.  A lot of deals die and they can
21  revive quickly, but this was -- I had walked from it, and
22  then from that to a totally new structure to closing was very
23  quick, yes.
24  Q.  What -- what was the purpose in communicating with
25  Genesis and the lawyers representing Genesis with respect to

1  this contract if the contract was between Nery's and Nascent

2  and Genesis wasn't a party to it?

3  A.  Well, I'd negotiated the price and some of the initial

4  terms with Nascent, and then Genesis negotiated the term down

5  and the documents.

6  Q.  So is it your testimony that what's marked as Exhibit 22,

7  the draft or this version or earlier drafts were provided to

8  lawyers for Genesis to review?

9  A.  I know Genesis lawyers made comments and edits; yes, they

10  were involved in editing that document, yes.  So was I and so

11  was Nascent.

12  Q.  And did anyone from Genesis ever object to any of the

13  terms of what ended up being Exhibit 22, the contract in this

14  case?

15  A.  Not in what was ultimately signed.  If they'd objected,

16  it wouldn't have been signed.

17  Q.  Why is that?

18  A.  It was their complete decision whether this was going to

19  get executed or not.

20  Q.  Is that because they were a secured creditor?

21  A.  Yes.

22  Q.  We saw an email earlier in the course of evidence during

23  the plaintiff's case about Institute Mexicano Social

24  Security, the Mexican social security, IMSS, that was sent

25  from Mr. Reyes to Mr. Doede in July of 2009.  Do you recall

1  seeing that document on the screen and testimony?

2  A.  Yes.

3  Q.  Prior to executing the stock purchase agreement in

4  February 2010, had anyone ever given you that email?

5  A.  No.

6  Q.  Had anyone from Genesis ever discussed the contents of

7  that email with you with respect to the social security taxes

8  that were owed?

9  A.  No.

10  Q.  Had anyone from Nascent discussed with you the fact that

11  that email had been sent discussing the serious issues

12  related to IMSS tax liens prior to signing the contract?

13  A.  No.

14  Q.  Did you and Mr. Piancone ever have any conversation prior

15  to you signing the contract where Mr. Piancone disclosed to

16  you that there were unpaid taxes due to IMSS?

17  A.  No.

18  Q.  If you had known the extent of the company's tax

19  liabilities on February 9, 2010, would have executed the

20  stock purchase agreement?

21       MR. HEMME:  Objection; calls for speculation,

22  vague, and ambiguous.

23       THE COURT:  The objection is overruled on each

24  ground.

25       THE WITNESS:  No.

1    BY MR. MCNUTT:   Q.  Why not?

2    A.  I could not have provided enough working capital to

3    combat those, and the -- the asset just simply wouldn't have

4    been worth it.  At some point in time, it just wouldn't be --

5    more than I wanted to tackle, maybe more than I could have

6    tackled.

7    Q.  At the time you purchased the company through Nery's and

8    took over, did you ever see a single piece of paper in

9    Targa's books, just one sheet, that summarized all of the

10   actual or claimed tax liabilities of the company that had

11   arisen prior to the time you bought it, you purchased it?

12   A.  At what time?

13   Q.  Let me rephrase.

14         THE COURT:  Yeah, would you rephrase your question,

15   please.

16         BY MR. MCNUTT:   Q.  After you purchased the company

17   on February 10, 2010, did anyone at Targa ever hand you a

18   single piece of paper that existed prior to the time you

19   bought the company -- not created afterwards, prior -- that

20   summarized all the tax liabilities that remained unpaid?

21   A.  No.

22   Q.  Why were the tax liabilities so problematic to you when

23   you took over the company?

24   A.  Both amount and inconvenience.  The first tax liability

25   that came in the door was a threat to, you know, pay today or

1  we're going to impound your equipment.

2  Q.  And was this a regular occurrence?

3  A.  It started about the second week, and then it would

4  happen once or twice a week for a while.  I don't remember

5  how many weeks it went on.  I eventually started being

6  proactive in trying to get attorneys to address these tax

7  authorities so they didn't confiscate equipment.

8  Q.  So were you living in San Diego or Tijuana at the time?

9  A.  Stayed in Tijuana.  I never really lived in Tijuana, I

10  stayed across, but there from time to time as needed.

11  Q.  So did you ever personally interact with any of these

12  Mexican tax agents when they came to Targa?

13  A.  No.

14  Q.  So how would you be notified by your people?

15  A.  They would always ask for the legal representative when

16  they walked in, who was Chris Alvarez, and Chris Alvarez

17  would call me either while they're standing there or after

18  they left.

19  Q.  You've had an opportunity to review Exhibit 308, which we

20  provided to the Court, a summary of the liabilities.  Are

21  there liabilities that were existing in 2009 -- I'm sorry --

22  2010 after you bought the company that were not listed in

23  Exhibit 308?

24          MR. HEMME:  Objection; lacks foundation.

25          THE COURT:  Would you repeat your question.

1        MR. MCNUTT:  Sure, your Honor.  I'm asking

2   Mr. Cathcart to offer testimony about the existence of

3   company liabilities --

4        THE COURT:  I know what you're going to -- would

5   you just repeat the question so I can --

6        MR. MCNUTT:  Sure.

7        BY MR. MCNUTT:  Q.  Mr. Cathcart, were there

8   liabilities of Targa that you ended up paying that did not

9   end up in Exhibit 308 in 2010?

10  A.  Yes.

11  Q.  And how did you pay those liabilities?

12  A.  Well, a lot of them were in cash because that's customary

13  in Mexico for immediate credit.  People don't trust a check

14  or sometimes even a cashier's check.

15  Q.  And why don't we have the documentation that we can add

16  into Exhibit 308 from the liabilities that were paid in cash?

17  A.  Well, everything went into 308 that we had documentation

18  for.  There were some items, especially those first few

19  visits from the tax authority where they levied a notice and

20  got paid, whether check or somebody went and got cash and

21  paid it.  A lot of that initial paperwork was lost.  The

22  company in those first few weeks was in disarray still.  I

23  didn't show one day with a crack accounting team.  And there

24  was also subsequent turnover because everybody who stayed

25  started to believe that we were going to be shut down, so

---

there was more turnover in what accounting staff was there.
So there were some documents that we simply couldn't find.

Q.   How long did it take you before you got the company's
financial system and recordkeeping in order?  How long -- how
many months did that take you?

A.   Many months.  I went through hiring Nascent -- I'm
sorry -- Targa's old accountant, who had stopped keeping the
books because she wasn't being paid, and negotiated something
on her back bills -- I hope that's in there -- to bring the
records up-to-date as soon as -- as well as possible.  But
then there were other off-book things that still continue.

          MR. HEMME:  Objection; move to strike as
nonresponsive.

          THE COURT:  Well, overruled.  Technically you're
correct, Mr. Hemme, but just for the purpose of just moving
on, I'll overrule the objection.

          THE WITNESS:  I apologize.  Can you give me -- ask
the question again --

          BY MR. MCNUTT:  Q.  I'll clean it up.

A.   -- and I'll try to be more concise.

Q.   That's okay.  I'll move on.

          THE COURT:  Tell you what.  We're just about at
that point, so I had a question or two with your indulgence,
Mr. McNutt, and --

          MR. MCNUTT:  Your Honor, I would be thrilled if you

1   don't -- I don't share in all of the wealth created by these

2   projects; I share in a fraction of them.

3   Q.  Okay.  Your assets are, is it correct to say, would it be

4   fair to say that you have a lot of your assets invested in

5   the stock market and in positions that aren't easily

6   converted to cash to do new deals?

7   A.  Yes.  What few stock positions I have today are fairly

8   illiquid.

9   Q.  Okay.  And at the time?

10  A.  The same.

11  Q.  So was it your practice rather than investing your own

12  money into all these transactions is you're putting investors

13  together with companies that need money rather than investing

14  a lot of your own money into them?

15  A.  Correct.

16  Q.  Why did you do it that way?

17  A.  Well, first out of necessity.  I have written checks, and

18  it puts a different strain on the situation for me.  But

19  mostly just out of need; it can be a long time between

20  paychecks for me, so whatever I have I hold onto.

21  Q.  Would it be fair to say that at the time you took over

22  Targa using Nery's USA Inc. that there was not a complete

23  picture in your mind about all of the liabilities of the

24  company in the first 60 to 90 days?

25  A.  For sure we did not have a complete picture.  Can you ask

1    that again?

2    Q.  Sure.  After you took over the company, was there a point

3    in which you asked Moncerrat to try to prepare a picture of

4    the company's liabilities?

5    A.  Yes, I asked Moncerrat, who was on the accounting staff

6    there, to go try to gather up, look through the files, find

7    every liability, potential tax liability, try to go dig into

8    these files and find anything that might be owed.

9    Q.  Okay.  So let's turn to Exhibit 80 because we've had

10   extensive testimony from a couple of guys from Tijuana, and I

11   want to ask you about Exhibit 80.  And what I'd like to do is

12   just to go ahead and turn to the third page of this.

13            MR. MCNUTT:  And for the Court's convenience -- I

14   apologize -- I don't know if we're going to be able to blow

15   it up enough on the screen, so I'm afraid we're going to have

16   to rely on the good old-fashioned exhibit binders, and I

17   probably need to pull my own.

18            THE COURT:  Tell you what.  Give me a minute here

19   to get with you --

20            MR. MCNUTT:  Sure.

21            THE COURT:  -- in the joint exhibits.

22            BY MR. MCNUTT:  Q.  Mr. Cathcart, do you have it?

23   A.  Yes.

24            MR. MCNUTT:  Mr. Hemme, are you there?

25            MR. HEMME:  Yes.

1   A.   It's about right, yes.

2   Q.   Okay.  And the dollar conversion at the time, we'll

3   assume judicial notice, it's about 13 to one; would you agree

4   or disagree that was about 70 -- about $70,000?

5   A.   Yes.

6   Q.   More or less?  Okay.  And the last line here, the last

7   three lines, what is your understanding of where this dollar

8   figure comes from?  Does that come from the next page of this

9   chart?

10  A.   Correct.

11  Q.   All right.  So let's look at the next page of this chart

12  on Exhibit 80.  What is your understanding of what this page

13  represents?

14  A.   Those are payables owed by Targa that are invoiced in

15  dollars.

16  Q.   All right.  So these would be liabilities that would be

17  in addition to or subsumed within the first page?

18  A.   In addition to, although it's added on the front page as

19  well.

20  Q.   Okay.  What's your understanding of what line 78 was?

21  A.   That's Collica; that's the vendor that supplied food

22  products that then turned it over to their insurance who in

23  turn became a claim from Exim Bank.

24  Q.   So at the time you purchased Targa using Nery's, was this

25  liability to Collica and/or Exim Bank something that was

1  discussed with Mr. Piancone?

2  A.  Yes.

3  Q.  Okay.  And what was the substance of that discussion?

4  A.  That's the one vendor that he couldn't take care of that

5  I had to address.

6  Q.  And did Mr. Piancone -- I know this list was prepared

7  after you took control of the company -- but did Mr. Piancone

8  show you a list similar to this at any time prior to the date

9  you purchased the company?

10  A.  Yes, similar in format and content, yes.

11  Q.  Okay.  And what was on that list?

12  A.  I don't recall exactly but similar vendors, pesos, and

13  dollars.

14  Q.  All right.  And what did he tell you about he was going

15  to do with the vendors?

16  A.  Well, we went line by line -- I think I commented on this

17  earlier -- originally it totaled over $4 million, and a lot

18  of that in which the vast majority was intercompany stuff

19  that would go away, and it did; it was either owed to or from

20  Nascent or Best Beer or other subsidiaries.

21  Q.  So was it your understanding that Mr. Piancone was

22  telling you that a lot of those liabilities were liabilities

23  that were intercompany between the Nascent divisions?

24  A.  Correct.

25  Q.  Is that common in -- in holding companies to have

1  intercompany liabilities?

2  A.  Yes, especially with multiple subsidiaries that interact

3  with each other.

4  Q.  And was there any representation that the leave-behind

5  liabilities would be greater than the 150,000 owed to Exim

6  Bank?

7  A.  No, other than a few trivial amounts, some of these that

8  were dealt in hundreds of dollars that he did not think would

9  come back.

10  Q.  So, Mr. Cathcart, could you explain why the bottom of

11  this chart has 860,000 in pesos on line 57 but four million

12  in pesos down on line 66.

13  A.  Well, that's the -- it takes the peso liability, then

14  they took the dollar liability, converted it to pesos, and

15  added the two together.  So that would be the total of this

16  list in pesos.

17  Q.  So would you agree or disagree that based on this chart

18  and your understanding, the liabilities of Targa as of April

19  6, 2010, at least on the books, was just over four and a half

20  million pesos?

21  A.  That's what this says, yes.

22  Q.  Was this -- was this -- I'll call it 370 -- was this

23  $370,000 in liabilities of Targa a problem for you

24  implementing your original business plan?

25  A.  Yes.

1    Q.  Why?

2    A.  Well, some of these I needed to address right away

3    because they were suppliers that I needed to purchase from,

4    so those were the first ones I had to pay off that I didn't

5    anticipate.

6    Q.  Like whom?

7    A.  Uline, the packaging suppliers, box suppliers, things I

8    needed to start a production of the cheese packaging, some

9    trucking.

10   Q.  And why else was it a problem?

11   A.  Well, there's a lot more liabilities just here than I had

12   planned on tackling.

13   Q.  Okay.  So let's talk about that.  The understanding that

14   you reached with Mr. Piancone and with Genesis was that there

15   was going to be an express written contract, not an oral

16   agreement, for the sale of this company; is that a fair

17   statement?

18            MR. HEMME:  Objection, leading.

19            MR. MCNUTT:  I'll rephrase, your Honor.

20            THE COURT:  Okay.  Both sides have led their

21   witnesses though pretty extensively.

22            MR. MCNUTT:  I'll be happy to rephrase.

23            MR. HEMME:  My witnesses have all been adverse

24   except for Mr. Bisio.

25            THE COURT:  Okay.

1        MR. MCNUTT:  I'll be more careful, your Honor.

2        BY MR. MCNUTT:  Q.  Mr. Cathcart, was it your

3  understanding when you were doing all these negotiations that

4  the final product was going to be an express written contract

5  rather than an oral agreement?

6  A.  Yes.

7  Q.  But as part of those negotiations, what was your

8  understanding about the total liabilities of the company?  As

9  you're doing the negotiations in the fall of 2009, what was

10 your understanding about what the liabilities of the company

11 were going to be when you bought it?

12 A.  It was going to be the Collica obligation, $150,000.

13 Q.  So in your mind was there -- your state of mind, not

14 Mr. Piancone's -- was there any confusion about the meaning

15 of the word "accounts payable" built into section 2.2 (a) of

16 the contract?

17        MR. HEMME:  Objection, your Honor; the document

18 speaks for itself.

19        THE COURT:  The objection is overruled.

20        THE WITNESS:  Can you ask it again?

21        BY MR. MCNUTT:  Q.  Sure.  In your mind, your state

22 of mind as you were negotiating and signing this contract,

23 was there any confusion in your mind about the meaning of the

24 phrase "accounts payable" in section 2.2 (a) of the contract?

25 A.  No.

1 Q. What was your understanding of what that phrase "accounts

2 payable of 150,000" meant?

3 A. Anything the company owed and had to pay.

4 Q. Liabilities?

5 A. Liabilities, yes.

6 Q. Was there an express discussion between you and Mr.

7 Piancone about the subtleties or the semantics of the phrase

8 "accounts payable" versus liabilities?

9 A. No, there was no discussion of the definition or

10 subtleties.

11 Q. So from your perspective, your understanding was what

12 with respect to the 150,000? What did that represent in the

13 contract section 2.2 (a)?

14      MR. HEMME: Objection; parol evidence rule.

15      MR. MCNUTT: We have an integrated agreement, your

16 Honor. He's trying to explain what it means. Your Honor, I

17 can easily clarify that. If there's any ambiguity, as

18 Mr. Hemme has tried to create by trying to create buckets of

19 liabilities and put them into accounts payable, ambiguity can

20 be resolved by looking at the parties' understanding and

21 intent even in the face of an integration clause. If the

22 Court want to issue a ruling on the spot that the contract is

23 not ambiguous and that the phrase "accounts payable" has a

24 defined custom and practice in Mexico and the United States,

25 I'd be happy to take the ruling and we'll argue it, but until

1  there's a ruling, I think we're entitled to look at extrinsic

2  evidence to try to resolve any ambiguity in the contract.

3        THE COURT:  Well, you have implied in a couple of

4  your questions, Mr. Hemme, that there might be a distinction

5  between accounts payable and liabilities; I think, for

6  example, at one point you were suggesting that rent due would

7  not be an account payable.  But insofar as the contract

8  itself is concerned, are you taking the position that the

9  term "accounts payable" is ambiguous or that it does not

10  represent all liabilities?

11        MR. HEMME:  I think it is not ambiguous, and I

12  think does not represent all liabilities.  I mean as I

13  understand the defense, they're saying that the contract was

14  breached.  And the $150,000 limit, as has been testified to,

15  isn't even in the reps and warranties; so there's no

16  representation in that contract that $150,000 is the limit.

17        THE COURT:  I will overrule the objection.

18        MR. MCNUTT:  Thank you, your Honor.

19        BY MR. MCNUTT:  Q.  So, Mr. Cathcart, let me

20  rephrase now that we've gone through that process.  In your

21  state of mind and through all your conversations with Mr.

22  Piancone, did you guys have an understanding about what the

23  meaning of section 2.2 (a) was, which is the 150,000 accounts

24  payable?  What did that mean to you?

25  A.  That was the extent of the liabilities.  In the course of

1  listening to that conversation, it would include anything
2  payable:  Rents, taxes, whatever you got to pay is a payable.
3  Q.  So that was your belief, and you have no reason to
4  believe that Mr. Piancone disagreed with you about that
5  point?
6  A.  I have no reason to believe he disagreed.
7  Q.  And, in fact, wasn't the use of the word "liability"
8  something that was built into all the prior negotiations with
9  Mr. Piancone and Genesis?
10              MR. HEMME:  Objection, leading.
11              THE COURT:  Sustained.
12              MR. MCNUTT:  I'll withdraw it.
13              BY MR. MCNUTT:  Q.  Mr. Cathcart, I'd like you to
14  turn to Exhibit 22, please.  It's the contract.  We're going
15  to go through it for about six or seven minutes here
16  provision by provision on the critical seven provisions that
17  were raised in the opening.  Do you have it?
18  A.  I'm there now.
19              THE COURT:  You're going -- I've got the notebook
20  with the bad rings, so every time I put exhibits here or flip
21  exhibits --
22              MR. MCNUTT:  We're going to have to put that on Mr.
23  Hemme, your Honor.  He's the one that provided the first
24  notebook.  I won't take that one on me.
25              THE COURT:  Hold on.  Okay.

067

1      BY MR. MCNUTT:  Q.  All right, Mr. Cathcart.  I'm

2    going to ask you to turn to page 8 of the contract, which is

3    the 13th page of the exhibit, and the Bates number on the

4    bottom right corner is Genesis 420.  I'm looking at section

5    3.8, which is entitled "financial statements and undisclosed

6    liabilities."  Are you there?

7    A.  Yes.

8    Q.  So page 8 of the contract, section 3.8.

9    A.  Yes.

10   Q.  Now, section 3.8, would you agree or disagree, has four

11   subdivisions, A, B, C, and D?

12   A.  3.8?

13   Q.  Yeah.

14   A.  Yes.

15   Q.  And would you agree or disagree that section 3.8 is under

16   Article III, which is reps and warranties of Nascent and

17   Targa?

18   A.  Yes.

19   Q.  And would you agree or disagree that the following

20   statement:  I, John Cathcart, relied on the reps and

21   warranties of Nascent in signing this contract.  Is that a

22   true statement?

23   A.  Yes, that's a true statement.

24   Q.  All right.  So let's look at section 3.8 (c), which

25   states except as set forth on Schedule 3.8 (c), the company

1  does not have any liabilities, whether known or unknown,

2  whether direct or indirect, whether absolute or contingent,

3  whether accrued or unaccrued, whether liquidated or

4  unliquidated, and whether due or to become due, including any

5  liability for taxes except for liabilities set forth in the

6  company current financials and liabilities that have arisen

7  after the company current financials in the ordinary course

8  of business.

9         Mr. Cathcart, having had a chance to review this

10 language, what can you tell me about Mr. Piancone's

11 disclosures to you about Targa's financials before you bought

12 the company?

13 A.  That Nascent or its subsidiaries would address all the

14 liabilities at that time prior to the close with the

15 exception of the Collica/Exim debt.

16 Q.  And was it your understanding that the $149,500 Exim Bank

17 liability was addressed and included in section 2.2 (a) under

18 the purchase price?

19 A.  Correct.

20 Q.  So would you agree or disagree that when you signed this

21 contract, you relied on the representation that Targa had no

22 liabilities other than the liability included in section 2.2

23 (a)?

24 A.  Yes, I relied on it.

25 Q.  Was that your understanding?

1    A.   It was an absolute condition.

2    Q.   And was that based not only on the contract but on

3    conversations with anyone that you had at Nascent, including

4    Mr. Piancone?

5    A.   Sorry.  Say that again.

6    Q.   Sure.  Was that -- was that based only upon the contract

7    or was that also based because you had conversations with

8    Mr. Piancone?

9    A.   Well, the conversations are what became the contract.

10   Q.   Okay.  Now, Mr. Cathcart, since it's been three years

11   since Nery's acquired the company, have you discovered or

12   learned that this promise that the company had no liabilities

13   in excess of the Exim Bank liability, whether that was true

14   or false?

15   A.   I found it to be false within the first few days.

16   Q.   What did you find to be false about the representation

17   that the company would have no excess liabilities?

18   A.   Well, the first thing that came in the door actually

19   breached two of these reps and warranties.  The first thing

20   that came in the door was a -- delivered by Chris Alvarez,

21   brought me a list of all the employees who were on staff at

22   the end of December and had not received their aguinaldo,

23   which is their mandatory Christmas bonus to be paid by the

24   20th of December, and that both exceeded the liabilities

25   because the Exim Bank liability is real, and it also breached

1  the labor fulfillment part in this contract, no unfunded

2  labor costs.

3  Q.  Okay.  We'll get to the labor section here in a minute.

4  Let me ask you a question I'm sure everyone has in their

5  minds.  When this aguinaldo liability came in, why didn't you

6  immediately file a lawsuit against Nascent to rescind this

7  contract for breach of the warranty?

8  A.  At that point it wasn't really material; it was five or

9  $6,000.

10  Q.  Okay.  So at some point did all of these liabilities

11  coming in the door give you cause to believe that Nascent had

12  breached this contract?

13  A.  Absolutely, a technical breach, and when it became

14  material, it was a matter of weeks.

15  Q.  Any particular reason why you didn't file a lawsuit

16  against Nascent to rescind the contract?  Did you have

17  conversations with Mr. Piancone about these problems?

18  A.  I brought every problem to his attention, and along the

19  way he had told me there's nothing Nascent can do about it,

20  Nascent doesn't have any money; so I had a choice to fold or

21  keep fighting, and I kept fighting.

22  Q.  Would it have been a pointless act to sue Nascent?

23          MR. HEMME:  Objection; calls for speculation.

24          THE COURT:  Sustained.

25          BY MR. MCNUTT:  Q.  Did you believe there would

1  to section 3.10, page ten of the contract, the 15th page of

2  the exhibit.

3  A.  Okay.

4  Q.  Section 3.10 covers AR.  What was your understanding of

5  what this provision entitled you to -- entitled Targa to do

6  after you acquired the company?

7  A.  Well, it's saying all the accounts receivable are indeed

8  good accounts receivable.

9  Q.  And how much money was that to your understanding?

10  A.  A little over $30,000.

11  Q.  Did you attempt to collect it?

12  A.  Yes, I had -- I directed somebody in Tijuana to try to

13  collect it.

14  Q.  And was anything collected?

15  A.  I don't believe any.

16  Q.  So would it be your position that this was also breach of

17  the contract?

18          MR. HEMME:  Objection, leading.

19          THE COURT:  Sustained.

20          BY MR. MCNUTT:  Q.  Do you have any belief as to

21  whether or not Nascent did or did not fulfill its obligation

22  under section 3.10?

23  A.  They did not fulfill their obligation because the

24  receivables were not all collectible.

25  Q.  Let's turn to the next page, section 3.12.

1    A.   Okay.

2    Q.   What is your understanding of what "welfare plans" means

3    under this contract given the definitions and the

4    descriptions in section 3.12?

5    A.   Anything do with employee cost I think other than their

6    actual paycheck.

7    Q.   And do you have anything to tell us about whether this

8    section of the contract was complied with by Nascent?

9    A.   Well, that was the first thing that came in the door on

10   day 1 or 2, and then -- that was for the aguinaldo I

11   mentioned.  And then after I paid or worked out terms with

12   all those, a few days later Chris came in with another list,

13   and it was people who did not take vacations wanted their

14   vacation pay, and I think there was also a couple of

15   severance payments due on there.

16   Q.   And we'll turn to section 3.13, page 12 of the contract

17   covering taxes.

18   A.   Okay.

19   Q.   Section 3.13 (b) states that the company has paid or has

20   made adequate reserves on its books for the payment of all

21   taxes shown to be due or claimed to be due by any

22   governmental authority or which the company otherwise is

23   liable for or is required to withhold on behalf of any other

24   person.  Did you rely on this -- on this promise in the

25   contract to induce you into executing it?

1    A.   Yes, I did.

2    Q.   In fact, did you learn or discover at some point after

3    acquiring the company that this section 3.13 (b) was not

4    performed by Nascent?

5             MR. HEMME:   Lacks foundation.

6             THE COURT:   The objection is overruled.   You may

7    answer that, sir.

8             MR. HEMME:   May I be heard, your Honor?   This is

9    taxed based on tax returns, and there's been no testimony or

10   any evidence of the tax returns that would show these taxes

11   that haven't been paid, so that was the reason for my

12   objection.

13            MR. MCNUTT:   Your Honor, the second clause of 3.13

14   (b), the company has paid -- skip the tax returns -- has paid

15   the payment of all the taxes claimed to be due by any

16   governmental authority or which the company otherwise is

17   liable for.   So it's not subsumed only within tax returns; it

18   would cover all taxes for which the company could be liable.

19            THE COURT:   The objection's overruled Mr. Cathcart.

20            BY MR. MCNUTT:   Q.   Mr. Cathcart?

21   A.   I'm sorry.   What's your question again?

22   Q.   At some point after you bought the company, did you learn

23   that there were unpaid taxes that were claimed against Targa

24   prepurchase?

25   A.   On a continuous basis for about almost two years.

1  Q.  And I won't go over old ground, but I'm going to cover

2  the $300,000 tax lien.  We've talked about all the little,

3  you know, the ones coming in the door you paid.  Let's go

4  right away to the issue with the tobacco and the $300,000 tax

5  lien.

6           At some point did you learn that there was a nearly

7  4 million peso tax lien imposed by SAT against Targa that was

8  noticed against Targa in 2010?

9  A.  Yes.

10  Q.  What did you learn and what was your understanding of

11  what it was?

12  A.  I found out around July that a tax lien had been imposed

13  upon Targa, it went on April 30, according to the

14  government's records, of 2010, and it was a claim by SAT,

15  which is the Mexican IRS, that there was a dispute over

16  duties paid prior to my acquiring the company.

17  Q.  And in July of 2010, what were you doing to try to

18  implement the business plan of Targa given the other excess

19  liabilities we talked about?

20  A.  Well, I had -- my plan A was pretty much dead because of

21  lack of working capital, so I immediately tried to find other

22  areas of business to help the company to survive.  So as

23  opposed to what my original plan was, which was Nery's

24  branded cheese and the tobacco imports, I started doing

25  imports of bulk cheese, which have lower margins, or

1  plan was to purchase four truckloads a month.

2  Q.  And what impact did the lien have on your negotiations

3  with La Central to distribute tobacco in Mexico?

4  A.  Well, I had already failed to deliver over the previous

5  months because of working capital issues; I hadn't delivered

6  anything they ordered, but I still had the relationship.  It

7  ended our closing of a financing and also built a little

8  mistrust between us and them because all and around the lien

9  before when they discovered it and after they discovered it.

10  Q.  So after you learned about the -- we'll call it the

11  $300,000 lien, how did that impact your ability to raise new

12  working capital for Targa to move cheese and tobacco?

13  A.  Well, it crushed it completely because you would have to

14  disclose it to anybody that you wanted to borrow or bring in

15  money from.  And really all I thought I needed and all I

16  thought I could raise would be about $300,000, and this lien

17  could have come down on the company as an enforcement action

18  any day.

19  Q.  So given all these liabilities and money coming out the

20  door, how did you keep the company alive in 2010?

21  A.  I continued to do what COD business I could do buying

22  bulk cheese.

23  Q.  You're going to have to explain COD.

24  A.  I'm sorry.  Cash on delivery, no credit terms.  So

25  whatever cash business I could do on products.

1  Q.  All right.  Is that what you call bulk cheese sales?

2  A.  That was one of them, yes.

3  Q.  Okay.  What are the margins like on bulk cheese sales?

4  A.  Small, a few thousand dollars a truck, which on a

5  percentage basis would be 2 or 3 percent.

6  Q.  Did you need a lot of working capital to do these bulk

7  cheese sales?

8  A.  Yes.  The majority of them I gave the customer up front

9  cash; I'd collect from the customer before I'd actually have

10  to pay for the cheese, so I kind of reverse cash-flowed it.

11  Q.  How long did the $300,000 tax lien stay around as an

12  issue of concern for you after you learned of it in July of

13  2010?

14  A.  I was told on a couple of occasions it was removed, but

15  it ultimately didn't come off until I believe October of

16  2011, so over a year.

17  Q.  Who told you it had been removed?

18  A.  Humberto Reyes.  And I saw his exhibit here, an email I

19  had seen, and I was even party to the strand.  Humberto Reyes

20  told me several times over the course of many months that

21  he's got it removed, and I learned to question him, and

22  indeed it had not been removed.  He believed it would be.

23  Q.  So the final resolution of that was sometime at the end

24  of 2011; is that a fair statement?

25  A.  Yes.

1    Q.   Okay.   Why did you believe that number?

2    A.   The business internally had idled, the income from the

3    royalty string wasn't where it should be, about $15,000, and

4    it was a distress situation, which lowers the value.   So

5    that's what I originally proposed, which wasn't accepted.

6    Q.   By whom?

7    A.   By Sandro Piancone.

8    Q.   And what aspects of Targa did you think did have value?

9    A.   Thinking it was being included in the company, the Nery's

10   brand and the ability to package that cheese and sell it

11   significantly less than that you could outsource it for, and

12   the potential of the cigarette importation permits.

13   Q.   Was the history of sales in Baja of value to you?

14   A.   Well, that was my entire minimal goal; if I could just

15   achieve the sales where they were internally just a year

16   before, that was my -- my -- my conservative down side was

17   just getting back to the seven million in sales and a

18   million, two in gross profit.

19   Q.   And this offer you made for $300,000, when did you make

20   that offer?

21         MR. HEMME:   Objection; misstates his testimony.   I

22   don't think he ever gave us an amount of the offer.

23         THE COURT:   Sustained.

24         BY MR. MCNUTT:   Q.   Did you make an offer to buy

25   the company prior to executing the stock purchase agreement?

1          MR. MCNUTT:  I understand.  Thank you, your Honor.

2          THE COURT:  So you can get your answer and then

3   we'll move on as you indicated.

4          BY MR. MCNUTT:  Q.  Mr. Cathcart --

5   A.  If you're asking me in hindsight, I'd say the company

6   itself is less than worthless.  The assets and the brand name

7   would have some value, but even in that there's some risk

8   because in some cases, especially in tax cases, the

9   liabilities can follow the assets.

10  Q.  And the liabilities, which we've gone over extensively in

11  Exhibit 308, were hundred of thousands of dollars, and did

12  those essentially exceed what you think the value of the

13  assets were?

14  A.  Well, I'm just talking about the tax authorities.  If I

15  knew everything in whole, yeah, I would say the liabilities

16  exceeded; they were more than a few hundred thousand dollars.

17         THE COURT:  You didn't answer his question though.

18  You say the liability exceeded a couple hundred thousand

19  dollars, and we know that, we know the excess liabilities,

20  sir.  But his question was the liabilities exceeded the

21  assets, in other words, Nery's brand, the cigarette licenses,

22  and -- what was the third part of it?

23         MR. MCNUTT:  The factory.

24         THE COURT:  Yeah, the physical plant.  So there was

25  a conflation there of --

1           THE WITNESS:  Then even in an optimistic scenario

2      between the asset, the brand, the equipment, the permits,

3      it's pretty close to even.

4           BY MR. MCNUTT:  Q.  So the company in your opinion

5      would essentially not be worth the 300,000 that you

6      originally offered for it?

7      A.  The company certainly not.  That stock was a liability.

8      Q.  In the last three years, has Targa shown a profit?  And I

9      know that's a very loaded question.  I'm asking to explain to

10     the Court in layman's terms, not as an expert, if in the

11     three years that you've owned this company has it become

12     profitable?

13     A.  No.

14     Q.  Why?

15     A.  Well, the first year expenses simply exceeded revenues.

16     Towards the tail end of the year, I had a food service

17     distribution contract which allowed me to -- through buying

18     product on terms now through that contract, was able to keep

19     enough cash to propel it.  But no, it hasn't shown a profit.

20     Q.  So how many employees work for -- how many people are

21     down in the factory today working cutting cheese?

22     A.  Maybe 15 or 16.

23     Q.  So revenues for 2012 -- what were revenues in 2012?

24     A.  About eight million.

25     Q.  Okay.  And all the expenses added all up, what were the

1    expenses in 2012?

2    A.  Well, I can tell you for 2012 -- and the books haven't

3    finished review by the auditors -- but show a loss.

4             MR. HEMME:  I'm going to object; lacks foundation.

5             THE COURT:  The objection is overruled.  You may

6    answer.  Why don't you start your answer again, sir.

7    Revenues at eight million.

8    A.  2012 revenues are about eight million and showed a loss

9    of about 150,000.

10           BY MR. MCNUTT:  Q.  So the doors are open, but you

11    seem to be having a hard time generating profits; is that a

12    fair statement?

13    A.  I'm working on thin margins.

14    Q.  And how is 2013 going?

15    A.  Sales are trending up.  I'm starting to invest capital

16    back into the Nery's brand cheese.  I'm trying to find other

17    distribution partners for tobacco products.  I'm trying to

18    build the business, and it's going in the right direction.

19    Q.  It's been several years now.  What was the original

20    projection that you believed you were going to earn profits

21    in the first 12 months if your original business plan could

22    have been implemented?

23             MR. HEMME:  Objection; relevance, lacks foundation.

24             THE COURT:  Sustained.

25           BY MR. MCNUTT:  Q.  Mr. Cathcart, could you turn to

1    Exhibit 142, please.  Do you have it?

2    A.   Yes.

3    Q.   What is it?

4    A.   It's a real simple cash flow projection based on sales.

5         (Exhibit No. 142 identified.)

6    Q.   Okay.  And is this based on numbers that you provided

7    someone to run this table?

8    A.   Yes.  I would have probably run them out on a pad of

9    paper and asked somebody to input them into Excel.

10   Q.   Okay.  And can you explain to us in the top left-hand

11   corner starting in column 1 what you meant when you put

12   $150,000 in cash on hand.

13   A.   Well, that's if I only had $150,000 in cash, assuming

14   worst-case scenario, that I'd have to pay Exim Bank all of it

15   at the time; so it showed a starting point of $150,000 in

16   cash.

17   Q.   Was it your plan to pay off the Exim Bank liability from

18   day 1?

19   A.   No, I had planned to work out a payment plan with them

20   and keep most of the 300 as working capital.

21   Q.   Okay.  So can you explain how you moved from month 1 to

22   month 2?  What is -- what is listed at the bottom of column 1

23   at the very, very bottom?  What do those words mean, three

24   cigars and three cheese?

25   A.   That's three truckloads in that month, being able to turn

1   three truckloads of cigarettes and three truckloads of

2   cheese.

3   Q.  And explain to us how you make money on each truckload.

4   When you use the word "turn," what does that mean?

5   A.  Three turns, meaning I had only limited cash, I can only

6   buy one truck at a time, so it's linear transactions.  So

7   couldn't buy three on day 1.  I had to by one, sell it,

8   collect, buy another one, sell it.

9   Q.  And then the profits you earn on each truckload, what

10  would you do with that money?  Would that be reinvested?

11  A.  That's exactly what this cash flow statement shows.  It

12  deducts an amount for expenses and trucking overheads, and

13  then uses that next cash the next month to build working

14  capital to purchase additional inventory.

15  Q.  And in 2007 what was Targa doing financially?

16  A.  About seven million --

17       MR. HEMME:  Objection; vague and ambiguous.

18       BY MR. MCNUTT:  Q.  How much money was Targa

19  earning in 2007?

20       MR. HEMME:  Lacks foundation.

21       MR. MCNUTT:  It's a stipulated fact, your Honor.

22  It's in the pretrial order.

23       THE COURT:  Gentlemen, what are we doing here?

24  Let's get through this, please.  Let's just keep moving and

25  finish this today, finish the evidence today.  This is really

1  becoming cumulative at this point.  I think we've hit the

2  point of diminishing returns.  I think both sides have had a

3  fair opportunity to get their proofs before the Court.  Let's

4  not make it any more complicated than it is.  The objection

5  is overruled.  You may answer, sir, if you're able to.

6      THE WITNESS:  Targa's sales in 2007 were about

7  seven million in revenue and about 11.2 million cash flow.

8  Sorry.  I thought I was --

9      BY MR. MCNUTT:  Q.  And how many truckloads of

10  cheese of month was Targa doing in 2007, if you knew?

11  A.  Close to six.

12  Q.  Okay.  So are these projections a conservative value -- a

13  conservative approach to trying to return Targa to the 2007

14  numbers?

15      MR. HEMME:  Objection, leading.

16      THE COURT:  Overruled.

17      THE WITNESS:  Yes.  I started off at about half,

18  and it's I guess important to note if I want to explain

19  myself that Nery's sales never left the market, so it wasn't

20  like I had to go start from zero; the sales were there, the

21  sales were handed to Zahava, so the product was still in the

22  grocery stores; it was just taking the sales from Zahava and

23  continuing to supply.  So three is fairly -- it was factual

24  probably at the time.

25      BY MR. MCNUTT:  Q.  Okay.  So was it your

1  projection -- what was your projection of the profits you

2  would earn in the first 12 months if you'd been able to

3  implement the business plan that you thought you were going

4  to be able to implement based on the contract?

5  A.   This shows accumulating cash by the end of the year of

6  about 2.4 million.

7  Q.   And would you have to subtract out the remaining working

8  capital to show profits for the year?

9  A.   Yes.   And expenses are already subtracted out of that

10 cash amount, so my starting cash, if you subtract from there,

11 would be the cash generated from operations.

12 Q.   Okay.   And was there any kind of overhead built into this

13 to pay interest on the Nascent note?

14 A.   Well, there is an interest expense coming in about month

15 7.   I'm not sure why I put that in there at this point, but

16 based on what I know to be operating overhead, there's enough

17 in the -- in just the one line, cash used for expenditures,

18 enough to service the note.

19 Q.   And were you projecting -- this shows 40 to 45,000

20 raising to 50,000.   So would it have been your intention that

21 that line item would have covered the interest on the Nascent

22 note?

23 A.   Knowing what I know about the overheads of Targa, that --

24 that certainly has about 15 to $20,000 cushion, so I must

25 have been thinking of the debt service at that time.

1  Q.  So would it be your testimony that this profit projection

2  based on your 30 years of experience in the business world

3  was realistic?

4  A.  Yes.

5          MR. MCNUTT:  Your Honor, I'll pass to Mr. Hemme for

6  now, but I would reserve the right to recall Mr. Cathcart.

7          THE COURT:  All right.  Cross-examination?  I'd ask

8  you not to repeat any of the examination you took initially,

9  just cross-examination on new matters if you would, Mr.

10 Hemme.  Thank you.

11         MR. HEMME:  Just finding one thing, your Honor.

12         MR. MCNUTT:  I'm sorry, your Honor.  Just as a

13 procedural matter, the documents that we referred to, I'd

14 like to move those into evidence unless there's objection.

15         MR. HEMME:  We'll waive them.

16         THE COURT:  New exhibits would be 110 -- no, no.  I

17 don't know if 110 was referred to previously --

18         MR. MCNUTT:  It was not.

19         THE COURT:  -- through other witnesses.  110, 12 --

20 110 is admitted.  You've got 12, you've got 69 -- I assume

21 there's no objection to that.  Exhibit 16 and 142.  Any

22 objection to 142, Mr. Hemme?

23         MR. HEMME:  Relevance, lacks foundation.

24         THE COURT:  I'm going to overrule the objection,

25 and it can come in.  As indicated, it's got very limited

1  testimony from this.  You said there was a point in time

2  that -- prior to the deal closing that you were going to blow

3  it off or you were walking from the deal, right?  And when

4  did you think that happened?

5  A.  I thought it happened more in the November-December time

6  frame, but things I've seen, I think it must have happened

7  more in the December-January time frame.

8  Q.  And I think you were shown one of those proposed deal

9  sheets which had the million dollar cap on it, that was about

10  October.  Would you turn to Exhibit 17, please.

11  A.  I'm there.  Sorry.  Now I am.

12  Q.  And Exhibit 17 is an email from you to Mr. Doede, right?

13  A.  Yes.

14      (Exhibit No. 17 identified.)

15  Q.  And this is your proposal to reduce the capital to

16  $300,000?

17  A.  Yes.

18  Q.  That was on November 16, 2009, right?

19  A.  Correct.

20  Q.  So by the time these -- when we looked at Exhibit 17 and

21  then I think it was 69 that counsel showed you earlier, the

22  million dollars capital, both those deals were premised on

23  Genesis supplying the financing for the deal, right?

24  A.  This one, yes.

25  Q.  Well, is it your recollection there was the prior

1   Q.  And he reviewed it and had an opportunity to make any

2   corrections or changes that he wanted to make?

3   A.  Yes.

4   Q.  Now, let's look at Exhibit 22.  Go to page 6, section

5   2.2.

6   A.  Okay.

7   Q.  The language of 2.2 that says that Nery's will assume the

8   accounts payable for $150,000 as part of the purchase price,

9   right?

10  A.  Correct.

11  Q.  So that was consideration being given to Nascent as part

12  payment of the purchase price, right?

13  A.  Yes.

14  Q.  And isn't it true though that the Exim Bank obligation

15  was only an obligation of Targa, not Nery's, correct?

16  A.  I don't know.

17  Q.  And if it's not paid, then Targa owes the money, right?

18  A.  The claim is against Targa.

19  Q.  Right.  But Nery's -- although it assumes that obligation

20  in this agreement, did Nery's confirm to Exim Bank that it

21  would be responsible for the debt as well?

22  A.  Nery's?

23  Q.  Yes.

24  A.  No.

25  Q.  But this language, it's your understanding, was a

1  commitment by Nery's to pay the $150,000 debt to Exim Bank,

2  right?

3  A.  Say that again.  I'm sorry.

4  Q.  Under your prior testimony you said this $150,000

5  liability, or accounts payable, refers to the Exim Bank

6  obligation, right?

7  A.  Yes.

8  Q.  And Nery's agreed to pay that obligation, right?

9  A.  The entity, yes.

10  Q.  Yes, the entity.  I'm talking about the entity.  And

11  Nery's has not fulfilled that obligation by paying it yet,

12  has it?

13  A.  We began negotiations and we ceased them, so the answer

14  is correct, they have not paid it yet.

15  Q.  Okay.  Let's look at 3.8.  It's on page 8.

16  A.  Okay.

17  Q.  Subpart A.  See that?

18  A.  Yes.

19  Q.  Says the books of account and other financial records of

20  the company, all of which have been made available to buyer,

21  are correct and complete in all material respects.  You knew

22  at the time that you signed this agreement that that

23  statement wasn't true, was it?  Didn't you?

24  A.  No.

25  Q.  Well, you testified earlier that the books and records

1   no witnesses referred to it.

2           MR. HEMME:  Correct.

3           MR. MCNUTT:  And my understanding, your Honor, is

4   that for the -- I think there has been -- at least in

5   Mr. Cathcart's deposition, he testified that he couldn't

6   recall but he did not draft the collateral assignment, which

7   he confirmed there.  So other than that I'm not sure who

8   drafted the purchase agreement.

9           THE COURT:  Okay.  Thank you.

10          BY MR. HEMME:  Q.  Now, Mr. Cathcart, you testified

11  extensively about all these tax liabilities and things that

12  happened, and I thought you said that the tax liabilities

13  came in over a two-year period?

14  A.  Well, things have continued to come up.  The bulk of what

15  we've talked about happened in the first 60 days, then the

16  lien, although came in in the first 60 days, I didn't learn

17  about it for four months.  But things have still trickled in

18  the door from time to time.  There's a transfer tax liability

19  that I -- well, maybe I learned about towards the end of the

20  year.

21  Q.  But as far as the Exhibit 307, which is the summary of

22  everything you've paid, and that totals $241,000 and some

23  change, the bulk of that was paid in the first six months or

24  so; is that fair?

25  A.  The bulk of that was probably paid in the first 90 days,

1  but that's all I have documentation for.  I paid more than

2  that.

3  Q.  Well, on that list -- if you'd like to refer to it, it's

4  307, right, Exhibit 307?

5  A.  Sorry.  I understand 307, yes.

6  Q.  Okay.  There is an unpaid rent of $88,000, which is

7  88,000 of the 241, which would be almost one-third of it.

8  A.  No, that's not correct.  That 241 I believe is showing a

9  total of paid.  I actually paid that over a more than a

10 two-year period.  So the only portion I paid towards that

11 back rent would have been in that total, whatever time frame

12 that's for.

13 Q.  What's what I'm trying to determine.  So can you turn to

14 page 307, I mean Exhibit 307.

15 A.  Yeah, I'm sorry.

16 Q.  It's going to be to the second black book.

17           THE COURT:  Hold on.

18           THE WITNESS:  Is that right here?

19           BY MR. HEMME:  Q.  That might be easier.  I'll put

20 it --

21 A.  I'm sorry, Mr. Hemme.  I'm not sure which is 307.

22 Q.  Let me put it up on the screen and I'll do a call-out for

23 you.  Mr. Cathcart --

24 A.  I think I found it now.

25 Q.  Okay.

1   A.  Very few of those were stretched out.  They were vendors

2   I needed to do business with, so they had to be paid.  I

3   don't recall any long-term payment plans with anybody.

4   Q.  And the second accounts payable of $13,735?

5   A.  Would have been the same thing, early on, because they

6   were vendors I needed to do business with or were demanding

7   payment.

8   Q.  So is it fair say then that with the exception of the

9   rent line, most of the stuff was paid in the first six

10  months?

11  A.  Most of it was paid the first two or three months.

12  Q.  Okay.  Now let's take a look at Exhibit 34.

13  A.  Okay.

14  Q.  See Exhibit 34?

15  A.  Yes.

16  Q.  This is a letter that looks like it's been written by

17  Sandro Piancone to a Dear Fernando, but this email was sent

18  on October 10, 2010 to -- from looks like Kimberly and Sandro

19  to J. Cathcart?

20  A.  Right, so this would be a draft.

21      (Exhibit No. 34 identified.)

22  Q.  So he was asking for your approval of this draft before

23  it was sent to this Fernando.  Who is Fernando?

24  A.  Fernando is a -- I'm not sure of his title -- but a

25  senior executive or board member of La Central.

1    indulgence, there are --

2    THE COURT:  You've got the additional time.  I

3    don't want you to feel as though you're limited.  You haven't

4    come too close to your ten hours.  I know both sides are

5    trying to get this done earlier, but I'm not going to -- you

6    know, the original understanding was that you'd have a

7    certain amount of time.  You've got plenty of time left; you

8    know, you've got at this point probably close to three hours

9    left.  So don't cut yourself short.  I just don't want the

10   same story told two or three times.

11   MR. MCNUTT:  I understand, your Honor.  I will --

12   there are about nine exhibits that I need to get in, so I

13   need to just go through the books with Mr. Cathcart.  I'll

14   use some of them or many of them in my closing, will not

15   dwell on the exhibits, but Mr. Hemme has not yet agreed to

16   stipulate to any, and he has had an opportunity to look at

17   them.

18                   Redirect Examination

19   BY MR. MCNUTT:  Q.  So if we could turn to Exhibit

20   30, please.  Mr. Cathcart, did you send an email to Mr. Doede

21   on or about August 3, 2010?

22   A.  That appears to be what this is.

23      (Exhibit No. 30 identified.)

24   Q.  Okay.  Thank you.

25   MR. MCNUTT:  Your Honor, I'll move 30 in.

1      THE COURT:  Okay.

2      MR. MCNUTT:  I'm sorry, your Honor, 35.

3  Mr. Lorenzano's handwriting and my ability to read it are

4  still in transition.

5      THE COURT:  Okay, 35.  Are you offering 48?

6      MR. MCNUTT:  Yes, your Honor, we are.

7      THE COURT:  Okay.  Exhibit 48 is admitted.  35 is a

8  new exhibit?

9      (Exhibit No. 48 admitted.)

10      MR. MCNUTT:  No, I believe 35 was referenced by Mr.

11  Hemme yesterday.

12      THE COURT:  34 to 36, yes, he referred to 34 to 36,

13  but, once again, they are not received.

14      MR. MCNUTT:  Your Honor, we have no objection to

15  moving in 34.

16      MR. HEMME:  Your Honor, there's about six from

17  yesterday I didn't move in and I was going to clean up.  I

18  can do that now so we can stop doing this.

19      THE COURT:  Okay.

20      MR. HEMME:  The numbers I would like to move into

21  evidence are Exhibit 17, 18 --

22      THE COURT:  Hold on.  17 is already in -- well, I

23  thought it was previously admitted, but we'll mark it as

24  admitted, 17, 18 -- and if you object to any of these, let me

25  know, Mr. McNutt.

1  A.  Correct.

2  Q.  Okay.  So let's turn to exhibit -- let me ask you a

3  foundational question.  At some point did you ask Nascent

4  about taking care of the transfer tax that was Nascent's

5  obligation in section 6.7 of the stock purchase agreement?

6  A.  I told him I'd become aware that there's a --

7  Q.  I'm sorry.  Let me you stop you, Mr. Cathcart.  We don't

8  like pronouns in court, the word "him" is very dangerous.

9  A.  Sorry.

10  Q.  Proper names, please.  Please restate your answer.

11  A.  I informed Mr. Piancone when I became aware there was a

12  transfer tax on the shares that was due by Nascent and had

13  they not been paid, it will fall to the stock of the company

14  transfered, which in this case is Targa.  I did inform him of

15  that and told him he needed to address it, and his words

16  were, to the effect, I can't.

17  Q.  And to your knowledge has the Mexican government ever

18  attempted to collect on that transfer tax, assuming that that

19  transfer tax is a real obligation?

20  A.  Not on Targa.  I do not know if they've gone to Nascent.

21  Q.  Where is your understanding about, if that transfer tax

22  is valid, what the ballpark is for that number?

23  A.  Well, you could split hairs if the purchase price here

24  was 1.85 or $2 million, but it's 25 percent of the value of

25  the transaction; so in rough numbers $500,000.

Q.   Is that a potential liability of Targa's that I don't
want to say keeps you up at night, but does that still
concern you that that might come down the pike?
A.   It forces me to operate a company that could get shut
down tomorrow.

        MR. MCNUTT:   Your Honor, I'd like to move into
evidence Exhibit 316.   This was the Nascent press release
covering 2006 revenue and sales.   We were discussing it
briefly in Mr. Piancone's direct or cross, but it didn't get
in my understanding.

        MR. HEMME:   It's a hearsay document, your Honor.   I
object to it.

        THE COURT:   Well, is it being offered for the truth
or for some other --

        MR. MCNUTT:   Your Honor, there was a -- there was a
public press release by Nascent representing to the world
that its revenues and sales were at $7 million.   That's a
stipulated fact in the case in the pretrial order.   It's just
documentary evidence that would confirm the business lines
that Nascent was in.   Mr. Piancone confirmed the divisions of
Nascent on that document.   I would deem it a business record.
That company was defaulted out, so it was -- you know, they
didn't respond in discovery.   At some point I think that
the -- there's no real question that the document existed for
years in the files of various companies, so if Mr. Hemme's

1   Exhibit 132 in the book.

2          THE COURT:  132?

3          MR. HEMME:  Yeah.  His declaration is marked as an

4   exhibit.

5          THE COURT:  I didn't hear the last.

6          MR. HEMME:  132 is marked as an exhibit in the

7   exhibit notebook.

8       (Exhibit No. 132-11 identified.)

9          THE COURT:  132, okay.  Why don't you check that,

10  Mr. Cathcart.

11         THE WITNESS:  Do you know what book, Mr. Hemme?

12         BY MR. HEMME:  Q.  It would be the first black

13  volume.

14  A.  Okay.

15  Q.  All right.  So at paragraph 29 --

16  A.  Okay.

17  Q.  -- this would be in, what was it, February 1st, 2012,

18  right?

19  A.  Okay.  I didn't look at the front page.  Yes.

20  Q.  At paragraph 29 you stated that the Nery's actual total

21  sales and net profit loss for 2010 and 2011 were, 2010, a net

22  loss of $896,000 on sales of $20,880,000; and 2011, a net

23  profit of $24,000 on sales of three -- $38,720,676, correct?

24  A.  That's what this says, but I --

25  Q.  And that's what you said under penalty of perjury in this

1   board of directors of Nery's at the time.  So which hat did

2   he have on when he was -- when he was looking at those

3   liabilities?

4          THE COURT:  Well, he testified that he gave the

5   notices or evidence of liabilities, additional payments due

6   to Piancone and requested that Nascent take care of it

7   through Piancone.  I believe the testimony was Piancone said

8   they couldn't do it, they just didn't have the capital.

9          MR. HEMME:  Right.

10         THE COURT:  What's your view on whether or not what

11  Mr. Cathcart did was substantial compliance with the

12  indemnification requirement?

13         MR. HEMME:  Well, my view is he did not comply.

14  They're asserting very strict construction of the language,

15  and if they're going to do that, it seems to me it's kind

16  of --

17         THE COURT:  Well, let me ask --

18         MR. HEMME:  But certainly --

19         THE COURT:  Let me ask a more basic question.

20         MR. HEMME:  All right.

21         THE COURT:  Does the doctrine of substantial

22  compliance apply in that kind of a circumstance?

23         MR. HEMME:  It can, your Honor.  I think there's

24  enough support in the law to make it apply.

25         THE COURT:  So your argument would be that even

1    though the doctrine of substantial compliance applies in that

2    circumstance, what Mr. Cathcart did by making his requests of

3    Mr. Piancone with evidence of the additional payments did not

4    substantially comply with what he had to do under the

5    indemnification provision.

6              MR. HEMME:  Correct.

7              THE COURT:  Okay.

8              MR. HEMME:  All right.  And then 8.5, which says

9    that this indemnification provision is the exclusive remedy

10   and that any causes of action for breach of contract or tort

11   are waived.  So that was what the parties negotiated.  That's

12   how they decided to handle any problems because they knew

13   there could be problems.  Targa was a mess by everybody's

14   testimony.  The books and records were incomplete.  The risk

15   of having undisclosed liabilities or liabilities they didn't

16   know about was very strong, and certainly what Mr. Cathcart

17   knew from his past experience it was going to be there.

18             THE COURT:  Back to indemnification.

19             MR. HEMME:  Yes.

20             THE COURT:  If Nascent couldn't indemnify, then

21   what good was the exclusive remedy?

22             MR. HEMME:  Well, I don't agree with characterizing

23   this as -- that Nascent couldn't indemnify.  Nery's owed

24   Nascent on a note.  They had a right of equitable offset.

25             THE COURT:  Didn't Mr. Piancone tell Mr. Cathcart

1  payment.  And if you look at that tab -- it's under accounts

2  payable for '11, those payments are being made to Rob

3  Piancone; that's Sandro's brother.  Apparently the way the

4  document states, he had made a $50,000 loan to Targa, so they

5  were paying that back; so Mr. Cathcart's paying back Sandro's

6  brother in the last year, but he's not paying any other

7  accounts payable.

8       On the third page I gave you the yearly totals and

9  then it shows on the summary that if you include the rent,

10  the total gain in cash flow is $2,250,000.  So Mr. Cathcart

11  has -- and Nery's have already been indemnified for these

12  undisclosed liabilities or whatever you want to call them,

13  but they were dealt with, and he hasn't -- they are certainly

14  not what impacted his cash flow.

15       Now, I went through that analysis because I asked

16  Mr. Cathcart to -- on the stand, I took --

17       THE COURT:  In your view, offsets equal

18  indemnification.

19       MR. HEMME:  Correct.  It's a form of payment.

20       THE COURT:  Offsets equal indemnification.

21       MR. HEMME:  Yes.

22       THE COURT:  Is it your claim that by not making the

23  payments, Nery's breached the contract?

24       MR. HEMME:  Yes.

25       THE COURT:  So offsets equal indemnification, but

1    they also equal breach of the contract.

2              MR. HEMME:  Well, they are not breach of the

3    contract to the extent you have an offset.  So once --

4              THE COURT:  They're still breach --

5              MR. HEMME:  -- once he's been made whole with his

6    indemnification -- because he would have a right to offset;

7    it's a form of payment -- then the breach thereafter would

8    be -- it would be breached.  So if he's been made whole by

9    the contract, by the offset -- well, for example, if there's

10   a $15,000 payment, he owes he has a $7,000 liability --

11             THE COURT:  I'm just trying to understand the

12   argument --

13             MR. HEMME:  Yeah, right.

14             THE COURT:  -- what you're saying.  You're saying

15   offsets equal indemnification but also offsets equal breach

16   of the contract.  So what good does indemnification do,

17   self-help indemnification, if it also exposes Nery's to

18   breach of the contract?  Add to that that you had the SAT tax

19   obligation of approximately $300,000 that weren't clarified

20   or taken off the books until 2011, which made the situation a

21   lot more gauzy.  So what you seem to be saying is --

22             MR. HEMME:  Well --

23             THE COURT:  -- Nery's should have -- Cathcart

24   should have provided -- should have engaged in self-help,

25   which would have consisted of basically obtaining

1  indemnification through offsets by not making payments under

2  the contract but that he was also risking his own breach of

3  the contract.

4  MR. HEMME:  No.  I think that if you use it as an

5  offset -- it's like currency.  And so if there was a payment

6  due that was $15,000 and he had a right to be indemnified by

7  $15,000 and he said okay, I'm -- I'm going to self-help, I'm

8  going to not pay you because otherwise I'm writing you a

9  check and you're writing me back, that he has satisfied his

10  obligation on that payment that month and he would not be in

11  breach of the contract for that month.  That's why you kind

12  of have to look at it on a month-to-month basis.

13  THE COURT:  When did Cathcart breach the contract?

14  This is a mathematical --

15  MR. HEMME:  It's a mathematical thing.  You go down

16  and look at the liabilities, and as soon as he --

17  THE COURT:  When did he breach it?

18  MR. HEMME:  Huh?

19  THE COURT:  When did he breach it.  Do you have

20  that figure right off the top?

21  MR. HEMME:  Actually I don't know that off the top

22  of my head, but if you -- I gave you the information to

23  calculate it.  He's probably breaching it roughly somewhere

24  in September 2010.

25  THE COURT:  September of 2010?

1      MR. HEMME:  Yeah.  I'm -- real rough term.  I don't

2 want to make that representation without figuring it out, but

3 you would -- he made the first two payments, but then he

4 stopped making payments, and that $15,000 a month, that's

5 going to get there pretty quick.  He certainly had it

6 breached by the end of 2010 because the liabilities were

7 $93,000 and --

8      THE COURT:  So what about the $300,000 tax lien

9 that --

10      MR. HEMME:  So wait a minute, your Honor, wait a

11 minute.  I don't think he breaches the contract -- wait a

12 minute.  I don't think his right to indemnification's even

13 triggered until he has paid out $150,000 in liabilities.  So

14 I take that back.

15      THE COURT:  Well, that's based on your working

16 assumption that the 150,000 did not relate to the Exim

17 Bank --

18      MR. HEMME:  Correct.

19      THE COURT:  -- liability.  But I think it's fair to

20 conclude that it was the parties' understanding that the

21 $150,000 account payable reference was to Exim.

22      MR. HEMME:  Okay.  That's not what it says, and

23 the -- you know, this is post-contract interpretation, and --

24      THE COURT:  Well, I've got to engage in it here.

25      MR. HEMME:  Huh?

103

 1 | And we shouldn't lose sight of the fact too that Targa, the
 2 | company, guaranteed this obligation and guaranteed it without
 3 | offset; that was decided by the motion for summary judgment
 4 | as well. And remember, Targa is charged with not -- whatever
 5 | knowledge it has of the -- of whatever liabilities there
 6 | were, and so it's -- was kind of, you know, the incestuous
 7 | nature of the relationship by having Mr. Piancone on both
 8 | sides of the relationship. So Genesis, as much as counsel
 9 | tried to -- and the defense tried to put them -- hook them up
10 | with Mr. Piancone, Genesis was just a lender here, and they
11 | made an accommodation to try and get paid, but they never
12 | changed that role as a lender, and they're now seeking
13 | payment, and we ask for judgment in our favor, your Honor.
14 |      THE COURT: Couple of questions for you --
15 |      MR. HEMME: Yeah.
16 |      THE COURT: -- before you sit down. In my order on
17 | summary judgment a while back, I strongly implied that
18 | Genesis would stand in the shoes of Nascent, that any
19 | defenses Nascent might have would be -- or liabilities or
20 | defenses, for that matter -- would be those of Genesis. Do
21 | you agree with that?
22 |      MR. HEMME: I agree to it to a limited extent, and
23 | the reason I'm stating that way is because I think that to
24 | the extent there are equitable offsets under the
25 | indemnification provisions of the note, that Nery's has the

1    right to offset against the balance of the note by the amount

2    of those offsets.

3          There was some questions and some implication that

4    somehow Genesis, by standing in the shoes of the -- Nascent,

5    had the obligation to actually indemnify Nery's -- and I

6    don't know if that's where the Court's going with this, but

7    -- or assume that obligation to indemnify, and that's not in

8    these documents, and we briefed that in our trial brief, your

9    Honor, because if you look at the collateral assignment,

10   which is the terms under which Genesis accepted the note as

11   collateral, the specific provision is in that document that

12   says that Genesis does not assume any obligations under these

13   contracts, it is only -- the only thing being assigned is the

14   right to receive payment.  So to that extent --

15         THE COURT:  But defenses against Nascent exist

16   against Genesis.

17         MR. HEMME:  Pardon?

18         THE COURT:  Defenses against -- that can be

19   asserted against Nascent can be asserted against Genesis.

20         MR. HEMME:  Yes.

21         THE COURT:  All right.  Second question.

22         MR. HEMME:  That was the Court's ruling.

23         THE COURT:  If the Court decides that both sides

24   are in material breach of the contract, are fees recoverable

25   under California Civil Code 1717?

1    Here's what it is.

2          Civil Code Section 1710 states that deceit is
3    either the assertion as a fact of that which is not true by
4    one who has no reasonable ground for believing it to be true.
5    So here Nascent represented that there were no unpaid tax
6    liabilities for Targa.  It was an express representation in
7    the contract.  It was covered in Sections 3.13 (b) and 6.5.
8    We know as a matter of fact that that was not a true
9    representation, that was a false representation.  And that
10   has meaning because under Furla v. Jon Douglas, which is a
11   1998 case quoting Civil Code Section 1572, the Court of
12   Appeal made the following holding:  Negligent
13   misrepresentation -- and this is a contract case --
14   inducement of a contract -- negligent misrepresentation is a
15   form of actual fraud consisting of a positive assertion in a
16   manner not warranted by the information of the person making
17   it of that which is not true though he believes it to be
18   true.

19         So the evidence came in from Mr. Piancone.  He
20   testified I was putting this deal together, yeah, we knew
21   about the Exim Bank thing.  Fine.  Mr. Piancone in his mind,
22   if the Court wants to look back on that testimony and his
23   state of mind, the Court -- the Court can make a finding, I
24   find that Mr. Piancone was telling the truth, he really just
25   didn't have a clue.  Fine.  You don't have to find that he

1   lied in court to find that there was a negligent
2   misrepresentation.  In his mind he could have believed that.
3   But all the other evidence that came in about what Nascent
4   knew as a corporation states that in 2009 -- I'm going to
5   skip ahead here and come back to this because now that I've
6   gotten onto this topic, I think it's important to cover it.
7   Mr. Hemme states in his closing brief on page 7, line 25 that
8   there was no evidence of an intentional misrepresentation
9   here by Mr. Piancone.  That is not the legal standard in
10  California for rescission.  You do not have to have an
11  intentional misrepresentation to constitute fraud.
12          In the summary judgment order, this Court stated
13  that defendants have not provided any evidence that Nascent
14  conclusively knew -- these are the Court's words -- or should
15  have known that Targa had additional liabilities such that
16  they can assert that defense against Genesis as Nascent's
17  assignee.  That's page 13 to 14 of the Court's order.
18          So here's the evidence that came in on the tax
19  liabilities.  The defense position is that Nascent knew or
20  should have known that the social security taxes, also known
21  as Institute for Mexican Social Security, among others, were
22  not paid.  We provided evidence in Exhibit 327 and 308 that
23  the 2009 taxes, which were paid on a monthly basis, were not
24  paid.  Plaintiff does not dispute that; it's an undisputed
25  issue.

1    you're asking me.

2        THE COURT:  Well, your argument essentially a few

3    minutes ago was, you know, Mr. Cathcart would like to take

4    this company and just shove it back to Genesis here, this

5    contract is rescinded, we promptly gave notice of rescission

6    when we filed the cross-complaint, including the counterclaim

7    for rescission, so that's our priority, we want this over, we

8    want our 46,000 bucks back, we want something representing

9    some of the liabilities that were liquidated, and we'll deal

10   with attorney's fees another day.  And then you're wrapping

11   things up and you're talking about classic breach of

12   contract, and you seem to be saying the remedy there would be

13   entitlement to the company, that Mr. Cathcart would keep the

14   company, Genesis gets nothing, and we deal with attorney's

15   fees another day.

16       MR. MCNUTT:  Your Honor, I apologize.  I should

17   have been more clear.  I have -- not I -- the defense has a

18   layered defense, a tiered defense.  Our first defense and our

19   primary objective is to defeat the complaint on a pure

20   contract analysis, to elect a remedy only if the Court does

21   not want to give that to us, which would be the remedy of

22   rescission.  So the issue is we win either way because --

23       THE COURT:  May I stop you there?  If you prevail

24   on a pure contract basis, as you call it, where does that

25   leave the parties?

108

1          MR. MCNUTT: Sure. The complaint -- judgment would

2  be entered against the complaint, we would voluntarily

3  dismiss the cross-complaint, and then Genesis would walk

4  away. They've litigated, they would get no recovery against

5  Nery's, and then there would be a post-trial motion for fees

6  on the grounds which side would you say is prevailing or

7  would be entitled, and obviously that's very much the

8  discretion of the Court. So that would be our number 1 goal

9  and which is what we're requesting.

10         The issue is election of remedies. If we could get

11  the first goal, then we'll take that. But if the Court

12  decides we're not entitled to it --

13         THE COURT: Well, under the first goal -- under the

14  first goal who has the company?

15         MR. MCNUTT: Mr. Cathcart would keep the company.

16  The complaint would simply be dismissed.

17         THE COURT: He doesn't want the company.

18         MR. MCNUTT: We're willing to give the company back

19  and we're happy to give the company back if we're -- if what

20  we're entitled to return is returned to us under rescission.

21  And I think the issue is that as a legal matter, we don't

22  have to elect that remedy until the Court tells us we're

23  entitled to the remedy. I think that issue -- if I didn't

24  brief it well, you know, I'm happy to submit a one-page brief

25  on the election of remedies.

1   We're happy to give the company back.  We can sign
2   the stock certificates next week.  It's not a challenge for
3   us.  But we would have to be compensated for that.
4   Obviously -- you know, if the Court is going to say give the
5   company back and you don't get a dime, then our first
6   position is we believe we're entitled to just win this case
7   from a contract -- from a legal perspective, we believe
8   entitled to win clean and keep the company.  Obviously we'd
9   prefer to keep the company.  We built it up into a
10  multi-million-dollar enterprise.  It has value now.  No, it's
11  not particularly profitable, but he's rebuilt the brand.
12  He's rebuilt the brand in Baja.  He's got product going out
13  the door.
14      So yes, from an economic perspective, we would
15  rather just beat the complaint clean legally.  If the Court
16  doesn't want to do that, then we believe we've triggered a
17  rescission right; we'll give them the company back, you give
18  us appropriate compensation for it.
19      THE COURT:  Thank you.
20      MR. MCNUTT:  Thank you, your Honor.
21      THE COURT:  Appreciate your argument.  Mr. Hemme?
22      MR. HEMME:  Sounds like what the defense would like
23  to do is keep the business for $46,000, and that is not the
24  law, it's not equitable, and all the jury instructions, all
25  the black letter law that counsel cited ignored a very basic

| 9th Circuit Case Number(s) | 13-56797 & 13-57106 |
|---|---|

**************************************************************

## CERTIFICATE OF SERVICE

### When All Case Participants are Registered for the Appellate CM/ECF System

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system

on (date) | June 2, 2014 | .

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Signature (use "s/" format) | s/Charles A. Bird |

**************************************************************

## CERTIFICATE OF SERVICE

### When <u>Not</u> All Case Participants are Registered for the Appellate CM/ECF System

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system

on (date) | June 2, 2014 | .

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

I further certify that some of the participants in the case are not registered CM/ECF users. I have mailed the foregoing document by First-Class Mail, postage prepaid, or have dispatched it to a third party commercial carrier for delivery within 3 calendar days to the following non-CM/ECF participants:

A hard copy was also mailed to Raymond A. Cardozo.

Signature (use "s/" format) | s/Charles A. Bird |